UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                   :
In re                                              :          Chapter 11 Case No.
                                                   :
ATKINS NUTRITIONALS, INC. et al.,                  :          05-15913 (ALG)
                                                   :
                    Debtors.                       :
                                                   :
---------------------------------------------------------------x

## SUPPLEMENT TO DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
  Debtors In Possession
767 Fifth Avenue
New York, New York    10153
(212) 310-8000

**Atkins Nutritionals, Inc. et al.,**
**Case No. 05-15913 (ALG)**

**SUPPLEMENT TO**

**DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**Index**

**Document[1]**

New Common Stock ........................................................................................Exhibit 1

New Working Capital Facility .......................................................................Exhibit 2

Registration Rights Agreement ......................................................................Exhibit 3

New Organizational Documents ....................................................................Exhibit 4

   ➤ Reorganized Atkins Nutritionals Inc. Certificate of Incorporation
   ➤ Reorganized Atkins Nutritionals Inc. By-Laws
   ➤ Reorganized Atkins Nutritionals Holdings, Inc. Certificate of
      Incorporation
   ➤ Reorganized Atkins Nutritionals Holdings, Inc. By-Laws
   ➤ Articles of Amendment to the Articles of Incorporation for Atkins
      Nutritionals (Canada) Limited
   ➤ Atkins Nutritionals Holdings II, Inc. Certificate of Amendment to
      Certificate of Incorporation

Biographical Information for Initial Boards of Directors of Reorganized Debtors ..............Exhibit 5

Biographical Information for Initial Officers of Reorganized Debtors ...............................Exhibit 6

New Senior Note Agreement and Form of New Tranche A Senior Note ...........................Exhibit 7

New CVR Agreement .....................................................................................Exhibit 8

New CVR Interest...........................................................................................Exhibit 9

Management Incentive Plan ...........................................................................Exhibit 10

New Management Agreements........................................................................Exhibit 11

New Management Interests .............................................................................Exhibit 12

List of Executory Contracts and Unexpired Leases to be Assumed ..................................Exhibit 13

---

[1] As described in the Debtors' Second Amended Joint Plan of Reorganization.

## Exhibit 1

## New Common Stock



NUMBER

SHARES

# Atkins Nutritionals Holdings, Inc.

**This Certifies that**

_____ is the owner of _____

_____ fully paid and

non-assessable Shares of the above Corporation transferable only on the

books of the Corporation by the holder hereof in person or by duly authorized

Attorney upon surrender of this Certificate properly endorsed.

*In Witness Whereof,* the said Corporation has caused this Certificate to be signed

by its duly authorized officers and to be sealed with the Seal of the Corporation.

Dated

PRIOR TO SUCH TIME AS ATKINS NUTRITIONALS HOLDINGS, INC. ("THE CORPORATION") EFFECTS A PUBLIC OFFERING OF ITS STOCK PURSUANT TO A REGISTRATION STATEMENT THAT IS DECLARED EFFECTIVE BY THE SECURITIES AND EXCHANGE COMMISSION, THE CORPORATION'S BOARD OF DIRECTORS MAY REFUSE TO RECOGNIZE OR TO REGISTER ANY TRANSFER, OR ATTEMPTED OR PURPORTED TRANSFER, OF SHARES OF STOCK OF THE CORPORATION OR ANY INTEREST THEREIN OR RIGHT WITH RESPECT THEREOF, THAT WOULD RESULT IN THE CORPORATION'S BECOMING SUBJECT TO THE REQUIREMENTS OF SECTION 12(G) OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, AND IN SUCH CASE SUCH TRANSFER OR ATTEMPTED OR PURPORTED TRANSFER WILL BE VOID AND WILL BE INEFFECTIVE AS AGAINST THE CORPORATION.

AS A CONDITION TO THE RECOGNITION AND REGISTRATION OF A TRANSFER (A "CHANGE OF CONTROL TRANSFER") OF THE COMMON STOCK OF THE CORPORATION WHICH WOULD RESULT IN SUCH TRANFEREE'S BECOMING THE OWNER (WHETHER INDIVIDUALLY OR AS PART OF A SYNDICATE OR GROUP OF PERSONS THAT IS CONSIDERED TO BE A "PERSON" FOR PURPOSES OF SECTION 13(D)(3) OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED) OF 80% OR MORE OF THE THEN ISSUED AND OUTSTANDING SHARES OF COMMON STOCK, SUCH TRANSFEREE IS REQUIRED TO DISCLOSE TO THE CORPORATION THE PRICE AT WHICH SUCH TRANSFEREE ACQUIRED THE LAST SHARES OF COMMON STOCK ACQUIRED BY SUCH TRANSFEREE (INCLUDING SHARES ACQUIRED PURSUANT TO SUCH CHANGE OF CONTROL TRANSFER) THAT CONSTITUTE 5% OF THE THEN ISSUED AND OUTSTANDING SHARES OF COMMON STOCK.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations. Additional abbreviations may also be used though not in the list.

| | | | |
|---|---|---|---|
| TEN COM | —as tenants in common | UNIF GIFT MIN ACT — ................Custodian................ (Minor) | |
| TEN ENT | —as tenants by the entireties | under Uniform Gifts to Minors Act................................ (State) | |
| JT TEN | —as joint tenants with right of survivorship and not as tenants in common | | |

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

*For value received, the undersigned hereby sells, assigns and transfers unto*

............................................................................................................

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE

............................................................................................................

............................................................................................................*Shares*

*represented by the within Certificate, and hereby irrevocably constitutes and appoints*................................

............................................................................................................*Attorney to transfer the said*

*shares on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated,*............................................

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the certificate in every particular, without alteration or enlargement, or any change whatever.

In presence of ............................................................................

............................................................................................................

**Exhibit 2**

**New Working Capital Facility**

$20,000,000

REVOLVING
CREDIT AGREEMENT


dated as of December [__], 2005,

among

ATKINS NUTRITIONALS, INC.
as Borrower,

ATKINS NUTRITIONALS HOLDINGS, INC.,


and


ATKINS NUTRITIONALS (CANADA) LIMITED
as Guarantors,

and

THE LENDERS PARTY HERETO

and

UBS SECURITIES LLC,
as Bookmanager, Lead Arranger and Syndication Agent,

UBS LOAN FINANCE LLC,
as Swingline Lender,

and

UBS AG, STAMFORD BRANCH,
as Issuing Bank, Administrative Agent and Collateral Agent


Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022

# TABLE OF CONTENTS

Page

ARTICLE I      DEFINITIONS ............................................................................. 2

    Section 1.01.    Defined Terms ................................................................ 2
    Section 1.02.    Classification of Loans and Borrowings ..................................... 34
    Section 1.03.    Terms Generally ............................................................... 34
    Section 1.04.    Accounting Terms; GAAP; Fiscal and Calendar Periods ............ 35

ARTICLE II      THE CREDITS ............................................................................. 35

    Section 2.01.    Commitments .................................................................. 35
    Section 2.02.    Loans ........................................................................... 35
    Section 2.03.    Borrowing Procedure ....................................................... 37
    Section 2.04.    Evidence of Debt; Repayment of Loans .................................. 37
    Section 2.05.    Fees ............................................................................. 38
    Section 2.06.    Interest on Loans ............................................................ 39
    Section 2.07.    Termination and Reduction of Commitments ........................... 40
    Section 2.08.    Interest Elections ............................................................ 40
    Section 2.09.    Temporary Reduction of Revolving Commitments .................... 42
    Section 2.10.    Optional and Mandatory Prepayments of Loans ...................... 42
    Section 2.11.    Alternate Rate of Interest ................................................. 44
    Section 2.12.    Increased Costs .............................................................. 45
    Section 2.13.    Breakage Payments ......................................................... 46
    Section 2.14.    Payments Generally; Pro Rata Treatment:  Sharing of
                Setoffs ......................................................................... 46
    Section 2.15.    Taxes ........................................................................... 48
    Section 2.16.    Mitigation Obligations; Replacement of Lenders ...................... 50
    Section 2.17.    Swingline Loans ............................................................. 51
    Section 2.18.    Letters of Credit ............................................................. 52
    Section 2.19.    Determination of Borrowing Base ........................................ 58
    Section 2.20.    Release ......................................................................... 63
    Section 2.21.    Cash Management System.  On or prior to the Closing
                Date, the Borrower and the other Loan Parties will establish
                and will maintain, until the Termination Date, the cash
                management system described below (the "Cash
                Management System") .................................................... 63

ARTICLE III      REPRESENTATIONS AND WARRANTIES ........................... 65

    Section 3.01.    Organization; Powers ...................................................... 66
    Section 3.02.    Authorization; Enforceability ............................................. 66
    Section 3.03.    Governmental Approvals; No Conflicts ................................. 66
    Section 3.04.    Financial Statements ....................................................... 66
    Section 3.05.    No Claims ..................................................................... 67

i

Section 3.06.    Properties ...................................................................................67
Section 3.07.    Intellectual Property ......................................................................67
Section 3.08.    Condition and Maintenance of Equipment ..................................68
Section 3.09.    Equity Interests and Subsidiaries ..................................................68
Section 3.10.    Litigation; Compliance with Laws ...............................................69
Section 3.11.    Agreements ....................................................................................69
Section 3.12.    Federal Reserve Regulations .........................................................70
Section 3.13.    Investment Company Act; Public Utility Holding Company
                 Act ..................................................................................................70
Section 3.14.    Use of Proceeds ............................................................................70
Section 3.15.    Taxes ..............................................................................................70
Section 3.16.    No Material Misstatements ...........................................................70
Section 3.17.    Labor Matters ................................................................................71
Section 3.18.    Employee Benefit Plans ................................................................71
Section 3.19.    Environmental Matters ..................................................................72
Section 3.20.    Insurance .......................................................................................73
Section 3.21.    Security Documents ......................................................................73
Section 3.22.    Accuracy of Borrowing Base ........................................................74
Section 3.23.    Solvency ........................................................................................74

ARTICLE IV       CONDITIONS TO CREDIT EXTENSIONS...........................74
Section 4.01.    Conditions to Initial Credit Extension .........................................74
Section 4.02.    Conditions to All Credit Extensions .............................................79

ARTICLE V        AFFIRMATIVE COVENANTS..............................................80
Section 5.01.    Financial Statements, Reports, etc ...............................................80
Section 5.02.    Litigation and Other Notices ........................................................84
Section 5.03.    Existence; Businesses and Properties ...........................................84
Section 5.04.    Insurance .......................................................................................85
Section 5.05.    Obligations and Taxes ..................................................................86
Section 5.06.    Employee Benefits ........................................................................86
Section 5.07.    Maintaining Records; Access to Properties and Inspections .......86
Section 5.08.    Use of Proceeds ............................................................................87
Section 5.09.    Compliance with Environmental Laws; Environmental
                 Reports ...........................................................................................87
Section 5.10.    Intentionally Omitted ....................................................................87
Section 5.11.    Additional Collateral; Additional Guarantors ..............................87
Section 5.12.    Security Interests; Further Assurances ..........................................89
Section 5.13.    Information Regarding Collateral ..................................................89
Section 5.14.    Cooperation with Advisors ...........................................................90
Section 5.15.    Landlord Access Agreement .........................................................90

ii

ARTICLE VI       NEGATIVE COVENANTS ..................................................................... 91

    Section 6.01.       Indebtedness ........................................................................ 91
    Section 6.02.       Liens .................................................................................... 92
    Section 6.03.       Sale and Leaseback Transactions ................................................ 95
    Section 6.04.       Investment, Loan and Advances .................................................. 95
    Section 6.05.       Mergers, Consolidations, Sales of Assets and Acquisitions ........ 96
    Section 6.06.       Dividends ............................................................................. 97
    Section 6.07.       Transactions with Affiliates ....................................................... 97
    Section 6.08.       Financial Covenants ................................................................. 98
    Section 6.09.       Limitation on Modifications and Prepayment of
                    Indebtedness; Modifications of Certificate of Incorporation,
                    or Other Constitutive Documents, By-laws and Certain
                    Other Agreements, etc. .............................................................. 100
    Section 6.10.       Limitation on Certain Restrictions on Subsidiaries ................... 101
    Section 6.11.       Limitation on Issuance of Capital Stock ................................... 101
    Section 6.12.       Limitation on Creation of Subsidiaries ..................................... 102
    Section 6.13.       Business................................................................................ 102
    Section 6.14.       Limitation on Accounting Changes .......................................... 102
    Section 6.15.       Fiscal Year............................................................................ 102
    Section 6.16.       Lease Obligations .................................................................. 102
    Section 6.17.       No Further Negative Pledge .................................................... 102

ARTICLE VII      GUARANTEE ............................................................................ 103

    Section 7.01.       The Guarantee....................................................................... 103
    Section 7.02.       Obligations Unconditional ...................................................... 103
    Section 7.03.       Reinstatement ....................................................................... 104
    Section 7.04.       Subrogation; Subordination..................................................... 105
    Section 7.05.       Remedies .............................................................................. 105
    Section 7.06.       Instrument for the Payment of Money ...................................... 105
    Section 7.07.       Continuing Guarantee ............................................................ 105
    Section 7.08.       General Limitation on Guarantee Obligations .......................... 105
    Section 7.09.       Release of Guarantors ............................................................ 105

ARTICLE VIII     EVENTS OF DEFAULT ............................................................ 106

ARTICLE IX       THE ADMINISTRATIVE AGENT AND THE COLLATERAL
                    AGENT.................................................................................. 108

    Section 9.01.       Appointment ......................................................................... 108
    Section 9.02.       Agent in Its Individual Capacity.............................................. 109
    Section 9.03.       Exculpatory Provisions ........................................................... 109
    Section 9.04.       Reliance by Agent .................................................................. 109
    Section 9.05.       Delegation of Duties ............................................................... 110

Section 9.06.    Successor Agent ........................................................................110
Section 9.07.    Non-Reliance on Agent and Other Lenders .............................110
Section 9.08.    No Other Administrative Agent ...............................................110
Section 9.09.    Indemnification ........................................................................111

ARTICLE X     MISCELLANEOUS ........................................................................111

Section 10.01.    Notices ......................................................................................111
Section 10.02.    Waivers; Amendment ...............................................................112
Section 10.03.    Expenses; Indemnity ................................................................114
Section 10.04.    Successors and Assigns .............................................................116
Section 10.05.    Survival of Agreement .............................................................118
Section 10.06.    Counterparts; Integration; Effectiveness ...................................119
Section 10.07.    Severability ..............................................................................119
Section 10.08.    Right of Setoff .........................................................................119
Section 10.09.    Governing Law; Jurisdiction; Consent to Service of Process ....119
Section 10.10.    Waiver of Jury Trial .................................................................120
Section 10.11.    Headings ...................................................................................120
Section 10.12.    Confidentiality .........................................................................120
Section 10.13.    Interest Rate Limitation ............................................................121
Section 10.14.    Application of Proceeds of Collateral .......................................122
Section 10.15.    Lender Addendum ....................................................................122
Section 10.16.    Obligations Absolute ................................................................122
Section 10.17.    Intercreditor Agreement ...........................................................123

SCHEDULES

| | |
|---|---|
| Schedule 1.01(a) | Mortgaged Property |
| Schedule 1.01(b) | Subsidiary Guarantors |
| Schedule 2.20 | Accounts |
| Schedule 3.03 | Governmental Approvals; Compliance with Laws |
| Schedule 3.05 | Claims |
| Schedule 3.06(b) | Real Property |
| Schedule 3.07(a) | Intellectual Property Claims |
| Schedule 3.07(c) | Violations or Proceedings |
| Schedule 3.09(a) | Subsidiaries |
| Schedule 3.09(c) | Corporate Organizational Chart |
| Schedule 3.10 | Litigation |
| Schedule 3.11(c) | Material Agreements |
| Schedule 3.15 | Taxes |
| Schedule 3.19 | Environmental Matters |
| Schedule 3.20 | Insurance |
| Schedule 5.01(l) | Inventory Appraisal Letter |
| Schedule 6.01(b) | Existing Indebtedness |
| Schedule 6.02(c) | Existing Liens |
| Schedule 6.04(a) | Existing Investments |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Borrowing Base Certificate |
| Exhibit D | Form of Borrowing Request |
| Exhibit E | Form of Interest Election Request |
| Exhibit F | Form of Joinder Agreement |
| Exhibit G | Form of Landlord Access Agreement |
| Exhibit H | Form of Non-Bank Certificate |
| Exhibit I-1 | Form of Perfection Certificate |
| Exhibit I-2 | Form of Perfection Certificate Supplement |
| Exhibit J-1 | Form of Revolving Note |
| Exhibit J-2 | Form of Swingline Note |
| Exhibit K | Form of Account Control Agreement |
| Exhibit L | Form of Security Agreement |
| Exhibit M | Form of Intercompany Note |
| Exhibit N | Form of Lender Addendum |
| Exhibit O-1 | Form of Compliance Certificate (Annual) |

NYDOCS/1207090.12

# TABLE OF CONTENTS
(cont'd)

Exhibit O-2          Form of Compliance Certificate (Quarterly)
Exhibit P             Form of LC Request
Exhibit Q             Form of Intercreditor Agreement

NYDOCS/1207090.12

# REVOLVING

# CREDIT AGREEMENT[1]

 This REVOLVING CREDIT AGREEMENT (this "**Agreement**") dated as of December [__], 2005, among ATKINS NUTRITIONALS, INC., a New York corporation ("**the Borrower**"), ATKINS NUTRITIONALS HOLDINGS, INC., a Delaware corporation ("**Parent**"), ATKINS NUTRITIONALS (CANADA) LIMITED, a Canadian corporation ("**Atkins Canada**") (each other capitalized term used but not defined herein having the meaning given to it in Article I), the Lenders, UBS SECURITIES LLC, as bookmanager and lead arranger (in such capacity, "**Lead Arranger**"), as documentation agent (in such capacity, "**Documentation Agent**") and as syndication agent (in such capacity, "**Syndication Agent**"), UBS LOAN FINANCE LLC, as swingline lender (in such capacity, "**Swingline Lender**"), and UBS AG, STAMFORD BRANCH, as issuing bank (in such capacity, "**Issuing Bank**"), as administrative agent (in such capacity, "**Administrative Agent**") for the Lenders and as collateral agent (in such capacity, "**Collateral Agent**") for the Secured Parties and the Issuing Bank.

## WITNESSETH:

 WHEREAS, on July, 31, 2005 (the "**Petition Date**"), the Borrower, Parent and Atkins Canada (the Borrower, [Holdco][2], Parent and Atkins Canada, collectively referred to herein as the "**Debtors**"), commenced Chapter 11 Case Nos. 05-15913 through 05-15916, as administratively consolidated in Chapter 11 Case No. 05-15913 by filing separate voluntary petitions for reorganization under the Bankruptcy Code (as defined below), with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), and on August 3, 2005 the Debtors commenced ancillary proceedings in Canada under Section 18.06 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "Cases");

 WHEREAS, on August 5, 2005, the Borrower entered into that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement with Holdco, the Parent and Atkins Canada, as guarantors, the lenders party thereto, UBS Securities LLC, as book manager, lead arranger, documentation agent and syndication agent, UBS Loan Finance LLC, as swing line lender, and UBS AG, Stamford Branch, as issuing bank, administrative agent for the lenders and Collateral Agent (as amended, supplemented or otherwise modified to the date hereof, the "**DIP Credit Agreement**");

 WHEREAS, on November [__], 2005, the Debtors filed the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (amending (i) the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code filed on August

---

[1] Any bracketed terms remain subject to the consent of the Debtors and the Prepetition Agent prior to execution.

[2] It is currently contemplated that Holdco will be merged into Parent prior to, on or after the Closing Date for tax reasons.

24, 2005 and (ii) the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of The Bankruptcy Code filed on September 30, 2005) (the "**Plan of Reorganization**") with the Bankruptcy Court;

WHEREAS, on [_____], the Bankruptcy Court entered an order pursuant to Section 1129 of the Bankruptcy Code confirming the Plan of Reorganization (the "**Confirmation Order**");

WHEREAS, it is a condition precedent to the effectiveness of the Plan of Reorganization, that the Borrower enter into a new senior secured revolving credit agreement in an aggregate principal amount of $20,000,000 to fund the working capital requirements of the Borrower;

WHEREAS, each of the Guarantors (as defined below) has agreed to guaranty the obligations of the Borrower hereunder, and the Borrower and each Guarantor has agreed, subject to the Intercreditor Agreement, to secure its obligations hereunder by granting security interests in and Liens on substantially all its Property and assets, whether real or personal, tangible or intangible, now existing or hereafter acquired or arising, all as more fully provided herein and in the Loan Documents; and

WHEREAS, the Lenders are willing to extend such senior secured revolving credit facility to the Borrower and the Issuing Bank is willing to issue letters of credit for the account of the Borrower on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

# ARTICLE I

## DEFINITIONS

**Section 1.01.  Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

"**ABR**" shall mean, when used in reference to any Loan or Borrowing, that such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"**ABR Borrowing**" shall mean a Borrowing comprised of ABR Loans.

"**ABR Loan**" shall mean any Loan bearing interest at a rate determined by reference to the Alternate Base Rate.

"**Account Control Agreement**" shall mean an agreement substantially in the form of Exhibit K.

"**Account Debtor**" shall mean any Person who may become obligated to another Person under, with respect to, or on account of, an Account.

2

"**Accounts**" shall mean all "accounts", as such term is defined in the UCC as in effect on the date hereof in the State of New York, in which such Person now or hereafter has rights.

"**Acquisition Consideration**" shall mean the purchase consideration for any Permitted Acquisition and all other payments by the Parent or any of its Subsidiaries in exchange for, or as part of, or in connection with, any Permitted Acquisition (other than fees and expenses related to such transaction), whether paid in cash or by exchange of Equity Interests or of assets or otherwise and whether payable at or prior to the consummation of such Permitted Acquisition or deferred for payment at any future time, whether or not any such future payment is subject to the occurrence of any contingency, and includes any and all payments representing the purchase price and any assumptions of Indebtedness, "earn-outs" and other agreements to make any payment the amount of which is, or the terms of payment of which are, in any respect subject to or contingent upon the revenues, income, cash flow or profits (or the like) of any Person or business; provided, that any such future or deferred payment shall only be considered Acquisition Consideration to the extent of the reserve, if any, required under GAAP at the time of such sale to be established in respect thereof by the Parent or any Subsidiary thereof.

"**Adjusted LIBOR Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, (a) an interest rate per annum (rounded upward, if necessary, to the next 1/100th of 1%) determined by the Administrative Agent to be equal to the LIBOR Rate for such Eurodollar Borrowing in effect for such Interest Period divided by (b) 1 *minus* the Statutory Reserves (if any) for such Eurodollar Borrowing for such Interest Period.

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble and includes each other Person appointed as the successor pursuant to Article IX.

"**Administrative Agent Fees**" shall have the meaning assigned to such term in Section 2.05(b).

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Administrative Agent.

"**Affiliate**" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided, that for purposes of Section 6.07, the term "Affiliate" shall also include any Person that directly or indirectly owns more than 10% of any class of Equity Interests of the Person specified or that is an executive officer or director of the Person.

"**Agents**" shall mean the Lead Arranger, Syndication Agent, Documentation Agent, Administrative Agent and the Collateral Agent.

"**Agreement**" shall have the meaning assigned to such term in the preamble.

"**Alternate Base Rate**" shall mean, for any day, a rate per annum (rounded upward, if necessary, to the next 1/100th of 1%) equal to the greater of (a) the Base Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day *plus* 0.50%. If the

Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Base Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Base Rate or the Federal Funds Effective Rate, respectively.

"**Allowed**" has the meaning set forth in the Plan of Reorganization.

"**Applicable LC Margin**" shall mean 4.0% per annum.

"**Applicable Margin**" shall mean, (a) with respect to any ABR Loan, 2.0% per annum and (b) with respect to any Eurodollar Loan, 3.0% per annum.

"**Asset Sale**" shall mean any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any Sale and Leaseback Transaction) of any Property (including stock of any Subsidiary of the Parent, other than an Equity Issuance) by the holder thereof but excluding sales of inventory and dispositions of Cash Equivalents, in each case, in the ordinary course of business.

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by a Lender and an assignee, and accepted by the Administrative Agent, in the form of Exhibit B, or such other form as shall be approved by the Administrative Agent.

"**Atkins Canada**" shall have the meaning assigned to such term in the recitals.

"**Attributable Indebtedness**" shall mean, when used with respect to any sale and leaseback transaction, as at the time of determination, the present value (discounted at a rate equivalent to the Borrower's then current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the aggregate obligations of the lessee for rental payments during the remaining term of the lease included in any such sale and leaseback transaction.

"**Bankruptcy Code**" shall have the meaning assigned to such term in the recitals.

"**Bankruptcy Court**" shall have the meaning assigned to such term in the recitals.

"**Base Rate**" shall mean, for any day, a rate per annum that is equal to the corporate base rate of interest established by the Administrative Agent at its Stamford, Connecticut office for dollars from time to time; each change in the Base Rate shall be effective on the date such change is effective. The corporate base rate is not necessarily the lowest rate charged by the Administrative Agent to its customers.

"**Blocked Account**" shall mean any account subject to an Account Control Agreement.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" shall mean, with respect to any Person, (i) in the case of any corporation, the board of directors of such Person, (ii) in the case of any limited liability company, the board of managers of such Person, (iii) in the case of any partnership, the Board of Directors of the general partner of such Person and (iv) in any other case, the functional equivalent of the foregoing.

"**Borrower**" shall have the meaning assigned to such term in the preamble.

"**Borrower Forecast**" shall mean the thirteen (13) week (or longer period provided by the Borrower) projections of the cash receipts, operating disbursements, payroll disbursements, non-operating disbursements and cash balances of the Loan Parties, on a rolling thirteen (13) week (or longer period provided by the Borrower) period, together with a forecast of Borrowings for the next succeeding thirteen (13) weeks (or longer period provided by the Borrower), consistent in form to the thirteen (13) week projections (or longer period provided by the Borrower) delivered pursuant to the DIP Credit Agreement, all in form and substance reasonably satisfactory to the Administrative Agent.

"**Borrowing**" shall mean (a) Revolving Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect, or (b) a Swingline Loan.

"**Borrowing Base**" shall mean at any time, subject to adjustments as provided herein, an amount equal to the sum of, without duplication:

(a)        the book value of Eligible Accounts of the Borrower multiplied by the advance rate of 75 %; plus

(b)        the lesser of (i) the Cost of Eligible Inventory of the Borrower multiplied by the advance rate of 60%, or (ii) the Net Orderly Liquidation Value multiplied by the advance rate of 85%; minus

(c)        effective upon notification thereof to the Borrower by the Administrative Agent, any Reserves established from time to time by the Administrative Agent.

Subject to the relevant terms and provisions set forth in this Agreement, the Administrative Agent at all times shall be entitled to reduce or increase (subject to Sections 2.19 and 10.02) the standards of eligibility under this Agreement, in each case in its reasonable credit judgment.

The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate theretofore delivered to the Administrative Agent with such adjustments as the Administrative Agent deems appropriate in its reasonable judgment to assure that the Borrowing Base is calculated in accordance with the terms of this Agreement.

The Administrative Agent will consult with the Borrower in connection with the establishment, modification or elimination of Reserves, the adjustment and establishment of eligibility standards and any other adjustments to the Borrowing Base or Borrowing Base Certificate described in this definition, but neither such consultation nor any failure to so consult, based on then facts and circumstances that in the Administrative Agent's reasonable credit judgment make such consultation not practicable, shall provide the Borrower with any right to challenge, delay or otherwise interfere with the Administrative Agent's reasonable credit decision to establish, modify or eliminate any Reserve, to adjust or establish eligibility standards and to make any other adjustment to the Borrowing Base or Borrowing Base Certificate described in this definition.

"**Borrowing Base Certificate**" shall mean a certificate to be executed and delivered from time to time by the Borrower in the form attached hereto as Exhibit C.

"**Borrowing Request**" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit D, or such other form as shall be approved by the Administrative Agent.

"**Breakage Account**" shall have the meaning assigned to such term in Section 2.10(h)(ii).

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which banks in New York City are authorized or required by law to close; provided, that when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"**Capital Expenditures**" shall mean, with respect to any Person, for any period, the aggregate amount of all expenditures by such Person and its Subsidiaries during that period for fixed or capital assets that, in accordance with GAAP, are or should be classified as capital expenditures in the consolidated statement of cash flows of such Person and its Consolidated Subsidiaries; provided, that Capital Expenditures shall not include (i) expenditures of proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other Property, to the extent such expenditures are made in accordance with Section 2.10(g) and the other terms and provisions of the Loan Documents, to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other Property or otherwise to acquire, maintain, develop, construct, improve or repair assets or properties useful in the business of the Borrower and its Subsidiaries, (ii) amounts expended in respect of Permitted Acquisitions or (iii) with respect to any Person acquired pursuant to a Permitted Acquisition, amounts expended by such Person prior to such acquisition.

"**Capital Lease Obligations**" shall mean, with respect to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal Property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Cash**" shall mean money, currency or a credit balance in a Deposit Account.

"**Cash Management System**" shall have the meaning assigned to such term in <u>Section 2.20</u>.

"**Cash Equivalents**" shall mean, as to any Person:  (a) securities issued, or directly, unconditionally and fully guaranteed or insured, by the United States or any agency or instrumentality thereof (<u>provided</u>, that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person; (b) time deposits and certificates of deposit of the Administrative Agent or Citibank, N.A. or any commercial bank having, or which is the principal banking Subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia (or, with respect to any Foreign Subsidiary, the country in which such Foreign Subsidiary is organized) having, capital and surplus aggregating in excess of $500,000,000 and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such Person; (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities; (d) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by Standard & Poor's Rating Service ("**S&P**") or at least P-1 or the equivalent thereof by Moody's Investors Service Inc.  ("**Moody's**"), and in each case maturing not more than one year after the date of acquisition by such Person; (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above; and (f) demand deposit accounts maintained in the ordinary course of business.

"**Casualty Event**" shall mean, with respect to any Property (including Real Property) of any Person, any loss of title with respect to such Property or any loss of or damage to or destruction of, or any condemnation or other taking (including by any Governmental Authority) of, such Property for which such Person or any of its Subsidiaries receives insurance proceeds or proceeds of a condemnation award or other compensation.  "Casualty Event" shall include but not be limited to any taking of all or any part of any Real Property of any Person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any Person or any part thereof by any Governmental Authority, civil or military.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.*

"**Change of Control**" means the occurrence after the Closing Date of:

(a)  any direct or indirect sale or other transfer of all or substantially all of the assets (regardless of form or structure, and whether in a single transaction or a series of transactions) of the Parent or the Issuer to any Person other than an Affiliate of the Parent;

NYDOCS/1207090.12

(b)	a merger, consolidation or share exchange of the Parent into or with any Person (other than an Affiliate of the Parent or a merger or consolidation qualifying as a reorganization under Section 368(a)(1)(F) of the Internal Revenue Code of 1986, as amended), if, as a result of such transaction, the Persons (or Affiliates thereof) who were holders of the Parent's Shares immediately prior to such transaction do not own at least a majority of the issued and outstanding equity securities of the resulting Person (or of the ultimate parent of the resulting Person);

(c)	any direct or indirect sale of outstanding Parent Shares (whether in a single transaction or a series of transactions) if, as a result of such sale, (x) more than eighty percent (80%) of the then issued and outstanding Parent's Shares are held by (I) a Person which was not a holder of 10% or more of the Parent's Shares issued and outstanding as of the Closing Date, or (II) by a Group that does not include a Person who was a holder of 10% or more of the Parent Shares issued and outstanding as of the Closing Date, or (y) more than eighty percent (80%) of the then issued and outstanding Parent Shares are held by (I) Persons who, at the Closing Date, held five percent (5%) or more but less than ten (10%) of the Parent Shares issued and outstanding as of the Closing Date, or (II) by a Group that includes such a Person, and more than sixty (60%) of the Persons who are members of the Board of Directors following such sale were not members of the Board of Directors prior to such sale; or

(d)	any "Change of Control" as defined in either the CVR Agreement (other than in connection with a Qualified IPO) or the Term Note Documents.

"**Change in Law**" shall mean (a) the adoption of any law, treaty, order, rule or regulation after the date of this Agreement, (b) any change in any law, treaty, order, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or Issuing Bank (or for purposes of Section 2.12(b), by any lending office of such Lender or by such Lender's or Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"**Charges**" shall have the meaning assigned to such term in Section 10.13.

"**Chattel Paper**" shall mean all "chattel paper," as such term is defined in the UCC as in effect on the date hereof in the State of New York in which any Person now or hereafter has rights.

"**Claim**" has the meaning set forth in the Plan of Reorganization.

"**Class**" shall mean, when used in reference to any Loan or Borrowing, whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans or Swingline Loans and, when used in reference to any Commitment refers to whether such Commitment is a Revolving Commitment or Swingline Commitment.

"**Closing Date**" shall mean the date the conditions precedent set forth in Section 4.01 and Section 4.02 shall have been satisfied, and the initial Credit Extension is made.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" shall mean, collectively, all of the Security Agreement Collateral, the Mortgaged Property and all other Property of whatever kind and nature pledged as or constituting collateral under any Security Document.

"**Collateral Agent**" shall have the meaning assigned to such term in the preamble.

"**Collateral Agent Concentration Account**" shall have the meaning set forth in Section 2.21(c).

"**Commercial Letter of Credit**" shall mean any letter of credit or similar instrument issued for the account of the Borrower for the benefit of the Borrower or any of its Subsidiaries, for the purpose of providing credit support in connection with the purchase of materials, goods or services by the Borrower or any of its Subsidiaries in the ordinary course of their businesses.

"**Commitment**" shall mean, with respect to any Lender, such Lender's Revolving Commitment or Swingline Commitment.

"**Commitment Fee**" shall have the meaning assigned to such term in Section 2.05(a).

"**Commitment Termination Date**" shall mean the earliest of (a) the Maturity Date, (b) the date of termination of Lenders' obligations to make Loans and to participate in Letters of Credit pursuant to Article VIII hereof, and (c) the permanent reduction of all Revolving Commitments to zero dollars ($0).

"**Companies**" shall mean the Parent and its Subsidiaries; and "**Company**" shall mean any one of the Parent and its Subsidiaries.

"**Compliance Certificate**" shall mean a certificate substantially in the form of Exhibits O-1 and O-2.

"**Confirmation Order**" shall have the meaning assigned to such term in the recitals.

"**Consolidated Cash Interest Expense**" shall mean, for any period, the total consolidated cash interest expense of the Borrower and its Consolidated Subsidiaries for such period (calculated without regard to any limitations on the payment thereof, commitment fees, letter of credit fees and net amounts payable under Interest Rate Agreements) determined in accordance with GAAP plus, without duplication, (a) the portion of Capital Lease Obligations of the Borrower and its Consolidated Subsidiaries representing the interest factor for such period and (b) imputed interest on Attributable Indebtedness. Consolidated Cash Interest Expense shall be calculated on a Pro Forma Basis to give effect to any Indebtedness incurred, assumed or permanently repaid or extinguished during the relevant Test Period in connection with any Permitted Acquisitions and Asset Sales (other than any Asset Sale pursuant to Section 6.05(b)(ii), Section 6.05(b)(iii), Section 6.05(d), Section 6.05(i) or Section 6.05(l) and other dispositions in the ordinary course of business) as if such incurrence, assumption, repayment or extinguishing had been effected on the first day of such period. Notwithstanding the foregoing, for calculations in connection with any Test Period ending on or prior to [September 30, 2006], Consolidated Cash Interest Expense for: the fiscal quarter ending March 31, 2005 shall be deemed to equal $[_____], for the fiscal quarter ending June 30, 2005 shall be deemed to equal

$[_____], for the fiscal quarter ending September 30, 2005 shall be deemed to equal $[_____], and for the fiscal quarter ending December 31, 2005 shall be deemed to equal $[_____].

"**Consolidated EBITDA**" shall mean, for any period, (a) Consolidated Net Income for such period for the Borrower and its Consolidated Subsidiaries, <u>plus</u>, (b) to the extent deducted in determining such Consolidated Net Income for such period, the sum of:

(i) the amount of Consolidated Cash Interest Expense <u>plus</u> any non-cash interest expense,

(ii) provision for taxes based on income,

(iii) amortization expense,

(iv) depreciation expense,

(v) non-cash write-offs of goodwill and intangibles,

(vi) non-cash stock compensation expenses,

(vii) all other non-cash items (excluding any non-cash charge that results in an accrual or a reserve for cash charges in any future period);

(viii) professional fees and other expenses directly relating to the Case and the Transactions;

(ix) inventory credits to customers recorded pursuant to written agreements (a) existing as of the Closing Date or (b) approved by the Administrative Agent,[3] and

(x) restructuring expenses reasonably acceptable to the Administrative Agent;

<u>plus</u> (x) any cash recoveries generated from the administrative proceedings of Atkins Nutritionals (UK) Limited or from the wind down of Atkins Nutritionals PTY LTD, (y) subtracting from Consolidated Net Income for such period the sum of the aggregate amount of all non-cash items, determined on a consolidated basis, to the extent such items increased Consolidated Net Income for such period. Consolidated EBITDA shall be calculated on a Pro Forma Basis to give effect to any Permitted Acquisition and Asset Sales (other than any Asset Sale pursuant to <u>Section 6.05(b)(ii)</u>, <u>Section 6.05(b)(iii)</u>, <u>Section 6.05(d)</u>, <u>Section 6.05(i)</u> or <u>Section 6.05(j)</u> and other dispositions in the ordinary course of business) consummated during the fiscal period of the Borrower ended on the last day of the Test Period thereof as if each such Permitted Acquisition had been effected on the first day of such period and as if each such Asset Sale had been consummated on the day prior to the first day of such period. Notwithstanding the foregoing, for calculations in connection with any Test Period ending on or prior to [September 30, 2006], Consolidated EBITDA for the fiscal quarter ending March 31, 2005 shall be deemed to equal $[_____], for the fiscal quarter ending June 30, 2005 shall be deemed to equal

---

[3] Company to provide updated current status of inventory credits.

$[_____], for the fiscal quarter ending September 30, 2005 shall be deemed to equal $[_____], and for the fiscal quarter ending December 31, 2005 shall be deemed to equal $[_____].

"**Consolidated Indebtedness**" shall mean, as at any date of determination, the aggregate amount of all Indebtedness (but including in any event the then outstanding principal amount of all Loans and all Capital Lease Obligations and all LC Exposure) of the Borrower and its Consolidated Subsidiaries on a consolidated basis as determined in accordance with GAAP.

"**Consolidated Interest Coverage Ratio**" shall mean, for any Test Period, the ratio of (x) Consolidated EBITDA for such Test Period to (y) Consolidated Cash Interest Expense for such Test Period.

"**Consolidated Net Income**" shall mean, for any period, the consolidated net income (or loss) of the Borrower and its Consolidated Subsidiaries determined in accordance with GAAP, but excluding in any event (a) after-tax extraordinary gains or extraordinary losses; (b) after-tax gains or losses realized from (i) the acquisition of any securities, or the extinguishment of any Indebtedness of the Borrower or any of its Subsidiaries, or (ii) any Asset Sale; (c) net earnings or loss of any other Person (other than a Subsidiary of the Borrower) in which the Borrower or any Consolidated Subsidiary has an ownership interest, except (in the case of any such net earnings) to the extent such net earnings shall have actually been received by the Borrower or such Consolidated Subsidiary (subject to the limitation in clause (d) below) in the form of cash dividends or distributions; (d) the net income (or loss) of any Consolidated Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Consolidated Subsidiary of its net income is not at the time of determination permitted without approval, under applicable law or regulation or under such Consolidated Subsidiary's Organizational Documents or any agreement or instrument applicable to such Consolidated Subsidiary or its stockholders; (e) gains or losses from the cumulative effect of any change in accounting principles; (f) earnings or losses resulting from any reappraisal, revaluation or write-up or write-down of assets; and (g) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Borrower or any Consolidated Subsidiary or is merged into or consolidated with the Borrower or any Consolidated Subsidiary or that Person's assets are acquired by the Borrower or such Consolidated Subsidiary.

"**Consolidated Subsidiary**" shall mean, as to any Person, all [Domestic][4] Subsidiaries of such Person which are consolidated with such Person for financial reporting purposes in accordance with GAAP.

"**Contested Collateral Lien Conditions**" shall mean, with respect to any Permitted Lien of the type described in Section 6.02(a), (b) and (f), the following conditions:

      (a)      the Borrower shall be contesting such Lien in good faith; and

      (b)      to the extent such Lien is in an amount in excess of [$200,000], in the aggregate with all other such Liens, the Administrative Agent shall have established a Reserve

---

[4] Inclusion of foreign subsidiaries to be determined.

NYDOCS/1207090.12

(to the extent of such Lien on Accounts or Inventory) with respect thereto or obtained a bond in an amount sufficient to pay and discharge such Lien and the Administrative Agent's reasonable estimate of all interest and penalties related thereto.

"**Contingent Obligation**" shall mean, as to any Person, any obligation, agreement, understanding or arrangement of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (a) to purchase any such primary obligation or any Property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation; (d) with respect to bankers' acceptances and letters of credit, until a reimbursement obligation arises (which obligation shall constitute Indebtedness); or (e) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, that the term "**Contingent Obligation**" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or any product warranties for deposit or collection in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable, whether severally or jointly, pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the term "**Controlled**" shall have a meaning correlative thereto.

"**Control Agreement**" shall have the meaning assigned to such term in the Security Agreement.

"**Cost**" shall mean, with respect to Inventory, the lower of (a) [landed] cost computed on first-in a first-out basis in accordance with GAAP or (b) market value; provided, that for purposes of the calculation of the Borrowing Base, (i) the Cost of the Inventory shall not include write-ups or write-downs in cost with respect to currency exchange rates, and (ii) notwithstanding anything to the contrary contained herein, the cost of the Inventory shall be computed in the same manner and consistent with the most recent Inventory Appraisal which has been received and approved by the Administrative Agent in its reasonable discretion and has been provided to the Borrower.

"**Credit Extension**" shall mean, as the context may require, (i) the making of a Loan by a Lender or (ii) the issuance of any Letter of Credit, or the amendment, extension or renewal of any existing Letter of Credit, by the Issuing Bank.

"**Currency Agreement**" shall mean any foreign exchange contract, currency swap agreement or other similar agreement.

"**CVR Agreement**" shall mean the Contingent Value Rights Agreement entered into by Parent with [_____], as trustee on the Closing Date.

"**Debt Issuance**" shall mean the incurrence by the Parent, the Borrower or any of their Subsidiaries of any Indebtedness after the Closing Date (other than as permitted by <u>Section 6.01</u>).

"**Debtors**" shall have the meaning assigned to such term in the <u>recitals</u>.

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Deposit Account**" shall mean a demand, time, savings, passbook or similar account maintained with a Person engaged in the business of banking, including a savings bank, savings and loan association, credit union or trust company.

"**Depository Bank**" shall mean Citibank, N.A.

"**Depository Bank Concentration Account**" shall have the meaning set forth in <u>Section 2.21(a)</u>.

"**DIP Credit Agreement**" shall have the meaning assigned to such term in the <u>recitals</u>.

"**DIP Obligation**" shall mean the obligations owing under the DIP Credit Agreement.

"**Disclosure Statement**" shall mean [_____].

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise; or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the first anniversary of the Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in clause (a) above, in each case at any time prior to the first anniversary of the Maturity Date, or (c) contains any repurchase obligation which may come into effect prior to payment in full of all Obligations (other than pursuant to a change of control or asset disposition as long as such repurchase obligation is subject and subordinate to repayment of the Loans and other Obligations) on terms satisfactory to the Administrative Agent.

13

"**Dividend**" shall mean, with respect to any Person, any declaration or payment of a dividend by such Person or return on any equity capital to the holders of such Person's Equity Interests or authorization or making of any other distribution, payment or delivery of Property or cash to the holders of such Person's Equity Interests as such, or the redemption, retirement, purchase or other acquisition, directly or indirectly, for a consideration of any shares of any class of such Person's Equity Interests outstanding (or any options or warrants issued by such Person with respect to its Equity Interests), or the setting aside of any funds for any of the foregoing purposes, or such Person shall have permitted any of its Subsidiaries to purchase or otherwise acquire for a consideration any shares of any class of Equity Interests of such Person outstanding (or any options or warrants issued by such Person with respect to its Equity Interests). Without limiting the foregoing, "**Dividends**" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**Dollars**" or "**$**" shall mean lawful money of the United States.

"**Domestic Subsidiary**" shall mean each Subsidiary that is not a Foreign Subsidiary.

"**Eligible Accounts**" shall have the meaning assigned to such term in Section 2.19(a).

"**Eligible Inventory**" shall have the meaning assigned to such term in Section 2.19(b).

"**Enforcement Action**" shall mean the exercise by an Agent and/or the Required Lenders of any rights or remedies after an Event of Default, including terminating the Commitments, declaring the Loans then outstanding to be immediately due and payable, and/or exercising any rights with respect to any of the Collateral, each as more fully provided for in Article VIII.

"**Environment**" shall mean ambient air, surface water and groundwater (including, without limitation, potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, the workplace or as otherwise defined in any Environmental Law.

"**Environmental Claim**" shall mean any claim, notice, demand, order, action, suit, proceeding or other communication alleging liability for investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, Property damage, fines, penalties or other costs resulting from, related to or arising out of (a) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (b) any violation of Environmental Law, and shall include, without limitation, any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to health, safety or the Environment.

"**Environmental Law**" shall mean any and all applicable present and future treaties, laws, statutes, ordinances, regulations, rules, decrees, orders, judgments, consent orders, consent decrees or other binding requirements relating to the Environment, the Release or threatened Release of Hazardous Material, natural resources or natural resource damages, or occupational safety or health.

NYDOCS/1207090.12

"**Environmental Permit**" shall mean any permit, license, approval, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"**Equipment**" shall have the meaning assigned to such term in the Security Agreement.

"**Equity Documents**" shall mean the Restated Certificate of Incorporation, the Registration Rights Agreement, the CVR Agreement and the Management Incentive Plan.

"**Equity Interest**" shall mean, with respect to any Person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or non-voting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, such partnership, whether outstanding on the date hereof or issued after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**Equity Issuance**" shall mean, without duplication, any issuance or sale by any Person of (a) any Equity Interests (including any Equity Interests issued upon exercise of any warrant or option) or any warrants or options to purchase Equity Interests or (b) any other security or instrument representing an Equity Interest (or the right to obtain any Equity Interest) in the issuing or selling Person.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived by regulation); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, the failure to make by its due date a required installment under Section 412(m) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Company or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Company or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (f) the incurrence by any Company or any of its ERISA Affiliates of any liability with respect to the withdrawal from any Plan or Multiemployer Plan; (g) the receipt by any Company or its ERISA Affiliates of any notice, concerning the imposition of Withdrawal

Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) the making of any amendment to any Plan which could result in the imposition of a lien or the posting of a bond or other security; and (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in liability to any Company.

"**Eurodollar Borrowing**" shall mean a Borrowing comprised of Eurodollar Loans.

"**Eurodollar Loan**" shall mean any Loan bearing interest at a rate determined by reference to the Adjusted LIBOR Rate.

"**Event of Default**" shall have the meaning assigned to such term in Article VIII.

"**Excess Amount**" shall have the meaning assigned to such term in Section 2.10(h)(ii).

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) income or franchise taxes imposed on (or measured by) its net income and any backup withholding Taxes, in each case imposed by the United States, or by any Governmental Authority as a result of a present or former connection (including location of such Person's principal office or, in the case of any Lender, location of its applicable lending office) between the recipient and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Administrative Agent, such Lender or the Issuing Bank having executed or delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document), (b) any branch profits taxes imposed by the United States or any similar Tax imposed by any other jurisdiction described in clause (a) above or (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.15(e)), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure to comply with Section 2.15(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.15(a) (it being understood and agreed, for the avoidance of doubt, that any withholding tax imposed on a Foreign Lender as a result of a Change in Law or regulation or interpretation thereof occurring after the time such Foreign Lender became a party to this Agreement shall not be an Excluded Tax).

"**Existing Lien**" shall have the meaning assigned to such term in Section 6.02(c).

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a

16

Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Fee Letter**" shall mean the confidential Fee Letter, dated [_____], 2005, among UBS Loan Finance LLC, UBS Securities LLC and the Borrower with respect to certain fees to be paid from time to time by the Borrower to UBS.

"**Fees**" shall mean the Commitment Fees, the Administrative Agent Fees, the LC Participation Fees and the Fronting Fees.

"**Final Order**" shall mean an order or judgment of a court of competent jurisdiction, which has been signed by the Bankruptcy Court and entered on the docket maintained by the clerk of such court, and which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

"**Financial Officer**" shall mean, with respect to any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person.

"**FIRREA**" shall mean the Federal Institutions Reform, Recovery and Enforcement Act of 1989.

"**Fiscal Year**" shall mean [_____][5].

"**Foreign Lender**" shall mean any Lender that is not, for U.S. federal income tax purposes, (a) a citizen or resident of the United States, (b) a corporation or entity treated as a corporation created or organized in or under the laws of the United States, or any political subdivision thereof, (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States Persons have the authority to control all substantial decisions of such trust.

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Company with respect to employees employed outside the United States.

---

[5] Definition to conform with Company's 4/4/5 accounting

"**Foreign Subsidiary**" shall mean a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any state thereof or the District of Columbia.

"**Fronting Fees**" shall have the meaning assigned to such term in Section 2.05(c).

"**Funded Debt**" shall mean all Indebtedness of the Borrower or another specified Person which is payable more than one year from the date of creation thereof and shall include (a) current maturities of such Indebtedness and (b) all Indebtedness consisting of reimbursement obligations with respect to letters of credit other than letters of credit issued to finance inventory purchases or to secure other debt appearing on the balance sheet of the obligor.

"**GAAP**" shall mean generally accepted accounting principles in the United States applied on a consistent basis.

"**Governmental Authority**" shall mean any federal, state, local or foreign court, central bank or governmental agency, authority, instrumentality or regulatory body.

"**Governmental Real Property Disclosure Requirements**" shall mean any Requirement of Law of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including, without limitation, any transfer of control) of any Real Property, facility, establishment or business, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling of Hazardous Material on, at, under or near the Real Property, facility, establishment or business to be sold, leased, mortgaged, assigned or transferred.

"**Group**" shall mean a syndicate or group of Persons that is considered to be a "person" for purposes of Section 13(d)(3) of the Exchange Act.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in Section 7.01.

"**Guarantees**" shall mean the guarantees issued pursuant to Article VII by the Guarantors.

"**Guarantors**" shall mean Parent and the Subsidiary Guarantors.

"**Hazardous Materials**" shall mean the following: hazardous substances; hazardous wastes; polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs; asbestos or any asbestos-containing materials in any form or condition; radon or any other radioactive materials including any source, special nuclear or by product material; petroleum, crude oil or any fraction thereof; and any other pollutant or contaminant or chemicals, wastes, materials, compounds, constituents or substances, subject to regulation or which can give rise liability under any Environmental Laws.

"**Hedging Agreement**" shall mean any Interest Rate Agreement, Currency Agreement, commodity price protection agreement or other interest or currency exchange rate or commodity

price hedging arrangement, in each case entered into in the ordinary course of business and not for speculative purposes.

"**Holdco**" shall mean Atkins Nutritionals Holdings II, Inc., a Delaware corporation which shall be merged into the Borrower prior to the Closing Date.

"**Indebtedness**" shall mean, with respect to any Person, without duplication, (a) all obligations of such Person for borrowed money or advances; (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such Person upon which interest charges are customarily paid or accrued; (d) all obligations of such Person under conditional sale or other title retention agreements relating to Property purchased by such Person; (e) all obligations of such Person issued or assumed as the deferred purchase price of Property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on Property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed; (g) all Capital Lease Obligations, Purchase Money Obligations and synthetic lease obligations of such Person; (h) all obligations of such Person in respect of Interest Rate Agreements and Currency Agreements to the extent required to be reflected on a balance sheet of such Person; (i) all Attributable Indebtedness of such Person; (j) all obligations for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; and (k) all Contingent Obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (j) above.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent that terms of such Indebtedness provide that such Person is not liable therefor.

"**Indemnified Taxes**" shall mean all Taxes other than Excluded Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in Section 10.03(b).

"**Information**" shall have the meaning assigned to such term in Section 10.12.

"**Instruments**" shall mean all "instruments," as such term is defined in the UCC as in effect on the date hereof in the State of New York, in which any Person now or hereafter has rights.

"**Intellectual Property**" shall have the meaning assigned to such term in Section 3.07(a).

"**Intercompany Note**" shall mean a promissory note substantially in the form of Exhibit M.

"**Intercreditor Agreement**" shall mean an agreement substantially in the form of Exhibit Q.

"**Interest Election Request**" shall mean a request by the Borrower to convert or continue a Revolving Borrowing in accordance with Section 2.08(b), substantially in the form of Exhibit E.

"**Interest Payment Date**" shall mean (a) with respect to any ABR Loan (other than a Swingline Loan), the last day of each calendar month to occur during the period that such Loan is outstanding and the final maturity date of such Loan, (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Loan with an Interest Period of more than one months' duration, the last day of each calendar month to occur during such Interest Period and (c) with respect to any Swingline Loan, the day that such Loan is required to be repaid.

"**Interest Period**" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two or three months thereafter, as the Borrower may elect; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing

"**Interest Rate Agreement**" shall mean any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement or similar agreement or arrangement.

"**Inventory**" shall mean all "inventory", as such term is defined in the UCC as in effect on the date hereof in the State of New York, wherever located, in which any Person now or hereafter has rights.

"**Inventory Appraisal**" shall mean (a) on the Closing Date, the inventory appraisal prepared by the Inventory Appraiser dated [_____], 2005 and (b) thereafter, the most recent inventory appraisal conducted by an independent appraisal firm and delivered pursuant to Section 5.01(l) hereof, copies of which have been provided to the Loan Parties.

"**Inventory Appraisal Letter**" shall mean the Letter attached as Schedule 5.01(l).

"**Inventory Appraiser**" shall mean [_____].

"**Investments**" shall have the meaning assigned to such term in Section 6.04.

"**Issuing Bank**" shall mean UBS AG, Stamford Branch, or any Affiliate thereof.

"**Joinder Agreement**" shall mean that certain joinder agreement substantially in the form of Exhibit F.

20

"**Landlord Access Agreement**" shall mean an agreement substantially in the form of Exhibit G.

"**LC Account**" shall have the meaning set forth in Section 2.18(i).

"**LC Commitment**" shall mean the commitment of the Issuing Bank to issue Letters of Credit pursuant to Section 2.18.

"**LC Disbursement**" shall mean a payment or disbursement made by the Issuing Bank pursuant to a Letter of Credit.

"**LC Exposure**" shall mean at any time the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time *plus* (b) the aggregate principal amount of all Reimbursement Obligations outstanding at such time. The LC Exposure of any Revolving Lender at any time shall mean its Pro Rata Percentage of the aggregate LC Exposure at such time.

"**LC Participation Fee**" shall have the meaning assigned to such term in Section 2.05(c).

"**LC Request**" shall mean a request by the Borrower in accordance with the terms of Section 2.18(b) and substantially in the form of Exhibit Q, or such other form as shall be approved by the Administrative Agent.

"**Lead Arranger**" shall have the meaning assigned to such term in the preamble.

"**Leases**" shall mean any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property.

"**Lender Addendum**" shall mean with respect to any Lender, a lender addendum in the form of Exhibit N to be executed and delivered by such Lender as provided in Section 10.15.

"**Lender Affiliate**" shall mean with respect to any Lender that is a fund that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor as such Lender, or by an Affiliate of such advisor.

"**Lenders**" shall mean (a) the financial institutions that have become a party hereto pursuant to a Lender Addendum (other than any such financial institution that has ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any financial institution that has become a party hereto pursuant to an Assignment and Acceptance. Unless the context clearly indicates otherwise, the term "**Lenders**" shall include the Swingline Lender.

"**Letter of Credit**" shall mean any (a) Standby Letter of Credit and (b) Commercial Letter of Credit, in each case, issued or to be issued by an Issuing Bank for the account of the Borrower pursuant to Section 2.18.

"**Letter of Credit Cover**" shall mean (a) causing Letter(s) of Credit to be canceled and returned, (b) cash collateralizing such Letter(s) of Credit in accordance with Section 2.18(i), and/or (c) providing standby letter(s) of credit to backup Letters of Credit in accordance with clause (C) of the last sentence of Section 2.18(c).

"**Letter of Credit Expiration Date**" shall mean the date which is fifteen days prior to the Maturity Date.

"**Leverage Ratio**" shall mean, at any date of determination, the ratio of Consolidated Indebtedness on such date to Consolidated EBITDA for the Test Period then most recently ended.

"**LIBOR Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period therefor, the rate per annum determined by the Administrative Agent to be the arithmetic mean (rounded to the nearest 1/100th of 1%) of the offered rates for deposits in dollars with a term comparable to such Interest Period that appears on the Telerate British Bankers Assoc. Interest Settlement Rates Page (as defined below) at approximately 11:00 a.m., London, England time, on the second full Business Day preceding the first day of such Interest Period; provided, that (i) if no comparable term for an Interest Period is available, the LIBOR Rate shall be determined using the weighted average of the offered rates for the two terms most nearly corresponding to such Interest Period and (ii) if there shall at any time no longer exist a Telerate British Bankers Assoc. Interest Settlement Rates Page, "LIBOR Rate" shall mean, with respect to each day during each Interest Period pertaining to Eurodollar Borrowings comprising part of the same Borrowing, the rate per annum equal to the rate at which the Administrative Agent is offered deposits in dollars at approximately 11:00 a.m., London, England time, two Business Days prior to the first day of such Interest Period in the London interbank market for delivery on the first day of such Interest Period for the number of days comprised therein and in an amount comparable to its portion of the amount of such Eurodollar Borrowing to be outstanding during such Interest Period. "**Telerate British Bankers Assoc. Interest Settlement Rates Page**" shall mean the display designated as Page 3750 on the Telerate System Incorporated Service (or such other page as may replace such page on such service for the purpose of displaying the rates at which dollar deposits are offered by leading banks in the London interbank deposit market).

"**Lien**" shall mean, with respect to any Property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, claim, charge, assignment, hypothecation, security interest or encumbrance of any kind, any other type of preferential arrangement in respect of such Property or any filing of any financing statement under the UCC or any other similar notice of Lien under any similar notice or recording statute of any Governmental Authority, including any easement, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law, and any agreement to give any of the foregoing; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such Property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Lock-Up Agreement**" shall mean [_____].

"**Loan Documents**" shall mean (a) this Agreement, the Notes (if any), the Security Documents, the Intercreditor Agreement, the Fee Letter, (b) any other agreement, instrument or document evidencing, securing or guaranteeing any Obligations or the Collateral and (c) any other agreement, instrument or document designated by the Borrower and the Administrative Agent as a "**Loan Document**".

"**Loan Parties**" shall mean the Borrower and the Guarantors.

"**Loans**" shall mean the Revolving Loans and the Swingline Loans.

"**Management Incentive Plan**" shall mean [_____].

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on the business, Property, results of operations, prospects or condition, financial or otherwise, of the Borrower and the Subsidiaries, taken as a whole; (b) material impairment of the ability of the Loan Parties to fully and timely perform any of their obligations under any Loan Document; (c) material impairment of the rights of or benefits or remedies available to the Lenders or the Collateral Agent under any Loan Document; or (d) a material adverse effect on the Liens in favor of the Collateral Agent (for its benefit and for the benefit of the other Secured Parties) on the Collateral or the priority of such Liens.

"**Material Indebtedness**" shall mean any Indebtedness (other than the Loans), or obligations in respect of one or more Hedging Agreements, of any Loan Party evidencing an aggregate outstanding principal amount exceeding $1,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of such Loan Party in respect of any Hedging Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Loan Party would be required to pay if such Hedging Agreement were terminated at such time.

"**Maturity Date**" shall mean [December 31, 2008].

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.13.

"**Moody's**" has the meaning assigned to such term in the definition of "Cash Equivalents."

"**Mortgage**" shall mean an agreement, including, but not limited to, a mortgage, deed of trust or any other document, creating and evidencing a Lien on a Mortgaged Property, which shall be in a form reasonably satisfactory to the Collateral Agent, with such schedules and including such provisions as shall be necessary to conform such document to applicable local or foreign law or as shall be customary under applicable local or foreign law.

"**Mortgaged Property**" shall mean each Real Property, if any, which shall be subject to a Mortgage delivered after the Closing Date pursuant to Section 5.11(d).

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA (a) to which any Company or any ERISA Affiliate is then making or accruing an obligation to make contributions or (b) to which any Company or any ERISA Affiliate has within the preceding five plan years made contributions.

"**Net Cash Proceeds**" shall mean:

(a)     with respect to any Asset Sale, the cash proceeds received by any Loan Party (including cash proceeds subsequently received (as and when received by any Loan Party) in respect of noncash consideration initially received) net of (i) selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and the Borrower's good faith estimate of income taxes paid or payable in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP, against any liabilities under any indemnification obligations associated with such Asset Sale (underlined, that to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds); (iii) the Borrower's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the assets sold within 90 days of such Asset Sale (underlined, that to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 90 days of such Asset Sale, such cash proceeds shall constitute Net Cash Proceeds); and (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness which is secured by a Lien on the asset sold in such Asset Sale (so long as such Lien was a Permitted Lien) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such asset);

(b)     with respect to any Debt Issuance, or any issuance of Equity Interests, the cash proceeds received in respect thereof, net of customary fees, commissions, costs and other expenses incurred in connection therewith; and

(c)     with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received in respect thereof, net of all reasonable costs and expenses incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event.

"**Net Orderly Liquidation Value**" shall mean the mid-range "net orderly liquidation value" set forth in the most recently delivered Inventory Appraisal.

"**Non-Guarantor Subsidiary**" shall mean each Subsidiary that is not a Subsidiary Guarantor.

"**Notes**" shall mean any notes evidencing the Revolving Loans or Swingline Loans issued pursuant to this Agreement, if any, substantially in the form of Exhibit I-1 or I-2.

"**Obligations**" shall mean (a) obligations of the Borrower and any and all of the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar Proceeding, regardless of whether allowed or allowable in such Proceeding) on the Loans, when and as due, whether at

maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) each payment required to be made by the Borrower and any and all of the other Loan Parties under this Agreement in respect of any Letter of Credit, when and as due, including payments in respect of Reimbursement Obligations, interest thereon and obligations to provide cash collateral and (iii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar Proceeding, regardless of whether allowed or allowable in such Proceeding), of the Borrower and any and all of the other Loan Parties under this Agreement and the other Loan Documents owing to any of the Secured Parties (in their capacity as such), (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrower and each other Loan Party under or pursuant to this Agreement and the other Loan Documents owing to any of the Secured Parties (in their capacity as such), and (c) the due and punctual payment and performance of all obligations in respect of overdrafts and related liabilities owed to any Lender, any Affiliate of a Lender, the Administrative Agent or the Collateral Agent arising from treasury, depositary and cash management services or in connection with any automated clearinghouse transfer of funds.

"**Officers' Certificate**" shall mean a certificate executed by the chairman of the Board of Directors of the Borrower (if an officer of the Borrower) or the chief executive officer or the President of the Borrower and, solely for the purposes of certifying pro forma compliance with Section 6.08 in connection with a Permitted Acquisition, one of the Financial Officers, in each case in his or her official (and not individual) capacity.

"**Organizational Documents**" shall mean, with respect to any Person, (a) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (b) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (e) in any other case, the functional equivalent of the foregoing.

"**Other Taxes**" shall mean any and all present or future stamp or documentary taxes or any other excise or Property taxes, charges or similar levies (including interest, fines, penalties and additions to tax) arising from any payment made or required to be made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"**Parent**" shall have the meaning assigned to such term in the preamble.

"**Parent Shares**" means shares of the Parent's Common Stock, $0.01 par value per share.

"**Participant**" shall have the meaning assigned to such term in Section 10.04(e).

"**Payment In Full**" or "**Paid In Full**" shall mean (a) the indefeasible payment in full in cash of all Obligations (other than contingent reimbursement obligations under Letters of Credit but including all reimbursement and indemnification obligations to the extent then due and

payable), (b) either (i) the termination of all Letters of Credit and/or (ii) delivery of Letter of Credit Cover for all outstanding Letters of Credit, and (c) the termination of all Commitments.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation.

"**Perfection Certificate**" shall mean a certificate in the form of Exhibit I-1 or any other form approved by the Collateral Agent and the Borrower, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"**Perfection Certificate Supplement**" shall mean a certificate supplement in the form of Exhibit I-2 or any other form approved by the Collateral Agent.

"**Permitted Acquisition**" shall mean, with respect to the Borrower or any Subsidiary Guarantor, any transaction or series of related transactions for the (a) direct or indirect acquisition of all or substantially all of the Property of any other Person, or of any business or division of any other Person; (b) direct or indirect acquisition of in excess of 50% of the Equity Interests of any other Person, or otherwise causing any other Person to become a Subsidiary of such Person; or (c) merger or consolidation or any other combination with any other Person (other than the Borrower or any Subsidiary Guarantor), if each of the following conditions are met:

(i)      no Default then exists or would result therefrom;

(ii)      after giving effect to such acquisition on a Pro Forma Basis, (A) the Borrower shall be in compliance with all covenants set forth in Section 6.08 as of the most recent Test Period (assuming, for purposes of Section 6.08, that such acquisition, and all other Permitted Acquisitions consummated since the first day of the relevant Test Period for each of the financial covenants set forth in Section 6.08 ending on or prior to the date of such acquisition, had occurred on the first day of such relevant Test Period), and (B) unless expressly approved by the Administrative Agent, the Borrower shall have generated positive cash flow for the Test Period most recently ended prior to the date of consummation of such acquisition;

(iii)      no Company shall, in connection with any such acquisition, assume or remain liable with respect to any Indebtedness or other liability (including any material tax or ERISA liability) of the related seller or the business, Person or assets acquired, except (A) to the extent permitted under Section 6.01 and (B) obligations not constituting Indebtedness incurred in the ordinary course of business and necessary or desirable to the continued operation of the underlying properties, and any other such liabilities or obligations not permitted to be assumed or otherwise supported by any Company hereunder shall be paid in full or released as to the business, Persons or assets being so acquired on or before the consummation of such acquisition;

(iv)      the acquired Person shall be engaged in a business of the type that the Borrower and the Subsidiaries are permitted to be engaged in under Section 6.13 or activities incidental or reasonably related or complementary thereto and the Property acquired in connection with any such acquisition shall be made subject to the Lien of the

26

Security Documents to the extent required by <u>Section 5.11</u> and shall be free and clear of any Liens, other than Permitted Liens;

(v)     the Board of Directors of the Person to be acquired shall not have indicated publicly its opposition to the consummation of such acquisition;

(vi)     all transactions in connection therewith shall be consummated in accordance with all applicable laws of all applicable Governmental Authorities;

(vii)     with respect to any acquisition involving Acquisition Consideration of more than $1,000,000, unless the Administrative Agent shall otherwise agree, the Borrower shall have provided the Administrative Agent (with sufficient copies for each Lender) with (A) historical financial statements for the last three fiscal years (or, if less, the number of years since formation) of the Person or business to be acquired (audited if available without undue cost or delay) and unaudited financial statements thereof for the most recent interim period which are available, (B) reasonably detailed projections for the succeeding five years pertaining to the Person or business to be acquired and updated projections for the Borrower after giving effect to such acquisition, (C) a reasonably detailed description of all material information relating thereto and copies of all material documentation pertaining to such acquisition, and (D) all such other information and data relating to such acquisition or the Person or business to be acquired as may be reasonably requested by the Administrative Agent or the Required Lenders;

(viii)     at least 10 Business Days prior to the proposed date of consummation of the acquisition, the Borrower shall have delivered to the Administrative Agent and the Lenders an Officers' Certificate executed and delivered by signatories referenced in the definition thereof certifying that (A) such acquisition complies with this definition (which shall have attached thereto reasonably detailed backup data and calculations showing such compliance), and (B) such acquisition could not reasonably be expected to result in a Material Adverse Effect;

(ix)     the Acquisition Consideration for such acquisition shall not exceed $2,500,000, and the aggregate amount of the Acquisition Consideration for all Permitted Acquisitions since the Closing Date shall not exceed $5,000,000; and

if the acquisition involves clause (b) or (c) of this definition, the Person acquired merges with or into the Borrower or a Subsidiary Guarantor or becomes substantially contemporaneously with such acquisition a Subsidiary Guarantor.

"**Permitted Collateral Liens**" shall have the meaning assigned to such term in the Security Agreement.

"**Permitted Liens**" shall have the meaning assigned to such term in <u>Section 6.02</u>.

"**Person**" shall mean any natural Person, corporation, business, trust, joint venture, association, company, limited liability company, partnership or government, or any agency or political subdivision thereof, in any case, whether acting in a personal, fiduciary or other capacity.

NYDOCS/1207090.12

"**Petition Date**" shall have the meaning assigned to such term in the <u>recitals</u>.

"**Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA which is maintained or contributed to by any Company or its ERISA Affiliate or with respect to which any Company could incur liability.

"**Plan of Reorganization**" shall have the meaning assigned to such term in the <u>recitals</u>.

"**Preferred Stock**" shall mean, with respect to any Person, any and all preferred or preference Equity Interests (however designated) of such Person whether now outstanding or issued after the Closing Date.

"**Preferred Stock Issuance**" shall mean the issuance or sale of any Preferred Stock.

"**Prepetition Agent**" shall mean UBS, in its capacity as Administrative Agent for the Prepetition Lenders under the Prepetition Credit Agreement.

"**Prepetition Credit Agreement**" shall have the meaning assigned to such term in the <u>recitals</u>.

"**Prepetition Lenders**" shall mean the lenders from time to time party to the Prepetition Credit Agreement.

"**Prepetition Obligations**" shall mean the "Obligations" as such term is defined in the Prepetition Credit Agreement.

"**Pro Forma Basis**" shall mean on a basis in accordance with Article 11 of Regulation S-X or otherwise reasonably satisfactory to the Administrative Agent.

"**Pro Rata Percentage**" shall mean, with respect to any Revolving Lender at any time, the percentage of the aggregate Revolving Commitment represented by such Lender's Revolving Commitment.

"**Proceeding**" shall mean, as the context shall require, with respect to any Person, any (a) insolvency, bankruptcy, receivership, reorganization, readjustment, composition or other similar proceeding relating to such Person or its Property or creditors in such capacity, (b) proceeding for any liquidation, dissolution or other winding-up of such Person, voluntary or involuntary, whether or not involving insolvency or proceedings under the Bankruptcy Code, whether partial or complete and whether by operation of law or otherwise, (c) assignment for the benefit of creditors of such Person or (d) other marshalling of the assets of such Person.

"**Projections**" shall mean the projections attached as Exhibit C to the Disclosure Statement.

"**Property**" shall mean any right, title or interest in or to Property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including

Equity Interests or other ownership interests of any Person and whether now in existence or owned or hereafter entered into or acquired, including, without limitation, all Real Property.

"**Purchase Money Obligation**" shall mean, for any Person, the obligations of such Person in respect of Indebtedness incurred for the purpose of financing all or any part of the purchase price of any Property (including Equity Interests of any Person) or the cost of installation, construction or improvement of any Property or assets and any refinancing thereof; provided, that such Indebtedness is incurred within 90 days after such acquisition of such Property by such Person.

"**Qualified Capital Stock**" of any Person shall mean any Equity Interests of such Person that are not Disqualified Capital Stock.

"**Qualified IPO**" means an underwritten public offering pursuant to an effective registration statement under the Securities Act, covering the issuance, offer and sale of Parent Shares by the Parent but only if (x) the number of Parent Shares to be issued, offered and sold by the Parent in such public offering is equal to or greater than 25% of the number of Parent Shares then issued and outstanding; and (y) each of the underwriters participating in such public offering shall be obligated to buy on a "firm commitment" basis all Parent Shares that such underwriters shall have agreed to distribute.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real Property owned, leased or operated by any Person, whether by lease, license or other shall mean, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other Property and rights incidental to the ownership, lease or operation thereof.

"**Register**" shall have the meaning assigned to such term in Section 10.04(c).

"**Registration Rights Agreement**" shall mean the Registration Rights Agreement entered into by the Parent and certain holders of its common stock on the Closing Date.

"**Regulation D**" shall mean Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation S-X**" shall mean Regulation S-X promulgated under the Securities Act.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Reimbursement Obligations**" shall mean the Borrower's obligations under <u>Section 2.18(e)</u> to reimburse LC Disbursements.

"**Related Person**" shall have the meaning assigned to such term in <u>Section 2.20</u>.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Reorganization**" shall mean the reorganization of the Debtors described in the Plan of Reorganization.

"**Required Lenders**" shall mean, at any time, Lenders having Loans, LC Exposure and unused Revolving Commitments representing more than 50% of the sum of all Loans outstanding, LC Exposure and unused Revolving Commitments at such time.

"**Requirements of Law**" shall mean, collectively, any and all requirements of any Governmental Authority including any and all laws, ordinances, rules, regulations or similar statutes or case law.

"**Reserves**" shall mean reserves established against the Borrowing Base that the Administrative Agent may, in its reasonable credit judgment, establish from time to time. The Administrative Agent shall give the Borrower notice from time to time of any change in the Reserves.

"**Response**" shall mean (a) "response" as such term is defined in CERCLA, 42 U.S.C. § 9601(24), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to: (i) clean up, remove, treat, abate or in any other way address any Hazardous Material in the environment; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, clause (i) or (ii) above.

"**Responsible Officer**" shall mean, with respect to any corporation, any executive officer or Financial Officer of such corporation and any other officer or similar official thereof with responsibility for the administration of the obligations of such corporation in respect of this Agreement.

"**Restated Certificate of Incorporation**" shall mean [_____].

"**Revolving Availability Period**" shall mean the period from and including the Closing Date to but excluding the earlier of the Business Day preceding the Maturity Date and the date of termination of the Revolving Commitments.

"**Revolving Borrowing**" shall mean a Borrowing comprised of Revolving Loans.

"**Revolving Commitment**" shall mean, with respect to each Lender, the commitment of such Lender to make Revolving Loans hereunder up to the amount set forth on Schedule I to the Lender Addendum executed and delivered by such Lender, or in the Assignment and Acceptance

pursuant to which such Lender assumed its Revolving Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.07 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 10.04. The aggregate amount of the Lenders' Revolving Commitments on the Closing Date is $20,000,000.

"**Revolving Exposure**" shall mean, with respect to any Lender at any time, the aggregate principal amount at such time of all outstanding Revolving Loans of such Lender, *plus* the aggregate amount at such time of such Lender's LC Exposure, *plus* the aggregate amount at such time of such Lender's Swingline Exposure.

"**Revolving Lender**" shall mean a Lender with a Revolving Commitment.

"**Revolving Loan**" shall mean each Loan made by the Lenders to the Borrower pursuant to Section 2.01. Each Revolving Loan shall be either an ABR Loan or a Eurodollar Loan.

"**S&P**" shall have the meaning assigned to such term in the definition of "Cash Equivalents."

"**Sale and Leaseback Transaction**" shall have the meaning assigned to such term in Section 6.03.

"**Secured Parties**" shall mean, collectively, the Administrative Agent, the Collateral Agent, each other Agent, the Issuing Bank, and the Lenders.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Securities Collateral**" shall have the meaning assigned to such term in the Security Agreement.

"**Security Agreement**" shall mean a Security Agreement substantially in the form of Exhibit L among the Loan Parties and Collateral Agent for the benefit of the Secured Parties.

"**Security Agreement Collateral**" shall mean all Property pledged or granted as collateral pursuant to the Security Agreement delivered on the Closing Date or thereafter pursuant to Section 5.11.

"**Security Documents**" shall mean the Security Agreement, the Mortgages, the Perfection Certificate and each other security document or pledge agreement delivered in accordance with applicable local or foreign law to grant a valid, perfected security interest in any Property, and all UCC or other financing statements or instruments of perfection required by this Agreement, the Security Agreement, any Mortgage or any such other security document or pledge agreement to be filed with respect to the security interests in Property and fixtures created pursuant to the Security Agreement or any Mortgage and any other document or instrument utilized to pledge as collateral for the Obligations any Property of whatever kind or nature.

"**Standby Letter of Credit**" shall mean any standby letter of credit or similar instrument issued for the purpose of supporting (a) workers' compensation liabilities of the Borrower or any of its Subsidiaries, (b) the obligations of third-party insurers of the Borrower or any of its

31

Subsidiaries arising by virtue of the laws of any jurisdiction requiring third-party insurers to obtain such letters of credit, (c) performance, payment, deposit or surety obligations of the Borrower or any of its Subsidiaries if required by law or governmental rule or regulation or in accordance with custom and practice in the industry, (d) Indebtedness of the Borrower or any of its Subsidiaries permitted to be incurred under Section 6.01 or (e) any other purpose not prohibited hereunder.

"**Statutory Reserves**" shall mean, for any Interest Period for any Eurodollar Borrowing, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained during such Interest Period under Regulation D by member banks of the United States Federal Reserve System in New York City with deposits exceeding one billion dollars against "Eurodollar liabilities" (as such term is used in Regulation D). Eurodollar Borrowings shall be deemed to constitute Eurodollar liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to any Lender under Regulation D.

"**Subject Guarantor**" shall have the meaning assigned to such term in Section 7.09.

"**Subsidiary**" shall mean, with respect to any Person (the "**parent**") at any date, (a) any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date and (b) any other corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Board of Directors thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent. Unless the context requires otherwise, "**Subsidiary**" refers to a subsidiary of the Borrower. [For the avoidance of doubt, Atkins Nutritionals (UK) Limited and Snakti Pty Ltd. shall not be considered a Subsidiaries of the Borrower for so long as they are in administrative proceedings.]

"**Subsidiary Guarantor**" shall mean each Subsidiary listed on Schedule 1.01(b), and each other Subsidiary that is or becomes a party to this Agreement pursuant to Section 5.11.

"**Survey**" shall mean a survey of any Mortgaged Property (and all improvements thereon) which is (a) (i) prepared by a surveyor or engineer licensed to perform surveys in the state where such Mortgaged Property is located, (ii) dated (or redated) not earlier than six months prior to the date of delivery thereof unless there shall have occurred within six months prior to such date of delivery any exterior construction on the site of such Mortgaged Property, in which event such survey shall be dated (or redated) after the completion of such construction or if such construction shall not have been completed as of such date of delivery, not earlier than 20 days prior to such date of delivery, (iii) certified by the surveyor (in a manner reasonably acceptable to the Administrative Agent) to the Administrative Agent, the Collateral Agent and the Title Company, (iv) complying in all respects with the minimum detail requirements of the American Land Title Association as such requirements are in effect on the date of preparation of such survey and (v) sufficient for the Title Company to remove all standard survey exceptions from the title insurance policy (or commitment) relating to such Mortgaged Property or (b) otherwise acceptable to the Collateral Agent.

"**Swingline Commitment**" shall mean the commitment of the Swingline Lender to make loans pursuant to Section 2.17, as the same may be reduced from time to time pursuant to Section 2.07 or Section 2.17.  The Swingline Commitment is paid as part of, and not in addition to, the Revolving Commitment.

"**Swingline Exposure**" shall mean at any time the aggregate principal amount at such time of all outstanding Swingline Loans.  The Swingline Exposure of any Revolving Lender at any time shall equal its Pro Rata Percentage of the aggregate Swingline Exposure at such time.

"**Swingline Lender**" shall have the meaning assigned to such term in the preamble.

"**Swingline Loan**" shall mean any loan made by the Swingline Lender pursuant to Section 2.17.

"**Syndication Agent**" shall have the meaning assigned to such term in the preamble.

"**Tax Return**" shall mean all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Tax Sharing Agreements**" shall mean all tax sharing, tax allocation and other similar agreements entered into by Parent or any Subsidiary of Parent.

"**Taxes**" shall mean (a) any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges, whether computed on a separate, consolidated, unitary, combined or other basis and any and all liabilities (including interest, fines, penalties or additions to tax) with respect to the foregoing, and (b) any transferee, successor, joint and several, contractual or other liability (including, without limitation, liability pursuant to Treasury Regulation § 1.1502-6 (or any similar provision of state, local or non-U.S. law)) in respect of any item described in clause (a).

"**Termination Date**" shall mean the date on which all Obligations have been paid in full.

"**Term Note Debt**" shall mean Indebtedness of the Borrower evidenced by the Term Note Documents.

"**Term Note Documents**" shall mean and includes the Term Note Agreement and each of the other documents, instruments and other agreements evidencing, guaranteeing or securing Term Note Debt as in effect on the Closing Date and as the same may be entered into, amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms of Section 6.09.

"**Term Note Agent**" shall mean (a) UBS, as agent to the Term Noteholders under the Term Note Agreement, together with its successors and assigns, in such capacity, or (b) any other financial institution designated by the holders of the Term Note Debt (by providing written notice to the Lenders of such designation) as the "Term Note Agent" for purposes of this Agreement.

"**Term Noteholders**" shall mean the holders of the Term Note Debt.

"**Term Note Agreement**" shall mean the $110,000,000 Term Note Agreement entered into by the Loan Parties on the Closing Date with the Term Note Agent and the Term Noteholders party thereto.

["**Test Period**" shall mean, at any time, the four consecutive fiscal quarters of the Borrower then last ended (in each case taken as one accounting period) for which financial statements have been or are required to be delivered pursuant to Section 5.01(a) or (b).][6]

"**Title Company**" shall mean any title insurance company as shall be retained by the Borrower and reasonably acceptable to the Administrative Agent.

"**Transaction Documents**" shall mean any and all agreements and other material documents entered into or delivered in connection with the Transactions, including but not limited to the Loan Documents, the Term Note Documents and the Equity Documents.

"**Transactions**" shall mean, collectively, the transactions to occur pursuant to the Transaction Documents, the Plan of Reorganization and the Confirmation Order, including (a) the execution, delivery and performance of the Loan Documents and the initial Credit Extensions hereunder; (b) the execution, delivery and performance of the Term Note Documents; (c) the distributions required to be made pursuant to and other transactions contemplated by the Plan of Reorganization; and (d) payment of all fees and expenses to be paid on the Closing Date and owing in connection with the foregoing.

"**Type**" shall mean, when used in reference to any Loan or Borrowing, whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBOR Rate or the Alternate Base Rate.

"**UBS**" shall mean UBS AG, Stamford Branch.

"**UCC**" shall mean the Uniform Commercial Code as in effect in the applicable state or jurisdiction.

"**Voting Stock**" shall mean, with respect to any Person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect a majority of the Board of Directors of such Person.

"**Wholly Owned Subsidiary**" shall mean, as to any Person, (a) any corporation 100% of whose capital stock (other than directors' qualifying shares) is at the time owned by such Person and/or one or more Wholly Owned Subsidiaries of such Person and (b) any partnership, association, joint venture, limited liability company or other entity in which such Person and/or one or more Wholly Owned Subsidiaries of such Person have a 100% equity interest at such time.

---

[6] This definition will need further revision in order to be consistent with Company's 4/4/5 accounting.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

**Section 1.02.  Classification of Loans and Borrowings**.  For purposes of this Agreement, Loans may be classified and referred to by Class (*e.g.*, a "Revolving Loan") or by Type (*e.g.*, a "Eurodollar Loan") or by Class and Type (*e.g.*, a "Eurodollar Revolving Loan"). Borrowings also may be classified and referred to by Class (*e.g.*, a "Revolving Borrowing") or by Type (*e.g.*, a "Eurodollar Borrowing") or by Class and Type (*e.g.*, a "Eurodollar Revolving Borrowing").

**Section 1.03.  Terms Generally**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The term "manifest error" shall be deemed to include any clearly demonstrable error whether or not obvious on the face of document containing such error.  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (e) the words "asset" and "Property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**Section 1.04.  Accounting Terms; GAAP; Fiscal and Calendar Periods**.  Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP as in effect on the date hereof subject to the following sentence.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and the Borrower, the Administrative Agent or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to approval of the Required Lenders); provided, that until so amended, such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change.

## ARTICLE II

## THE CREDITS

**Section 2.01.  Commitments**.  Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to make Revolving Loans to the Borrower, at any time and from time to time after the Closing Date until the earlier of one Business Day prior to the Maturity Date and the termination of the Commitment of such Lender in accordance with the terms hereof, in an aggregate principal amount at any time outstanding that will not result in such Lender's Revolving Exposure exceeding the lesser of (a) such Lender's Revolving Commitment and (b) such Lender's Pro Rata Percentage multiplied by the Borrowing Base then in effect.  Within the limits set forth above and subject to the terms, conditions and limitations set forth herein, the Borrower may borrow, pay or prepay and reborrow Revolving Loans.

**Section 2.02.  Loans**.  (a)  Each Loan (other than Swingline Loans) shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; provided, that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).  Except for Swingline Loans and Loans deemed made pursuant to Section 2.18(e), Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $1,000,000 and not less than $2,000,000 or (ii) equal to the remaining available balance of the applicable Commitments.

(b)     Subject to Section 2.11 and Section 2.12, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request pursuant to Section 2.03.  Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided, that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.  Borrowings of more than one Type may be outstanding at the same time; provided, that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than three (3) Eurodollar Borrowings outstanding hereunder at any one time.  For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c)     Except with respect to Loans made pursuant to Section 2.18(e), each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 10:00 a.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account as directed by the Borrower in the applicable Borrowing Request maintained with the Administrative Agent or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

(d)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative

NYDOCS/1207090.12

Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) above, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.

(e)     Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03. **Borrowing Procedure**. To request a Revolving Borrowing, the Borrower shall deliver, by hand delivery or telecopy, a duly completed and executed Borrowing Request to the Administrative Agent (i) in the case of a Eurodollar Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the date of the proposed Borrowing or (ii) in the case of an ABR Borrowing, not later than 10:00 a.m., New York City time, one Business Day prior to the date of the proposed Borrowing. Each Borrowing Request shall be irrevocable and shall specify the following information in compliance with Section 2.02:

(a)     the aggregate amount of such Borrowing;

(b)     the date of such Borrowing, which shall be a Business Day;

(c)     whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(d)     in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(e)     the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.02; and

(f)     that the conditions set forth in Section 4.02(b) through (f) are satisfied as of the date of the notice.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of

one month's duration (subject to the proviso in clause (e) above). Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

**Section 2.04. Evidence of Debt; Repayment of Loans**. (a) the Borrower hereby unconditionally promises to pay (i) to the Administrative Agent for the account of each Revolving Lender, the then unpaid principal amount of each Revolving Loan of such Lender on the Maturity Date and (ii) to the Swingline Lender the then unpaid principal amount of each Swingline Loan on the earlier of (x) the Maturity Date and (y) the first date after such Swingline Loan is made that is the 15th or last day of a calendar month and is at least two Business Days after such Swingline Loan is made; provided, that on each date that a Revolving Borrowing is made, the Borrower shall repay all Swingline Loans that were outstanding on the date such Borrowing was requested.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Type and Class thereof and the Interest Period applicable thereto ; (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall, in the absence of manifest error, be *prima facie* evidence of the existence and amounts of the obligations therein recorded; provided, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.

(e)     Any Lender may request that Loans of any Class made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in the form of Exhibit J- 1 or J-2, as the case may be. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

**Section 2.05. Fees**.

(a)     Commitment Fee. The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee (a "**Commitment Fee**"), equal to 0.50% per annum on the average daily unused amount of each Commitment of such Lender during the

period from and including the date hereof but excluding the date on which such Commitment terminates.  Accrued Commitment Fees shall be payable in arrears (i) on the last day of each of March, June, September and December (or, if such last day is not a Business Day, the Business Day immediately preceding such last day), commencing on the first such date to occur after the date hereof and (ii) on the date on which the Revolving Commitments terminate.  All Commitment Fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  For purposes of computing Commitment Fees, a Revolving Commitment of a Lender shall be deemed to be used to the extent of the outstanding Revolving Loans and LC Exposure of such Lender (and the Swingline Exposure of such Lender shall be disregarded for such purpose).

(b)  <u>Administrative Agent Fees</u>. The Borrower agrees to pay to the Administrative Agent, for its own account, the administrative fees set forth in the Fee Letter or such other fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent (the "**Administrative Agent Fees**").

(c)  <u>LC and Fronting Fees</u>.  The Borrower agrees to pay (i) to the Administrative Agent for the account of each Revolving Lender a participation fee ("**LC Participation Fee**") with respect to its participations in Letters of Credit, which shall accrue at a rate equal to the Applicable LC Margin on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to Reimbursement Obligations) during the period from and including the Closing Date to but excluding the later of the date on which such Lender's Revolving Commitment terminates and the date on which such Lender ceases to have any LC Exposure, and (ii) to the Issuing Bank a fronting fee ("**Fronting Fee**"), which shall accrue at the rate of 0.25% per annum on the average daily amount of the LC Exposure (excluding any portion thereof attributable to Reimbursement Obligations) during the period from and including the Closing Date to but excluding the later of the date of termination of the Revolving Commitments and the date on which there ceases to be any LC Exposure, as well as the Issuing Bank's standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.  LC Participation Fees and Fronting Fees shall be payable in arrears (i) on the last day of each calendar month (or, if such last day is not a Business Day, the Business Day immediately preceding such last day), commencing on the first such date to occur after the date hereof, and (ii) on the date on which the Revolving Commitments terminate, and any such fees accruing after the date on which the Revolving Commitments terminate shall be payable on demand.  Any other fees payable to the Issuing Bank pursuant to this paragraph shall be payable within 10 days after demand.  All LC Participation Fees and Fronting Fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(d)  All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders, except that the Borrower shall pay the Fronting Fees directly to the Issuing Bank.  Once paid, none of the Fees shall be refundable under any circumstances.

**Section 2.06.  Interest on Loans**. (a)  Subject to the provisions of <u>Section 2.06(c)</u>, the Loans comprising each ABR Borrowing, including each Swingline Loan, shall bear interest at a

rate per annum equal to the Alternate Base Rate *plus* the Applicable Margin in effect from time to time.

(b)     Subject to the provisions of <u>Section 2.06(c)</u>, the Loans comprising each Eurodollar Borrowing shall bear interest at a rate per annum equal to the Adjusted LIBOR Rate for the Interest Period in effect for such Borrowing *plus* the Applicable Margin in effect from time to time.

(c)     Notwithstanding the foregoing, during a Default, all Obligations shall bear interest, after as well as before judgment, at a rate of 2.0% per annum in excess of the higher of (i) the Base Rate *plus* the relevant Applicable Margin and (ii) the rate (including the relevant Applicable Margin), if any, otherwise applicable to such Loan or other amount, and will be payable on demand.

(d)     Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Revolving Commitments; <u>provided</u>, that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBOR Rate shall be determined by the Administrative Agent in accordance with the provisions of this Agreement and such determination shall be conclusive absent manifest error.

**Section 2.07.  <u>Termination and Reduction of Commitments</u>**.  (a)  The Revolving Commitments, the Swingline Commitment and the LC Commitment shall automatically terminate on the Commitment Termination Date.

(b)     The Borrower may at any time terminate, or from time to time reduce, the Commitments of any Class; <u>provided</u>, that (i) each reduction of the Commitments of any Class shall be in an amount that is an integral multiple of $[1,000,000] and not less than $[2,000,000] and (ii) the Revolving Commitments shall not be terminated or reduced if, after giving effect to any concurrent prepayment of the Revolving Loans in accordance with <u>Section 2.10</u>, the sum of the Revolving Exposures would exceed the aggregate amount of Revolving Commitments.

(c)     The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments under paragraph (b) of this Section at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section shall be irrevocable.  Any termination or reduction of the Commitments of any Class

shall be permanent.  Each reduction of the Commitments of any Class shall be made ratably among the Lenders in accordance with their respective Commitments of such Class.

Section 2.08.  **Interest Elections**.  (a) Each Revolving Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.  Notwithstanding anything to the contrary, the Borrower shall not be entitled to request any conversion or continuation that, if made, would result in more than three (3) Eurodollar Borrowings outstanding hereunder at any one time.  This Section 2.08 shall not apply to Swingline Borrowings, which may not be converted or continued.

(b)     To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Revolving Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request substantially in the form of Exhibit E.

(c)     Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.03:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)     if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration (subject to the proviso in clause (iv) above).

41

(d)     Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If an Interest Election Request with respect to a Eurodollar Borrowing is not timely delivered prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, after the occurrence and during the continuance of such Event of Default, (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

**Section 2.09.  Temporary Reduction of Revolving Commitments.** The Revolving Commitments shall be deemed reduced by an amount equal to any Net Cash Proceeds required to be used to make prepayments under Section 2.10(c) and (f) that are not yet permanently applied to such prepayments.

**Section 2.10.  Optional and Mandatory Prepayments of Loans.**

(a)     Optional Prepayments.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, subject to the requirements of this Section; provided, that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $2,000,000, or if less than $2,000,000, the entire principal amount then outstanding.

(b)     Revolving Loan Prepayments.

(i)     In the event of the termination of all the Revolving Commitments, the Borrower shall, on the date of such termination, repay or prepay all its outstanding Revolving Borrowings and all outstanding Swingline Loans and provide Letter of Credit Cover for all outstanding Letters of Credit.

(ii)     In the event of any partial reduction of the Revolving Commitments, then (x) at or prior to the effective date of such reduction, the Administrative Agent shall notify the Borrower and the Revolving Lenders of the sum of the Revolving Exposures after giving effect thereto and (y) if the sum of the Revolving Exposures would exceed the aggregate amount of Revolving Commitments after giving effect to such reduction, then the Borrower shall, on the date of such reduction, first, repay or prepay Swingline Loans, second, repay or prepay Revolving Borrowings and third, provide Letter of Credit Cover for any outstanding Letters of Credit, in an amount sufficient to eliminate such excess.

(iii)     In the event that the sum of all Lenders' Revolving Exposures exceeds the Borrowing Base then in effect, the Borrower shall, without notice or demand, immediately first, repay or prepay Swingline Loans, second, repay or prepay Revolving

42

Borrowings, and <u>third</u>, provide Letter of Credit Cover for any outstanding Letters of Credit, in an amount sufficient to eliminate such excess.

(iv)     In the event that the sum of all Lenders' Revolving Exposures exceeds the Revolving Commitments then in effect, the Borrower shall, without notice or demand, immediately <u>first</u>, repay or prepay Swingline Loans, <u>second</u>, repay or prepay Revolving Borrowings and <u>third</u>, provide Letter of Credit Cover for any outstanding Letters of Credit, in an amount sufficient to eliminate such excess.

(v)     In the event that the aggregate LC Exposure exceeds the LC Commitment then in effect, the Borrower shall, without notice or demand, provide Letter of Credit Cover for any outstanding Letters of Credit, in an amount sufficient to eliminate such excess.

(c)     <u>Asset Sales</u>.  Not later than one Business Day following the receipt of any Net Cash Proceeds of any Asset Sale by any Loan Party, the Borrower shall apply 100% of the Net Cash Proceeds received with respect thereto to make prepayments in accordance with <u>Section 2.10(g)</u> and <u>(h)</u>; <u>provided</u>, that the Borrower shall not be required to make any prepayments from Assets Sales unless the Loan Parties shall have received Net Cash Proceeds in excess of $250,000 from and after the Closing Date.

(d)     <u>Debt Issuance</u>.  Upon any Debt Issuance of any Loan Party after the Closing Date, the Borrower shall make prepayments in accordance with <u>Section 2.10(g)</u> and <u>(h)</u> in an aggregate principal amount equal to 100% of the Net Cash Proceeds of such Debt Issuance.

(e)     <u>Equity Issuance</u>.  Upon any Equity Issuance of the Parent or any of its Subsidiaries after the Closing Date, the Borrower shall make prepayments in accordance with <u>Section 2.10(g)</u> and <u>(h)</u> in an aggregate principal amount equal to 100% (50% in the case of an Equity Issuance by the Parent which is not a Preferred Stock Issuance) of the Net Cash Proceeds of such Equity Issuance.

(f)     <u>Casualty Events</u>.  Not later than one Business Day following the receipt of any Net Cash Proceeds from a Casualty Event, the Borrower shall apply an amount equal to 100% of such Net Cash Proceeds to make prepayments in accordance with <u>Section 2.10(g)</u> and <u>(h)</u>;

(g)     <u>Application of Prepayments and Commitments</u>.

(i)     Prior to any optional or mandatory prepayment of Borrowings hereunder, the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to <u>Section 2.10(h)</u>.  All mandatory prepayments required to be made pursuant to this <u>Section 2.10(i)</u> shall be applied as follows: <u>first</u>, to Fees and reimbursable expenses of any of the Agents then due and payable pursuant to any of the Loan Documents; <u>second</u> to interest then due and payable on the Swingline Loans; <u>third</u>, to the principal balance of the Swingline Loans outstanding until the same has been repaid in full; <u>fourth</u>, to interest due and payable on the Revolving Loans; <u>fifth</u>, to the principal balance outstanding of Revolving Loans until the same has been paid in full, including accompanying accrued interest and charges

43

under Sections 2.12, 2.13 and 2.15 (the Borrower may elect which of any Eurodollar Borrowings is to be prepaid); sixth, to all other Obligations then due and payable pro rata in accordance with the amounts that such Lender certifies is then due and payable; and, last, returned to the Borrower or to such party as otherwise required by law.  Mandatory prepayments of the Revolving Loans applied pursuant to this Section 2.10(i) shall not cause a corresponding reduction in the Revolving Commitments of the Lenders.

(ii)     Amounts to be applied to the prepayment of Revolving Loans pursuant to this Section 2.10, shall be applied, as applicable, first to reduce outstanding ABR Loans. Any amounts remaining after each such application shall be applied to prepay Eurodollar Loans.  Notwithstanding the foregoing, if the amount of any prepayment of Loans required to be applied under this Section 2.10(i) shall be in excess of the amount of the ABR Loans at the time outstanding (an "**Excess Amount**"), only the portion of the amount of such prepayment as is equal to the amount of such outstanding ABR Loans shall be immediately prepaid and, at the election of the Borrower, the balance of such required prepayment shall be either (A) deposited in an account that shall, on terms and conditions satisfactory to the Administrative Agent, constitute part of the Collateral (the "**Breakage Account**") and applied to the prepayment of Eurodollar Loans on the last day of the then next expiring Interest Period for Eurodollar Loans (with all interest accruing thereon for the account of the Borrower) or (B) prepaid immediately, together with any amounts owing to the Lenders under Section 2.13; provided, that (i) interest in respect of such Excess Amount shall continue to accrue thereon at the rate provided hereunder for the Loans which such Excess Amount is intended to repay until such Excess Amount shall have been used in full to repay such Loans and (ii) at any time while a Default has occurred and is continuing, the Administrative Agent may, and upon written direction from the Required Lenders shall, apply any or all proceeds then on deposit in the Breakage Account to the payment of such Loans in an amount equal to such Excess Amount.

(h)     Notice of Prepayment.  The Borrower shall notify the Administrative Agent (and, in the case of prepayment of a Swingline Loan, the Swingline Lender) by telephone (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the date of prepayment, (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the date of prepayment or (iii) in the case of prepayment of a Swingline Loan, not later than 11:00 a.m., New York City time, on the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice (other than a notice relating solely to Swingline Loans), the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest as required by Section 2.06.

**Section 2.11.  Alternate Rate of Interest**.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBOR Rate for such Interest Period; or

(b)     the Administrative Agent is advised by the Required Lenders that the Adjusted LIBOR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist (which the Administrative Agent agrees to do promptly after it learns that such circumstances cease to exist), (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

**Section 2.12.  Increased Costs**.  (a)  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender(except any such reserve requirement reflected in the Adjusted LIBOR Rate) or the Issuing Bank; or

(ii)     impose on any Lender or the Issuing Bank or the London interbank market any other condition (*excluding, however*, for purposes of this clause (a) any such increased costs or reduction in amount resulting from (A) Indemnified Taxes or Other Taxes (as to which Section 2.15 shall govern), and (B) changes in the basis of taxation of overall net income or overall gross income by the United States or any foreign jurisdiction or any political subdivision of either thereof under the laws of which such Lender is organized or has its lending office) affecting this Agreement or Eurodollar Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or the Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

(b)     If any Lender or the Issuing Bank determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such

Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)      A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.12 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)      Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section 2.12 shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; provided, that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section 2.12 for any increased costs or reductions incurred more than 270 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor; further provided, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall not begin earlier than the date of effectiveness of the Change in Law.

Section 2.13.  **Breakage Payments**.  In the event of (a) the payment or prepayment, whether optional or mandatory, of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Revolving Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.16, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to be an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBOR Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market.  A

46

certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.13 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

**Section 2.14.  Payments Generally; Pro Rata Treatment:  Sharing of Setoffs**.  (a) The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 2.12, Section 2.13 or Section 2.15, or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at 677 Washington Boulevard, Stamford, Connecticut, except payments to be made directly to the Issuing Bank or Swingline Lender as expressly provided herein and except that payments pursuant to Section 2.12, Section 2.13, Section 2.15, and Section 10.03 shall be made directly to the Persons entitled thereto and payments pursuant to the other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in Dollars.

(b)     If and to the extent any payment owed to the Administrative Agent or any Lender is not made when due, each Loan Party hereby authorizes the Administrative Agent and such Lender to setoff and charge any amount so due against any deposit account maintained by such Loan Party with the Administrative Agent or such Lender or against other amounts due from the Administrative Agent or such Lender, in each case whether or not the deposit therein or such other amount is then due.

(c)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, Reimbursement Obligations, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal and Reimbursement Obligations then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and Reimbursement Obligations then due to such parties.

(d)     If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Revolving Loans or participations in LC Disbursements or Swingline Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Revolving Loans and participations in LC Disbursements and Swingline Loans and accrued interest thereon than the

47

proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Revolving Loans and participations in LC Disbursements and Swingline Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Revolving Loans and participations in LC Disbursements, and Swingline Loans; provided, that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(e)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(f)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.02(c), Section 2.14(e), Section 2.17(d), Section 2.18(d) or Section 2.18(e) or Section 10.03(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.15. **Taxes**. (a) Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made without set-off, counterclaim or other defense and free and clear of and without deduction or withholding for any and all Indemnified Taxes; provided, that if any Loan Party shall be required by law to deduct any Indemnified Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions or withholdings applicable to additional sums payable under this Section 2.15) the Administrative Agent, Lender

or Issuing Bank (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) such Loan Party shall make such deductions or withholdings and (iii) such Loan Party shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(b)     In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     Each Loan Party shall indemnify the Administrative Agent, each Lender and the Issuing Bank, within 10 Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent, such Lender or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of such Loan Party hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to such Loan Party by a Lender or the Issuing Bank, or by the Administrative Agent on its own behalf or on behalf of a Lender or the Issuing Bank, shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Loan Party to a Governmental Authority, and, in any event, within 45 days of any such payment being made, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), to the extent such Foreign Lender is legally entitled to do so, at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law and reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate. Each Foreign Lender either (1) (i) agrees to furnish either U.S.  Internal Revenue Service Form W-8ECI or U.S.  Internal Revenue Service Form W-8BEN (or successor form) on or before the date the Foreign Lender becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation) and (ii) agrees (for the benefit of the Borrower and the Administrative Agent), to the extent it may lawfully do so at such times, upon reasonable request by the Borrower or the Administrative Agent, to provide a new Form W-8ECI or Form W-8BEN (or successor form) upon the expiration or obsolescence of any previously delivered form to reconfirm any complete exemption from, or any entitlement to a reduction in, U.S.  federal withholding tax with respect to any interest payment hereunder or (2) in the case of any such Foreign Lender that is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (i) agrees to furnish either (a) a "Non-Bank Certificate" substantially in the form of <u>Exhibit H</u> and two accurate and complete

49

original signed copies of Internal Revenue Service Form W-8BEN (or successor form) on or before the date the Foreign Lender becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation) or (b) an Internal Revenue Service Form W-8ECI (or successor form), certifying (in each case) to such Foreign Lender's legal entitlement to an exemption or reduction from U.S. federal withholding tax with respect to all interest payments hereunder and (ii) agrees (for the benefit of the Borrower and the Administrative Agent) to the extent it may lawfully do so at such times, upon reasonable request by the Borrower or the Administrative Agent, to provide a new Form W-8BEN or W-8ECI (or successor form) upon the expiration or obsolescence of any previously delivered form to reconfirm any complete exemption from, or any entitlement to a reduction in, U.S. federal withholding tax with respect to any interest payment hereunder. Each Foreign Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Foreign Lender shall not be required to deliver any form pursuant to this paragraph that such Foreign Lender is not legally able to deliver.

(f)     If the Administrative Agent or a Lender (or an assignee) determines in its reasonable discretion that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which such Loan Party has paid additional amounts pursuant to this Section 2.15, it shall pay over such refund to such Loan Party (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.15 with respect to the Indemnified Taxes or the Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (or assignee) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that such Loan Party, upon the request of the Administrative Agent or such Lender (or assignee), agrees to repay within 10 days after receiving such request the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender (or assignee) in the event the Administrative Agent or such Lender (or assignee) is required to repay such refund to such Governmental Authority. Nothing contained in this Section 2.15(f) shall require the Administrative Agent or any Lender (or assignee) to make available its tax returns or any other information which it deems confidential to any Loan Party or any other Person. Notwithstanding anything to the contrary, in no event will any Lender be required to pay any amount to any Loan Party the payment of which would place such Lender in a less favorable net after-tax position than such Lender would have been in had the additional amounts giving rise to such refund of any Indemnified Taxes or Other Taxes never been paid in the first place.

### Section 2.16. **Mitigation Obligations; Replacement of Lenders**.

(a)     Mitigation of Obligations.  If any Lender requests compensation under Section 2.12, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the, reasonable judgment of such Lender, such designation or

assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or Section 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)       Replacement of Lenders.  If any Lender requests compensation under Section 2.12, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or if any Lender defaults in its obligation to fund Loans hereunder, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 10.04), all of its interests, rights and obligations under this Agreement to an assignee selected by the Borrower that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided, that (i) Borrower shall have received the prior written consent of the Administrative Agent (and, if a Revolving Commitment is being assigned, the Issuing Bank and Swingline Lender), which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements and Swingline Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.12 or payments required to be made pursuant to Section 2.15, such assignment will result in a material reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment and delegation cease to apply.

### Section 2.17.  Swingline Loans.

(a)       Swingline Commitment.  Subject to the terms and conditions set forth herein, the Swingline Lender agrees to make Swingline Loans to the Borrower from time to time during the Revolving Availability Period, in an aggregate principal amount at any time outstanding that will not result in the aggregate principal amount of outstanding Swingline Loans exceeding $[2,000,000]; provided, that after making a Swingline Loan, the sum of the aggregate Revolving Exposures shall not exceed  the lesser of (i) the aggregate Revolving Commitments and (ii) the Borrowing Base then in effect; further provided, that the Swingline Lender shall not be required to make a Swingline Loan to refinance an outstanding Swingline Loan.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow Swingline Loans.

(b)       Swingline Loans.  To request a Swingline Loan, the Borrower shall notify the Administrative Agent of such request by telephone (confirmed by telecopy), not later than 2:00 p.m., New York City time, on the day of a proposed Swingline Loan.  Each such notice shall be irrevocable and shall specify the requested date (which shall be a Business Day) and amount of the requested Swingline Loan.  The Administrative Agent will promptly advise the Swingline Lender of any such notice received from the Borrower.  The Swingline Lender shall

make each Swingline Loan available to the Borrower by means of a credit to the general deposit account of the Borrower with the Swingline Lender (or, in the case of a Swingline Loan made to finance the reimbursement of an LC Disbursement as provided in Section 2.18(e), by remittance to the Issuing Bank) by 3:00 p.m., New York City time, on the requested date of such Swingline Loan. The Borrower shall not request a Swingline Loan if at the time of and immediately after giving effect to such request a Default has occurred and is continuing. Swingline Loans shall be made in minimum amounts of $[500,000] and integral multiples of $[100,000] above such amount.

(c)     Prepayment. The Borrower shall have the right at any time and from time to time to repay any Swingline Loan, in whole or in part, upon giving written or telecopy notice (or telephone notice promptly confirmed by written, or telecopy notice) to the Swingline Lender and to the Administrative Agent before 12:00 (noon), New York City time on the date of repayment at the Swingline Lender's address for notices specified in the Swingline Lender's Administrative Questionnaire. All principal payments of Swingline Loans shall be accompanied by accrued interest on the principal amount being repaid to the date of payment.

(d)     Participations. The Swingline Lender may by written notice given to the Administrative Agent not later than 12:00 noon, New York City time, on any Business Day require the Revolving Lenders to acquire participations on such Business Day in all or a portion of the Swingline Loans outstanding. Such notice shall specify the aggregate amount of Swingline Loans in which Revolving Lenders will participate. Promptly upon receipt of such notice, the Administrative Agent will give notice thereof to each Revolving Lender, specifying in such notice such Lender's Pro Rata Percentage of such Swingline Loan or Loans. Each Revolving Lender hereby absolutely and unconditionally agrees, upon receipt of notice as provided above, to pay to the Administrative Agent, for the account of the Swingline Lender, such Lender's Pro Rata Percentage of such Swingline Loan or Loans. Each Revolving Lender acknowledges and agrees that its obligation to acquire participations in Swingline Loans pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever (provided, that such payment shall not cause such Lender's Revolving Exposure to exceed such Lender's Revolving Commitment). Each Revolving Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.02(c) with respect to Loans made by such Lender (and Section 2.02 shall apply, mutatis mutandis, to the payment obligations of the Revolving Lenders), and the Administrative Agent shall promptly pay to the Swingline Lender the amounts so received by it from the Revolving Lenders. The Administrative Agent shall notify the Borrower of any participations in any Swingline Loan acquired pursuant to this paragraph, and thereafter payments in respect of such Swingline Loan shall be made to the Administrative Agent and not to the Swingline Lender. Any amounts received by the Swingline Lender from the Borrower (or other party on behalf of the Borrower) in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Administrative Agent; any such amounts received by the Administrative Agent shall be promptly remitted by the Administrative Agent to the Revolving Lenders that shall have made their payments pursuant to this paragraph and to the Swingline Lender, as their interests may appear. The purchase of participations in a Swingline

Loan pursuant to this paragraph shall not relieve the Borrower of any default in the payment thereof.

**Section 2.18.  Letters of Credit.**

(a)     General.  Subject to the terms and conditions set forth herein, the Borrower may request the Issuing Bank, and the Issuing Bank agrees, to issue Letters of Credit for its own account [or, subject to the provisions of this clause (a), the account of a Foreign Subsidiary], in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time during the Revolving Availability Period (provided, that the Borrower shall be a co-applicant, and be jointly and severally liable, with respect to each Letter of Credit issued for the account of or in favor of a Foreign Subsidiary).  The Issuing Bank shall be under no obligation to issue, and the Borrower shall not request the issuance of, any Letter of Credit at any time if after giving effect to such issuance the LC Exposure shall exceed the LC Commitment or the aggregate Revolving Exposure would exceed the lesser of (i) the aggregate Revolving Commitments, or (ii) the Borrowing Base then in effect.  The Issuing Bank shall be under no obligation to issue, and the Borrower shall not request the issuance of, any Letter of Credit for the account of any Foreign Subsidiary if giving effect to such issuance the face amount of all Letters of Credit issued for the account of Foreign Subsidiaries plus any Investments made pursuant to clause 6.04(l) shall exceed $600,000.  In the event of any inconsistency between the terms and conditions of this Agreement and any other Loan Document and the terms and conditions of any, form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement or such Loan Document shall control.

(b)     Request for Issuance, Amendment, Renewal, Extension; Certain Conditions.  To request the issuance of a Letter of Credit or the amendment, renewal or extension of an outstanding Letter of Credit, the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) an LC Request to the Issuing Bank and the Administrative Agent not later than 11:00 a.m. on the third Business Day preceding the requested date of issuance, amendment, renewal or extension (or such later date and time as is acceptable to the Issuing Bank).

(i)     A request for an initial issuance of a Letter of Credit shall specify in form and detail satisfactory to the Issuing Bank:

(ii)     the proposed issuance date of the requested Letter of Credit (which shall be a Business Day);

(iii)     the amount thereof;

(iv)     the expiry date thereof (which shall not be later than the Letter of Credit Expiration Date);

(v)     the name and address of the beneficiary thereof;

(vi)     whether the Letter of Credit is to be issued for its own account or for the account of one if its Subsidiaries (provided, that the Borrower shall be a co-applicant, and

therefore jointly and severally liable, with respect to each Letter of Credit issued for the account of a Subsidiary);

       (vii)     the documents to be presented by such beneficiary in connection with any drawing thereunder;

       (viii)    the full text of any certificate to be presented by such beneficiary in connection with any drawing thereunder; and

       (ix)      such other matters as the Issuing Bank may require.

A request for an amendment, renewal or extension of any outstanding Letter of Credit shall specify in form and detail satisfactory to the Issuing Bank:

       (i)       the Letter of Credit to be amended, renewed or extended;

       (ii)      the proposed date of amendment, renewal or extension thereof (which shall be a Business Day);

       (iii)     the nature of the proposed amendment, renewal or extension; and

       (iv)      such other matters as the Issuing Bank may require.

If requested by the Issuing Bank, the Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit.  A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension, (i) the LC Exposure shall not exceed $[2,000,000] and (ii) the aggregate Revolving Exposure shall not exceed the lesser of (A) the aggregate Revolving Commitments and (B) the Borrowing Base then in effect.  Unless the Issuing Bank shall agree otherwise, no Letter of Credit shall be in an initial amount less than $[100,000], in the case of a Commercial Letter of Credit, or $100,000, in the case of a Standby Letter of Credit.

       (c)      <u>Expiration Date</u>.  Each Letter of Credit shall expire at or prior to the close of business on (i) in the case of a Standby Letter of Credit or the earlier of, (x) the date which is no later than one year after the date of the issuance of such Standby Letter of Credit (or in the case of any renewal or extension thereof, no later than one year after such renewal or extension) and (y) the Letter of Credit Expiration Date and (ii) in the case of a Commercial Letter of Credit, on the earlier of (x) the date that is no later than 180 days after the date of issuance of such Commercial Letter of Credit (or, in the case of any renewal or extension thereof, no later than 180 days after such renewal or extension) and (y) the Letter of Credit Expiration Date.  If any undrawn Letters of Credit shall for any reason be outstanding on the Commitment Termination Date, the Borrower shall either (A) provide cash collateral therefor in the manner described in clause (i) of this Section, or (B) cause all such Letters of Credit to be canceled and returned, or (C) deliver a stand-by letter (or letters) of credit in guaranty of such LC Exposure, which stand-by letter (or letters) of credit shall be of like tenor and duration (plus thirty (30) additional days) as, and in an amount equal to 105% of, the aggregate maximum amount then available to be

drawn under, the Letters of Credit to which such outstanding LC Exposure relates and shall be issued by a Person, and shall be subject to such terms and conditions, as those may be satisfactory to the Administrative Agent in its sole discretion.

(d)    Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby irrevocably grants to each Revolving Lender, and each Revolving Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Pro Rata Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration of and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Pro Rata Percentage of each LC Disbursement made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in paragraph (e) of this Section 2.18, or of any reimbursement payment required to be refunded to the Borrower for any reason.  Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)    Reimbursement.  If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Issuing Bank an amount equal to such LC Disbursement not later than 2:00 p.m., New York City time, on the date that such LC Disbursement is made, if the Borrower shall have received notice of such LC Disbursement prior to 11:00 a.m., New York City time, on such date, or, if such notice has not been received by the Borrower prior, to such time, on such date, then not later than 2:00 p.m., New York City time on (i) the Business Day that the Borrower receives such notice, if such notice is received prior to 11:00 am., New York City time, on the day of receipt, or (ii) the Business Day immediately following the day that the Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; provided, that the Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.03 that such payment be financed with an ABR Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing.

If the Borrower fails to make such payment when due, the Issuing Bank shall notify the Administrative Agent and the Administrative Agent shall notify each Revolving Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Pro Rata Percentage thereof.  Each Revolving Lender shall pay by wire transfer of immediately available funds to the Administrative Agent on such date (or, if such Revolving Lender shall have received such notice later than 12:00 noon on any day, not later than 11:00 a.m.  on the immediately following Business Day), an amount equal to such Revolving Lender's Pro Rata Percentage of the unreimbursed LC Disbursement in the same manner as provided in Section 2.02(c) with respect to Loans made by such Lender, and the Administrative Agent will promptly pay to the Issuing Bank the amounts so received by it from the Revolving Lenders.  The Administrative Agent will promptly pay to the Issuing Bank any amounts received by it

NYDOCS/1207090.12

from the Borrower pursuant to the above paragraph prior to the time that any Revolving Lender makes any payment pursuant to the preceding sentence; any such amounts received by the Administrative Agent thereafter will be promptly remitted by the Administrative Agent to the Revolving Lenders that shall have made such payments and to the Issuing Bank, as appropriate.

If any Revolving Lender shall not have made its Pro Rata Percentage of such LC Disbursement available to the Administrative Agent as provided above, each of such Revolving Lender and the Borrower severally agrees to pay interest on such amount, for each day from and including the date such amount is required to be paid in accordance with the foregoing to but excluding the date such amount is paid, to the Administrative Agent for the account of the Issuing Bank at (i) in the case of the Borrower, the rate per annum set forth in <u>Section 2.18(h)</u> and (ii) in the case of such Lender, at a rate determined by the Administrative Agent in accordance with banking industry rules or practices on interbank compensation.

(f)     <u>Obligations Absolute</u>.  The Reimbursement Obligation of the Borrower as provided in <u>Section 2.18(e)</u> shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein; (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that fails to comply with the terms of such Letter of Credit; (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the obligations of the Borrower hereunder; (v) the fact that a Default or Event of Default shall have occurred and be continuing; and (vi) any adverse change in the business, assets, Property, results of operations, prospects or condition, financial or otherwise, of the Borrower and its Subsidiaries.  None of the Agents, the Lenders, the Issuing Bank or any of their Affiliates, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; <u>provided</u>, that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such

documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)    Disbursement Procedures.  The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by telecopy) of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; provided, that any failure to give or delay in giving such notice shall not relieve the Borrower of its Reimbursement Obligation to the Issuing Bank and the Revolving Lenders with respect to any such LC Disbursement (other than with respect to the timing of such Reimbursement Obligation set forth in Section 2.18(e)).

(h)    Interim Interest.  If the Issuing Bank shall make any LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest payable on demand, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum as determined pursuant to Section 2.06(c).  Interest accrued pursuant to this paragraph shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any Revolving Lender pursuant to paragraph (e) of this Section 2.18 to reimburse the Issuing Bank shall be for the account of such Lender to the extent of such payment.

(i)    Cash Collateralization.  If any Event of Default shall occur and be continuing, or if otherwise required by this Agreement, on the Business Day that the Borrower receives notice from the Administrative Agent or the Required Lenders (or, if the maturity of the Loans has been accelerated, Revolving Lenders with LC Exposure representing greater than 50% of the aggregate LC Exposure) demanding the deposit of cash collateral pursuant to this paragraph, the Borrower shall deposit in an account, in the name of the Collateral Agent and for the benefit of the Lenders (the "**LC Account**"), an amount in cash equal to the LC Exposure as of such date plus any accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in clause (f) or (g) Article 8. Each such deposit shall be held by the Collateral Agent as collateral for the payment and performance of the obligations of the Borrower under this Agreement.  The Collateral Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account.  Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Collateral Agent and at the risk and expense of the Borrower, such deposits shall not bear interest.  Interest or profits, if any, on such investments shall accumulate in such account.  Moneys in such account shall be applied by the Collateral Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of Revolving Lenders with LC Exposure representing greater than two-thirds of the aggregate LC Exposure), be applied to

satisfy other Obligations of the Borrower under this Agreement. If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount plus any accrued interest or realized profits of such amounts (to the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived.

(j)     Resignation or Removal of the Issuing Bank. The Issuing Bank may resign as Issuing Bank hereunder at any time upon at least 30 days' prior notice to the Lenders, the Administrative Agent and the Borrower. The Issuing Bank may be replaced at any time by written agreement among the Borrower, each Agent, the replaced Issuing Bank and the successor Issuing Bank. The Administrative Agent shall notify the Lenders of any such replacement of the Issuing Bank or any such additional Issuing Bank. At the time any such resignation or replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.05(c). From and after the effective date of any such resignation or replacement or addition, as applicable, (i) the successor or additional Issuing Bank shall have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "**Issuing Bank**" shall be deemed to refer to such successor or such addition or to any previous Issuing Bank, or to such successor or such addition and all previous Issuing Banks, as the context shall require. After the resignation or replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such resignation or replacement, but shall not be required to issue additional Letters of Credit. If at any time there is more than one Issuing Bank hereunder, the Borrower may, in its discretion, select which Issuing Bank is to issue any particular Letter of Credit.

(k)     The Issuing Bank shall be under no obligation to issue any Letter of Credit if:

(i)     any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit, or any law applicable to the Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit, or request that the Issuing Bank refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the Issuing Bank with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the Issuing Bank is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which the Issuing Bank in good faith deems material to it; or

(ii)     the issuance of such Letter of Credit would violate one or more policies of the Issuing Bank.

(l)     The Issuing Bank shall be under no obligation to amend any Letter of Credit if (i) the Issuing Bank would have no obligation at such time to issue such Letter of Credit

in its amended form under the terms hereof, or (ii) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

**Section 2.19. <u>Determination of Borrowing Base</u>.**

(a)    <u>Eligible Accounts</u>.  On any date of determination of the Borrowing Base, all of the Accounts owned by the Borrower and reflected in the most recent Borrowing Base Certificate delivered by the Borrower to the Administrative Agent shall be "**Eligible Accounts**" for purposes of this Agreement, except any Account to which any of the exclusionary criteria set forth below applies.  The Administrative Agent shall have the right to establish, modify or eliminate Reserves against Eligible Accounts from time to time in its reasonable credit judgment. In addition, the Administrative Agent reserves the right, at any time and from time to time after the date hereof, to adjust any of the criteria set forth below, to establish new criteria, and to adjust advance rates with respect to Eligible Accounts, in its reasonable credit judgment, subject to the approval of the Required Lenders in the case of adjustments or new criteria or changes in advance rates or the elimination of Reserves which have the effect of making more credit available.  The Administrative Agent shall consult with the Borrower in connection with the establishment, modification or elimination of such Reserves, the adjustment of such criteria and the establishment of new criteria, but neither such consultation nor any failure to so consult, based on then facts and circumstances that in the Administrative Agent's reasonable credit judgment make such consultation not practicable, shall provide the Borrower with any right to challenge, delay or otherwise interfere with the Administrative Agent's reasonable credit decision to establish, modify or eliminate any Reserve against Eligible Accounts, to adjust the criteria with respect to Eligible Accounts or to establish new criteria with respect to Eligible Accounts.  Eligible Accounts shall not include:

(i)    any Account upon which the Collateral Agent, on behalf of the Secured Parties, does not have a first priority and perfected Lien;

(ii)    any Account that is not owned by the Borrower;

(iii)    any Account due from an Account Debtor that is not domiciled in the United States and organized under the laws of the United States or any political subdivision thereof;

(iv)    any Account that is payable in any currency other than Dollars;

(v)    any Account that does not arise from the sale of goods or the performance of services by the Borrower in the ordinary course of its business;

(vi)    any Account that does not comply with all applicable legal requirements, including, without limitation, all laws, rules, regulations and orders of any Governmental Authority;

(vii)    any Account (a) upon which the Borrower's right to receive payment either is not absolute or is contingent upon the fulfillment of any condition whatsoever unless such condition is satisfied or (b) as to which the Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial or

administrative process or (c) that represents a progress billing consisting of an invoice for goods sold or used or services rendered pursuant to a contract under which the Account Debtor's obligation to pay that invoice is subject to the Borrower's completion of further performance under such contract or is subject to the equitable lien of a surety bond issuer;

(viii)   any Account (a) to the extent that any defense, counterclaim, setoff or dispute is asserted as to such Account, it being understood that the remaining balance of the Account shall be eligible or (b) represented by an invoice for which an Account Debtor has an authorized deduction and only partially paid, or (c) represented by an invoice which are "rebills" (representing the rebilled portion of a disputed invoice);

(ix)   any Account (a) that is not a true and correct statement of bona fide indebtedness incurred in the amount of the Account for merchandise sold to or services rendered and accepted by the applicable Account Debtor, or (b) represented by a sale of product which has not yet been delivered to the customer or is subject to a month-end cutoff adjustment to correct revenue;

(x)   any Account with respect to which an invoice or other electronic transmission constituting a request for payment, reasonably acceptable to the Administrative Agent in form and substance, has not been sent on a timely basis to the applicable Account Debtor according to the normal invoicing and timing procedures of the Borrower;

(xi)   any Account that arises from a sale to any director, officer, other employee or Affiliate of the Borrower, or to any entity that has any common officer or director with the Borrower, other than public companies that do not Control, are not Controlled by, or under common Control with, the Borrower;

(xii)   any Account to the extent (a) the Borrower or any Subsidiary is liable for goods sold or services rendered by the applicable Account Debtor to the Borrower or any Subsidiary but only to the extent of the potential offset, or (b) the Borrower has a payment obligation to an Account Debtor which has aged for more than 60 days past its due date;

(xiii)   any Account that arises with respect to goods that are delivered on a bill-and-hold, cash-on-delivery basis or placed on consignment, guaranteed sale or other terms by reason of which the payment by the Account Debtor is or may be conditional;

(xiv)   any Account that is in default as determined by the Administrative Agent in its reasonable credit judgment; provided, that without limiting the generality of the foregoing, an Account shall be deemed in default upon the occurrence of any of the following:

(a)   any Account is not paid within 60 days following its due date (and for purposes of this clause (a), "due date" shall mean any date which is within 30 days of such Account's invoice date); or

(b)     the Account Debtor obligated upon such Account suspends business, makes a general assignment for the benefit of creditors or fails to pay its debts generally as they come due; or

(c)     a petition is filed by or against any Account Debtor obligated upon such Account under any bankruptcy law or any other federal, state or foreign (including any provincial) receivership, insolvency relief or other law or laws for the relief of debtors;

(xv)     any Account that is the obligation of an Account Debtor (other than an individual) if 50% or more of the dollar amount of all Accounts owing by that Account Debtor are ineligible under the other criteria set forth hereunder;

(xvi)     any Account as to which any of the representations or warranties in the Loan Documents are untrue;

(xvii)   to the extent such Account is evidenced by a judgment, Instrument or Chattel Paper;

(xviii)  to the extent such Account exceeds any credit limit established by the Administrative Agent, in its reasonable credit judgment, following prior notice of such limit by the Administrative Agent to the Borrower;

(xix)     any Account (a) on which the Account Debtor is a Governmental Authority, unless, if the Account Debtor is the United States of America, any State or political subdivision thereof or any department, agency or instrumentality of the United States of America or any State or political subdivision thereof, the Borrower has assigned its rights to payment of such Account to the Administrative Agent pursuant to the Assignment of Claims Act of 1940, as amended, in the case of any such federal Governmental Authority, and pursuant to any requirements of applicable law, if any, in the case of any such other Governmental Authority, or (b) if the Account Debtor is any other Governmental Authority, the Borrower has, if required by any applicable law, assigned its rights to payment of such Account to the Collateral Agent pursuant to applicable law, if any, and, in each such case where such acceptance and acknowledgment is required by applicable law, such assignment has been accepted and acknowledged by the appropriate government officers to the extent so required.

(b)     Eligible Inventory.  On any date of determination of the Borrowing Base, all of the Inventory owned by the Borrower and reflected in the most recent Borrowing Base Certificate delivered by the Borrower to the Administrative Agent shall be "**Eligible Inventory**" for purposes of this Agreement, except any Inventory to which any of the exclusionary criteria set forth below applies.  The Administrative Agent shall have the right to establish, modify or eliminate Reserves against Eligible Inventory from time to time in its reasonable credit judgment.  In addition, the Administrative Agent reserves the right, at any time and from time to time after the Closing Date, to adjust the criteria set forth below to establish new criteria and to adjust advance rates with respect to Eligible Inventory, in its reasonable credit judgment, subject to the approval of the Required Lenders in the case of adjustments or new criteria or changes in

advance rates or the elimination of Reserves which have the effect of making more credit available. The Administrative Agent shall consult with the Borrower in connection with the establishment, modification or elimination of such Reserves, the adjustment of such criteria and the establishment of new criteria, but neither such consultation nor any failure to so consult, based on then facts and circumstances that in the Administrative Agent's reasonable credit judgment make such consultation not practicable, shall provide the Borrower with any right to challenge, delay or otherwise interfere with the Administrative Agent's reasonable credit decision to establish, modify or eliminate any Reserve against Eligible Inventory, to adjust the criteria with respect to Eligible Inventory or to establish new criteria with respect to Eligible Inventory. Eligible Inventory shall not include:

(i)    any Inventory (a) upon which the Collateral Agent, on behalf of the Secured Parties, does not have a first priority and perfected Lien, or (b) which is subject (or may become subject ) to a landlord, warehouseman's, or similar Lien or other statutory Lien which is, or may become, *pari passu* or senior to the Lien granted to the Collateral Agent on behalf of the Secured Parties;

(ii)    any Inventory placed on consignment, unless a valid consignment agreement which is reasonably satisfactory to the Administrative Agent is in place with respect to such Inventory.

(iii)    any Inventory in transit;

(iv)    any Inventory covered by a negotiable document of title, unless such document has been delivered to the Administrative Agent with all necessary endorsements, free and clear of all Liens except those in favor of the Administrative Agent and the Lenders and landlords, carriers, bailees and warehousemen if clause (ii) above has been complied with;

(v)    any Inventory to be returned to suppliers;

(vi)    any Inventory which is obsolete, unsalable, shopworn, seconds, damaged, unfit for sale, slow-moving, discontinued;

(vii)    any Inventory which consists of empty display items, packing, packaging or shipping materials, manufacturing supplies, work-in-process Inventory, replacement Inventory, or Inventory to be donated;

(viii)    any Inventory which is not of a type held for sale in the ordinary course of business of the Borrower;

(ix)    any Inventory which breaches any of the representations or warranties pertaining to Inventory set forth in the Loan Documents;

(x)    any Inventory which consists of Hazardous Material or goods that can be transported or sold only with licenses that are not readily available;

(xi)    any Inventory which is not covered by casualty insurance maintained as required by Section 5.04; or

(xii)    any Inventory which is subject to any licensing arrangement the effect of which would be to limit the ability of the Administrative Agent, or any Person selling the Inventory on behalf of the Administrative Agent, to sell such Inventory in enforcement of the Administrative Agent's Liens, without further consent or payment to the licensor or other Person, unless such consent has been obtained.

**Section 2.20.  Release.**  Each Loan Party, on behalf of its successors, assigns, estates, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them (collectively, the "**Releasing Parties**"), hereby fully, finally and forever releases and discharges all Secured Parties and all Secured Parties' past and present officers, directors, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "**Released Parties**") of and from any and all past, and present actions, causes of action, chooses in action, demands, suits, claims, liabilities, costs, damages, debts, deficiencies, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, any arising under the Bankruptcy Code, including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to the Transactions or the Transaction Documents, provided that nothing herein shall be deemed to be a release of any Secured Party from its obligations under the Loan Documents, provided further that nothing contained herein shall be deemed to limit or modify the rights granted to third parties under the Confirmation Order.[7]

**Section 2.21.  Cash Management System.**[8]  On or prior to the Closing Date, the Borrower and the other Loan Parties will establish and will maintain, until the Termination Date, the cash management system described below (the "**Cash Management System**").

(a)    Blocked Accounts.  Each Loan Party represents and warrants on the date hereof and on the date of each Credit Extension that each deposit, securities, and other account maintained by any Loan Party with any bank or other financial institution is set forth on Schedule 2.21, and that each such account is a Blocked Account.  No Loan Party shall establish or maintain any account with any bank or other financial institution except for accounts that are Blocked Accounts.  The Blocked Accounts shall be cash collateral accounts, with all cash,

---

[7] Subject to the prior approval as to the terms and provisions of the Confirmation Order by the Administrative Agent.

[8] Cash Management is subject to further discussion.

checks and other similar items of payment in such accounts securing payment of the Obligations in the manner set forth herein, and in which each Loan Party shall have granted a Lien to the Collateral Agent, on behalf of the Secured Parties, pursuant to the applicable Security Documents.  Notwithstanding the foregoing, a Loan Party may, with the consent of the Administrative Agent, establish and maintain a fiduciary account for a Person other than a Loan Party which is not a Blocked Account.  On each Business Day, all amounts on deposit in each of the Blocked Accounts shall be transferred to the Borrower's existing main operating account at the Depository Bank (the "**Depository Bank Concentration Account**") provided, however, that the Borrower may maintain amounts on deposit in Blocked Accounts other than the Depository Bank Concentration Account, so long as the aggregate amount of all such deposits outside the Depository Bank Concentration Account does not exceed $[300,000] at any time.  Subject to Section 2.21(d), amounts deposited in the Depository Bank Concentration Account may only be used to fund disbursements into the Borrower's payroll account(s), investment account(s) and other disbursement account(s).

(b)     Deposits to Blocked Accounts.  Each Loan Party shall deposit or cause to be deposited, no later than the first Business Day after the date of receipt thereof, all cash, checks, drafts or other similar items of payment into one or more Blocked Accounts.  Each Loan Party shall and shall cause its Affiliates, officers, employees, agents, directors or other Persons acting for or in concert with such Loan Party (each a "**Related Person**") to (i) hold in trust for the Collateral Agent, for the benefit of itself and the Secured Parties, all checks, cash and other items of payment relating to or constituting payments made in respect of any and all Collateral intended for any Loan Party received by such Related Person, and (ii) promptly after receipt by such Related Person of any such checks, cash or other items of payment, deposit the same into a Blocked Account.  Each Loan Party on behalf of itself and each Related Person thereof acknowledges and agrees that all such cash, checks or other items of payment constituting proceeds of Collateral are part of the Collateral.  All proceeds of the sale or other disposition of any Collateral shall be deposited directly into the applicable Blocked Accounts.

(c)     Collateral Agent Concentration Account.  On or before the Closing Date, the Borrower shall establish a concentration account (the "**Collateral Agent Concentration Account**") with the Collateral Agent.

(d)     Daily Sweep.  The Loan Parties hereby acknowledge and agree that the Collateral Agent may, in its sole and absolute discretion, instruct the Depository Bank (or any other bank or other financial institution with which the Borrower maintains Blocked Accounts) to transfer on each Business Day, any or all amounts on deposit in each of the Blocked Accounts to the Collateral Agent Concentration Account in accordance with the terms of the relevant Account Control Agreement (the "**Daily Sweep**"), to be applied in accordance with clauses (e), (f), or (g) below, as applicable, with the balance (after such application) returned to such Blocked Accounts as the Borrower may instruct prior to the end of such Business Day.  Notwithstanding the foregoing, the Borrower may, in accordance with the provisions in the relevant Account Control Agreements, provide for designated amounts in Blocked Accounts to not be subject to the Daily Sweep, provided, that the aggregate of all such designated amounts shall not exceed $[300,000] at any time.

64

(e)    Application if No Event of Default.  If an Event of Default shall not have occurred or be continuing, on any Business Day the Collateral Agent shall, after a Daily Sweep, apply funds in the Collateral Agent Concentration Account first, to interest then due and payable on the Swingline Loans; second, to the principal balance of the Swingline Loans outstanding until the same has been repaid in full; third, to interest due and payable on the Revolving Loans; fourth, to the principal balance outstanding of Revolving Loans until the same has been paid in full, including accompanying accrued interest and charges under Sections 2.12, 2.13 and 2.15 (the Borrower may elect which of any Eurodollar Borrowings is to be prepaid); fifth, to all other Obligations then due and payable pro rata in accordance with the amounts that such Lender certifies is then due and payable; and, last, returned to such Blocked Accounts as the Borrower may instruct.  All amounts applied pursuant to this clause (e) shall be applied in accordance with the provisions set forth in Section 2.10(h)(ii).

(f)    Application During an Event of Default and Prior to an Enforcement Action.  If an Event of Default shall have occurred and be continuing, but prior to the occurrence of any Enforcement Action, on each Business Day the Collateral Agent shall, after a Daily Sweep, apply funds in the Collateral Agent Concentration Account first, to Fees and reimbursable expenses of any of the Agents then due and payable pursuant to any of the Loan Documents; second to interest then due and payable on the Swingline Loans; third, to the principal balance of the Swingline Loans outstanding until the same has been repaid in full; fourth, to interest due and payable on the Revolving Loans; fifth, to the principal balance outstanding of Revolving Loans until the same has been paid in full, including accompanying accrued interest and charges under Sections 2.12, 2.13 and 2.15 (the Borrower may elect which of any Eurodollar Borrowings is to be prepaid); sixth, to provide cash collateral for Letters of Credit in accordance with the provisions of Section 2.18(i); seventh, to all other Obligations then due and payable pro rata in accordance with the amounts that such Lender certifies is then due and payable; and, last, returned to such Blocked Accounts as the Borrower may instruct.  All amounts applied pursuant to this clause (f) shall be applied in accordance with the provisions set forth in Section 2.10(h)(ii).

(g)    Application After an Enforcement Action.  If an Enforcement Action has occurred and is continuing, on each Business Day the Collateral Agent shall, after a Daily Sweep, apply funds in the Collateral Agent Concentration Account in accordance with Section 10.14.

(h)    Addition of Blocked Accounts.  So long as no Default or Event of Default shall have occurred and be continuing, the Borrower may amend Schedule 2.20 to add a Blocked Account; provided, that (i) the Administrative Agent and the Collateral Agent shall have consented in writing in advance to such addition, and (ii) such account shall be subject to an Account Control Agreement in form and substance satisfactory to the Administrative Agent and Collateral Agent.

(i)    Atkins Canada.  Notwithstanding any provision in this Agreement to the contrary, Atkins Canada shall not establish or maintain any deposit, securities, or other account with any bank, financial institution, or any other Person.

65

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES**

Each Loan Party represents and warrants to the Administrative Agent, the Collateral Agent, the Issuing Bank and each of the Lenders that:

**Section 3.01.  Organization; Powers**.  Each Company (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and to own and lease its Property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**Section 3.02.  Authorization; Enforceability**.  The Transactions to be entered into by each Loan Party are within such Loan Party's powers and, have been duly authorized by all necessary action on its part.  This Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**Section 3.03.  Governmental Approvals; No Conflicts**.  Except as set forth on Schedule 3.03, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority other than the entry of the Confirmation Order and, except (i) such as have been obtained or made and are in full force and effect, (ii) filings necessary to perfect Liens created by the Loan Documents and (iii) consents, approvals, registrations, filings or actions the failure of which to obtain or perform could not reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Company or any order of any Governmental Authority, (c) will not violate, result in a default or require any consent or approval under any applicable law or regulation, indenture, agreement or other instrument binding upon any Company or its assets, or give rise to a right thereunder to require any payment to be made by any Company, except for violations, defaults or the creation of such rights that could not reasonably be expected to result in a Material Adverse Effect, and (d) will not result in the creation or imposition of any Lien on any Property of any Company, except Liens created by the Loan Documents and Permitted Liens.

**Section 3.04.  Financial Statements**.  The Borrower has heretofore furnished to the Lenders (a) the consolidated balance sheet and related statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries as of and for the Fiscal Years ended December 31, 2001, 2002 and 2003, audited by and accompanied by the opinion of Deloitte & Touche LLP, independent public accountants, (b) the unaudited consolidated balance sheet and related statements of income and cash flows of the Borrower and its Subsidiaries as of and for the Fiscal Year ended December 31, 2004, and (c) the unaudited consolidated balance sheet of

66

the Borrower and its Subsidiaries as of the end of [_____], 2005 and the related consolidated statements of income and cash flows of the Borrower and its Subsidiaries for such month and for the then elapsed portion of the Fiscal Year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous Fiscal Year. Such financial statements have been prepared in accordance with GAAP consistently applied and present fairly and accurately in all material respects the financial condition and results of operations and cash flows of the Borrower as of such dates and for such periods. Except as set forth in such financial statements, there are no liabilities of any Company of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which could reasonably be expected to result in a Material Adverse Effect, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in such a liability, other than liabilities under the Loan Documents. The Projections (read together with any qualifications set forth in the Disclosure Statement) were prepared in good faith and the Borrower utilized reasonable assumptions and due course in the preparation thereof.

Section 3.05. **No Claims**. Each Company owns or has rights to use all of the Collateral and all rights with respect to any of the foregoing used in, necessary for or material to each Company's business as currently conducted. To the knowledge of each Company, the use by each Company of such Collateral and all such rights with respect to the foregoing do not infringe on the rights of any Person other than such infringement which would not, individually or in the aggregate, result in a Material Adverse Effect. Except as set forth on Schedule 3.05, no claim has been made and remains outstanding that any Company's use of any Collateral does or may violate the rights of any third Person that would individually, or in the aggregate, have a Material Adverse Effect.

Section 3.06. **Properties**. (a) Each Company has good title to, or valid leasehold interests in, all its Property material to its business, free and clear of all Liens except for (x) Permitted Liens and (y) minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere in any material respect with its ability to conduct its business as currently conducted or to utilize such Property for its intended purpose. The Property of the Companies, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) (except to the extent that the failure to be in such condition could not reasonably be expected to result in a Material Adverse Effect) and (ii) constitutes all the Property which is required for the business and operations of the Companies as presently conducted.

(b) Schedule 3.06(b) contains a true and complete list of each interest in Real Property owned by any Company as of the date hereof and describes the type of interest therein held by such Company. Schedule 3.06(b) contains a true and complete list of each Real Property leased, subleased or otherwise occupied or utilized by any Company, as lessee, sublessee, franchisee or licensee, as of the date hereof and describes the type of interest therein held by such Company and whether such lease, sublease or other instrument requires the consent of the landlord thereunder or other parties thereto to the Transactions.

(c) (i) No Company has received any notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Casualty Event affecting all or any portion of the Property except those that, in the aggregate, would not have a Material Adverse Effect and (ii) no Mortgage encumbers improved Real Property that is located in an area that has been

identified by the Secretary of Housing and Urban Development as an area having special flood hazards and with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968.

### Section 3.07.  **Intellectual Property**.

(a)     Ownership/No Claims.  Each Company owns, or is licensed to use, all patents, patent applications, trademarks, trade names, servicemarks, copyrights, technology, trade secrets, proprietary information, domain names, know-how and processes necessary for the conduct of its business as currently conducted (the "**Intellectual Property**"), except for the Intellectual Property, which the failure to own or license, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  Except as set forth in Schedule 3.07(a) annexed hereto, no claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does any Company know of any valid basis for any such claim.  To the knowledge of each Company, the use of such Intellectual Property by each Company does not infringe the rights of any Person, except for such claims and infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     Registrations.  Except pursuant to licenses and other user agreements entered into by each Company in the ordinary course of business that are listed in Schedules 15(a) and 15(b) annexed to the Perfection Certificate, on and as of the date hereof (i) each Company owns and possesses the right to use, and has done nothing to authorize or enable any other person to use, any Copyright, Patent or Trademark (as such terms are defined in the Security Agreement) listed in Schedules 13(a) and 13(b) annexed to the Perfection Certificate and (ii) all registrations listed in Schedules 13(a) and 13(b) annexed to the Perfection Certificate are valid and in full force and effect.

(c)     No Violations or Proceedings.  Except as set forth on Schedule 3.07(c), to each Company's knowledge, on and as of the date hereof, (i) there is no material violation by others of any right of such Company with respect to any Intellectual Property, (ii) such Company is not infringing upon any Intellectual Property of any other Person other than such infringement that, individually or in the aggregate, would not (or would not reasonably be expected to) result in a Material Adverse Effect, and (iii) no proceedings have been instituted or are pending against such Company or threatened, and no claim against such Company has been received by such Company, alleging any such violation.

### Section 3.08.  **Condition and Maintenance of Equipment**.  The Equipment of each Company is in good repair, working order and condition, reasonable wear and tear excepted. Each Company shall cause the Equipment to be maintained and preserved in good repair, working order and condition, reasonable wear and tear excepted, and shall as quickly as commercially practicable make or cause to be made all repairs, replacements and other improvements which are necessary or appropriate in the conduct of each Company's business.

### Section 3.09.  **Equity Interests and Subsidiaries**.  (a)  Schedule 3.09(a) sets forth a list of (i) each Company and its jurisdiction of organization and (ii) the number of shares of each

class of its Equity Interests authorized, and the number outstanding, and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights on the Closing Date. All Equity Interests of each Company are duly and validly issued and are fully paid and non-assessable and are owned by the Borrower, directly or indirectly through its Subsidiaries and as described on <u>Schedule 3.09(a)</u> and all Equity Interests of the Borrower are owned directly by the Parent. Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under the Security Agreement, free of any and all Liens, rights or claims of other Persons, except the security interest created by the Security Agreement, and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or Property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)    No consent of any Person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or desirable in connection with the creation, perfection or first priority status of the security interest of the Collateral Agent in any Equity Interests pledged to the Collateral Agent for the benefit of the Secured Parties under the Security Agreement or the exercise by the Collateral Agent of the voting or other rights provided for in the Security Agreement or the exercise of remedies in respect thereof.

(c)    An accurate organization chart, showing the ownership structure of the Parent, the Borrower and each Subsidiary on the Closing Date, and after giving effect to the Transactions, is set forth on <u>Schedule 3.09(c)</u>.

**Section 3.10.    <u>Litigation; Compliance with Laws</u>.**  (a)  Except as set forth on <u>Schedule 3.10</u>, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Company, threatened against or affecting any Company or any business, Property or rights of any such Person (i) that involve any Loan Document or the Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    Except for matters covered by <u>Section 3.19</u>, no Company or any of its Property is in violation of, nor will the continued operation of its Property as currently conducted violate, any Requirements of Law (including any zoning or with respect to any owned Real Property, any building ordinance, code or approval or any building permits) or, with respect to any owned Real Property, any restrictions of record or agreements affecting the Real Property or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default could reasonably be expected to result in a Material Adverse Effect.

**Section 3.11.    <u>Agreements</u>.**  (a)  No Company is a party to any agreement or instrument or subject to any corporate or other constitutional restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(b)     No Company is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its Property are or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect.

(c)     Schedule 3.11(c) accurately and completely lists all material agreements (other than leases of Real Property set forth on Schedule 3.06(b)) to which any Company is a party which are in effect on the date hereof in connection with the operation of the business conducted thereby and the Borrower has delivered to the Administrative Agent complete and correct copies of all such material agreements, including any amendments, supplements or modifications with respect thereto.

**Section 3.12.  Federal Reserve Regulations**.  (a)  No Company is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)     No part of the proceeds of any Loan or any Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X.  The pledge of the Securities Collateral pursuant to the Security Agreement does not violate such regulations.

**Section 3.13.  Investment Company Act; Public Utility Holding Company Act**.  No Company is (a) an "investment company" or a company "controlled" by a Person required to register as an "investment company,"  as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended, or (b) a "holding company,"  an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company,"  as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935, as amended.

**Section 3.14.  Use of Proceeds**.  The Borrower will use the proceeds of the Revolving Loans to (i) make cash payments on Allowed Claims and certain costs and expenses related to the consummation of the Plan of Reorganization, each as provided for in the Plan of Reorganization, (ii) refinance outstanding loans that were issued under the DIP Credit Agreement, pursuant to the Plan of Reorganization (iii) to pay fees and expenses incurred in connection with the Loan Documents, and (iv) fund working capital requirements and capital expenditures and for general corporate purposes.  The Borrower may use the proceeds for Investments in and advances to Foreign Subsidiaries in accordance with the provisions hereof.

**Section 3.15.  Taxes**.  Except as set forth in Schedule 3.15[9], each Company has (a) timely filed or caused to be timely filed all federal Tax Returns and all material, state, local and foreign Tax Returns or materials required to have been filed by it and all such Tax Returns are true and correct in all material respects and (b) duly and timely paid or caused to be duly and timely paid all Taxes (whether or not shown on any Tax Return) due and payable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate

---

[9] Schedule is subject to the satisfaction of the Administrative Agent.

proceedings and for which such Company shall have set aside on its books adequate reserves in accordance with GAAP or (ii) which could not, individually or in the aggregate, have a Material Adverse Effect; provided, that any such contest of Taxes with respect to Collateral shall also satisfy the Contested Collateral Lien Conditions. Each Company has made adequate provision in accordance with GAAP for all Taxes not yet due and payable. Each Company is unaware of any proposed or pending tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.

Section 3.16. **No Material Misstatements**. No information, report, financial statement, exhibit or schedule furnished by or on behalf of any Company to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto when taken as a whole contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading as of the date such information is dated or certified; provided, that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each Company represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.

Section 3.17. **Labor Matters**. As of the date hereof and the Closing Date, there are no strikes, lockouts or slowdowns against any Company pending or, to the knowledge of any Company, threatened. The hours worked by and payments made to employees of any Company have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters in any manner which could reasonably be expected to result in a Material Adverse Effect. All payments due from any Company, or for which any claim may be made against any Company, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Company except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Company is bound.

Section 3.18. **Employee Benefit Plans**. (a) Each Company and its ERISA Affiliates is in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in material liability of any Company or any of its ERISA Affiliates or the imposition of a Lien on any of the assets of a Company. The present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans. Using actuarial assumptions and computation methods consistent with subpart 1 of subtitle E of Title IV of ERISA, the aggregate liabilities of each Company or its ERISA Affiliates to all Multiemployer Plans in the event of a complete withdrawal therefrom, as of the close of the most recent Fiscal Year of each such Multiemployer Plan, could not reasonably be expected to result in a Material Adverse Effect.

71

(b) Each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities. No Company has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Plan. The present value of the accrued benefit liabilities (whether or not vested) under each Foreign Plan which is funded, determined as of the end of the most recently ended Fiscal Year of the respective Company on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Plan, and for each Foreign Plan which is not funded, the obligations of such Foreign Plan are properly accrued.

**Section 3.19. <u>Environmental Matters</u>**. (a) Except as set forth in <u>Schedule 3.19</u> and except as, individually or in the aggregate, are not reasonably likely to result in a Material Adverse Effect:

(i) The Companies and their businesses, operations and Real Property are and in the last six years have been in compliance with, and the Companies have no liability under, Environmental Law;

(ii) The Companies have obtained all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their assets, under Environmental Law, all such Environmental Permits are valid and in good standing and, under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to renew or modify such Environmental Permits during the next five years;

(iii) There has been no Release or threatened Release of Hazardous Material on, at, under or from any Real Property or facility presently or formerly owned, leased or operated by the Companies or their predecessors in interest that could result in liability by the Companies under Environmental Law;

(iv) There is no Environmental Claim pending or, to the knowledge of the Companies, threatened against the Companies, or relating to the Real Property currently or formerly owned, leased or operated by the Companies or relating to the operations of the Companies, and there are no actions, activities, circumstances, conditions, events or incidents that could form the basis of such an Environmental Claim;

(v) No Person with an indemnity or contribution, obligation to the Companies relating to compliance with or liability under Environmental Law is in default with respect to such obligation;

(vi) No Company is obligated to perform any action or otherwise incur any expense under Environmental Law pursuant to any order, decree, judgment or agreement by which it is bound or has assumed by contract or agreement, and no Company is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location;

(vii)　No Real Property or facility owned, operated or leased by the Companies and, to the knowledge of the Companies, no Real Property or facility formerly owned, operated or leased by the Companies or any of their predecessors in interest is (A) listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA, (B) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (C) included on any similar list maintained by any Governmental Authority including, without limitation, any such list relating to petroleum; and

(viii)　The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements or any other Environmental Law.

(b)　Except as set forth in Schedule 3.19:

(i)　No Lien has been recorded or, to the knowledge of any Loan Party, threatened under any Environmental Law with respect to any Real Property or assets of the Loan Parties; and

(ii)　The Companies have made available to Lenders all material records and files in the possession, custody or control of, or otherwise reasonably available to, the Companies concerning compliance with or liability under Environmental Law including, without limitation, those concerning the existence of Hazardous Material at real Property or facilities currently or formerly owned, operated, leased or used by the Companies.

**Section 3.20.  Insurance**.  Schedule 3.20 sets forth a true, complete and correct description of all insurance maintained by each Company as of the Closing Date.  As of such date, such insurance is in full force and effect.  Each Company has to such Company's knowledge insurance in such amounts and covering such risks and liabilities as are in accordance with normal industry practice.  Such Schedule 3.20 may be amended and revised from time to time with the consent of the Administrative Agent.

**Section 3.21.  Security Documents**.  (a)  The Security Agreement is effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, a legal, valid and enforceable security interest in and Lien on the Security Agreement Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule [__] to the Perfection Certificate and (ii) upon the taking of possession or control by the Collateral Agent of the Security Agreement Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by each Security Agreement), the Lien created by the Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the grantors thereunder in the Security Agreement Collateral (other than (A) the Intellectual Property (as defined in the Security Agreement) and (B) such Security Agreement Collateral in which a security interest

cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Collateral Liens.

(b)     When the Security Agreement or a short form thereof is filed in the United States Patent and Trademark Office and the United States Copyright Office, the Lien created by the U.S. Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the grantors thereunder in the Intellectual Property, in each case subject to no Liens other than Permitted Collateral Liens.

(c)     Each Mortgage, when executed and delivered by the relevant Loan Party, will be effective to create, in favor of the Collateral Agent, for its benefit and the benefit of the Secured Parties, subject only to the Existing Liens (as defined in such Mortgage), a legal, valid and enforceable Lien on and security interest in all of the Loan Parties' right, title and interest in and to the Mortgaged Properties thereunder and the proceeds thereof, and when the Mortgages are filed in the offices specified on Schedule 1.01(a) (or, in the case of any Mortgage executed and delivered after the date thereof in accordance with the provisions of Section 5.11, Section 5.12 and Section 5.14, when such Mortgage is filed in the offices specified in the local counsel opinion delivered with respect thereto in accordance with the provisions of Section 5.11, Section 5.12 and Section 5.14), the Mortgages shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in the Mortgaged Properties and the proceeds thereof, in each case prior and superior in right to any other Person, other than Existing Liens (as defined in each such Mortgage) or other Liens acceptable to the Collateral Agent.

(d)     Each Security Document delivered pursuant to Section 5.11 and Section 5.12 will, upon execution and delivery thereof, be effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in and Lien on all of the Loan Parties' right, title and interest in and to the Collateral thereunder, and when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable law, such Security Document will constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than the applicable Permitted Liens.

Section 3.22.  **Accuracy of Borrowing Base**.  To the best of the Borrower's knowledge, at the time any Borrowing Base Certificate is delivered pursuant to this Agreement, each Account and each item of Inventory included in the calculation of the Borrowing Base satisfies all of the criteria stated herein (or of which the Borrower has hereafter been notified by the Administrative Agent under Section 2.19) to be an Eligible Account and an item of Eligible Inventory, respectively.

Section 3.23.  **Solvency**.  Immediately after the consummation of the Transactions to occur on the Closing Date and immediately following the making of each Loan and after giving effect to the application of the proceeds of each Loan, (a) the fair value of the assets of each Loan Party (individually and on a consolidated basis with its Subsidiaries) will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the

property of each Loan Party (individually and on a consolidated basis with its Subsidiaries)[10] will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) each Loan Party (individually and on a consolidated basis with its Subsidiaries) will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) each Loan Party (individually and on a consolidated basis with its Subsidiaries) will not have unreasonably small capital with which to conduct its business in which it is engaged as such business is now conducted and is proposed to be conducted following the Closing Date.

## ARTICLE IV

## CONDITIONS TO CREDIT EXTENSIONS

**Section 4.01.  Conditions to Initial Credit Extension**.  The obligation of each Lender and, if applicable, the Issuing Bank to fund the initial Credit Extension requested to be made by it shall be subject to the prior or concurrent satisfaction of each of the conditions precedent set forth in this Section 4.01 in a manner satisfactory to the Administrative Agent:

(a)  Plan of Reorganization.  The Plan of Reorganization shall not have been amended, supplemented or otherwise modified without the approval of the Administrative Agent and shall have become effective in accordance with its terms.  In addition, without limitation:

(i)  the Plan of Reorganization shall include full releases of the Prepetition Agent and the other Prepetition Lenders;

(ii)  all conditions precedent to the effectiveness of the Plan of Reorganization shall have been satisfied (or waived with the consent of the Administrative Agent),

(iii)  the Confirmation Order shall have become a Final Order;

(iv)  the Administrative Agent shall be satisfied that the Bankruptcy Court's retention of jurisdiction under the Confirmation Order will not govern the enforcement of the Transaction Documents;

(v)  the conditions precedent to the effectiveness of the Term Note Agreement, and the CVR Agreement shall have been satisfied

(vi)  all authorizations, consents, and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan of Reorganization are obtained and not revoked; and

(vii)  the Debtors shall have received the Cash contribution specified in section 5.2(a) of the Plan of Reorganization.

---

[10] Subject to exception for certain immaterial Subsidiaries to be agreed.

(b)    Other Agreements and Obligations.  (i) The Administrative Agent shall be reasonably satisfied with the Transaction Documents and such documents shall have been executed and delivered by the parties thereto and shall be in effect, and (ii) the Administrative Agent shall be reasonably satisfied that each DIP Obligation shall have been paid in full in Cash and all commitments under the [DIP Credit Agreement] shall have been terminated, and all Liens securing the DIP Obligations shall have been released, in each case on terms and conditions reasonably satisfactory to the Administrative Agent

(c)    Reorganization.  The Reorganization shall have been consummated on the terms and conditions set forth in the Plan of Reorganization and the Effective Date of the Plan of Reorganization (as defined in the Plan of Reorganization) shall be not later than January [__], 2006.

(d)    Liquidity. On the Closing Date, after giving pro forma effect to the Plan of Reorganization, the sum of (a) the lesser of (i) the aggregate amount of the Commitments, and (ii) the Borrowing Base then in effect, plus (b) the aggregate amount of Cash and Cash Equivalents of the Borrower, minus (c) the aggregate amount of the outstanding Loans and the face amount of Letters of Credit under this Agreement shall be not be less than $10,000,000.

(e)    Loan Documents.  All legal matters incident to this Agreement, the Credit Extensions hereunder and the other Loan Documents shall be reasonably satisfactory to the Lenders and to the Administrative Agent and there shall have been delivered to the Administrative Agent an executed counterpart of each of the Loan Documents.

(f)    Transaction Documents.  The Administrative Agent shall have received:

(i)    a certificate of a Responsible Officer of the Borrower certifying (A) that attached thereto is a true, correct and complete copy of the Confirmation Order (including the Plan of Reorganization attached to the Confirmation Order) and (B) that no appeal or motion for rehearing has been filed in connection with such Confirmation Order; and

(ii)    a copy of each Transaction Document, certified as being true, complete and correct by a Responsible Officer of the Borrower.

(g)    Corporate Documents.  The Administrative Agent shall have received:

(i)    a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of each Organizational Document of such Loan Party, certified (to the extent applicable) as of a recent date by the Secretary of State of the state of its organization, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Transaction Documents to which such Person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party (together with a certificate

of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate in this clause (i);

(ii)　　a long form certificate as to the good standing of each Loan Party as of a recent date, from such Secretary of State; and

(iii)　　such other documents as the Lenders, Issuing Bank or the Administrative Agent may reasonably request.

(h)　　Officer's Certificate.  The Administrative Agent shall have received a certificate, dated the Closing Date and signed by the Chief Executive Officer or President of the Borrower (acting in such capacity and not in his individual capacity), confirming compliance with the conditions precedent set forth in Section 4.01 and 4.02, other than as to events which are required to be determined to the satisfaction of the Administrative Agent.

(i)　　Other Related Transactions, Etc.

(i)　　Holdco shall have merged into the Borrower, and the Borrower shall be the sole direct Subsidiary of the Parent, owning directly or indirectly all the equity of Parent's Subsidiaries (other than the Borrower).

(j)　　Financial Statements; Projections.  The Lenders shall have received and shall be reasonably satisfied with the form and substance of (i) the financial statements described in Section 3.04, (ii) of the Projections, and (iii) the initial Borrower Forecasts.

(k)　　Indebtedness and Minority Interests.  No Loan Party shall have outstanding any Indebtedness, preferred stock or minority interests other than (i) the Loans and extensions of credit hereunder, (ii) the Term Note Debt, (iii) up to $[_____] of other Indebtedness listed on Schedule 6.01(b) and (iv) Indebtedness owed to the Borrower or any Guarantor.

(l)　　Opinions of Counsel.  The Administrative Agent shall have received, on behalf of itself, the Collateral Agent and the Lenders a written opinion of Weil, Gotshal & Manges LLP, special counsel for the Loan Parties, in a form reasonably satisfactory to the Administrative Agent.

(m)　　Appraisals and Reports.  The Administrative Agent and the Collateral Agent shall have received, with sufficient copies for each Lender, all field examinations, audits, reports and opinions of appraisers, consultants or other advisors retained by them to review the Collateral, business, operation or condition of the Loan Parties after giving effect to the Transactions, and the Administrative Agent and the Lenders shall be reasonably satisfied in form and substance with all such field examinations, audits, reports and opinions.

(n)　　Requirements of Law.  The Administrative Agent shall be reasonably satisfied that the Transactions shall be in full compliance with all material Requirements of Law, including without limitation Regulations T, U and X of the Board.  The Administrative Agent shall have received reasonably satisfactory evidence of compliance with all applicable Requirements of Law, including all applicable environmental laws and regulations.

(o)     Consents.  The Administrative Agent shall be reasonably satisfied that all requisite Governmental Authorities and third parties shall have approved or consented to the Transactions, and there shall be no governmental or judicial action, actual or threatened, that has or would have, singly or in the aggregate, a reasonable likelihood of restraining, preventing or imposing burdensome conditions on the Transactions or the transactions contemplated hereby.

(p)     Litigation.  There shall be no litigation, public or private, or administrative proceedings, governmental investigation or other legal or regulatory developments, actual or threatened, that, singly or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, or could materially and adversely affect the ability of the Parent, the Borrower and the Subsidiaries to fully and timely perform their respective obligations under the Transaction Documents, or the ability of the parties to consummate the financings contemplated hereby or the other Transactions.

(q)     Uses.  The proceeds of the Loans shall be used as set forth in Section 3.14.

(r)     Fees.  The Lead Arranger and the Administrative Agent shall have received all Fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses (including (i) the legal fees and expenses of Bingham McCutchen LLP, special counsel to the Agents and  (ii) the fees and expenses of any local counsel, appraisers, consultants and other advisors required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

(s)     Personal Property Requirements.  The Collateral Agent shall have received:

(i)     all certificates, agreements or instruments representing or evidencing the shares of the Borrower and each Guarantor (other than Parent), accompanied by instruments of transfer and stock powers endorsed in blank;

(ii)     all other certificates, agreements, including control agreements, or instruments necessary to perfect the Collateral Agent's security interest in all Chattel Paper, all Instruments and all Investment Property of each Loan Party (as each such term is defined in the Security Agreement and to the extent required by Section 3.3 of the Security Agreement);

(iii)     UCC Financing Statements in appropriate form for filing under the UCC, filings with the United States Patent, Trademark and Copyright offices and such other documents under applicable Requirements of Law in each jurisdiction as may be necessary or appropriate or, in the opinion of the Collateral Agent, desirable to perfect the Liens created, or purported to be created, by the Security Documents and, with respect to all UCC Financing Statements required to be filed pursuant to the Loan Documents, evidence satisfactory to the Administrative Agent that the Borrower has retained, at its sole cost and expense, a service provider acceptable to the Administrative Agent for the tracking of all such financing statements and notification to the Administrative Agent, of, among other things, the upcoming lapse or expiration thereof;

NYDOCS/1207090.12

(iv)     certified copies of UCC, tax and judgment lien searches, bankruptcy and pending lawsuit searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party as debtor and that are filed in those state and county jurisdictions in which any Property of any Loan Party is located and the state and county jurisdictions in which any Loan Party is organized or maintains its principal place of business and such other searches that the Collateral Agent deems necessary or appropriate, none of which encumber the Collateral covered or intended to be covered by the Security Documents (other than those relating to Liens (A) securing the Prepetition Obligations which will be released on the Effective Date of the Plan of Reorganization (as defined in the Plan of Reorganization) and (B) Liens which are acceptable to the Administrative Agent, in its sole discretion.

(v)     evidence acceptable to the Collateral Agent of payment by the Loan Parties of all applicable recording taxes, fees, charges, costs and expenses required for the recording of the Security Documents.

(t)     Real Property Requirements.  The Collateral Agent shall have received with respect to each Real Property, copies of all Leases in which the Borrower or any Subsidiary holds a leasehold or other possessory interest.

(u)     Insurance.  The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.04 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable endorsement and to name the Collateral Agent as additional insured, in form and substance satisfactory to the Administrative Agent.

(v)     Board of Directors.  A new Board of Directors shall have been elected and serving in satisfaction of the requirements of the term sheet attached to the Lock-Up Agreement.

**Section 4.02.  Conditions to All Credit Extensions**.  The obligation of each Lender and each Issuing Bank to make any Credit Extension (including the initial Credit Extension) shall be subject to, and to the satisfaction of, each of the conditions precedent set forth below:

(a)     Notice.  The Administrative Agent shall have received a Borrowing Request as required by Section 2.03 (or such notice shall have been deemed given in accordance with Section 2.03) if Loans are being requested or, in the case of the issuance, amendment, extension or renewal of a Letter of Credit, the Issuing Bank and the Administrative Agent shall have received a notice requesting the issuance, amendment, extension or renewal of such Letter of Credit as required by Section 2.18(b) or, in the case of the Borrowing of a Swingline Loan, the Swingline Lender and the Administrative Agent shall have received a notice requesting such Swingline Loan as required by Section 2.17(b).

(b)     No Default.  Each of the Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document on its part to be observed or performed, and, at the time of and

immediately after such Credit Extension, no Default shall have occurred and be continuing on such date or after giving effect to the Credit Extension requested to be made on such date.

(c)  Representations and Warranties.  Each of the representations and warranties made by any Loan Party set forth in Article III hereof or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date.

(d)  No Material Adverse Effect.  There has been no event, condition and/or contingency that has had or is reasonably likely to have a Material Adverse Effect.

(e)  No Legal Bar.  No order, judgment or decree of any Governmental Authority shall purport to restrain any Lender from making any Loans to be made by it.  No injunction or other restraining order shall have been issued, shall be pending or noticed with respect to any action, suit or proceeding seeking to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated by this Agreement or the making of Loans hereunder.

(f)  Cash and Cash Equivalents.  At the time of any Credit Extension, which is a Loan, the Cash and Cash Equivalents of the Loan Parties shall not exceed $2,000,000 in the aggregate.

Each of the delivery of a Borrowing Request or notice requesting the issuance, amendment, extension or renewal of a Letter of Credit and the acceptance by the Borrower of the proceeds of such Credit Extension shall constitute a representation and warranty by the Borrower and each other Loan Party that on the date of such Credit Extension (both immediately before and after giving effect to such Credit Extension and the application of the proceeds thereof) the conditions contained in this Section 4.02 have been satisfied.  The Borrower shall provide such information (including calculations in reasonable detail of the covenants in Section 6.07) as the Administrative Agent may reasonably request to confirm that the conditions in this Section 4.02 have been satisfied.

**ARTICLE V**

**AFFIRMATIVE COVENANTS**

Each Loan Party covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Obligations have been Paid In Full, each Loan Party will, and will cause each of its Subsidiaries to:

**Section 5.01.  Financial Statements, Reports, etc**.  In the case of the Parent and the Borrower, furnish to the Administrative Agent (with a copy for each Lender):

(a)  Annual Reports.  Within 90 days after the end of each Fiscal Year (but if any Loan Party is then subject to Section 13(d) or 15 of the Exchange Act, no later than the date

on which such Loan Party is required to file a Form 10-K under the Exchange Act), (i) the consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such Fiscal Year and related consolidated statements of income, cash flows and stockholder's equity for such Fiscal Year, in comparative form with such financial statements as of the end of, and for, the preceding Fiscal Year, and notes thereto, all prepared in accordance with GAAP and accompanied by an opinion of independent public accountants of recognized national standing reasonably satisfactory to the Administrative Agent (which opinion shall not be qualified as to scope or contain any going concern or other qualification) stating that such financial statements fairly present, in all material respects, the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries as of such dates and for such periods and in each case on a consolidated basis in accordance with GAAP consistently applied (provided that for Fiscal Year 2005 only an audited balance sheet shall be required), and (ii) a management discussion and analysis setting forth results of operations and cash flows of the Borrower and its Subsidiaries as of the end of and for such Fiscal Year, and as compared to budgeted amounts as compared to the previous Fiscal Year.

(b)      Quarterly Reports.  Within 45 days after the end of each of the first three fiscal quarters of each Fiscal Year (but if any Loan Party is then subject to Section 13(d) or 15 of the Exchange Act, no later than the date on which such Loan Party is required to file a Form 10-Q under the Exchange Act), (i) the consolidated balance sheets of the Borrower and its Subsidiaries as of the end of such fiscal quarter and related consolidated statements of income and cash flows for such fiscal quarter and for the then elapsed portion of the Fiscal Year, all prepared in accordance with GAAP, subject to year end audit adjustments, the omission of footnotes, and accompanied by a certificate of a Financial Officer stating that such financial statements fairly present, in all material respects and to the best of their knowledge, the consolidated financial condition, results of operations and cash flows of the Borrower and its Subsidiaries as of such date and for such periods in accordance with GAAP, subject to year end audit adjustments and the omission of footnotes, and (ii) a management discussion and analysis setting forth results of operations and cash flows of the Borrower and its Subsidiaries as of the end of and for such fiscal quarter, as compared to budgeted amounts [and as compared to comparable periods in the previous Fiscal Year].

(c)      Monthly Reports.  Within 30 days after the end of each of the first, second, fourth, fifth, seven, eighth, tenth, and eleventh fiscal periods of the Borrower's Fiscal Year, the consolidated balance sheets of the Borrower and its Subsidiaries as of the end of such month and the related consolidated statements of income and cash flows of the Borrower and its Subsidiaries for such month and for the then elapsed portion of the Fiscal Year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous Fiscal Year, accompanied by a certificate of a Financial Officer stating that, to the best of the Financial Officer's knowledge, such financial statements fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of the Borrower and its Subsidiaries as of the date and for the periods specified in accordance with GAAP, subject to year end audit adjustments and the omission of footnotes.

(d)      Required Certificates.  (i) Concurrently with any delivery of financial statements under clause (a), (b) or (c) above, a certificate of a Responsible Officer (acting in such capacity and not in his individual capacity) certifying, to the best of the Borrower's knowledge,

no Default has occurred or, if such a Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto; (ii) concurrently with any delivery of financial statements under clause (a), (b) or (c) above, a certificate of a Financial Officer (acting in such capacity and not in his individual capacity) setting forth computations in reasonable detail satisfactory to the Administrative Agent demonstrating compliance with the relevant covenants contained in Section 6.08, in each case for the applicable test period; and (iii) in the case of clause (a) above, a report of the accounting firm opining on or certifying such financial statements stating that in the course of its regular audit of the financial statements of the Borrower and its Subsidiaries, such accounting firm obtained no knowledge that any Default (insofar as it relates to financial or accounting matters) has occurred or, if in the opinion of such accounting firm such a Default has occurred, specifying the nature and extent thereof.

(e)    Responsible Officer's Certificate Regarding Collateral.  Concurrently with any delivery of financial statements under paragraph (a) above, a certificate of a Responsible Officer (acting in such capacity and not in his individual capacity) setting forth the information required pursuant to the Perfection Certificate Supplement or confirming that there has been no change in such information since the date of the Perfection Certificate or latest Perfection Certificate Supplement;

(f)    Public Reports.  Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Company with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to holders of its Indebtedness pursuant to the terms of the documentation governing such Indebtedness (or any trustee, agent or other representative therefor), as the case may be;

(g)    Management Letters.  Promptly after the receipt thereof by any Company, a copy of any final "management letter" received by any such Person from its certified public accountants and copies of all management's written responses thereto;

(h)    Budgets.  No later than 30 days after the first day of each Fiscal Year, the Borrower shall (i) provide a consolidated budget for such Fiscal Year in form reasonably satisfactory to the Administrative Agent (including income statements, cash flow statements and balance sheets) prepared by the Borrower for each month of such Fiscal Year prepared in detail, for the Loan Parties, with appropriate presentation and discussion of the principal assumptions upon which such budgets are based accompanied by the statement of a Financial Officer of the Borrower to the effect that the budget is prepared in good faith and (ii) after delivery of such budget, at the request of the Administrative Agent or Required Lenders, hold a meeting telephonically (at a mutually agreeable time) with the Administrative Agent and all Lenders who wish to participate, in order to review and discuss such budget.

(i)    Annual Meetings with Lenders.  Within 120 days after the close of each Fiscal Year, Parent and the Borrower shall, at the request of the Administrative Agent or Required Lenders, hold a meeting (at a mutually agreeable location and time) with the Administrative Agent and all Lenders who choose to attend such meeting at which meeting shall

82

be reviewed the financial results of the previous Fiscal Year and the financial conditions of the Companies presented for the current Fiscal Year of the Companies.

(j)     Monthly Reports.  On the last Business Day of each month, the Borrower Forecast and weekly point-of-sale data, consistent in form to the weekly point-of-sale data delivered pursuant to the DIP Credit Agreement, and  in form and substance and reasonably satisfactory to the Administrative Agent;

(k)     Borrowing Base-Related Reports.  The Borrower shall deliver or cause to be delivered (at the expense of the Borrower) to the Administrative Agent the following:

(i)     on or before each Thursday of each week, and any other time upon the request of the Administrative Agent, a Borrowing Base Certificate accompanied by such supporting detail and documentation as shall be requested by the Administrative Agent in its reasonable judgment;

(ii)     upon request by the Administrative Agent, and in no event less frequently than 30 days after the end of (i) each month, a monthly trial balance showing Accounts outstanding aged from statement date as follows:  within 1 to 30 days, 31 to 60 days, 61 to 90 days and 91 days or more, and such supporting detail and documentation as shall be reasonably requested by the Administrative Agent in its reasonable credit judgment, (ii) each month, a monthly trial balance showing an aging of outstanding accounts payable, and (iii) each month, a summary of Inventory by location and type accompanied by such supporting detail and documentation as shall be reasonably requested by the Administrative Agent in its reasonable credit judgment (in each case, together with a copy of all or any part of such delivery requested by any Lender in writing after the Closing Date);

(iii)     at the time of delivery of each of the financial statements delivered pursuant to Sections 5.01(a) and (b): (i) a reconciliation of the Accounts trial balance and monthly Inventory reports of the Borrower to the general ledger of such Loan Party, in each case, accompanied by such supporting detail and documentation as shall be reasonably requested by the Administrative Agent in its reasonable credit judgment; (ii) a general description of Asset Sales since the date of the most recent Inventory Appraisal conducted pursuant to Section 5.01(l) and the aggregate book value thereof; and (iii) a list of any applications for the registration of any patent, trademark or copyright with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency which any Loan Party has filed in the prior fiscal quarter;

(iv)     such other reports, statements and reconciliations with respect to the Borrowing Base or Collateral of any or all Loan Parties as the Administrative Agent shall from time to time reasonably request in its reasonable credit judgment.

The delivery of each certificate and report or any other information delivered pursuant to this Section 5.01(k) shall constitute a representation and warranty by the Borrower that the statements and information contained therein are true and correct to the best of the Borrower's knowledge in all material respects on and as of such date.

(l)  Borrowing Base Verification; Inventory Appraisals  Any of the Administrative Agent's and Collateral Agent's officers, employees or agents shall have the right, at any time or times, in the name of the Administrative Agent or Collateral Agent, as applicable, any designee of the Administrative Agent, Collateral Agent or the Borrower, to verify the validity, amount or any other matter relating to Accounts or Inventory (including "at-risk Inventory) by mail, telephone, electronic communication, personal inspection (on reasonable notice and during business hours) or otherwise and to conduct field audits of the financial affairs and Collateral of the Loan Parties.  The Borrower shall cooperate fully with the Administrative Agent and Collateral Agent in an effort to facilitate and promptly conclude any such verification process.  The Loan Parties shall cooperate fully with the Administrative Agent and its agents during all Collateral field audits and Inventory Appraisals done on reasonable notice during business hours, including by providing the data files, reports, and various other information as more fully set forth in the Inventory Appraisal Letter, all of which shall be at the reasonable expense of the Borrower and shall be conducted, in the case of field audits, quarterly and, in the case of Inventory Appraisals, quarterly, or, in each case, following the occurrence and during the continuation of an Event of Default, more frequently at Administrative Agent's reasonable request; and

(m)  Other Information.  Promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Company, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

**Section 5.02.  Litigation and Other Notices**.  Furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)  any Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)  the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against any Company or any Affiliate thereof that could reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document;

(c)  any development that has resulted in, or could reasonably be expected to result in a Material Adverse Effect;

(d)  the occurrence of a Casualty Event where the estimated cost of repair, replacement or restoration is greater than $[500,000] and will ensure that the Net Cash Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Security Documents; and

(e)  (i)  the incurrence of any material Lien (other than Permitted Liens) on, or claim asserted against any of the Collateral or (ii) the occurrence of any other event which could materially affect the value of the Collateral.

NYDOCS/1207090.12

**Section 5.03.  Existence; Businesses and Properties**.  (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05 or, in the case of any Subsidiary, where the failure to perform such obligations, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)  (i) Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names material to the conduct of its business; (ii) comply with all applicable Requirements of Law (including any and all zoning, building, Environmental Law, ordinance, code or approval or any building permits or any restrictions of record or agreements affecting the Real Property (except in the case of any Leased Real Property, where the lessor is responsible for such compliance)) and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; pay and perform its obligations under all Leases and Transaction Documents except where failure to do so could not reasonably be expected to have a Material Adverse Effect; and (iii) at all times maintain and preserve all Property material to the conduct of such business and keep such Property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times; provided, that nothing in this Section 5.03(b) shall prevent (x) sales of assets, consolidations or mergers by or involving any Company in accordance with Section 6.05; (y) the withdrawal by any Company of its qualification as a foreign corporation in any jurisdiction where such withdrawal, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; or (z) the abandonment by any Company of any rights, franchises, licenses, trademarks, trade names, copyrights or patents that such Person reasonably determines are not useful to its business.

**Section 5.04.  Insurance**.  (a)  Keep its insurable Property adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks, including fire and other risks insured against by extended coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death or Property damage occurring upon, in, about or in connection with the use of any Property owned, occupied or controlled by it; and maintain such other insurance as may be required by law; and, with respect to the Collateral, otherwise maintain all insurance coverage required under each applicable Security Document, such policies to be in such form and amounts and having such coverage as may be reasonably satisfactory to the Administrative Agent and the Collateral Agent.

(b)  All such insurance shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days after receipt by the Collateral Agent of written notice thereof, (ii) name the Collateral Agent as mortgagee (in the case of Property insurance covering Mortgaged Properties) or additional insured (in the case of liability insurance) or loss payee (in the case of casualty insurance), as

applicable, (iii) if reasonably requested by the Collateral Agent, include a breach of warranty clause and (iv) be reasonably satisfactory in all other respects to the Collateral Agent.

(c)     Notify the Administrative Agent and the Collateral Agent immediately whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this <u>Section 5.04</u> is taken out by any Loan Party; and promptly deliver to the Administrative Agent and the Collateral Agent a duplicate original copy of such policy or policies.

(d)     To the extent available, obtain flood insurance in such total amount as the Administrative Agent or the Required Lenders may from time to time require, if at any time the area in which any improvements located on any real Property covered by a Mortgage is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

(e)     Deliver to the Administrative Agent and the Collateral Agent and the Lenders a report of a reputable insurance broker with respect to such insurance and such supplemental reports with respect thereto as the Administrative Agent or the Collateral Agent may from time to time reasonably request but, unless a Default shall have occurred and be continuing, not more than two times per year.

**Section 5.05.  <u>Obligations and Taxes</u>**.  (a)  Pay its Material Indebtedness and other obligations promptly and in accordance with their terms and pay and discharge promptly when due all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its Property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien other than a Permitted Lien upon such properties or any part thereof; <u>provided</u>, that such payment and discharge shall not be required with respect to any such obligation, Tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and the applicable Company shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation, Tax, assessment or charge and enforcement of a Lien other than a Permitted Lien and, in the case of Collateral, the applicable Company shall have otherwise complied with the Contested Collateral Lien Conditions.

(b)     Timely and correctly file all material Tax Returns required to be filed by it.

**Section 5.06.  <u>Employee Benefits</u>**.  (a) Comply in all material respects with the applicable provisions of ERISA and the Code and (b) furnish to the Administrative Agent (x) as soon as possible after, and in any event within 10 days after any Responsible Officer of the Loan Parties or their ERISA Affiliates or any ERISA Affiliate knows or has reason to know that, any ERISA Event has occurred that, alone or together with any other ERISA Event could reasonably be expected to result in liability of the Loan Parties or their ERISA Affiliates in an aggregate amount exceeding $[1,000,000] or the imposition of a Lien, a statement of a Financial Officer of

the Borrower setting forth details as to such ERISA Event and the action, if any, that the Loan Parties propose to take with respect thereto, and (y) upon request by the Administrative Agent, copies of: (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Loan Party or any ERISA Affiliate with the Internal Revenue Service with respect to each Plan; (ii) the most recent actuarial valuation report for each Plan; (iii) all notices received by any Loan Party or any ERISA Affiliate from a Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event; and (iv) such other documents or governmental reports or filings relating to any Plan (or employee benefit plan sponsored or contributed to by any Loan Party) as the Administrative Agent shall reasonably request.

Section 5.07. **Maintaining Records; Access to Properties and Inspections**. Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law are made of all dealings and transactions in relation to its business and activities. Each Company will permit any representatives designated by the Administrative Agent or any Lender to visit and inspect the financial records, physical and other assets (including documentation relating to intellectual property) on reasonable notice and during regular business hours, and the Property of such Company at reasonable times and as often as reasonably requested on reasonable notice and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances and condition of any Company with the officers thereof and independent accountants therefor (but, unless a Default shall have occurred and be continuing, not more than two times per year).

Section 5.08. **Use of Proceeds**. Use the proceeds of the Loans and request the issuance of Letters of Credit only for the purposes set forth in Section 3.14.

Section 5.09. **Compliance with Environmental Laws; Environmental Reports**. (a) Comply, and cause all lessees and other Persons occupying Real Property owned, operated or leased by any Company to comply, in all material respects with all Environmental Laws and Environmental Permits applicable to its operations and Real Property; obtain and renew all material Environmental Permits applicable to its operations and Real Property; and conduct any Response that the Borrower or any such lessee or other Person is required to conduct pursuant to Environmental Laws in accordance with Environmental Laws; provided, that no Company shall be required to undertake any Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

(b) If a Default caused by reason of a breach of Section 3.19 or Section 5.09(a) shall have occurred and be continuing for more than 20 days without the Companies commencing activities reasonably likely to cure such Default, at the written request of the Required Lenders through the Administrative Agent, provide to the Lenders within 45 days after such request, at the expense of the Borrower, an environmental assessment report regarding the matters which are the subject of such Default, including where appropriate, any soil and/or groundwater sampling, prepared by an environmental consulting firm and in the form and substance reasonably acceptable to the Administrative Agent and indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance or Response to address them.

87

**Section 5.10.  Intentionally Omitted** .

**Section 5.11.  Additional Collateral; Additional Guarantors**.  (a)  Subject to this Section 5.11, with respect to any Property (including Intellectual Property) acquired after the Closing Date by the Borrower or any other Loan Party that is not subject to the Lien created by the Security Documents promptly (and in any event within 30 days after the acquisition thereof): (i) execute and deliver to the Administrative Agent and the Collateral Agent such amendments or supplements to the relevant Security Documents or such other documents as the Administrative Agent or the Collateral Agent shall reasonably deem necessary or advisable to grant to the Collateral Agent, for its benefit and for the benefit of the other Secured Parties, a Lien on such Property subject to no Liens other than Permitted Liens, and (ii) take all actions necessary to cause such Lien to be duly perfected to the extent required by such Security Document in accordance with all applicable Requirements of Law, including, without limitation, the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent.  The Borrower shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Administrative Agent or the Collateral Agent shall reasonably require to confirm the validity, perfection and priority of the Lien of the Security Documents against such after-acquired properties or assets.

(b)     With respect to any Person that is or becomes a Wholly Owned Subsidiary promptly (and in any event within [15] days after such Person becomes a Subsidiary (i) deliver to the Collateral Agent the certificates, if any, representing the Equity Interests of such Subsidiary, together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of such Subsidiary's parent, as the case may be, and all intercompany notes owing from such Subsidiary to any Loan Party together with instruments of transfer executed and delivered in blank by a duly authorized officer of such Subsidiary, and (ii) cause such new Subsidiary (in the case of a Foreign Subsidiary, to the extent required by the Administrative Agent or the Collateral Agent) (A) to execute a Joinder Agreement or such comparable documentation and a joinder agreement to the Security Agreement in the form annexed thereto, and (B) to take all actions necessary or advisable in the opinion of the Administrative Agent or the Collateral Agent to cause the Lien created by the Security Agreement to be duly perfected to the extent required by such agreement in accordance with all applicable Requirements of Law, including, without limitation, the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent or the Collateral Agent.

(c)     Each Loan Party will promptly grant to the Collateral Agent, within 30 days of the acquisition thereof, a security interest in and Mortgage on (i) each Real Property owned in fee by such Loan Party as is acquired by such Loan Party after the Closing Date and that, together with any improvements thereon, individually has a fair market value of at least $1,000,000, and (ii) unless the Collateral Agent otherwise consents, each leased Real Property of such Loan Party which lease individually has a fair market value of at least $1,000,000, in each case, as additional security for the Obligations [(unless the subject Property is already mortgaged to a third party to the extent permitted by Section 6.02)].  Such Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Administrative Agent and the Collateral Agent and shall constitute valid and enforceable perfected Liens subject only to Existing Liens (defined in each such Mortgage) or Permitted Liens.  The Mortgages or

88

instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Mortgages and all taxes, fees and other charges payable in connection therewith shall be paid in full.  Such Loan Party shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Administrative Agent or the Collateral Agent shall reasonably require to confirm the validity, perfection and priority of the Lien of any existing Mortgage or new Mortgage against such after-acquired Real Property (including, without limitation, a Lender's title insurance policy containing such endorsements and affirmative insurance as the Administrative Agent and the Collateral Agent shall reasonably require, a Survey and local counsel opinion (each in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent) in respect of such Mortgage).

(d)     Notwithstanding anything contained in this Section 5.11 to the contrary, to the extent (i) permitted by applicable foreign law (including Section 151 and 158 of the Companies Act 1985 (England) related to the giving of unlawful financial assistance) and (ii) requested by the Collateral Agent, the Borrower and its Subsidiaries will (A) cause each of the Borrower's direct and indirect Foreign Subsidiaries to execute and deliver to the Collateral Agent the documents necessary for such Foreign Subsidiary to guarantee the Obligations (such documentation to include both (x) a joinder agreement whereby such Foreign Subsidiary becomes a Subsidiary Guarantor and subject to the Guarantee and (y) a guarantee executed pursuant to the applicable foreign law requirements of such Foreign Subsidiary) and grant to the Collateral Agent, for its benefit and the benefit of the other Secured Parties, a perfected security interest (subject to no Liens other than Permitted Liens) in substantially all of such Foreign Subsidiary's assets (subject to exclusions acceptable to the Collateral Agent) in order to secure the Obligations; (B) deliver such other documents, certificates and opinions which the Collateral Agent reasonably requests in connection with the foregoing; and (C) take all other actions necessary or advisable in the opinion of the Administrative Agent or the Collateral Agent to cause the Lien created by each of the forgoing Security Documents to be duly perfected to the extent required by such agreement in accordance with all applicable Requirements of Law, including, without limitation, the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent or the Collateral Agent, in the case of all of the foregoing, on terms and pursuant to documentation satisfactory to the Collateral Agent.

**Section 5.12.  Security Interests; Further Assurances**.  Promptly, upon the reasonable request of the Administrative Agent, the Collateral Agent or any Lender, at the Borrower's expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by the Administrative Agent or the Collateral Agent reasonably necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby superior to and prior to the rights of all third Persons other than the holders of Permitted Liens and subject to no other Liens, other than Permitted Liens, or obtain any consents, including, without limitation, landlord or similar lien waivers and consents, as may be necessary or appropriate in connection therewith.  Deliver or cause to be delivered to the Administrative Agent and the Collateral Agent from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably

satisfactory to the Administrative Agent and the Collateral Agent as the Administrative Agent and the Collateral Agent shall reasonably deem necessary to perfect or maintain the Liens on the Collateral pursuant to the Security Documents. Upon the exercise by the Administrative Agent, the Collateral Agent or the Required Lenders of any power, right, privilege or remedy pursuant to any Loan Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority execute and deliver all applications, certifications, instruments and other documents and papers that the Administrative Agent, the Collateral Agent or the Required Lenders may so require. If the Administrative Agent, the Collateral Agent or the Required Lenders determine in good faith that they are required by law or regulation to have appraisals prepared in respect of the Real Property of any Loan Party constituting Collateral, the Borrower shall provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA and are otherwise in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent.

Section 5.13. **Information Regarding Collateral**. (a) With respect to any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any or (v) in any Loan Party's jurisdiction of organization (in each case, including, without limitation, by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), such Loan Party shall not effect such change until (A) it shall have given the Collateral Agent and the Administrative Agent not less than 15 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the Collateral Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Collateral Agent or the Administrative Agent may reasonably request and (B) with respect to such change, such Loan Party shall have taken all action reasonably satisfactory to the Collateral Agent to maintain the perfection and priority of the security interest of the Collateral Agent for the benefit of the Secured Parties in the Collateral, if applicable and if requested by the Collateral Agent. Each Loan Party agrees to promptly provide the Collateral Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence. Upon the request of the Collateral Agent, but, unless an Event of Default has occurred and is continuing, not more often than once every six months, such Loan Party also agrees to promptly notify the Collateral Agent of any change in the location of any office in which it maintains material books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it (including the establishment of any such new office or facility), other than changes in location to a Mortgaged Property. The Borrower also agrees promptly to notify the Administrative Agent and the Collateral Agent if any material portion of the Collateral is subject to a Casualty Event.

(b) Each year, at the time of delivery of annual financial statements with respect to the preceding Fiscal Year pursuant to Section 5.01(a), deliver to the Administrative Agent and the Collateral Agent a Perfection Certificate Supplement and a certificate of the Chief Executive Officer, the President or a Financial Officer or the chief legal officer of the Borrower certifying that all UCC Financing Statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Collateral have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction to the extent necessary

90

to protect and perfect the security interests and Liens under the Security Documents for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period).

**Section 5.14.  Cooperation with Advisors.**  Each of the Loan Parties will use commercially reasonable efforts to provide full cooperation and assistance to all consultants, appraisers or other advisors hired by or at the direction of the Administrative Agent (or its counsel) to enable such consultants, appraisers and advisors to perform the services for which they were engaged.

**Section 5.15.Landlord Access Agreement**.  To the extent requested by the Collateral Agent, with respect to each leased Real Property location set forth on Schedule 3.6(b), the Borrower shall use reasonable commercial efforts to obtain a Landlord Access Agreement or bailee letter (as applicable) in form and substance satisfactory to the Collateral Agent.

**ARTICLE VI**

**NEGATIVE COVENANTS**

Each Loan Party covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Obligations have been Paid In Full, unless the Required Lenders shall otherwise consent in writing, no Loan Party will, nor will it cause or permit any of its Subsidiaries to:

**Section 6.01.  Indebtedness**.  Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness, except:

(a)     Indebtedness incurred pursuant to this Agreement and the other Loan Documents;

(b)     the Term Note Debt;

(c)     (i) Indebtedness outstanding on the Closing Date and listed on Schedule 6.01(b) or (ii) refinancings, renewals or replacements thereof; provided, that (A) any such refinancing Indebtedness is in an aggregate principal amount not greater than the aggregate principal amount of the Indebtedness being renewed or refinanced, *plus* the amount of any premiums required to be paid thereon and fees and expenses associated therewith, (B) such refinancing Indebtedness has a later or equal final maturity and longer or equal weighted average life than the Indebtedness being renewed or refinanced and (C) the covenants, events of default, subordination and other provisions thereof (including any guarantees thereof) shall be, in the aggregate, no less favorable to the Lenders than those contained in the Indebtedness being renewed or refinanced;

(d)     Indebtedness of any Loan Party under Interest Rate Agreements entered into in order to fix the effective interest rate on the Senior Subordinated Notes and such other nonspeculative Interest Rate Agreements which may be entered into from time to time by any Loan Party and which such Loan Party in good faith believes will provide protection against

91

fluctuations in interest rates with respect to floating rate Indebtedness then outstanding, and permitted to remain outstanding, pursuant to the other provisions of this Section 6.01;

(e)     intercompany Indebtedness incurred after the Closing Date to the extent permitted by Section 6.04(g);

(f)     Indebtedness incurred after the Closing Date in respect of Purchase Money Obligations and Capital Lease Obligations, and refinancings and renewals thereof, in an aggregate amount not to exceed $2,500,000 at any time outstanding;

(g)     Indebtedness in respect of workers' compensation claims, self-insurance obligations, performance bonds, surety appeal or similar bonds and completion guarantees provided by a Loan Party in the ordinary course of its business;

(h)     Contingent Obligations of any Loan Party in respect of Indebtedness or other obligations otherwise permitted under Section 6.01;

(i)     (A) Indebtedness assumed in connection with the acquisition of any real or personal Property, and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof or (B) Indebtedness of any Person that becomes a Subsidiary Guarantor after the date hereof; provided, that (x) such Indebtedness exists at the time such Property is acquired or such Person becomes a Subsidiary Guarantor and is not created in contemplation thereof and (y) the aggregate principal amount of Indebtedness permitted by this clause (i) shall not exceed $2,000,000 at any time outstanding;

(j)     other unsecured Indebtedness incurred after the Closing Date of any Loan Party in an aggregate amount outstanding not to exceed $1,000,000; and

(k)     Indebtedness incurred after the Closing Date to finance insurance premiums in an aggregate amount outstanding not to exceed $3,000,000.

Section 6.02.  Liens.  Create, incur, assume or permit to exist, directly or indirectly, any Lien on any Property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except (the "**Permitted Liens**"):

(a)     inchoate Liens for taxes, assessments or governmental charges or levies not yet due and payable or delinquent and Liens for taxes, assessments or governmental charges or levies, which (i) are being contested in good faith by appropriate proceedings for which adequate reserves, to the extent required by GAAP, have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the Property or assets subject to any such Lien or (ii) in the case of any such charge or claim which has or may become a Lien against any of the Collateral, such Lien and the contest thereof shall satisfy the Contested Collateral Lien Conditions.

(b)     Liens in respect of Property of any Company imposed by law which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers',

repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, and which do not in the aggregate materially detract from the value of the Property of the Loan Parties, taken as a whole and (x) which are not then due and payable or (y) (A) which do not materially impair the use of the Property of the Companies in the operation of the business of the Companies, taken as a whole, (B) which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the Property or assets subject to any such Lien and (C) in the case of any such Lien which has or may become a Lien against any of the Collateral, such Lien and the contest thereof shall satisfy the Contested Collateral Lien Conditions.

(c)        any Lien in existence on the Closing Date and set forth on <u>Schedule 6.02(c)</u> and any Lien granted as a replacement or substitute therefor; <u>provided</u>, that as to any such replacement or substitution Lien, (i) except as permitted by <u>Section 6.01(b)(ii)(A)</u>, the aggregate principal amount of the Indebtedness, if any, secured by such Lien does not materially increase; and (ii) such Lien does not encumber any Property other than the Property subject thereto on the Closing Date or replacement Property (any such Lien, an "**Existing Lien**");

(d)        easements, rights-of-way, restrictions (including zoning restrictions), covenants, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any Real Property, in each case whether now or hereafter in existence, not (i) securing Indebtedness, (ii) individually or in the aggregate materially impairing the value or marketability of such Real Property and (iii) individually or in the aggregate materially interfering with the conduct of the business of the Companies at such Real Property;

(e)        Liens arising out of judgments or awards not resulting in a Default and in respect of which such Company shall in good faith be prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings; <u>provided</u>, that the aggregate amount of all such judgments or awards (and any cash and the fair market value of any Property subject to such Liens) does not exceed $1,000,000 at any time outstanding;

(f)        Liens (other than any Lien imposed by ERISA) (i) imposed by law or deposits made in connection therewith in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, (ii) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or (iii) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; <u>provided</u>, that (w) with respect to clauses (i), (ii) and (iii) of this paragraph (f), such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of

93

preventing the forfeiture or sale of the Property or assets subject to any such Lien, (x) to the extent such Liens are not imposed by law, such Liens shall in no event encumber any Property other than cash and Cash Equivalents, (y) in the case of any such Lien against any of the Collateral, such Lien and the contest thereof shall satisfy the Contested Collateral Lien Conditions and (z) the aggregate amount of deposits at any time pursuant to clauses (ii) and (iii) of this paragraph (f) shall not exceed $1,000,000 in the aggregate;

(g)     Leases of the assets or properties of any Company, in each case entered into in the ordinary course of such Company's business or relating to Real Property which, in the good faith judgment of such Loan Party, is no longer useful or necessary in the conduct of such Loan Party's business, so long as such Leases are subordinate in all respects to the Liens granted and evidenced by the Security Documents and do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of any Loan Party or (ii) materially impair the use (for its intended purposes) or the value of the Property subject thereto;

(h)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Company in the ordinary course of business;

(i)     Liens securing Indebtedness incurred pursuant to Section 6.01(e); provided, that (i) the Indebtedness secured by any such Lien (including refinancings thereof) does not exceed 100% of the cost of the Property being acquired or leased at the time of the incurrence of such Indebtedness and (ii) any such Liens attach only to the Property being financed pursuant to such Indebtedness and do not encumber any other Property of any Company;

(j)     bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and cash equivalents on deposit in one or more accounts maintained by any Company, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained and securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; provided, that unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(k)     Liens on Property of a Person existing at the time such Person is acquired or merged with or into or consolidated with any Company (and not created in anticipation or contemplation thereof); provided, that such Liens do not extend to Property not subject to such Liens at the time of acquisition (other than improvements thereon) and renewals or replacements thereof that are no more favorable to the lienholders than such existing Lien;

(l)     Intentionally Omitted;

(m)     Liens granted pursuant to the Security Documents;

(n)     any interest or title of a lessor under any lease (including any lease for Real Property) entered into in the ordinary course of business by any Loan Party;

(o)     the filing of financing statements solely as a precautionary measure in connection with operating leases or consignment of goods;

(p)     Liens on the Collateral securing obligations under the Note Agreement or any refinancing thereof and have the same priority of the Liens afforded thereto; provided that all such Liens are subordinated to the Liens securing obligations with, and otherwise subject to, the terms of the Intercreditor Agreement;

(q)     Liens on insurance contracts and proceeds thereof securing Indebtedness permitted pursuant to Section 6.01(k); and

(r)     Liens securing any Indebtedness outstanding in reliance on Section 6.01(i), so long as such Liens do not extend beyond the property acquired (or the property of the Person acquired) in connection with the assumption of such Indebtedness;

provided, that no consensual Liens shall be permitted to exist, directly or indirectly, on any Securities Collateral, other than Liens granted pursuant to the Security Documents.

Section 6.03.  **Sale and Leaseback Transactions**.  Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any Property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such Property or other Property which it intends to use for substantially the same purpose or purposes as the Property being sold or transferred (a "**Sale and Leaseback Transaction**") unless (i) the sale of such Property is permitted by Section 6.05 and (ii) any Liens arising in connection with its use of such Property are permitted by Section 6.02.

Section 6.04.  **Investment, Loan and Advances**.  Directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted:

(a)     Investments outstanding on the Closing Date and identified on Schedule 6.04(a);

(b)     the Companies may (i) acquire and hold accounts receivables owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) acquire and hold cash and Cash Equivalents, (iii) endorse negotiable instruments for collection in the ordinary course of business or (iv) make lease, utility and other similar deposits in the ordinary course of business;

(c)     the Borrower may enter into and perform its obligations under Interest Rate Agreements to the extent permitted by Section 6.01(c);

(d)     the Borrower and its Subsidiaries may make loans and advances (including payroll, travel and entertainment related advances) in the ordinary course of business to their respective employees so long as the aggregate principal amount thereof at any time

outstanding (determined without regard to any write-downs or write-offs of such loans and advances) shall not exceed $250,000;

(e)     the Companies may sell or transfer amounts to the extent permitted by Section 6.05;

(f)     Investments (i) by the Borrower in any Subsidiary Guarantor, (ii) by any Company in the Borrower or any Subsidiary Guarantor, (iii) by a Subsidiary Guarantor in another Subsidiary Guarantor, and (iv) by a Subsidiary that is not a Subsidiary Guarantor in any other Subsidiary that is not a Subsidiary Guarantor; provided, that any Investment in the form of a loan or advance shall be evidenced by an Intercompany Note substantially in the form of Exhibit M and, in the case of a loan by a Loan Party, pledged by such Loan Party as Collateral pursuant to the Security Documents;

(g)     Investments in securities of trade creditors or customers in the ordinary course of business that are received in settlement of bona fide disputes or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(h)     Investments by the Borrower or any Subsidiary in the form of non-cash consideration received in connection with an Asset Sale made in compliance with Section 6.05;

(i)     Investments in Subsidiaries as a result of the consummation of Permitted Acquisitions;

(j)     Guarantees constituting Indebtedness permitted by Section 6.01;

(k)     Investments in Foreign Subsidiaries described in Schedule 3.09(a); and

(l)     Investments in Foreign Subsidiaries after the Closing Date provided that such Investments plus the face amount of all Letters of Credit issued for the account of Foreign Subsidiaries, do not exceed $600,000 in the aggregate at any one time.

**Section 6.05.  Mergers, Consolidations, Sales of Assets and Acquisitions**.  Wind up, liquidate or dissolve its affairs or enter into any transaction of merger or consolidation, engage in any Asset Sale or purchase or otherwise acquire (in one or a series of related transactions) any part of the Property or assets of any Person (or agree to do any of the foregoing at any future time), except that:

(a)     Capital Expenditures by Borrower and its Subsidiaries shall be permitted to the extent permitted by Section 6.08(c);

(b)     (i) purchases and other acquisitions and sales of inventory, materials, equipment and intangible assets in the ordinary course of business shall be permitted, (ii) subject to Section 2.10(c), Asset Sales of used, damaged, worn out, obsolete or surplus Property by any Loan Party in the ordinary course of business and the abandonment or Asset Sale of Property that is, in the reasonable judgment of the Borrower, no longer economically practicable to maintain or useful in the conduct of the business of the Companies taken as a whole shall be permitted,

96

(iii) subject to Section 2.10(c), the sale, lease or other disposal of any assets shall be permitted; provided, that the aggregate consideration received in respect of all Asset Sales pursuant to this clause (b)(iii) shall not exceed (x) $250,000 in any four consecutive fiscal quarters of the Borrower and (y) $1,000,000 in the aggregate; and (iv) a sale of Property by any Domestic Guarantor or the Borrower to any Domestic Guarantor or by any Domestic Guarantor to the Borrower, provided that the Lien on the Property granted in favor of the Collateral Agent under the Security Documents shall be maintained in a manner acceptable to the Collateral Agent;

(c)        Investments may be made in compliance with Section 6.04;

(d)        The Borrower and its Subsidiaries may sell Cash Equivalents in the ordinary course of business;

(e)        The Borrower and its Subsidiaries may lease (as lessee or lessor) real or personal Property and may guaranty such lease, in each case, in the ordinary course of business (or, when the Borrower or a Subsidiary is the lessor of Real Property, with respect to Real Property which, in such Person's good faith judgment, is no longer useful or necessary in the conduct of such Person's business);

(f)        the Borrower and its Subsidiaries may consummate Permitted Acquisitions;

(g)        any Foreign Subsidiary may merge or consolidate with or into any other Foreign Subsidiary and any Domestic Subsidiary Guarantor may merge or consolidate with or into the Borrower or any other Domestic Subsidiary Guarantor (as long as the Borrower or a Domestic Subsidiary Guarantor is the surviving Person in such merger or consolidation and remains a Subsidiary of the Borrower; provided, that the Lien on and security interest in such Property granted or to be granted in favor of the Collateral Agent under the Security Documents shall be maintained or created in accordance with the provisions of Section 5.11 or Section 5.12, as applicable;

(h)        [Holdco may merge into Parent prior to, on or after the Closing Date.]

(i)        any Subsidiary may dissolve, liquidate or wind up its affairs at any time; provided, that such dissolution, liquidation or winding-up, as applicable, could not reasonably be expected to have a Material Adverse Effect;

(j)        sales, transfers and dispositions of accounts receivable in connection with the compromise, settlement or collection thereof; and

(k)        within 365 days after the consummation of a Permitted Acquisition, the sale, transfer or disposition for cash and for fair market value of assets acquired in connection with such Permitted Acquisition and not required in the operation of the business of the Borrower or any of the Subsidiaries; provided, that the aggregate consideration since the Closing Date in respect of all such sales, transfers and dispositions shall not exceed $1,000,000.

To the extent the Required Lenders waive the provisions of this Section 6.05 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 6.05, such Collateral

(unless sold to a Loan Party) shall be sold free and clear of the Liens created by the Security Documents.  No less than 80% of the consideration received in any Asset Sale pursuant to Section 6.05(b)(iii) or Section 6.05(j) shall be in cash or Cash Equivalents (it being understood that any Indebtedness of the Borrower or any Subsidiary assumed by the purchaser in such Asset Sale shall be deemed cash for purposes of this sentence).

**Section 6.06.  Dividends**.  Authorize, declare or pay, directly or indirectly, any Dividends with respect to any Loan Party, except that:

(a)     any Subsidiary of the Borrower may pay cash Dividends to the Borrower or any Wholly Owned Subsidiary of the Borrower; and

(b)     the Borrower may pay cash Dividends to Parent for the purpose of paying, so long as all proceeds thereof are promptly used by Parent to pay, its franchise taxes and operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including legal and accounting expenses and similar expenses and customary fees to non-officer directors of Parent); provided, that the aggregate amount of Dividends paid to Parent pursuant to this paragraph (c) shall not exceed $200,000 in any Fiscal Year.

**Section 6.07.  Transactions with Affiliates**.  Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of any Company (other than between or among the Borrower and one or more Subsidiary Guarantors), other than in the ordinary course of business and on terms and conditions substantially as favorable to such Loan Party as would reasonably be obtained by such Loan Party at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that:

(a)     Dividends may be paid to the extent permitted by Section 6.06;

(b)     loans may be made and other transactions may be entered into between and among any Loan Party and any other Loan Party to the extent permitted by Section 6.01 and Section 6.04;

(c)     customary fees may be paid to non-officer directors of the Parent and the Borrower and customary indemnities may be provided to all officers and directors of the Parent and the Borrower;

**Section 6.08.  Financial Covenants**.

(a)     Minimum Consolidated Interest Coverage Ratio.  Permit the Consolidated Interest Coverage Ratio, for any Test Period ending during any period set forth in the table below, to be less than the ratio set forth opposite such period in the table below:

| Test Period Ending | Minimum Consolidated Interest Coverage Ratio |
|---|---|
| March [31], 2006 | [_____] |

| | |
|---|---|
| June [30], 2006 | [_____] |
| September [30], 2006 | [_____] |
| December [31], 2006 | [_____] |
| March [31], 2007 | [_____] |
| June [30], 2007 | [_____] |
| September [30], 2007 | [_____] |
| December [31], 2007 | [_____] |
| March [31], 2008 | [_____] |
| June [30], 2008 | [_____] |
| September [30], 2008 | [_____] |
| December [31], 2008 | [_____] |

(b)    Maximum Capital Expenditures.  Permit the aggregate amount of Capital Expenditures made in any period set forth below, to exceed the amount set forth opposite such period below; provided, that so long as no Default has occurred and is continuing or would result from such Capital Expenditures, any unused amounts may be carried over for expenditure in the next following period (provided that unused amounts may only be carried over for one test period and for purposes of calculations under this Section, the "carried over amount" shall be deemed to be the last amounts utilized in any test period).

| Period | Capital Expenditures |
|---|---|
| Closing Date through December 31, 2006 | $1,800,000 |
| 2007 and each calendar year thereafter | $1,800,000 |

(c)    Minimum Consolidated EBITDA.  Permit Consolidated EBITDA for any Test Period to be less than the amount set forth opposite such period below:

| Test Period Ending | Consolidated EBITDA |
|---|---|
| March [31], 2006 | [_____] |
| June [30], 2006 | [_____] |
| September [30], 2006 | [_____] |
| December [31], 2006 | [_____] |
| March [31], 2007 | [_____] |
| June [30], 2007 | [_____] |
| September [30], 2007 | [_____] |

99

| December [31], 2007 | [_____] |
|---|---|
| March [31], 2008 | [_____] |
| June [30], 2008 | [_____] |
| September [30], 2008 | [_____] |
| December [31], 2008 | [_____] |

(d)     Leverage Ratio.  Permit the Leverage Ratio for any Test Period to be less than the ratio set forth below.

| Test Period Ending | Leverage Ratio |
|---|---|
| March [31][11], 2006 | [_____] |
| June [30], 2006 | [_____] |
| September [30], 2006 | [_____] |
| December [31], 2006 | [_____] |
| March [31], 2007 | [_____] |
| June [30], 2007 | [_____] |
| September [30], 2007 | [_____] |
| December [31], 2007 | [_____] |
| March [31], 2008 | [_____] |
| June [30], 2008 | [_____] |
| September [30], 2008 | [_____] |
| December [31], 2008 | [_____] |

**Section 6.09.  Limitation on Modifications and Prepayment of Indebtedness; Modifications of Certificate of Incorporation, or Other Constitutive Documents, By-laws and Certain Other Agreements, etc.**  Subject to the terms of the Intercreditor Agreement and as otherwise provided hereunder:

(a)     optionally prepay, retire, redeem, purchase, defease or exchange, or make or arrange for any mandatory prepayment, retirement, redemption, purchase or defeasance of any outstanding Indebtedness, other than (1) any refinancing of Indebtedness permitted by Section 6.01(c) and (2) the Obligations), or (3) any optional prepayment or mandatory prepayment pursuant to the provisions of the Term Note Agreement;

---

[11] All dates need to correspond with Company's 4/4/5 accounting.

NYDOCS/1207090.12

(b)     amend or modify, or permit the amendment or modification of, any provision of existing Indebtedness or of any agreement (including any purchase agreement, indenture, loan agreement or security agreement) relating thereto other than any amendments or modifications to Indebtedness which do not in any way adversely affect the interests of the Lenders and are otherwise permitted under Section 6.01(c);

(c)     amend or modify, or permit the amendment or modification of, any other Transaction Document, in each case except for amendments or modifications which are not in any way adverse in any material respect to the interests of the Lenders;

(d)     amend, modify or change its articles of incorporation or other constitutive documents (including by the filing or modification of any certificate of designation) or by-laws, or any agreement entered into by it, with respect to its capital stock (including any shareholders' agreement), or enter into any new agreement with respect to its capital stock, other than any amendments, modifications, agreements or changes pursuant to this clause (d) or any such new agreements pursuant to this clause (d) which do not in any way adversely affect in any material respect the interests of the Lenders; or

(e)     amend or modify, or permit the amendment or modification of, the Term Note Documents; provided, that any amendment, supplement, waiver or modification for which no fee is payable to the holders of the Term Note Debt (other than reasonable out-of-pocket expenses incurred by a representative for the holders of any Term Note Debt and payable in connection with such amendment, supplement, waiver or modification) and which (i) extends the date or reduces the amount of any required repayment, prepayment or redemption of the principal of such Term Note Debt, (ii) reduces the rate or extends the date for payment of the interest, premium (if any) or fees payable on such Term Note Debt, (iii) increases the interest rate by an amount not more than [2%] per annum; provided, that any amounts accrued in respect of such increased interest are payable only upon maturity of the Term Note Debt, or (iv) otherwise modifies the covenants, events of default, or remedies in such Term Note Documents (provided that such amendments, supplements, waivers or modifications do not make the covenants, events of default or remedies in such Term Note Documents more restrictive, when taken as a whole, on the Loan Parties), shall be permitted.

**Section 6.10.  Limitation on Certain Restrictions on Subsidiaries**.  Directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any Subsidiary, to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Borrower or any Subsidiary of the Borrower, or pay any Indebtedness owed to the Borrower or a Subsidiary of the Borrower (b) make loans or advances to the Borrower or any of the Borrower's Subsidiaries or (c) transfer any of its properties to the Borrower or any of the Borrower's Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law; (ii) this Agreement and the other Loan Documents; (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or a Subsidiary of the Borrower; (iv) customary provisions restricting assignment of any agreement entered into by the Borrower or a Subsidiary of the Borrower in the ordinary course of business; (v) any holder of a Lien permitted by Section 6.02 may restrict the transfer of the asset

or assets subject thereto; (vi) restrictions which are not more restrictive than those contained in this Agreement contained in the Term Note Documents; and (vii) customary restrictions and conditions contained in any agreement relating to the sale of any Property permitted under Section 6.05 pending the consummation of such sale.

**Section 6.11. <u>Limitation on Issuance of Capital Stock</u>**. (a) With respect to Parent, issue any Equity Interest that is not Qualified Capital Stock.

(b) the Borrower will not, and will not permit any Subsidiary to, issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Equity Interest, except (i) for stock splits, stock dividends and additional issuances of Equity Interests which do not decrease the percentage ownership of the Borrower or any Subsidiaries in any class of the Equity Interest of such Subsidiary; (ii) Subsidiaries of the Borrower formed after the Closing Date in accordance with Section 6.12 may issue Equity Interests to the Borrower or the Subsidiary of the Borrower which is to own such Equity Interests; and (iii) the Borrower may issue common stock that is Qualified Capital Stock to Parent. All Equity Interests issued in accordance with this Section 6.11(b) shall, to the extent required by Section 5.11 and Section 5.12 or any Security Agreement, be delivered to the Collateral Agent for pledge pursuant to the applicable Security Agreement.[12]

**Section 6.12. <u>Limitation on Creation of Subsidiaries</u>**. Establish, create or acquire any additional Subsidiaries without the prior written consent of the Administrative Agent and the Required Lenders; <u>provided</u>, that without such consent, the Borrower may (a) establish or create one or more Domestic Subsidiaries of the Borrower that are Wholly Owned Subsidiaries, or (b) acquire one or more Domestic Subsidiaries in connection with a Permitted Acquisition, so long as, in each case, Section 5.11(b) shall be complied with.

**Section 6.13. <u>Business</u>**. (a) With respect to Parent, engage in any business activities or have any assets or liabilities, other than (i) its ownership of the Equity Interests of the Borrower, (ii) obligations under the Loan Documents and the Term Note Documents and (iii) activities and assets incidental to the foregoing clauses (i) and (ii).

(b) With respect to the Parent, engage in any business activities or have any assets or liabilities, other than (i) its ownership of the Equity Interests of the Borrower, (ii) obligations under the Loan Documents and the Term Note Documents and (iii) activities and assets incidental to the foregoing clauses (i) and (ii).

(c) With respect to the Borrower and its Subsidiaries, engage (directly or indirectly) in any business other than those businesses in which the Borrower and its Subsidiaries are engaged on the Closing Date, and other activities reasonably related thereto.

**Section 6.14. <u>Limitation on Accounting Changes</u>**. Make or permit, any change in accounting policies or reporting practices, without the consent of the Administrative Agent and

---

[12] Subject to further discussion.

the Required Lenders, which consent shall not be unreasonably withheld, except changes that are required by GAAP.

**Section 6.15.  Fiscal Year**.  Change the basis upon which the Company determines its Fiscal Year.

**Section 6.16.  Lease Obligations**.  Create, incur, assume or suffer to exist any obligations as lessee for the rental or hire of real or personal Property of any kind under leases or agreements to lease having an original term of one year or more that would cause the direct and contingent liabilities of the Borrower and its Subsidiaries, on a consolidated basis, in respect of all such obligations to exceed $4,000,000, payable in any period of 12 consecutive months.

**Section 6.17.  No Further Negative Pledge**.  Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties, assets or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following: (a) this Agreement and the other Loan Documents; (b) the Term Note Documents (provided any such provision in the Term Note Documents shall not be modified to be any more restrictive than such provisions in effect on the Closing Date); (c) covenants in documents creating Liens permitted by Section 6.02 prohibiting further Liens on the assets encumbered thereby; and (d) customary restrictions contained in leases not subject to a waiver.

# ARTICLE VII

## GUARANTEE

**Section 7.01.  The Guarantee**.  The Guarantors hereby jointly and severally guarantee as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code) on the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrower, and all other Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document or Interest Rate Protection Agreement related to the Loans, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**").  The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**Section 7.02.  Obligations Unconditional**.  The obligations of the Guarantors under Section 7.01 shall constitute a guaranty of payment and are absolute, irrevocable and

unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i)     at any time or from time to time, without notice to the Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)    any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)   the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(iv)    any lien or security interest granted to, or in favor of, Issuing Bank or any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(v)     the release of any other Guarantor.

The Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Loan Party thereof exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent

NYDOCS/1207090.12

upon the pursuit by the Secured Parties or any other Person at any time of any right or remedy against the Borrower or against any other Person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

Section 7.03. **Reinstatement**. The obligations of the Guarantors under this <u>Article VII</u> shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise. The Guarantors jointly and severally agree that they will indemnify each Secured Party on demand for all reasonable costs and expenses (including reasonable fees of counsel) incurred by such Secured Party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law, other than any costs or expenses resulting from the bad faith or willful misconduct of such Secured Party.

Section 7.04. **Subrogation; Subordination**. Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall not exercise any right or remedy arising by reason of any performance by it of its guarantee in <u>Section 7.01</u>, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any Indebtedness of any Loan Party permitted pursuant to <u>Section 6.01(e)</u> shall be subordinated to such Loan Party's Obligations in the manner set forth in the Intercompany Note evidencing such Indebtedness.

Section 7.05. **Remedies**. The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in <u>Article X</u> (and shall be deemed to have become automatically due and payable in the circumstances provided in said <u>Article X</u>) for purposes of <u>Section 7.01</u>, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of <u>Section 7.01</u>.

Section 7.06. **Instrument for the Payment of Money**. Each Guarantor hereby acknowledges that the guarantee in this <u>Article VII</u> constitutes an instrument for the payment of money, and consents and agrees that any Lender or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion action under New York CPLR Section 3213.

105

**Section 7.07.  <u>Continuing Guarantee</u>**.  The guarantee in this <u>Article VII</u> is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

**Section 7.08.  <u>General Limitation on Guarantee Obligations</u>**.  In any action or proceeding involving any state corporate, limited partnership, limited liability company or organizational law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under <u>Section 7.01</u> would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under <u>Section 7.01</u>, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

**Section 7.09.  <u>Release of Guarantors</u>**.  If in compliance with the terms and provisions of the Loan Documents, all or substantially all of the Equity Interests or assets of any Guarantor are sold or otherwise transferred to a Person or Persons, none of which is the Borrower or another Subsidiary (any such Guarantor, a "**Subject Guarantor**"), such Subject Guarantor shall, upon the consummation of such sale or transfer, be released from its obligations under this Agreement (including under <u>Section 10.03</u> hereof) and its obligations to pledge and grant any Collateral owned by it pursuant to any Security Document and, the pledge of such Equity Interests to the Collateral Agent pursuant to the Security Agreements shall be released, and the Collateral Agent shall take such actions as are necessary to effect each release described in this <u>Section 7.09</u> in accordance with the relevant provisions of the Security Documents.

# ARTICLE VIII

# EVENTS OF DEFAULT

In case of the happening of any of the following events ("**Events of Default**"):

(a)  default shall be made in the payment of any principal of any Loan or any Reimbursement Obligation when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(b)  default shall be made in the payment of any interest on any Loan or any Fee or any other amount (other than an amount referred to in clause (a) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three Business Days;

(c)  any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings or issuances of Letters of Credit hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document,

shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(d)     default shall be made in the due observance or performance by any Company (i) of any covenant, condition or agreement contained in Section 5.02, 5.03(a), or Section 5.08 or Article VI (other than Section 6.08(a)) or (ii) with respect to the covenant contained in Section 6.08(a) for two (2) or more consecutive weekly compliance test periods of any such covenant;

(e)     default shall be made in the due observance or performance by any Company of any covenant, condition or agreement contained in any Loan Document (other than those specified in clauses (a), (b) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of 30 days after written notice thereof from the Administrative Agent and Required Lenders to the Borrower;

(f)     any Company shall (i) fail to pay any principal or interest, regardless of amount, due in respect on any Material Indebtedness (other than the Obligations), when and as the same shall become due and payable, or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness if the effect of any failure referred to in this clause (ii) is to cause, or to permit the holder or holders of such Indebtedness or a trustee on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Indebtedness to become due prior to its stated maturity;

(g)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of any Company, or of a substantial part of the Property or assets of any Company, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal, state, or foreign bankruptcy, insolvency, receivership or similar law; (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Company or for a substantial part of the Property or assets of any Company; or (iii) the winding up or liquidation of any Company; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)     any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal, state, or foreign bankruptcy, insolvency, receivership or similar law; (ii)consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (h) above; (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of the property or assets of any Loan Party; (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding; (v) make a general assignment for the benefit of the creditors; (vi) become unable, admit in writing its inability or fail generally to pay its debt as they become due; (vii) take any formal action by the Board of Directors for the purpose of effecting any of the foregoing; or (viii) wind up or liquidate;

(i)     one or more judgments for the payment of money in an aggregate amount in excess of $1,000,000 shall be rendered against any Company or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of any Company, to enforce any such judgment;

(j)     an ERISA Event or noncompliance with respect to Foreign Plans shall have occurred that, in the reasonable opinion of the Administrative Agent and the Required Lenders, when taken together with all other such ERISA Events and noncompliance with respect to Foreign Plans that have occurred, could reasonably be expected to result in liability of any Loan Party and its ERISA Affiliates in an aggregate amount exceeding $1,000,000 or the imposition of a Lien on any assets of a Loan Party;

(k)     any security interest and Lien purported to be created by any Security Document shall cease to be in full force and effect, or shall cease to give the Collateral Agent, for the benefit of the Secured Parties, the Liens, rights, powers and privileges purported to be created and granted under such Security Documents (including a perfected first priority security interest in and Lien on, all of the Collateral thereunder (except as otherwise expressly provided in such Security Document,)) in favor of the Collateral Agent, or shall be asserted by the Borrower or any other Loan Party not to be, a valid, perfected, first priority (except as otherwise expressly provided in this Agreement, or such Security Document) security interest in or Lien on the Collateral covered thereby;

(l)     any Guarantee shall cease to be in full force and effect except as provided in any Loan Document or any Guarantor shall contest the validity or enforceability of any provision of the Guarantee;

(m)     any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Loan Party or any other Person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Loan Party shall repudiate or deny that it has any liability or obligation for the payment of principal or interest or other obligations purported to be created under any Loan Document;

(n)     there shall have occurred a Change in Control;

then, and in every such event (other than an event with respect to Parent or the Borrower described in clause (g) or (h) above), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:  (i) terminate forthwith the Commitments and (ii) declare the Loans and Reimbursement Obligations then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans and Reimbursement Obligations so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are

hereby expressly waived by the Borrower and the Guarantors, and/or exercise any other rights or remedies available to the Note Agent or the Noteholders under the Loan Documents anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event with respect to Parent or the Borrower described in clause (g) or (h) above, the Commitments shall automatically terminate and the principal of the Loans and Reimbursement Obligations then outstanding, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, anything contained herein or in any other Loan Document to the contrary notwithstanding.

**ARTICLE IX**

**THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT**

**Section 9.01.  Appointment**.  Each Lender hereby irrevocably designates and appoints each of the Administrative Agent and the Collateral Agent as an agent of such Lender under this Agreement, the Intercreditor Agreement and the other Loan Documents.  Each Lender irrevocably authorizes each Agent, in such capacity, through its agents or employees, to take such actions on its behalf under the provisions of this Agreement, the Intercreditor Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of this Agreement, the Intercreditor Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.

**Section 9.02.  Agent in Its Individual Capacity**.  Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

**Section 9.03.  Exculpatory Provisions**.  No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that such Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.02), and (c) except as expressly set forth in the Loan Documents, no Agent shall have any duty to disclose or shall be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as such Agent or any of its Affiliates in any capacity.  No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.02) or in the absence of its own gross negligence or willful misconduct.  No Agent shall be deemed to have knowledge of any

109

Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document.

Section 9.04. **Reliance by Agent**. Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by a proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by a proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or advisors.

Section 9.05. **Delegation of Duties**. Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by such Agent. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Affiliates. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Affiliates of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

Section 9.06. **Successor Agent**. Each Agent may resign as such at any time upon at least 30 days' prior notice to the Lenders, the Issuing Bank and the Borrower. Upon any such resignation, the Required Lenders shall have the right, with, if no Default shall have occurred and be continuing, the consent of the Borrower (such consent not to be unreasonably withheld), to appoint a successor Agent from among the Lenders. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders and the Issuing Bank, appoint a successor Agent, which successor shall be a commercial banking institution organized under the laws of the United States (or any State thereof) or a United States branch or agency of a commercial banking institution, in each case, having combined capital and surplus of at least $250,000,000.

Upon the acceptance of its appointment as an Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After an Agent's resignation hereunder, the provisions of this Article IX and Section 10.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective

110

Affiliates in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

**Section 9.07. <u>Non-Reliance on Agent and Other Lenders</u>**. Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

**Section 9.08. <u>No Other Administrative Agent</u>**. The Lenders identified in this Agreement, the Syndication Agent and the Documentation Agent shall not have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders. Without limiting the foregoing, neither the Syndication Agent nor the Documentation Agent shall have or be deemed to have a fiduciary relationship with any Lender. Each Lender hereby makes the same acknowledgments with respect to the Syndication Agent and the Documentation Agent as it makes with respect to the Administrative Agent or any other Lender in this <u>Article IX</u>. Notwithstanding the foregoing, the parties hereto acknowledge that the Documentation Agent and the Syndication Agent hold such titles in name only, and that such titles confer no additional rights or obligations relative to those conferred on any Lender hereunder.

**Section 9.09. <u>Indemnification</u>**. The Lenders severally agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by the Borrower or the Guarantors and without limiting the obligation of the Borrower or the Guarantors to do so), ratably according to their respective outstanding Loans and Commitments in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which all Commitments shall have terminated and the Loans and Reimbursement Obligations shall have been paid in full, ratably in accordance with such outstanding Loans and Commitments as in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans and Reimbursement Obligations) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; <u>provided</u>, that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct. The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder.

NYDOCS/1207090.12

# ARTICLE X

# MISCELLANEOUS

**Section 10.01.  Notices**.  Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)    if to any Loan Party, to the Borrower at:

Atkins Nutritionals, Inc.
105 Maxess Rd, Suite N109
Melville, NY 11747
Attention:  President and General Counsel
Telecopy No.:  (631) 953-4001

with a copy to:

Atkins Nutritionals, Inc
Mark Rodriguez
105 Maxess Rd, Suite N109
Melville, NY 11747

with a copy to:
Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Marcia L. Goldstein
                    Shai Y. Waisman
Telecopy No.:  (212) 310-8007

(b)    if to the Administrative Agent or the Collateral Agent, to it at:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut 06901
Attention:  Tom Donnelly
Telecopy No.:  (203) 719-3162;

with a copy to:

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
Attention:  Frederick F. Eisenbiegler
Telecopy No.:  (212) 702-3646;

112

(c)     if to a Lender, to it at its address (or telecopy number) set forth on the applicable Lender Addendum or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by telecopy or by certified or registered mail, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 10.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 10.01 and failure to deliver courtesy copies of notices and other communications shall in no event affect the validity or effectiveness of such notices and other communications.

**Section 10.02.  Waivers; Amendment**.  (a)  No failure or delay by any Agent, the Collateral Agent, the Issuing Bank or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of each Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 10.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether any Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower, the Required Lenders and the Administrative Agent or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the written consent of the Required Lenders; provided, that no such agreement shall:

(i)     increase the Commitment of any Lender without the written consent of each Lender;

(ii)     reduce the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any Fees payable hereunder (or amend the definition of the term "Interest Period" so as to permit intervals in excess of three months), without the written consent of each Lender entitled to such principal, interest or fee;

113

(iii)     postpone or extend the maturity of any Loan, or the required date of payment of any Reimbursement Obligation, or any date for the payment of any interest, fees or premium payable hereunder, or reduce the amount of, waive or excuse any such payment except in connection with the waiver of applicability of any post-default increase in interest rate, which waiver shall be effective with the consent of the Required Lenders, or postpone the scheduled date of expiration of any Commitment or postpone the scheduled date of expiration of any Letter of Credit beyond the Maturity Date, without the written consent of each Lender adversely affected thereby;

(iv)     change Section 2.15(c) or (d) in a manner that would alter the *pro rata* sharing of payments or setoffs required thereby, without the written consent of each Lender (other than to provide for *pro rata* sharing of any additional loans made to the Borrower hereunder);

(v)     change the percentage set forth in the definition of "**Required Lenders**" or any other provision of any Loan Document (including this Section) specifying the number or percentage of Lenders required to waive, amend or modify any rights there under or make any determination or grant any consent thereunder, without the written consent of each Lender;

(vi)     release Parent or any Subsidiary Guarantor from its Guarantee (except as expressly provided in Article VII), or limit Parent's or such Guarantor's liability in respect of such Guarantee, without the written consent of each Lender;

(vii)     release all or substantially all of the Collateral from the Liens of the Security Documents or alter the relative priorities of the Obligations entitled to the Liens of the Security Documents (except in connection with securing additional Obligations equally and ratably with the other Obligations), in each case without the written consent of each Lender;

(viii)     change the order of application of proceeds of Collateral under Section 10.14 without the consent of each Lender adversely affected thereby; or

(ix)     change Section 10.04 without the written consent of the Administrative Agent;

further provided, that (1) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, the Collateral Agent, the Issuing Bank or the Swingline Lender without the prior written consent of the Administrative Agent, the Issuing Bank or the Swingline Lender, as the case may be and (2) any waiver, amendment or modification prior to the date of the successful completion of the syndication of the Loans and Commitments (as determined by the Lead Arranger) may not be effected without the written consent of UBS Loan Finance LLC, as a Lender.  Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by the Borrower, the Required Lenders and the Administrative Agent (and, if their rights or obligations are affected thereby, the Issuing Bank and the Swingline Lender) if (x) by the terms of such agreement the Commitment of each Lender not consenting to the amendment provided for therein shall terminate upon the

effectiveness of such amendment and (y) at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under this Agreement.

Section 10.03. **Expenses; Indemnity**. (a) The Loan Parties agree, jointly and severally, to promptly pay (i) all reasonable out-of-pocket costs and expenses (including but not limited to (A) reasonable expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses and (B) the reasonable fees, charges and disbursements of Bingham McCutchen LLP, Buxbaum Group, LLC and BDO Seidman, LLP (as professional advisors for the Administrative Agent and the Collateral Agent) incurred by (x) the Agents, the Swingline Lender and the Issuing Bank in connection with (1) the syndication of the credit facilities provided for herein, (2) the preparation, filing and/or recordation, execution, delivery and administration of this Agreement and the other Loan Documents, (3) the perfection and maintenance of the Liens securing the Collateral, and (4) any amendments, consents, enforcement costs, documentary taxes or waivers of the provisions of this Agreement or the other Loan Documents (whether or not the transactions hereby or thereby contemplated shall be consummated) or (y) the Agents or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents or in connection with the Loans made or Letters of Credit issued hereunder, and (ii) the reasonable fees, charges and expenses of any auditors, accountants, counsel, consultants, appraisers or other advisors hired by or on behalf of any of the Agents or any counsel for any of the Agents.

(b) The Loan Parties agree, jointly and severally, to indemnify the Agents, each Lender, the Issuing Bank and the Swingline Lender, each Affiliate of any of the foregoing Persons and each of their respective partners, controlling Persons, directors, officers, shareholders, trustees, employees, advisors and agents (each such Person being called an "**Indemnitee**") against, and to hold each Indemnitee harmless from, all reasonable out-of-pocket costs and any and all losses, claims, damages, liabilities, penalties, judgments, suits and related expenses, including reasonable counsel fees, charges and disbursements, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution, delivery, performance, administration or enforcement of the Loan Documents, (ii) any actual or proposed use of the proceeds of the Loans or issuance of Letters of Credit, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, or (iv) any actual or alleged presence or Release or threatened Release of Hazardous Materials, on, at, under or from any Property owned, leased or operated by any Company, or any Environmental Claim related in any way to any Company; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee. In any claim, litigation, investigation or proceeding relating to any of the foregoing, or the preparation therefor, the Administrative Agent and the Lenders shall be entitled to select a single own counsel and, in addition to the foregoing indemnity, the Borrower agrees to pay promptly the reasonable fees and expenses of such counsel.

(c) The provisions of this Section 10.03 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of

115

the transactions contemplated hereby, the repayment of any of the Loans or Reimbursement Obligations, the release of all or a portion of any Collateral, the expiration of the Commitments, the expiration of any Letter of Credit, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Agents, the Issuing Bank or any Lender. All amounts due under this Section 10.03 shall be payable on written demand therefor accompanied by reasonably detailed documentation with respect to any reimbursement, indemnification or other amount requested.

(d)     To the extent that the Borrower fails to promptly pay any amount required to be paid by it to the Agents, the Issuing Bank or the Swingline Lender under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Agents, the Issuing Bank or the Swingline Lender, as the case may be, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against any of the Agents, the Issuing Bank or the Swingline Lender in its capacity as such; further provided, that to the extent any Issuing Bank or Swingline Lender is entitled to indemnification under this Section 10.03, to the extent such indemnification relates solely to such Issuing Bank's or such Swingline Lender's acting in such capacity the indemnification provided for in this Section 10.03 will be the obligation solely of the Revolving Lenders. For purposes hereof, a Lender's "***pro rata* share**" shall be determined based upon its share of the sum of the aggregate Revolving Exposure and unused Commitments at the time.

**Section 10.04. Successors and Assigns**. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agents and each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit) and, to the extent expressly contemplated hereby, the Affiliates of each of the Administrative Agent, the Issuing Bank and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Any Lender shall have the right at any time to assign to one or more banks, insurance companies, investment companies or funds or other institutions all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided, that (i) except in the case of an assignment to a Lender, an Affiliate of a Lender or a Lender Affiliate, each of the Borrower and the Administrative Agent (and, in the case of an assignment of all or a portion of a Revolving Commitment or any Lender's obligations in respect of its LC Exposure or Swingline Exposure, the Issuing Bank and the Swingline Lender) must give their prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed), (ii) except in the case of an assignment to a Lender, an Affiliate of a Lender or a Lender Affiliate, any assignment made in connection with the primary syndication of the Commitment and Loans by the Lead Arranger or an assignment of the entire remaining amount of the assigning Lender's

116

Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than in the case of Revolving Commitments and Revolving Loans, $[5,000,000] (which shall be in the aggregate in the event of simultaneous assignments to or by two or more Lender Affiliates) unless each of the Borrower and the Administrative Agent otherwise consent, (iii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, except that this clause (iii) shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Loans, (iv) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance in the form of Exhibit B, together with a processing and recordation fee of $3,500 (provided, that only one such fee shall be payable in the event of simultaneous assignments to or by two or more Lender Affiliates), and (v) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire; further provided, that any consent of the Borrower otherwise required under this paragraph shall not be required (x) if a Default has occurred and is continuing or (y) in the case of assignments by the Administrative Agent and its Affiliates, in connection with the primary syndication of the Loans and Commitments. Subject to acceptance and recording thereof pursuant to paragraph (d) of this Section, from and after the effective date specified in each Assignment and Acceptance the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement (provided, that any liability of the Borrower to such assignee under Section 2.12, Section 2.13 or Section 2.15 shall be limited to the amount, if any, that would have been payable thereunder by the Borrower in the absence of such assignment, except to the extent any such amounts are attributable to a Change in Law occurring after the date of such assignment), and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.12, Section 2.13, Section 2.15 and Section 10.03).

(c)     The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive in the absence of manifest error, and the Borrower, the Administrative Agent, the Issuing Bank and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Issuing Bank, the Collateral Agent, the Swingline Lender and any Lender (with respect to its own interest only), at any reasonable time and from time to time upon reasonable prior notice.

(d)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the assignee's completed Administrative

Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.04(b) and any written consent to such assignment required by Section 10.04(b), the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)     Any Lender shall have the right at any time, without the consent of the Borrower, the Administrative Agent, the Issuing Bank or the Swingline Lender, sell participations to one or more banks or other entities (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided, that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clause (i), (ii) or (iii) of the first proviso to Section 10.02 that affects such Participant.  Subject to paragraph (f) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Section 2.12, Section 2.13 and Section 2.15 and to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; provided, that such Participant agrees to be subject to Section 2.14(c) as though it were a Lender.  Each Lender shall, acting for this purpose as an agent of the Borrower, maintain at one of its offices a register for the recordation of the names and addresses of its Participants, and the amount and terms of its participations, provided, that no Lender shall be required to disclose or share the information contained in such register with the Borrower or any other party, except as required by applicable law.

(f)     A Participant shall not be entitled to receive any greater payment under Section 2.12, Section 2.13 or Section 2.15 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, (i) unless the sale of the participation to such Participant is made with the prior written consent of the Borrower (which consent shall not be unreasonably withheld or delayed) or (ii) except to the extent such entitlement to a greater payment results from a Change in Law after such Participant became a Participant.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.15 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.15(e) and (f) as though it were a Lender.

(g)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall

not apply to any such pledge or assignment of a security interest; _provided_, that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  In the case any Lender is a fund that invests in bank loans, such Lender may, without the consent of the Borrower or the Administrative Agent, collaterally assign or pledge all or any portion of its rights under this Agreement, including the Loans and Notes or any other instrument evidencing its rights as a Lender under this Agreement, to any holder of, trustee for, or any other representative of holders of, obligations owed or securities issued, by such fund, as security for such obligations or securities.

**Section 10.05.  Survival of Agreement**.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agents, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated.  The provisions of Section 2.12, Sections 2.14(a) and (e), Section 2.15, Section 10.03 and Article IX shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the payment of the Reimbursement Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.

**Section 10.06.  Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and the Fee Letter constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

**Section 10.07.  Severability**.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

NYDOCS/1207090.12

**Section 10.08. <u>Right of Setoff</u>**. If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates are hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured. The rights of each Lender under this <u>Section 10.08</u> are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

**Section 10.09. <u>Governing Law; Jurisdiction; Consent to Service of Process</u>**. (a) This Agreement shall be construed in accordance with and governed by the law of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

(b) Each Loan Party hereby irrevocably and unconditionally submits, for itself and its Property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that the Administrative Agent, the Issuing Bank or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c) Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in this <u>Section 10.09(b)</u>. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) Except as consented to by the Administrative Agent, the Bankruptcy Court's retention of jurisdiction under the Confirmation Order shall not govern the enforcement of the Loan Documents or any rights or remedies related thereto.

Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document in the manner provided for notices in <u>Section 10.01</u>. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable law.

120

**Section 10.10.** **Waiver of Jury Trial**. Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement, any other Loan Document or the transactions contemplated hereby (whether based on contract, tort or any other theory). Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section.

**Section 10.11.** **Headings**. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**Section 10.12.** **Confidentiality**. (a) Each of the Administrative Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Lender Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential pursuant to the terms hereof), (ii) to the extent requested by any regulatory authority, (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (iv) to any other party to this Agreement, (v) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section 10.12, to (x) any assignee or pledgee of or Participant in, or any prospective assignee or pledgee of or Participant in, any of its rights or obligations under this Agreement or (y) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (vii) with the consent of the Borrower or (viii) to the extent such Information (x) is publicly available at the time of disclosure or becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower or any Subsidiary. For the purposes of this Section, "**Information**" means all information received from the Borrower or any Subsidiary relating to the Borrower or any Subsidiary or its business that is clearly identified at the time of delivery as confidential, other than any such information that is available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any Subsidiary. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b) Notwithstanding the foregoing, and notwithstanding any other express or implied agreement or understanding to the contrary, each of the parties hereto and their respective employees, representatives and other agents are authorized to disclose the tax treatment and tax structure of these transactions to any and all Persons, without limitation of any

121

kind. Each of the parties hereto may disclose all materials of any kind (including opinions or other tax analyses) insofar as they relate to the tax treatment and tax structure of the transactions contemplated by the Loan Documents. This authorization does not extend to disclosure of any other information including (without limitation) (a) the identities of participants or potential participants in the transactions, (b) the existence or status of any negotiations, (c) any pricing or other financial information or (d) any other term or detail not related to the tax treatment and tax structure of the transactions contemplated by the Loan Documents.

Section 10.13. **Interest Rate Limitation**. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively, the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.14. **Application of Proceeds of Collateral**. The proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral if an Enforcement Action has occurred and is continuing, shall be applied, together with any other sums then held by the Collateral Agent pursuant to this Agreement, promptly by the Collateral Agent as follows:

(a) *First*, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including, without limitation, compensation to the Collateral Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Collateral Agent in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(b) *Second*, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including, without limitation, compensation to the other Secured Parties and their agents and counsel and all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full; and

(c) *Third*, without duplication of amounts applied pursuant to clauses (a) and (b) above, to the indefeasible payment in full in cash, *pro rata*, of (i) interest, principal and other amounts constituting Obligations owing to the Secured Parties, in each case equally and ratably in accordance with the respective amounts thereof then due and owing.

122

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (c) of this <u>Section 10.14</u>, the Loan Parties shall remain liable for any deficiency.

**Section 10.15.  <u>Lender Addendum</u>**.  Each Lender to become a party to this Agreement on the date hereof shall do so by delivering to the Administrative Agent a Lender Addendum duly executed by such Lender, the Borrower and the Administrative Agent.

**Section 10.16.  <u>Obligations Absolute</u>**.  To the fullest extent permitted by applicable law, all obligations of the Loan Parties hereunder shall be absolute and unconditional irrespective of:

(a)     any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any other Loan Party;

(b)     any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any other Loan Party;

(c)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d)     any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(e)     any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f)     any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

**Section 10.17. <u>Intercreditor Agreement</u>**.  In the event of a conflict between this Agreement and the Intercreditor Agreement, the Intercreditor Agreement prevails, and each Lender acknowledges and agrees that it has received a copy of the Intercreditor Agreement, has read it and consents and agrees to each provision contained therein and agrees to be bound thereby to the same extent as if a signatory thereto.

*[Signature Pages Follow]*

NYDOCS/1207090.12

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

ATKINS NUTRITIONALS, INC., as the Borrower

By: _____

    Name:
    Title:


ATKINS NUTRITIONALS HOLDINGS, INC.

By: _____

    Name:
    Title:


ATKINS NUTRITIONALS (CANADA) LIMITED

By: _____

    Name:
    Title:

NYDOCS/1207090.12

UBS SECURITIES LLC, as Bookmanager and Lead Arranger

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

UBS AG, STAMFORD BRANCH, as Issuing Bank, Administrative Agent and Collateral Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

UBS LOAN FINANCE LLC, as Swingline Lender

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

NYDOCS/1207090.12

# Intercreditor Agreement

INTERCREDITOR AGREEMENT


Dated as of December [__], 2005


among


ATKINS NUTRITIONALS, INC.,
as Borrower,


and


UBS AG, STAMFORD BRANCH,
as First Lien Collateral Agent


and


UBS AG, STAMFORD BRANCH,
as Second Lien Collateral Agent


and


UBS AG, STAMFORD BRANCH,
as Control Agent


Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022

# TABLE OF CONTENTS

SECTION 1   DEFINITIONS ..........................................................................................2

    1.1   Defined Terms ...........................................................................................2
    1.2   Terms Generally ........................................................................................5

SECTION 2   LIEN PRIORITIES ......................................................................................5

    2.1   Relative Priorities......................................................................................5
    2.2   Failure to Perfect ......................................................................................5
    2.3   Nature of First Lien Obligations...............................................................6
    2.4   Prohibition on Contesting Liens ...............................................................6
    2.5   No New Liens............................................................................................6
    2.6   Similar Liens and Agreements..................................................................8

SECTION 3   ENFORCEMENT ........................................................................................8

    3.1   Exercise of Remedies................................................................................8
    3.2   Actions Upon Breach ..............................................................................11

SECTION 4   PAYMENTS ..............................................................................................11

    4.1   Application of Proceeds ..........................................................................11
    4.2   Payment Turnover...................................................................................12
    4.3   Permitted Mandatory Prepayments of Second Lien Obligations ...........12

SECTION 5   OTHER AGREEMENTS............................................................................12

    5.1   Releases...................................................................................................12
    5.2   Insurance ................................................................................................13
    5.3   Amendments to First Lien Credit Documents and Second Lien Credit
            Documents...............................................................................................14
    5.4   Rights As Unsecured Creditors ..............................................................16
    5.5   Control Agent for Perfection ..................................................................16
    5.6   When Payment in Full of First Lien Obligations Deemed to Not Have
            Occurred .................................................................................................18
    5.7   Purchase Right ........................................................................................18

SECTION 6   INSOLVENCY PROCEEDINGS ...............................................................19

    6.1   Use of Cash Collateral and Financing Issues .........................................19
    6.2   Sale Issues ..............................................................................................20
    6.3   Relief from the Automatic Stay..............................................................20
    6.4   Adequate Protection................................................................................20
    6.5   No Waiver ...............................................................................................21

i

6.6     Avoidance Issues .................................................................21
6.7     Separate Grants of Security and Separate Classification ....................................22
6.8     Reorganization Securities.................................................................22
6.9     Post-Petition Claims.................................................................22
6.10    Waiver .................................................................23
6.11    Expense Claims .................................................................23
6.12    Other Matters.................................................................23
6.13    Effectiveness in Insolvency Proceedings .................................................................23

SECTION 7     RELIANCE; WAIVERS; ETC.................................................................23

7.1     Non-Reliance .................................................................23
7.2     No Warranties or Liability .................................................................24
7.3     No Waiver of Lien Priorities .................................................................25
7.4     Obligations Unconditional .................................................................27
7.5     Certain Notices .................................................................27

SECTION 8     MISCELLANEOUS .................................................................28

8.1     Conflicts .................................................................28
8.2     Effectiveness; Continuing Nature of this Agreement; Severability...............28
8.3     Amendments; Waivers.................................................................29
8.4     Information Concerning Financial Condition of Company and its
        Subsidiaries.................................................................29
8.5     Subrogation.................................................................29
8.6     Application of Payments .................................................................30
8.7     SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL...................30
8.8     Notices.................................................................31
8.9     Further Assurances.................................................................31
8.10    Binding on Successors and Assigns.................................................................31
8.11    Specific Performance .................................................................31
8.12    Headings .................................................................31
8.13    Counterparts.................................................................31
8.14    Authorization .................................................................32
8.15    No Third Party Beneficiaries.................................................................32
8.16    Provisions Solely to Define Relative Rights .................................................................32

# INTERCREDITOR AGREEMENT

This **INTERCREDITOR AGREEMENT**, is dated as of December [\_\_], 2005, and entered into by and among ATKINS NUTRITIONALS, INC., a New York corporation (the "**Company**"), and UBS AG, STAMFORD BRANCH, in its capacity as collateral agent for holders of the First Lien Obligations (as defined below), including its successors and assigns from time to time (the "**First Lien Collateral Agent**"), and UBS AG, STAMFORD BRANCH, in its capacity as collateral agent for holders of the Second Lien Obligations (as defined below), including its successors and assigns from time to time (the "**Second Lien Collateral Agent**") and UBS AG, STAMFORD BRANCH, in its capacity as control agent for the First Lien Collateral Agent and the Second Lien Collateral Agent, including its successors and assigns from time to time (the "**Control Agent**"). Capitalized terms used herein but not otherwise defined herein have the meanings set forth in Section 1 below.

## RECITALS

**WHEREAS**, the Company, the Guarantors (as defined below), the lenders party thereto, UBS Securities LLC, as lead arranger, documentation agent and syndication agent, UBS Finance LLC, as swingline lender and UBS AG, Stamford Branch, as administrative agent and collateral agent, have entered into that certain Credit Agreement dated as of the date hereof providing for a revolving credit working capital facility to the Company (the "**Initial First Lien Credit Agreement**");

**WHEREAS**, the Company, the Guarantors, the noteholders party thereto, and UBS AG, Stamford Branch, as note agent and collateral agent, have entered into that certain Term Note Agreement dated as of the date hereof providing for the issuance of secured subordinated notes to the Noteholders (the "**Initial Second Lien Term Note Agreement**");

**WHEREAS**, the obligations of Company and the Guarantors under the First Lien Credit Agreement, will be secured by substantially all of the assets of Company and the Guarantors pursuant to the terms of the First Lien Collateral Documents;

**WHEREAS**, the obligations of Company under the Second Lien Term Note Agreement will be secured by substantially all of the assets of Company and the Guarantors pursuant to the terms of the Second Lien Collateral Documents;

**WHEREAS**, the First Lien Credit Documents and the Second Lien Credit Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral; and

**WHEREAS**, in order to induce the First Lien Collateral Agent and the First Lien Claimholders to consent to the Grantors' incurring the Second Lien Obligations and to induce the First Lien Claimholders to extend credit and other financial accommodations to or for the benefit of Company, or any other Grantor, the Second Lien Collateral Agent on behalf of the Second Lien Claimholders has agreed to the lien subordination and other provisions set forth in this Agreement.

**NOW**, **THEREFORE**, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## SECTION 1   Definitions.

1.1     Defined Terms.  As used in the Agreement, the following terms shall have the following meanings:

"**Agreement**" means this Intercreditor Agreement, as amended, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Bankruptcy Code**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Bankruptcy Law**" means the Bankruptcy Code and all other liquidation, receivership, moratorium, conservatorship, assignment for the benefit of creditors, insolvency or similar federal, state or foreign law for the relief of debtors.

"**Business Day**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Capital Stock**" means (i) in the case of a corporation, capital stock, (ii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (iii) in the case of a partnership, partnership interests (whether general or limited), (iv) in the case of a limited liability company, membership interests and (v) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"**Collateral**" means all of the assets and property of any Grantor, whether tangible or intangible, constituting both First Lien Collateral and Second Lien Collateral.

"**Company**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Control Collateral**" means any Collateral consisting of any Certificated Security, Instrument, Investment Property, Deposit Accounts (each as defined in the UCC), cash and any other Collateral as to which a first priority Lien shall or may be perfected through possession or control by the secured party or any agent therefor.

"**Controlled Account**" means those certain Deposit Accounts (as defined in the UCC) of any Grantor subject to Liens under the terms of the First Lien Collateral Documents and the Second Lien Collateral Documents.

"**DIP Financing**" has the meaning set forth in Section 6.1.

"**Disposition**" has the meaning set forth in Section 5.1(a)(ii).

"**Dollars**" or "**$**" means lawful money of the United States.

"**Exercise of Remedies**" has the meaning set forth in <u>Section 5.1(a)(i)</u>.

"**First Lien Claimholders**" means, at any relevant time, the holders of First Lien Obligations at such time.

"**First Lien Collateral Agent**" has the meaning set forth in the recitals hereto.

"**First Lien Collateral**" means all the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any First Lien Obligations.

"**First Lien Collateral Documents**" means the Security Documents (as defined in the First Lien Credit Agreement).

"**First Lien Credit Agreement**" means the Initial First Lien Credit Agreement and any amendment, modification, refinancing or replacement thereof to the extent permitted by the Second Lien Credit Documents.

"**First Lien Credit Documents**" means the First Lien Credit Agreement and the Loan Documents (as defined in the First Lien Credit Agreement).

"**First Lien Obligations**" means the [Secured Obligations] as defined in the First Lien Collateral Documents, <u>provided</u> that the principal amount of the First Lien Obligations shall not exceed the principal amount of Senior Debt (as defined in the Second Lien Term Note Agreement).

"**Grantors**" means Company and each of the Guarantors that have executed and delivered, or may from time to time hereafter execute and deliver, a First Lien Collateral Document or a Second Lien Collateral Document.

"**Guarantors**" means the Parent and the Subsidiary Guarantors.

"**Governmental Authority**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Initial Second Lien Term Note Agreement**" has the meaning set forth in the recitals hereto.

"**Insolvency Proceeding**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Lien**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Payment in Full**" or "**Paid in Full**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Parent**" means Atkins Nutritionals Holdings, Inc., a Delaware corporation.

"**Person**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Property**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Real Property**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Recovery**" has the meaning set forth in Section 6.6.

"**Required Lenders**" has the meaning set forth in the First Lien Credit Agreement.

"**Second Lien Claimholders**" means, at any relevant time, the holders of Second Lien Obligations at such time.

"**Second Lien Collateral**" means all of the assets and Property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Second Lien Obligations.

"**Second Lien Collateral Agent**" has the meaning set forth in the preamble hereof.

"**Second Lien Collateral Documents**" means the Security Documents (as defined in the Second Lien Term Note Agreement).

"**Second Lien Credit Documents**" means the Second Lien Term Note Agreement and the Note Documents (as defined in the Second Lien Term Note Agreement).

"**Second Lien Enforcement Date**" means the date which is 120 days after the occurrence of (i) an Event of Default (under and as defined in the Second Lien Term Note Agreement) and (ii) the First Lien Collateral Agent's receipt of written notice from the Second Lien Collateral Agent certifying that (x) an Event of Default (under and as defined in the Second Lien Term Note Agreement) has occurred and is continuing and (y) the Second Lien Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the Second Lien Term Note Agreement; provided that the Second Lien Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time the First Lien Collateral Agent or the First Lien Claimholders have commenced and are diligently pursuing any enforcement action with respect to the Collateral, (2) the First Lien Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the First Lien Credit Agreement, (3) at any time any Grantor is then a debtor under or with respect to (or otherwise subject to) any Insolvency Proceeding or (4) if the acceleration of the Second Lien Obligations (if any) is rescinded in accordance with the terms of the Second Lien Term Note Agreement.

"**Second Lien Lenders**" means the "Noteholders" under and as defined in the Second Lien Term Note Agreement.

"**Second Lien Obligations**" means the "Secured Obligations" as defined in the Second Lien Collateral Documents.

"**Second Lien Term Note Agreement**" means the Initial Second Lien Term Note Agreement, any amendment, modification, refinancing or replacement thereof to the extent permitted by the Second Lien Credit Documents.

"**Subsidiary**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Subsidiary Guarantors** " has the meaning ascribed to such term in the First Lien Credit Agreement or the Second Lien Term Note Agreement, as applicable.

"**UCC**" has the meaning set forth in the Second Lien Term Note Agreement.

**1.2**     Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Exhibits or Sections shall be construed to refer to Exhibits or Sections of this Agreement and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## SECTION 2   Lien Priorities.

**2.1**     Relative Priorities.  Notwithstanding the date, manner or order of grant, attachment or perfection of any Liens securing the Second Lien Obligations granted on the Collateral or of any Liens securing the First Lien Obligations granted on the Collateral and notwithstanding any provision of the UCC, or any applicable law or the Second Lien Credit Documents, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby agrees that:  (a) any Lien on the Collateral securing any First Lien Obligations now or hereafter held by or on behalf of the First Lien Collateral Agent or any First Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any of the Second Lien Obligations; and (b) any Lien on the Collateral now or hereafter held by or on behalf of the Second Lien Collateral Agent, any Second Lien Claimholders or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any First Lien Obligations.

**2.2**     Failure to Perfect.  All Liens on the Collateral securing any First Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Second Lien Obligations for all purposes, notwithstanding any failure of the First Lien Collateral

Agent or the First Lien Claimholders to adequately perfect its security interests in the Collateral, the subordination of any Lien on the Collateral securing any First Lien Obligations to any Lien securing any other obligation of any Grantor, or the avoidance, invalidation or lapse of any Lien on the Collateral securing any First Lien Obligations.

2.3    Nature of First Lien Obligations.  The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Claimholders, acknowledges that (a) the First Lien Obligations are revolving in nature, (b) the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, (c) subject to the limitations set forth in Section 5.3, the terms of the First Lien Obligations may be modified, extended or amended from time to time, and (d) subject to the limitations on the aggregate principal amount of First Lien Obligations set forth in the definition of "First Lien Obligations" or in Section 5.3, the aggregate amount of the First Lien Obligations may be increased or refinanced, in either event, without notice to or consent by the Second Lien Claimholders and without affecting the provisions hereof.  The Lien priorities provided in Sections 2.1 and 2.2 shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the First Lien Obligations or the Second Lien Obligations, or any portion thereof.

2.4    Prohibition on Contesting Liens.  Each of the Second Lien Collateral Agent, for itself and on behalf of each Second Lien Claimholder, and the First Lien Collateral Agent, for itself and on behalf of each First Lien Claimholder, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency Proceeding), the priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in the First Lien Collateral or by or on behalf of any of the Second Lien Claimholders in the Second Lien Collateral, as the case may be; provided that nothing in this Agreement shall be construed to prevent or impair the rights of the First Lien Collateral Agent or any First Lien Claimholder to enforce this Agreement, including the priority of the Liens securing the First Lien Obligations as provided in Sections 2.1 and 3.1.

2.5    No New Liens.

(a)    Limitation on other Collateral for First Lien Claimholders.  So long as any Second Lien Obligations remain outstanding, and subject to Section 6, (i) the First Lien Collateral Agent agrees that, after the date hereof, neither the First Lien Collateral Agent nor any First Lien Claimholder shall acquire or hold any Lien on any assets of any Grantor securing any First Lien Obligations which assets are not also subject to the Lien of the Second Lien Collateral Agent under the Second Lien Collateral Documents, and (ii) each Grantor agrees not to grant any Lien on any of its assets, or permit any of its Subsidiaries to grant a Lien on any of its assets, in favor of the First Lien Collateral Agent or the First Lien Claimholders unless it, or such Subsidiary, has granted a similar Lien on such assets in favor of the Second Lien Collateral Agent or the Second Lien

Claimholders.[1] If the First Lien Collateral Agent or any First Lien Claimholder shall (nonetheless and in breach hereof) acquire any Lien on any assets of any Grantor or any of their respective Subsidiaries securing any First Lien Obligations which assets are not also subject to the Lien of the Second Lien Collateral Agent under the Second Lien Collateral Documents, then the First Lien Collateral Agent (or the relevant First Lien Claimholder), shall, without the need for any further consent of any other Person and notwithstanding anything to the contrary in any other First Lien Document hold, and be deemed to have held such Lien and security interest for the benefit of the Second Lien Collateral Agent as security for the Second Lien Obligations subject to the priorities set forth herein, with any amounts received in respect thereof subject to distribution and turnover under Section 4.

(b)     Limitation on other Collateral for Second Lien Claimholders.  Until the date upon which the Payment in Full of First Lien Obligations shall have occurred, (i) the Second Lien Collateral Agent agrees that, after the date hereof, neither the Second Lien Collateral Agent nor any Second Lien Claimholder shall acquire or hold any Lien on any assets of any Borrower, any Guarantor or any of their respective Subsidiaries securing any Second Lien Obligations which assets are not also subject to the Lien of the First Lien Collateral Agent under the First Lien Collateral Documents, and (ii) each Grantor agrees not to grant any Lien on any of its assets, or permit any of its Subsidiaries to grant a Lien on any of its assets, in favor of the Second Lien Collateral Agent or the Second Lien Claimholders unless it, or such Subsidiary, has granted a similar Lien on such assets in favor of the First Lien Collateral Agent or the First Lien Claimholders.  If the Second Lien Collateral Agent or any Second Lien Claimholder shall (nonetheless and in breach hereof) acquire any Lien on any assets of any Grantor or any of their respective Subsidiaries securing any Second Lien Obligations which assets are not also subject to the Lien of the First Lien Collateral Agent under the First Lien Collateral Documents, then the Second Lien Collateral Agent (or the relevant Second Lien Claimholder), shall, without the need for any further consent of any other Person and notwithstanding anything to the contrary in any other Second Lien Document, hold and be deemed to have held such Lien and security interest for the benefit of the First Lien Collateral Agent as security for the First Lien Obligations.

---

[1]     Consider operation of Cash Management System.

**2.6**   Similar Liens and Agreements[2].  The parties hereto agree that it is their intention that the First Lien Collateral and the Second Lien Collateral be identical.  In furtherance of the foregoing and of Section 8.9, the parties hereto agree, subject to the other provisions of this Agreement:

(a)   upon request by the First Lien Collateral Agent or the Second Lien Collateral Agent, to use commercially reasonable efforts and to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the First Lien Collateral and the Second Lien Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the First Lien Credit Documents and the Second Lien Credit Documents; and

(b)   that the documents and agreements creating or evidencing the First Lien Collateral and the Second Lien Collateral and guaranties for the First Lien Obligations and the Second Lien Obligations shall be in all material respects substantially the same forms of documents other than with respect to the senior and subordinate nature of the security interests in the Collateral securing the respective Obligations thereunder.

## SECTION 3   Enforcement.

**3.1**   Exercise of Remedies.

(a)   So long as the Payment in Full of First Lien Obligations has not occurred, whether or not any Insolvency Proceeding has been commenced by or against Company or any other Grantor:

(i)   the Second Lien Collateral Agent and the Second Lien Claimholders:

(A)   from the date hereof until the occurrence of the Second Lien Enforcement Date, will not exercise or seek to exercise any rights or remedies (including any right of set-off or recoupment) with respect to any Collateral (including, without limitation, the exercise of any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Second Lien Collateral Agent or any Second Lien Claimholder is a party) or institute or commence (or join with any other Person in commencing) any enforcement, collection, execution, levy or foreclosure action or

---

[2]   The revolver requires that a cash management system and account control agreements be in place.  The Term Note Agreement does not separately have this requirement, however so long as the cash management system and account control agreements are in place, such arrangements shall be for the benefit of the First and Second Lienholders, subject to the provisions of this Agreement.

proceeding (including, without limitation, any Insolvency Proceeding) with respect to any Collateral or Lien held by it under the Second Lien Collateral Documents or any other Second Lien Credit Document or otherwise; and

(B)      will not contest, protest or object to any foreclosure proceeding or action brought by the First Lien Collateral Agent or any First Lien Claimholder or any other exercise by the First Lien Collateral Agent or any First Lien Claimholder, of any rights and remedies relating to the Collateral under the First Lien Credit Documents or otherwise, provided that the respective interests of the Second Lien Claimholders attach to the proceeds thereof, subject to the relative priorities described in Section 2 and Section 4; and

(C)      subject to the rights of the Second Lien Collateral Agent under clause (i)(A) above, object to the forbearance by the First Lien Collateral Agent or the First Lien Claimholders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Collateral; and

(ii)      subject to Section 5.1, the First Lien Collateral Agent and the First Lien Claimholders shall have the exclusive right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make determinations regarding the release, disposition or restrictions with respect to the Collateral without any consultation with or the consent of the Second Lien Collateral Agent or any Second Lien Claimholder; provided, that

(A)      in any Insolvency Proceeding commenced by or against Company or any other Grantor, the Second Lien Collateral Agent may file a claim or statement of interest with respect to the Second Lien Obligations,

(B)      the Second Lien Collateral Agent may take any action (not adverse to the Liens on the Collateral securing the First Lien Obligations, or the rights of any First Lien Collateral Agent or the First Lien Claimholders to exercise remedies in respect thereof) in order to preserve or protect its Lien on the Collateral,

(C)      the Second Lien Claimholders shall be entitled to file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Second Lien Claimholders, including without limitation any claims secured by the Collateral, if any, in each case in accordance with the terms of this Agreement,

(D)     in any Insolvency Proceeding, the Second Lien Claimholders shall be entitled to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either Bankruptcy Law or applicable non-bankruptcy law, in each case in accordance with the terms of this Agreement,

(E)     in any Insolvency Proceeding, the Second Lien Claimholders shall be entitled to vote on any plan of reorganization, to the extent consistent with the provisions hereof, and

(F)     the Second Lien Collateral Agent or any Second Lien Claimholder may exercise any of its rights or remedies with respect to the Collateral upon the occurrence and during the effective continuation of the Second Lien Enforcement Date.

In exercising rights and remedies with respect to the Collateral, the First Lien Collateral Agent and the First Lien Claimholders may enforce the provisions of the First Lien Credit Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion.  Such exercise and enforcement shall include the rights of an agent appointed by the First Lien Collateral Agent and the First Lien Claimholders to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b)     The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including set-off or recoupment) with respect to any Collateral, and that any Collateral or proceeds taken or received by it will be paid over to the First Lien Collateral Agent pursuant to Section 4.2, unless and until the Payment in Full of First Lien Obligations has occurred, except as expressly provided in Section 6.7.  Without limiting the generality of the foregoing, unless and until the Payment in Full of First Lien Obligations has occurred, except as expressly provided in Section 3.1(a)(ii), the sole right of the Second Lien Collateral Agent and the Second Lien Claimholders with respect to the Collateral is to hold a Lien on the Collateral pursuant to the Second Lien Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Payment in Full of First Lien Obligations has occurred in accordance with the terms of the Second Lien Credit Documents and applicable law.

(c)     Subject to the proviso in clause (ii) of Section 3.1(a), the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, agrees that (i) the Second Lien Collateral Agent and the Second Lien Claimholders will not take any action that would hinder, delay or impede any exercise of remedies under the First Lien Credit Documents, including any sale, lease, exchange, transfer or other disposition of the

Collateral, whether by foreclosure or otherwise, and (ii) the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby waives any and all rights it or the Second Lien Claimholders may have as a junior lien creditor or otherwise to object to the manner or order in which the First Lien Collateral Agent or the First Lien Claimholders seek to enforce or collect the First Lien Obligations or the Liens granted in any of the First Lien Collateral.

(d)     The Second Lien Collateral Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second Lien Collateral Documents or any other Second Lien Credit Document shall be deemed to restrict in any way the rights and remedies of the First Lien Collateral Agent or the First Lien Claimholders with respect to the Collateral as set forth in this Agreement and the First Lien Credit Documents.

**3.2**     <u>Actions Upon Breach</u>.

(a)     If any Second Lien Claimholder, contrary to this Agreement, commences or participates in any action or proceeding against Company, any other Grantor or the Collateral, the First Lien Collateral Agent may interpose in the name of the First Lien Claimholders or in the name of Company or such Grantor the making of this Agreement as a defense or dilatory plea.

(b)     Should any Second Lien Claimholder, contrary to this Agreement, in any way take, or attempt or threaten to take, any action with respect to the Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, the First Lien Collateral Agent (in its own name or in the name of a Grantor) may obtain relief against such Second Lien Claimholder by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Second Lien Collateral Agent on behalf of each Second Lien Claimholder that (i) the First Lien Claimholders' damages from such actions may be difficult to ascertain and may be irreparable, and (ii) the Second Lien Collateral Agent on behalf of each Second Lien Claimholder waives any defense that the First Lien Claimholders cannot demonstrate damage or be made whole by the awarding of damages.

**SECTION 4** **<u>Payments</u>.**

**4.1**     <u>Application of Proceeds</u>.  So long as the Payment in Full of First Lien Obligations has not occurred, any proceeds of Collateral received in connection with the sale or other disposition of such Collateral, or collection on such Collateral upon the exercise of remedies, shall be applied by the First Lien Collateral Agent to the First Lien Obligations in such order as specified in the relevant First Lien Credit Documents.  Upon the Discharge of the First Lien Obligations, the First Lien Collateral Agent shall deliver to the Second Lien Collateral Agent any proceeds of Collateral held by it in the same form as received, with any necessary endorsements or, as a court of competent jurisdiction may otherwise direct, to be applied by the Second Lien Collateral Agent to the Second Lien Obligations in such order as specified in the Second Lien Collateral Documents.

**4.2**    Payment Turnover.  So long as the Payment in Full of First Lien Obligations has not occurred and except as specifically permitted by Section 4.3, any Collateral or proceeds thereof (together with assets or proceeds subject to Liens referred to in the final sentence of Section 2.3) received by the Second Lien Collateral Agent or any Second Lien Claimholders in connection with the exercise of any right or remedy (including set-off or recoupment) in respect of the Collateral shall be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  The First Lien Collateral Agent is hereby authorized to make any such endorsements as agent for the Second Lien Collateral Agent or any such Second Lien Claimholders.  This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

**4.3**    Permitted Mandatory Prepayments of Second Lien Obligations.  Notwithstanding the foregoing provisions of this Section 4, if no "Event of Default" (as defined in the First Lien Credit Agreement) has occurred and is continuing, mandatory prepayments required under Section 2.8 of the Second Lien Term Note Agreement may be made if and applied to the Second Lien Obligations (A) if (i) the payment to the Second Lien Claimholders is permitted by the First Lien Credit Agreement or (ii) the corresponding mandatory prepayment of the First Lien Credit Documents is waived by the Required Lenders under the First Lien Credit Agreement) or (B) at all times following the Payment in Full of the First Lien Obligations.

**SECTION 5   Other Agreements.**

**5.1**    Releases.

(a)     If, in connection with:

(i)     the exercise of any First Lien Collateral Agent's remedies in respect of the Collateral, including any sale, lease, exchange, transfer or other disposition of any such Collateral (an "**Exercise of Remedies**"); or

(ii)    any sale, lease, exchange, transfer or other disposition of any Collateral permitted under the terms of the First Lien Credit Documents (whether or not an event of default thereunder, and as defined therein, has occurred and is continuing) (a "**Disposition**"), or

(iii)   any release of Liens on the assets of any Grantor, all of the Capital Stock of which is being released pursuant to any other provision of this Section 5.1(a);

the First Lien Collateral Agent, for itself or on behalf of any of the First Lien Claimholders, releases any of its Liens on any part of the Collateral, or releases any Grantor from its obligations under its guaranty of the First Lien Obligations, in each case other than in connection with the Payment in Full of the First Lien Obligations, then the Liens, if any, of the Second Lien Collateral Agent, for itself or for the benefit of the Second Lien Claimholders, on such Collateral, and the obligations of such Grantor under

its guaranty of the Second Lien Obligations, shall be automatically, unconditionally and simultaneously released (the "**Second Lien Release**") and the Second Lien Collateral Agent, for itself or on behalf of any such Second Lien Claimholders, promptly shall execute and deliver to the First Lien Collateral Agent or such Grantor such termination statements, releases and other documents as the First Lien Collateral Agent or such Grantor may request to effectively confirm such release; provided, however, that the Second Lien Release shall not occur without the consent of the Second Lien Collateral Agent (x) in the case of an Exercise of Remedies, as to any Collateral the net proceeds of the disposition of which will not be applied to repay (and, to the extent applicable, to reduce permanently commitments with respect to) the First Lien Obligations or (y) in the case of a Disposition, if the Disposition is prohibited by any provision of the Second Lien Term Note Agreement.

(b)     Until the Payment in Full of First Lien Obligations occurs, the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby irrevocably constitutes and appoints the First Lien Collateral Agent and any officer or agent of the First Lien Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Second Lien Collateral Agent or such holder or in the First Lien Collateral Agent's own name, from time to time in the First Lien Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release.  This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(c)     Until the Payment in Full of First Lien Obligations occurs, to the extent that the First Lien Collateral Agent for itself and on behalf of the First Lien Claimholders (i) has released any Lien on Collateral or any Grantor from its obligation under its guaranty and any such Liens or guaranty are later reinstated or (ii) obtains any new Liens or additional guaranties from Grantors, then the Second Lien Collateral Agent for itself and on behalf of the Second Lien Claimholders shall be granted a Lien on any such Collateral and an additional guaranty, as the case may be, subject to the priorities set forth in Section 2.

**5.2**     Insurance.  The First Lien Collateral Agent and the Second Lien Collateral Agent shall be named as additional insureds and the Control Agent shall be named as loss payee (on behalf of the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent and the Second Lien Claimholders) under any insurance policies maintained from time to time by any Grantor.  Subject to the terms of the Loan Documents, until the date upon which the Payment in Full of First Lien Obligations shall have occurred, as between the First Lien Collateral Agent and the First Lien Claimholders, on the one hand, and the Second Lien Collateral Agent and the Second Lien Claimholders on the other, the First Lien Collateral Agent and the First Lien Claimholders shall have the sole and exclusive right (a) to adjust or settle any insurance policy or claim covering any Collateral in the event of any loss thereunder and (b) to approve any award granted in any condemnation or similar proceeding affecting any Collateral.

Until the date upon which the Payment in Full of First Lien Obligations shall have occurred, all proceeds of any such policy and any such award in respect of any Collateral that are payable to the First Lien Collateral Agent and the Second Lien Collateral Agent shall be paid to the First Lien Collateral Agent for the benefit of the First Lien Claimholders to the extent required under the First Lien Credit Documents and thereafter to the Second Lien Collateral Agent for the benefit of the Second Lien Claimholders to the extent required under the applicable Second Lien Credit Documents and then to the owner of the subject property or as a court of competent jurisdiction may otherwise direct. If the Second Lien Collateral Agent or any Second Lien Claimholder shall, at any time, receive any proceeds of any such insurance policy or any such award in contravention of this Agreement, it shall pay such proceeds over to the First Lien Collateral Agent in accordance with the terms of Section 4.2.

5.3     Amendments to First Lien Credit Documents and Second Lien Credit Documents.

(a)     The First Lien Credit Documents may be amended, supplemented or otherwise modified in accordance with their terms and the First Lien Credit Agreement may be refinanced in each case, without the consent of the Second Lien Collateral Agent or the Second Lien Claimholders; provided, that the holders of such refinancing debt bind themselves in writing to the terms of this Agreement and any such amendment, supplement, modification or refinancing shall comply with the relevant provisions of the Second Lien Term Note Agreement, including, without limitation, Sections 6.01 and 6.10(b) thereof.

(b)     Until the Payment in Full of First Lien Obligations occurs, the Second Lien Credit Documents may be amended, supplemented or otherwise modified in accordance with their terms and the Second Lien Term Note Agreement may be refinanced in each case, without the consent of the First Lien Collateral Agent or the First Lien Claimholders provided, however, that the holders of such refinancing debt bind themselves in writing to the terms of this Agreement and any such amendment, supplement, modification or refinancing shall comply with the relevant provisions of the First Lien Credit Agreement, including, without limitation, Section 6.09 thereof.

(c)     Notwithstanding the foregoing clauses (a) and (b) of this Section 5.3, until the date upon which the Payment in Full of First Lien Obligations shall have occurred, without the prior written consent of the First Lien Collateral Agent, no Second Lien Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Second Lien Term Note Agreement or Second Lien Collateral Document, would contravene any of the terms of this Agreement.

(d)     The Second Lien Collateral Agent agrees that each Second Lien Collateral Document shall include the following language:

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the collateral agent pursuant to this Agreement and the exercise of any right or remedy by the collateral agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of December [__], 2005 as the same may be

amended, supplemented, modified or replaced from time to time (the "**Intercreditor Agreement**") among UBS AG, STAMFORD BRANCH, as First Lien Collateral Agent, UBS AG, STAMFORD BRANCH, as Second Lien Collateral Agent, UBS AG, STAMFORD BRANCH, as Control Agent, and the Grantors (as defined therein) from time to time a party thereto.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern."

In addition, the Second Lien Collateral Agent agrees that each Second Lien Collateral Document under which any Lien on Real Property owned by any Loan Party is granted to secure the Second Lien Obligations covering any Collateral shall contain such other language as the First Lien Collateral Agent may reasonably request to reflect the priority of the First Lien Collateral Document covering such Collateral over such Second Lien Collateral Document.

(e)     Notwithstanding the foregoing clauses (a) and (b) of this Section 5.3, until the date upon which the Payment in Full of First Lien Obligations shall have occurred, in the event the First Lien Collateral Agent or the First Lien Claimholders enter into any amendment, waiver or consent in respect of any of the First Lien Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of any First Lien Collateral Document or changing in any manner the rights of the First Lien Collateral Agent, the First Lien Claimholders, the Grantors thereunder, then such amendment, waiver or consent shall automatically apply in a comparable manner to any comparable provision of the Second Lien Collateral Documents without the consent of the Second Lien Collateral Agent or the Second Lien Claimholders and without any action by the Second Lien Collateral Agent or any Grantor; provided, however, (A) that no such amendment, waiver or consent shall be effective to (i) release any Lien of the Second Lien Collateral Documents, (ii) remove assets subject to the Lien of the Second Lien Collateral Documents, (iii) adversely affect the perfection or priority of any such Lien, (iv) reduce the principal of, or interest or other amounts payable on, any amount payable under the Second Lien Term Note Agreement or any Second Lien Credit Document, (v) postpone any date fixed for any payment of principal of, or interest or other amounts payable on, any amounts payable under the Second Lien Term Note Agreement or any Second Lien Credit Document, (vi) or permit any Liens on the Collateral not permitted under the Second Lien Credit Documents or Section 6, or (vii) impose duties on the Second Lien Collateral Agent without its consent, except, in the cases of clauses (i), (ii) and (iii), to the extent that a release of, or adverse effect on the perfection or priority of, such Lien is permitted by Section 5.1 or Section 6, and (B) notice of such amendment, waiver or consent shall have been given to the Second Lien Collateral Agent no later than 10 days after its effectiveness, provided that the failure to give such notice shall not affect the effectiveness or validity thereof; and provided further that this paragraph is intended solely to set forth provisions by which the Second Lien Collateral Documents shall be automatically affected by amendments, waivers and consents given by the First Lien Collateral Agent and First Lien Claimholders under the First Lien Credit Agreement and the First Lien Collateral

Documents and is not intended to impose any liability on the First Lien Collateral Agent or First Lien Claimholders.

5.4    Rights As Unsecured Creditors.  Except as otherwise set forth in Section 2.1 or Section 3.1, the Second Lien Collateral Agent and the Second Lien Claimholders may exercise rights and remedies as unsecured creditors against any Grantor in accordance with and consistent with the terms of the Second Lien Credit Documents (including Article XI of the Second Lien Term Note Agreement) and applicable law.  Except as otherwise set forth in Section 2.1 and Section 4, nothing in this Agreement shall prohibit the receipt by the Second Lien Collateral Agent or any Second Lien Claimholders of the required payments of interest and principal so long as such receipt is not the direct or indirect result of the exercise by the Second Lien Collateral Agent or any Second Lien Claimholders of rights or remedies as a secured creditor (including set-off or recoupment) or enforcement of any Lien held by any of them.  Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Lien Collateral Agent or the First Lien Claimholders may have with respect to the Collateral.  In the event that any Second Lien Claimholder becomes a judgment Lien creditor as a result of its enforcement of its rights as an unsecured creditor, such judgment Lien shall be subject to the terms of this Agreement for all purposes to the same extent as all other Liens securing the Second Lien Obligations subject to this Agreement.

5.5    Control Agent for Perfection.

(a)    The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, each hereby appoint UBS AG, Stamford Branch as its collateral agent (in such capacity, together with any successor in such capacity appointed by the First Lien Collateral Agent and the Second Lien Collateral Agent, the "**Control Agent**") for the limited purpose of acting as the agent on behalf of the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) with respect to the Control Collateral for purposes perfecting the Liens of such parties on the Control Collateral. The Control Agent accepts such appointment and agrees to hold the Control Collateral in its possession or control (or in the possession or control of its agents or bailees) as Control Agent for the benefit of the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) and any permitted assignee of any thereof solely for the purpose of perfecting the security interest granted to such parties in such Control Collateral, subject to the terms and conditions of this Section 5.5.  The First Lien Collateral Agent and the Second Lien Collateral Agent hereby acknowledge that the Control Agent will obtain "control" under the UCC over each Controlled Account as contemplated by the First Lien Collateral Documents and the Second Lien Collateral Documents for the benefit of both the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) pursuant to the control agreements relating to each respective Controlled Account.  The First Lien Collateral Agent and the Second Lien Collateral Agent hereby also acknowledge and agree that the Control Agent will obtain

landlord lien waivers as contemplated by the First Lien Collateral Documents and the Second Lien Collateral Documents for the benefit of (i) the First Lien Collateral Agent for the benefit of the First Lien Claimholders and (ii) the Second Lien Collateral Agent for the benefit of Second Lien Claimholders.

(b)     The Control Agent, the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, each hereby agrees that the First Lien Collateral Agent shall have the sole and exclusive right and authority to give instructions to, and otherwise direct, the Control Agent in respect of the Control Collateral or any control agreement with respect to any Control Collateral until the earlier of (i) the date upon which the Payment in Full of First Lien Obligations shall have occurred and (ii) the Second Lien Enforcement Date and neither the Second Lien Collateral Agent nor any Second Lien Claimholder will impede, hinder, delay or interfere with the exercise of such rights by the First Lien Collateral Agent in any respect.  The Grantors hereby jointly and severally agree to pay, reimburse, indemnify and hold harmless the Control Agent to the same extent and on the same terms that the Grantors are required to do so for the First Lien Collateral Agent in accordance with the First Lien Credit Agreement.  The First Lien Claimholders and the Second Lien Claimholders hereby jointly and severally agree to pay, reimburse, indemnify and hold harmless the Control Agent to the same extent and on the same terms that the First Lien Claimholders are required to do so for the First Lien Collateral Agent in accordance with the First Lien Credit Agreement and the Second Lien Claimholders are required to do so for the Second Lien Collateral Agent in accordance with the Second Lien Term Note Agreement.

(c)     Except as set forth below, the Control Agent shall have no obligation whatsoever to the Second Lien Collateral Agent or any Second Lien Claimholder, including, without limitation, any obligation to assure that the Control Collateral is genuine or owned by any Grantor or one of their respective Subsidiaries or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.5.  In acting on behalf of the Second Lien Collateral Agent and the Second Lien Claimholders and the First Lien Collateral Agent and the First Lien Claimholders, the duties or responsibilities of the Control Agent under this Section 5.5 shall be limited solely (i) to physically holding the Control Collateral delivered to the Control Agent by any Grantor as agent for the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) for purposes of perfecting the Lien held by the First Lien Collateral Agent and the Second Lien Collateral Agent and (ii) delivering such collateral as set forth in Section 5.5(d).

(d)     The rights of the Second Lien Collateral Agent shall at all times be subject to the terms of this Agreement and to the First Lien Collateral Agent's rights under the First Lien Credit Documents.

(e)     Neither the Control Agent nor the First Lien Collateral Agent shall have by reason of the Second Lien Credit Documents or this Agreement or any other document

a fiduciary relationship in respect of the Second Lien Collateral Agent or any Second Lien Claimholder.

(f)     Upon the Payment in Full of First Lien Obligations (other than in connection with a Refinancing of the First Lien Obligations), the Control Agent shall deliver to the Second Lien Collateral Agent the Control Collateral together with any necessary endorsements (or otherwise allow the Second Lien Collateral Agent to obtain control of such Control Collateral) or as a court of competent jurisdiction may otherwise direct and the Second Lien Collateral Agent shall accept and succeed to the role of the Control Agent as the agent for perfection on the Control Collateral.

(g)     The Control Agent shall have an unfettered right to resign as Control Agent upon 30 days notice to the First Lien Collateral Agent and the Second Lien Collateral Agent.  If upon the effective date of such resignation no successor to the Control Agent has been appointed by the First Lien Collateral Agent and the Second Lien Collateral Agent, the Control Agent shall deliver to the First Lien Collateral Agent the Control Collateral together with any necessary endorsements (or otherwise allow the First Lien Collateral Agent to obtain control of such Control Collateral) or as a court of competent jurisdiction may otherwise direct and the First Lien Collateral Agent shall accept and succeed to the role of the Control Agent as the agent for perfection on the Control Collateral.

**5.6**     <u>When Payment in Full of First Lien Obligations Deemed to Not Have Occurred</u>. If at any time after the Payment in Full of First Lien Obligations has occurred, the Company thereafter enters into any Refinancing of any First Lien Credit Document evidencing a First Lien Obligation which Refinancing is permitted hereby and by the terms of the Second Lien Credit Documents, then such Payment in Full of First Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Payment in Full of First Lien Obligations), and the obligations under such Refinancing First Lien Credit Document shall automatically be treated as First Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the First Lien Collateral Agent under such First Lien Credit Documents shall be a First Lien Collateral Agent for all purposes of this Agreement.  Upon receipt of a notice stating that the Company has entered into a new First Lien Credit Document (which notice shall include the identity of the new collateral agent, such agent, the "**New Agent**"), the Second Lien Collateral Agent shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as the Company or such New Agent shall reasonably request in order to provide to the New Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement.  If the new First Lien Obligations under the new First Lien Credit Documents are secured by assets of the Grantors of the type constituting Collateral that do not also secure the Second Lien Obligations, then the Second Lien Obligations shall be secured at such time by a second priority Lien on such assets to the same extent provided in the Second Lien Collateral Documents.

5.7    Purchase Right.  Without prejudice to the enforcement of the First Lien Claimholders' remedies, the First Lien Claimholders agree that at any time following (a) acceleration of the First Lien Obligations in accordance with the terms of the First Lien Credit Agreement, (b) a payment default under the First Lien Credit Agreement that has not been cured or waived by the First Lien Claimholders within sixty (60) days of the occurrence thereof or (c) the commencement of an Insolvency Proceeding (each, a "**Purchase Event**"), one or more of the Second Lien Claimholders may request, and the First Lien Claimholders hereby offer the Second Lien Claimholders the option, to purchase all, but not less than all, of the aggregate amount of outstanding First Lien Obligations outstanding at the time of purchase at par, (including any applicable premium) without warranty or representation or recourse (except for representations and warranties required to be made by assigning lenders pursuant to the Assignment Agreement (as such term is defined in the First Lien Credit Agreement)).  If such right is exercised, the parties shall endeavor to close promptly thereafter but in any event within ten (10) Business Days of the request.  If one or more of the Second Lien Claimholders exercise such purchase right, it shall be exercised pursuant to documentation mutually acceptable to each of the First Lien Collateral Agent and the Second Lien Collateral Agent.  If none of the Second Lien Claimholders exercise such right, the First Lien Claimholders shall have no further obligations pursuant to this Section 5.7 for such Purchase Event and may take any further actions in their sole discretion in accordance with the First Lien Credit Documents and this Agreement.

## SECTION 6    Insolvency Proceedings.

6.1    Use of Cash Collateral and Financing Issues.  Until the Payment in Full of First Lien Obligations has occurred, if Company or any other Grantor shall be subject to any Insolvency Proceeding and the First Lien Collateral Agent shall desire to permit the use of cash collateral on which the First Lien Collateral Agent or any other creditor has a Lien or to permit Company or any other Grantor to obtain financing, from one or more of the First Lien Claimholders under Section 363 or Section 364 of the Bankruptcy Code or any similar Bankruptcy Law (each, a "**DIP Financing**"), then, so long as the maximum amount of Indebtedness that may be outstanding from time to time in connection with such DIP Financing shall not exceed an amount equal to [**$_____**][3] then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, (A) agrees that it will raise no objection to such use of cash collateral or DIP Financing nor support any other Person objecting to, such sale, use, or lease of cash collateral or DIP Financing and will not request any form of adequate protection or any other relief in connection therewith (except as agreed by the First Lien Collateral Agent or to the extent expressly permitted by Section 6.4) and, to the extent the Liens securing the First Lien Obligations are subordinated to or pari passu with such DIP Financing, the Second Lien Collateral Agent will subordinate its Liens in the Collateral to (x) the Liens securing such DIP Financing (and all Obligations relating thereto), (y) any adequate protection Liens provided to the First Lien Claimholders and (z) any "carve-out" for professional or United States Trustee fees agreed to by the First Lien Collateral Agent; and (B) agrees that notice received two (2)

---

[3]    Allow First Lien to rollover into DIP.

calendar days prior to the entry of an order approving such usage of cash collateral or approving such DIP Financing shall be adequate notice.

**6.2** <u>Sale Issues</u>. The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will raise no objection to or oppose a sale or other disposition of any Collateral (and any post-petition assets subject to adequate protection liens in favor of the First Lien Collateral Agent) free and clear of its Liens or other claims under Section 363 of the Bankruptcy Code if the Required Lenders under the First Lien Credit Agreement have consented to such sale or disposition of such assets so long as the interests of the Second Lien Claimholders in the Collateral (and any post-petition assets subject to adequate protection liens, if any, in favor of the Second Lien Collateral Agent) attach to the proceeds thereof, subject to the terms of this Agreement. If requested by the First Lien Collateral Agent in connection therewith, the Second Lien Collateral Agent shall affirmatively consent to such a sale or disposition.

**6.3** <u>Relief from the Automatic Stay</u>. Until the Payment in Full of First Lien Obligations has occurred, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall (i) seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of the Collateral, without the prior written consent of the First Lien Collateral Agent, or (ii) oppose any request by the First Lien Collateral Agent or any First Lien Claimholder to seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of the Collateral.

**6.4** <u>Adequate Protection</u>.

(a) The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall contest (or support any other person contesting) (i) any request by the First Lien Collateral Agent or the First Lien Claimholders for adequate protection or (ii) any objection by the First Lien Collateral Agent or the First Lien Claimholders to any motion, relief, action or proceeding based on the First Lien Collateral Agent or the First Lien Claimholders claiming a lack of adequate protection. In any Insolvency Proceeding, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, may seek adequate protection in respect of the Second Lien Obligations, subject to the provisions of this Agreement, only if (A) the First Lien Claimholders (or any subset thereof) are granted adequate protection in the form of additional collateral including replacement liens on post-petition collateral and (B) such additional protection requested by the Second Lien Collateral Agent is in the form of a Lien on such additional collateral, which Lien, if granted, will be subordinated to the adequate protection Liens securing the First Lien Obligations and the Liens securing any DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the Liens securing the First Lien Obligations under this Agreement and the Liens securing any such DIP Financing. In the event the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, seeks or requests adequate protection in respect of Second Lien Obligations and such adequate protection is granted in the form of additional collateral, then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Collateral Agent shall also be granted a Lien on

such additional collateral as security for the First Lien Obligations and for any DIP Financing and that any Lien on such additional collateral securing the Second Lien Obligations shall be subordinated to the Liens on such collateral securing the First Lien Obligations and any DIP Financing (and all Obligations relating thereto) and to any other Liens granted to the First Lien Claimholders as adequate protection on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the Liens securing the First Lien Obligations under this Agreement and the Liens securing any DIP Financing.

(b)      Similarly, if the First Lien Claimholders are granted adequate protection in the form of a superpriority claim, then the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, may seek or request a superpriority claim, which superpriority claim will be junior in all respects to the superpriority claim granted to the First Lien Collateral Agent and the First Lien Claimholders, and, in the event that the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, seeks or requests adequate protection in respect of Second Lien Obligations and such adequate protection is granted in the form of a superpriority claim, then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Collateral Agent and the providers of any DIP Financing also shall be granted a superpriority claim, which superpriority claim will be senior in all respects to the superpriority claim granted to the Second Lien Collateral Agent and the Second Lien Claimholders.

(c)      Notwithstanding the foregoing, if the First Lien Claimholders are deemed by a court of competent jurisdiction to be fully secured on the petition date of any Insolvency Proceeding, then the Second Lien Collateral Agent and the Second Lien Claimholders shall not be prohibited from seeking adequate protection in the form of payments in the amount of current post-petition interest, incurred fees and expenses or other cash payments.

**6.5**    No Waiver.  Nothing contained herein shall prohibit or in any way limit the First Lien Collateral Agent or any First Lien Claimholder from objecting in any Insolvency Proceeding or otherwise to any action taken by the Second Lien Collateral Agent or any of the Second Lien Claimholders, including the seeking by the Second Lien Collateral Agent or any Second Lien Claimholders of adequate protection or the asserting by the Second Lien Collateral Agent or any Second Lien Claimholders of any of its rights and remedies under the Second Lien Credit Documents or otherwise; provided, however, that this Section 6.5 shall not limit the rights of the Second Lien Claimholders under the proviso in Section 3.1(a)(ii) or under Section 6.4 or Section 6.9.

**6.6**    Avoidance Issues.  If any First Lien Claimholder is required in any Insolvency Proceeding, or otherwise, to turn over or otherwise pay to the estate of Company or any other Grantor any amount in respect of a First Lien Obligation (a "**Recovery**"), then such First Lien Claimholders shall be entitled to a reinstatement of First Lien Obligations with respect to all such recovered amounts.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not

diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement. Collateral or proceeds thereof received by the Second Lien Collateral Agent or any Second Lien Claimholder after a Payment in Full of First Lien Obligations and prior to the reinstatement of such First Lien Obligations shall be delivered to the First Lien Collateral Agent upon such reinstatement in accordance with <u>Section 4.2</u>.

**6.7** <u>Separate Grants of Security and Separate Classification</u>. Each of the Grantors, the First Lien Claimholders and the Second Lien Claimholders acknowledges and agrees that (i) the grants of Liens pursuant to the First Lien Collateral Documents and the Second Lien Collateral Documents constitute two separate and distinct grants of Liens and (ii) because of, among other things, their differing rights in the Collateral, the Second Lien Obligations are fundamentally different from the First Lien Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Lien Claimholders and Second Lien Claimholders in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the First Lien Claimholders shall be entitled to receive, in addition to amounts distributed to them from, or in respect of, the Collateral in respect of principal, pre-petition interest (including default interest) and other claims, all amounts owing in respect of post-petition interest (including default interest), fees, costs, premiums and other charges, irrespective of whether a claim for such amounts is allowed or allowable in such Insolvency Proceeding, before any distribution from, or in respect of, any Collateral is made in respect of the claims held by the Second Lien Claimholders), with the Second Lien Claimholders hereby acknowledging and agreeing to turn over to the First Lien Claimholders amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Lien Claimholders.

**6.8** <u>Reorganization Securities</u>. If, in any Insolvency Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, both on account of First Lien Obligations and on account of Second Lien Obligations, then, to the extent the debt obligations distributed on account of the First Lien Obligations and on account of the Second Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

**6.9** <u>Post-Petition Claims</u>.

(a)     Neither the Second Lien Collateral Agent nor any other Second Lien Claimholder shall oppose or seek to challenge any claim by the First Lien Collateral Agent or any First Lien Claimholder for allowance in any Insolvency Proceeding of First Lien Obligations consisting of post-petition interest, fees, costs, charges or expenses to the extent of the value of the Lien of the First Lien Collateral Agent held for the benefit of the First Lien Claimholders, without regard to the existence of the Lien of the Second Lien Collateral Agent on behalf of the Second Lien Claimholders on the Collateral.

- 23 -

(b)     Neither the First Lien Collateral Agent nor any other First Lien Claimholder shall oppose or seek to challenge any claim by the Second Lien Collateral Agent or any Second Lien Claimholder for allowance in any Insolvency Proceeding of Second Lien Obligations consisting of post-petition interest, fees, costs, charges or expenses to the extent of the value of the Lien of the Second Lien Collateral Agent on behalf of the Second Lien Claimholders on the Collateral (after taking into account Payment in Full of the First Lien Obligations).

**6.10**     Waiver.  The Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, waives any claim it or they may hereafter have against the First Lien Collateral Agent or any First Lien Claimholder arising out of the election of the First Lien Collateral Agent or any First Lien Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code, or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in any Insolvency Proceeding.

**6.11**     Expense Claims.  Neither the Second Lien Collateral Agent nor any Second Lien Claimholder will (i) contest the payment of fees, expenses or other amounts to the First Lien Collateral Agent or any First Lien Claimholder under Section 506(b) of the Bankruptcy Code or otherwise to the extent provided for in the First Lien Credit Agreement or (ii) assert or enforce, at any time prior to the Payment in Full of First Lien Obligations, any claim under Section 506(c) of the Bankruptcy Code senior to or on parity with the First Lien Obligations for costs or expenses of preserving or disposing of any Collateral.

**6.12**     Other Matters.  To the extent that the Second Lien Collateral Agent or any Second Lien Claimholder has or acquires rights under Section 361, Section 363 or Section 364 of the Bankruptcy Code with respect to any of the Collateral, the Second Lien Collateral Agent agrees, on behalf of itself and the Second Lien Claimholders not to assert any of such rights without the prior written consent of the First Lien Collateral Agent; provided that if requested by the First Lien Collateral Agent, the Second Lien Collateral Agent shall timely exercise such rights in the manner requested by the First Lien Collateral Agent, including any rights to payments in respect of such rights.

**6.13**     Effectiveness in Insolvency Proceedings.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Proceeding.  All references in this Agreement to any Grantor shall include such Person as a debtor-in-possession and any receiver or trustee for such Person in any Insolvency Proceeding.

**SECTION 7     Reliance; Waivers; Etc.**

**7.1**     Non-Reliance

(a)     The consent by the First Lien Claimholders to the execution and delivery of the Second Lien Credit Documents and the grant to the Second Lien Collateral Agent on behalf of the Second Lien Claimholders of a Lien on the Collateral and all loans and other extensions of credit made or deemed made on and after the date hereof by the First

Lien Claimholders to the Grantors shall be deemed to have been given and made in reliance upon this Agreement. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, acknowledges that it and the Second Lien Claimholders have, independently and without reliance on the First Lien Collateral Agent or any First Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the Second Lien Term Note Agreement, the other Second Lien Credit Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the Second Lien Term Note Agreement, the other Second Lien Credit Documents or this Agreement.

(b)     The consent by the Second Lien Claimholders to the execution and delivery of the First Lien Credit Documents and the grant to the First Lien Collateral Agent on behalf of the First Lien Claimholders of a Lien on the Collateral and all loans and other extensions of credit made or deemed made on and after the date hereof by the Second Lien Claimholders to the Grantors shall be deemed to have been given and made in reliance upon this Agreement. The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, acknowledges that it and the First Lien Claimholders have, independently and without reliance on the Second Lien Collateral Agent or any Second Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the First Lien Credit Agreement, the other First Lien Credit Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the First Lien Credit Agreement, the other First Lien Credit Documents or this Agreement.

**7.2**    <u>No Warranties or Liability</u>.  The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under its First Lien Credit Documents, acknowledges and agrees that each of the Second Lien Collateral Agent and the Second Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Lien Credit Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The Second Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the Second Lien Credit Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Obligations, acknowledges and agrees that the First Lien Collateral Agent and the First Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Lien Credit Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The First Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under their respective First Lien Credit Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Second Lien Collateral Agent and the Second Lien Claimholders shall have no duty to the First Lien Collateral Agent or any of the First Lien Claimholders, and the First Lien Collateral Agent and the First Lien Claimholders shall have no duty to the Second Lien Collateral Agent or any of the Second Lien Claimholders,

to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with Company or any Guarantor (including the First Lien Credit Documents and the Second Lien Credit Documents), regardless of any knowledge thereof which they may have or be charged with.

**7.3**     No Waiver of Lien Priorities.

(a)     No right of the First Lien Claimholders, the Control Agent, the First Lien Collateral Agent or any of them to enforce any provision of this Agreement or any First Lien Credit Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of Company or any other Grantor or by any act or failure to act by the Control Agent, any First Lien Claimholder or the First Lien Collateral Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First Lien Credit Documents or any of the Second Lien Credit Documents, regardless of any knowledge thereof which the Control Agent, the First Lien Collateral Agent or the First Lien Claimholders, or any of them, may have or be otherwise charged with.

(b)     Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of Company and the other Grantors under the First Lien Credit Documents and subject to the provisions of Section 5.3(b)), the First Lien Claimholders, the First Lien Collateral Agent and any of them may, at any time and from time to time in accordance with the First Lien Credit Documents or applicable law, without the consent of, or notice to, the Second Lien Collateral Agent or any Second Lien Claimholders, without incurring any liabilities to the Second Lien Collateral Agent or any Second Lien Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the Second Lien Collateral Agent or any Second Lien Claimholders is affected, impaired or extinguished thereby) do any one or more of the following:

(i)     make loans and advances to any Grantor or issue, guaranty or obtain letters of credit for the account of any Grantor or otherwise extend credit to any Grantor, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing (subject, in each case, to the limits set forth in the definition of "First Lien Obligations" and Section 5.3);

(ii)     change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the First Lien Obligations or any Lien on any First Lien Collateral or guaranty thereof or any liability of Company or any other Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the First Lien Obligations, without any restriction as to the amount, tenor or terms of any such increase or extension, subject to the limits set forth in the definition of "First Lien Obligations") or, subject to the provisions of this Agreement, otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the First Lien Collateral Agent or any of the First

Lien Claimholders, the First Lien Obligations or any of the First Lien Credit Documents; provided, however, the foregoing shall not prohibit the Second Lien Collateral Agent and the Second Lien Claimholders from enforcing, consistent with the other terms of this Agreement, any right arising under the Second Lien Term Note Agreement as a result of any grantor's violation of the terms thereof.

(iii)    subject to the provisions of this Agreement, sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Collateral or any liability of Company or any other Grantor to the First Lien Claimholders or the First Lien Collateral Agent, or any liability incurred directly or indirectly in respect thereof;

(iv)    settle or compromise any First Lien Obligation or any other liability of Company or any other Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the First Lien Obligations) in any manner or order;

(v)    exercise or delay in or refrain from exercising any right or remedy against Company or any security or any other Grantor or any other Person, elect any remedy and otherwise deal freely with Company, any other Grantor or any First Lien Collateral and any security and any guarantor or any liability of Company or any other Grantor to the First Lien Claimholders or any liability incurred directly or indirectly in respect thereof;

(vi)    take or fail to take any Lien securing the First Lien Obligations or any other collateral security for any First Lien Obligations or take or fail to take any action which may be necessary or appropriate to ensure that any Lien securing First Lien Obligations or any other Lien upon any property is duly enforceable or perfected or entitled to priority as against any other Lien or to ensure that any proceeds of any property subject to any Lien are applied to the payment of any First Lien Obligation or any Obligation secured thereby; or

(vii)    otherwise release, discharge or permit the lapse of any or all Liens securing the First Lien Obligations or any other Liens upon any property at any time securing any First Lien Obligations.

(c)    The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, also agrees that the Control Agent, the First Lien Claimholders and the First Lien Collateral Agent shall have no liability to the Second Lien Collateral Agent or any Second Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives all claims against the Control Agent, any First Lien Claimholder or the First Lien Collateral Agent, arising out of any and all actions which the First Lien Claimholders or the First Lien Collateral Agent may take or permit or omit to take with respect to:  (i) the First Lien Credit Documents, (ii) the collection of the First Lien Obligations or (iii) the foreclosure upon, or sale, liquidation or other disposition of, any Collateral (including, without limitation, the Control Collateral,

as applicable). The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Claimholders and the First Lien Collateral Agent have no duty to them in respect of the maintenance or preservation of the Collateral, the First Lien Obligations or otherwise.

(d) The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

**7.4** <u>Obligations Unconditional</u>. All rights, interests, agreements and obligations of the First Lien Collateral Agent and the First Lien Claimholders and the Second Lien Collateral Agent and the Second Lien Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

(a) any lack of validity or enforceability of any First Lien Credit Documents or any Second Lien Credit Documents or any setting aside or avoidance of any Lien;

(b) except as otherwise set forth in this Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the First Lien Obligations or Second Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any First Lien Credit Document or any Second Lien Credit Document;

(c) any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First Lien Obligations or Second Lien Obligations or any guaranty thereof;

(d) the commencement of any Insolvency Proceeding in respect of Company or any other Grantor; or

(e) any other circumstances which otherwise might constitute a defense available to, or a discharge of, Company or any other Grantor in respect of the First Lien Obligations, or of the Second Lien Collateral Agent or any Second Lien Claimholder in respect of this Agreement.

**7.5** <u>Certain Notices</u>.

(a) Promptly upon the Payment in Full of First Lien Obligations, the First Lien Collateral Agent shall deliver written notice confirming same to the Second Lien Collateral Agent; <u>provided</u> that the failure to give any such notice shall not result in any liability of the First Lien Collateral Agent or the First Lien Claimholders hereunder or in the modification, alteration, impairment, or waiver of the rights of any party hereunder.

(b)      Promptly upon (or as soon as practicable following) the commencement by the First Lien Collateral Agent of any enforcement action or the exercise of any remedy with respect to any Collateral (including by way of a public or private sale of Collateral), the First Lien Collateral Agent shall notify the Second Lien Collateral Agent of such action; provided that the failure to give any such notice shall not result in any liability of the First Lien Collateral Agent or the First Lien Claimholders hereunder or in the modification, alteration, impairment, or waiver of the rights of any party hereunder.

## SECTION 8   Miscellaneous.

**8.1**      Conflicts.  Subject to the first sentence of this Section 8.1, in the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Credit Documents or the Second Lien Credit Documents, the provisions of this Agreement shall govern and control.  The parties hereto acknowledge that the terms of this Agreement are not intended to negate any specific rights granted to Company in the First Lien Credit Documents and the Second Lien Credit Documents.  The parties agree that the provisions of this Agreement and Article XI of the Second Lien Term Note Agreement (and related definitions) are to be read and interpreted as providing supplemental rights and restrictions with respect to the parties thereto and are to be given independent effect.

**8.2**      Effectiveness; Continuing Nature of this Agreement; Severability.  This Agreement shall become effective when executed and delivered by the parties hereto.  This is a continuing agreement of lien subordination and the First Lien Claimholders may continue, at any time and without notice to the Second Lien Collateral Agent or any Second Lien Claimholder subject to the Second Lien Credit Documents, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any Grantor constituting First Lien Obligations in reliance hereof.  The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency Proceeding.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to Company or any other Grantor shall include Company or such Grantor as debtor and debtor-in-possession and any receiver or trustee for Company or any other Grantor (as the case may be) in any Insolvency Proceeding.  This Agreement shall terminate and be of no further force and effect, (i) with respect to the Second Lien Collateral Agent, the Second Lien Claimholders and the Second Lien Obligations, upon the later of (1) the date upon which the obligations under the Second Lien Term Note Agreement terminate and payment has been made in full in cash of all other Second Lien Obligations outstanding on such date and (2) if there are other Second Lien Obligations outstanding on such date, the date upon which such Second Lien Obligations terminate and (ii) with respect to the First Lien Collateral Agent, the First Lien Claimholders and the First Lien Obligations, the date of Payment in Full of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 5.6 and Section 6.5.

**8.3**     Amendments; Waivers.  No amendment, modification or waiver of any of the provisions of this Agreement by the Second Lien Collateral Agent or the First Lien Collateral Agent shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, Company shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent its rights or obligations are directly and affected.

**8.4**     Information Concerning Financial Condition of Company and its Subsidiaries.

(a)     The First Lien Collateral Agent and the First Lien Claimholders, on the one hand, and the Second Lien Claimholders and the Second Lien Collateral Agent, on the other hand, shall each be responsible for keeping themselves informed of (a) the financial condition of Company and its Subsidiaries and all endorsers and/or guarantors of the First Lien Obligations or the Second Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations or the Second Lien Obligations.  The First Lien Collateral Agent and the First Lien Claimholders shall have no duty to advise the Second Lien Collateral Agent or any Second Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the First Lien Collateral Agent or any of the First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Second Lien Collateral Agent or any Second Lien Claimholder, it or they shall be under no obligation (w) to make, and the First Lien Collateral Agent and the First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information which, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

(b)     The Grantors agree that any information provided to the First Lien Collateral Agent, the Second Lien Collateral Agent, the Control Agent, any First Lien Claimholder or any Second Lien Claimholder may be shared by such Person with any First Lien Claimholder, any Second Lien Claimholder, the Control Agent, the First Lien Collateral Agent or the Second Lien Collateral Agent notwithstanding a request or demand by such Grantor that such information be kept confidential; provided, that such information shall otherwise be subject to the respective confidentiality provisions in the First Lien Credit Agreement and the Second Lien Term Note Agreement, as applicable.

**8.5**     Subrogation.  The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any rights of subrogation it may acquire as a result of any payment hereunder until the Payment in Full of First Lien Obligations has occurred.

**8.6** <u>Application of Payments</u>. All payments received by the First Lien Collateral Agent or the First Lien Claimholders may be applied, reversed and reapplied, in whole or in part, to such part of the First Lien Obligations provided for in the First Lien Credit Documents. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, assents to any extension or postponement of the time of payment of the First Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the First Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

**8.7** SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.

(a) This Agreement shall be construed in accordance with and governed by the law of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

(b) Each party hereby irrevocably and unconditionally submits, for itself and its Property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement against any other party or its properties in the courts of any jurisdiction.

(c) Each party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in <u>Section 8.7(b)</u>. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to this Agreement in the manner provided for notices in <u>Section 8.8</u>. Nothing in this Agreement or any other Note Document will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable law.

(e) **Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or any other theory). Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to**

**enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this <u>Section 8.7</u>.**

**8.8**    <u>Notices</u>.  All notices to the Control Agent, the Second Lien Claimholders and the First Lien Claimholders permitted or required under this Agreement shall also be sent to the Second Lien Collateral Agent and the First Lien Collateral Agent, respectively.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of electronic mail or four (4) Business Days after deposit in the U.S. mail (registered or certified, with postage prepaid and properly addressed).  For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

**8.9**    <u>Further Assurances</u>.  The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under the First Lien Credit Documents, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders under the Second Lien Credit Documents, and Company, agrees that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the First Lien Collateral Agent or the Second Lien Collateral Agent may reasonably request to effectuate the terms of and the lien priorities contemplated by this Agreement.

**8.10**    <u>Binding on Successors and Assigns</u>.  This Agreement shall be binding upon the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent, the Second Lien Claimholders, the Control Agent and their respective successors and assigns.

**8.11**    <u>Specific Performance</u>.  Each of the First Lien Collateral Agent and the Second Lien Collateral Agent may demand specific performance of this Agreement.  The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under its First Lien Credit Documents, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by any First Lien Collateral Agent or the Second Lien Collateral Agent, as the case may be.

**8.12**    <u>Headings</u>.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**8.13**    <u>Counterparts</u>.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**8.14**    <u>Authorization</u>.  By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

**8.15**    <u>No Third Party Beneficiaries</u>.  This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent, the Second Lien Claimholders, the Control Agent and the Company.  No other Person shall have or be entitled to assert rights or benefits hereunder.

**8.16**    <u>Provisions Solely to Define Relative Rights</u>.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Claimholders on the one hand and the Second Lien Claimholders on the other hand.  Nothing in this Agreement is intended to or shall impair the rights of Company or any other Grantor, or the obligations of Company or any other Grantor, which are absolute and unconditional, to pay the First Lien Obligations and the Second Lien Obligations as and when the same shall become due and payable in accordance with their terms.

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

**UBS AG, STAMFORD BRANCH,**
as First Lien Collateral Agent,

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

<u>Notice Address</u>:

Principal Office:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut 06901
Attention: Tom Donnelly
Telecopier: (203) 719-3162

with a copy to:

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
Attention: Frederick F. Eisenbiegler
Telephone: (212) 705-3646

**UBS AG, STAMFORD BRANCH,**
as Second Lien Collateral Agent,

By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

Notice Address:

Principal Office:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut 06901
Attention: Tom Donnelly
Telecopier: (203) 719-3162

with a copy to:

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
Attention: Frederick F. Eisenbiegler
Telephone: (212) 705-3646

**UBS AG, STAMFORD BRANCH,**
as Control Agent,


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


<u>Notice Address</u>:

Principal Office:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut 06901
Attention: Tom Donnelly
Telecopier: (203) 719-3162

with a copy to:

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
Attention: Frederick F. Eisenbiegler
Telephone: (212) 705-3646

**ATKINS NUTRITIONALS, INC.**
as Company


By:‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
    Name:
    Title:


<u>Notice Address</u>:

Atkins Nutritionals, Inc.
2002 Orville Drive North, Suite A
Ronkonkoma, New York 11779
Attention: President and Chief Executive Officer
Telecopy: (631) 738-8713

with a copy to:

Atkins Nutritionals, Inc.
100 Park Avenue
New York, New York 10017
Attention: Mark Rodriguez

with a copy to :

Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:  Marcia L. Goldstein
             Shai Y. Waisman
Telecopier: (212)310-8007

**Exhibit 3**

**Registration Rights Agreement**

**REGISTRATION RIGHTS AGREEMENT**

**by and among**

**ATKINS NUTRITIONALS HOLDINGS, INC.**

**and**

**THE HOLDERS NAMED HEREIN**

---

**Dated as of December [  ], 2005**

---

# TABLE OF CONTENTS

SECTION 1     DEFINITIONS ................................................................................................... 1

SECTION 2     SECURITIES ACT REGISTRATION ON REQUEST ........................................ 4

     (a)     Request for Registration. ................................................................................... 4

     (b)     Registration of Other Securities. ...................................................................... 5

     (c)     Registration Statement Form. ........................................................................... 5

     (d)     Effective Registration Statement. ..................................................................... 5

     (e)     Selection of Underwriters. ................................................................................ 6

     (g)     Shelf Registrations. .......................................................................................... 6

SECTION 3     PIGGYBACK REGISTRATION. ..................................................................... 6

SECTION 4     EXPENSES. ..................................................................................................... 7

SECTION 5     REGISTRATION PROCEDURES. .................................................................. 7

SECTION 6     UNDERWRITTEN OFFERINGS. .................................................................. 11

     (a)     Requested Underwritten Offerings. ................................................................ 11

     (b)     Priority. .......................................................................................................... 11

     (c)     Holders of Registrable Common Stock to be Parties to Underwriting Agreement. ........ 12

SECTION 7     PREPARATION; CONFIDENTIALITY. ...................................................... 12

     (a)     Preparation. .................................................................................................... 12

     (b)     Confidentiality. .............................................................................................. 13

SECTION 8     POSTPONEMENTS. ..................................................................................... 13

SECTION 9     INDEMNIFICATION. .................................................................................. 14

     (a)     Indemnification by the Company. .................................................................. 14

     (b)     Indemnification by the Offerors and Sellers. ................................................. 15

     (c)     Notices of Losses, etc. ................................................................................... 15

     (d)     Contribution. .................................................................................................. 15

     (e)     Other Indemnification. ................................................................................... 16

     (f)     Indemnification Payments. ............................................................................ 16

SECTION 10     REGISTRATION RIGHTS TO OTHERS. ..................................................... 16

SECTION 11     ADJUSTMENTS AFFECTING REGISTRABLE COMMON STOCK. ............... 16

SECTION 12     RULES 144 AND 144A. ................................................................................ 16

SECTION 13     AMENDMENTS AND WAIVERS. ................................................................ 17

SECTION 14     NOMINEES FOR BENEFICIAL OWNERS. .................................................. 17

SECTION 15     ASSIGNMENT. ............................................................................................ 17

i

SECTION 16     CALCULATION OF PERCENTAGE OR NUMBER OF SHARES OF
                REGISTRABLE COMMON STOCK. ...................................................................17

SECTION 17     INFORMATION RIGHTS. ...............................................................................18

SECTION 18     TERMINATION OF REGISTRATION RIGHTS. ...............................................19

SECTION 19     MISCELLANEOUS ........................................................................................19

    (a)        Further Assurances. ...........................................................................................19

    (b)        Headings. ...........................................................................................................19

    (c)        Conflicting Instructions. ....................................................................................19

    (d)        Remedies.............................................................................................................19

    (e)        Entire Agreement. ..............................................................................................20

    (f)        Notices. ...............................................................................................................20

    (g)        Governing Law....................................................................................................20

    (h)        Severability. .......................................................................................................20

    (i)        Counterparts........................................................................................................20

# REGISTRATION RIGHTS AGREEMENT

REGISTRATION RIGHTS AGREEMENT dated as of December [    ], 2005, (this "Agreement") by and among ATKINS NUTRITIONALS HOLDINGS, INC., a Delaware corporation (the "Company"), and the Holders (as hereinafter defined) of Registrable Common Stock (as hereinafter defined) who are signatories to this Agreement.

This Agreement is being entered into in connection with the acquisition of Common Stock (as hereinafter defined) on or after the Effective Date (as hereinafter defined) by certain Holders (the original stockholder parties to this Agreement being hereinafter referred to as "Original Holders") pursuant to the Plan (as hereinafter defined). Upon the issuance of the Common Stock, each Original Holder will own the number of shares of Common Stock specified with respect to such Original Holder set forth on Exhibit A hereto.

In consideration of the premises and the mutual agreements set forth herein, the parties hereto hereby agree as follows:

**Section 1        Definitions.**

Unless otherwise defined herein, capitalized terms used herein and in the recitals above shall have the following meanings:

"10% Holder" means any Holder that owns 10% or more of the Common Stock outstanding as of the Effective Date.

"Affiliate" of a Person means any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such other Person. For purposes of this definition, "control" means the ability of one Person to direct the management and policies of another Person.

"Bankruptcy Code" means Title 11 of the United States Code.

"Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to be closed.

"Commission" means the U.S. Securities and Exchange Commission.

"Common Stock" means the shares of common stock, $.01 par value per share, of the Company, as adjusted to reflect any merger, consolidation, recapitalization, reclassification, split-up, stock dividend, rights offering or reverse stock split made, declared or effected with respect to the Common Stock.

"Company Indemnitee" has the meaning set forth in Section 9(a).

"Company Information" has the meaning set forth in Section 17.

"Confidential Material" means any and all non-public information, in written or other tangible form, concerning or relating to the Company (whether prepared by the Company, its Representatives or otherwise) that is marked as being confidential and furnished to a Holder of Registrable Common Stock or its Representative by or on behalf of the Company pursuant to Section

7(a). "Confidential Material" shall not include information that: (a) is or becomes available to the public generally, other than as a result of disclosure by the relevant Holder or by a Representative of such Holder in breach of the terms of this Agreement, or (b) becomes available to the relevant Holder from a source other than the Company, provided that, the Holder reasonably believes that such source is not bound by a confidentiality agreement with or does not have a contractual, legal or fiduciary obligation of confidentiality to the Company with respect to such information.

"Effective Date" means the effective date of the Plan pursuant to the terms thereof.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any similar or successor statute, and the rules and regulations thereunder.

"Expenses" means all expenses incident to the Company's performance of or compliance with its obligations under this Agreement, including, without limitation, all registration, filing, listing, stock exchange and NASD fees (including, without limitation, all fees and expenses of any "qualified independent underwriter" required by the rules of the NASD), all fees and expenses of complying with state securities or blue sky laws (including the reasonable fees, disbursements and other charges of counsel for the underwriters in connection with blue sky filings), all word processing, duplicating and printing expenses, messenger, telephone and delivery expenses, all rating agency fees, the fees, disbursements and other charges of counsel for the Company and of its independent registered public accountants, including the expenses incurred in connection with any special audits or comfort letters required by or incident to such performance and compliance, the fees and expenses incurred in connection with the listing of the securities to be registered on each securities exchange or national market system on which similar securities issued by the Company are then listed, any fees and disbursements of underwriters customarily paid by issuers or sellers of securities, the reasonable fees, disbursements and other charges of one law firm (per registration statement prepared) to the Selling Holders of Registrable Common Stock pursuant to a registration under Section 2 (selected by the Selling Holders holding a majority of the shares of Registrable Common Stock covered by such registration), the fees and expenses of any special experts retained by the Company in connection with such registration, and the fees and expenses of other Persons retained by the Company, but excluding underwriting discounts and commissions and applicable transfer taxes, if any, which discounts, commissions and transfer taxes shall be borne by the Selling Holders in all cases; provided that, if the Company shall, in accordance with Section 3 or Section 8, not register any securities with respect to which it had given written notice of its intention to register to holders of Registrable Common Stock, notwithstanding anything to the contrary in the foregoing, all reasonable out-of-pocket expenses incurred by Holders in connection with such registration (other than the reasonable fees, disbursements and other charges of counsel other than the one firm of counsel referred to above) shall be deemed to be Expenses; and provided further that, in any case where Expenses are not to be borne by the Company, such Expenses shall not include salaries of Company personnel or general overhead expenses of the Company, auditing fees, premiums or other expenses relating to liability insurance required by underwriters or other expenses for the preparation of financial statements or other data normally prepared by the Company in the ordinary course of its business or which the Company would have incurred in any event.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect from time to time.

"Holder" means (a) any Original Holder who owns at least 2% of the Common Stock outstanding as of the Effective Date, or (b) any Person who (i) acquired at least 2% of the Common Stock

outstanding as of the Effective Date from an Original Holder, (ii) after giving effect to such acquisition owns at least 10% of the Common Stock outstanding as of the Effective Date and (iii) has agreed in writing to be bound by the terms of this Agreement in accordance with Section 15.

"Holder Indemnitee" has the meaning set forth in Section 9(b).

"Initiating Holder" means at the time of delivery of an Initiating Request a 10% Holder.

"Initiating Request" has the meaning set forth in Section 2.

"Loss" and "Losses" have the meanings set forth in Section 9(a).

"NASD" means the National Association of Securities Dealers, Inc.

"Non-withdrawing Holders" has the meaning set forth in Section 2(ii)(C).

"Offering Documents" has the meaning set forth in Section 9(a).

"Person" means any individual, corporation, partnership, firm, joint venture, association, company, trust, unincorporated organization, governmental or regulatory body or subdivision thereof or other entity.

"Piggyback Registration" has the meaning set forth in Section 3.

"Piggyback Requesting Holder" has the meaning set forth in Section 3.

"Plan" means the Second Amended Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code for the Company and certain of its subsidiaries, dated November 16, 2005, as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof.

"Public Offering" means a public offering and sale of Common Stock pursuant to an effective registration statement under the Securities Act.

"Registrable Common Stock" means any of the Common Stock owned by the Holders from time to time, provided, however, that a share of Common Stock will cease to be a share of Registrable Common Stock if (a) a registration statement covering such Registrable Common Stock has been declared effective and such Registrable Common Stock has been sold pursuant to such effective registration statement, (b) such Registrable Common Stock has been Transferred to a Person who is not (and does not become as a result of such Transfer) a Holder, or (c) the Company delivers to the Holders of such share a written opinion of counsel, reasonably acceptable to such Holder and addressed to such Holder, to the effect that such Registrable Common Stock is otherwise freely-transferable by such Holder without any restriction under the Securities Act at the time such Holder desires to sell or transfer such securities.

"Reporting Company" means a company that is subject to the periodic reporting requirements under Section 13 or 15(d) of the Exchange Act.

"Representative" has the meaning set forth in Section 7(b).

"Securities Act" means the Securities Act of 1933, or any similar or successor statute, as amended, and the rules and regulations thereunder.

"Selling Holder" means a Holder who is selling Registrable Common Stock requested to be registered pursuant to this Agreement

"Shelf Registration" means a shelf registration pursuant to Rule 415 promulgated under the Securities Act.

"Shelf Registration Statement" means a registration statement filed with the Commission pursuant to a shelf registration.

"Third Party Securityholders" has the meaning set forth in Section 6(b)(iii).

"Transfer" means any transfer, sale, assignment, pledge, hypothecation or other disposition of any interest. "Transferor" and "Transferee" have correlative meanings.

"Withdrawal Notice" has the meaning set forth in Section 18.

In this Agreement, all references to "ownership" of Common Stock or Registrable Common Stock shall be deemed to mean the beneficial ownership of Common Stock or Registrable Common Stock, unless otherwise specified.

**Section 2        Securities Act Registration on Request.**

(a)                **Request for Registration.**  At any time after 180 days after the effective date of the registration statement for the first Public Offering after the Effective Date on any form other than Form S-4 or S-8 (or any successor or similar form that the Commission may adopt), one or more Initiating Holders may deliver to the Company a written request (an "Initiating Request") that the Company register with the Commission under the Securities Act all or part of the Registrable Common Stock owned by such Initiating Holder or Initiating Holders, which request shall specify the number of shares of Registrable Common Stock to be disposed of by such Initiating Holder or Initiating Holders and the proposed plan of distribution of such shares.  Upon the receipt of any Initiating Request for registration pursuant to this Section 2, the Company will promptly (and in any event within 10 Business Days after receipt of such Initiating Request) notify in writing all other Holders of the receipt of such request and will use commercially reasonable efforts to effect, at the earliest practicable date, such registration under the Securities Act, of

(i)        the Registrable Common Stock that the Company has been so requested to register by such Initiating Holder or Initiating Holder Group; and

(ii)        all other Registrable Common Stock that the Company has been requested to register by any other Holders by written request given to the Company within 30 days after the giving of written notice by the Company to such other Holders of the Initiating Request,

all to the extent necessary to permit the proposed method of disposition of the Registrable Common Stock so to be registered; provided, that,

(A)        the Company shall not be required to effect more than a total of two registrations pursuant to this Section 2 for all Holders of Registrable Common Stock;

(B)        if the Company shall have previously effected a registration pursuant to this Section 2 or shall have previously effected a registration of which notice has been given to the Holders pursuant to Section 3, the Company shall not be required to effect

any registration pursuant to this Section 2 until a period of 180 days shall have elapsed from the date on which such previous registration ceased to be effective;

(C)     any Initiating Holder or Initiating Holders whose Registrable Common Stock was to be included in any such registration pursuant to this Section 2, may, by written notice to the Company, withdraw its Initiating Request.  Upon receipt of such withdrawal notice, the Company shall not effect such registration and such registration shall not count as one of the permitted registrations pursuant to paragraph (A) above if such notice of withdrawal is delivered to the Company prior to the execution of the underwriting agreement, if any, or the execution of the custody agreement with respect to such registration, if any; provided that, if the members of an Initiating Holder Group that have not requested withdrawal of an Initiating Request collectively own and wish the Company to register the offering of 10% or more of the shares of  Common Stock outstanding at the Effective Date (the "Non-withdrawing Holders"), the Company shall effect a registration that includes only such shares of Registrable Common Stock owned by the Non-withdrawing Holders and such registration shall count as one of the permitted registrations pursuant to paragraph (A) above; and

(D)     the Company shall not be required to effect any registration pursuant to this Section 2 unless at least 15% of the shares of Common Stock outstanding at the Effective Date is to be included in such registration.

(b)     Registration of Other Securities.  Whenever the Company shall effect a registration pursuant to this Section 2, no securities other than (i) Registrable Common Stock and (ii) subject to Section 6(b), Common Stock to be sold by the Company for its own account shall be included among the securities covered by such registration unless the Selling Holders holding not less than a majority of the shares of Registrable Common Stock to be covered by such registration shall have consented in writing to the inclusion of such other securities.

(c)     Registration Statement Form.  Registrations under this Section 2 shall be on such appropriate registration form prescribed by the Commission under the Securities Act as shall be selected by the Company and which form shall be available for the sale of the Registrable Common Stock to be registered thereunder in accordance with the method of distribution thereof proposed by the Initiating Holder or Initiating Holders.  The Company agrees to include in any such registration statement filed pursuant to this Section 2 all information that outside counsel for the Selling Holders holding a majority of the shares of Registrable Common Stock covered by such registration shall advise is legally required to be included.  The Company may, if permitted by law, effect any registration requested under this Section 2 by the filing of a registration statement on Form S-3 (or any successor or similar short form registration statement that the Commission may adopt); provided, however, that in the case of an underwritten offering, if the managing underwriters advise the Company that in their opinion the use of another permitted form is of material importance to the success of the offering, then the Company shall use commercially reasonable efforts to effect such registration on such other permitted form.

(d)     Effective Registration Statement.  A registration requested pursuant to this Section 2 shall not be deemed to have been effected:

(i)     unless a registration statement with respect thereto has been declared effective by the Commission and remains effective in compliance with the provisions of the Securities Act and the laws of any state or other jurisdiction applicable to the disposition of Registrable Common Stock covered by such registration statement until the earliest of (A) such time as all of such Registrable Common Stock has been disposed of in accordance with such registration statement, (B) there shall cease

to be any Registrable Common Stock, or (C) 180 days after such registration statement has been declared effective, provided that, with respect to any Shelf Registration, such period shall extend for the period provided for in Section 2(f);

(ii)        if, after it has become effective, such registration is interfered with by any stop order, injunction or other order or requirement of the Commission or other governmental or regulatory agency or court for any reason other than a violation of applicable law solely by any Selling Holder and has not thereafter become effective; or

(iii)        if, in the case of an underwritten offering, the conditions to closing specified in an underwriting agreement to which the Company is a party are not satisfied (other than solely by reason of any breach or failure by any Selling Holder) or waived.

(e)        <u>Selection of Underwriters</u>.  The underwriter or underwriters of each underwritten Public Offering, if any, of the Registrable Common Stock to be registered pursuant to this Section 2 shall be selected by the Company, subject to approval by the Selling Holders owning at least a majority of the shares of Registrable Common Stock to be registered, which approval shall not be unreasonably withheld, delayed or conditioned.

(f)        <u>Shelf Registrations</u>.  If a demand made pursuant to Section 2 is for a Shelf Registration, the period for which such Shelf Registration Statement must remain effective shall be the period of time specified in the Initiating Request, but in any event not more than one year after the date on which such Shelf Registration Statement initially is declared effective by the Commission (plus a number of Business Days equal to the number of days, if any, that the Shelf Registration Statement is not kept effective after the initial date of its effectiveness and prior to such first anniversary thereof).

**Section 3**        **Piggyback Registration.**

If the Company, at any time after the Effective Date, proposes to register any of its securities under the Securities Act by registration on any form other than Form S-4 or S-8 (or any successor or similar form that the Commission may adopt), whether for its own account, for the account of any of its securityholders or otherwise, the Company shall give written notice to all the Holders as soon as reasonably practicable (and in any event at least 30 days prior to such proposed registration) of such proposed registration, and such notice shall offer the Holders the opportunity to register such number of shares of Registrable Common Stock as each such Holder may request in accordance with the provisions of this Section 3 (a "<u>Piggyback</u> <u>Registration</u>").  Upon the written request of any Holder receiving notice of such proposed registration (a "<u>Piggyback</u> <u>Requesting</u> <u>Holder</u>") made within 30 days after the receipt of any such notice (10 days if the Company states in such written notice or gives telephonic notice to the relevant Holder, with written confirmation to follow promptly thereafter, stating that (a) such registration will be on Form S-3 (or any successor or similar short form registration statement that the Commission may adopt) and (b) such shorter period of time is required because of a planned filing date), the Company shall, subject to Section 6(b), be required to permit the Registrable Common Stock requested to be included in a Piggyback Registration to be included on the same terms and conditions as any other securities included therein.  Such written request shall specify the number of shares of Registrable Common Stock intended to be disposed of by such Piggyback Requesting Holder and the minimum net price at which such Piggyback Requesting Holder is willing to sell its Registrable Common Stock.  Each Piggyback Requesting Holder may, at any time prior to the time at which the Company and the managing underwriters determine the public offering price and underwriting discount at which shares of Common Stock will be sold under such registration statement, advise the Company of any change in the minimum net price at which such Piggyback Requesting Holder is willing to sell its Registrable Common Stock.  If the public offering price and underwriting discount agreed upon by the Company and the managing

underwriter with respect to an offering under such registration statement result in a net price to any Piggyback Requesting Holder that is less than the last minimum net price specified by such Piggyback Requesting Holder, then the shares of Registrable Common Stock owned by such Piggyback Requesting Holder shall not be included in such offering, but without prejudice to the rights of such Piggyback Requesting Holder to include its Registrable Common Stock in any future registration (or registrations) pursuant to this Section 3 or to cause such registration to be effected as a registration under Section 2, as the case may be, provided that, if such registration statement is a Shelf Registration Statement and after the completion of such offering there will remain additional securities registered for future offering and sale under such Shelf Registration Statement, such Piggyback Requesting Holder's shares of Registrable Common Stock shall continue to be registered under such Shelf Registration Statement and shall be eligible for inclusion in future offerings and sales effected under such Shelf Registration Statement.  If at any time after giving written notice of its intention to register any securities and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register or to delay registration of such securities, the Company shall give written notice of such determination to each Piggyback Requesting Holder and (a) in the case of a determination not to register, shall be relieved of its obligation to register any Registrable Common Stock in connection with such registration (but not from any obligation of the Company to pay the Expenses in connection therewith), without prejudice, however, to the rights of any Holder to include Registrable Common Stock in any future registration (or registrations) pursuant to this Section 3 or to cause such registration to be effected as a registration under Section 2, as the case may be, and (b) in the case of a determination to delay registering, shall be permitted to delay registering any Registrable Common Stock, for the same period as the delay in registering such other securities.  No registration effected under this Section 3 shall relieve the Company of its obligation to effect any registration upon request under Section 2 and no registration effected pursuant to this Section 3 shall be deemed to have been effected pursuant to Section 2.

## Section 4        Expenses.

The Company shall pay all Expenses in connection with any registration initiated pursuant to Section 2 or 3, whether or not such registration shall become effective and whether or not all or any portion of the shares of Registrable Common Stock originally requested to be included in such registration are ultimately included in such registration.

## Section 5        Registration Procedures.

If and whenever the Company is required or elects to effect any registration under the Securities Act as provided in Sections 2 and 3 hereof, the Company shall, as expeditiously as reasonably possible:

(a)                prepare and file with the Commission (promptly and, in the case of any registration pursuant to Section 2, in any event on or before the date that is 90 days after the end of the period within which requests for registration may be given to the Company pursuant to Section 2(a)(ii), the requisite registration statement to effect such registration and thereafter use commercially reasonable efforts to cause such registration statement to become and remain effective; provided, however, that the Company may discontinue any registration of its securities that are not shares of Registrable Common Stock (and, under the circumstances specified in Sections 3 and 8(b) hereof, its securities that are shares of Registrable Common Stock) at any time prior to the effective date of the registration statement relating thereto;

(b)        prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective and to comply with the provisions of the Securities Act and the Exchange

Act with respect to the disposition of all Registrable Common Stock covered by such registration statement until such time as all of such Registrable Common Stock has been disposed of in accordance with the method of disposition set forth in such registration statement; provided, that, except with respect to any Shelf Registration, such period need not extend beyond 180 days after the effective date of the registration statement; and provided, further, that with respect to any Shelf Registration, such period need not exceed the applicable period provided for in Section 2(f);

(c)        furnish to each Selling Holder and each underwriter, if any, such number of copies of such drafts and final conformed versions of such registration statement and of each such amendment and supplement thereto (in each case including all exhibits and any documents incorporated by reference), such number of copies of such drafts and final versions of the prospectus contained in such registration statement (including each preliminary prospectus and any summary prospectus) and any other prospectus filed pursuant to Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, and such other documents, as the Selling Holders or any underwriter may reasonably request in writing;

(d)        use commercially reasonable efforts (i) to register or qualify all Registrable Common Stock and other securities, if any, covered by such registration statement under such other securities or blue sky laws of such states or other jurisdictions of the United States of America as the Selling Holders shall reasonably request in writing, (ii) to keep such registration or qualification in effect for so long as such registration statement remains in effect and (iii) to take any other action that may be necessary or reasonably advisable to enable such Selling Holders to consummate the disposition in such jurisdictions of the securities to be sold by such Selling Holders, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this Section 5(d) be obligated to be so qualified, to subject itself to taxation in such jurisdiction or to consent to general service of process in any such jurisdiction;

(e)        use commercially reasonable efforts to cause all shares of Registrable Common Stock and other securities, if any, covered by such registration statement to be registered with or approved by such other federal or state governmental agencies or authorities as may be necessary in the opinion of counsel to the Company and counsel to the Selling Holder or Selling Holders to enable the Selling Holder or Selling Holders to consummate the disposition of such Registrable Common Stock;

(f)        use commercially reasonable efforts to obtain and, if obtained, furnish to each Selling Holder, and each underwriter, if any, a signed copy, addressed to each such Selling Holder and each underwriter, of:

(i)        an opinion or opinions of counsel for the Company, dated the effective date of such registration statement (and, if such registration involves an underwritten offering, dated the date of the closing under the underwriting agreement), reasonably satisfactory (based on the form and substance of opinions of issuers' counsel customarily given in such an offering) in form and substance to such Selling Holder and underwriter, and

(ii)        a comfort letter or comfort letters, dated the effective date of such registration statement (and, if such registration involves an underwritten offering, dated the date of the closing under the underwriting agreement) and signed by the independent registered public accountants who have certified the Company's financial statements included or incorporated by reference in such registration statement, reasonably satisfactory (based on the form and substance of comfort letters of issuers' independent registered public accountants customarily given in such an offering) in form and substance to such Selling Holder and underwriter,

in each case, covering such matters as are customarily covered in opinions of issuers' counsel and in accountants' comfort letters delivered to underwriters in underwritten public offerings of securities;

(g)        notify each Selling Holder and the managing underwriter or underwriters, if any, promptly, and confirm such advice promptly in writing thereafter (i) when the registration statement, the prospectus or any prospectus supplement related thereto or post-effective amendment to the registration statement has been filed and, with respect to the registration statement and any post-effective amendment, when the same has become effective; (ii) of any request by the Commission for amendments or supplements to the registration statement or prospectus or for additional information; (iii) of the issuance by the Commission of any stop order suspending the effectiveness of the registration statement or the initiation of any proceedings by any Person for that purpose; (iv) if at any time any of the representations and warranties of the Company made as contemplated by Section 6(a) ceases to be true and correct; and (v) of the receipt by the Company of any notification with respect to the suspension of the registration or qualification of any Registrable Common Stock for sale under the securities or blue sky laws of any jurisdiction or the initiation or threat of any proceeding for such purpose;

(h)        notify each Selling Holder and the managing underwriter or underwriters, if any, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made, and, at the written request of any such Selling Holder or underwriter, promptly prepare and furnish to it a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such prospectus, as supplemented or amended, shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made; provided that, in the event the Company shall give such notice, the Company shall extend the period for which such registration shall remain effective by the number of days during the period from and including the date of the giving of such notice to the date when the Company shall make available to the Selling Holders and underwriter such supplemented and amended prospectus;

(i)        use commercially reasonable efforts to obtain the withdrawal of any order suspending the effectiveness of a registration statement relating to the Registrable Common Stock at the earliest possible moment;

(j)        otherwise comply with all applicable rules and regulations of the Commission and any other governmental agency or authority having jurisdiction over the offering; make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve months, but not more than eighteen months, beginning with the first full calendar month after the effective date of such registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 promulgated thereunder; furnish to each Selling Holder and to the managing underwriter or managing underwriters, if any, at least 10 days prior to the filing thereof with the Commission a copy of any amendment or supplement to such registration statement or prospectus; and not file with the Commission any amendment or supplement thereof that does not comply in all material respects with the requirements of the Securities Act or the rules and regulations thereunder;

(k)        use commercially reasonable efforts to cause all shares of Registrable Common Stock covered by a registration statement to be listed or quoted on each securities exchange or inter-dealer automated quotation system on which similar securities issued by the Company are then listed or quoted;

(l)         provide and maintain a transfer agent and registrar for the shares of Registrable Common Stock covered by a registration statement from and after a date no later than the effective date thereof;

(m)        enter into such agreements (including, in the case of an underwritten offering, an underwriting agreement in customary form) and take such other actions as the Selling Holders holding a majority of the shares of Registrable Common Stock covered by such registration statement shall reasonably request in order to expedite or facilitate the disposition of such Registrable Common Stock, including customary indemnification;

(n)        if requested by the managing underwriter or the Selling Holders holding a majority of the shares of Registrable Common Stock being sold in connection with an underwritten Public Offering, promptly incorporate in a prospectus supplement or post-effective amendment such information as the managing underwriter or the Selling Holders holding a majority of the Registrable Common Stock being sold agree should be included therein relating to the plan of distribution with respect to such Registrable Common Stock, including without limitation, information with respect to the number of shares of Registrable Common Stock being sold to such underwriters, the purchase price being paid therefore by such underwriters and with respect to any other terms of the underwritten offering of the Registrable Common Stock to be sold in such offering, and make all required filings of such prospectus supplement or post-effective amendment as soon as notified of the matters to be incorporated in such prospectus supplement or post-effective amendment;

(o)        if requested by the Selling Holders holding a majority of the shares of Registrable Common Stock being sold, cooperate with the Selling Holders and the managing underwriter, if any, to facilitate the timely preparation and delivery of certificates representing the shares of Registrable Common Stock to be sold and not bearing any restrictive legends, and enable such Registrable Common Stock to be in such share amounts and registered in such names as the managing underwriter or, if none, the Selling Holders holding a majority of the shares of Registrable Common Stock being sold, may request at least three Business Days prior to any sale of Registrable Common Stock to the underwriters; and

(p)        cause representatives of the Company to participate in any "road show" or "road shows" reasonably requested by any managing underwriter of an underwritten Public Offering of Registrable Common Stock.

As a condition to the obligations of the Company to effect any registration pursuant to this Agreement with respect to the Registrable Common Stock of a Selling Holder, such Selling Holder must furnish to the Company in writing such information regarding itself, the Registrable Common Stock held by it and the intended methods of disposition of the Registrable Common Stock held by it as is necessary to effect the registration of such Selling Holder's Registrable Common Stock and is requested in writing by the Company.  At least 30 days prior to the first anticipated filing date of a registration statement for any registration under this Agreement, the Company will notify in writing each Holder of the information referred to in the preceding sentence that the Company is requesting from that Holder whether or not such Holder has elected to have any of its Registrable Common Stock included in the registration statement. If, within 10 days prior to the anticipated filing date, the Company has not received the requested information from a Holder, then the Company may file the Registration Statement without including the shares of Registrable Common Stock of such Holder.

Each Holder agrees that as of the date that a final prospectus is made available to it for distribution to prospective purchasers of Registrable Common Stock it shall cease to distribute copies of any preliminary prospectus prepared in connection with the offer and sale of such Registrable Common Stock.  Each

Holder further agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 5(h), such Holder shall forthwith discontinue such Holder's disposition of Registrable Common Stock pursuant to the registration statement relating to such Registrable Common Stock until such Holder's receipt of the copies of the supplemented or amended prospectus contemplated Section 5(h) and, if so directed by the Company, shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies, then in such Holder's possession of the prospectus relating to such Registrable Common Stock current at the time of receipt of such notice. If any event of the kind described in Section 5(h) occurs and such event is the fault solely of a Selling Holder (or Selling Holders), such Selling Holder (or Selling Holders) shall pay all Expenses attributable to the preparation, filing and delivery of any supplemented or amended prospectus contemplated by Section 5(h).

**Section 6      Underwritten Offerings.**

(a)            <u>Requested Underwritten Offerings</u>.    If requested by the underwriters in connection with a request for a registration under Section 2, the Company shall enter into a firm commitment underwriting agreement with such underwriters for such Public Offering, such agreement to be reasonably satisfactory in substance and form to the Company, the Selling Holders holding a majority of the Registrable Common Stock included in such registration and the underwriters and to contain such representations, warranties and undertaking with respect to holdback periods by the Company and such other terms as are customary in agreements of that type, including, without limitation, indemnification and contribution to the effect and to the extent provided in Section 9.

(b)            <u>Priority</u>.

(i)            If a registration under Section 2 involves an underwritten Public Offering, and if the managing underwriter of such underwritten offering shall advise the Company in writing (with a copy to each Selling Holder requesting that Registrable Common Stock be included in such registration statement) that the number of shares of Registrable Common Stock requested to be included in such registration exceeds the number of shares of Registrable Common Stock that can be sold in such Public Offering within a price range stated to such managing underwriter by Selling Holders owning at least a majority of the shares of Registrable Common Stock requested to be included in such registration to be acceptable to such Selling Holders, then the Company shall include in such registration pursuant to Section 2, to the extent of the number of shares of Registrable Common Stock that the Company is advised can be sold in such Public Offering, (A) first, Registrable Common Stock requested to be registered by the Initiating Holder or Initiating Holders pursuant to Section 2, <u>pro rata</u> among the Initiating Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Initiating Holders, (B) second, Registrable Common Stock requested to be registered by other Selling Holders requesting that Registrable Common Stock be included in such registration statement pursuant to Section 2, <u>pro rata</u> among such Selling Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Selling Holders (C) third, securities that the Company proposes to issue and sell for its own account and (D) fourth, other securities, if any.

(ii)            If the Company proposes to register any of its securities under the Securities Act for its own account as contemplated by Section 3 and such securities are to be distributed by or through one or more underwriters, and if the managing underwriter of such underwritten offering shall advise the Company in writing (with a copy to the Piggyback Requesting Holders) that if all the Registrable Common Stock requested to be included in such registration were so included, then, in its opinion, the number and type of securities proposed to be included in such registration would exceed the number and type of securities that could be sold in such offering within a price range acceptable to the Company, then the Company shall include in such registration pursuant to Section 3, to the extent of the

number and type of securities that the Company is so advised can be sold in such offering, (A) first, securities that the Company proposes to issue and sell for its own account, (B) second, Registrable Common Stock requested to be registered by Piggyback Requesting Holders pursuant to Section 3, pro rata among the Piggyback Requesting Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Piggyback Requesting Holders and (C) third, other securities, if any.

(iii) In the case of any other registration contemplated by Section 3 where the Company proposes to register its securities for the account of its securityholders other than the Holders ("Third Party Securityholders"), which involves an underwritten offering, if the managing underwriter of such underwritten offering shall advise the Company in writing (with a copy to the Piggyback Requesting Holders) that if all Registrable Common Stock requested to be included in such registration were so included, then, in its opinion, the number and type of securities proposed to be included in such registration would exceed the number and type of securities that could be sold in such offering within a price range stated to such managing underwriter by Piggyback Requesting Holders owning at least a majority of the shares of Registrable Common Stock requested to be included in such registration to be acceptable to such Piggyback Requesting Holders, then the Company shall include in such registration pursuant to Section 3, to the extent of the number and type of securities that the Company is so advised can be sold in such offering, (A) first, the securities of such Third Party Securityholders proposed to be registered in such registration, (B) second, the securities that the Company proposes to issue and sell for its own account (C) third, Registrable Common Stock requested to be registered by Piggyback Requesting Holders pursuant to Section 3, pro rata among the Piggyback Requesting Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Piggyback Requesting Holders, and (D) fourth, other securities.

Any Holder may withdraw its request to have all or any portion of its Registrable Common Stock included in any such offering by notice to the Company within 10 Business Days after receipt of a copy of a notice from the managing underwriter pursuant to this Section 6(b).

(c) Holders of Registrable Common Stock to be Parties to Underwriting Agreement. The Holders of Registrable Common Stock to be distributed by underwriters in an underwritten offering contemplated by Section 6(a) or (b) shall be parties to the underwriting agreement between the Company and such underwriters and any such Holder, at its option, may reasonably require that any or all of the representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such underwriters shall also be made to and for the benefit of such Holders and that any or all of the conditions precedent to the obligations of such underwriters under such underwriting agreement be conditions precedent to the obligations of such Holders. No such Holder shall be required to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties or agreements regarding such Holder, such Holder's Registrable Common Stock and such Holder's intended method of distribution.

**Section 7     Preparation; Confidentiality.**

(a) Preparation. In connection with the preparation and filing of each registration statement under the Securities Act pursuant to this Agreement, the Company shall (i) give representatives (designated to the Company in writing) of each Selling Holder or group of Selling Holders holding at least 20% of the shares of Registrable Common Stock registered under such registration statement, the underwriters, if any, and one firm of counsel, one firm of accountants and one firm of other agents retained on behalf of all underwriters and one firm of counsel, one firm of accountants and one firm of other agents retained on behalf of the Selling Holders holding a majority of the shares of Registrable Common Stock covered by such registration statement, the reasonable opportunity to participate in the

preparation of such registration statement, each prospectus included therein or filed with the Commission, and each amendment thereof or supplement thereto, (ii) upon reasonable advance notice to the Company, give each of them such reasonable access to all financial and other records, corporate documents and properties of the Company and its subsidiaries, as shall be necessary, in the reasonable opinion of such Selling Holders' and such underwriters' counsel, to conduct a reasonable due diligence investigation for purposes of the Securities Act, and (iii) upon reasonable advance notice to the Company, provide such reasonable opportunities to discuss the business of the Company with its officers, directors, employees and the independent registered public accountants who have certified its financial statements as shall be necessary, in the reasonable opinion of such Selling Holders' and such underwriters' counsel, to conduct a reasonable due diligence investigation for purposes of the Securities Act.

(b)     Confidentiality.

(i)     Each Holder shall and shall cause its directors, officers, partners, managers, members, employees, advisors, agents and other representatives, including without limitation attorneys, accountants, consultants and financial advisors (collectively, "Representatives") to maintain the confidentiality of and not to disclose any Confidential Material; provided, however, that a Holder may disclose Confidential Material (A) to such of its Representatives who need such information in connection with advising such Holder with respect to its investment in securities of the Company, or (B) to the extent required by applicable law, regulation, legal process or court order or requested by regulatory authority (provided, however, that such Holder shall use its reasonable efforts to provide the Company with prior written notice of such requirement to afford the Company with an opportunity to seek a protective order or other appropriate remedy in response). If any Holder shall specify in a request delivered pursuant to Section 2(a)(ii) or 3 that such Holder does not wish to receive any Confidential Material, except as set forth in such request, then the Company shall not deliver to such Holder any such Confidential Material.

(ii)     Each Holder shall be bound by this Section 7(b) and shall remain bound until the earlier of (A) the first anniversary of the date on which the Confidential Material is delivered to such Holder, and (B) the first date on which the Confidential Material received by such Holder ceases to be Confidential Material.

**Section 8     Postponements.**

(a)     If the Company shall fail to file any registration statement required to be filed pursuant to a request for registration under Section 2, the Initiating Holder or Initiating Holders requesting such registration shall have the right to withdraw the request for registration if such withdrawal is made by the Initiating Holders that own a majority of the shares of Registrable Common Stock as to which registration had been requested. Any such withdrawal shall be made by giving written notice to the Company within 20 days after the date on which a registration statement would otherwise have been required to have been filed with the Commission under Section 2 (i.e., 20 days after the date that is 90 days after the conclusion of the period within which requests for registration may be given to the Company pursuant to Section 2(a)(ii)). In the event of such withdrawal, the request for registration shall not be counted for purposes of determining the number of registrations to which Holders are entitled pursuant to Section 2. The Company shall pay all Expenses incurred in connection with a request for registration withdrawn pursuant to this Section 8(a).

(b)     The Company shall not be obligated to file any registration statement, or file any amendment or supplement to any registration statement, and may suspend any Selling Holder's rights to make sales pursuant to any effective registration statement, at any time (but not more than one time in any twelve-month period) when the Company, in the good faith judgment of its Board of Directors, reasonably determines that the filing thereof at the time requested, or the offering of securities pursuant

thereto, would adversely affect a pending or proposed offering of the Company's securities, a material financing, or a material acquisition, merger, recapitalization, consolidation, reorganization or similar transaction, or negotiations, discussions or pending proposals with respect thereto. The Company shall promptly give the Selling Holders written notice that such determination has been made by the Board of Directors, the general basis on which such determination has been made and an estimate of the anticipated duration of the delay. The filing of a registration statement, or any amendment or supplement thereto, by the Company cannot be deferred, and the Selling Holders' rights to make sales pursuant to an effective registration statement cannot be suspended, pursuant to this Section 8(b) for more than 10 days after the abandonment or consummation of any of the foregoing proposals or transactions or for more than 120 days after the date of the Board's determination described in the first sentence of this Section 8(b). The Company shall promptly notify each Selling Holder of the expiration or earlier termination of such deferral or suspension period. If the Company suspends any Selling Holder's rights to make sales pursuant to this Section 8(b), the applicable period during which a registration statement is required pursuant to Section 2 or 3 to remain in effect shall be extended by the number of days of such suspension.

**Section 9      Indemnification.**

(a)              _Indemnification by the Company_.  In connection with any registration statement filed by the Company pursuant to Section 2 or 3, the Company shall, and hereby agrees to, indemnify and hold harmless to the fullest extent permitted by law, each Holder, each Person who participates as an underwriter in the offering or sale of securities covered by such registration statement, each other Person, if any, who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) any such Holder or underwriter, and their respective stockholders, directors, officers, employees, partners, agents, investment advisors and Affiliates (each, a "<u>Company</u> <u>Indemnitee</u>"), against any losses, claims, damages, liabilities, joint or several, actions or proceedings, whether commenced or threatened, in respect thereof and whether or not such Company Indemnitee is a party thereto, and expenses, including, without limitation, the reasonable fees, disbursements and other charges of legal counsel and reasonable costs of investigation and defense, to which such Company Indemnitee may become subject under the Securities Act or otherwise (collectively, a "<u>Loss</u>" or "<u>Losses</u>"), insofar as such Losses arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any registration statement under which securities were registered or otherwise offered or sold under the Securities Act or otherwise, any preliminary prospectus, final prospectus or summary prospectus related thereto, any amendment or supplement thereto, any exhibits to such registration statement or documents or other information incorporated by reference into such registration statement or prospectus (collectively, the "<u>Offering</u> <u>Documents</u>"), or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the light of the circumstances in which they were made not misleading, or any violation by the Company of any federal or state law, rule or regulation applicable to the Company and relating to action required of or inaction by the Company in connection with any such registration; <u>provided</u>, that, the Company shall not be liable to any Company Indemnitee in any such case to the extent that any such Loss arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such Offering Documents in reliance upon and in conformity with information furnished by such Company Indemnitee to the Company in a writing duly executed by such Company Indemnitee specifically stating that it is expressly for use therein; and provided, further, that the Company shall not be liable to any Person who participates as an underwriter in the offering or sale of Registrable Common Stock or any other Person, if any, who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) such underwriter, in any such case to the extent that any such Loss arises out of such Person's failure to send or give a copy of the final prospectus (including any documents incorporated by reference therein), as the same may be then supplemented or amended, to the Person asserting an untrue statement or alleged untrue statement or omission or alleged omission at or prior to the written confirmation of the sale of Registrable Common Stock to such Person if such statement or omission was corrected in such

final prospectus. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such Company Indemnitee and shall survive the transfer of such securities by such Company Indemnitee.

(b)  <u>Indemnification by the Offerors and Sellers</u>.  In connection with any registration statement filed by the Company pursuant to Section 2 or 3 in which a Selling Holder has registered for sale Registrable Common Stock, each such Selling Holder, severally and not jointly, shall and hereby agrees to indemnify and hold harmless to the fullest extent permitted by law the Company and each of its directors, officers, employees, agents, partners, stockholders, Affiliates and each other Person, if any, who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) the Company and each other seller and such seller's employees, directors, officers, stockholders, partners, agents and Affiliates and each other Person, if any, who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) such other seller (each, a "<u>Holder Indemnitee</u>"), against all Losses insofar as such Losses arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in any Offering Documents or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the light of circumstances in which they were made not misleading, if such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with information furnished by such Selling Holder to the Company in a writing duly executed by such Selling Holder specifically stating that it is expressly for use therein; <u>provided</u>, <u>however</u>, that the liability of such indemnifying party under this Section 9(b) shall be limited to the amount of the net proceeds received by such indemnifying party in the sale of Registrable Common Stock giving rise to such liability.  Such indemnity shall remain in full force and effect, regardless of any investigation made by or on behalf of the Holder Indemnitee and shall survive the transfer of such securities by such indemnifying party.

(c)  <u>Notices of Losses, etc.</u>  Promptly after receipt by an indemnified party of written notice of the commencement of any action or proceeding involving a Loss referred to in Section 9(a) or (b), such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party, give written notice to the latter of the commencement of such action; <u>provided</u>, <u>however</u>, that the failure of any indemnified party to give notice as provided herein shall not relieve the indemnifying party of its obligations under Section 9(a) or (b), except to the extent that the indemnifying party is materially and actually prejudiced by such failure to give notice.  In case any such action is brought against an indemnified party, the indemnifying party shall be entitled to participate in and, unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist in respect of such Loss, to assume and control the defense thereof, in each case at its own expense, jointly with any other indemnifying party similarly notified, to the extent that it may wish, with counsel reasonably satisfactory to such indemnified party, and after its assumption of the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof other than reasonable costs of investigation, unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties arises in respect of such claim after the assumption of the defense thereof.  No indemnifying party shall be liable for any settlement of any such action or proceeding effected without its written consent, which shall not be unreasonably withheld, delayed or conditioned.  No indemnifying party shall, without the consent of the indemnified party (which consent shall not be unreasonably withheld, delayed or conditioned), consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect of such Loss or that requires action on the part of such indemnified party or otherwise subjects the indemnified party to any obligation or restriction to which it would not otherwise be subject.

(d)          Contribution.  If the indemnification provided for in this Section 9 shall for any reason be unavailable to an indemnified party under Section 9(a) or (b) in respect of any Loss, then, in lieu of the amount paid or payable under Section 9(a) or (b), the indemnified party and the indemnifying party under Section 9(a) or (b) shall contribute to the aggregate Losses (including legal or other expenses reasonably incurred in connection with investigating the same) (i) in such proportion as is appropriate to reflect the relative fault of the Company and the prospective Selling Holders that resulted in such Loss or action in respect thereof, with respect to the statements, omissions or actions that resulted in such Loss or action in respect thereof, as well as any other relevant equitable considerations, or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as shall be appropriate to reflect the relative benefits received by the Company, on the one hand, and such prospective Selling Holders, on the other hand, from their sale of Registrable Common Stock; provided, that, for purposes of this clause (ii), the relative benefits received by the prospective Selling Holders shall be deemed not to exceed the amount received by such Selling Holders.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  The obligations, if any, of the Selling Holders to contribute as provided in this Section 9(d) are several in proportion to the relative value of their respective shares of Registrable Common Stock covered by such registration statement and not joint.  In addition, no Person shall be obligated to contribute hereunder any amounts in payment for any settlement of any action or Loss effected without such Person's consent (provided that such consent shall not be unreasonably withheld, delayed or conditioned).

(e)          Other Indemnification.  The Company and, in connection with any registration statement filed by the Company pursuant to Section 2 or 3, each Holder who has registered for sale Registrable Common Stock, shall, with respect to any required registration or other qualification of securities under any Federal or state law or regulation of any governmental authority other than the Securities Act, indemnify Holder Indemnitees and Company Indemnitees, respectively, against Losses, or, to the extent that indemnification shall be unavailable to a Holder Indemnitee or Company Indemnitee, contribute to the aggregate Losses of such Holder Indemnitee or Company Indemnitee in a manner similar to that specified in the preceding subsections of this Section 9 (with appropriate modifications).

(f)          Indemnification Payments.  The indemnification and contribution required by this Section 9 shall be made by periodic payments of the amount thereof during the course of any investigation or defense, as and when any Loss is incurred and is due and payable.

## Section 10      Registration Rights to Others.

If the Company shall at any time hereafter provide to any holder of any securities of the Company rights with respect to the registration of such securities under the Securities Act, such rights shall not be in conflict with or adversely affect any of the rights provided to the Holders in, or conflict (in a manner that adversely affects Holders) with any other provisions included in, this Agreement.

## Section 11      Adjustments Affecting Registrable Common Stock.

Without the written consent of Holders of a majority of the outstanding shares of Registrable Common Stock, the Company shall not effect or permit to occur any combination, subdivision or reclassification of Registrable Common Stock that would materially adversely affect the ability of the Holders to include such Registrable Common Stock in any registration of its securities under the Securities Act contemplated by this Agreement or the marketability of such Registrable Common Stock under any such registration or other offering.

**Section 12       Rule 144.**

From the Effective Date and continuing until no Holder is a 10% Holder, the Company shall take (a) all actions necessary to enable Holders to sell Registrable Common Stock without registration under the Securities Act pursuant to the exemptions provided by (i) Rule 144 under the Securities Act, as such Rule may be amended from time to time, from and after such time as the Company becomes a Reporting Company, including filing on a timely basis all reports required to be filed under the Exchange Act and (ii) any similar rules or regulations hereafter adopted by the Commission and (b) in connection with a proposed transfer by a 10% Holder of shares of Registrable Common Stock, provide to any prospective purchaser of Common Stock designated by such 10% Holder, promptly following the request of such 10% Holder a brief statement of the nature of the Company's business and the products and services it offers, the Company's most recent balance sheet and profit and loss and retained earnings statement and similar financial statements for each of the two preceding years (such financial statements to be audited to the extent reasonably available).  Upon the written request of any Holder, the Company shall deliver to such Holder a written statement as to whether the Company has complied with such requirements.

**Section 13       Amendments and Waivers.**

Any provision of this Agreement may be amended, modified or waived if, but only if, the written consent to such amendment, modification or waiver has been obtained from (i) except as provided in clause (ii) below, the Holder or Holders of at least a majority of the shares of Registrable Common Stock then outstanding and held by all Holders and (ii) in the case of any amendment, modification or waiver of any provision of Sections 4 or 9 or this Section 13 or any provision as to the number of requests for registration to which holders of Registrable Common Stock are entitled under Section 2 or 3, or any amendment, modification or waiver that adversely affects any right and/or obligation under this Agreement of any Holder, the written consent of each Holder so affected.

**Section 14       Nominees for Beneficial Owners.**

In the event that any Registrable Common Stock is held by a nominee for the beneficial owner thereof, the beneficial owner thereof may, at its election in a writing delivered to the Company, be treated as the Holder of such Registrable Common Stock for purposes of any request or other action by any Holder or Holders pursuant to this Agreement or any determination of the number or percentage of shares of Registrable Common Stock held by any Holder or Holders contemplated by this Agreement.  If the beneficial owner of any Registrable Common Stock so elects, the Company may require assurances reasonably satisfactory to it of such owner's beneficial ownership of such Registrable Common Stock.

**Section 15       Assignment.**

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.  Any Holder may assign to any Transferee (as permitted under applicable law) of its Registrable Common Stock its rights and obligations under this Agreement, provided that (i) such Transferee shall agree in writing with the parties hereto prior to the assignment to be bound by the terms of this Agreement as if it were an original party hereto and (ii) after giving effect to the Transfer, such Transferee would be a 10% Holder, whereupon such assignee shall for all purposes be deemed to be a Holder under this Agreement.  Except as provided above or otherwise permitted by this Agreement, neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by any Holder without the prior written consent of the other parties hereto.  The Company may not assign this Agreement or any right, remedy, obligation or liability arising hereunder or by reason hereof.

**Section 16     Calculation of Percentage or Number of Shares of Registrable Common Stock.**

For purposes of this Agreement, all references to a percentage or number of shares of Registrable Common Stock or Common Stock shall be calculated based upon the number of shares of Registrable Common Stock or Common Stock, as the case may be, outstanding at the time such calculation is made and shall exclude any Registrable Common Stock or Common Stock, as the case may be, owned by the Company or any subsidiary of the Company.  For the purposes of calculating any percentage or number of shares of Registrable Common Stock or Common Stock as contemplated by the previous sentence, the terms "10% Holder", "Holder" "Initiating Holder" and "Original Holder" shall include all Affiliates thereof owning any shares of Registrable Common Stock or Common Stock.

**Section 17     Information Rights.**

From and after the Effective Date and until such time as the Company becomes a Reporting Company, the Company shall make the information set forth below (the "Company Information"), other than such portions of the Company Information as the Board of Directors, in good faith, determines to be competitively sensitive, available via a secured website to which only the Company, holders of Common Stock (whether or not Holders) and other parties designated by the Company or by any holder of Common Stock (whether or not a Holder), which other parties agree in a manner reasonably acceptable to the Company to keep such Company Information confidential, shall have access:

(a)     as soon as practicable after the end of each fiscal year of the Company, but in any event within ninety days after the end of the fiscal year, (i) a balance sheet as of the last day of such year and an income statement, a statement of cash flows and a statement of changes in stockholders' equity for such year, such financial statements to be prepared and presented in accordance with GAAP and audited and certified by reputable independent public accountants of selected by the Company (provided that with respect to the 2005 fiscal year of the Company, only the balance sheet of the Company shall be required to be audited and certified by independent public accountants), and (ii) a management's discussion and analysis of such financial statements in such detail as is reasonably necessary to an understanding of the Company's financial condition, changes in financial condition and results of operations;

(b)     as soon as practicable after the end of the first three quarters of each fiscal year of the Company, but in any event within forty-five days after the end of such quarter, (i) an unaudited balance sheet as of the last day of such quarter and an unaudited income statement, statement of cash flows and  statement of changes in stockholders' equity for such quarter and the preceding portion of such fiscal year, such financial statements to be prepared and presented in accordance with GAAP, and (ii) a management's discussion and analysis of such financial statements in such detail as is reasonably necessary to an understanding of the Company's financial condition, changes in financial condition and results of operations; and

(c)     as soon as practicable, but in any event within the time period required for the filing of a Form 8-K by the Company if the Company were a Reporting Company, the information that the Company would be required to disclose by Items 1.01, 1.02, 1.03, 2.01, 2.03, 2.04, 2.05 and 2.06 of Form 8-K if the Company were a Reporting Company.

Each holder of the Company's Common Stock from time to time, whether or not such stockholder is then a Holder or was a Holder as of the Effective Date, is an intended beneficiary of this Section 17 and shall be entitled to seek enforcement of the Company's obligations under this Section 17.

**Section 18          Termination of Registration Rights.**

        The Company's obligations under Sections 2 and 3 to register sales of Registrable Common Stock under the Securities Act shall terminate on the fifth anniversary of the Effective Date; provided, however, that if on such fifth anniversary any Holder is a 10% Holder, the Company's obligations hereunder shall continue solely with respect to such 10% Holder and shall terminate when such Holder ceases to be a 10% Holder; provided further that, if the disposition of Registrable Common Stock is suspended as a result of a notice of the type described in Section 5(h), or if the Company defers any registration and/or suspends any Selling Holder's rights to make sales pursuant to Section 8(b), the Company's obligations under Sections 2 and 3 to register Registrable Common Stock for sale under the Securities Act shall be extended by the total number of days of all such deferrals and suspensions.  In addition, the Company's obligations under this Agreement shall cease with respect to any Person when such Person (i) ceases to be a Holder or (ii) delivers to the Company a Withdrawal Notice (as hereinafter defined) in accordance with the provisions of this Section 18.  Any Holder may elect, at any time and from time to time, to cause all (but not less than all) of the Registrable Common Stock held by such Holder not to be subject to this Agreement by delivery of a written notice to the Company (a "Withdrawal Notice").  Upon receipt of a Withdrawal Notice, all such shares shall no longer be deemed to be Registrable Common Stock and such Holder shall no longer be bound by or entitled to the benefits of this Agreement.  Notwithstanding any of the foregoing, (i) the Company's obligations under Sections 4, 9, 12 and 17 and (ii) the Holders' obligations under Section 7(b) and 9 with respect to any registration under either Section 2 or 3 that commences prior to the termination of this Agreement shall survive in accordance with the terms of those respective sections.

**Section 19          Miscellaneous.**

        (a)          Further Assurances.  Each of the parties hereto shall execute such documents and perform such further acts as may be reasonably required or advisable to carry out the provisions of this Agreement and the transactions contemplated hereby.

        (b)          Headings.  The headings in this Agreement are for convenience of reference only and shall not control or affect the meaning or construction of any provisions hereof.

        (c)          Conflicting Instructions.  If the Company receives conflicting instructions, notices or elections from two or more Persons with respect to the same shares of Registrable Common Stock, the Company will act upon the basis of instructions, notice or election received from the registered owner of such Registrable Common Stock.

        (d)          Remedies.  Each Holder, in addition to being entitled to exercise all rights granted by law, including recovery of damages, will be entitled to specific performance of its rights under this Agreement.  The parties agree that monetary damages would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Agreement and each party hereby agrees to waive the defense in any action for specific performance that a remedy at law would be adequate.

        (e)          Entire Agreement.  This Agreement constitutes the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and there are no restrictions, promises, representations, warranties, covenants, or undertakings with respect to the subject matter hereof, other than those expressly set forth or referred to herein.  This Agreement supersedes all prior agreements and understandings between the parties hereto with respect to the subject matter hereof.

        (f)          Notices.  Any notices or other communications to be given hereunder by any party to another party shall be in writing, shall be delivered personally, by telecopy, by certified or

registered mail, postage prepaid, return receipt requested, or by Federal Express or other comparable delivery service, as follows:

          (i)       if to the Company, to:

                 Atkins Nutritionals Holdings, Inc.
                 105 Maxess Road
                 Ste. N109
                 Melville, NY  11747
                 Attention:  General Counsel

          (ii)       if to a Holder, to the address of such Holder as set forth in the signature pages hereto, or

          (iii)      to such other address as the party to whom notice is to be given may provide in a written notice to the other parties hereto, a copy of which shall be on file with the Secretary of the Company.

Notice shall be effective when delivered if given personally, when receipt is acknowledged if telecopied, three Business Days after mailing if given by registered or certified mail as described above, and one Business Day after deposit if given by Federal Express or comparable delivery service.

          (g)       <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with, and all disputes arising under or relating to this Agreement shall be resolved in accordance with, the internal laws of the State of New York.

          (h)       <u>Severability</u>.  Notwithstanding any provision of this Agreement, neither the Company nor any other party hereto shall be required to take any action that would be in violation of any applicable Federal or state securities law.  The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or the validity, legality or enforceability of this Agreement, including any such provision, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

          (i)       <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same Agreement.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

ATKINS NUTRITIONALS HOLDINGS, INC.


By:
    Name:
    Title:

<u>HOLDERS</u>:

[Name of Institution]


By: _____
Name:
Title:
Address:

## Common Stock Holdings

Name of Original Holder | No. of Shares of Common Stock Held by Original Holder as of the Effective Date

**Exhibit 4**

**New Organizational Documents**

**Reorganized Atkins Nutritionals, Inc.**
**Certificate of Incorporation**

CERTIFICATE OF AMENDMENT

TO THE

RESTATED CERTIFICATE OF INCORPORATION

OF

ATKINS NUTRITIONALS, INC.

Under Section 808 of the Business Corporation Law

of the State of New York

Atkins Nutritionals, Inc., a corporation organized and existing under the laws of the State of New York (the "Corporation") certifies that:

FIRST:  The name of the Corporation is Atkins Nutritionals, Inc.  The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of New York on July 13, 1989, under the name Complimentary Formulations, Inc.

SECOND:  The original Certificate of Incorporation was filed with the Secretary of State of the State of New York on November 25, 1969.

THIRD:  The subject matter of each provision of the Restated Certificate of Incorporation which is to be amended or eliminated is (i) the Corporation will be prohibited from issuing non-voting stock in accordance with section 1123 of title 11 of the United States Code, (ii) the indemnification provision is to be amended and restated and (iii) Article 9 is to be deleted in its entirety, and the full text of each provision which is to be substituted or added is as follows:

FOURTH:  Article 4 of the Restated Certificate of Incorporation is hereby amended by adding the following Section after Section 4.2:

> "4.3     The Corporation shall not issue any nonvoting equity securities to the extent prohibited by section 1123(a)(6) of title 11 of the United States Code (the "Bankruptcy Code") as in effect on the date of the filing of this Certificate of Incorporation with the Secretary of State of the State of Delaware; provided, however, that this Section 4.3 (i) will have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation,

and (iii) in all events may be amended or eliminated in accordance with such applicable law as from time to time may be in effect."

FIFTH:  Article 7 is hereby deleted in its entirety and replaced with the following:

"7.    Indemnification.

The Corporation, to the full extent permitted and in the manner required by the laws of the State of New York as in effect at the time of the adoption of this Article 7 or as the law may be amended from time to time, shall (i) indemnify any person (and the heirs and legal representatives of such person) made, or threatened to be made, a party in an action or proceeding (including, without limitation, one by or in the right of the Corporation to procure a judgment in its favor), whether civil or criminal, including an action by or in the right of any other corporation of any type or kind, domestic or foreign, or any partnership, joint venture, trust, employee benefit plan or other enterprise, which any director or officer of the Corporation served in any capacity at the request of the Corporation, by reason of the fact that such director or officer, or such director's or officer's testator or intestate, was a director or officer of the Corporation or served such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise in any capacity, and (ii) provide to any such person (and the heirs and legal representatives of such person) advances for expenses incurred in pursuing such action or proceeding, upon receipt of an undertaking by or on behalf of such director or officer to repay such amount as, and to the extent, required by Section 725(a) of the Business Corporation Law of the State of New York."

SIXTH:  Article 9 of the Restated Certificate of Incorporation is hereby deleted in its entirety.

SEVENTH:  The foregoing amendment was authorized in accordance with Section 808 of the Business Corporation Law of the State of New York and provision for this Certificate of Amendment is contained in the Second Amended and Restated Certificate of Incorporation of the Corporation, *et al.*, which was confirmed by the United States Bankruptcy Court for the Southern District of New York pursuant to an order dated [_____ __, 200_] under chapter 11 of title 11 of the United States Code, in *In re Atkins Nutritionals, Inc., et al* (05-15913 (ALG) (Jointly Administered)).

IN WITNESS WHEREOF, I have subscribed this certificate and do hereby affirm the foregoing as true under the penalties of perjury, this ___ day of _____, 200_.

ATKINS NUTRITIONALS, INC.

_____

Name:
Title:

**Reorganized Atkins Nutritionals, Inc. By-Laws**

# AMENDED and RESTATED BYLAWS

## OF

## ATKINS NUTRITIONALS, INC.

(Adopted on [_____ __, 200_])

## ARTICLE I

### OFFICES

Section 1.    Principal Office

The principal office of the Corporation shall be located in the County of Suffolk, State of New York.

Section 2.    Additional Offices

The Corporation may have such additional offices at such other place within or, without the State of New York as the Board of Directors may from time to time determine or as the business of the Corporation may require.

## ARTICLE II

### SHAREHOLDERS' MEETING

Section 1.    Annual Meeting

An annual meeting of shareholders shall be held within six (6) months after the close of the fiscal year of the Corporation on such date and at the time and place (either within or without the State of New York) as shall be fixed by the Board of Directors. At the annual meeting the shareholders shall elect directors and transact such other business as may properly be brought before the meeting.

Section 2.    Special Meeting

A special meeting of the shareholders shall be called (i) by the Vice Chairman, (ii) by the President, at the request in writing filed with the Chairman by a majority of the Board of Directors then in office, or (iii) by the Secretary, at the request in writing filed with the Chairman by the holders of majority of the issued and outstanding shares of the capital stock of the Corporation entitled to vote at such meeting. Any such request shall state the purpose or, purposes of the proposed meeting. Business transacted at any special meeting of shareholders shall be confined to the purposes set forth in the notice thereof.

Section 3.     Notice of Meeting

(a)     Written notice of the time, place and purpose of every meeting of shareholders (and, if a special meeting, the name and capacity of the person or persons at whose request the meeting is being called), shall be given by the Secretary to each shareholder of record entitled to vote at such meeting, not less than ten (10) or more than sixty (60) days prior to the date set for the meeting.  Notice shall be given either personally or by mailing said notice by first class mail to each shareholder at his or, her, address appearing on the stock book of the Corporation or at such other address supplied by him or her in writing to the Secretary of the Corporation for the purpose of receiving notice.  If mailed, such notice is given when deposited in the United States mail, with postage thereon prepaid, properly, addressed to the shareholder as provided herein.

(b)     A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice.  The attendance by a shareholder at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such shareholder

(c)     All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

Section 4.     Quorum

The holders of a majority of the votes of shares of stock issued and outstanding and entitled, to vote thereat, present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of shareholders except as otherwise provided by statute or the Certificate of Incorporation.

Section 5.     Voting

Every shareholder entitled to vote at any meeting shall be entitled to one (1) vote for, each share of stock entitled to vote and held by him or her of record on the date fixed as the record date for said meeting and may so vote in person or, by proxy. Any corporate action, other than the election of directors, shall be authorized by a majority of the votes cast in favor of or against such action by the holders of shares entitled to vote thereon except as otherwise provided in the Business Corporation Law of the State of New York ("BCL"), the Certificate of Incorporation or the specific provision of a Bylaw adopted by the shareholders.

The members of the Board of Directors shall be elected by a plurality of the votes cast at a meeting of shareholders, by the holders of shares entitled to vote thereon, except as otherwise provided in the Certificate of Incorporation.

Section 6.    Proxies

(a)    Every proxy shall be valid only if filed with the Secretary of the Corporation or with the Secretary of the meeting prior to the commencement of voting on the matter in regard to which said proxy is to be voted.  No proxy shall be valid after the expiration of eleven (11) months from the date of its execution unless otherwise expressly provided in the proxy.

(b)    Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by Section 609 of the BCL.  Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the shareholder who executed such proxy and the revocation is filed with the Secretary of the Corporation or with the Secretary of the Meeting prior to the voting of the proxy.

(c)    A shareholder may execute a writing authorizing another person or persons to act for him as proxy, Execution may be accomplished by the shareholder or the shareholder's authorized officer, director, employee or agent signing such writing or causing his or her signature to be affixed to such writing by any reasonable means including, but not limited to, by facsimile signature.  A shareholder may authorize another person or persons to act for the shareholder as proxy by telegram, cablegram or by other electronic transmission to the person who will be the holder of the proxy or to an agent duly authorized by the proxyholder to receive such transmission.  Any such electronic transmission must set forth or be submitted with sufficient information from which it can be reasonably determined, that the electronic transmission was authorized by the shareholder.  The information relied upon by the inspectors or other persons making the determination shall be specified.

(d)    Any copy, facsimile or other reliable reproduction of the writing or transmission created pursuant to this section may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile or other, reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 7.    Shareholders' List

A list of shareholders as of the record date, certified by the Secretary of the Corporation or by a transfer agent appointed by the Board of Directors, shall be prepared for every meeting of shareholders and shall be produced by the Secretary or some other officer of the Corporation thereat.

Section 8.    Inspectors at Meetings

In advance of any shareholders meeting, the Board of Directors may appoint one (1) or more inspectors to act at the meeting or at any adjournment thereof and make a written report thereof and may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate has been appointed or if such persons are unable to act at a meeting of shareholders, the person presiding at any such meeting may appoint one or more inspectors.  Each inspector, before entering upon the discharge of his duties as set forth in Section 611 of the BCL, shall take and sign an oath faithfully to execute the duties of inspector, at such meeting with strict impartiality and according to the best of his ability.

Section 9.    Conduct of Meeting

All meetings of shareholders shall be presided over by the Vice-Chairman, or if the Vice-Chairman is not present, by Chairpersons thereby chosen by the shareholders at the meeting.  The Secretary of the Corporation, or in his or her absence, an Assistant Secretary, shall act as secretary of every meeting but if neither the Secretary nor the Assistant Secretary is present, the Chairperson of the meeting shall appoint any person present to act as secretary of the meeting.

Section 10.    Action Without Meeting

(a)    Whenever by any provision of law shareholders are required or permitted to take any action by vote, such action may be taken without a meeting on written consent, setting forth the action so taken, signed by the holders of a sufficient number of outstanding shares required for such corporate action, as provided by the Certificate of Incorporation and/or these Bylaws.

(b)    No written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered in the manner required by this paragraph to the Corporation; written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to its registered office in this state, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of shareholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

ARTICLE III

BOARD OF DIRECTORS

Section 1.    Function and Definition

The business and property of the Corporation shall be managed by its Board of Directors who may exercise all the powers of the Corporation and do all such

lawful acts and things as are not by statute or by the Certificate of Incorporation or by these Bylaws directed or required to be exercised or done by the shareholders.

Section 2.    Number and Qualification

The number of directors constituting the entire Board shall not be less than one (1) nor more than nine (9), as may be fixed by resolution of the Board of Directors or by the shareholders entitled to vote for the election of directors, provided that any such action of the Board shall require the vote of a majority of the entire Board.  The phrase "entire board" as used herein means the total number of directors which the Corporation would have if there were no vacancies.  Unless and until a different number shall be so fixed within the limits above specified, the Board shall consist of five (5) directors.

(b)    Each director shall be at least eighteen (18) years of age.  A director need not be a shareholder, a citizen of the United States or a resident of the State of New York.

Section 3.    Election, Term and Vacancies

(a)    Except as otherwise provided in this Section 3, all directors shall be elected at the annual meeting of shareholders and all directors who are so elected or who are elected in the interim to fill vacancies and newly created directorships, shall hold office until the next annual meeting of the shareholders and his successor has been elected and qualified.

(b)    In the interim between annual meetings of shareholders, newly created directorships resulting from an increase in the number of directors and vacancies occurring in the Board, may be filled by the vote of a majority of the directors then remaining in office, although less than a quorum may exist.

Section 4.    Resignation; Removal

(a)    Any director may resign at any time, by giving written notice of such resignation to the Board of Directors or to the President, and such resignation shall be effective upon delivery of such notice or at such time as may be specified in such notice.

(b)    The shareholders entitled to vote for the election of directors may, at any time, remove any or all of the directors for cause.

Section 5.    Meetings

(a)    The annual meeting of the Board of Directors for the election of executive officers and the transaction of such other business as may come before the meeting, shall be held immediately following the annual meeting of shareholders at the same place at which such shareholders' meeting is held.

(b)     Regular meetings of the Board of Directors shall be held at such time and place, within or outside the State of blew York as shall be fixed by resolution of the Board, and when so fixed, no further notice thereof need be given.  Regular meetings not fixed by resolution of the Board may be held on notice at such time and place as shall be determined by the Board.

(c)     Special meetings of the Board of Directors may be called on notice at any time by the Chairman, and shall be called by the Chairman at the written request of a majority of the directors then in office.

Section 6.     Notice of Meetings

In the case of all special meetings and of regular meetings not fixed by resolution of the Board, written notice of the time and place of each such meeting shall be mailed to each director, addressed to his residence or usual place of business, not less than ten (10) days before the date on which such meeting is to be held, or shall be sent to such address by telegram, or be given personally, or by telephone not less than one (1) day before the date oft which such meeting is to be field.  The notice of the meeting need not specify the purpose of the meeting.

(b)     Any meeting of the Board of Directors for which notice is required by these Bylaws or by statute need not be given to any director who submits a signed Waiver of Notice whether before or after the meeting, or who attends the meeting without protesting prior thereto or at its commencement the lack of notice to him.  All signed Waivers of Notice shall be filed with the minutes of the meeting.

Section 7.     Conduct of Meetings

The Vice Chairman, if present, shall preside at all meetings of directors.  At all at which the Vice Chairman is not present, the Chairman shall preside.

Section 8.     Quorum Adjournment and Voting

(a)     Except as otherwise provided by the Certificate of Incorporation, a majority of the entire Board shall be requisite and shall constitute a quorum at all meetings of the Board of Directors for the transaction of business.  Where a vacancy or vacancies prevents such majority, a majority of the directors then in office shall constitute a quorum.

(b)     Except as otherwise provided by the Certificate of Incorporation, when a quorum is present at any meeting, a majority of the directors present shall decide any questions brought before such meeting and the act of such majority shall be the act of the Board.

Section 9.     Action Without Meeting

Any action required or, permitted to be taken by the Board of Directors or of any committee thereof may be taken without a meeting if all members of the Board of Directors or of any committee thereof consent in writing to the adoption of a resolution authorizing the action.

Section 10.     Compensation of Directors

Directors, as such, shall not receive any stated salary for their services, but, by resolution of the Board, a fixed sum and expenses of attendance, if any, may be allowed for attendance at any meeting of the Board of Directors or of any committee thereof.  Nothing herein contained shall be construed to preclude any director from serving the Corporation in any other capacity and receiving reasonable compensation therefor.

Section 11.     Committees

The Board of Directors, by resolution of a majority of the entire Board, may designate from among its members one or more committees, each consisting of two (2) or more directors, and each of which, to the extent provided in such resolution, shall have all the authority of the Board except that no such committee shall have authority as to any of the following matters:

(a)     The submission to shareholders of any action that needs shareholders' approval pursuant to statute, the Certificate of Incorporation of by these Bylaws;

(b)     The filling of vacancies in the Board of Directors or in any committee thereof;

(c)     The fixing of compensation of the directors for serving on the Board or on any committee thereof,

(d)     The amount or repeal of these Bylaws, or the adoption of new Bylaws; and

(e)     The amendment or repeal of any resolution of the Board of Directors which by its terms shall not be so amendable or repealable

The Board may designate one or more directors as alternate members of any such committee who may replace any absent member or members at any meeting of such committee.

Each such committee shall serve at the pleasure of the Board. The Board of Directors shall have the power at any time to fill vacancies in, to change the membership of, or to discharge any such committee.  Committees shall keep minutes of their proceedings and shall report the same to the Board of Directors at the meeting of the Board next succeeding, and any action by the committee shall be subject to revision and

alteration by the Board of Directors, provided that no rights of a third party shall be affected in any such revision or alteration.

ARTICLE IV

EXECUTIVE OFFICERS

Section 1.        Executive Officers

The executive officers of the Corporation shall be a Chairman, a Vice Chairman, a President, a Chief Executive Officer, a Chief Operating Officer, one of more Senior Vice-Presidents, a Treasurer, and a Secretary and such Assistant Treasurer and Assistant Secretaries and other executive officers as the Board of Directors may determine.  Any two or more offices may be held by the same person.  When all of the issued and outstanding shares of capital stock of the Corporation are owned by a person, such person may hold all or any combination of offices.

Section 2.        Election

The Chairman and the President shall be chosen from among the directors and together with one or more Senior Vice-Presidents, the Treasurer and Secretary shall be elected by the Board of Directors to hold office until the meeting of the Board held immediately following the next annual meeting of the shareholders and shall hold office for the term for which elected and until their successors have been elected and qualified. The Board of Directors may from time to time appoint all such other executive officers as it may determine and such officers shall hold office from the time of their appointment and qualifications until the time at which their successors are appointed and qualified.  A vacancy in any executive office (other than the Vice Chairman), arising from any cause, may be filled for the unexpired portion of the term by the Board of Directors.

Section 3.        Term of Office; Removal

All executive officers shall be elected or appointed by the Board of Directors and shall hold office for such time as may be prescribed by the Board.  Any executive officer or agent elected or appointed by the Board (other than the Vice Chairman) may be removed for any reason or for no reason at all at any time by the Board.  The election or appointment of any executive officer shall not of itself create any contractual rights.

Section 4.        Resignations

Any executive officer of the Corporation may resign at any time by giving written notice to the Board of Directors, the President or the Secretary.  Any such resignation shall be effective upon delivery of such notice or at such time as may be specified therein.

Section 5.     Delegation of Powers

The Board of Directors may from time to time delegate the power or duties of any executive officer of the Corporation, in the event of his absence or failure to act otherwise, to any other executive officer or director or person whom the Board of Directors may select.

Section 6.     Compensation

The compensation of each executive officer shall be such as the Board of Directors may from time to time determine.

Section 7.     Chairman

In the absence of the Vice Chairman, the Chairman shall preside at all meetings of the shareholders and the Board of Directors. He or she may sign certificates for shares of the Corporation and any deeds, mortgages, bonds, contracts, or other instruments which the Board of Directors has authorized to be executed, whether or not under the seal of the Corporation, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer or agent of the Corporation. The Chairman shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

Section 8.     Vice Chairman

The Vice Chairman shall preside at all meetings of the shareholders and the Board of Directors, and when so presiding, shall have all the powers of and be subject to all the restrictions upon the Chairman. The Vice Chairman shall perform such other duties and have such other powers as the Board of Directors or the Chairman may from time to time prescribe.

Section 9.     Chief Executive Officer

The Chief Executive Officer shall be responsible for the general and active management of the business of the Corporation and shall report to and be subject to the directions of the Board of Directors. He or she may sign certificates for shares of the Corporation and any deeds, mortgages, bonds, contracts, or other instruments, which the Board of Directors has authorized to be executed, whether or not under the seal of the Corporation, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer of agent of the Corporation. The Chief Executive Officer shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

Section 10.     President

The President shall be responsible for the general and active management of the business of the Corporation, subject to the oversight of the Chief Executive Officer

and the Board. He or she may sign certificates for shares of the Corporation and any deeds, mortgages, bonds, contracts, or other instruments which the Board of Directors has authorized to be executed, whether or not under the seal of the Corporation, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other executive officer or agent of the Corporation. The President shall perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer may from time to time prescribe.

Section 11.    <u>Chief Operating Officer</u>

The Chief Operating Officer shall be responsible for the day-to-day operations of the Corporation, subject to the oversight of the Chief Executive Officer and the Board. The Chief Operating Officer shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

Section 12.    <u>Senior Vice-President</u>

The Senior Vice-President(s) shall have such powers and perform such duties as the Board of Directors may from time to time prescribe. In the absence or inability of the President to perform his duties or exercise his powers, the Senior Vice-President or, if there be more than one (1), a Senior Vice-President designated by the Board, shall exercise the powers and perform the duties of the President subject to the direction of the Board of Directors.

Section 13.    <u>Secretary</u>

The Secretary shall keep the minutes of all meetings and record all votes of shareholders, the Board of Directors and committees in at book to be kept for that purpose. He or she shall give or cause to be given any required notice of meetings of shareholders, the Board of Directors or any committee, and shall be responsible for preparing or obtaining from a transfer agent appointed by the Board, the list of shareholders required by Article II, Section 7 thereof. He or she shall be the custodian of the seal of the Corporation and shall affix or cause to be affixed the seal to any instrument requiring it and attest the same and exercise the powers and perform the duties incident to the office of Secretary subject to the direction of the Board of Directors.

Section 14.    <u>Treasurer</u>

Subject to the direction of the Board of Directors, the Treasurer shall have charge of the general supervisor of the funds and securities of the Corporation and the books of account of the Corporation and shall exercise the powers and perform the duties incident to the office of the Treasurer. If required by the Board of Directors, he or she shall give the Corporation a bond in such sum and with such sureties as may be satisfactory to the Board of Directors for the faithful discharge of his duties.

Section 15.    Other Executive Officers

All other executive officers, if any, shall have such authority and shall perform such duties as may be specified from time to time by the Board of Directors.

Section 16.    Bonds

If the Board of Directors shall so require, any executive officer or agent of the Corporation shall give the Corporation a bond for such term, in such sum and with such surety or sureties as shall be satisfactory to the Board, for the faithful performance of the duties of his office and for the restoration to the Corporation, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession or under his control belonging to the Corporation.

## ARTICLE V

## SHARE CERTIFICATES

Section 1.    Form; Signature

The certificates for shares of the Corporation shall be in such form as shall be determined by the Board of Directors and shall be numbered consecutively and recorded in the books of the Corporation as they are issued.  Each certificate shall state: (i) that the Corporation has been formed under the laws of the State of New York, and (ii) the registered holder's name and the number and class of shaves, and shall be signed by the Chairman, the President or a Vice-President and the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, and shall bear the seal of the Corporation or a facsimile thereof.  Where any such certificate is countersigned by a transfer agent, or registered by a registrar, the signature of any such executive officer may be a facsimile signature.  In case any executive officer who signed, or whose facsimile signature or signatures were placed on such certificate, shall have ceased to be such executive officer before such certificate is issued, it may nevertheless be issued by the Corporation with the same effect as if he were such execrative officer at the date of issue.

Section 2.    Lost Certificates

The Board of Directors may direct that a new share certificate or certificates be issued in place of any certificate of certificates theretofore issued by the Corporation and alleged to have been lost or destroyed; upon the furnishing to the Corporation of an affidavit to that effect by the person claiming that the certificate has been lost or destroyed.  When authorizing such issue of a new certificate or certificates, the Board may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost or destroyed certificate or certificates, or his legal representative, to give the Corporation and its transfer agent(s) and registrar(s) a bond in such sum as it may direct (including a bond without limit as to amount) as indemnity

against any claim which may be made against the Corporation with respect to the certificate alleged to have been lost or destroyed.

Section 3.    Registration of Transfer

Upon compliance with the restrictions on the transferability of shares, if any, and upon surrender to the Corporation or any transfer agent of the Corporation of a certificate or certificates for shares duly indorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the Corporation or such transfer agent to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

Section 4.    Registered Shareholders

Except otherwise provided by law, the Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of share, to receive dividends or other distributions and to vote as such owner, and the Corporation shall be entitled to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or legal claim to of interest in such share or shaves on the part of any other person, whether or not it has actual or other notice thereof.

Section 5.    Record Date

For the purpose of determining the shareholders entitled to notice of or to vote at any meeting of shareholders or any adjournment thereof, or to express consent to or dissent from any proposal without a meeting, or for the purpose of determining shareholders entitled to receive payment of any dividend or the allotment of any rights, or for the purpose of any other action affecting the interest of shareholders, the Board of Directors may fix, in advance, a record date.  Such date shall not be more than sixty (64) not less than ten (10) days before the date of any such meeting, not more than sixty (64) days prior to such other action.

In each such case, except as otherwise provided by law, only such persons as shall be shareholders of record on the date so fixed shall be entitled to notice of, and to vote at, such meeting and any adjournment thereof; or to express such consent or dissent, or to receive payment of such dividend or such allotment of tights, or otherwise to be recognized as shareholders for the relevant purpose, notwithstanding any registration of transfer of shares on the books of the Corporation after any such record date so fixed.

## ARTICLE VI

## GENERAL PROVISIONS

Section 1.     Statutory Notices

The Board of Directors may appoint the Treasurer or any other executive officer of the Corporation to cause to be prepared and furnished to shareholders entitled thereto any special financial notice and/or statement which may be required by Section 510, 511, 515, 516, 519 and 520 of the BCL or by any other applicable statute.

Section 2.     Fiscal Year

The fiscal year of the Corporation shall be fixed by the Board of Directors by resolution duly adopted, and, from time to time, by resolution duly adopted, the Board of Directors may alter such fiscal year.

Section 3.     Corporate Seal

The Corporate seal shall have inscribed thereon the name of the Corporation, the year of its incorporation and the words "Corporate Seal" and "New York" and shall be in such form and contain such other words and/or figures as the Board of Directors shall determine.  The Corporate seal may be used by printing, engraving, lithographing, stamping or otherwise making, placing or affixing, or causing to be printed, engraved, lithographed, stamped or otherwise made, placed or affixed, upon any paper or document, by any process whatsoever, an impression, facsimile or other reproduction of said Corporate seal.

Section 4.     Books and Records

There shall be maintained at the principal office of the Corporation books of account of all the Corporation's business and transactions.

There shall be maintained at the principal office of the Corporation or at the office of the Corporation's transfer agent a record containing the names and addresses of all shareholders, the number and class of shares held by such and the dates when they respectively became the owners of record thereof.

Section 5.     Dividends

Subject to any provisions of the Certificate of Incorporation and the laws of the State of New York, dividends upon the outstanding shares of the Corporation may be declared by the Board of Directors at any regular or special meeting and may be paid in cash, property or shares of the capital stock of the Corporation.

Section 6. <u>Reserves</u>

Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sure of sums as the Board of Directors may from time to time, in its absolute discretion, deem proper as a reserve fund to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purposes as the Board may deem conducive to the interests of the Corporation, and the Board may modify or abolish any such reserve in the manner in which it was created.

Section 7. <u>Checks; Obligations</u>

All checks, demands for money and notes or, other instruments evidencing indebtedness or obligations of the Corporation shall be signed by such executive officer or officers, or such other person of persons, as the Board of Directors may from time to time designate.

**Reorganized Atkins Nutritionals Holdings, Inc.**
**Certificate of Incorporation**

**SECOND AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF**
**ATKINS NUTRITIONALS HOLDINGS, INC.**

ATKINS NUTRITIONALS HOLDINGS, INC., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies that:

A.    The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on May 20, 2003 under the name Lean Holdings, Inc.  The Corporation's Amended and Restated Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on October 29, 2003.

B.    On July 31, 2005, the Corporation and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 05-15913 (ALG)).  This Second Amended and Restated Certificate of Incorporation amends and restates the Amended and Restated Certificate of Incorporation of the Corporation, as amended to date (the "Certificate of Incorporation"), and has been duly adopted in accordance with Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware (the "Delaware GCL"), pursuant to the authority granted to the Corporation under Section 303 of the Delaware GCL to put into effect and carry out the Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of the Corporation, et al., as confirmed on _____ __, 2005 by order (the "Order") of the Bankruptcy Court.  Provision for amending the Certificate of Incorporation is contained in the Order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the reorganization of the Corporation.

C.    The Certificate of Incorporation of the Corporation is hereby amended and restated to read as follows:

FIRST:  Name.  The name of the corporation is Atkins Nutritionals Holdings, Inc. (the "Corporation").

SECOND:  Address, Registered Office and Registered Agent.  The address of the registered office of the Corporation in the State of Delaware is 615 South DuPont Highway, in the City of Dover, County of Kent, Delaware 19901.  The name of the registered agent of the Corporation at such address is National Corporate Research, Ltd.

THIRD:  Purposes.  The nature of the business or purpose to be conducted or promoted by the Corporation is to engage in any lawful act or activity for which

corporations may be organized under the General Corporation Law of the State of Delaware (the "Delaware GCL").

FOURTH:   Stock.

Section 1.  Authorized Shares.  The total number of shares of capital stock that the Corporation shall have authority to issue is 15,000,000 shares of common stock, par value $0.01 per share (the "Common Stock").

Section 2.  Voting Rights.  Each share of Common Stock shall be entitled to one vote per share, in person or by proxy, on all matters submitted to a vote of the stockholders of the Corporation.  Except as otherwise required in this Certificate of Incorporation, the Corporation's bylaws or by applicable law, each registered holder of Common Stock shall be entitled to vote for the election of directors of the Corporation and on all other matters submitted to a vote of stockholders of the Corporation.

Section 3.  Dividends and Distributions.  The holders of shares of Common Stock shall be entitled to receive such dividends and other distributions in cash, property or shares of stock of the Corporation as may be declared thereon by the Corporation's Board of Directors from time to time out of assets or funds of the Corporation legally available therefor.

Section 4.  Liquidation.  In the event of any voluntary or involuntary liquidation, dissolution, or winding-up of the Corporation, the holders of shares of Common Stock shall be entitled to receive the assets of the Corporation available for distribution to its stockholders, ratably in proportion to the number of shares of Common Stock held by each of them.

Section 5.  Preemptive Rights.

(a)  The Corporation shall not Issue any Securities to any Person unless the Corporation shall have given written notice to each Common Stockholder stating the Corporation's intention to Issue such Securities (the "Offered Securities") and the terms upon which it intends to make such Issue (the "Offer").  Thereafter, each Common Stockholder shall have a first option to purchase, in whole or in part, its Percentage Entitlement of the Offered Securities at the price and on the terms and conditions specified in the Offer.  The right to purchase Offered Securities pursuant to this Section 5(a) shall be exercised by such Common Stockholder, by giving, within 21 Business Days after delivery of such notice by the Corporation, a counter-notice, which counter-notice shall state that the Common Stockholder giving such counter-notice desires to purchase a specified portion of the Offered Securities up to its Percentage Entitlement.

(b)  In the event that one or more of the Common Stockholders fails to exercise its option under Section 5(a) to purchase its full Percentage Entitlement of the Offered Securities, the Corporation shall give written notice to the Common Stockholders who are exercising their option under Section 5(a) to purchase their full Percentage

Entitlement (the "Purchasing Common Stockholders) stating the amount of Offered Securities not agreed to be purchased pursuant to Section 5(a) (the "Remaining Offered Securities"). Each Purchasing Common Stockholder shall have the right, prior to any other Person but in common with each other Purchasing Common Stockholder, to purchase all or any portion of the Remaining Offered Securities. If more than one Purchasing Common Stockholder exercises its option under this Section 5(b), each such Purchasing Common Stockholder shall be entitled to purchase, together with such other Purchasing Common Stockholders, a pro rata amount of the Remaining Offered Securities. The right to purchase the Remaining Offered Securities pursuant to this Section 5(b) shall be exercised by such Purchasing Common Stockholder, by giving, within 10 Business Days after the Corporation's notice pursuant to this Section 5(b), a counter-notice to the Corporation stating that the Purchasing Common Stockholder desires to purchase a specified portion of the Remaining Offered Securities up to its pro rata share.

(c)     Each Common Stockholder electing pursuant to Section 5(a) to purchase a portion of the Offered Securities and, if applicable, electing pursuant to Section 5(b) to purchase a portion of the Remaining Offered Securities, shall be obligated to purchase such Offered Securities and such Remaining Offered Securities (if applicable), and the Corporation shall be obligated to sell such Offered Securities and such Remaining Offered Securities (if applicable), at the price and on the terms and conditions contained in such Offer, except that (i) the closing date of such purchase and sale shall take place within 30 Business Days after the final date to give the counter-notice under Section 5(a) or, if applicable, under Section 5(b), and (ii) in the event that all or any part of the purchase price stated in the Offer is not payable in cash, the Common Stockholder giving the applicable counter-notice may make payment in cash in an amount at least equal to the fair market value of the non-cash consideration of such Offer.

(d)     If the Common Stockholders fail to elect to purchase, or to consummate the purchase of, all the Offered Securities and Remaining Offered Securities, the Corporation may thereafter Issue to any other Person or Persons that amount of Offered Securities or Remaining Offered Securities not purchased pursuant to the terms hereof and specified in such Offer at the price and on the terms and conditions contained in such Offer. In the event that the Corporation does not so consummate the Issue of the Offered Securities or the Remaining Offered Securities within 75 Business Days after the expiration of the final applicable counter-notice period, the Corporation shall not thereafter Issue any Securities, without first again offering such Securities to the Common Stockholders in the manner provided in this Section 5.

(e)     The provisions of this Section 5 shall not apply to the Issue: (i) after March 31, 2007, of any Securities to directors, officers, employees or consultants of the Corporation pursuant to any stock option, stock purchase or stock bonus plan, provided that the aggregate number of shares of Common Stock so Issued (including shares of Common Stock issuable upon exercise of all stock options granted under such plans, but not including any shares of Common Stock Issued pursuant to clause (iv) of this Section 5(e)) shall not exceed 6% of the Corporation's issued and outstanding shares

of Common Stock; (ii) of any Securities in consideration of the acquisition (whether by merger or otherwise) by the Corporation or any of its subsidiaries of all or substantially all of the stock or assets of any other Person; (iii) of Common Stock to holders of contingent value rights pursuant to the Contingent Value Rights Agreement dated as of _____, 2005, by and between the Corporation and [_____] in exchange for such contingent value rights upon the occurrence of a "Change of Control" (as defined in such Contingent Value Rights Agreement) in accordance with the terms of such Contingent Value Rights Agreement; (iv) of Common Stock to holders of management interests pursuant to the Management Incentive Plan dated as of _____, 2005, in exchange for such management interests upon the occurrence of a "Change of Control" (as defined in such Management Incentive Plan) in accordance with the terms of such Management Incentive Plan; and (iv) of shares of Common Stock pursuant to any Qualified Initial Public Offering.

(f)     The rights of each Common Stockholder under this Section 5 (i) may be waived by the holders of a majority of the shares of Common Stock then outstanding with respect to any proposed Issue of Securities and (ii) shall terminate upon the consummation of a Qualified Initial Public Offering.

(g)     For purposes of this Section 5, the term:

"Business Day" means any day other than a day on which banking institutions in New York, New York are permitted or required by law to remain closed.

"Common Stockholder" means each record holder of Common Stock.

"Issue" means, with respect to any Securities, any issue, sale, transfer, pledge, mortgage, assignment or other disposal of such Securities by the Corporation or any commitment or agreement to effect any of the foregoing.

"Percentage Entitlement", with respect to any Common Stockholder, means a fraction, the numerator of which is the number of shares of Common Stock held of record by such Common Stockholder and the denominator of which is the aggregate number of all shares of Common Stock then issued and outstanding.

"Person" means an individual, partnership, corporation, limited liability company, association, trust, joint venture, unincorporated organization, and any government, governmental department or agency or political subdivision thereof.

"Qualified Initial Public Offering" means an underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, covering the issuance, offer and sale of shares of Common Stock by the Corporation but only if (i) the number of shares of Common Stock to be issued, offered and sold by the Corporation in such public offering is equal to or greater than 25% of the number of shares of Common Stock then issued and outstanding, after giving effect to

such public offering; and (ii) each of the underwriters participating in such public offering shall be obligated to buy on a "firm commitment" basis all shares of Common Stock that such underwriters shall have agreed to distribute.

"Securities" means any shares of any class of the capital stock of the Corporation or any option, warrant, convertible or exchangeable security or other right to acquire, convertible into or exchangeable for, any such capital stock.

Section 6.  Nonvoting Equity Securities.  The Corporation shall not issue any nonvoting equity securities to the extent prohibited by section 1123(a)(6) of title 11 of the United States Code the ("Bankruptcy Code") as in effect on the date of the filing of this Certificate of Incorporation with the Secretary of State of the State of Delaware; provided, however, that this Section 6 of Article FOURTH (i) will have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation, and (iii) in all events may be amended or eliminated in accordance with such applicable law as from time to time may be in effect.

Section 7.  Transfer Restrictions.

(a)    Prior to such time as the Corporation effects a public offering of its stock pursuant to a registration statement that is declared effective by the Securities and Exchange Commission, the Corporation's Board of Directors may refuse to recognize or to register any transfer, or attempted or purported transfer, of shares of stock of the Corporation, contingent value rights or other equity securities of the Corporation or any interest therein or right with respect thereof, that would result in the Corporation's becoming subject to the requirements of Section 12(g) of the Securities Exchange Act of 1934, as amended, and in such case such transfer or attempted or purported transfer will be void and will be ineffective as against the Corporation.

(b)    As a condition to the recognition and registration of a transfer (a "Change of Control Transfer") of the Common Stock which would result in such tranferee's becoming the owner (whether individually or as part of a syndicate or group of persons that is considered to be a "person" for purposes of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended) of 80% or more of the then issued and outstanding shares of Common Stock, such transferee is required to disclose to the Corporation the price at which such transferee acquired the last shares of Common Stock acquired by such transferee (including shares acquired pursuant to such Change of Control Transfer) that constitute 5% of the then issued and outstanding shares of Common Stock.

FIFTH:  Directors.

Section 1.  Number of Directors.  The number of directors that shall constitute the Board of Directors shall be five.

Section 2.  Removal.  Any director or the entire Board of Directors may be removed, with or without cause, by the affirmative vote of the holders of at least a majority of all then outstanding shares of capital stock entitled to vote at an election of directors.

Section 3.  Vacancies.  Newly created directorships resulting from an increase in the size of the Board of Directors and any vacancy occurring on the Board of Directors as a result of the removal of a director shall be filled by vote of the stockholders.  Vacancies occurring on the Board of Directors for any other reason may be filled by vote of a majority of the remaining members of the Board of Directors, although less than a quorum, at any meeting of the Board of Directors.

SIXTH:  Bylaws.  The Board of Directors shall have the power and authority to adopt, amend or repeal by-laws of the Corporation, subject only to such limitation, if any, as may be from time to time imposed by law.

SEVENTH:  Liability of Directors.  No director of the Corporation shall be personally liable to the Corporation or to any of its stockholders for monetary damages for breach of fiduciary duty as a director, notwithstanding any provision of law imposing such liability; provided, however, that to the extent required from time to time by applicable law, this Article SEVENTH shall not eliminate or limit the liability of a director, to the extent such liability is provided by applicable law, (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware GCL, or (iv) for any transaction from which the director derived an improper personal benefit.  No amendment to or repeal of this Article SEVENTH shall apply to or have any effect on the liability or alleged liability of any director for or with respect to any acts or omissions of such director occurring prior to the effective date of such amendment or repeal.

EIGHTH:  Action Without a Meeting.  Any action required or permitted to be taken by the stockholders of the Corporation must be effected at an annual or special meeting of the stockholders of the Corporation, and may not be effected by any consent in writing by such stockholders, unless such written consent is unanimous.

NINTH:  Business Combinations with Interested Stockholders.

Section 1.  Requirements for Business Combinations with Interested Stockholders.  The Corporation shall not engage in any Business Combination with any Interested Stockholder for a period of three years following the time that such stockholder became an Interested Stockholder, unless:

(a)  prior to the time that such stockholder became an Interested Stockholder, the Board of Directors of the Corporation approved either the Business Combination or the transaction that resulted in the stockholder becoming an Interested Stockholder;

(b)  upon consummation of the transaction that resulted in the stockholder becoming an Interested Stockholder, the Interested Stockholder Owned at least 85% of the Voting Stock of the Corporation outstanding at the time the transaction commenced, excluding for purposes of determining the Voting Stock outstanding (but not the outstanding Voting Stock Owned by the Interested Stockholder) those shares Owned (i) by individuals who are directors and also officers of the Corporation and (ii) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; or

(c)  at or subsequent to the time that such stockholders became an Interested Stockholder, the Business Combination is approved by the Board of Directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 2/3% of the Voting Stock of the Corporation that is not Owned by the Interested Stockholder.

Section 2.  Definitions.  For purposes of this Article NINTH, the term:

(a)  "Affiliate" means a Person that directly, or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, another Person.

(b)  "Associate," when used to indicate a relationship with any Person, means: (i) any corporation, partnership, unincorporated association or other entity of which such Person is a director, officer or partner or is, directly or indirectly, the Owner of 20% or more of any class of Voting Stock; (ii) any trust or other estate in which such Person has at least a 20% beneficial interest or as to which such Person serves as trustee or in a similar fiduciary capacity; and (iii) any relative or spouse of such Person, or any relative of such spouse, who has the same residence as such Person.

(c)  "Business Combination" means:

(i)  any merger or consolidation of the Corporation or any direct or indirect majority-owned subsidiary of the Corporation with (A) an Interested Stockholder, or (B) with any other corporation, partnership, unincorporated association or other entity if the merger or consolidation is caused by the Interested Stockholder; and as a result of such merger or consolidation Section 1 of Article NINTH is not applicable to the surviving entity;

(ii)  any sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions), except proportionately as a stockholder of the Corporation, to or with the Interested Stockholder, whether as part of a dissolution or otherwise, of assets of the Corporation or of any direct or indirect majority-owned subsidiary of the Corporation which assets have an aggregate market value equal to 10% or more of either the aggregate market value of all the assets of the Corporation

determined on a consolidated basis or the aggregate market value of all the outstanding stock of the Corporation;

(iii) any transaction that results in the issuance or transfer by the Corporation or by any direct or indirect majority-owned subsidiary of the Corporation of any stock of the Corporation or of such subsidiary to the Interested Stockholder, except: (A) pursuant to the exercise, exchange or conversion of securities (including contingent value rights) exercisable for, exchangeable for or convertible into stock of such Corporation or any such subsidiary which securities were outstanding prior to the time that the Interested Stockholder became such; (B) pursuant to a merger under Section 251(g) of the Delaware GCL; (C) pursuant to a dividend or distribution paid or made, or the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible into stock of the Corporation or any such subsidiary which security is distributed, pro rata to all holders of a class or series of stock of the Corporation subsequent to the time the Interested Stockholder became such; (D) pursuant to an exchange offer by the Corporation to purchase stock made on the same terms to all holders of such stock; or (E) any issuance or transfer of stock by the Corporation; provided however, that in no case under items (C), (D) or (E) of this subparagraph shall there be an increase in the Interested Stockholder's proportionate share of the stock of any class or series of the Corporation;

(iv) any transaction involving the Corporation or any direct or indirect majority-owned subsidiary of the Corporation that has the effect, directly or indirectly, of increasing the proportionate share of the stock of any class or series, or securities convertible into the stock of any class or series, of the Corporation or of any such subsidiary that is Owned by the Interested Stockholder, except as a result of immaterial changes due to fractional share adjustments or as a result of any purchase or redemption of any shares of stock not caused, directly or indirectly, by the Interested Stockholder; or

(v) any receipt by the Interested Stockholder of the benefit, directly or indirectly (except proportionately as a stockholder of the Corporation), of any loans, advances, guarantees, pledges or other financial benefits (other than those expressly permitted in subparagraphs (i)-(iv) of this Section 2(c)) provided by or through the Corporation or any direct or indirect majority-owned subsidiary of the Corporation.

(d) "Control," including the terms "Controlling," "Controlled by" and "under common Control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of Voting Stock, by contract or otherwise. A Person who Owns 20% or more of the outstanding Voting Stock of any corporation, partnership, unincorporated association or other entity shall be presumed to have control of such entity, in the absence of proof by a preponderance of the evidence to the contrary. Notwithstanding the foregoing, a presumption of Control shall not apply where such Person holds Voting Stock, in good faith and not for the purpose of circumventing this

Article NINTH, as an agent, bank, broker, nominee, custodian or trustee for one or more owners who do not individually or as a group have Control of such entity.

(e) "Interested Stockholder" means any Person (other than the Corporation and any direct or indirect majority-owned subsidiary of the Corporation) that is (i) an Owner of 15% or more of the outstanding Voting Stock of the Corporation; (ii) an Affiliate or Associate of the Corporation and was an Owner of 15% or more of the outstanding Voting Stock of the Corporation at any time within the three-year period immediately prior to the date on which it is to be determined whether such Person is an Interested Stockholder; or (iii) an Affiliate or an Associate of a Person described in the preceding clause (i) or (ii). Notwithstanding the foregoing, the term "Interested Stockholder" shall not include (i) any Person whose ownership of shares in excess of the 15% limitation set forth herein is the result of action taken solely by the Corporation, provided that such Person shall be an Interested Stockholder if thereafter such Person acquires additional shares of Voting Stock of the Corporation, except as a result of further corporate action not caused, directly or indirectly, by such Person or (ii) any Person who was a stockholder of the Corporation as of the effective date of the Corporation's Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code dated November 16, 2005. For the purpose of determining whether a Person is an Interested Stockholder, the Voting Stock of the Corporation deemed to be outstanding shall include stock deemed to be Owned by the Person through application of Section 2(f) below but shall not include any other unissued stock of the Corporation that may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise.

(f) "Owner," including the terms "Own" and "Owned," when used with respect to any Voting Stock, means a Person that individually or with or through any of its Affiliates or Associates:

(i) beneficially owns such Voting Stock, directly or indirectly;

(ii) has (A) the right to acquire such Voting Stock (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding, or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise; provided, however, that a Person shall not be deemed to be the Owner of Voting Stock tendered pursuant to a tender or exchange offer made by such Person or any of such Person's Affiliates or Associates until such tendered stock is accepted for purchase or exchange; or (B) the right to vote such Voting Stock pursuant to any agreement, arrangement or understanding; provided, however, that a Person shall not be deemed to be an Owner of any Voting Stock because of such Person's right to vote such Voting Stock if the agreement, arrangement or understanding to vote such Voting Stock arises solely from a revocable proxy or consent given in response to a proxy or consent solicitation made to ten or more Persons; or

(iii) has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting (except voting pursuant to a revocable proxy or

consent as described in clause (B) of subparagraph (ii) of this Section 2(f)), or disposing of such Voting Stock with any other Person that beneficially owns, or whose Affiliates or Associates beneficially own, directly or indirectly, such Voting Stock.

(g) "Person" means an individual, partnership, corporation, limited liability company, association, trust, joint venture, unincorporated organization, and any government, governmental department or agency or political subdivision thereof.

(h) "Voting Stock" means, with respect to any corporation, stock of any class or series entitled to vote generally in the election of directors and, with respect to any entity that is not a corporation, any equity interest entitled to vote generally in the election of the governing body of such entity. Every reference to a percentage of Voting Stock shall refer to such percentage of the votes of such Voting Stock.

Section 3. <u>Amendment</u>. Notwithstanding any other provision of this Certificate of Incorporation or any provision of law that might otherwise permit a lesser vote or no vote, the affirmative vote of the holders of at least 66 2/3% of the outstanding Voting Stock of the Corporation that is not Owned by an Interested Stockholder shall be required to amend or repeal any provision of this Article NINTH.

TENTH: <u>Indemnification</u>.

Section 1. <u>Right to Indemnification</u>. Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding") by reason of being or having been a director or officer of the Corporation or serving or having served at the request of the Corporation as a director, trustee, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (an "Indemnitee"), whether the basis of such proceeding is alleged action or failure to act in an official capacity as a director, trustee, officer, employee or agent or in any other capacity while serving as a director, trustee, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the Delaware GCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than permitted prior thereto), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such Indemnitee in connection therewith and such indemnification shall continue as to an Indemnitee who has ceased to be a director, trustee, officer, employee or agent and shall inure to the benefit of the Indemnitee's heirs, executors and administrators; provided, however, that, except as provided in Section 2 of Article TENTH hereof with respect to Proceedings to enforce rights to indemnification, the Corporation shall indemnify any such Indemnitee in connection with a Proceeding (or part thereof) initiated by such Indemnitee only if such Proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. The right to indemnification conferred in this Article TENTH shall be a contract right and shall include the right to be

paid by the Corporation the expenses (including attorneys' fees) incurred in defending any such Proceeding in advance of its final disposition (an "Advancement of Expenses"); provided, however, that, if the Delaware GCL so requires, an Advancement of Expenses incurred by an Indemnitee shall be made only upon delivery to the Corporation of an undertaking (an "Undertaking"), by or on behalf of such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (a "Final Adjudication") that such Indemnitee is not entitled to be indemnified for such expenses under this Article TENTH or otherwise.

Section 2. <u>Right of Indemnitee to Bring Suit</u>. If a claim under Section 1 of Article TENTH is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an Advancement of Expenses, in which case the applicable period shall be 30 days, the Indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the Indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. In (i) any suit brought by the Indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the Indemnitee to enforce a right to an Advancement of Expenses) it shall be a defense that, and (ii) in any suit by the Corporation to recover an Advancement of Expenses pursuant to the terms of an Undertaking the Corporation shall be entitled to recover such expenses upon a Final Adjudication that, the Indemnitee has not met the applicable standard of conduct set forth in the Delaware GCL. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such suit that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth in the Delaware GCL, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) that the Indemnitee has not met such applicable standard of conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the Indemnitee, be a defense to such suit.

Section 3. <u>Non-Exclusivity of Rights</u>. The rights to indemnification and to the Advancement of Expenses conferred in this Article TENTH shall not be exclusive of any other right that any person may have or hereafter acquire under any statute, the Certificate of Incorporation, agreement, vote of stockholders or disinterested directors or otherwise.

Section 4. <u>Insurance</u>. The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under this Article TENTH or under the Delaware GCL.

Section 5.  <u>Indemnification of Employees and Agents of the Corporation</u>.  The Corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification, and to the Advancement of Expenses, to any employee or agent of the Corporation to the fullest extent of the provisions of this Article TENTH with respect to the indemnification and Advancement of Expenses of directors and officers of the Corporation.

IN WITNESS WHEREOF, the undersigned has executed this Second Amended and Restated Certificate of Incorporation this ___ day of _____, 2005.

_____
Name:
Title:

# Reorganized Atkins Nutritionals Holdings, Inc. By-Laws

**ATKINS NUTRITIONALS HOLDINGS, INC.**

**SECOND AMENDED AND RESTATED**

**BYLAWS**

# TABLE OF CONTENTS

ARTICLE I - GENERAL. ...............................................................................................................1
    1.1    Offices. ...........................................................................................................1
    1.2    Seal. ...............................................................................................................1
    1.3    Fiscal Year. ....................................................................................................1
ARTICLE II - STOCKHOLDERS ................................................................................................1
    2.1    Place of Meetings. ........................................................................................1
    2.2    Annual Meeting. ...........................................................................................1
    2.3    Notice of Annual Meetings. .........................................................................1
    2.4    Special Meetings. .........................................................................................1
    2.5    Notice of Special Meetings. .........................................................................1
    2.6    Quorum. .........................................................................................................2
    2.7    Right to Vote; Proxies. .................................................................................2
    2.8    Voting. ...........................................................................................................2
    2.9    Stockholders' List. .......................................................................................2
    2.10    Inspectors. ...................................................................................................3
    2.11    Nomination of Directors. ............................................................................3
    2.12    Business to be Brought Before a Meeting of Stockholders. ........................4
ARTICLE III - DIRECTORS. .......................................................................................................4
    3.1    General Powers. ............................................................................................4
    3.2    Place of Meetings and Books. ......................................................................4
    3.3    Annual Meeting. ...........................................................................................4
    3.4    Regular Meetings. .........................................................................................4
    3.5    Special Meetings. .........................................................................................4
    3.6    Quorum. .........................................................................................................5
    3.7    Vacancies. .....................................................................................................5
    3.8    Resignation. ..................................................................................................5
    3.9    Removal. ........................................................................................................5
    3.10    Committees. .................................................................................................5
    3.11    Committee Meetings. ..................................................................................5
    3.12    Substitution and Removal of Members; Vacancies....................................6
    3.13    Compensation of Directors. ........................................................................6
    3.14    Telephonic Participation in Meetings. ........................................................6
    3.15    Action by Consent. .....................................................................................6
ARTICLE IV - OFFICERS. ...........................................................................................................6
    4.1    Selection; Title. .............................................................................................6
    4.2    Time of Election. ...........................................................................................6
    4.3    Additional Officers. ......................................................................................6
    4.4    Terms of Office. ............................................................................................7
    4.5    Compensation of Officers. ...........................................................................7
    4.6    Chairman of the Board. .................................................................................7
    4.7    President. .......................................................................................................7
    4.8    Vice-Presidents. ............................................................................................7
    4.9    Treasurer. ......................................................................................................7
    4.10    Secretary. .....................................................................................................7
    4.11    Assistant Secretary. .....................................................................................8
    4.12    Assistant Treasurer. .....................................................................................8
    4.13    Subordinate Officers. ..................................................................................8
ARTICLE V - STOCK. .................................................................................................................8

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| 5.1 | Stock. | 8 |
| 5.2 | Fractional Share Interests | 8 |
| 5.3 | Transfers of Stock. | 9 |
| 5.4 | Record Date. | 9 |
| 5.5 | Transfer Agent and Registrar. | 9 |
| 5.6 | Dividends. | 10 |
| 5.7 | Lost, Stolen or Destroyed Certificates. | 10 |
| 5.8 | Inspection of Books. | 10 |
| ARTICLE VI - MISCELLANEOUS MANAGEMENT PROVISIONS. | | 10 |
| 6.1 | Checks, Drafts and Notes. | 10 |
| 6.2 | Notices. | 10 |
| 6.3 | Conflict of Interest. | 11 |
| 6.4 | Voting of Securities Owned by the Corporation. | 11 |
| ARTICLE VII - AMENDMENTS. | | 11 |
| 7.1 | Amendments. | 11 |

# ATKINS NUTRITIONALS HOLDINGS, INC.
## SECOND AMENDED AND RESTATED
## BYLAWS

## Article I - General.

**1.1** **Offices.** The registered office of Atkins Nutritionals Holdings, Inc. (the "Corporation"), required by the General Corporation Law of Delaware (the "Delaware GCL") to be maintained in the State of Delaware shall be the registered office named in the Second Amended and Restated Certificate of Incorporation of the Corporation, as may be amended from time to time (the "Certificate of Incorporation"). The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

**1.2** **Seal.** The seal of the Corporation, if any, shall be in the form of a circle and shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware".

**1.3** **Fiscal Year.** The fiscal year of the Corporation shall be the twelve-month period established from time to time by the Board of Directors.

## Article II - Stockholders.

**2.1** **Place of Meetings.** All meetings of the stockholders shall be held at the principal office of the Corporation except such meetings as the Board of Directors expressly determine shall be held elsewhere or solely by means of remote communication, in which cases meetings may be held upon notice as hereinafter provided at such other place or places within or outside of the State of Delaware or by remote communication as the Board of Directors shall have determined and as shall be stated in such notice.

**2.2** **Annual Meeting.** The annual meeting of the stockholders shall be held on such date and at such time as the Board of Directors shall fix, which date shall be within thirteen months after the prior annual meeting of stockholders. At each annual meeting the stockholders entitled to vote shall elect a Board of Directors, and they may transact such other corporate business as may properly be brought before the meeting. At the annual meeting any business may be transacted, irrespective of whether the notice calling such meeting shall have contained a reference thereto, except where notice is required by law, the Certificate of Incorporation or these bylaws.

**2.3** **Notice of Annual Meetings.** Written notice of the annual meeting of the stockholders, stating the time, the place, and the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, shall be sent not less than ten nor more than 60 days prior to the meeting.

**2.4** **Special Meetings.** Special meetings of the stockholders for any purpose or purposes, unless otherwise provided by statute, may be called by a majority of the Board of Directors, the Chairman of the Board, if any, the President or by any one or more persons who in the aggregate beneficially own 15% or more of the stock of the Corporation entitled to vote at such meeting.

**2.5** **Notice of Special Meetings.** Written notice of a special meeting of stockholders, stating the time, the place, the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting and the purpose thereof, shall be sent by

1

the person or persons calling such meeting not less than ten nor more than 60 days before such meeting. No business may be transacted at such meeting except that referred to in said notice, or in a supplemental notice given also in compliance with the provisions hereof, or such other business as may be germane or supplementary to that stated in said notice or notices.

2.6 **Quorum.** At all meetings of the stockholders the holders of a majority of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum requisite for the transaction of business except as otherwise provided by law, by the Certificate of Incorporation or by these bylaws. If, however, such majority shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or by proxy, by a majority vote, shall have power to adjourn the meeting from time to time without notice other than announcement at the meeting until the requisite amount of voting stock shall be present. If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. At such adjourned meeting, at which the requisite amount of voting stock shall be represented, any business may be transacted that might have been transacted if the meeting had been held as originally called.

2.7 **Right to Vote; Proxies.** Except as otherwise provided in the Certificate of Incorporation, each holder of a share or shares of capital stock of the Corporation having the right to vote at any meeting shall be entitled to one vote for each such share of stock held by such stockholder. Any stockholder entitled to vote at any meeting of stockholders may vote either in person or by proxy, but no proxy that is dated more than three years prior to date of the meeting at which it is offered shall confer the right to vote thereat unless the proxy provides that it shall be effective for a longer period. A proxy may be granted by a writing executed by the stockholder or his, her or its authorized officer, director, employee or agent or by transmission or authorization of transmission of a telegram, cablegram, or other means of electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, subject to the conditions set forth in Section 212 of the Delaware GCL.

2.8 **Voting.** At all meetings of stockholders, except as otherwise expressly provided for by law, the Certificate of Incorporation or these bylaws: (i) in all matters other than the election of directors, the affirmative vote of a majority of shares present in person or by means of remote communication or represented by proxy at the meeting and entitled to vote on such matter shall be the act of the stockholders; and (ii) directors shall be elected by a plurality of the votes of the shares present in person or by means of remote communication or represented by proxy at the meeting and entitled to vote on the election of directors. Except as otherwise expressly provided by law, the Certificate of Incorporation or these bylaws, at all meetings of stockholders the voting shall be by voice vote, but any stockholder qualified to vote on the matter in question may demand a stock vote, by shares of stock, upon such question, whereupon such stock vote shall be taken by ballot which may be by electronic transmission by any stockholder present by means of remote communication, each of which shall state the name of the stockholder voting and the number of shares voted by such stockholder, and, if such ballot be cast by a proxy, it shall also state the name of the proxy.

2.9 **Stockholders' List.** A complete list of the stockholders entitled to vote at any meeting of stockholders, arranged in alphabetical order and showing the address of each stockholder, and the number of shares registered in the name of each stockholder, shall be prepared by the Secretary and shall be open to examination of any stockholder, for any purpose germane to the meeting for a period of at least ten days before such meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting; or (ii) during ordinary

business hours at the principal office of the Corporation. Such list shall be open to examination during the whole time of said meeting, at the place of such meeting, or, if the meeting held is by remote communication, on a reasonably accessible electronic network and the information required to access such list shall be provided with the notice of the meeting.

### 2.10    Inspectors.

(a)  One or more inspectors may be appointed by the Board of Directors before or at any meeting of stockholders, or, if no such appointment shall have been made, the presiding officer may make such appointment at the meeting. At the meeting for which the inspector or inspectors are appointed, he, she or they shall open and close the polls, receive and take charge of the proxies and ballots, and decide all questions touching on the qualifications of voters, the validity of proxies and the acceptance and rejection of votes. If any inspector previously appointed shall fail to attend or refuse or be unable to serve, the presiding officer shall appoint an inspector in his or her place.

(b) At any time at which the Corporation has a class of voting stock that is (i) listed on a national securities exchange, (ii) authorized for quotation on an inter-dealer quotation system of a registered national securities association, or (iii) held of record by more than 2,000 stockholders, the provisions of Section 231 of the Delaware GCL with respect to inspectors of election and voting procedures shall apply, in lieu of the provisions of paragraph (a) of this Section 2.10.

### 2.11    Nomination of Directors.    Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors, except as otherwise provided in Section 3.1 of these bylaws or in Section 3 of Article FIFTH of the Certificate of Incorporation. Nominations of persons for election to the Board of Directors of the Corporation may be made at a meeting of stockholders: (i) by or at the direction of the Board of Directors; or (ii) by any stockholder of the Corporation who is a stockholder of record at the time of giving of notice provided for in this Section 2.11, who shall be entitled to vote for the election of directors at the meeting and who complies with the notice procedures set forth in this Section 2.11. Such nominations, other than those made by or at the direction of the Board of Directors, shall be made pursuant to timely notice in writing to the Secretary of the Corporation. To be timely, a stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the Corporation: (i) with respect to an election to be held at the annual meeting of the stockholders of the Corporation, 60 days prior to the anniversary date of the immediately preceding annual meeting of stockholders of the Corporation; and (ii) with respect to an election to be held at a special meeting of stockholders of the Corporation for the election of directors, not later than the close of business on the 10th day following the day on which such notice of the date of the meeting was given or public disclosure of the date of the meeting was made, whichever first occurs. Such stockholder's notice to the Secretary shall set forth: (i) as to each person whom the stockholder proposes to nominate for election or re-election as a director, all information relating to the person that is required to be disclosed in solicitations for proxies for election of directors, or is otherwise required, pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended (including the written consent of such person to be named in the proxy statement as a nominee and to serve as a director if elected); and (ii) as to the stockholder giving the notice (A) the name and address, as they appear on the Corporation's books, of such stockholder, and (B) the class and number of shares of voting stock of the Corporation that are beneficially owned by the stockholder. At the request of any officer of the Corporation, any person nominated by the Board of Directors for election as a director shall furnish to the Secretary of the Corporation that information required to be set forth in a stockholder's notice of nomination that pertains to the nominee. In the event that a person is validly designated as a nominee to the Board and shall thereafter become unable or unwilling to stand for election to the Board of Directors, the Board of Directors or the stockholder who proposed such nominee, as the case may be, may designate a substitute nominee. The chairman of the meeting of stockholders shall, if the facts warrant, determine and declare

to the meeting that a nomination was not made in accordance with the procedures prescribed by these bylaws, and if the chairman should so determine, the chairman shall so declare to the meeting and the defective nomination shall be disregarded.

**2.12** **Business to be Brought Before a Meeting of Stockholders.** To be properly brought before a meeting of stockholders, business must be either: (i) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors; (ii) otherwise brought before the meeting by or at the direction of the Board of Directors; or (iii) otherwise properly brought before the meeting by a stockholder of the Corporation who is a stockholder of record at the time of giving of notice provided for in this Section 2.12, who shall be entitled to vote at such meeting and who complies with the notice procedures set forth in this Section 2.12. In addition to any other applicable requirements for business to be brought before a stockholders' meeting by a stockholder of the Corporation, the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation. To be timely, a stockholder's notice must be delivered to or mailed and received at the principal executive offices of the Corporation: (i) in the case of an annual meeting, not less than 60 days prior to the anniversary date of the immediately preceding annual meeting of stockholders of the Corporation; and (ii) in the case of a special meeting of the stockholders, not later than the close of business on the 10th day following the day on which such notice of the date of the meeting was given or public disclosure of the date of the meeting was made, whichever first occurs. A stockholder's notice to the Secretary shall set forth as to each matter: (i) a brief description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting; (ii) the name and address, as they appear on the Corporation's books, of the stockholder proposing such business; (iii) the acquisition date, the class and the number of shares of voting stock of the Corporation that are owned beneficially by the stockholder; (iv) any material interest of the stockholder in such business; and (v) a representation that the stockholder intends to appear in person or by proxy at the meeting to bring the proposed business before the meeting.

## Article III - Directors.

**3.1** **General Powers.** The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, and subject to the restrictions imposed by law or the Certificate of Incorporation, the Board of Directors may exercise all the powers of the Corporation.

**3.2** **Place of Meetings and Books.** The Board of Directors may hold its meetings and keep the books of the Corporation within or outside the State of Delaware, at such places as the Board may from time to time determine.

**3.3** **Annual Meeting.** The newly elected Board of Directors may meet at such place and time as shall be fixed and announced by the presiding officer at the annual meeting of stockholders, for the purpose of organization or otherwise, and no further notice of such meeting shall be necessary to the newly elected directors in order legally to constitute the meeting, provided a quorum shall be present, or they may meet at such place and time as shall be stated in a notice given to such directors two days prior to such meeting, or as shall be fixed by the consent in writing of all the directors.

**3.4** **Regular Meetings.** Regular meetings of the Board of Directors may be held without notice at such time and place as shall from time to time be determined by the Board.

**3.5** **Special Meetings.** Special meetings of the Board of Directors may be called by the Chairman of the Board, if any, the President or by the Secretary at the request of at least two directors on two days' notice to each director.

**3.6** **Quorum.** At all meetings of the Board of Directors, a majority of the total number of directors shall be necessary and sufficient to constitute a quorum for the transaction of business, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically permitted or provided by law, or by the Certificate of Incorporation or by these bylaws. If at any meeting of the Board of Directors there shall be less than a quorum present, a majority of those present may adjourn the meeting from time to time until a quorum is obtained, and no further notice thereof need be given other than by announcement at said meeting which shall be so adjourned.

**3.7** **Vacancies.** Newly created directorships resulting from an increase in the size of the Board of Directors and any vacancy occurring on the Board of Directors as a result of the removal of a director shall be filled by vote of the stockholders. Vacancies occurring on the Board of Directors for any other reason may be filled by vote of a majority of the remaining members of the Board of Directors, although less than a quorum, at any meeting of the Board of Directors. A person so elected by the Board of Directors to fill a vacancy shall hold office until the next annual stockholders' meeting, and until his or her successor shall have been duly elected and qualified.

**3.8** **Resignation.** Any director of the Corporation may resign at any time by giving notice in writing or by electronic transmission to the Chairman of the Board, if any, the President or the Secretary of the Corporation. Such resignation shall take effect at the time specified therein, at the time of receipt if no time is specified therein and at the time of acceptance if the effectiveness of such resignation is conditioned upon its acceptance. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**3.9** **Removal.** Any director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of all then outstanding shares of capital stock then entitled to vote at an election of directors.

**3.10** **Committees.** The Board of Directors may, by resolution passed by a majority of the total number of directors then in office, designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it, but no such committee shall have the power or authority in reference to: (i) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal of directors) expressly required by the Delaware GCL to be submitted to the stockholders for approval; or (ii) adopting, amending or repealing any bylaw of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board of Directors.

**3.11** **Committee Meetings.** Any committee designated pursuant to Section 3.10 shall keep regular minutes of its meetings in a book provided for that purpose if the minutes are maintained in paper form and shall keep regular minutes in an electronic file if the minutes are maintained in electronic form and report the same to the Board of Directors at its meeting next succeeding such meeting, shall fix its own rules or procedures, and shall meet at such times and at such place or places as may be provided by such rules, or by such committee or the Board of Directors. Should a committee fail to fix its own rules, the provisions of these bylaws pertaining to the calling of meetings and conduct of business by the Board of Directors shall apply as nearly as practicable. At every meeting of any such committee, the presence of a majority of all the members thereof shall constitute a quorum, except as provided in Section 3.12, and

the affirmative vote of a majority of the members present shall be necessary for the adoption by it of any resolution.

**3.12** **Substitution and Removal of Members; Vacancies.** The Board of Directors may designate one or more directors as alternate members of any committee who may replace any absent or disqualified member at any meeting of such committee. In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not constituting a quorum, may unanimously appoint another member of the Board of Directors who has been designated as an alternate member of that committee to act at the meeting in the place of the absent or disqualified member. The Board of Directors shall have the power at any time to remove any member or members of a committee and to appoint other directors in lieu of the person or persons so removed and shall also have the power to fill vacancies in a committee.

**3.13** **Compensation of Directors.** The Board of Directors shall have the power to fix the compensation of directors and members of committees of the Board. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

**3.14** **Telephonic Participation in Meetings.** Members of the Board of Directors or any committee designated by the Board may participate in a meeting of the Board or committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this section shall constitute presence in person at such meeting.

**3.15** **Action by Consent.** Unless otherwise restricted by the Certificate of Incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission and such consent is filed in paper form with the minutes of proceedings of the Board or committee.

<u>**Article IV - Officers.**</u>

**4.1** **Selection; Title.** The officers of the Corporation shall be chosen by the Board of Directors. There shall be a President, a Secretary and a Treasurer, and there may be a Chairman of the Board of Directors, one or more Vice Presidents, one or more Assistant Secretaries, and one or more Assistant Treasurers, as the Board of Directors may elect. Any number of offices may be held by the same person.

**4.2** **Time of Election.** The officers named in Section 4.1 shall be chosen by the Board of Directors at its first meeting after each annual meeting of stockholders. None of such officers (other than the Chairman of the Board of Directors) must be a director.

**4.3** **Additional Officers.** The Board of Directors may appoint such other officers and agents as it shall deem necessary, who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board.

**4.4** **Terms of Office.** Each officer of the Corporation shall hold office until his or her successor is chosen and qualified, or until his or her earlier resignation or removal. Any officer elected or appointed by the Board of Directors may be removed at any time by the Board of Directors.

**4.5** **Compensation of Officers.** The Board of Directors shall have power to fix the compensation of all officers of the Corporation. The Board may authorize any officer upon whom the power of appointing subordinate officers may have been conferred to fix the compensation of such subordinate officers.

**4.6** **Chairman of the Board.** The Chairman of the Board of Directors shall preside at all meetings of the stockholders and directors, and shall have such other duties as may be assigned to him or her from time to time by the Board of Directors.

**4.7** **President.** Unless the Board of Directors otherwise determines, the President shall be the chief executive officer of the Corporation. Unless there is a Chairman of the Board, the President shall preside at all meetings of directors and stockholders. Under the supervision of the Board of Directors, the President shall have the general control and management of the business and affairs of the Corporation, subject, however, to the right of the Board of Directors to confer any specific power, except such as may be by statute exclusively conferred on the President, upon any other officer or officers of the Corporation. The President shall perform and do all acts and things incident to the position of President and such other duties as may be assigned to him or her from time to time by the Board of Directors.

**4.8** **Vice-Presidents.** The Vice-Presidents shall perform such of the duties of the President on behalf of the Corporation as may be respectively assigned to them from time to time by the Board of Directors or by the President. The Board of Directors may designate one of the Vice-Presidents as the Executive Vice-President, and in the absence or inability of the President to act, such Executive Vice-President shall have and possess all of the powers and discharge all of the duties of the President, subject to the control of the Board of Directors.

**4.9** **Treasurer.** The Treasurer shall have the care and custody of all the funds and securities of the Corporation that may come into his or her hands as Treasurer, and the power and authority to endorse checks, drafts and other instruments for the payment of money for deposit or collection when necessary or proper and to deposit the same to the credit of the Corporation in such bank or banks or depository as the Board of Directors or the officers or agents to whom the Board of Directors may delegate such authority may designate, and the Treasurer may endorse all commercial documents requiring endorsements for or on behalf of the Corporation. The Treasurer may sign all receipts and vouchers for the payments made to the Corporation. The Treasurer shall render an account of his or her transactions to the Board of Directors as often as the Board shall require the same. The Treasurer shall enter regularly in the books to be kept by him or her for that purpose full and adequate account of all moneys received and paid by him or her on account of the Corporation. The Treasurer shall perform all acts incident to the position of Treasurer, subject to the control of the Board of Directors. The Treasurer shall, when requested, pursuant to vote of the Board of Directors, give a bond to the Corporation conditioned for the faithful performance of his or her duties, the expense of which bond shall be borne by the Corporation.

**4.10** **Secretary.** The Secretary shall keep the minutes of all meetings of the Board of Directors and of the stockholders. The Secretary shall attend to the giving and serving of all notices of the Corporation. Except as otherwise ordered by the Board of Directors, the Secretary shall attest the seal of the Corporation upon all contracts and instruments executed under such seal and shall affix the seal of the Corporation thereto and to all certificates of shares of capital stock of the Corporation. The Secretary shall have charge of the stock certificate book, transfer book and stock ledger, and such other books and

papers as the Board of Directors may direct. The Secretary shall, in general, perform all the duties of Secretary, subject to the control of the Board of Directors.

**4.11** **Assistant Secretary.** The Board of Directors or any two of the officers of the Corporation acting jointly may appoint or remove one or more Assistant Secretaries of the Corporation. Any Assistant Secretary upon his or her appointment shall perform such duties of the Secretary, and also any and all such other duties as the Board of Directors or the President or the Executive Vice-President or the Treasurer or the Secretary may designate.

**4.12** **Assistant Treasurer.** The Board of Directors or any two of the officers of the Corporation acting jointly may appoint or remove one or more Assistant Treasurers of the Corporation. Any Assistant Treasurer upon his or her appointment shall perform such of the duties of the Treasurer, and also any and all such other duties as the Board of Directors or the President or the Executive Vice-President or the Treasurer or the Secretary may designate.

**4.13** **Subordinate Officers.** The Board of Directors may select such subordinate officers as it may deem desirable. Each such officer shall hold office for such period, have such authority, and perform such duties as the Board of Directors may prescribe. The Board of Directors may, from time to time, authorize any officer to appoint and remove subordinate officers and to prescribe the powers and duties thereof.

## Article V - Stock.

**5.1** **Stock.** Each stockholder shall be entitled to a certificate or certificates of stock of the Corporation in such form as the Board of Directors may from time to time prescribe. The certificates of stock of the Corporation shall be numbered and shall be entered in the books of the Corporation as they are issued. They shall certify the holder's name and number and class of shares and shall be signed by both of (i) any one of the Chairman of the Board, the President or a Vice President, and (ii) any one of the Treasurer or an Assistant Treasurer or the Secretary or an Assistant Secretary, and may, but need not, be sealed with the corporate seal of the Corporation. If such certificate is countersigned (i) by a transfer agent other than the Corporation or its employee, or, (ii) by a registrar other than the Corporation or its employee, the signature of the officers of the Corporation and the corporate seal may be facsimiles. In case any officer or officers who shall have signed, or whose facsimile signature or signatures shall have been used on, any such certificate or certificates shall cease to be such officer or officers of the Corporation, whether because of death, resignation or otherwise, before such certificate or certificates shall have been delivered by the Corporation, such certificate or certificates may nevertheless be adopted by the Corporation and be issued and delivered as though the person or persons who signed such certificate or certificates or whose facsimile signature shall have been used thereon had not ceased to be such officer or officers of the Corporation.

**5.2** **Fractional Share Interests.** The Corporation may, but shall not be required to, issue fractions of a share. If the Corporation does not issue fractions of a share, it shall: (i) arrange for the disposition of fractional interests by those entitled thereto; (ii) pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined; or (iii) issue scrip or warrants in registered or bearer form which shall entitle the holder to receive a certificate for a full share upon the surrender of such scrip or warrants aggregating a full share. A certificate for a fractional share shall, but scrip or warrants shall not unless otherwise provided therein, entitle the holder to exercise voting rights, to receive dividends thereon, and to participate in any of the assets of the Corporation in the event of liquidation. The Board of Directors may cause scrip or warrants to be issued subject to the conditions that they shall become void if not exchanged for certificates representing full shares before a specified date, or subject to the conditions that the shares for which scrip or warrants are exchangeable

may be sold by the Corporation and the proceeds thereof distributed to the holders of scrip or warrants, or subject to any other conditions that the Board of Directors may impose.

**5.3   Transfers of Stock.**  Subject to any transfer restrictions then in force, the shares of stock of the Corporation shall be transferable only upon its books by the holders thereof in person or by their duly authorized attorneys or legal representatives and upon such transfer the old certificates shall be surrendered to the Corporation by the delivery thereof to the person in charge of the stock and transfer books and ledgers or to such other person as the Board of Directors may designate by whom they shall be cancelled and new certificates shall thereupon be issued.  The Corporation shall be entitled to treat the holder of record of any share or shares of stock as the holder in fact thereof and accordingly shall not be bound to recognize any equitable or other claim to or interest in such share on the part of any other person whether or not it shall have express or other notice thereof save as expressly provided by the laws of Delaware.

**5.4   Record Date.**  For the purpose of determining the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or the allotment of any rights, or entitled to exercise any rights in respect of any change, conversion, or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which shall not be more than 60 days nor less than ten days before the date of such meeting, nor more than 60 days prior to any other action.  If no such record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  If the Board of Directors does not fix the record date for determining stockholders entitled to consent to corporate action in writing without a meeting when no prior action by the Board of Directors is necessary the record date shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation at its registered office in the state of incorporation of the Corporation, at its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  If the Board of Directors does not fix the record date for determining stockholders entitled to consent to corporate action in writing without a meeting and prior action by the Board of Directors is necessary the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.  A determination of stockholders of record entitled to notice of or to vote at any meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

**5.5   Transfer Agent and Registrar.**  The Board of Directors may appoint one or more transfer agents or transfer clerks and one or more registrars and may require all certificates of stock to bear the signature or signatures of any of them.

**5.6   Dividends.**

(a)  Power to Declare.  Dividends upon the capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation, if any, may be declared by the Board of Directors at any regular or special meeting, pursuant to law.  Dividends may be paid in cash, in property, or in

shares of the capital stock, subject to the provisions of the Certificate of Incorporation and the laws of Delaware.

(b) Reserves. Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, determines to be proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the Board shall determine to be in the interests of the Corporation, and the Board may modify or abolish any such reserve in the manner in which it was created.

5.7 **Lost, Stolen or Destroyed Certificates.** No certificates for shares of stock of the Corporation shall be issued in place of any certificate alleged to have been lost, stolen or destroyed, except upon production of such evidence of the loss, theft or destruction and upon indemnification of the Corporation and its agents to such extent and in such manner as the Board of Directors may from time to time prescribe.

5.8 **Inspection of Books.** The stockholders of the Corporation, by a majority vote at any meeting of stockholders duly called, or in case the stockholders shall fail to act, the Board of Directors shall have power from time to time to determine whether and to what extent and at what times and places and under what conditions and regulations the accounts and books of the Corporation (other than the stock ledger) or any of them, shall be open to inspection by stockholders. No stockholder shall have any right to inspect any account or book or document of the Corporation except as conferred by law or authorized by the Board of Directors or by a resolution of the stockholders.

## Article VI - Miscellaneous Management Provisions.

6.1 **Checks, Drafts and Notes.** All checks, drafts or orders for the payment of money, and all notes and acceptances of the Corporation shall be signed by such officer or officers, agent or agents as the Board of Directors may designate.

6.2 **Notices.**

(a) Notices to directors and stockholders may be: (i) in writing and delivered personally or mailed to the directors or stockholders at their addresses appearing on the books of the Corporation; (ii) by facsimile telecommunication, when directed to a number at which the director or stockholder has consented to receive notice; or (iii) by electronic mail, when directed to an electronic mail address at which the director or stockholder has consented to receive notice. Notice by mail shall be deemed to be given at the time when the same shall be deposited in the U.S. mail, postage prepaid.

(b) Whenever any notice is required to be given under the provisions of applicable law, the Certificate of Incorporation or these bylaws, a written waiver signed by the person or persons entitled to said notice, or waiver by electronic transmission by the person entitled to said notice, whether before or after the time stated therein or the meeting or action to which such notice relates, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

6.3     **Conflict of Interest.**  No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association, or other organization in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the Board of Directors or committee thereof which authorized the contract or transaction, or solely because his, her or their votes are counted for such purpose, if: (i) the material facts as to his or her relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee and the Board or committee in good faith authorizes the contract or transaction by the affirmative vote of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; (ii) the material facts as to his or her relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders of the Corporation entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of such stockholders; or (iii) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the Board of Directors, a committee or the stockholders.  Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or of a committee that authorizes the contract or transaction.

6.4     **Voting of Securities Owned by the Corporation.**  Subject always to the specific directions of the Board of Directors: (i) any shares or other securities issued by any other corporation and owned or controlled by the Corporation may be voted in person at any meeting of security holders of such other corporation by the President of the Corporation if he or she is present at such meeting, or in his or her absence by the Treasurer of the Corporation if he or she is present at such meeting; and (ii) whenever, in the judgment of the President, it is desirable for the Corporation to execute a proxy or written consent in respect to any shares or other securities issued by any other corporation and owned by the Corporation, such proxy or consent shall be executed in the name of the Corporation by the President, without the necessity of any authorization by the Board of Directors, affixation of corporate seal or countersignature or attestation by another officer, provided that if the President is unable to execute such proxy or consent by reason of sickness, absence from the United States or other similar cause, the Treasurer may execute such proxy or consent.  Any person or persons designated in the manner above stated as the proxy or proxies of the Corporation shall have full right, power and authority to vote the shares or other securities issued by such other corporation and owned by the Corporation the same as such shares or other securities might be voted by the Corporation.

## Article VII - Amendments.

7.1     **Amendments.**  The bylaws of the Corporation may be altered, amended or repealed at any meeting of the Board of Directors upon notice thereof in accordance with these bylaws, or at any meeting of the stockholders by the vote of the holders of the majority of the stock issued and outstanding and entitled to vote at such meeting, in accordance with the provisions of the Certificate of Incorporation and of the laws of Delaware.

**Articles of Amendment to the Articles of Incorporation for Atkins Nutritionals (Canada) Limited**


**FORM 4**
**ARTICLES OF AMENDMENT**
**(SECTIONS 27 OR 177)**

**FORMULAIRE 4**
**CLAUSES MODIFICATRICES**
**(ARTICLES 27 OU 177)**

| 1 -- Name of the Corporation - Dénomination sociale de la société | 2 -- Corporation No. - Nº de la société |
|---|---|
| ATKINS NUTRITIONALS (CANADA) LIMITED | 421179-1 |

3 -- The articles of the above-named corporation are amended as follows:      Les statuts de la société mentionnée ci-dessus sont modifiés de la façon suivante :

To add the following to paragraph 7 of the Articles of the Corporation:

(d)    The Corporation shall not issue any nonvoting equity securities to the extent prohibited by section 1123(a)(6) of title 11 of the United States Code (the "Bankruptcy Code") as in effect on the date of the filing of these articles of amendment with The Director under the *Canada Business Corporations Act;* provided, however, that this provision (i) will have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation's parent, and (iii) in all events may be amended or eliminated in accordance with such applicable law as from time to time may be in effect.

| Signature | Printed Name - Nom en lettres moulées | 4 -- Capacity of - En qualité de | 5 -- Tel. No. - Nº de tél. |
|---|---|---|---|
| | | | |

**FOR DEPARTMENTAL USE ONLY - À L'USAGE DU MINISTÈRE SEULEMENT**

IC 3069 (2003/06)

Canada

**Atkins Nutritionals Holdings II, Inc.**
**Certificate of Amendment to Certificate of Incorporation**

# CERTIFICATE OF AMENDMENT
## TO THE
### AMENDED AND RESTATED
### CERTIFICATE OF INCORPORATION
### OF
### ATKINS NUTRITIONALS HOLDINGS II, INC.

ATKINS NUTRITIONALS HOLDINGS, INC., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies that:

A.    The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on August 20, 2003 under the name Lean Holdings II, Inc.

B.    On July 31, 2005, the Corporation and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 05-15913 (ALG)).  This Certificate of Amendment to the Amended and Restated Certificate of Incorporation amends the Amended and Restated Certificate of Incorporation of the Corporation, as amended to date (the "Certificate of Incorporation"), and has been duly adopted in accordance with Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware (the "Delaware GCL"), pursuant to the authority granted to the Corporation under Section 303 of the Delaware GCL to put into effect and carry out the Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of the Corporation, et al., as confirmed on _____ __, 2005 by order (the "Order") of the Bankruptcy Court. Provision for amending the Certificate of Incorporation is contained in the Order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the reorganization of the Corporation.

C.    Article 4 of the Certificate of Incorporation is hereby amended by adding the following Section after Section 4.4:

"4.5    The Corporation shall not issue any nonvoting equity securities to the extent prohibited by section 1123(a)(6) of title 11 of the United States Code (the "Bankruptcy Code") as in effect on the date of the filing of this Certificate of Incorporation with the Secretary of State of the State of Delaware; provided, however, that this Section 4.5 (i) will have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation, and (iii) in all events may be amended or eliminated in accordance with such applicable law as from time to time may be in effect."

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Amendment to the Amended and Restated Certificate of Incorporation this ___ day of _____, 2005.

_____
Name:
Title:

BUSDOCS/1501250.6
C:\DOCUME~1\PHILLI~1\LOCALS~1\TEMP\NOTES418A54\ATKINS NUTRITIONALS HOLDINGS II_ INC_ -- CERTIFICATE OF AMENDMENT TO CERTIFICATE OF INCORPORATION_#1594467.DOC

2

**Exhibit 5**

**Biographical Information for Initial Boards of Directors of Reorganized Debtors**

**Biographical Summaries: Members of the**
**Boards of Directors of the Reorganized Debtors**

*Mark Rodriguez*

Mark S. Rodriguez was appointed President, CEO and Director of Atkins Nutritionals, Inc. (ANI) in June 2005. Since February 2005 he served as President of ANI North America, having previously been General Manager, ANI North American Product Sales and Marketing. He joined the company in March 2004.

Before joining ANI, Mr. Rodriguez founded Acirca, Inc., a private-equity funded roll-up of branded organic foods companies, which was sold to NASDAQ-listed Hain-Celestial Group in 2003. Previous to this, he served for nine years as President and CEO of Great Brands of Europe, Inc. and Danone International Brands, Inc., both wholly owned North American subsidiaries of the $16B Paris-based Danone Group, where he was responsible for their bottled water and specialty food operations. During his tenure he helped pioneer the development of the single-serve container bottled water market. In 1997 he was given the company's first worldwide award, Gran Prix for Innovation, for his work conceiving and successfully launching Dannon Natural Spring water.

Mr. Rodriguez also serves on the Board of Directors of Share Our Strength, one of the nation's largest not-for-profit organizations dedicated to ending childhood hunger.

He attended the Graduate School of Public Administration at the University of Southern California and earned a BA degree in Professional Studies from San Diego State University.

*Robert W. Carpenter*

Robert W. Carpenter is President of ARAMARK Healthcare - Food, a division of ARAMARK Corporation. He is responsible for all U.S. retail and patient food services provided in over 300 hospitals. He joined ARMARK in September 2003 as President of ARAMARK Facilities Services–Specialty Markets where he was responsible for North American Facilities Management services across the Business & Industry, Sports & Entertainment, Food Processing, Corrections and Aviation marketplaces.

Before joining ARMARK, Mr. Carpenter was Vice President of Marketing for McNeil Consumer & Specialty Pharmaceuticals where he led a department covering 21 different product lines. He was responsible for the Tylenol, Motrin, Imodium, and St. Joseph portfolio of brands. Mr. Carpenter also served as Franchise Director for New Marketing Ventures.

Prior to McNeil Consumer & Specialty Pharmaceuticals, Mr. Carpenter held a variety of positions with Johnson & Johnson / Merck, both in the United States and Germany.

Mr. Carpenter earned a MBA degree from Harvard University and a BA degree in History from Middlebury College.

***Kevin S. Flannery***

Kevin S. Flannery is currently President and CEO of Whelan Financial Corporation where he advises a number of newly reorganized companies. At Whelan, he is engaged in corporate advisory work in the following capacities: Chairman of the Stockholders Committee of Tesoro Petroleum Corp; Advisor to the Equity Committee of Raytech Corp; Advisor to the Creditors of Aviation Sales Corp and Advisor to the Creditors Committee of Geneva Steel Company. Mr. Flannery has provided financial services advisory work to a number of well known banks and private equity firms.

From January 2003 to October 2004, Mr. Flannery was Chairman and CEO of RoweCom, Inc. Prior to RoweCom, Mr. Flannery was Chairman and CEO of Telespectrum Worldwide Inc.

Mr. Flannery is currently a Director for Dan River Inc., Seitel Inc., Darling International, Inc., Texas Petrochemical LP, and Sheffield Steel Corp.


***Hugh R. Rovit***

Hugh R. Rovit is a Principal in interim management at Masson & Company LLC, a turnaround advisory and financial restructuring firm. His clients include a number of well known private equity firms where he works with their portfolio companies in the areas of situation assessment, budget development and the implementation of operating controls.

Prior to joining Masson & Company, Mr. Rovit was Chief Operating Officer and Chief Financial Officer of Best Manufacturing, Inc., a manufacturer and distributor of institutional service apparel and textiles. Before joining Best Manufacturing, Inc., Mr. Rovit was Chief Financial Officer of Royce Hosiery Mills, Inc., a manufacturer, marketer and distributor of men's and women's hosiery.

Mr. Rovit is on the Board of Oneida, Ltd. where he is Chairman of the Finance committee, as well as on the Audit and Nominating and Governance committees.

Mr. Rovit earned a MBA degree from Harvard University and a BA degree with Distinction in Government from Dartmouth College.

***Tim Healy***

Mr. Healy currently is Chairman and CEO of Ubiquity Brands, Inc. owner of a number of well known snack food lines. He has held numerous positions with leading consumer staple companies over the past 30 years, including Managing Director and Operating Partner of J.W. Childs Associates L.P., Chairman, CEO and President of Select Beverages, Inc., and Executive Vice President and Chief Operating Officer of National Beverage Corporation.

Mr. Healy also served as Vice President of World Wide Marketing for the NutraSweet Division of G.D. Searle & Co., Business Unit Manager of General Foods Corporation, General Manager of Marketing for Heinz, USA, Marketing Director of Frito-Lay, Inc., and Brand Manager for Procter & Gamble Co.

Mr. Healy is currently a Director for Polar Beverages and Tom's Foods. He previously served as Director for Empire Kosher Poultry, American Safety Razor Corp, AquaPenn Spring Water Co., Personal Care Group, Natural Nutrition Group, Dr. Pepper Bottlers Association and Seven-Up Bottlers Association. Mr. Healy was also Chairman of The NutraSweet Company and International Diverse Foods.

Mr. Healy earned a MBA degree with Distinction from the Johnson School of Management at Cornell University and a BA degree from Iowa State University.

## Board Compensation

The Board Compensation is $25,000 per year payable in quarterly installments with a $1,500 payment for each scheduled meeting attended in person and a $3,000 annual payment for serving as a committee chair.

**Exhibit 6**

**Biographical Information for Initial Officers of Reorganized Debtors**

## Officers of Reorganized ANI

### *Mark Rodriguez: President, Chief Executive Officer and Director*

Mark S. Rodriguez was appointed President, CEO and Director of Atkins Nutritionals, Inc. (ANI) in June 2005. Since February 2005 he served as President of ANI North America, having previously been General Manager, ANI North American Product Sales and Marketing. He joined the company in March 2004.

Before joining ANI, Mr. Rodriguez founded Acirca, Inc., a private-equity funded roll-up of branded organic foods companies, which was sold to NASDAQ-listed Hain-Celestial Group in 2003. Previous to this, he served for nine years as President and CEO of Great Brands of Europe, Inc. and Danone International Brands, Inc., both wholly owned North American subsidiaries of the $16B Paris-based Danone Group, where he was responsible for their bottled water and specialty food operations. During his tenure he helped pioneer the development of the single-serve container bottled water market. In 1997 he was given the company's first worldwide award, Gran Prix for Innovation, for his work conceiving and successfully launching Dannon Natural Spring water.

Mr. Rodriguez also serves on the Board of Directors of Share Our Strength, one of the nation's largest not-for-profit organizations dedicated to ending childhood hunger.

He attended the Graduate School of Public Administration at the University of Southern California and earned a BA degree in Professional Studies from San Diego State University.

Mr. Rodriguez's base compensation for 2006 is $500,000.00, with a year end target bonus of $350,000.00. Additionally, Mr. Rodriguez will be entitled to a one time bonus of $490,000 and New Management Interests.

### *Joseph Conklin: Senior Vice President, General Counsel, Secretary and Director of Human Resources*

Joseph J. Conklin is Senior Vice President, General Counsel, Secretary and Director of Human Resources for ANI. He is responsible for the company's general corporate legal affairs including transactional matters, litigation strategy and oversight, regulatory compliance initiatives (including the review of advertising, marketing, claims substantiation and labeling materials), risk management and the management of the Atkins intellectual property portfolio. He joined ANI in 2003 as Vice President, Assistant General Counsel.

Prior to joining ANI, Mr. Conklin was the General Counsel for Twin Laboratories, Inc., a leading manufacturer of dietary supplements. Before moving to in-house practice, he spent several years as a Litigation Associate at Donovan Leisure Newton & Irvine, and as a partner at an intellectual property boutique firm.

Mr. Conklin has published several articles on advertising and trademark law and currently serves as Chairman of the Food Law Committee of the New York State Bar Association. He has been rated "AV" by Martindale-Hubbell.

Mr. Conklin graduated from The George Washington University and St. John's University School of Law, where he was an editor of the Law Review.

Mr. Conklin's base compensation for 2006 is $226,571.00, with a year end target bonus of $113,300.00. Additionally, Mr. Conklin will be entitled to a one time bonus of $222,000 and New Management Interests.

### *Jeff Powers: Vice President, Customer Management and Sales*

Jeff Powers is Vice President, Customer Management and Sales of ANI. He is responsible for the commercial development and sales execution for all Atkins® products in all channels. Additionally, he manages the Sales Planning, Administration and Control Department. Under his supervision, ANI has recently restructured its sales organization by evolving from a network of small regional sales brokers to a national network through Acosta Sales and Marketing Company, which is North America's largest sales agency. He joined ANI in June 2003.

Mr. Powers, prior to joining ANI, was Vice President of Sales, North America for Acirca, Inc., an organic food and beverage company. Here he was responsible for the development of the sales organization, the implementation of a national broker network and the execution of all strategic sales initiatives. Previous to this work, he held several positions at the Danone Group, where as division manager he was charged with executing the national launch of Dannon Natural Spring Water. He also initiated the Sales Planning Department.

He was awarded the President's Award for Outstanding Leadership during his tenure at Danone.

Mr. Powers earned a BS degree in Business Administration with an emphasis in Marketing from the University of Southern California.

Mr. Powers's base compensation for 2006 is $194,000.00, with a year end target bonus of $97,000.00. Additionally, Mr. Powers will be entitled to a one time bonus of $190,000 and New Management Interests.

### *Beth Neumann: Vice President, Marketing / Chief Marketing Officer*

Beth Neumann is the Vice President, Marketing / Chief Marketing Officer for ANI. In this capacity she oversees all aspects of brand development for the company's portfolio. She joined ANI in 2004 as director of the Atkins Advantage® and Morning Start™ brands.

Prior to ANI, Ms. Neumann spent seven years at Kraft Foods, where she served as Brand Director of Balance® Bar at the end of her tenure. In this role, she transitioned the newly acquired brand into Kraft while maintaining a retail sales growth rate of 22 percent. She also led the development of a 10-year financial plan for the brand and developed the vision, positioning and communication strategy. While at Kraft, she also managed Kool-Aid®, Crystal Light® and Country Time®. Prior to Kraft, Ms. Neumann served as a Senior Consultant at Andersen Consulting in Florham Park, NJ for three years, specializing in supply chain management.

Ms. Neumann earned a MBA degree from Harvard University. She received a BS degree in Operations Research and Industrial Engineering from the Cornell University School of Engineering.

Ms. Neumann's base compensation for 2006 is $170,000.00, with a year end target bonus of $85,000.00. Additionally, Ms. Neumann will be entitled to a one time bonus of $55,000 and New Management Interests.

### *Stephen Galinski: Vice President, Operations and Customer Support*

Stephen Galinski is Vice President, Operations and Customer Support of ANI. He is responsible for all aspects of the supply chain including demand planning, supply planning, contract manufacturing, purchasing, inbound transportation, distribution centers, warehousing, inventory control, customer service and outbound transportation. He joined ANI in 2003 as Vice President of Customer Support and Logistics.

Before joining ANI, Mr. Galinski was employed by FIJI Water where he was a member of the Executive Committee and responsible for worldwide supply chain operations. He was previously with Danone Group for five years and served as the Director of Logistics for North America. In this role, he managed demand planning, supply planning, warehousing, transportation and customer service. Prior to that, Mr. Galinski managed a warehouse and oversaw customer service, transportation and warehousing across the US for Novartis Pharmaceuticals for six years.

Mr. Galinski earned a BS degree in Logistics from Pennsylvania State University.

Mr. Galinski's base compensation for 2006 is $160,000.00, with a year end target bonus of $80,000.00. Additionally, Mr. Galinski will be entitled to a one time bonus of $61,000 and New Management Interests.

### *Matt Spolar: Vice President, Product Technology*

Matt Spolar is Vice President, Product Technology for ANI. As a food scientist, he is responsible for product development, production support/engineering and quality assurance. He is also responsible for the scientific validation of all products, most recently demonstrated with patent-pending clinical methodology to test the blood sugar response of Atkins products, which has been presented to the FDA, Health Canada, and Health Policy Administrators within European Parliament. He joined ANI in 1999 as Manager of Product Development.

Prior to joining ANI, Mr. Spolar was an analyst at Datamonitor, Inc., a global management consultancy, where he worked to provide information solutions for Fortune 500 consumer packaged goods companies.

Mr. Spolar earned MS and BS degrees in Food Science from Pennsylvania State University.

Mr. Spolar's base compensation for 2006 is $154,500.00, with a year end target bonus of $77,250.00. Additionally, Mr. Spolar will be entitled to a one time bonus of $61,000.

### Officers of Other Reorganized Debtors

Certain officers of ANI will also serve as officers of the other Reorganized Debtors.

**Exhibit 7**

**New Senior Note Agreement and Form of New Tranche A Senior Note**

$110,000,000

TERM NOTE AGREEMENT

dated as of December [__], 2005

among

ATKINS NUTRITIONALS, INC.
as Issuer,

THE GUARANTORS PARTY HERETO,
as Guarantors,

THE NOTEHOLDERS PARTY HERETO,

and

UBS AG, STAMFORD BRANCH,
as Note Agent and Collateral Agent

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ..........................................................................2
Section 1.01. Defined Terms ..........................................................2
Section 1.02. Terms Generally .......................................................31
Section 1.03. Accounting Terms; GAAP .......................................32

ARTICLE II ISSUANCE OF NOTES; PAYMENTS; FEES; MISCELLANEOUS
PROVISIONS ...........................................................................32
Section 2.01. The Notes ................................................................32
Section 2.02. Repayment of Notes.................................................32
Section 2.03. Intentionally Omitted ...............................................33
Section 2.04. Fees.........................................................................33
Section 2.05. Interest.....................................................................33
Section 2.06. Intentionally Omitted ...............................................34
Section 2.07. Interest Period Elections; Evidence of Debt.............34
Section 2.08. Optional and Mandatory Prepayments of Notes.......35
Section 2.09. Alternate Rate of Interest ........................................37
Section 2.10. Payments Generally; Pro Rata Treatment; Sharing of
Setoffs ...................................................................39
Section 2.11. Taxes .......................................................................40
Section 2.12. Capital Adequacy....................................................42
Section 2.13. Mitigation Obligations; Replacement of Noteholders ................43

ARTICLE III REPRESENTATIONS AND WARRANTIES ..........................44
Section 3.01. Organization; Powers...............................................44
Section 3.02. Authorization; Enforceability ...................................44
Section 3.03. Governmental Approvals; No Conflicts.....................44
Section 3.04. Financial Statements ...............................................44
Section 3.05. No Claims.................................................................45
Section 3.06. Properties.................................................................45
Section 3.07. Intellectual Property.................................................46
Section 3.08. Condition and Maintenance of Equipment.................46
Section 3.09. Equity Interests and Subsidiaries.............................47
Section 3.10. Litigation; Compliance with Laws ............................47
Section 3.11. Agreements..............................................................47
Section 3.12. Federal Reserve Regulations ...................................48
Section 3.13. Investment Company Act; Public Utility Holding Company
Act.........................................................................48
Section 3.14. Issuance of Notes ....................................................48
Section 3.15. Taxes .......................................................................48
Section 3.16. No Material Misstatements .......................................49
Section 3.17. Labor Matters...........................................................49
Section 3.18. Employee Benefit Plans ...........................................49

i

| Section 3.19. | Environmental Matters | 50 |
| Section 3.20. | Insurance | 51 |
| Section 3.21. | Security Documents | 51 |
| Section 3.22. | Solvency | 52 |
| Section 3.23. | Rule 144 Eligibility | 52 |

**ARTICLE IV  CONDITIONS TO THE ISSUANCE OF THE NOTES** ............................. 53

| Section 4.01. | Conditions to the Issuance of the Notes | 53 |

**ARTICLE V  AFFIRMATIVE COVENANTS** ............................................................. 58

| Section 5.01. | Financial Statements, Reports, etc | 58 |
| Section 5.02. | Litigation and Other Notices | 60 |
| Section 5.03. | Existence; Businesses and Properties | 61 |
| Section 5.04. | Insurance | 61 |
| Section 5.05. | Obligations and Taxes | 62 |
| Section 5.06. | Employee Benefits | 62 |
| Section 5.07. | Maintaining Records; Access to Properties and Inspections | 63 |
| Section 5.08. | Issuance of Notes | 63 |
| Section 5.09. | Compliance with Environmental Laws; Environmental Reports | 63 |
| Section 5.10. | Interest Rate Protection. | 64 |
| Section 5.11. | Additional Collateral; Additional Guarantors | 64 |
| Section 5.12. | Security Interests; Further Assurances | 65 |
| Section 5.13. | Information Regarding Collateral | 66 |
| Section 5.14. | Noteholder Meetings | 66 |
| Section 5.15. | Cooperation with Advisors | 67 |
| Section 5.16. | Landlord Access Agreement | 67 |
| Section 5.17. | Information | 67 |

**ARTICLE VI  NEGATIVE COVENANTS** .................................................................. 67

| Section 6.01. | Indebtedness | 67 |
| Section 6.02. | Liens | 68 |
| Section 6.03. | Sale and Leaseback Transactions | 71 |
| Section 6.04. | Investment, Loan and Advances | 71 |
| Section 6.05. | Mergers, Consolidations, Sales of Assets and Acquisitions | 72 |
| Section 6.06. | Dividends | 74 |
| Section 6.07. | Transactions with Affiliates | 74 |
| Section 6.08. | Financial Covenants | 74 |
| Section 6.09. | Intentionally Omitted. | 77 |
| Section 6.10. | Modification of Certain Agreements | 77 |
| Section 6.11. | Limitation on Certain Restrictions on Subsidiaries | 78 |
| Section 6.12. | Limitation on Issuance of Capital Stock | 78 |
| Section 6.13. | Limitation on Creation of Subsidiaries | 78 |
| Section 6.14. | Business | 78 |
| Section 6.15. | Limitation on Accounting Changes | 79 |
| Section 6.16. | Fiscal Year | 79 |

ii

Section 6.17.    Lease Obligations ....................................................................79
Section 6.18.    No Further Negative Pledge ....................................................79

ARTICLE VII    GUARANTEE ....................................................................80

Section 7.01.    The Guarantee....................................................................80
Section 7.02.    Obligations Unconditional ......................................................80
Section 7.03.    Reinstatement ....................................................................81
Section 7.04.    Subrogation; Subordination......................................................81
Section 7.05.    Remedies ....................................................................82
Section 7.06.    Instrument for the Payment of Money .......................................82
Section 7.07.    Continuing Guarantee ....................................................................82
Section 7.08.    General Limitation on Guarantee Obligations ..........................82
Section 7.09.    Release of Guarantors ....................................................................82

ARTICLE VIII    EVENTS OF DEFAULT....................................................................83

ARTICLE IX    THE NOTE AGENT AND THE COLLATERAL AGENT ........................85

Section 9.01.    Appointment ....................................................................85
Section 9.02.    Agent in Its Individual Capacity................................................85
Section 9.03.    Exculpatory Provisions ....................................................................85
Section 9.04.    Reliance by Agent ....................................................................86
Section 9.05.    Delegation of Duties ....................................................................86
Section 9.06.    Successor Agent....................................................................86
Section 9.07.    Non-Reliance on Agent and Other Noteholders.........................87
Section 9.08.    Indemnification....................................................................87

ARTICLE X    MISCELLANEOUS....................................................................88

Section 10.01.    Notices....................................................................88
Section 10.02.    Waivers; Amendment ....................................................................89
Section 10.03.    Expenses; Indemnity ....................................................................90
Section 10.04.    Successors and Assigns....................................................................91
Section 10.05.    Survival of Agreement ....................................................................94
Section 10.06.    Counterparts; Integration; Effectiveness....................................94
Section 10.07.    Severability....................................................................94
Section 10.08.    Right of Setoff ....................................................................94
Section 10.09.    Governing Law; Jurisdiction; Consent to Service of Process ......95
Section 10.10.    Waiver of Jury Trial....................................................................95
Section 10.11.    Headings....................................................................96
Section 10.12.    Confidentiality....................................................................96
Section 10.13.    Interest Rate Limitation....................................................................97
Section 10.14.    Application of Proceeds of Collateral........................................97
Section 10.15.    Noteholder Addendum ....................................................................98
Section 10.16.    Obligations Absolute....................................................................98
Section 10.17.    Intercreditor Agreement ....................................................................98
Section 10.18.    Information Regarding Holders.................................................99

ARTICLE XI    SUBORDINATION....................................................................99

iii

| | | |
|---|---|---|
| Section 11.01. | Notes Subordinate to Senior Debt | 99 |
| Section 11.02. | Payment Over of Proceeds Upon Dissolution | 99 |
| Section 11.03. | No Payment in Certain Circumstances | 100 |
| Section 11.04. | Payments Otherwise Permitted | 102 |
| Section 11.05. | Subrogation to Rights of Holders of Senior Debt | 102 |
| Section 11.06. | Provisions Solely to Define Relative Rights | 102 |
| Section 11.07. | No Waiver or Impairment of Subordination Provisions | 102 |
| Section 11.08. | Reliance on Judicial Order or Certificate of Liquidating Agent | 103 |
| Section 11.09. | Limitation on Rights and Remedies; Notice of Exercise of Remedies | 103 |
| Section 11.10. | Assignments | 104 |
| Section 11.11. | Notices | 104 |
| Section 11.12. | Miscellaneous | 104 |

iv

ANNEXES

Annex I                    Notices

SCHEDULES

Schedule 1.01(a)           Mortgaged Property
Schedule 1.01(b)           Refinancing Indebtedness To Be Repaid
Schedule 1.01(c)           Subsidiary Guarantors
Schedule 2.01              Notes Issued
Schedule 3.03              Governmental Approvals; Compliance with Laws
Schedule 3.05              Claims
Schedule 3.06(b)           Real Property
Schedule 3.07(a)           Intellectual Property Claims
Schedule 3.07(c)           Violations or Proceedings
Schedule 3.09(a)           Subsidiaries
Schedule 3.09(c)           Corporate Organizational Chart
Schedule 3.10              Litigation
Schedule 3.11(c)           Material Agreements
Schedule 3.15              Taxes
Schedule 3.19              Environmental Matters
Schedule 3.20              Insurance
Schedule 6.01(b)           Existing Indebtedness
Schedule 6.02(c)           Existing Liens
Schedule 6.04(b)           Existing Investments

EXHIBITS

Exhibit A                  Form of Administrative Questionnaire
Exhibit B                  Form of Assignment and Acceptance
Exhibit C                  Form of Interest Period Election Request
Exhibit D                  Form of Joinder Agreement
Exhibit E                  Form of Landlord Access Agreement
Exhibit F                  Form of Note
Exhibit G-1                Form of Perfection Certificate
Exhibit G-2                Form of Perfection Certificate Supplement
Exhibit H                  Form of Security Agreement
Exhibit I                  Form of PIK Tranche A Note
Exhibit J                  Form of Intercompany Note
Exhibit K                  Form of Noteholder Addendum
Exhibit L-1                Form of Compliance Certificate (Annual)
Exhibit L-2                Form of Compliance Certificate (Quarterly)
Exhibit M                  Form of Intercreditor Agreement

# TERM NOTE AGREEMENT[1]

This TERM NOTE AGREEMENT (this "**Agreement**") dated as of December [__], 2005, among ATKINS NUTRITIONALS, INC., a New York corporation (the "**Issuer**"), the Guarantors (as defined below), the Noteholders (as defined below), and UBS AG, STAMFORD BRANCH, as note agent (in such capacity, the "**Note Agent**") for the Noteholders and as collateral agent (in such capacity, the "**Collateral Agent**") for the Secured Parties.

## WITNESSETH:

WHEREAS, on July 31, 2005 (the "**Petition Date**"), the Issuer, [Holdco][2], Atkins Nutritionals Holdings, Inc., a Delaware corporation (the "**Parent**"), and Atkins Nutritionals (Canada) Limited, a Canada corporation ("**Canada**" and, collectively with the Issuer, Holdco and the Parent, the "**Debtors**"), commenced Chapter 11 Case Nos. 05-15913 through 05-15916, as administratively consolidated in Chapter 11 Case No. 05-15913 by filing separate voluntary petitions for reorganization under the Bankruptcy Code (as defined below), with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), and on August 3, 2005, the Debtors commenced ancillary proceedings in Canada under Section 18.06 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "**Cases**");

WHEREAS, on August 5, 2005, the Issuer entered into that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement with Holdco, the Parent and Atkins Canada, as guarantors, the lenders party thereto, UBS Securities LLC, as book manager, lead arranger, documentation agent and syndication agent, UBS Loan Finance LLC, as swing line lender, and UBS AG, Stamford Branch, as issuing bank, administrative agent for the lenders and Collateral Agent (as amended, supplemented or otherwise modified to the date hereof, the "**DIP Credit Agreement**");

WHEREAS, on November [___], 2005, the Debtors filed the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (amending (i) the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code filed on August 24, 2005) and (ii) the Debtor's First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code filed on September 30, 2005) (the "**Plan of Reorganization**") with the Bankruptcy Court;

WHEREAS, on [_____], the Bankruptcy Court entered an order pursuant to Section 1129 of the Bankruptcy Code confirming the Plan of Reorganization (the "**Confirmation Order**");

---

[1] Any bracketed terms remain subject to the consent of the Debtors and the Prepetition Agent prior to execution.

[2] It is currently contemplated that Holdco will be merged into Parent prior to, on or after the Closing Date for tax reasons.

WHEREAS, it is a condition precedent to the effectiveness of the Plan of Reorganization that the Issuer issue the Notes (as defined below) to the Noteholders in an aggregate principal amount of $110,000,000 and in an amount for each Noteholder calculated in accordance with Section 5.2(b) of the Plan of Reorganization; and

WHEREAS, each of the Guarantors has agreed to guarantee the obligations of the Issuer hereunder, and the Issuer and each Guarantor (as defined below) has agreed, subject to the Intercreditor Agreement, to secure its obligations hereunder by granting security interests in, and Liens on, substantially all its Property and assets, whether real or personal, tangible or intangible, now existing or hereafter acquired or arising, all as more fully provided herein and in the Note Documents.

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.01.** **Defined Terms**. As used in this Agreement, the following terms shall have the meanings specified below:

"**Accounts**" shall mean all "accounts," as such term is defined in the UCC as in effect on the date hereof in the State of New York, in which such Person now or hereafter has rights.

"**Acquisition Consideration**" shall mean the purchase consideration for any Permitted Acquisition and all other payments by the Parent or any of its Subsidiaries in exchange for, or as part of, or in connection with, any Permitted Acquisition (other than fees and expenses related to such transaction), whether paid in cash or by exchange of Equity Interests or of assets or otherwise and whether payable at or prior to the consummation of such Permitted Acquisition or deferred for payment at any future time, whether or not any such future payment is subject to the occurrence of any contingency, and includes any and all payments representing the purchase price and any assumptions of Indebtedness, "earn-outs" and other agreements to make any payment the amount of which is, or the terms of payment of which are, in any respect subject to or contingent upon the revenues, income, cash flow or profits (or the like) of any Person or business; provided, that any such future or deferred payment shall only be considered Acquisition Consideration to the extent of the reserve, if any, required under GAAP at the time of such sale to be established in respect thereof by the Parent or any Subsidiary thereof.

"**Adjusted LIBOR Rate**" shall mean, with respect to any Note for any Interest Period, (a) an interest rate per annum (rounded upward, if necessary, to the next 1/100th of 1%) determined by the Note Agent to be equal to the LIBOR Rate for such Note in effect for such Interest Period divided by (b) 1 *minus* the Statutory Reserves (if any) for such Note for such Interest Period.

2

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Note Agent.

"**Affiliate**" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided, that for purposes of Section 6.07, the term "Affiliate" shall also include any Person that directly or indirectly owns more than 10% of any class of Equity Interests of the Person specified or that is an executive officer or director of the Person.

"**Agents**" shall mean the Note Agent and the Collateral Agent.

"**Agreement**" shall have the meaning assigned to such term in the preamble.

"**Allowed**" has the meaning set forth in the Plan of Reorganization.

"**Amortization Payments**" shall have the meaning specified in Section 2.02.

"**Applicable Margin**" shall mean 12.0% per annum.

"**Asset Sale**" shall mean any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any Sale and Leaseback Transaction) of any Property (including stock of any Subsidiary of the Parent, other than an Equity Issuance) by the holder thereof but excluding sales of inventory and dispositions of Cash Equivalents, in each case, in the ordinary course of business.

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by a Noteholder and an assignee, and accepted by the Note Agent, in the form of Exhibit B, or such other form as shall be approved by the Note Agent.

"**Atkins Canada**" shall have the meaning assigned to such term in the recitals.

"**Attributable Indebtedness**" shall mean, when used with respect to any sale and leaseback transaction, as at the time of determination, the present value (discounted at a rate equivalent to the Issuer's then current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the aggregate obligations of the lessee for rental payments during the remaining term of the lease included in any such sale and leaseback transaction.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as now constituted or hereafter amended.

"**Bankruptcy Court**" shall have the meaning assigned to such term in the recitals.

"**Base Rate**" shall mean 5.0% per annum.

3

"**Blockage Notice**" has the meaning set forth in <u>Section 11.03(b)</u>.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" shall mean, with respect to any Person, (i) in the case of any corporation, the board of directors of such Person, (ii) in the case of any limited liability company, the board of managers of such Person, (iii) in the case of any partnership, the Board of Directors of the general partner of such Person and (iv) in any other case, the functional equivalent of the foregoing.

"**Business Day**" shall mean any day other than (a) a Saturday, Sunday or other day on which banks in New York City are authorized or required by law to close, and (b) if such day relates to any LIBOR Rate determination, any day on which dealings in Dollar deposits are not conducted by and between banks in the London interbank market, or are in fact closed.

"**Capital Expenditures**" shall mean, with respect to any Person, for any period, the aggregate amount of all expenditures by such Person and its Subsidiaries during that period for fixed or capital assets that, in accordance with GAAP, are or should be classified as capital expenditures in the consolidated statement of cash flows of such Person and its Consolidated Subsidiaries; <u>provided</u>, that Capital Expenditures shall not include (i) expenditures of proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other Property, to the extent such expenditures are made in accordance with <u>Section 2.08(f)</u> and the other terms and provisions of the Note Documents, to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other Property or otherwise to acquire, maintain, develop, construct, improve or repair assets or properties useful in the business of the Issuer and its Subsidiaries, (ii) amounts expended in respect of Permitted Acquisitions, or (iii) with respect to any Person acquired pursuant to a Permitted Acquisition, amounts expended by such Person prior to such acquisition.

"**Capital Lease Obligations**" shall mean, with respect to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal Property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Cash**" shall mean money, currency or a credit balance in a Deposit Account.

"**Cash Equivalents**" shall mean, as to any Person: (a) securities issued, or directly, unconditionally and fully guaranteed or insured, by the United States or any agency or instrumentality thereof (<u>provided</u>, that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person; (b) time deposits and certificates of deposit of any commercial bank having, or which is the principal banking Subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia (or, with respect to any Foreign Subsidiary, the country in which such Foreign Subsidiary is organized) having, capital and

4

surplus aggregating in excess of $500,000,000 and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such Person; (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities; (d) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by Standard & Poor's Rating Service ("**S&P**") or at least P-1 or the equivalent thereof by Moody's Investors Service Inc. ("**Moody's**"), and in each case maturing not more than one year after the date of acquisition by such Person; (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above; and (f) demand deposit accounts maintained in the ordinary course of business.

"**Casualty Event**" shall mean, with respect to any Property (including Real Property) of any Person, any loss of title with respect to such Property or any loss of or damage to or destruction of, or any condemnation or other taking (including by any Governmental Authority) of, such Property for which such Person or any of its Subsidiaries receives insurance proceeds or proceeds of a condemnation award or other compensation. "Casualty Event" shall include but not be limited to any taking of all or any part of any Real Property of any Person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any Person or any part thereof by any Governmental Authority, civil or military.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.*

"**Change in Law**" shall mean (a) the adoption of any law, treaty, order, rule or regulation after the date of this Agreement or (b) any change in any law, treaty, order, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement.

"**Change of Control**" means the occurrence after the Closing Date of:

(a) any direct or indirect sale or other transfer of all or substantially all of the assets (regardless of form or structure, and whether in a single transaction or a series of transactions) of the Parent or the Issuer to any Person other than an Affiliate of the Parent;

(b) a merger, consolidation or share exchange of the Parent into or with any Person (other than an Affiliate of the Parent or a merger or consolidation qualifying as a reorganization under Section 368(a)(1)(F) of the Internal Revenue Code of 1986, as amended), if, as a result of such transaction, the Persons (or Affiliates thereof) who were holders of the Parent's Shares immediately prior to such transaction do not own at least a majority of the issued and outstanding equity securities of the resulting Person (or of the ultimate parent of the resulting Person);

5

(c) any direct or indirect sale of outstanding Parent Shares (whether in a single transaction or a series of transactions) if, as a result of such sale, (x) more than eighty percent (80%) of the then issued and outstanding Parent's Shares are held by (I) a Person which was not a holder of 10% or more of the Parent's Shares issued and outstanding as of the Closing Date, or (II) by a Group that does not include a Person who was a holder of 10% or more of the Parent Shares  issued and outstanding as of the Closing Date, or (y) more than eighty percent (80%) of the then issued and outstanding Parent Shares are held by (I) Persons who, at the Closing Date, held five percent (5%) or more but less than ten (10%) of the Parent Shares issued and outstanding as of the Closing Date, or (II) by a Group that includes such a Person, and more than sixty (60%) of the Persons who are members of the Board of Directors following such sale were not members of the Board of Directors prior to such sale; or

(d) any "Change of Control" as defined in either the CVR Agreement (other than in connection with a Qualified IPO) or the Exit Facility.

"**Chattel Paper**" shall mean all "chattel paper," as such term is defined in the UCC as in effect on the date hereof in the State of New York in which any Person now or hereafter has rights.

"**Charges**" shall have the meaning assigned to such term in Section 10.13.

"**Closing Date**" shall mean the date the conditions precedent set forth in Section 4.01 shall have been satisfied.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" shall mean, collectively, all of the Security Agreement Collateral, the Mortgaged Property and all other Property of whatever kind and nature pledged as or constituting collateral under any Security Document.

"**Collateral Agent**" shall have the meaning assigned to such term in the preamble.

"**Companies**" shall mean the Parent and its Subsidiaries; and "**Company**" shall mean any one of the Parent and its Subsidiaries.

"**Compliance Certificate**" shall mean a certificate substantially in the form of Exhibits L-1 and L-2.

"**Confirmation Order**" shall have the meaning assigned to such term in the recitals.

"**Consolidated Cash Interest Expense**" shall mean, for any period, the total consolidated cash interest expense of the Issuer and its Consolidated Subsidiaries for such period (calculated without regard to any limitations on the payment thereof, commitment fees, letter of credit fees and net amounts payable under Interest Rate Agreements) determined in accordance

with GAAP plus, without duplication, (a) the portion of Capital Lease Obligations of the Issuer and its Consolidated Subsidiaries representing the interest factor for such period, and (b) imputed interest on Attributable Indebtedness. Consolidated Cash Interest Expense shall be calculated on a Pro Forma Basis to give effect to any Indebtedness incurred, assumed or permanently repaid or extinguished during the relevant Test Period in connection with any Permitted Acquisitions and Asset Sales (other than any Asset Sale pursuant to Section 6.05(b)(ii), Section 6.05(b)(iii), Section 6.05(d), Section 6.05(i) or Section 6.05(j) and other dispositions in the ordinary course of business) as if such incurrence, assumption, repayment or extinguishing had been effected on the first day of such period. Notwithstanding the foregoing, for calculations in connection with any Test Period ending on or prior to September 30, 2006, Consolidated Cash Interest Expense for: the fiscal quarter ending March 31, 2005 shall be deemed to equal $[_____], for the fiscal quarter ending June 30, 2005 shall be deemed to equal $[_____], and for the fiscal quarter ending September 30, 2005 shall be deemed to equal $[_____].

"**Consolidated Current Assets**" means, at any date of determination, the total assets of the Issuer and its Consolidated Subsidiaries which may properly be classified as current assets on a consolidated balance sheet of the Issuer and its Consolidated Subsidiaries in accordance with GAAP.

"**Consolidated Current Liabilities**" means, at any date of determination, the total liabilities of the Issuer and its Consolidated Subsidiaries which may properly be classified as current liabilities (other than the current portion of any Notes) on a consolidated balance sheet of the Issuer and its Consolidated Subsidiaries in accordance with GAAP.

"**Consolidated EBITDA**" shall mean, for any period, (a) Consolidated Net Income for such period for the Issuer and its Consolidated Subsidiaries, plus, (b) to the extent deducted in determining such Consolidated Net Income for such period, the sum of:

     (i)     the amount of Consolidated Cash Interest Expense plus any non-cash interest expense,

     (ii)     provision for taxes based on income,

     (iii)     amortization expense,

     (iv)     depreciation expense,

     (v)     non-cash write-offs of goodwill and intangibles,

     (vi)     non-cash stock compensation expenses,

     (vii)     all other non-cash items (excluding any non-cash charge that results in an accrual or a reserve for cash charges in any future period);

     (viii)     professional fees and other expenses directly relating to the Cases and the Transactions;

(ix)    inventory credits to customers recorded pursuant to written agreements (a) existing as of the Closing Date or (b) approved by the Note Agent,[3] and

(x)    restructuring expenses reasonably acceptable to the Note Agent;

**plus** (x) any cash recoveries generated from the administrative proceedings of Atkins Nutritionals (UK) Limited or from the wind down of Atkins Nutritionals PTY LTD, (y) subtracting from Consolidated Net Income for such period the sum of the aggregate amount of all non-cash items, determined on a consolidated basis, to the extent such items increased Consolidated Net Income for such period. [Other than for purposes of calculating Excess Cash Flow,] Consolidated EBITDA shall be calculated on a Pro Forma Basis to give effect to any Permitted Acquisition and Asset Sales (other than any Asset Sale pursuant to Section 6.05(b)(ii), Section 6.05(b)(iii), Section 6.05(d), Section 6.05(i) or Section 6.05(j) and other dispositions in the ordinary course of business) consummated during the fiscal period of the Issuer ended on the last day of the Test Period thereof as if each such Permitted Acquisition had been effected on the first day of such period and as if each such Asset Sale had been consummated on the day prior to the first day of such period. Notwithstanding the foregoing, for calculations in connection with any Test Period ending on or prior to [September 30, 2006], Consolidated EBITDA for the fiscal quarter ending March 31, 2005 shall be deemed to equal $[_____], for the fiscal quarter ending June 30, 2005 shall be deemed to equal $[_____], for the fiscal quarter ending September 30, 2005 shall be deemed to equal $[_____].

"**Consolidated Funded Debt**" shall mean, at any date, all Funded Debt of the Issuer and its Subsidiaries on a consolidated basis.

"**Consolidated Indebtedness**" shall mean, as at any date of determination, the aggregate amount of all Indebtedness (but including in any event the then outstanding principal amount of all Notes and all Capital Lease Obligations) of the Issuer and its Consolidated Subsidiaries on a consolidated basis as determined in accordance with GAAP.

"**Consolidated Interest Coverage Ratio**" shall mean, for any Test Period, the ratio of (x) Consolidated EBITDA for such Test Period to (y) Consolidated Cash Interest Expense for such Test Period.

"**Consolidated Net Income**" shall mean, for any period, the consolidated net income (or loss) of the Issuer and its Consolidated Subsidiaries determined in accordance with GAAP, but excluding in any event (a) after-tax extraordinary gains or extraordinary losses; (b) after-tax gains or losses realized from (i) the acquisition of any securities, or the extinguishment of any Indebtedness, of the Issuer or any of its Subsidiaries or (ii) any Asset Sale; (c) net earnings or loss of any other Person (other than a Subsidiary of the Issuer) in which the Issuer or any Consolidated Subsidiary has an ownership interest, except (in the case of any such net

---

[3] Company please provide update as to current status of inventory credits.

earnings) to the extent such net earnings shall have actually been received by the Issuer or such Consolidated Subsidiary (subject to the limitation in clause (d) below) in the form of cash dividends or distributions; (d) the net income (or loss) of any Consolidated Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Consolidated Subsidiary of its net income is not at the time of determination permitted without approval, under applicable law or regulation or under such Consolidated Subsidiary's Organizational Documents or any agreement or instrument applicable to such Consolidated Subsidiary or its stockholders; (e) gains or losses from the cumulative effect of any change in accounting principles; (f) earnings or losses resulting from any reappraisal, revaluation or write-up or write-down of assets; and (g) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Issuer or any Consolidated Subsidiary or is merged into or consolidated with the Issuer or any Consolidated Subsidiary or that Person's assets are acquired by the Issuer or such Consolidated Subsidiary.

"**Consolidated Subsidiary**" shall mean, as to any Person, all [Domestic][4] Subsidiaries of such Person which are consolidated with such Person for financial reporting purposes in accordance with GAAP.

"**Contested Collateral Lien Conditions**" shall mean, with respect to any Permitted Lien of the type described in Section 6.02(a), (b) and (f), the following conditions:

(a)     the Issuer shall be contesting such Lien in good faith;

(b)     to the extent such Lien is in an amount in excess of $[_____], the appropriate Note Party shall maintain reserves in accordance with GAAP; and

(c)     such Lien shall in all respects be subject and subordinate in priority to the Liens and security interests created and evidenced by the Security Documents except if and to the extent that the law or regulation creating, permitting or authorizing any such Lien provides that such Lien is or must be superior to the Liens, and security interests created and evidenced by the Security Documents.

"**Contingent Obligation**" shall mean, as to any Person, any obligation, agreement, understanding or arrangement of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (a) to purchase any such primary obligation or any Property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary

---

[4] Discuss inclusion/exclusion of foreign subsidiaries.

obligor to make payment of such primary obligation; (d) with respect to bankers' acceptances and letters of credit, until a reimbursement obligation arises (which obligation shall constitute Indebtedness); or (e) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; <u>provided</u>, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or any product warranties for deposit or collection in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable, whether severally or jointly, pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the term "**Controlled**" shall have a meaning correlative thereto.

"**Currency Agreement**" shall mean any foreign exchange contract, currency swap agreement or other similar agreement.

"**CVR Agreement**" shall mean the Contingent Value Rights Agreement entered into by Parent with [_____], as trustee, on the Closing Date.

"**Debtors**" shall have the meaning assigned to such term in the <u>recitals</u>.

"**Debt Issuance**" shall mean the incurrence by the Parent, the Issuer or any of their Subsidiaries of any Indebtedness after the Closing Date (other than as permitted by <u>Section 6.01</u>).

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Deposit Account**" shall mean a demand, time, savings, passbook or similar account maintained with a Person engaged in the business of banking, including a savings bank, savings and loan association, credit union or trust company.

"**DIP Credit Agreement**" shall have the meaning assigned to such term in the <u>recitals</u>.

"**DIP Obligations**" shall mean the obligations owing under the DIP Credit Agreement.

"**Disclosure Statement**" shall mean [_____].

10

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise; or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the first anniversary of the Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in clause (a) above, in each case at any time prior to the first anniversary of the Maturity Date, or (c) contains any repurchase obligation which may come into effect prior to payment in full of all Obligations (other than pursuant to a change of control or asset disposition as long as such repurchase obligation is subject and subordinate to repayment of the Notes and other Obligations) on terms satisfactory to the Note Agent.

"**Dividend**" shall mean, with respect to any Person, any declaration or payment of a dividend by such Person or return on any equity capital to the holders of such Person's Equity Interests or authorization or making of any other distribution, payment or delivery of Property or cash to the holders of such Person's Equity Interests as such, or the redemption, retirement, purchase or other acquisition, directly or indirectly, for a consideration of any shares of any class of such Person's Equity Interests outstanding (or any options or warrants issued by such Person with respect to its Equity Interests), or the setting aside of any funds for any of the foregoing purposes, or such Person shall have permitted any of its Subsidiaries to purchase or otherwise acquire for a consideration any shares of any class of Equity Interests of such Person outstanding (or any options or warrants issued by such Person with respect to its Equity Interests). Without limiting the foregoing, "Dividends" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**Dollars**" or "**$**" shall mean lawful money of the United States.

"**Domestic Subsidiary**" shall mean each Subsidiary that is not a Foreign Subsidiary.

"**Enforcement Action**" shall mean the exercise by an Agent and/or the Noteholders of any rights or remedies after an Event of Default as set forth in Section 11.09(a).

"**Environment**" shall mean ambient air, surface water and groundwater (including, without limitation, potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, the workplace or as otherwise defined in any Environmental Law.

"**Environmental Claim**" shall mean any claim, notice, demand, order, action, suit, proceeding or other communication alleging liability for investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, Property damage, fines, penalties or other costs resulting from, related to or arising out of (a) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (b) any violation of Environmental Law, and shall include, without limitation, any

11

claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to health, safety or the Environment.

"**Environmental Law**" shall mean any and all applicable present and future treaties, laws, statutes, ordinances, regulations, rules, decrees, orders, judgments, consent orders, consent decrees or other binding requirements relating to the Environment, the Release or threatened Release of Hazardous Material, natural resources or natural resource damages, or occupational safety or health.

"**Environmental Permit**" shall mean any permit, license, approval, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"**Equipment**" shall have the meaning assigned to such term in the Security Agreement.

"**Equity Documents**" shall mean the Restated Certificate of Incorporation, the Registration Rights Agreement, the CVR Agreement and the Management Incentive Plan.

"**Equity Interest**" shall mean, with respect to any Person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or non-voting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, such partnership, whether outstanding on the date hereof or issued after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**Equity Issuance**" shall mean, without duplication, any issuance or sale by any Person of (a) any Equity Interests (including any Equity Interests issued upon exercise of any warrant or option) or any warrants or options to purchase Equity Interests or (b) any other security or instrument representing an Equity Interest (or the right to obtain any Equity Interest) in the issuing or selling Person.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that, together with the Issuer, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived by regulation); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, the failure to make by its due date a required installment under Section 412(m) of the Code with respect to any Plan or the failure to make any required

12

contribution to a Multiemployer Plan; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Company or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Company or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (f) the incurrence by any Company or any of its ERISA Affiliates of any liability with respect to the withdrawal from any Plan or Multiemployer Plan; (g) the receipt by any Company or its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) the making of any amendment to any Plan which could result in the imposition of a lien or the posting of a bond or other security; and (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in liability to any Company.

"**Event of Default**" shall have the meaning assigned to such term in <u>Article VIII</u>.

["**Excess Cash Flow**" shall mean, for any Fiscal Year of the Issuer, the sum, without duplication, of

(a)     Consolidated EBITDA for such Fiscal Year, <u>plus</u>

(b)     cash gains excluded from Consolidated Net Income, <u>plus</u>

(c)     reductions to non-cash working capital of the Issuer and its Consolidated Subsidiaries for such Fiscal Year (*i.e.*, the decrease, if any, in Consolidated Current Assets <u>minus</u> Consolidated Current Liabilities from the beginning to the end of such Fiscal Year), <u>minus</u>

(d)     the amount of any cash income taxes paid or payable by the Issuer and its consolidated Subsidiaries with respect to such Fiscal Year, net of any cash tax refunds received or receivable by the Issuer or any of its Subsidiaries in such Fiscal Year, <u>minus</u>

(e)     cash interest paid by the Issuer and its Consolidated Subsidiaries during such Fiscal Year, <u>minus</u>

(f)     the aggregate amount of cash Acquisition Consideration from Internally Generated Funds expended during such Fiscal Year for Permitted Acquisitions, <u>minus</u>

(g)     permanent repayments and prepayments of Indebtedness made by the Issuer and its Consolidated Subsidiaries during such Fiscal Year to the extent funded with Internally Generated Funds, <u>minus</u>

(h)     extraordinary cash losses from the sale of assets during such Fiscal Year and not included in Consolidated Net Income, <u>minus</u>

13

(i)     additions to noncash working capital for such Fiscal Year (*i.e.*, the increase, if any, in Consolidated Current Assets <u>minus</u> Consolidated Current Liabilities from the beginning to the end of such Fiscal Year); <u>plus</u>

(j)     all cash proceeds of asset sales under <u>Section 6.05(k)</u> during such Fiscal Year;

<u>provided</u>, that to the extent otherwise included therein, the Net Cash Proceeds of Asset Sales (other than under <u>Section 6.05(k)</u>) and Casualty Events shall be deducted in calculating Excess Cash Flow.]

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Excluded Taxes**" shall mean, with respect to the Note Agent, any Noteholder, or any other recipient of any payment to be made by or on account of any obligation of the Issuer hereunder, (a) income or franchise taxes imposed on (or measured by) its net income and any backup withholding Taxes, in each case imposed by the United States, or by any Governmental Authority as a result of a present or former connection (including location of such Person's principal office or, in the case of any Noteholder, location of its applicable lending office) between the recipient and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Note Agent or such Noteholder having executed or delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Note Document), (b) any branch profits taxes imposed by the United States or any similar Tax imposed by any other jurisdiction described in clause (a) above or (c) in the case of a Foreign Noteholder (other than an assignee pursuant to a request by the Issuer under <u>Section 2.11(e)</u>), any withholding tax that is imposed on amounts payable to such Foreign Noteholder at the time such Foreign Noteholder becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Noteholder's failure to comply with <u>Section 2.11(e)</u>, except to the extent that such Foreign Noteholder (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Issuer with respect to such withholding tax pursuant to <u>Section 2.11(a)</u> (it being understood and agreed, for the avoidance of doubt, that any withholding tax imposed on a Foreign Noteholder as a result of a Change in Law or regulation or interpretation thereof occurring after the time such Foreign Noteholder became a party to this Agreement shall not be an Excluded Tax).

"**Existing Lien**" shall have the meaning assigned to such term in <u>Section 6.02(c)</u>.

"**Exit Facility**" shall mean the $20,000,000 revolving credit facility entered into on the Closing Date among the Issuer, certain Affiliates of the Issuer, the Senior Debt Agent and the Senior Lenders, and any refinancing thereof effected in accordance with the terms of this Agreement.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a

14

Business Day, the average of the quotations for the day for such transactions received by the Note Agent from three federal funds brokers of recognized standing selected by it.

"**Fee Letter**" shall mean the confidential Fee Letter, dated [_____], 2005, among the Note Agent and the Issuer with respect to certain fees to be paid from time to time by the Issuer to the Note Agent.

"**Final Order**" shall mean an order or judgment of a court of competent jurisdiction, which has been signed by the Bankruptcy Court and entered on the docket maintained by the clerk of such court, and which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

"**Financial Officer**" shall mean, with respect to any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person.

"**FIRREA**" shall mean the Federal Institutions Reform, Recovery and Enforcement Act of 1989.

"**First Anniversary**" shall mean the first anniversary of the Closing Date.

"**First Lien Claims**" has the meaning set forth in the Plan of Reorganization.

"**Fiscal Year**" shall mean [_____][5].

"**Foreign Noteholder**" shall mean any Noteholder that is not, for U.S. federal income tax purposes, (a) a citizen or resident of the United States, (b) a corporation or entity treated as a corporation created or organized in or under the laws of the United States, or any political subdivision thereof, (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States Persons have the authority to control all substantial decisions of such trust.

---

[5] Definition to conform to Company's 4/4/5 accounting.

NYDOCS/1230942.8

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Company with respect to employees employed outside the United States.

"**Foreign Subsidiary**" shall mean a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any state thereof or the District of Columbia.

"**Funded Debt**" shall mean all Indebtedness of the Issuer or another specified Person which is payable more than one year from the date of creation thereof and shall include (a) current maturities of such Indebtedness and (b) all Indebtedness consisting of reimbursement obligations with respect to letters of credit other than letters of credit issued to finance inventory purchases or to secure other debt appearing on the balance sheet of the obligor.

"**GAAP**" shall mean generally accepted accounting principles in the United States applied on a consistent basis.

"**Governmental Authority**" shall mean any federal, state, local or foreign court, central bank or governmental agency, authority, instrumentality or regulatory body.

"**Governmental Real Property Disclosure Requirements**" shall mean any Requirement of Law of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including, without limitation, any transfer of control) of any Real Property, facility, establishment or business, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling of Hazardous Material on, at, under or near the Real Property, facility, establishment or business to be sold, leased, mortgaged, assigned or transferred.

"**Group**" shall mean a syndicate or group of Persons that is considered to be a "person" for purposes of Section 13(d)(3) of the Exchange Act.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in Section 7.01.

"**Guarantees**" shall mean the guarantees issued pursuant to Article VII by the Guarantors.

"**Guarantors**" shall mean the Parent and the Subsidiary Guarantors.

"**Hazardous Materials**" shall mean the following: hazardous substances; hazardous wastes; polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs; asbestos or any asbestos-containing materials in any form or condition; radon or any other radioactive materials including any source, special nuclear or by product material; petroleum, crude oil or any fraction thereof; and any other pollutant or contaminant or chemicals, wastes, materials, compounds, constituents or substances, subject to regulation or which can give rise liability under any Environmental Laws.

16

"**Hedging Agreement**" shall mean any Interest Rate Agreement, Currency Agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement, in each case entered into in the ordinary course of business and not for speculative purposes.

"**Hedging Obligations**" shall mean, with respect to any Person, all liabilities of such Person under Hedging Agreements.

"**Holdco**" shall mean Atkins Nutritionals Holdings II, Inc., a Delaware corporation, which shall be merged into the Issuer prior to the Closing Date.

"**Indebtedness**" shall mean, with respect to any Person, without duplication, (a) all obligations of such Person for borrowed money or advances; (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such Person upon which interest charges are customarily paid or accrued; (d) all obligations of such Person under conditional sale or other title retention agreements relating to Property purchased by such Person; (e) all obligations of such Person issued or assumed as the deferred purchase price of Property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on Property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed; (g) all Capital Lease Obligations, Purchase Money Obligations and synthetic lease obligations of such Person; (h) all obligations of such Person in respect of Interest Rate Agreements and Currency Agreements to the extent required to be reflected on a balance sheet of such Person; (i) all Attributable Indebtedness of such Person; (j) all obligations for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; and (k) all Contingent Obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (j) above. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent that terms of such Indebtedness provide that such Person is not liable therefor.

"**Indemnitee**" shall have the meaning assigned to such term in Section 10.03(b).

"**Information**" shall have the meaning assigned to such term in Section 10.12.

"**Intellectual Property**" shall have the meaning assigned to such term in Section 3.07(a).

"**Intercompany Note**" shall mean a promissory note substantially in the form of Exhibit J.

"**Intercreditor Agreement**" shall mean an agreement substantially in the form of Exhibit M.

17

"**Interest Period Election Request**" shall mean a request by the Issuer to elect an Interest Period.

"**Interest Period**" shall mean, (a) initially, the period commencing on the date the Notes are issued to the Noteholders and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter, as selected by the Issuer by written notice given to the Note Agent at least two Business Days prior to the Closing Date, and (b) thereafter, a period commencing on the last day of the immediately preceding Interest Period therefore and ending one, two, three or six months thereafter, as selected by the Issuer by written notice given to the Note Agent pursuant to Section 2.07; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.

"**Interest Rate Agreement**" shall mean any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement or similar agreement or arrangement.

"**Internally Generated Funds**" shall mean funds not constituting the proceeds of any Loan, Debt Issuance (without regard to the parenthetical phrase in the definition thereof), Preferred Stock Issuance, Equity Issuance (without regard to the proviso in the definition thereof), Asset Sale, insurance recovery or Indebtedness.

"**Inventory**" shall mean all "inventory," as such term is defined in the UCC as in effect on the date hereof in the State of New York, wherever located, in which any Person now or hereafter has rights.

"**Investments**" shall have the meaning assigned to such term in Section 6.04.

"**Issuer**" shall have the meaning assigned to such term in the preamble.

"**Joinder Agreement**" shall mean that certain joinder agreement substantially in the form of Exhibit E.

"**Landlord Access Agreement**" shall have the meaning assigned to such term in Section 5.14.

"**Leases**" shall mean any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property.

18

"**Letter of Credit**" shall mean any commercial letter of credit or standby letter of credit issued or to be issued by an issuing lender for the account of the Issuer or any of its Subsidiaries pursuant to the Exit Facility.

"**Letter of Credit Outstandings**" shall mean, on any date, an amount equal to the sum of (a) the then aggregate amount which is undrawn and available under all issued and outstanding Letters of Credit and (b) the then aggregate outstanding amount of all reimbursement obligations of the Issuer and its Subsidiaries under all Letters of Credit.

"**Leverage Ratio**" shall mean, at any date of determination, the ratio of Consolidated Indebtedness on such date to Consolidated EBITDA for the Test Period then most recently ended.

"**LIBOR Rate**" shall mean, with respect to any Note for any Interest Period therefor, the rate per annum determined by the Note Agent to be the arithmetic mean (rounded to the nearest 1/100th of 1%) of the offered rates for deposits in dollars with a term comparable to such Interest Period that appears on the Telerate British Bankers Assoc. Interest Settlement Rates Page (as defined below) at approximately 11:00 a.m., London, England time, on the second full Business Day preceding the first day of such Interest Period; provided, that (i) if no comparable term for an Interest Period is available, the LIBOR Rate shall be determined using the weighted average of the offered rates for the two terms most nearly corresponding to such Interest Period and (ii) if there shall at any time no longer exist a Telerate British Bankers Assoc. Interest Settlement Rates Page, "LIBOR Rate" shall mean, with respect to each day during each Interest Period pertaining to a Note comprising part of the same issuance, the rate per annum equal to the rate at which the Note Agent is offered deposits in dollars at approximately 11:00 a.m., London, England time, two Business Days prior to the first day of such Interest Period in the London interbank market for delivery on the first day of such Interest Period for the number of days comprised therein and in an amount comparable to its portion of the amount of such issuance to be outstanding during such Interest Period.  "**Telerate British Bankers Assoc. Interest Settlement Rates Page**" shall mean the display designated as Page 3750 on the Telerate System Incorporated Service (or such other page as may replace such page on such service for the purpose of displaying the rates at which dollar deposits are offered by leading banks in the London interbank deposit market).

"**Lien**" shall mean, with respect to any Property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, claim, charge, assignment, hypothecation, security interest or encumbrance of any kind, any other type of preferential arrangement in respect of such Property or any filing of any financing statement under the UCC or any other similar notice of Lien under any similar notice or recording statute of any Governmental Authority, including any easement, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law, and any agreement to give any of the foregoing; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such Property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Lock-Up Agreement**" shall mean [_____].

19

"**Management Incentive Plan**" shall mean [_____].

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on the business, Property, results of operations, prospects or condition, financial or otherwise, of the Issuer and the Subsidiaries, taken as a whole; (b) material impairment of the ability of the Note Parties to fully and timely perform any of their obligations under any Note Document; (c) material impairment of the rights of or benefits or remedies available to the Noteholders or the Collateral Agent under any Note Document; or (d) a material adverse effect on the Liens in favor of the Collateral Agent (for its benefit and for the benefit of the other Secured Parties) on the Collateral or the priority of such Liens.

"**Material Indebtedness**" shall mean any Indebtedness (other than the Notes), or obligations in respect of one or more Hedging Agreements, of any Note Party evidencing an aggregate outstanding principal amount exceeding [_____].  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of such Note Party in respect of any Hedging Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Note Party would be required to pay if such Hedging Agreement were terminated at such time.

"**Maturity Date**" shall mean [December 31, 2010].

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.13.

"**Moody's**" has the meaning assigned to such term in the definition of "Cash Equivalents."

"**Mortgage**" shall mean an agreement, including, but not limited to, a mortgage, deed of trust or any other document, creating and evidencing a Lien on a Mortgaged Property, which shall be in a form reasonably satisfactory to the Collateral Agent, with such schedules and including such provisions as shall be necessary to conform such document to applicable local or foreign law or as shall be customary under applicable local or foreign law.

"**Mortgaged Property**" shall mean each Real Property, if any, which shall be subject to a Mortgage delivered after the Closing Date pursuant to Section 5.11(d).

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA (a) to which any Company or any ERISA Affiliate is then making or accruing an obligation to make contributions or (b) to which any Company or any ERISA Affiliate has within the preceding five plan years made contributions.

"**Net Cash Proceeds**" shall mean:

(a)     with respect to any Asset Sale, the cash proceeds received by any Note Party (including cash proceeds subsequently received (as and when received by any Note Party) in respect of noncash consideration initially received) net of (i) selling expenses (including

reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and the Issuer's good faith estimate of income taxes paid or payable in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP, against any liabilities under any indemnification obligations associated with such Asset Sale (provided, that to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds); (iii) the Issuer's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the assets sold within 90 days of such Asset Sale (provided, that to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 90 days of such Asset Sale, such cash proceeds shall constitute Net Cash Proceeds); and (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness which is secured by a Lien on the asset sold in such Asset Sale (so long as such Lien was a Permitted Lien) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such asset);

(b)     with respect to any Debt Issuance, or any issuance of Equity Interests, the cash proceeds thereof, net of customary fees, commissions, costs and other expenses incurred in connection therewith; and

(c)     with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received in respect thereof, net of all reasonable costs and expenses incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event.

"**Non-Guarantor Subsidiary**" shall mean each Subsidiary that is not a Subsidiary Guarantor.

"**Non-Consenting Noteholder**" has the meaning set forth in Section 10.02(c).

"**Notes**" shall mean any notes issued pursuant to this Agreement, substantially in the form of Exhibit F.

"**Note Agent**" shall have the meaning assigned to such term in the preamble and includes each other Person appointed as the successor pursuant to Article X.

"**Note Documents**" shall mean (a) this Agreement, the Notes, the Security Documents, the Intercreditor Agreement, the Fee Letter, (b) any other agreement, instrument or document evidencing, securing or guaranteeing any Obligations or the Collateral and (c) any other agreement, instrument or document designated by the Issuer and the Note Agent as a "**Note Document**."

"**Note Parties**" shall mean the Issuer and the Guarantors; and "Note Party" shall mean any one of the Issuer and the Guarantors.

"**Noteholder Addendum**" shall mean with respect to any Noteholder, a Noteholder addendum in the form of Exhibit K to be executed and delivered by such Noteholder as set forth in Section 10.15.

"**Noteholder Affiliate**" shall mean with respect to any Noteholder that is a fund that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor as such Noteholder, or by an Affiliate of such advisor.

"**Noteholders**" shall mean (a) the financial institutions that have become a party hereto pursuant to a Noteholder Addendum (other than any such financial institution that has ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any financial institution that has become a party hereto pursuant to an Assignment and Acceptance.

"**Notice of Conversion or Continuation**" has the meaning set forth in Section 2.07.

"**Obligations**" shall mean the Notes and all other amounts, obligations, covenants and duties owing by the Issuer to the Note Agent, any Noteholder, any Affiliate of any of them or any Indemnitee, of every type and description (whether by reason of a guaranty, indemnification, interest rate hedging transaction or otherwise), present or future, arising under this Agreement, any other Note Document, any agreement for cash management services entered into in connection with this Agreement or any other Note Document, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired and whether or not evidenced by any note, guaranty or other instrument or for the payment of money, and includes all fees, interest, charges, expenses, attorneys' fees and disbursements and other sums chargeable to the Issuer under this Agreement, any other Note Document, any Hedging Agreement or any agreement for cash management services entered into in connection with this Agreement or any other Note Document.

"**Officers' Certificate**" shall mean a certificate executed by the chairman of the Board of Directors of the Issuer (if an officer of the Issuer), the chief executive officer or the President of the Issuer and, solely for the purposes of certifying pro forma compliance with Section 6.08 in connection with a Permitted Acquisition, one of the Financial Officers, in each case in his or her official (and not individual) capacity.

"**Organizational Documents**" shall mean, with respect to any Person, (a) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (b) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (e) in any other case, the functional equivalent of the foregoing.

"**Other Taxes**" shall mean any and all present or future stamp or documentary taxes or any other excise or Property taxes, charges or similar levies (including interest, fines, penalties and additions to tax) arising from any payment made or required to be made under any Note Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Note Document.

"**Parent**" shall have the meaning assigned to such term in the recitals.

"**Parent Shares**" means shares of the Parent's Common Stock, $0.01 par value per share.

"**Participant**" shall have the meaning assigned to such term in Section 10.04(e).

"**Payment In Full**" or "**Paid In Full**" shall mean, in relation to Senior Debt, (a) payment in full in cash of all obligations (other than Letter of Credit Outstandings described in clause (a) of such defined term, but including all reimbursement and indemnification obligations to the extent then due and payable) of the Issuer owing to the Senior Debt Agent and the Senior Lenders, (b) either the termination of all Letters of Credit or delivery by the Issuer of cash collateral or back-up letters of credit issued by a bank reasonably acceptable to the Senior Debt Agent, covering all Letter of Credit Outstandings described in clause (a) of such defined term, and (c) the termination of all commitments to extend credit under the Exit Facility.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation.

"**Perfection Certificate**" shall mean a certificate in the form of Exhibit G-1 or any other form approved by the Collateral Agent and the Issuer, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"**Perfection Certificate Supplement**" shall mean a certificate supplement in the form of Exhibit G-2 or any other form approved by the Collateral Agent.

"**Permitted Acquisition**" shall mean, with respect to the Issuer or any Subsidiary Guarantor, any transaction or series of related transactions for the (a) direct or indirect acquisition of all or substantially all of the Property of any other Person, or of any business or division of any other Person; (b) direct or indirect acquisition of in excess of 50% of the Equity Interests of any other Person, or otherwise causing any other Person to become a Subsidiary of such Person; or (c) merger or consolidation or any other combination with any other Person (other than the Issuer or any Subsidiary Guarantor), if each of the following conditions are met:

(i) no Default then exists or would result therefrom;

(ii) after giving effect to such acquisition on a Pro Forma Basis, (A) the Issuer shall be in compliance with all covenants set forth in Section 6.08 as of the most recent Test Period (assuming, for purposes of Section 6.08, that such acquisition, and all other Permitted Acquisitions consummated since the first day of the relevant Test Period for each of the financial covenants set forth in Section 6.08 ending on or prior to the date of such acquisition, had occurred on the first day of such relevant Test Period), and (B) unless expressly approved by the Note Agent, the Issuer shall have generated positive cash flow for the Test Period most recently ended prior to the date of consummation of such acquisition;

(iii) no Company shall, in connection with any such acquisition, assume or remain liable with respect to any Indebtedness or other liability

23

(including any material tax or ERISA liability) of the related seller or the business, Person or assets acquired, except (A) to the extent permitted under Section 6.01 and (B) obligations not constituting Indebtedness incurred in the ordinary course of business and necessary or desirable to the continued operation of the underlying properties, and any other such liabilities or obligations not permitted to be assumed or otherwise supported by any Company hereunder shall be paid in full or released as to the business, Persons or assets being so acquired on or before the consummation of such acquisition;

(iv) the acquired Person shall be engaged in a business of the type that the Issuer and the Subsidiaries are permitted to be engaged in under Section 6.14 or activities incidental or reasonably related or complementary thereto and the Property acquired in connection with any such acquisition shall be made subject to the Lien of the Security Documents to the extent required by Section 5.11 and shall be free and clear of any Liens, other than Permitted Liens;

(v) the Board of Directors of the Person to be acquired shall not have indicated publicly its opposition to the consummation of such acquisition;

(vi) all transactions in connection therewith shall be consummated in accordance with all applicable laws of all applicable Governmental Authorities;

(vii) with respect to any acquisition involving Acquisition Consideration of more than $[_____], unless the Note Agent shall otherwise agree, the Issuer shall have provided the Note Agent and the Noteholders with (A) historical financial statements for the last three Fiscal Years (or, if less, the number of years since formation) of the Person or business to be acquired (audited if available without undue cost or delay) and unaudited financial statements thereof for the most recent interim period which are available, (B) reasonably detailed projections for the succeeding five years pertaining to the Person or business to be acquired and updated projections for the Issuer after giving effect to such acquisition, (C) a reasonably detailed description of all material information relating thereto and copies of all material documentation pertaining to such acquisition, and (D) all such other information and data relating to such acquisition or the Person or business to be acquired as may be reasonably requested by the Note Agent or the Required Noteholders;

(viii) at least 10 Business Days prior to the proposed date of consummation of the acquisition, the Issuer shall have delivered to the Agents and the Noteholders an Officers' Certificate executed and delivered by signatories referenced in the definition thereof certifying that (A) such acquisition complies with this definition (which shall have attached thereto reasonably detailed backup data and calculations showing such compliance), and (B) such acquisition could not reasonably be expected to result in a Material Adverse Effect;

NYDOCS/1230942.8

(ix) the Acquisition Consideration for such acquisition shall not exceed $[_____], and the aggregate amount of the Acquisition Consideration for all Permitted Acquisitions since the Closing Date shall not exceed $[_____]; and

(x) if the acquisition involves clause (b) or (c) of this definition, the Person acquired merges with or into the Issuer or a Subsidiary Guarantor or becomes substantially contemporaneously with such acquisition a Subsidiary Guarantor.

"**Permitted Collateral Liens**" shall have the meaning assigned to such term in the Security Agreement.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**Person**" shall mean any natural Person, corporation, business, trust, joint venture, association, company, limited liability company, partnership or government, or any agency or political subdivision thereof, in any case, whether acting in a personal, fiduciary or other capacity.

"**Petition Date**" shall have the meaning assigned to such term in the recitals.

"**PIK Tranche A Note**" has the meaning set forth in Section 2.05(c).

"**Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA which is maintained or contributed to by any Company or its ERISA Affiliate or with respect to which any Company could incur liability.

"**Plan of Reorganization**" shall have the meaning assigned to such term in the recitals.

"**Preferred Stock**" shall mean, with respect to any Person, any and all preferred or preference Equity Interests (however designated) of such Person whether now outstanding or issued after the Closing Date.

"**Preferred Stock Issuance**" shall mean the issuance or sale of any Preferred Stock.

"**Prepetition Agent**" shall mean UBS, in its capacity as Administrative Agent for the Prepetition Lenders under the Prepetition Credit Agreement.

"**Prepetition Credit Agreement**" shall have the meaning assigned to such term in the recitals.

"**Prepetition Lenders**" shall mean the lenders from time to time party to the Prepetition Credit Agreement.

"**Prepetition Obligations**" shall mean the "Obligations" as such term is defined in the Prepetition Credit Agreement.

"**Pro Forma Basis**" shall mean on a basis in accordance with Article 11 of Regulation S-X or otherwise reasonably satisfactory to the Note Agent.

"**Proceeding**" shall mean, as the context shall require, with respect to any Person, any (a) insolvency, bankruptcy, receivership, reorganization, readjustment, composition or other similar proceeding relating to such Person or its Property or creditors in such capacity, (b) proceeding for any liquidation, dissolution or other winding-up of such Person, voluntary or involuntary, whether or not involving insolvency or proceedings under the Bankruptcy Code, whether partial or complete and whether by operation of law or otherwise, (c) assignment for the benefit of creditors of such Person or (d) other marshalling of the assets of such Person.

"**Projections**" shall mean the projections attached as Exhibit C to the Disclosure Statement.

"**Property**" shall mean any right, title or interest in or to Property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests or other ownership interests of any Person and whether now in existence or owned or hereafter entered into or acquired, including, without limitation, all Real Property.

"**Proposed Change**" has the meaning set forth in Section 10.02(c).

"**Purchase Money Obligation**" shall mean, for any Person, the obligations of such Person in respect of Indebtedness incurred for the purpose of financing all or any part of the purchase price of any Property (including Equity Interests of any Person) or the cost of installation, construction or improvement of any Property or assets and any refinancing thereof; provided, that such Indebtedness is incurred within 90 days after such acquisition of such Property by such Person.

"**Qualified Capital Stock**" of any Person shall mean any Equity Interests of such Person that are not Disqualified Capital Stock.

"**Qualified IPO**" means an underwritten public offering pursuant to an effective registration statement under the Securities Act, covering the issuance, offer and sale of Parent Shares by the Parent but only if (x) the number of Parent Shares to be issued, offered and sold by the Parent in such public offering is equal to or greater than 25% of the number of Parent Shares then issued and outstanding; and (y) each of the underwriters participating in such public offering shall be obligated to buy on a "firm commitment" basis all Parent Shares that such underwriters shall have agreed to distribute.

"**Quarterly Payment Date**" shall mean the last day of each March, June, September and December, commencing with [_____], or if any such day is not a Business Day, the next succeeding Business Day.

NYDOCS/1230942.8

"**Ratable Portion**" shall mean, with respect to any Noteholder, the percentage obtained by dividing (a) the outstanding Notes of such Noteholder by (b) the aggregate Notes outstanding.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real Property owned, leased or operated by any Person, whether by lease, license or other shall mean, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other Property and rights incidental to the ownership, lease or operation thereof.

"**Register**" shall have the meaning assigned to such term in Section 10.04(c).

"**Registration Rights Agreement**" shall mean the Registration Rights Agreement entered into by the Parent and certain holders of its common stock on the Closing Date.

"**Regulation D**" shall mean Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation S-X**" shall mean Regulation S-X promulgated under the Securities Act.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Reorganization**" shall mean the reorganization of the Debtors described in the Plan of Reorganization.

"**Reorganization Securities**" has the meaning set forth in Section 11.02.

"**Required Noteholders**" shall mean, at any time, Noteholders having Notes representing more than 50% of the sum of all Notes outstanding at such time.

"**Requirements of Law**" shall mean, collectively, any and all requirements of any Governmental Authority including any and all laws, ordinances, rules, regulations or similar statutes or case law.

NYDOCS/1230942.8

"**Response**" shall mean (a) "response" as such term is defined in CERCLA, 42 U.S.C. § 9601(24), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to: (i) clean up, remove, treat, abate or in any other way address any Hazardous Material in the environment; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, clause (i) or (ii) above.

"**Responsible Officer**" shall mean, with respect to any corporation any executive officer or Financial Officer of such corporation, and any other officer or similar official thereof with responsibility for the administration of the obligations of such corporation in respect of this Agreement.

"**Restated Certificate of Incorporation**" shall mean [_____].

"**S&P**" shall have the meaning assigned to such term in the definition of "Cash Equivalents."

"**Sale and Leaseback Transaction**" shall have the meaning assigned to such term in Section 6.03.

"**Secured Parties**" shall mean [the Agents and the Noteholders].[6]

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Securities Collateral**" shall have the meaning assigned to such term in the Security Agreement.

"**Security Agreement**" shall mean a Security Agreement substantially in the form of Exhibit H among the Note Parties and Collateral Agent for the benefit of the Secured Parties.

"**Security Agreement Collateral**" shall mean all Property pledged or granted as collateral pursuant to the Security Agreement delivered on the Closing Date or thereafter pursuant to Section 5.11.

"**Security Documents**" shall mean the Security Agreement, the Mortgages, the Perfection Certificate and each other security document or pledge agreement delivered in accordance with applicable local or foreign law to grant a valid, perfected security interest in any Property, and all UCC or other financing statements or instruments of perfection required by this Agreement, the Security Agreement, any Mortgage or any such other security document or pledge agreement to be filed with respect to the security interests in Property and fixtures created pursuant to the Security Agreement or any Mortgage and any other document or instrument utilized to pledge as collateral for the Obligations any Property of whatever kind or nature.

---

[6] Definition may need to be conformed to include the Exit Facility lenders.

"**Senior Debt**" shall mean:

(a)     all principal of and interest and premium (if any) on the Senior Loans and Letter of Credit Outstandings, in each case made under the Exit Facility;

(b)     all Hedging Obligations incurred in compliance with this Agreement under an agreement to which the counterparty is (or at the time such agreement was entered into, was) a Senior Lender (or an Affiliate of a Senior Lender); and

(c)     all other amounts (including all fees, costs, expenses and indemnities) payable under the Exit Facility to the Senior Lenders;

provided, that the aggregate outstanding principal amount of Senior Debt (which shall include, for this purpose, all Letter of Credit Outstandings) (i) shall not exceed the greater of (A) $22,500,000 and (B) the sum of 65% of the book value of Inventory of the Issuer plus 65% of the book value of the Accounts of the Issuer at the time of incurrence, and (ii) shall not include any obligations which are incurred or outstanding in violation of this Agreement.  Senior Debt shall be considered outstanding until all Senior Debt has been Paid in Full.

"**Senior Debt Agent**" shall mean (a) UBS, as agent to the Senior Lenders under the Exit Facility, together with its successors and assigns, in such capacity or (b) any other financial institution designated by the holders of the Senior Debt (by providing written notice to the Noteholders of such designation) as the "Senior Debt Agent" for purposes of this Agreement.

"**Senior Debt Documents**" shall mean each of the documents, instruments and other agreements, including the Exit Facility, evidencing, guaranteeing or securing the Senior Debt (including all Loan Documents as such term is defined in the Exit Facility), as in effect on the Closing Date and as amended, supplemented, modified, extended, renewed, restated, refinanced or replaced from time to time in compliance with the terms hereof.

"**Senior Debt Non-Payment Default**" has the meaning set forth in Section 11.03(b).

"**Senior Debt Payment Default**" has the meaning set forth in Section 11.03(a).

"**Senior Lenders**" shall mean the holders of the Senior Debt.

"**Senior Loans**" shall mean the loans made by the Senior Lenders under the Exit Facility.

"**Senior Subordinated Debt**" means the Notes, and the payment of the principal of and interest and premium (if any) on the Notes, and all other obligations, indebtedness and liabilities due and payable by any Note Party to the Noteholders under any of the Note Documents other than any fees, costs or expenses paid by any Note Party on the Closing Date.

"**Statutory Reserves**" shall mean, for any Interest Period, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are

29

required to be maintained during such Interest Period under Regulation D by member banks of the United States Federal Reserve System in New York City with deposits exceeding one billion dollars against "Eurodollar liabilities" (as such term is used in Regulation D). Notes shall be deemed to constitute Eurodollar liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to any Noteholder under Regulation D.

"**Subsidiary**" shall mean, with respect to any Person (the "parent") at any date, (a) any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date and (b) any other corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Board of Directors thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent. Unless the context requires otherwise, "Subsidiary" refers to a subsidiary of the Issuer. [For the avoidance of doubt, Atkins Nutritionals (UK) Limited and [Atkins Nutritionals Australia] shall not be considered Subsidiaries of the Issuer for so long as they are in administrative proceedings.]

"**Subsidiary Guarantor**" shall mean each Subsidiary listed on Schedule 1.01(c), and each other Subsidiary that is or becomes a party to this Agreement pursuant to Section 5.11.

"**Taxes**" shall mean (a) any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges, whether computed on a separate, consolidated, unitary, combined or other basis and any and all liabilities (including interest, fines, penalties or additions to tax) with respect to the foregoing, and (b) any transferee, successor, joint and several, contractual or other liability (including, without limitation, liability pursuant to Treasury Regulation § 1.1502-6 (or any similar provision of state, local or non-U.S. law)) in respect of any item described in clause (a).

"**Tax Return**" shall mean all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

["**Test Period**" shall mean, at any time, the four consecutive fiscal quarters of the Issuer then last ended (in each case taken as one accounting period) for which financial statements have been or are required to be delivered pursuant to Section 5.01(a) or (b).][7]

"**Transaction Documents**" shall mean any and all agreements and other material documents entered into or delivered in connection with the Transactions, including but not limited to the Note Documents, the Senior Debt Documents and the Equity Documents.

---

[7] This definition will need further consideration in order to be consistent with Company's 4/4/5 accounting.

"**Transactions**" shall mean, collectively, the transactions to occur pursuant to the Transaction Documents, the Plan of Reorganization and the Confirmation Order, including (a) the execution, delivery and performance of the Note Documents and the issuance of the Notes hereunder; (b) the execution, delivery and performance of the Senior Debt Documents; (c) the distributions required to be made pursuant to and other transactions contemplated by the Plan of Reorganization; and (d) payment of all fees and expenses to be paid on the Closing Date and owing in connection with the foregoing.

"**UBS**" shall mean [UBS AG, Stamford Branch].

"**UCC**" shall mean the Uniform Commercial Code as in effect in the applicable state or jurisdiction.

"**U.S. Noteholder**" shall mean each Noteholder that is a United States person as defined in section 7701(a)(30) of the Code.

"**Wholly Owned Subsidiary**" shall mean, as to any Person, (a) any corporation 100% of whose capital stock (other than directors' qualifying shares) is at the time owned by such Person and/or one or more Wholly Owned Subsidiaries of such Person and (b) any partnership, association, joint venture, limited liability company or other entity in which such Person and/or one or more Wholly Owned Subsidiaries of such Person have a 100% equity interest at such time.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

**Section 1.02.**     **Terms Generally**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The term "manifest error" shall be deemed to include any clearly demonstrable error whether or not obvious on the face of document containing such error.  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (a) any definition of or reference to any Note Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (e) the words "asset" and "Property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

NYDOCS/1230942.8

**Section 1.03.** **Accounting Terms; GAAP**. Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP as in effect on the date hereof subject to the following sentence. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Note Document, and the Issuer, the Note Agent or the Required Noteholders shall so request, the Note Agent, the Noteholders and the Issuer shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to approval of the Required Noteholders); provided, that until so amended, such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change.

## ARTICLE II

## ISSUANCE OF NOTES; PAYMENTS; FEES; MISCELLANEOUS PROVISIONS

**Section 2.01.** **The Notes**. On the terms and subject to the conditions contained in this Agreement, and in order to give effect to the Plan of Reorganization, the Issuer has authorized the issuance of Notes to holders of Allowed First Lien Claims in accordance with Section 4.2 of the Plan of Reorganization, and on the Closing Date the Issuer agrees to issue Notes to the holders of Allowed First Lien Claims in the aggregate principal amount of $110,000,000. The aggregate amount of Notes to be issued to each Noteholder on the Closing Date is set forth on Schedule 2.01.

**Section 2.02.** **Repayment of Notes**.

(a)    The Issuer unconditionally promises to repay (in Cash, in full and in immediately available funds) the entire unpaid principal amount of the Notes and all accrued but unpaid interest thereon on the Maturity Date or such earlier date on which the Notes shall be due and payable pursuant to this Agreement.

(b)    The Issuer promises to repay the Notes on the dates and in the amounts set forth below (collectively, the "**Amortization Payments**"):

| Payment Date | Amortization Payment |
|---|---|
| On each Quarterly Payment Date from March 31, 2007 to December 31, 2007 | $500,000 |
| On each Quarterly Payment Date from March 31, 2008 and ending on or prior to the Maturity Date | $1,000,000 |
| On the Maturity Date | The remaining outstanding amount of the Notes |

32

Any Amortization Payment shall be deemed to be a payment first, of any PIK Tranche A Notes outstanding, and second a payment with respect to other Notes. All repayments shall be allocated among the Notes of each Noteholder in accordance with such Noteholder's Ratable Portion.

(c)    Any prepayment of a Note shall be applied in accordance with Section 2.08(g). Notwithstanding the foregoing, any prepayment of a Note made pursuant to <u>Section 2.08</u> (other than a prepayment under Section 2.08(f)) on a date that is (i) the last day of an Interest Period and (ii) no more than five days prior to a scheduled Amortization Payment pursuant to <u>Section 2.02</u> shall be applied, first, to reduce the next scheduled Amortization Payment, and any excess shall be applied as required by the preceding sentence.

**Section 2.03.    <u>Intentionally Omitted</u>**.

**Section 2.04.    <u>Fees</u>**. The Issuer agrees to pay to the Note Agent the fees set forth in the Fee Letter.

**Section 2.05.    <u>Interest</u>**. (a) Each Note shall bear interest on the aggregate outstanding principal amount thereof from the date of issuance of such Note until paid in full in Cash at a rate per annum equal to the Adjusted LIBOR Rate <u>plus</u> the Applicable Margin.

(b)    Interest on the Notes shall be payable on each Quarterly Payment Date (commencing [_____]), on the Maturity Date, and on the date of payment or prepayment (whether voluntary or mandatory), in whole or in part, of principal outstanding on such Notes on the principal amount so paid or prepaid. Interest shall be payable in Cash, provided that, on each Quarterly Payment Date, the Issuer shall pay interest in Cash at a rate per annum equal to the Adjusted LIBOR Rate plus the Base Rate and may elect to pay the remaining interest payable on such Quarterly Payment Date, in Cash or in the form of additional Notes (the "PIK Tranche A Notes"), or a combination thereof. Notwithstanding the foregoing, for each of the first four Quarterly Payment Dates after the date hereof, the Issuer may elect to pay less than the Adjusted LIBOR Rate plus the Base Rate in Cash, <u>provided</u> that the total interest paid in Cash shall be no less than the Adjusted LIBOR Rate plus 2.5% and the total interest payable on such Quarterly Payment Date shall be equal to the Adjusted LIBOR Rate plus the Applicable Margin plus 0.5%.

(c)    PIK Tranche A Notes issued pursuant to Section 2.05(b) shall in all respects be identical to the Notes issued on the Closing Date.

(d)    All Obligations other than the Notes shall bear interest from the date such Obligations are due and payable until paid in full in Cash at the sum of the highest Adjusted LIBOR Rate then applicable to the Notes <u>plus</u> the Applicable Margin. Interest on Obligations other than the Notes shall be payable on demand.

33

(e)     Notwithstanding the foregoing, during a Default, the principal balance of all the Notes and the amount of all other Obligations shall bear interest, after as well as before judgment, at a rate of two percent (2%) per annum in excess of the rate otherwise applicable to such Notes or such other Obligations, and will be payable on demand.[8]

(f)     All interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

**Section 2.06.     Intentionally Omitted.**

**Section 2.07.     Interest Period Elections; Evidence of Debt.**     The initial Interest Period for the Notes shall be [_____].[9] Thereafter, the Issuer may elect Interest Periods therefor, all as provided in this Section 2.07. The Issuer may elect different options with respect to different portions of the affected Notes, in which case each such portion shall be allocated ratably among the Noteholders holding such Notes provided that no more than [__] Interest Periods shall be in effect with respect to the Notes at any time.

(a)     To make an election pursuant to this Section 2.07; the Issuer shall notify the Note Agent of such election by telephone. Each such telephonic Interest Period Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Note Agent of a written Interest Period Election Request substantially in the form of Exhibit C.

(b)     Each telephonic and written Interest Period Election Request shall be delivered at least three Business Days prior to the effectiveness thereof and shall specify the following information:

(i)     the Notes to which such Interest Period Election Request applies which shall be Notes in a minimum principal amount of $[_____] or whole multiples of $[_____] in excess thereof; and

(ii)     the effective date of the election made pursuant to such Interest Period Election Request, which shall be a Business Day.

If an Interest Period Election Request is not received by the Note Agent, if any such Interest Period Election Request does not specify an Interest Period, or if an Event of Default shall occur and during the continuance, then the Issuer shall be deemed to have selected an Interest Period of one month's duration.

(c)     Promptly following receipt of an Interest Period Election Request, the Note Agent shall advise each Noteholder of the details thereof.

---

[8] Consider PIKing of these amounts.

[9] Consider setting initial Interest Periods for PIK Notes at 3 months.

(d)     Notwithstanding any other provision of this Agreement, in the event that any Noteholder requests that the Issuer execute and deliver a promissory note or notes payable to such Noteholder in order to evidence the Indebtedness owing to such Noteholder by the Issuer hereunder, the Issuer will promptly execute and deliver a note or notes to such Noteholder, substantially in the form of <u>Exhibit G</u>.

## Section 2.08.     <u>Optional and Mandatory Prepayments of Notes</u>.

(a)     <u>Optional Prepayments</u>.  The Issuer shall have the right at any time and from time to time to prepay any Note, in whole or in part, subject to the requirements of this <u>Section 2.08</u>; <u>provided</u>, that each partial prepayment shall be in an amount that is an integral multiple of [_____] and not less than [_____].

(b)     <u>Asset Sales</u>.  So long as no Senior Debt Default shall have occurred and be continuing and shall not have been waived or cured, and no notice thereof shall have been received by the Note Agent, not later than one Business Day following the receipt of any Net Cash Proceeds of any Asset Sale of any Note Party, the Issuer shall apply 100% of the Net Cash Proceeds received with respect thereto to make prepayments in accordance with <u>Section 2.08(g)</u>; <u>provided</u>, that:

(i)     such Net Cash Proceeds shall only be required to be remitted to the Note Agent pursuant to this <u>Section 2.08(b)</u> to the extent they are neither (A) required to be applied to repay any amounts outstanding under the Exit Facility and/or to cash collateralize letters of credit under the Exit Facility and/or to reduce commitments under the Exit Facility, nor (B) applied within the reinvestment period permitted under the Exit Facility;

(ii)     the Issuer shall not be required to make any prepayments from Asset Sales unless it shall have received Net Cash Proceed in excess of $[_____] from and after the Closing Date; and

(iii)     so long as no Default shall then exist or would arise therefrom and the aggregate of such Net Cash Proceeds of Asset Sales shall not exceed $[_____] in any Fiscal Year of the Issuer, such proceeds shall not be required to be so applied on such date to the extent that the Issuer shall have delivered an Officers' Certificate to the Note Agent on or prior to such date stating that such Net Cash Proceeds shall be used to purchase long term assets useful in the Parent's business or acquire 100% of the Equity Interests of any person that owns such assets no later than 365 days following the date of such Asset Sale (which Officers' Certificate shall set forth the estimates of the proceeds to be so expended); <u>provided</u>, that if any portion of such Net Cash Proceeds not required to be applied to make prepayments shall not be utilized to purchase replacement assets or acquire such Equity Interests within such 365-day period, such unused portion shall be applied on the last day of such period as a mandatory prepayment as provided in this <u>Section 2.08(b)</u>; <u>provided</u> <u>further</u>, that if the Property subject to such Asset Sale constituted Collateral, then all Property purchased with the Net Cash Proceeds thereof pursuant to this subsection shall be made subject to the

35

Lien of the applicable Security Documents in favor of the Collateral Agent, for its benefit and for the benefit of the other Secured Parties in accordance with Section 5.11 and Section 5.12.

(c)     Debt Issuance.  Upon any Debt Issuance of any Note Party after the Closing Date, so long as no Senior Debt Default shall have occurred and be continuing and shall not have been waived or cured, and no notice thereof shall have been received by the Note Agent, the Issuer shall make prepayments in accordance with Section 2.08(g) in an aggregate principal amount equal to 100% of the Net Cash Proceeds of such Debt Issuance; provided that such Net Cash Proceeds shall only be required to be remitted to the Note Agent pursuant to this Section 2.08(c) to the extent they are not required to be applied to repay amounts under the Exit Facility.

(d)     Equity Issuance.  So long as no Senior Debt Default shall have occurred and be continuing and shall not have been waived or cured, and no notice thereof shall have been received by the Note Agent upon any Equity Issuance of the Parent or any of its Subsidiaries after the Closing Date, the Issuer shall make prepayments in accordance with Section 2.08(g) in an aggregate principal amount equal to 100% (50% in the case of an Equity Issuance by the Parent which is not a Preferred Stock Issuance) of the Net Cash Proceeds of such Equity Issuance; provided that such Net Cash Proceeds shall only be required to be remitted to the Note Agent pursuant to this Section 2.08(d) to the extent they are not required to be applied to repay amounts under the Exit Facility.

(e)     Casualty Events.  So long as no Senior Debt Default shall have occurred and be continuing and shall not have been waived or cured, and no notice thereof shall have been received by the Note Agent, not later than one Business Day following the receipt of any Net Cash Proceeds from a Casualty Event, the Issuer shall apply an amount equal to 100% of such Net Cash Proceeds to make prepayments in accordance with Section 2.08(g); provided, that:

(i)     such Net Cash Proceeds shall only be required to be remitted to the Note Agent pursuant to this Section 2.08(e) to the extent they are neither (A) required to be applied to repay any amounts under the Exit Facility and/or to cash collateralize letters of credit under the Exit Facility and/or to reduce commitments under the Exit Facility, nor (B) applied within the reinvestment period permitted under the Exit Facility; and

(ii)     so long as no Default shall then exist or arise therefrom, such proceeds shall not be required to be so applied on such date to the extent that the Issuer shall have delivered an Officers' Certificate to the Note Agent on or prior to such date stating that such proceeds shall be used (x) to repair, replace or restore any Property in respect of which such Net Cash Proceeds were paid no later than 365 days (or such later date requested by the Issuer that is reasonably acceptable to the Note Agent) following the date of receipt of such proceeds (which Officers' Certificate shall set forth the estimates of the proceeds to be so expended) or (y) to invest within 365 days (or such later date requested by the Issuer that is reasonably acceptable to the Note Agent) in other assets useful in the Issuer's business; provided, that if the Property subject to such Casualty Event

36

constituted Collateral under the Security Documents, then all Property purchased with the Net Cash Proceeds thereof pursuant to this subsection shall be made subject to the Lien of the applicable Security Documents in favor of the Collateral Agent, for its benefit and for the benefit of the other Secured Parties in accordance with Section 5.11 and Section 5.12; provided further, if all or any portion of such Net Cash Proceeds shall not be so applied within such 365-day period (or such later date requested by the Issuer that is reasonably acceptable to the Note Agent), such unused portion shall be applied on the last day of such period as a mandatory prepayment of principal of outstanding Notes as provided in this Section 2.08(e).

(f)        Excess Cash Flow.  Beginning with Fiscal Year 2007, so long as no Senior Debt Default shall have occurred and be continuing and shall not have been waived or cured, and no notice thereof shall have been received by the Note Agent, no later than the earlier of (i) 90 days after the end of each Fiscal Year of the Issuer, and (ii) the date on which the financial statements with respect to such period are delivered pursuant to Section 5.01(a), the Issuer shall make prepayments in accordance with Section 2.08(g) in an aggregate principal amount equal to 50% of Excess Cash Flow for the Fiscal Year then ended.

(g)        Application of Prepayments.  Subject to Section 2.02(c), all prepayments applied pursuant to this Section 2.08(g) shall be applied first, to reduce the PIK Tranche A Notes until paid in full, and second, to reduce the remaining outstanding Notes pro rata against the remaining Amortization Payments due in respect of the Notes under Section 2.02.  All such prepayments shall be accompanied by the payment of interest accrued and unpaid to the relevant prepayment date in respect of the principal amount of the Notes to be prepaid to the extent required by Section 2.05.

(h)        Notice of Prepayment.  The Issuer shall notify the Note Agent by telephone (confirmed by telecopy) of any prepayment hereunder not later than 11:00 a.m., New York City time, three Business Days before the date of prepayment.  Each such notice shall be irrevocable and the principal amount of Notes specified to be prepaid shall become due and payable on the date specified for such prepayment.  Each such notice shall specify the prepayment date, the principal amount of the Notes or portions thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Note Agent shall advise the Noteholders of the contents thereof.

**Section 2.09.        Alternate Rate of Interest**.

(a)        Determination of Interest Rate.  The LIBOR Rate for each Interest Period shall be determined by the Note Agent pursuant to the procedures set forth in the definition of "LIBOR Rate."  The Note Agent's determination shall be presumed to be correct, absent manifest error, and shall be binding on the Issuer.

(b)        Interest Rate Unascertainable, Inadequate or Unfair.  (i) In the event that the Note Agent determines that adequate and fair means do not exist for ascertaining the applicable interest rates by reference to the LIBOR Rate then being determined is to be fixed, the

37

Note Agent shall forthwith so notify the Issuer and the Noteholders, whereupon the Issuer and the Noteholders shall enter into negotiations in good faith with a view to establishing a satisfactory alternative basis for computing interest on the Notes for such Interest Period.

(c)     Increased Costs.  If at any time any Noteholder shall determine that the introduction of or any Change in Law (other than any change by way of imposition or increase of reserve requirements included in determining LIBOR Rate) or the compliance by such Noteholder with any guideline, request or directive from any central bank or other Governmental Authority (whether or not having the force of law), there shall be any increase in the cost to such Noteholder of maintaining any Notes, then the Issuer and each other Note Party shall from time to time, upon demand by such Noteholder (with a copy of such demand to the Note Agent), pay to the Note Agent for the account of such Noteholder additional amounts sufficient to compensate such Noteholder for such increased cost.  A certificate as to the amount of such increased cost, submitted to the Issuer and the Note Agent by such Noteholder, shall be conclusive and binding for all purposes, absent manifest error.  Failure or delay on the part of any Noteholder to demand compensation pursuant to this Section 2.09(c) or Section 2.12 below shall not constitute a waiver of such Noteholder's right to demand such compensation; provided, that the Issuer shall not be required to compensate a Noteholder pursuant to this Section 2.09(c) or Section 2.12 for any increased costs or reductions incurred more than 270 days prior to the date that such Noteholder, notifies the Issuer of the Change in Law giving rise to such increased costs or reductions and of such Noteholder's intention to claim compensation therefor; provided further, that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall not begin earlier than the date of effectiveness of the Change in Law.

(d)     Illegality.  Notwithstanding any other provision of this Agreement, if any Noteholder determines that the introduction of or any Change in Law after the date of this Agreement shall make it unlawful, or any central bank or other Governmental Authority shall assert that it is unlawful, for any Noteholder to hold Notes, then, on notice thereof and demand therefor by such Noteholder to the Issuer through the Note Agent, the Issuer and such Noteholder shall enter into negotiations in good faith with a view to establishing a satisfactory alternative basis for computing interest on the Notes or otherwise establishing a lawful manner pursuant to which such Noteholder may hold the Notes.

Breakage Costs.  In addition to all amounts required to be paid by the Issuer pursuant to Section 2.05, the Issuer shall compensate each Noteholder, upon demand, for all losses, expenses and liabilities (including any loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Noteholder to maintain such Noteholder's Notes a LIBOR Rates to the Issuer but excluding any loss of the Applicable Margin on the relevant Notes) which that Noteholder may sustain (i) if for any reason any Note is prepaid or redeemed (including mandatorily pursuant to Section 2.08) on a date which is not the last day of the applicable Interest Period, (ii) as a consequence of any failure by the Issuer to repay Notes when required by the terms hereof, or (iii) as a consequence of any sale or assignment of any Note other than on the last day of the Interest Period applicable thereto as a result of a request by the Issuer pursuant to Section 2.13 or Section 10.02.  The Noteholder making demand for such compensation shall deliver to the Issuer concurrently with such demand

38

a written statement as to such losses, expenses and liabilities, and this statement shall be conclusive as to the amount of compensation due to that Noteholder, absent manifest error.

**Section 2.10. Payments Generally; Pro Rata Treatment; Sharing of Setoffs**. (a)  The Issuer shall make each payment required to be made by it hereunder or under any other Note Document (whether of principal, interest or fees, or of amounts payable under Section 2.09(c), Section 2.09(e), Section 2.11, Section 2.12 or otherwise) on or before the time expressly required hereunder or under such other Note Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Note Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Note Agent at its offices at 677 Washington Boulevard, Stamford, Connecticut, and except that payments pursuant to Section 2.09(c), Section 2.09(e), Section 2.11 and Section 2.12 shall be made directly to the persons entitled thereto and payments pursuant to other Note Documents shall be made to the persons specified therein.  The Note Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof.  If any payment under any Note Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Note Document shall be made in Dollars.

(b)  If and to the extent any payment owed to the Note Agent or any Noteholder is not made when due, each Note Party hereby authorizes the Note Agent and such Noteholder to setoff and charge any amount so due against any deposit account maintained by such Note Party with the Note Agent or such Noteholder or against other amounts due from the Note Agent or such Noteholder, in each case whether or not the deposit therein or such other amount is then due.

(c)  If at any time insufficient funds are received by and available to the Note Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(d)  If any Noteholder shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Notes resulting in such Noteholder receiving payment of a greater proportion of the aggregate amount of its Notes and accrued interest thereon than the proportion received by any other Noteholder, then the Noteholder receiving such greater proportion shall purchase (for cash at face value) participations in the Notes of other Noteholders to the extent necessary so that the benefit of all such payments shall be shared by the Noteholders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Notes; provided, that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is

39

recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Issuer pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Noteholder as consideration for the assignment of or sale of a participation in any of its Notes to any assignee or participant, other than to the Issuer or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Issuer consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Noteholder acquiring a participation pursuant to the foregoing arrangements may exercise against the Issuer rights of setoff and counterclaim with respect to such participation as fully as if such Noteholder were a direct creditor of the Issuer in the amount of such participation.

(e)     Unless the Note Agent shall have received notice from the Issuer prior to the date on which any payment is due to the Note Agent for the account of the Noteholders hereunder that the Issuer will not make such payment, the Note Agent may assume that the Issuer has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Noteholders, the amount due.  In such event, if the Issuer has not in fact made such payment, then each of the Noteholders, severally agrees to repay to the Note Agent forthwith on demand the amount so distributed to such Noteholder with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Note Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Note Agent in accordance with banking industry rules on interbank compensation.

(f)     If any Noteholder shall fail to make any payment required to be made by it pursuant to Section 2.10(d) or (e), then the Note Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Note Agent for the account of such Noteholder to satisfy such Noteholder's obligations under such Section until all such unsatisfied obligations are fully paid.

Section 2.11.     Taxes.  (a) Any and all payments by or on account of any obligation of any Note Party hereunder or under any other Note Document shall be made without set-off, counterclaim or other defense and free and clear of and without deduction or withholding for any and all Indemnified Taxes; provided, that if any Note Party shall be required by law to deduct any Indemnified Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions or withholdings applicable to additional sums payable under this Section 2.11) the Note Agent or Noteholder (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) such Note Party shall make such deductions or withholdings and (iii) such Note Party shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(b)     In addition, the Note Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     Each Note Party shall indemnify the Note Agent and each Noteholder, within 10 Business Days after written demand therefor, for the full amount of any Indemnified

40

Taxes or Other Taxes paid by the Note Agent or such Noteholder as the case may be, on or with respect to any payment by or on account of any obligation of such Note Party hereunder or under any other Note Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.11) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to such Note Party by a Noteholder, or by the Note Agent on its own behalf or on behalf of a Noteholder, shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Note Party to a Governmental Authority, and, in any event, within 45 days of any such payment being made, such Note Party shall deliver to the Note Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Note Agent.

(e)     Any Foreign Noteholder that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Issuer is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Issuer (with a copy to the Note Agent), to the extent such Foreign Noteholder is legally entitled to do so, at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law and reasonably requested by the Issuer as will permit such payments to be made without withholding or at a reduced rate. Each Foreign Noteholder either (1) (i) agrees to furnish either U.S. Internal Revenue Service Form W-8ECI or U.S. Internal Revenue Service Form W-8BEN (or successor form) on or before the date the Foreign Noteholder becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation) and (ii) agrees (for the benefit of the Issuer and the Note Agent), to the extent it may lawfully do so at such times, upon reasonable request by the Issuer or the Note Agent, to provide a new Form W-8ECI or Form W-8BEN (or successor form) upon the expiration or obsolescence of any previously delivered form to reconfirm any complete exemption from, or any entitlement to a reduction in, U.S. federal withholding tax with respect to any interest payment hereunder or (2) in the case of any such Foreign Noteholder that is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (i) agrees to furnish either (a) a "Non-Bank Certificate" substantially in the form of Exhibit G and two accurate and complete original signed copies of Internal Revenue Service Form W-8BEN (or successor form) on or before the date the Foreign Noteholder becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation) or (b) an Internal Revenue Service Form W-8ECI (or successor form), certifying (in each case) to such Foreign Noteholder's legal entitlement to an exemption or reduction from U.S. federal withholding tax with respect to all interest payments hereunder and (ii) agrees (for the benefit of the Issuer and the Note Agent) to the extent it may lawfully do so at such times, upon reasonable request by the Issuer or the Note Agent, to provide a new Form W-8BEN or W-8ECI (or successor form) upon the expiration or obsolescence of any previously delivered form to reconfirm any complete exemption from, or any entitlement to a reduction in, U.S. federal withholding tax with respect to any interest payment hereunder. Each Foreign

41

Noteholder shall promptly notify the Issuer at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Issuer (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Foreign Noteholder shall not be required to deliver any form pursuant to this paragraph that such Foreign Noteholder is not legally able to deliver.

(f)     If the Note Agent or a Noteholder (or an assignee) determines in its reasonable discretion that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Note Party or with respect to which such Note Party has paid additional amounts pursuant to this Section 2.11, it shall pay over such refund to such Note Party (but only to the extent of indemnity payments made, or additional amounts paid, by such Note Party under this Section 2.11 with respect to the Indemnified Taxes or the Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Note Agent or such Noteholder (or assignee) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that such Note Party, upon the request of the Note Agent or such Noteholder (or assignee), agrees to repay within 10 days after receiving such request the amount paid over to such Note Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Note Agent or such Noteholder (or assignee) in the event the Note Agent or such Noteholder (or assignee) is required to repay such refund to such Governmental Authority. Nothing contained in this Section 2.11(f) shall require the Note Agent or any Noteholder (or assignee) to make available its tax returns or any other information which it deems confidential to any Note Party or any other person. Notwithstanding anything to the contrary, in no event will any Noteholder be required to pay any amount to any Note Party the payment of which would place such Noteholder in a less favorable net after-tax position than such Noteholder would have been in had the additional amounts giving rise to such refund of any Indemnified Taxes or Other Taxes never been paid in the first place.

Section 2.12.     **Capital Adequacy**. If at any time any Noteholder determines that (a) the adoption of or any change in or in the interpretation of any law, treaty or governmental rule, regulation or order after the date of this Agreement regarding capital adequacy, (b) compliance with any such law, treaty, rule, regulation, or order, or (c) compliance with any guideline or request or directive from any central bank or other Governmental Authority (whether or not having the force of law) shall have the effect of reducing the rate of return on such Noteholder's (or any corporation controlling such Noteholder's) capital as a consequence of its obligations hereunder to a level below that which such Noteholder or such corporation could have achieved but for such adoption, change, compliance or interpretation, then, upon demand from time to time by such Noteholder (with a copy of such demand to the Note Agent), the Issuer shall pay to the Note Agent for the account of such Noteholder, from time to time as specified by such Noteholder, additional amounts sufficient to compensate such Noteholder for such reduction. A certificate as to such amounts submitted to the Issuer and the Note Agent by such Noteholder shall be conclusive and binding for all purposes, absent manifest error.

NYDOCS/1230942.8

**Section 2.13.** **Mitigation Obligations; Replacement of Noteholders**.

(a) <u>Mitigation of Obligations</u>. If any Noteholder requests compensation under <u>Section 2.09(c)</u>, <u>Section 2.09(e)</u> or <u>Section 2.12</u> or if the Issuer is required to pay any additional amount to any Noteholder or any Governmental Authority for the account of any Noteholder pursuant to <u>Section 2.11</u>, then such Noteholder shall use reasonable efforts to designate a different lending office for funding or booking its Notes hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the, reasonable judgment of such Noteholder, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 2.09(c)</u>, <u>Section 2.09(e)</u>, <u>Section 2.11</u> or <u>Section 2.12</u>, as the case may be, in the future and (ii) would not subject such Noteholder to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Noteholder. The Issuer hereby agrees to pay all reasonable costs and expenses incurred by any Noteholder in connection with any such designation or assignment.

(b) <u>Replacement of Noteholders</u>. In the event that (a) any Noteholder makes a claim under <u>Section 2.09(b)</u> or <u>(c)</u> or <u>Section 2.12</u>, (b) it becomes illegal for any Noteholder to continue to maintain any Note and such Noteholder notifies the Issuer pursuant to <u>Section 2.09(d)</u>, (c) any Noteholder requests compensation under <u>Section 2.09(c)</u> or (d) if the Issuer is required to pay any additional amount to any Noteholder or any Governmental Authority for the account of any Noteholder pursuant to <u>Section 2.11</u>, then the Issuer may, at its sole expense and effort, upon notice to such Noteholder and the Note Agent, require such Noteholder to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in <u>Section 10.04</u>), all of its interests, rights and obligations under this Agreement to an assignee selected by the Issuer that shall assume such obligations (which assignee may be another Noteholder, if a Noteholder accepts such assignment); <u>provided</u>, that (i) the Issuer shall have received the prior written consent of the Note Agent, which consent shall not unreasonably be withheld, (ii) such Noteholder shall have received payment of an amount equal to the outstanding principal of its Notes, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Issuer (in the case of all other amounts), (iii) in the case of any such assignment resulting from a claim for compensation under <u>Section 2.09(c)</u>, <u>Section 2.09(e)</u> or <u>Section 2.12</u> or payments required to be made pursuant to <u>Section 2.11</u>, such assignment will result in a material reduction in such compensation or payments and (iv) if one or more Noteholder claims increased costs, illegality or right to payment arising from the same act or condition and such claims are received by the Issuer within 30 days of each other, then the Issuer may substitute all, but not (except to the extent the Issuer has already substituted one of such Noteholders before the Issuer's receipt of the other Noteholders' claims) less than all, Noteholders making such claims. A Noteholder shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Noteholder or otherwise, the circumstances entitling the Issuer to require such assignment and delegation cease to apply.

43

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Each Note Party represents and warrants to the Note Agent, the Collateral Agent, and each of the Noteholders that:

**Section 3.01.** **Organization; Powers**. Each Company (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and to own and lease its Property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**Section 3.02.** **Authorization; Enforceability**. The Transactions to be entered into by each Note Party are within such Note Party's powers and have been duly authorized by all necessary action on its part. This Agreement has been duly executed and delivered by each Note Party and constitutes, and each other Note Document to which any Note Party is to be a party, when executed and delivered by such Note Party, will constitute, a legal, valid and binding obligation of such Note Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**Section 3.03.** **Governmental Approvals; No Conflicts**. Except as set forth on Schedule 3.03, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority other than the entry of the Confirmation Order and except (i) such as have been obtained or made and are in full force and effect, (ii) filings necessary to perfect Liens created by the Note Documents and (iii) consents, approvals, registrations, filings or actions the failure of which to obtain or perform could not reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Company or any order of any Governmental Authority, (c) will not violate, result in a default or require any consent or approval under any applicable law or regulation, indenture, agreement or other instrument binding upon any Company or its assets, or give rise to a right thereunder to require any payment to be made by any Company, except for violations, defaults or the creation of such rights that could not reasonably be expected to result in a Material Adverse Effect, and (d) will not result in the creation or imposition of any Lien on any Property of any Company, except Liens created by the Note Documents and Permitted Liens.

**Section 3.04.** **Financial Statements**. The Issuer has heretofore furnished to the Noteholders (a) the consolidated balance sheet and related statements of income, stockholders' equity and cash flows of the Issuer and its Subsidiaries as of and for the Fiscal Years ended December 31, 2001, 2002 and 2003, audited by and accompanied by the opinion of Deloitte & Touche LLP, independent public accountants, (b) the unaudited consolidated balance sheet and related statements of income and cash flows of the Issuer and its Subsidiaries as of and

44

for the Fiscal Year ended December 31, 2004, and (c) the unaudited consolidated balance sheet of the Issuer and its Subsidiaries as of the end of [_____], 2005 and the related consolidated statements of income and cash flows of the Issuer and its Subsidiaries for such month and for the then elapsed portion of the Fiscal Year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous Fiscal Year. Such financial statements have been prepared in accordance with GAAP consistently applied and present fairly and accurately in all material respects the financial condition and results of operations and cash flows of the Issuer as of such dates and for such periods. Except as set forth in such financial statements, there are no liabilities of any Company of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which could reasonably be expected to result in a Material Adverse Effect, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in such a liability, other than liabilities under the Note Documents. The Projections (read together with any qualifications set forth in the Disclosure Statement) were prepared in good faith and the Issuer utilized reasonable assumptions and due care in the preparation thereof.

Section 3.05. **No Claims**. Each Company owns or has rights to use all of the Collateral and all rights with respect to any of the foregoing used in, necessary for or material to each Company's business as currently conducted. To the knowledge of each Company, the use by each Company of such Collateral and all such rights with respect to the foregoing do not infringe on the rights of any Person other than such infringement which would not, individually or in the aggregate, result in a Material Adverse Effect. Except as set forth on Schedule 3.05, no claim has been made and remains outstanding that any Company's use of any Collateral does or may violate the rights of any third Person that would individually, or in the aggregate, have a Material Adverse Effect.

Section 3.06. **Properties**. (a) Each Company has good title to, or valid leasehold interests in, all its Property material to its business, free and clear of all Liens except for (x) Permitted Liens and (y) minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere in any material respect with its ability to conduct its business as currently conducted or to utilize such Property for its intended purpose. The Property of the Companies, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) (except to the extent that the failure to be in such condition could not reasonably be expected to result in a Material Adverse Effect) and (ii) constitutes all the Property which is required for the business and operations of the Companies as presently conducted.

(b) Schedule 3.06(b) contains a true and complete list of each interest in Real Property owned by any Company as of the date hereof and describes the type of interest therein held by such Company. Schedule 3.06(b) contains a true and complete list of each Real Property leased, subleased or otherwise occupied or utilized by any Company, as lessee, sublessee, franchisee or licensee, as of the date hereof and describes the type of interest therein held by such Company and whether such lease, sublease or other instrument requires the consent of the landlord thereunder or other parties thereto to the Transactions.

(c) (i) No Company has received any notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Casualty Event affecting all or any portion

of the Property except those that, in the aggregate, would not have a Material Adverse Effect and (ii) no Mortgage encumbers improved Real Property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968.

**Section 3.07.** **Intellectual Property**.

(a) <u>Ownership/No Claims</u>. Each Company owns, or is licensed to use, all patents, patent applications, trademarks, trade names, servicemarks, copyrights, technology, trade secrets, proprietary information, domain names, know-how and processes necessary for the conduct of its business as currently conducted (the "**Intellectual Property**"), except for the Intellectual Property, which the failure to own or license, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. Except as set forth in <u>Schedule 3.07(a)</u> annexed hereto, no claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does any Company know of any valid basis for any such claim. To the knowledge of each Company, the use of such Intellectual Property by each Company does not infringe the rights of any Person, except for such claims and infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b) <u>Registrations</u>. Except pursuant to licenses and other user agreements entered into by each Company in the ordinary course of business that are listed in <u>Schedules 15(a)</u> and <u>15(b)</u> annexed to the Perfection Certificate, on and as of the date hereof, (i) each Company owns and possesses the right to use, and has done nothing to authorize or enable any other person to use, any Copyright, Patent or Trademark (as such terms are defined in the Security Agreement) listed in <u>Schedules 13(a)</u> and <u>13(b)</u> annexed to the Perfection Certificate and (ii) all registrations listed in <u>Schedules 13(a)</u> and <u>13(b)</u> annexed to the Perfection Certificate are valid and in full force and effect.

(c) <u>No Violations or Proceedings</u>. Except as set forth on <u>Schedule 3.07(c)</u>, to each Company's knowledge, on and as of the date hereof, (i) there is no material violation by others of any right of such Company with respect to any Intellectual Property, (ii) such Company is not infringing upon any Intellectual Property of any other Person other than such infringement that, individually or in the aggregate, would not (or would not reasonably be expected to) result in a Material Adverse Effect, and (iii) no proceedings have been instituted or are pending against such Company or threatened, and no claim against such Company has been received by such Company, alleging any such violation.

**Section 3.08.** **Condition and Maintenance of Equipment**. The Equipment of each Company is in good repair, working order and condition, reasonable wear and tear excepted. Each Company shall cause the Equipment to be maintained and preserved in good repair, working order and condition, reasonable wear and tear excepted, and shall as quickly as commercially practicable make or cause to be made all repairs, replacements and other improvements which are necessary or appropriate in the conduct of each Company's business.

46

**Section 3.09.     Equity Interests and Subsidiaries**.  (a)  Schedule 3.09(a) sets forth a list of (i) each Company and its jurisdiction of organization and (ii) the number of shares of each class of its Equity Interests authorized, and the number outstanding and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights on the Closing Date.  All Equity Interests of each Company are duly and validly issued and are fully paid and non-assessable and are owned by the Issuer, directly or indirectly through its Subsidiaries as described on Schedule 3.09(a) and all Equity Interests of the Issuer are owned directly by the Parent.  Each Note Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under the Security Agreement, free of any and all Liens, rights or claims of other Persons, except the security interest created by the Security Agreement, and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or Property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)     No consent of any Person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or desirable in connection with the creation, perfection or first priority status of the security interest of the Collateral Agent in any Equity Interests pledged to the Collateral Agent for the benefit of the Secured Parties under the Security Agreement or the exercise by the Collateral Agent of the voting or other rights provided for in the Security Agreement or the exercise of remedies in respect thereof.

(c)     An accurate organization chart, showing the ownership structure of the Parent, the Issuer and each Subsidiary on the Closing Date, and after giving effect to the Transactions, is set forth on Schedule 3.09(c).

**Section 3.10.     Litigation; Compliance with Laws**.  (a)  Except as set forth on Schedule 3.10, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Company, threatened against or affecting any Company or any business, Property or rights of any such Person (i) that involve any Note Document or the Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)     Except for matters covered by Section 3.19, no Company or any of its Property is in violation of, nor will the continued operation of its Property as currently conducted violate, any Requirements of Law (including any zoning or with respect to any owned Real Property, any building ordinance, code or approval or any building permits) or, with respect to any owned Real Property, any restrictions of record or agreements affecting the Real Property or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default could reasonably be expected to result in a Material Adverse Effect.

**Section 3.11.     Agreements**.  (a) No Company is a party to any agreement or instrument or subject to any corporate or other constitutional restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect.

NYDOCS/1230942.8

(b)     No Company is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its Property are or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect.

(c)     Schedule 3.11(c) accurately and completely lists all material agreements (other than leases of Real Property set forth on Schedule 3.06(b)) to which any Company is a party which are in effect on the date hereof in connection with the operation of the business conducted thereby and the Issuer has delivered to the Note Agent complete and correct copies of all such material agreements, including any amendments, supplements or modifications with respect thereto.

Section 3.12.     **Federal Reserve Regulations**.  (a) No Company is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)     No part of the proceeds of the Notes will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X.  The pledge of the Securities Collateral pursuant to the Security Agreement does not violate such regulations.

Section 3.13.     **Investment Company Act; Public Utility Holding Company Act**.  No Company is (a) an "investment company" or a company "controlled" by a Person required to register as an "investment company,"  as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended, or (b) a "holding company,"  an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company,"  as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935, as amended.

Section 3.14.     **Issuance of Notes**.  The Notes shall be issued in connection with the satisfaction of the Allowed First Lien Claims.

Section 3.15.     **Taxes**.  Except as set forth in Schedule 3.15[10], each Company has (a) timely filed or caused to be timely filed all federal Tax Returns and all material, state, local and foreign Tax Returns or materials required to have been filed by it and all such Tax Returns are true and correct in all material respects and (b) duly and timely paid or caused to be duly and timely paid all Taxes (whether or not shown on any Tax Return) due and payable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which such Company shall have set aside on its books adequate reserves in accordance with GAAP or (ii) which could not, individually or in the aggregate, have a Material Adverse Effect; provided, that any such contest of Taxes with respect to Collateral shall also satisfy the Contested Collateral Lien Conditions.  Each Company has made adequate

---

[10] Schedule is subject to the satisfaction of the Note Agent.

provision in accordance with GAAP for all Taxes not yet due and payable. Each Company is unaware of any proposed or pending tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.

**Section 3.16.** **No Material Misstatements**. No information, report, financial statement, exhibit or schedule furnished by or on behalf of any Company to the Note Agent or any Noteholder in connection with the negotiation of any Note Document or included therein or delivered pursuant thereto when taken as a whole contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading as of the date such information is dated or certified; provided, that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each Company represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.

**Section 3.17.** **Labor Matters**. As of the date hereof and the Closing Date, there are no strikes, lockouts or slowdowns against any Company pending or, to the knowledge of any Company, threatened. The hours worked by and payments made to employees of any Company have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters in any manner which could reasonably be expected to result in a Material Adverse Effect. All payments due from any Company, or for which any claim may be made against any Company, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Company except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Company is bound.

**Section 3.18.** **Employee Benefit Plans**. (a) Each Company and its ERISA Affiliates is in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in material liability of any Company or any of its ERISA Affiliates or the imposition of a Lien on any of the assets of a Company. The present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans. Using actuarial assumptions and computation methods consistent with subpart 1 of subtitle E of Title IV of ERISA, the aggregate liabilities of each Company or its ERISA Affiliates to all Multiemployer Plans in the event of a complete withdrawal therefrom, as of the close of the most recent Fiscal Year of each such Multiemployer Plan, could not reasonably be expected to result in a Material Adverse Effect.

(b) Each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and

orders and has been maintained, where required, in good standing with applicable regulatory authorities. No Company has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Plan. The present value of the accrued benefit liabilities (whether or not vested) under each Foreign Plan which is funded, determined as of the end of the most recently ended Fiscal Year of the respective Company on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Plan, and for each Foreign Plan which is not funded, the obligations of such Foreign Plan are properly accrued.

Section 3.19. **Environmental Matters**. (a) Except as set forth in <u>Schedule 3.19</u> and except as, individually or in the aggregate, are not reasonably likely to result in a Material Adverse Effect:

(i) The Companies and their businesses, operations and Real Property are and in the last six years have been in compliance with, and the Companies have no liability under, Environmental Law;

(ii) The Companies have obtained all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their assets, under Environmental Law, all such Environmental Permits are valid and in good standing and, under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to renew or modify such Environmental Permits during the next five years;

(iii) There has been no Release or threatened Release of Hazardous Material on, at, under or from any Real Property or facility presently or formerly owned, leased or operated by the Companies or their predecessors in interest that could result in liability by the Companies under Environmental Law;

(iv) There is no Environmental Claim pending or, to the knowledge of the Companies, threatened against the Companies, or relating to the Real Property currently or formerly owned, leased or operated by the Companies or relating to the operations of the Companies, and there are no actions, activities, circumstances, conditions, events or incidents that could form the basis of such an Environmental Claim;

(v) No Person with an indemnity or contribution, obligation to the Companies relating to compliance with or liability under Environmental Law is in default with respect to such obligation;

(vi) No Company is obligated to perform any action or otherwise incur any expense under Environmental Law pursuant to any order, decree, judgment or agreement by which it is bound or has assumed by contract or agreement, and no Company is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location;

NYDOCS/1230942.8

(vii)    No Real Property or facility owned, operated or leased by the Companies and, to the knowledge of the Companies, no Real Property or facility formerly owned, operated or leased by the Companies or any of their predecessors in interest is (A) listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA, (B) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (C) included on any similar list maintained by any Governmental Authority including, without limitation, any such list relating to petroleum; and

(viii)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements or any other Environmental Law.

(b)        Except as set forth in Schedule 3.19:

(i)    No Lien has been recorded or, to the knowledge of any Note Party, threatened under any Environmental Law with respect to any Real Property or assets of the Note Parties; and

(ii)    The Companies have made available to Noteholders all material records and files in the possession, custody or control of, or otherwise reasonably available to, the Companies concerning compliance with or liability under Environmental Law including, without limitation, those concerning the existence of Hazardous Material at real Property or facilities currently or formerly owned, operated, leased or used by the Companies.

Section 3.20.    **Insurance**.  Schedule 3.20 sets forth a true, complete and correct description of all insurance maintained by each Company as of the Closing Date.  As of such date, such insurance is in full force and effect.  Each Company has to such Company's knowledge insurance in such amounts and covering such risks and liabilities as are in accordance with normal industry practice.  Such Schedule 3.20 may be amended and revised from time to time with the consent of the Note Agent.

Section 3.21.    **Security Documents**.  (a) The Security Agreement is effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, a legal, valid and enforceable security interest in and Lien on the Security Agreement Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule [__] to the Perfection Certificate and (ii) upon the taking of possession or control by the Collateral Agent of the Security Agreement Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by each Security Agreement), the Lien created by the Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the grantors thereunder in the Security Agreement Collateral (other than (A) the Intellectual Property

51

(as defined in the Security Agreement) and (B) such Security Agreement Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Collateral Liens.

(b)     When the Security Agreement or a short form thereof is filed in the United States Patent and Trademark Office and the United States Copyright Office, the Lien created by the U.S. Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the grantors thereunder in the Intellectual Property, in each case subject to no Liens other than Permitted Collateral Liens.

(c)     Each Mortgage, when executed and delivered by the relevant Note Party, will be effective to create, in favor of the Collateral Agent, for its benefit and the benefit of the Secured Parties, subject only to the Existing Liens (as defined in such Mortgage), a legal, valid and enforceable Lien on and security interest in all of the Note Parties' right, title and interest in and to the Mortgaged Properties thereunder and the proceeds thereof, and when the Mortgages are filed in the offices specified on Schedule 1.01(a) (or, in the case of any Mortgage executed and delivered after the date thereof in accordance with the provisions of Section 5.11, Section 5.12 and Section 5.14, when such Mortgage is filed in the offices specified in the local counsel opinion delivered with respect thereto in accordance with the provisions of Section 5.11, Section 5.12 and Section 5.14), the Mortgages shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the Note Parties in the Mortgaged Properties and the proceeds thereof, in each case prior and superior in right to any other Person, other than Existing Liens (as defined in each such Mortgage) or other Liens acceptable to the Collateral Agent.

(d)     Each Security Document delivered pursuant to Section 5.11 and Section 5.12 will, upon execution and delivery thereof, be effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in and Lien on all of the Note Parties' right, title and interest in and to the Collateral thereunder, and when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable law, such Security Document will constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Note Parties in such Collateral, in each case subject to no Liens other than the applicable Permitted Collateral Liens.

Section 3.22.     Solvency.  Immediately after the consummation of the Transactions to occur on the Closing Date and immediately following the issuance of the Notes, (a) the fair value of the assets of each Note Party (individually and on a consolidated basis with its Subsidiaries) will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of each Note Party (individually and on a consolidated basis with its Subsidiaries) will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) each Note Party (individually and on a consolidated basis with its Subsidiaries) will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) each Note Party (individually and on a consolidated basis with its Subsidiaries) will not have unreasonably small capital with which to conduct its business in

which it is engaged as such business is now conducted and is proposed to be conducted following the Closing Date.

Section 3.23. **Rule 144 Eligibility.** The Notes and the Guarantees satisfy the eligibility requirements of Rule 144A(d)(3) under the Securities Act.

## ARTICLE IV

## CONDITIONS TO THE ISSUANCE OF THE NOTES

Section 4.01. **Conditions to the Issuance of the Notes**. The issuance of the Notes shall be subject to the prior or concurrent satisfaction of each of the conditions precedent set forth in this Section 4.01 in a manner satisfactory to the Note Agent:

(a) Plan of Reorganization. The Plan of Reorganization shall not have been amended, supplemented or otherwise modified without the approval of the Note Agent and shall have become effective in accordance with its terms. In addition, without limitation:

(i) the Plan of Reorganization shall include full releases of the Prepetition Agent and the other Prepetition Lenders;

(ii) all conditions precedent to the effectiveness of the Plan of Reorganization shall have been satisfied (or waived with the consent of the Note Agent),

(iii) the Confirmation Order shall have become a Final Order;

(iv) the Note Agent shall be satisfied that the Bankruptcy Court's retention of jurisdiction under the Confirmation Order will not govern the enforcement of the Transaction Documents;

(v) the conditions precedent to the effectiveness of the Exit Facility and the CVR Agreement shall have been satisfied

(vi) all authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan of Reorganization are obtained and not revoked; and

(vii) the Debtors shall have received the Cash contribution specified in section 5.2(a) of the Plan of Reorganization.

(b) Other Agreements and Obligations. (i) The Note Agent shall be reasonably satisfied with the Transaction Documents and such documents shall have been executed and delivered by the parties thereto and shall be in effect and (ii) the Note Agent shall be reasonably satisfied that each DIP Obligation shall have been paid in full in Cash and all commitments under the [DIP Credit Agreement] shall have been terminated and all Liens

53

securing the DIP Obligations shall have been released, in each case on terms and conditions reasonably satisfactory to the Note Agent.

(c)     Reorganization.  (i) The Reorganization shall have been consummated on the terms and conditions set forth in the Plan of Reorganization and the Effective Date of the Plan of Reorganization (as defined in the Plan of Reorganization) shall be not later than January [___], 2006.

(d)     Adequate Protection Payments.  Each Noteholder shall have received indefeasible payment in full in cash of all adequate protection payments due such Noteholder pursuant to the terms of paragraph 6 of that certain Final Order pursuant to Bankruptcy Code Sections 105, 362, 363 and 364 (i) authorizing use of cash collateral; (ii) authorizing secured post-petition financing on a superpriority basis; (iii) granting adequate protection; (iv) approving agreements related to the foregoing; (v) modifying automatic stay; and (vi) granting related relief, dated August 26, 2005, as same may have been amended from time to time.

(e)     Note Documents.  All legal matters incident to this Agreement, and the other Note Documents shall be reasonably satisfactory to the Noteholders and to the Note Agent and there shall have been delivered to the Note Agent an executed counterpart of each of the Note Documents.

(f)     Transaction Documents.  The Note Agent shall have received:

(i)     a certificate of a Responsible Officer of the Issuer certifying (A) that attached thereto is a true, correct and complete copy of the Confirmation Order (including the Plan of Reorganization attached to the Confirmation Order) and (B) that no appeal or motion for rehearing has been filed in connection with such Confirmation Order; and

(ii)     a copy of each Transaction Document, certified as being true, complete and correct by a Responsible Officer of the Issuer.

(g)     Corporate Documents.  The Note Agent shall have received:

(i)     a certificate of the Secretary or Assistant Secretary of each Note Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of each Organizational Document of such Note Party, certified (to the extent applicable) as of a recent date by the Secretary of State of the state of its organization, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Note Party authorizing the execution, delivery and performance of the Transaction Documents to which such Person is a party and, in the case of the Issuer, issuance of notes hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, and (C) as to the incumbency and specimen signature of each officer executing any Note Document or any other document delivered in connection herewith on behalf of such Note Party (together with a certificate of

54

another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate in this clause (i);

> (ii)     a long form certificate as to the good standing of each Note Party as of a recent date, from such Secretary of State; and

> (iii)     such other documents as the Note Agent may reasonably request.

(h)     Officer's Certificate.  The Note Agent shall have received a certificate, dated the Closing Date and signed by the Chief Executive Officer or President of the Issuer (acting in such capacity and not in his individual capacity), confirming compliance with the conditions precedent set forth in Section 4.01, other than as to events which are required to be determined to the satisfaction of the Noteholders or the Note Agent.

(i)     Other Related Transactions, Etc.

> (i)     Holdco shall have merged into the Issuer, and the Issuer shall be the sole direct Subsidiary of the Parent, owning directly or indirectly all the equity of the Parent's Subsidiaries (other than the Issuer).

(j)     Notes.  The Note Agent shall have received definitive Notes for the account of each Noteholder requesting the same, conforming to the requirements set forth herein.

(k)     Financial Statements; Projections.  The Noteholders shall have received and shall be reasonably satisfied with the form and substance of the financial statements described in Section 3.04 and of the Projections.

(l)     Indebtedness and Minority Interests.  No Note Party shall have outstanding any Indebtedness, preferred stock or minority interests other than (i) the Senior Debt, (ii) the Notes hereunder, (iii) the Indebtedness listed on Schedule 6.01(b) and (iv) Indebtedness owed to the Issuer or any Guarantor.

(m)     Opinions of Counsel.  The Note Agent shall have received, on behalf of itself, the Collateral Agent and the Noteholders a written opinion of Weil, Gotshal & Manges LLP, special counsel for the Note Parties, in a form reasonably satisfactory to the Note Agent.

(n)     Appraisals and Reports.  The Noteholders, the Note Agent and the Collateral Agent shall have received all field examinations, audits, reports and opinions of appraisers, consultants or other advisors retained by them to review the Collateral, business, operation or condition of the Note Parties after giving effect to the Transactions, and shall be reasonably satisfied in form and substance with all such field examinations, audits, reports and opinions.

(o)     Requirements of Law.  The Note Agent shall be reasonably satisfied that the Transactions shall be in full compliance with all material Requirements of Law, including without limitation Regulations T, U and X of the Board.  The Note Agent shall have received

reasonably satisfactory evidence of compliance with all applicable Requirements of Law, including all applicable environmental laws and regulations.

(p)     Consents.  The Note Agent shall be reasonably satisfied that all requisite Governmental Authorities and third parties shall have approved or consented to the Transactions, and there shall be no governmental or judicial action, actual or threatened, that has or would have, singly or in the aggregate, a reasonable likelihood of restraining, preventing or imposing burdensome conditions on the Transactions or the other transactions contemplated hereby.

(q)     Litigation.  There shall be no litigation, public or private, or administrative proceedings, governmental investigation or other legal or regulatory developments, actual or threatened, that, singly or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, or could materially and adversely affect the ability of the Parent, the Issuer and the Subsidiaries to fully and timely perform their respective obligations under the Transaction Documents, or the ability of the parties to consummate the financings contemplated hereby or the other Transactions.

(r)     Issuance of Notes.  The issuance of the Notes shall be in accordance with Section 3.14.

(s)     Fees.  The Note Agent shall have received, to the extent invoiced, reimbursement or payment of all reasonable out-of-pocket expenses (including (i) the legal fees and expenses of Bingham McCutchen LLP, special counsel to the Agents, (ii) the fees and expenses of Houlihan Lokey Howard & Zukin and (iii) the fees and expenses of any local counsel, appraisers, consultants and other advisors, required to be reimbursed or paid by the Issuer hereunder or under any other Note Document).

(t)     Personal Property Requirements.  The Collateral Agent shall have received:

(i)      all certificates, agreements or instruments representing or evidencing the shares of the Issuer and each Guarantor (other than the Parent), accompanied by instruments of transfer and stock powers endorsed in blank;

(ii)     all other certificates, agreements, including control agreements, or instruments necessary to perfect the Collateral Agent's security interest in all Chattel Paper, all Instruments and all Investment Property of each Note Party (as each such term is defined in the Security Agreement and to the extent required by Section 3.3 of the Security Agreement);

(iii)    UCC Financing Statements in appropriate form for filing under the UCC, filings with the United States Patent, Trademark and Copyright offices and such other documents under applicable Requirements of Law in each jurisdiction as may be necessary or appropriate or, in the opinion of the Collateral Agent, desirable to perfect the Liens created, or purported to be created, by the Security Documents and, with respect to all UCC Financing Statements required to be filed pursuant to the Note Documents, evidence satisfactory to the Note Agent that the

56

Issuer has retained, at its sole cost and expense, a service provider acceptable to the Note Agent for the tracking of all such financing statements and notification to the Note Agent, of, among other things, the upcoming lapse or expiration thereof;

       (iv)    certified copies of UCC, tax and judgment lien searches, bankruptcy and pending lawsuit searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Note Party as debtor and that are filed in those state and county jurisdictions in which any Property of any Note Party is located and the state and county jurisdictions in which any Note Party is organized or maintains its principal place of business and such other searches that the Collateral Agent deems necessary or appropriate, none of which encumber the Collateral covered or intended to be covered by the Security Documents (other than those relating to Liens (A) securing the Prepetition Obligations which will be released on the Effective Date of the Plan of Reorganization (as defined in the Plan of Reorganization), and (B) Liens that are acceptable to the Note Agent, in its sole discretion.

       (v)    evidence acceptable to the Collateral Agent of payment by the Note Parties of all applicable recording taxes, fees, charges, costs and expenses required for the recording of the Security Documents.

       (u)    <u>Real Property Requirements</u>.  The Collateral Agent shall have received with respect to each Real Property, copies of all Leases in which the Issuer or any Subsidiary holds a leasehold or other possessory interest.

       (v)    <u>Insurance</u>.  The Note Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by <u>Section 5.04</u> and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable endorsement and to name the Collateral Agent as additional insured, in form and substance satisfactory to the Note Agent.

       (w)    <u>Board of Directors</u>.  A new Board of Directors shall have been elected and shall be serving in satisfaction of the requirements in the term sheet attached to the Lock-Up Agreement.

       (x)    <u>No Default</u>.  Each of the Issuer and each other Note Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Note Document on its part to be observed or performed, and, at the time of and immediately after the issuance of the Notes, no Default shall have occurred and be continuing on such date or after giving effect to the issuance of the Notes made on such date.

       (y)    <u>Representations and Warranties</u>.  Each of the representations and warranties made by any Note Party set forth in <u>Article III</u> hereof or in any other Note Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all

respects) on and as of the date of the issuance of the Notes with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date.

(z)     No Material Adverse Effect.  There has been no event, condition and/or contingency that has had or is reasonably likely to have a Material Adverse Effect.

(aa)     No Legal Bar.  No order, judgment or decree of any Governmental Authority shall purport to restrain any Noteholder from performing its obligations under this Agreement.  No injunction or other restraining order shall have been issued, shall be pending or noticed with respect to any action, suit or proceeding seeking to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated by this Agreement.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Each Note Party covenants and agrees with each Noteholder that so long as this Agreement shall remain in effect and until the principal of and interest on each Note and all fees and all other expenses or amounts payable under any Note Document have been paid in full, unless the Required Noteholders shall otherwise consent in writing, each Note Party will, and will cause each of its Subsidiaries to:

**Section 5.01.     Financial Statements, Reports, etc**.  In the case of the Parent and the Issuer, furnish to the Note Agent (with a copy for each Noteholder):

(a)     Annual Reports.  Within 90 days after the end of each Fiscal Year (but if any Note Party is then subject to Section 13(d) or 15 of the Exchange Act, no later than the date on which any Note Party is required to file a Form 10-K under the Exchange Act), (i) the consolidated balance sheet of the Issuer and its Subsidiaries as of the end of such Fiscal Year and related consolidated statements of income, cash flows and stockholder's equity for such Fiscal Year, in comparative form with such financial statements as of the end of, and for, the preceding Fiscal Year, and notes thereto, all prepared in accordance with GAAP and accompanied by an opinion of independent public accountants of recognized national standing reasonably satisfactory to the Note Agent (which opinion shall not be qualified as to scope or contain any going concern or other qualification) stating that such financial statements fairly present, in all material respects, the financial condition, results of operations and cash flows of the Issuer and its Subsidiaries as of such dates and for such periods and in each case on a consolidated basis in accordance with GAAP consistently applied (provided that for Fiscal Year 2005 only an audited balance sheet shall be required), and (ii) a management report setting forth results of operations and cash flows of the Issuer and its Subsidiaries as of the end of and for such Fiscal Year, as compared to budgeted amounts and as compared to the previous Fiscal Year.

(b)     Quarterly Reports.  Within 45 days after the end of each of the first three fiscal quarters of each Fiscal Year (but if any Note Party is then subject to Section 13(d) or 15 of the Exchange Act, no later than the date on which any Note Party is required to file a Form 10-Q

58

under the Exchange Act), (i) the consolidated balance sheet of the Issuer and its Subsidiaries as of the end of such fiscal quarter and related consolidated statements of income and cash flows for such fiscal quarter and for the then elapsed portion of the Fiscal Year, all prepared in accordance with GAAP, subject to normal year end audit adjustments, the omission of footnotes, and accompanied by a certificate of a Financial Officer stating that such financial statements fairly present, in all material respects and to the best of their knowledge, the consolidated financial condition, results of operations and cash flows of the Issuer and its Subsidiaries as of such date and for such periods in accordance with GAAP, subject to year end audit adjustments and the omission of footnotes, and (ii) a management discussion and analysis setting forth results of operations and cash flows of the Issuer and its Subsidiaries as of the end of and for such fiscal quarter, as compared to budgeted amounts and as compared to comparable periods in the previous Fiscal Year.

(c)     <u>Monthly Reports</u>.  Within 30 days after the end of each of the first, second, fourth, fifth, seven, eighth, tenth and eleventh fiscal months of the Issuer's Fiscal Year, the consolidated balance sheets of the Issuer and its Subsidiaries as of the end of such month and the related consolidated statements of income and cash flows of the Issuer and its Subsidiaries for such month and for the then elapsed portion of the Fiscal Year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous Fiscal Year, accompanied by a certificate of a Financial Officer stating that, to the best of the Financial Officer's knowledge, such financial statements fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of the Issuer and its Subsidiaries as of the date and for the periods specified in accordance with GAAP, subject to year end audit adjustments and the omission of footnotes.

(d)     <u>Required Certificates</u>.  (i) Concurrently with any delivery of financial statements under clause (a), (b) or (c) above, a certificate of a Responsible Officer (acting in such capacity and not in his individual capacity) certifying, to the best of the Issuer's knowledge, no Default has occurred or, if such a Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto; (ii) concurrently with any delivery of financial statements under clause (a), (b) or (c) above, a certificate of a Financial Officer (acting in such capacity and not in his individual capacity) setting forth computations in reasonable detail satisfactory to the Note Agent demonstrating compliance with the relevant covenants contained in <u>Section 6.08</u>, in each case for the applicable test period; and (iii) in the case of clause (a) above, a report of the accounting firm opining on or certifying such financial statements stating that in the course of its regular audit of the financial statements of the Issuer and its Subsidiaries, such accounting firm obtained no knowledge that any Default (insofar as it relates to financial or accounting matters) has occurred or, if in the opinion of such accounting firm such a Default has occurred, specifying the nature and extent thereof.

(e)     <u>Responsible Officer's Certificate Regarding Collateral</u>.  Concurrently with any delivery of financial statements under paragraph (a) above, a certificate of a Responsible Officer (acting in such capacity and not in his individual capacity) setting forth the information required pursuant to the Perfection Certificate Supplement or confirming that there has been no change in such information since the date of the Perfection Certificate or latest Perfection Certificate Supplement;

59

(f)    _Public Reports_.  Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Company with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to holders of its Indebtedness pursuant to the terms of the documentation governing such Indebtedness (or any trustee, agent or other representative therefor), as the case may be;

(g)    _Management Letters_.  Promptly after the receipt thereof by any Company, a copy of any final "management letter" received by any such Person from its certified public accountants and copies of all management's written responses thereto;

(h)    _Budgets_.  No later than 30 days after the first day of each Fiscal Year, the Issuer shall (i) provide a consolidated budget for such Fiscal Year in form reasonably satisfactory to the Note Agent (including income statements, cash flow statements and balance sheets) prepared by the Issuer for each month of such Fiscal Year prepared in detail, for the Note Parties, with appropriate presentation and discussion of the principal assumptions upon which such budgets are based accompanied by the statement of a Financial Officer of the Issuer to the effect that the budget is prepared in good faith and (ii) after delivery of such budget, at the request of the Note Agent or the Required Noteholders, hold a meeting telephonically (at a mutually agreeable time) with the Note Agent and all Noteholders who wish to participate, in order to review and discuss such budget; and

(i)    _Other Information_.  Promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Company, or compliance with the terms of any Note Document, as the Note Agent or any Noteholder may reasonably request.

**Section 5.02.    Litigation and Other Notices**.  Furnish to the Note Agent and each Noteholder prompt written notice of the following:

(a)    any Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)    the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against any Company or any Affiliate thereof that could reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Note Document;

(c)    any development that has resulted in, or could reasonably be expected to result in a Material Adverse Effect;

(d)    the occurrence of a Casualty Event where the estimated cost of repair, replacement or restoration is greater than $[500,000] and will ensure that the Net Cash Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or

60

otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Security Documents; and

(e)    (i) the incurrence of any material Lien (other than Permitted Liens) on, or claim asserted against any of the Collateral or (ii) the occurrence of any other event which could materially affect the value of the Collateral.

**Section 5.03.    Existence; Businesses and Properties**.  (a)  Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05 or, in the case of any Subsidiary, where the failure to perform such obligations, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    (i) Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names material to the conduct of its business; (ii) comply with all applicable Requirements of Law (including any and all zoning, building, Environmental Law, ordinance, code or approval or any building permits or any restrictions of record or agreements affecting the Real Property (except in the case of any Leased Real Property, where the lessor is responsible for such compliance)) and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; pay and perform its obligations under all Leases and Transaction Documents except where failure to do so could not reasonably be expected to have a Material Adverse Effect; and (iii) at all times maintain and preserve all Property material to the conduct of such business and keep such Property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times; provided, that nothing in this Section 5.03(b) shall prevent (x) sales of assets, consolidations or mergers by or involving any Company in accordance with Section 6.05; (y) the withdrawal by any Company of its qualification as a foreign corporation in any jurisdiction where such withdrawal, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; or (z) the abandonment by any Company of any rights, franchises, licenses, trademarks, trade names, copyrights or patents that such Person reasonably determines are not useful to its business.

**Section 5.04.    Insurance**.  (a)  Keep its insurable Property adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks, including fire and other risks insured against by extended coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death or Property damage occurring upon, in, about or in connection with the use of any Property owned, occupied or controlled by it; and maintain such other insurance as may be required by law; and, with respect to the Collateral, otherwise maintain all insurance coverage required under each applicable Security Document, such policies to be in such form and amounts and having such coverage as may be reasonably satisfactory to the Note Agent and the Collateral Agent.

NYDOCS/1230942.8

(b)     All such insurance shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days after receipt by the Collateral Agent of written notice thereof, (ii) name the Collateral Agent as mortgagee (in the case of Property insurance covering Mortgaged Properties) or additional insured (in the case of liability insurance) or loss payee (in the case of casualty insurance), as applicable, (iii) if reasonably requested by the Collateral Agent, include a breach of warranty clause and (iv) be reasonably satisfactory in all other respects to the Collateral Agent.

(c)     Notify the Note Agent and the Collateral Agent immediately whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 5.04 is taken out by any Note Party, and promptly deliver to the Note Agent and the Collateral Agent a duplicate original copy of such policy or policies.

(d)     To the extent available, obtain flood insurance in such total amount as the Note Agent or the Required Noteholders may from time to time require, if at any time the area in which any improvements located on any real Property covered by a Mortgage is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

(e)     Deliver to the Note Agent and the Collateral Agent and the Noteholders a report of a reputable insurance broker with respect to such insurance and such supplemental reports with respect thereto as the Note Agent or the Collateral Agent may from time to time reasonably request but, unless a Default shall have occurred and be continuing, not more than two times per year.

Section 5.05.     **Obligations and Taxes**.  (a)  Pay its Material Indebtedness and other obligations promptly and in accordance with their terms and pay and discharge promptly when due all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its Property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien other than a Permitted Lien upon such properties or any part thereof; provided, that such payment and discharge shall not be required with respect to any such obligation, Tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and the applicable Company shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation, Tax, assessment or charge and enforcement of a Lien other than a Permitted Lien and, in the case of Collateral, the applicable Company shall have otherwise complied with the Contested Collateral Lien Conditions.

(b)     Timely and correctly file all material Tax Returns required to be filed by it.

Section 5.06.     **Employee Benefits**.  (a)  Comply in all material respects with the applicable provisions of ERISA and the Code and (b) furnish to the Note Agent (x) as soon as possible after, and in any event within 10 days after any Responsible Officer of the Note

Parties or their ERISA Affiliates or any ERISA Affiliate knows or has reason to know that, any ERISA Event has occurred that, alone or together with any other ERISA Event could reasonably be expected to result in liability of the Note Parties or their ERISA Affiliates in an aggregate amount exceeding [_____] or the imposition of a Lien, a statement of a Financial Officer of the Issuer setting forth details as to such ERISA Event and the action, if any, that the Note Parties propose to take with respect thereto, and (y) upon request by the Note Agent, copies of: (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Note Party or any ERISA Affiliate with the Internal Revenue Service with respect to each Plan; (ii) the most recent actuarial valuation report for each Plan; (iii) all notices received by any Note Party or any ERISA Affiliate from a Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event; and (iv) such other documents or governmental reports or filings relating to any Plan (or employee benefit plan sponsored or contributed to by any Note Party) as the Note Agent shall reasonably request.

**Section 5.07.** **Maintaining Records; Access to Properties and Inspections**. Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law are made of all dealings and transactions in relation to its business and activities. Each Company will permit any representatives designated by the Note Agent or any Noteholder to visit and inspect the financial records, physical and other assets (including documentation relating to intellectual property) on reasonable notice and during regular business hours, and the Property of such Company at reasonable times and as often as reasonably requested on reasonable notice and to make extracts from and copies of such financial records, and permit any representatives designated by the Note Agent or any Noteholder to discuss the affairs, finances and condition of any Company with the officers thereof and independent accountants therefor (but, unless a Default shall have occurred and be continuing, not more than two times per year).

**Section 5.08.** **Issuance of Notes**. Issue the Notes only for the purpose set forth in Section 3.14.

**Section 5.09.** **Compliance with Environmental Laws; Environmental Reports**. (a) Comply, and cause all lessees and other Persons occupying Real Property owned, operated or leased by any Company to comply, in all material respects with all Environmental Laws and Environmental Permits applicable to its operations and Real Property; obtain and renew all material Environmental Permits applicable to its operations and Real Property; and conduct any Response that the Issuer or any such lessee or other Person is required to conduct pursuant to Environmental Laws in accordance with Environmental Laws; provided, that no Company shall be required to undertake any Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

(b) If a Default caused by reason of a breach of Section 3.19 or Section 5.09(a) shall have occurred and be continuing for more than 20 days without the Companies commencing activities reasonably likely to cure such Default, at the written request of the Required Noteholders through the Note Agent, provide to the Noteholders within 45 days after such request, at the expense of the Issuer, an environmental assessment report regarding the

63

matters which are the subject of such Default, including where appropriate, any soil and/or groundwater sampling, prepared by an environmental consulting firm and in the form and substance reasonably acceptable to the Note Agent and indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance or Response to address them.

Section 5.10. **Intentionally Omitted.**

Section 5.11. **Additional Collateral; Additional Guarantors**. (a) Subject to this Section 5.11, with respect to any Property (including Intellectual Property) acquired after the Closing Date by the Issuer or any other Note Party that is not subject to the Lien created by the Security Documents promptly (and in any event within 30 days after the acquisition thereof): (i) execute and deliver to the Note Agent and the Collateral Agent such amendments or supplements to the relevant Security Documents or such other documents as the Note Agent or the Collateral Agent shall reasonably deem necessary or advisable to grant to the Collateral Agent, for its benefit and for the benefit of the other Secured Parties, a Lien on such Property subject to no Liens other than Permitted Liens, and (ii) take all actions necessary to cause such Lien to be duly perfected to the extent required by such Security Document in accordance with all applicable Requirements of Law, including, without limitation, the filing of financing statements in such jurisdictions as may be reasonably requested by the Note Agent. The Issuer shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Note Agent or the Collateral Agent shall reasonably require to confirm the validity, perfection and priority of the Lien of the Security Documents against such after-acquired properties or assets.

(b) With respect to any Person that is or becomes a Wholly Owned Subsidiary promptly (and in any event within [15] days after such Person becomes a Subsidiary) (i) deliver to the Collateral Agent the certificates, if any, representing the Equity Interests of such Subsidiary (provided, that with respect to any Foreign Subsidiary of the Issuer, in no event shall more than 65% of the Equity Interests of any Foreign Subsidiary be subject to any Lien or pledge under any Security Document), together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of such Subsidiary's parent, as the case may be, and all intercompany notes owing from such Subsidiary to any Note Party together with instruments of transfer executed and delivered in blank by a duly authorized officer of such Subsidiary, and (ii) cause any new Domestic Subsidiary (A) to execute a Joinder Agreement or such comparable documentation and a joinder agreement to the Security Agreement in the form annexed thereto, and (B) to take all actions necessary or advisable in the opinion of the Note Agent or the Collateral Agent to cause the Lien created by the Security Agreement to be duly perfected to the extent required by such agreement in accordance with all applicable Requirements of Law, including, without limitation, the filing of financing statements in such jurisdictions as may be reasonably requested by the Note Agent or the Collateral Agent.

(c) Each Note Party will promptly grant to the Collateral Agent, within 30 days of the acquisition thereof, a security interest in and Mortgage on (i) each Real Property owned in fee by such Note Party as is acquired by such Note Party after the Closing Date and that, together with any improvements thereon, individually has a fair market value of at least $[1,000,000], and (ii) unless the Collateral Agent otherwise consents, each leased Real Property

64

of such Note Party which lease individually has a fair market value of at least $[1,000,000], in each case, as additional security for the Obligations [(unless the subject Property is already mortgaged to a third party to the extent permitted by <u>Section 6.02</u>)].  Such Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Note Agent and the Collateral Agent and shall constitute valid and enforceable perfected Liens subject only to Existing Liens (defined in each such Mortgage) or Permitted Liens.  The Mortgages or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Mortgages and all taxes, fees and other charges payable in connection therewith shall be paid in full.  Such Note Party shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Note Agent or the Collateral Agent shall reasonably require to confirm the validity, perfection and priority of the Lien of any existing Mortgage or new Mortgage against such after-acquired Real Property (including, without limitation, a Noteholder's title insurance policy containing such endorsements and affirmative insurance as the Note Agent and the Collateral Agent shall reasonably require, a Survey and local counsel opinion (each in form and substance reasonably satisfactory to the Note Agent and the Collateral Agent) in respect of such Mortgage).

Section 5.12.    <u>Security Interests; Further Assurances</u>.  Promptly, upon the reasonable request of the Note Agent, the Collateral Agent or any Noteholder, at the Issuer's expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by the Note Agent or the Collateral Agent reasonably necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby superior to and prior to the rights of all third Persons other than the holders of Permitted Liens and subject to no other Liens, other than Permitted Liens, or obtain any consents, including, without limitation, landlord or similar lien waivers and consents, as may be necessary or appropriate in connection therewith.  Deliver or cause to be delivered to the Note Agent and the Collateral Agent from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to the Note Agent and the Collateral Agent as the Note Agent and the Collateral Agent shall reasonably deem necessary to perfect or maintain the Liens on the Collateral pursuant to the Security Documents.  Upon the exercise by the Note Agent, the Collateral Agent or the Required Noteholders of any power, right, privilege or remedy pursuant to any Note Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority execute and deliver all applications, certifications, instruments and other documents and papers that the Note Agent, the Collateral Agent or the Required Noteholders may so require.  If the Note Agent, the Collateral Agent or the Required Noteholders determine in good faith that they are required by law or regulation to have appraisals prepared in respect of the Real Property of any Note Party constituting Collateral, the Issuer shall provide to the Note Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA and are otherwise in form and substance reasonably satisfactory to the Note Agent and the Collateral Agent.

NYDOCS/1230942.8

**Section 5.13.**  **Information Regarding Collateral**.  (a)  With respect to any change (i) in any Note Party's legal name, (ii) in the location of any Note Party's chief executive office, (iii) in any Note Party's identity or organizational structure, (iv) in any Note Party's Federal Taxpayer Identification Number or organizational identification number, if any or (v) in any Note Party's jurisdiction of organization (in each case, including, without limitation, by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), such Note Party shall not effect such change until (A) it shall have given the Collateral Agent and the Note Agent not less than 15 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the Collateral Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Collateral Agent or the Note Agent may reasonably request and (B) with respect to such change, such Note Party shall have taken all action reasonably satisfactory to the Collateral Agent to maintain the perfection and priority of the security interest of the Collateral Agent for the benefit of the Secured Parties in the Collateral, if applicable and if requested by the Collateral Agent.  Each Note Party agrees to promptly provide the Collateral Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence.  Upon the request of the Collateral Agent, but, unless an Event of Default has occurred and is continuing, not more often than once every six months, such Note Party also agrees to promptly notify the Collateral Agent of any change in the location of any office in which it maintains material books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it (including the establishment of any such new office or facility), other than changes in location to a Mortgaged Property or a leased Property subject to a Landlord Access Agreement.  The Issuer also agrees promptly to notify the Note Agent and the Collateral Agent if any material portion of the Collateral is subject to a Casualty Event.

(b)  Each year, at the time of delivery of annual financial statements with respect to the preceding Fiscal Year pursuant to Section 5.01(a), deliver to the Note Agent and the Collateral Agent a Perfection Certificate Supplement and a certificate of the Chief Executive Officer, the President or a Financial Officer or the chief legal officer of the Issuer certifying that all UCC Financing Statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Collateral have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction to the extent necessary to protect and perfect the security interests and Liens under the Security Documents for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period).

**Section 5.14.**  **Noteholder Meetings.**  The Issuer will participate in one (1) in-person and three (3) telephonic meetings each year with the Note Agent and the Noteholders, on a schedule established by, and as reasonably requested by, the Note Agent.

**Section 5.15.**  **Cooperation with Advisors.**  Each of the Note Parties will use commercially reasonable efforts to provide full cooperation and assistance to all consultants, appraisers or other advisors hired by the Note Agent (or its counsel) and the Noteholders to

enable such consultants, appraisers and advisors to perform the services for which they were engaged.

Section 5.16. **Landlord Access Agreement**. To the extent requested by the Collateral Agent, with respect to each leased Real Property location set forth on Schedule 3.06(b), the Issuer shall use reasonable commercial efforts to obtain a Landlord Access Agreement or bailee letter (as applicable) in form and substance satisfactory to the Collateral Agent.

Section 5.17. **Information.** The Issuer will provide to the Noteholders and to prospective investors, upon the request of such holders, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act so long as the Note are not freely transferable under the Securities Act.

## ARTICLE VI

## NEGATIVE COVENANTS

Each Note Party covenants and agrees with each Noteholder that, so long as this Agreement shall remain in effect and until the principal of and interest on each Note and all fees and all other expenses or amounts payable under any Note Document have been paid in full, unless the Required Noteholders shall otherwise consent in writing, no Note Party will, nor will it cause or permit any of its Subsidiaries to:

Section 6.01. **Indebtedness**. Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness, except:

(a) Indebtedness incurred pursuant to this Agreement and the other Note Documents;

(b) the Senior Debt;

(c) (i) Indebtedness outstanding on the Closing Date and listed on Schedule 6.01(b) or (ii) refinancings, renewals or replacements thereof; provided, that (A) any such refinancing Indebtedness is in an aggregate principal amount not greater than the aggregate principal amount of the Indebtedness being renewed or refinanced, plus the amount of any premiums required to be paid thereon and fees and expenses associated therewith, and (B) such refinancing Indebtedness has a later or equal final maturity and longer or equal weighted average life than the Indebtedness being renewed or refinanced and (C) the covenants, events of default subordination and other provisions thereof (including any guarantees thereof) shall be, in the aggregate, no less favorable to the Noteholders than those contained in the Indebtedness being renewed or refinanced;

(d) Indebtedness of any Note Party under Interest Rate Agreements entered into in order to fix the effective interest rate on the Notes and such other nonspeculative Interest Rate Agreements which may be entered into from time to time by any Loan Party and which such Loan Party in good faith believes will provide protection against fluctuations in interest

67

rates with respect to floating rate Indebtedness then outstanding, and permitted to remain outstanding, pursuant to the other provisions of this Section 6.01;

(e)     intercompany Indebtedness incurred after the Closing Date to the extent permitted by Section 6.04(g) and (l);

(f)     Indebtedness incurred after the Closing Date in respect of Purchase Money Obligations and Capital Lease Obligations, and refinancings and renewals thereof, in an aggregate amount not to exceed [_____] at any time outstanding;

(g)     Indebtedness in respect of workers' compensation claims, self-insurance obligations, performance bonds, surety appeal or similar bonds and completion guarantees provided by a Note Party in the ordinary course of its business;

(h)     Contingent Obligations of any Note Party in respect of Indebtedness or other obligations otherwise permitted under Section 6.01;

(i)     (A) Indebtedness assumed in connection with the acquisition of any real or personal Property, and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof or (B) Indebtedness of any Person that becomes a Subsidiary Guarantor after the date hereof; provided, that (x) such Indebtedness exists at the time such Property is acquired or such Person becomes a Subsidiary Guarantor and is not created in contemplation thereof and (y) the aggregate principal amount of Indebtedness permitted by this clause (i) shall not exceed $[_____] at any time outstanding;

(j)     other unsecured Indebtedness incurred after the Closing Date of any Note Party in an aggregate amount outstanding not to exceed [_____]; and

(k)     Indebtedness incurred after the Closing Date to finance insurance premiums in an aggregate amount outstanding not to exceed [_____].

**Section 6.02.     Liens**.  Create, incur, assume or permit to exist, directly or indirectly, any Lien on any Property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except (the "**Permitted Liens**"):

(a)     inchoate Liens for taxes, assessments or governmental charges or levies not yet due and payable or delinquent and Liens for taxes, assessments or governmental charges or levies, which (i) are being contested in good faith by appropriate proceedings for which adequate reserves, to the extent required by GAAP, have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the Property or assets subject to any such Lien or (ii) in the case of any such charge or claim which has or may become a Lien against any of the Collateral, such Lien and the contest thereof shall satisfy the Contested Collateral Lien Conditions.

(b)     Liens in respect of Property of any Company imposed by law which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money,

such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, and which do not in the aggregate materially detract from the value of the Property of the Note Parties, taken as a whole and (x) which are not then due and payable or (y) (A) which do not materially impair the use of the Property of the Companies in the operation of the business of the Companies, taken as a whole, (B) which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the Property or assets subject to any such Lien and (C) in the case of any such Lien which has or may become a Lien against any of the Collateral, such Lien and the contest thereof shall satisfy the Contested Collateral Lien Conditions.

(c)     any Lien in existence on the Closing Date and set forth on <u>Schedule 6.02(c)</u> and any Lien granted as a replacement or substitute therefor; <u>provided</u>, that as to any such replacement or substitution Lien, (i) except as permitted by <u>Section 6.01(c)</u>, the aggregate principal amount of the Indebtedness, if any, secured by such Lien does not materially increase; and (ii) such Lien does not encumber any Property other than the Property subject thereto on the Closing Date or replacement Property (any such Lien, an "**Existing Lien**");

(d)     easements, rights-of-way, restrictions (including zoning restrictions), covenants, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any Real Property, in each case whether now or hereafter in existence, not (i) securing Indebtedness, (ii) individually or in the aggregate materially impairing the value or marketability of such Real Property and (iii) individually or in the aggregate materially interfering with the conduct of the business of the Companies at such Real Property;

(e)     Liens arising out of judgments or awards not resulting in a Default and in respect of which such Company shall in good faith be prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings; <u>provided</u>, that the aggregate amount of all such judgments or awards (and any cash and the fair market value of any Property subject to such Liens) does not exceed [_____] at any time outstanding;

(f)     Liens (other than any Lien imposed by ERISA) (i) imposed by law or deposits made in connection therewith in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, (ii) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or (iii) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; <u>provided</u>, that (w) with respect to clauses (i), (ii) and (iii) of this paragraph <u>(f)</u>, such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable, such amounts are being contested in good faith by appropriate

69

proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the Property or assets subject to any such Lien, (x) to the extent such Liens are not imposed by law, such Liens shall in no event encumber any Property other than cash and Cash Equivalents, (y) in the case of any such Lien against any of the Collateral, such Lien and the contest thereof shall satisfy the Contested Collateral Lien Conditions and (z) the aggregate amount of deposits at any time pursuant to clauses (ii) and (iii) of this paragraph (f) shall not exceed [_____] in the aggregate;

(g)     Leases of the assets or properties of any Company, in each case entered into in the ordinary course of such Company's business or relating to Real Property which, in the good faith judgment of such Note Party, is no longer useful or necessary in the conduct of such Note Party's business, so long as such Leases are subordinate in all respects to the Liens granted and evidenced by the Security Documents and do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of any Note Party or (ii) materially impair the use (for its intended purposes) or the value of the Property subject thereto;

(h)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Company in the ordinary course of business;

(i)     Liens securing Indebtedness incurred pursuant to Section 6.01(f); provided, that (i) the Indebtedness secured by any such Lien (including refinancings thereof) does not exceed 100% of the cost of the Property being acquired or leased at the time of the incurrence of such Indebtedness and (ii) any such Liens attach only to the Property being financed pursuant to such Indebtedness and do not encumber any other Property of any Company;

(j)     bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and cash equivalents on deposit in one or more accounts maintained by any Company, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained and securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; provided, that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(k)     Liens on Property of a Person existing at the time such Person is acquired or merged with or into or consolidated with any Company (and not created in anticipation or contemplation thereof); provided, that such Liens do not extend to Property not subject to such Liens at the time of acquisition (other than improvements thereon) and renewals or replacements thereof that are no more favorable to the lienholders than such existing Lien;

(l)     Liens securing Indebtedness incurred in reliance on Section 6.01(i); provided, that (i) such Liens do not extend to, or encumber, Property which constitutes Collateral

70

and (ii) such Liens extend only to the Property (or Equity Interests that are not required to be pledged to the Collateral Agent pursuant to Section 5.11(b)) of Foreign Subsidiaries;

(m)     Liens granted pursuant to the Security Documents;

(n)     other Liens incurred in the ordinary course of business of any Company with respect to obligations that do not in the aggregate exceed $[_____].

(o)     any interest or title of a lessor under any lease (including any lease for Real Property) entered into in the ordinary course of business by any Note Party;

(p)     the filing of financing statements solely as a precautionary measure in connection with operating leases or consignment of goods;

(q)     Liens on insurance contracts and proceeds thereof securing Indebtedness permitted pursuant to Section 6.01(k);

(r)     Liens securing payment of Senior Debt; and

(s)     Liens securing any Indebtedness outstanding in reliance on Section 6.01(i), so long as such Liens do not extend beyond the property acquired (or the property of the Person acquired) in connection with the assumption of such Indebtedness;

provided, that no consensual Liens shall be permitted to exist, directly or indirectly, on any Securities Collateral, other than Liens granted pursuant to the Security Documents.

Section 6.03.     **Sale and Leaseback Transactions**.  Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any Property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such Property or other Property which it intends to use for substantially the same purpose or purposes as the Property being sold or transferred (a "**Sale and Leaseback Transaction**") unless (i) the sale of such Property is permitted by Section 6.05 and (ii) any Liens arising in connection with its use of such Property are permitted by Section 6.02.

Section 6.04.     **Investment, Loan and Advances**.  Directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted:

(a)     Investments outstanding on the Closing Date and identified on Schedule 6.04(b);

(b)     the Companies may (i) acquire and hold accounts receivables owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) acquire and hold cash and Cash

71

Equivalents, (iii) endorse negotiable instruments for collection in the ordinary course of business or (iv) make lease, utility and other similar deposits in the ordinary course of business;

(c)     The Issuer may enter into and perform its obligations under Interest Rate Agreements to the extent permitted by Section 6.01(d);

(d)     the Issuer and its Subsidiaries may make loans and advances (including payroll, travel and entertainment related advances) in the ordinary course of business to their respective employees so long as the aggregate principal amount thereof at any time outstanding (determined without regard to any write-downs or write-offs of such loans and advances) shall not exceed $[_____];

(e)     the Companies may sell or transfer amounts to the extent permitted by Section 6.05;

(f)     [Investments (i) by the Issuer in any Domestic Subsidiary Guarantor, (ii) by any Company in the Issuer or any Domestic Subsidiary Guarantor, (iii) by a Subsidiary Guarantor in another Domestic Subsidiary Guarantor, and (iv) by a Subsidiary that is not a Subsidiary Guarantor in any other Subsidiary that is not a Subsidiary Guarantor; provided, that any Investment in the form of a loan or advance shall be evidenced by an Intercompany Note substantially in the form of Exhibit K and, in the case of a loan by a Note Party, pledged by such Note Party as Collateral pursuant to the Security Documents;]

(g)     Investments in securities of trade creditors or customers in the ordinary course of business that are received in settlement of bona fide disputes or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(h)     Investments made by the Issuer or any Subsidiary in the form of non-cash consideration received in connection with an Asset Sale made in compliance with Section 6.05;

(i)     Investments in Subsidiaries as a result of the consummation of Permitted Acquisitions;

(j)     Investments that do not exceed $500,000, in the aggregate outstanding at any time;

(k)     Guarantees constituting Indebtedness permitted by Section 6.01;

(l)     Investments in Foreign Subsidiaries described in Schedule 3.09(a); and

(m)     Investments in Foreign Subsidiaries after the Closing Date provided that Investments do not exceed $600,000 in the aggregate at any one time.

**Section 6.05.     Mergers, Consolidations, Sales of Assets and Acquisitions**. Wind up, liquidate or dissolve its affairs or enter into any transaction of merger or consolidation, engage in any Asset Sale or purchase or otherwise acquire (in one or a series of related

transactions) any part of the Property or assets of any Person (or agree to do any of the foregoing at any future time), except that:

(a)     Capital Expenditures by Issuer and its Subsidiaries shall be permitted to the extent permitted by Section 6.08(b);

(b)     (i) purchases and other acquisitions and sales of inventory, materials, equipment and intangible assets in the ordinary course of business shall be permitted, (ii) subject to Section 2.08(b), Asset Sales of used, damaged, worn out, obsolete or surplus Property by any Note Party in the ordinary course of business and the abandonment or other Asset Sale of Property that is, in the reasonable judgment of the Issuer, no longer economically practicable to maintain or useful in the conduct of the business of the Companies taken as a whole shall be permitted, (iii) subject to Section 2.08(b), the sale, lease or other disposal of any assets shall be permitted; provided, that the aggregate consideration received in respect of all Asset Sales pursuant to this Section 6.05(b)(iii) shall not exceed (x) $[_____] in any four consecutive fiscal quarters of the Issuer and (y) $[_____] in the aggregate, and (iv) a sale of Property by any Domestic Guarantor or the Issuer to any Domestic Guarantor or by any Domestic Guarantor to the Issuer, provided that the Lien on the Property granted in favor of the Note Agent under the Security Documents shall be maintained in a manner acceptable to the Note Agent;

(c)     Investments may be made in compliance with Section 6.04;

(d)     the Issuer and its Subsidiaries may sell Cash Equivalents in the ordinary course of business;

(e)     the Issuer and its Subsidiaries may lease (as lessee or lessor) real or personal Property and may guaranty such lease, in each case, in the ordinary course of business (or, when the Issuer or a Subsidiary is the lessor of Real Property, with respect to Real Property which, in such Person's good faith judgment, is no longer useful or necessary in the conduct of such Person's business);

(f)     the Issuer and its Subsidiaries may consummate Permitted Acquisitions;

(g)     any Foreign Subsidiary may merge or consolidate with or into any other Foreign Subsidiary and any Domestic Subsidiary Guarantor may merge or consolidate with or into the Issuer or any other Domestic Subsidiary Guarantor (as long as the Issuer or a Domestic Subsidiary Guarantor is the surviving Person in such merger or consolidation and remains a Subsidiary of the Issuer); provided, that the Lien on and security interest in such Property granted or to be granted in favor of the Collateral Agent under the Security Documents shall be maintained or created in accordance with the provisions of Section 5.11 or Section 5.12, as applicable;

(h)     [Holdco may merge into Parent prior to, on or after the Closing Date.]

(i)     any Subsidiary may dissolve, liquidate or wind up its affairs at any time; provided, that such dissolution, liquidation or winding-up, as applicable, could not reasonably be expected to have a Material Adverse Effect;

73

(j)     sales, transfers and dispositions of accounts receivable in connection with the compromise, settlement or collection thereof; and

(k)     within 365 days after the consummation of a Permitted Acquisition, the sale, transfer or disposition for cash and for fair market value of assets acquired in connection with such Permitted Acquisition and not required in the operation of the business of the Issuer or any of the Subsidiaries; provided, that the aggregate consideration since the Closing Date in respect of all such sales, transfers and dispositions shall not exceed $[_____].

To the extent the Required Noteholders waive the provisions of this Section 6.05 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 6.05, such Collateral (unless sold to a Note Party) shall be sold free and clear of the Liens created by the Security Documents.  No less than [80]% of the consideration received in any Asset Sale pursuant to Section 6.05(b)(iii) or Section 6.05(j) shall be in cash or Cash Equivalents (it being understood that any Indebtedness of the Issuer or any Subsidiary assumed by the purchaser in such Asset Sale shall be deemed cash for purposes of this sentence).

Section 6.06.     Dividends.  Authorize, declare or pay, directly or indirectly, any Dividends with respect to any Note Party, except that:

(a)     any Subsidiary of the Issuer may pay cash Dividends to the Issuer or any Wholly Owned Subsidiary of the Issuer;

(b)     the Issuer may pay cash Dividends to the Parent for the purpose of paying, so long as all proceeds thereof are promptly used by the Parent to pay, its franchise taxes and operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including legal and accounting expenses and similar expenses and customary fees to non-officer directors of the Parent); provided, that the aggregate amount of Dividends paid to the Parent pursuant to this paragraph (b) shall not exceed $[_____] in any Fiscal Year.

Section 6.07.     Transactions with Affiliates.  Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of any Company (other than between or among the Issuer and one or more Subsidiary Guarantors), other than in the ordinary course of business and on terms and conditions substantially as favorable to such Note Party as would reasonably be obtained by such Note Party at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that:

(a)     Dividends may be paid to the extent permitted by Section 6.06;

(b)     loans may be made and other transactions may be entered into between and among any Note Party and any other Note Party to the extent permitted by Section 6.01 and Section 6.04;

(c)     customary fees may be paid to non-officer directors of the Parent and the Issuer and customary indemnities may be provided to officers and directors of the Parent and the Issuer; and

74

(d) transactions among the Issuer and any Domestic Guarantor or any Domestic Guarantor and another Domestic Guarantor may be effected.

**Section 6.08.** **Financial Covenants**.

(a) <u>Minimum Consolidated Interest Coverage Ratio</u>. Permit the Consolidated Interest Coverage Ratio, for any Test Period ending during any period set forth in the table below, to be less than the ratio set forth opposite such period in the table below:

| Test Period Ending | Minimum Consolidated Interest Coverage Ratio |
|---|---|
| March [31][11], 2006 | [_____] |
| June [30], 2006 | [_____] |
| September [30], 2006 | [_____] |
| December [31], 2006 | [_____] |
| March [31], 2007 | [_____] |
| June [30], 2007 | [_____] |
| September [30], 2007 | [_____] |
| December [31], 2007 | [_____] |
| March [31], 2008 | [_____] |
| June [30], 2008 | [_____] |
| September [30], 2008 | [_____] |
| December [31], 2008 | [_____] |
| March [31], 2009 | [_____] |
| June [30], 2009 | [_____] |
| September [30], 2009 | [_____] |
| December [31], 2009 | [_____] |
| March [31], 2010 | [_____] |
| June [30], 2010 | [_____] |
| September [30], 2010 | [_____] |
| December [31], 2010 | [_____] |

(b) <u>Maximum Capital Expenditures</u>. Permit the aggregate amount of Capital Expenditures made in any period set forth below, to exceed the amount set forth opposite such

---

[11] Dates to be conformed to Company's 4/4/5 accounting.

75

period below; <u>provided</u>, that so long as no Default has occurred and is continuing or would result from such Capital Expenditures, any unused amounts may be carried over for expenditure in the next following period (provided that unused amounts may only be carried over for one test period and for purposes of calculations under this Section, the "carried over amount" shall be deemed to be the last amounts utilized in any test period.

| Period | Capital Expenditures |
|---|---|
| Closing Date through December 31, 2006 | $1,800,000 |
| 2007 and each calendar year thereafter | $1,800,000 |

       (c)     <u>Minimum Consolidated EBITDA</u>. Permit Consolidated EBITDA for any Test Period to be less than the amount set forth opposite such period below:

| Test Period Ending | Consolidated EBITDA |
|---|---|
| March [31], 2006 | [_____] |
| June [30], 2006 | [_____] |
| September [30], 2006 | [_____] |
| December [31], 2006 | [_____] |
| March [31], 2007 | [_____] |
| June [30], 2007 | [_____] |
| September [30], 2007 | [_____] |
| December [31], 2007 | [_____] |
| March [31], 2008 | [_____] |
| June [30], 2008 | [_____] |
| September [30], 2008 | [_____] |
| December [31], 2008 | [_____] |
| March [31], 2009 | [_____] |
| June [30], 2009 | [_____] |
| September [30], 2009 | [_____] |
| December [31], 2009 | [_____] |
| March [31], 2010 | [_____] |
| June [30], 2010 | [_____] |
| September [30], 2010 | [_____] |
| December [31], 2010 | [_____] |

NYDOCS/1230942.8

(d)　Leverage Ratio.  Permit the Leverage Ratio for any Test Period to be less than the ratio set forth below.

| Test Period Ending | Leverage Ratio |
|---|---|
| March [31], 2006 | [_____] |
| June [30], 2006 | [_____] |
| September [30], 2006 | [_____] |
| December [31], 2006 | [_____] |
| March [31], 2007 | [_____] |
| June [30], 2007 | [_____] |
| September [30], 2007 | [_____] |
| December [31], 2007 | [_____] |
| March [31], 2008 | [_____] |
| June [30], 2008 | [_____] |
| September [30], 2008 | [_____] |
| December [31], 2008 | [_____] |
| March [31], 2009 | [_____] |
| June [30], 2009 | [_____] |
| September [30], 2009 | [_____] |
| December [31], 2009 | [_____] |
| March [31], 2010 | [_____] |
| June [30], 2010 | [_____] |
| September [30], 2010 | [_____] |
| December [31], 2010 | [_____] |

**Section 6.09.** **Intentionally Omitted**.

**Section 6.10.** **Modification of Certain Agreements**.  Without the prior consent of the Noteholders, the Issuer will not, and will not permit any of its Subsidiaries to, amend, supplement, waive or otherwise modify, or consent to any amendment, supplement, waiver or other modification of, or enter into any forbearance from exercising any rights with respect to, the terms or provisions contained in

(a)　any of the Transaction Documents (other than the Senior Debt Documents), in each case which amendment, supplement, amendment and restatement, waiver, modification or forbearance would adversely affect the ability of the Issuer or any of its Subsidiaries to perform under the Note Documents or which would increase the Issuer's or any Subsidiary's obligations or liabilities, contingent or otherwise, except for such amendments,

77

supplements, amendments and restatements, waivers, modifications or acts of forbearance which would not cause the Issuer or any Subsidiary to breach any of their obligations set forth herein or in any other Note Document or which would not impair, or be in any manner adverse to, the rights, interests or obligations of any Noteholder under any Note Document;

(b)     the Senior Debt Documents, or refund or refinance the same, if the effect of such amendment or such refunding or refinancing is to amend or add any provision which expressly limits the Issuer's ability to pay the Senior Subordinated Debt or restricts the Issuer from making amendments or modifications to the Note Documents in a way that is more restrictive than such restrictions as are in effect in the Senior Debt Documents in effect on the Closing Date;

(c)     any Organizational Document of the Issuer or any Subsidiary if the effect thereof is to impair, or is in any manner adverse to, the rights, interests or obligations of any Noteholder under any Note Document.

**Section 6.11.     Limitation on Certain Restrictions on Subsidiaries**. Directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any Subsidiary, to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Issuer or any Subsidiary of the Issuer, or pay any Indebtedness owed to the Issuer or a Subsidiary of the Issuer, (b) make loans or advances to the Issuer or any of the Issuer's Subsidiaries or (c) transfer any of its properties to the Issuer or any of the Issuer's Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law; (ii) this Agreement and the other Note Documents; (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Issuer or a Subsidiary of the Issuer; (iv) customary provisions restricting assignment of any agreement entered into by the Issuer or a Subsidiary of the Issuer in the ordinary course of business; (v) any holder of a Lien permitted by Section 6.02 may restrict the transfer of the asset or assets subject thereto; (vi) restrictions which are not more restrictive than those contained in this Agreement contained in the Senior Debt Documents; and (vii) customary restrictions and conditions contained in any agreement relating to the sale of any Property permitted under Section 6.05 pending the consummation of such sale.

**Section 6.12.     Limitation on Issuance of Capital Stock**. (a)  With respect to the Parent, issue any Equity Interest that is not Qualified Capital Stock.

(b)     the Issuer will not, and will not permit any Subsidiary to, issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Equity Interest, except (i) for stock splits, stock dividends and additional issuances of Equity Interests which do not decrease the percentage ownership of the Issuer or any Subsidiaries in any class of the Equity Interest of such Subsidiary; (ii) Subsidiaries of the Issuer formed after the Closing Date in accordance with Section 6.13 may issue Equity Interests to the Issuer or the Subsidiary of the Issuer which is to own such Equity Interests; and (iii) the Issuer may issue common stock that is Qualified Capital Stock to the Parent.  All Equity Interests issued in accordance with this Section 6.12(b) shall, to the extent required by Section

78

5.11 and Section 5.12 or any Security Agreement, be delivered to the Collateral Agent for pledge pursuant to the applicable Security Agreement.

**Section 6.13.** **Limitation on Creation of Subsidiaries**. Establish, create or acquire any additional Subsidiaries without the prior written consent of the Note Agent and the Required Noteholders; provided, that without such consent, the Issuer may (a) establish or create one or more Domestic Subsidiaries of the Issuer that are Wholly Owned Subsidiaries, or (b) acquire one or more Domestic Subsidiaries in connection with a Permitted Acquisition, so long as, in each case, Section 5.11(b) shall be complied with.

**Section 6.14.** **Business**. (a) With respect to the Parent, engage in any business activities or have any assets or liabilities, other than (i) its ownership of the Equity Interests of the Issuer, (ii) obligations under the Note Documents and the Senior Debt Documents and (iii) activities and assets incidental to the foregoing clauses (i) and (ii).

(b) With respect to the Issuer and its Subsidiaries, engage (directly or indirectly) in any business other those businesses in which the Issuer and its Subsidiaries are engaged on the Closing Date, and other activities reasonably related thereto.

**Section 6.15.** **Limitation on Accounting Changes**. Make or permit any change in accounting policies or reporting practices without the consent of the Note Agent and the Required Noteholders, which consent shall not be unreasonably withheld, except changes that are required by GAAP.

**Section 6.16.** **Fiscal Year**. Change the basis upon which the Company determines its Fiscal Year.

**Section 6.17.** **Lease Obligations**. Create, incur, assume or suffer to exist any obligations as lessee for the rental or hire of real or personal Property of any kind under leases or agreements to lease having an original term of one year or more that would cause the direct and contingent liabilities of the Issuer and its Subsidiaries, on a consolidated basis, in respect of all such obligations to exceed $[_____], payable in any period of 12 consecutive months.

**Section 6.18.** **No Further Negative Pledge**. Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of any Note Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties, assets or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following: (1) this Agreement and the other Note Documents; (2) the Senior Debt Documents; (3) covenants in documents creating Liens permitted by Section 6.02 prohibiting further Liens on the assets encumbered thereby; and (4) customary restrictions contained in leases not subject to a waiver.

79

**Section 7.01.** **The Guarantee**. The Guarantors hereby jointly and severally guarantee as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code) on the Notes held by each Noteholder of, the Issuer, and all other Obligations from time to time owing to the Secured Parties by any Note Party under any Note Document or Interest Rate Agreement relating to the Notes, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"). The Guarantors hereby jointly and severally agree that if the Issuer or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**Section 7.02.** **Obligations Unconditional**. The obligations of the Guarantors under Section 7.01 shall constitute a guaranty of payment and are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Issuer under this Agreement, the Notes or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a) at any time or from time to time, without notice to the Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b) any of the acts mentioned in any of the provisions of this Agreement, the Notes or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c) the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Note Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)      any Lien or security interest granted to, or in favor of, any Noteholder or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(e)      the release of any other Guarantor.

The Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Note Party thereof exhaust any right, power or remedy or proceed against the Issuer under this Agreement or the Notes, or any other agreement or instrument referred to herein or therein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations.  The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Issuer and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee.  This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other Person at any time of any right or remedy against the Issuer or against any other Person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto.  This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Noteholders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

**Section 7.03.      Reinstatement**.  The obligations of the Guarantors under this Article VII shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Issuer or other Note Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.  The Guarantors jointly and severally agree that they will indemnify each Secured Party on demand for all reasonable costs and expenses (including reasonable fees of counsel) incurred by such Secured Party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law, other than any costs or expenses resulting from the bad faith or willful misconduct of such Secured Party.

**Section 7.04.      Subrogation; Subordination**.  Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations it shall not exercise any right or remedy arising by reason of any performance by it of its guarantee in Section 7.01, whether by subrogation or otherwise, against the Issuer or any other Guarantor

81

of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any Indebtedness of any Note Party permitted pursuant to Section 6.01(e) shall be subordinated to such Note Party's Obligations in the manner set forth in the Intercompany Note evidencing such Indebtedness.

Section 7.05. **Remedies**. The Guarantors jointly and severally agree that, as between the Guarantors and the Noteholders, the obligations of the Issuer under this Agreement and the Notes, may be declared to be forthwith due and payable as provided in Article X (and shall be deemed to have become automatically due and payable in the circumstances provided in said Article X) for purposes of Section 7.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Issuer and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Issuer) shall forthwith become due and payable by the Guarantors for purposes of Section 7.01.

Section 7.06. **Instrument for the Payment of Money**. Each Guarantor hereby acknowledges that the guarantee in this Article VII constitutes an instrument for the payment of money, and consents and agrees that any Noteholder or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion action under New York CPLR Section 3213.

Section 7.07. **Continuing Guarantee**. The guarantee in this Article VII is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 7.08. **General Limitation on Guarantee Obligations**. In any action or proceeding involving any state corporate, limited partnership, limited liability company or organizational law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 7.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Note Party or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 7.09. **Release of Guarantors.** If in compliance with the terms and provisions of the Note Documents, all or substantially all of the Equity Interests or assets of any Guarantor are sold or otherwise transferred to a Person or Persons, none of which is the Issuer or another Subsidiary, such Guarantor shall, upon the consummation of such sale or transfer be released from its obligations under this Agreement (including under Section 10.03 hereof) and its obligations to pledge and grant any Collateral owned by it pursuant to any Security Document and, the pledge of such Equity Interests to the Collateral Agent pursuant to the Security Agreements shall be released, and the Collateral Agent shall take such actions as are necessary to

82

effect each release described in this Section 7.09 in accordance with the relevant provisions of the Security Documents.

# ARTICLE VIII

# EVENTS OF DEFAULT

In case of the happening of any of the following events ("**Events of Default**"):

(a)     default shall be made in the payment of any principal of any Note when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(b)     default shall be made in the payment of any interest on any Note or any fee or any other amount (other than an amount referred to in clause (a) above) due under any Note Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five Business Days;

(c)     any representation or warranty made or deemed made in or in connection with any Note Document or the issuances of the Notes hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Note Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(d)     default shall be made in the due observance or performance by any Company of any covenant, condition or agreement contained in Section 5.02, 5.03(a) or Article VI;

(e)     default shall be made in the due observance or performance by any Company of any covenant, condition or agreement contained in any Note Document (other than those specified in clauses (a), (b) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of 35 days after written notice thereof from the Note Agent and Required Noteholders to the Issuer;

(f)     default shall have occurred under the Senior Debt Documents;

(g)     any Company shall (i) fail to pay any principal or interest on any Material Indebtedness at its stated maturity, or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness if the effect of any failure referred to in this clause (ii) is to cause, such Indebtedness to become due prior to its stated maturity;

(h)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of any Company, or of a substantial part of the Property or assets of any Company, under the Bankruptcy Code, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law; (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any

83

Company or for a substantial part of the Property or assets of any Company; or (iii) the winding-up or liquidation of any Company; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)     any Note Party shall (i) voluntarily commence any proceeding or file any petition seeking relief under the Bankruptcy Code, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law; (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (h) above; (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Note Party or for a substantial part of the property or assets of any Note Party; (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding; (v) make a general assignment for the benefit of creditors; (vi) become unable, admit in writing its inability or fail generally to pay its debt as they become due; (vii) take any formal action by the Board of Directors for the purpose of effecting any of the foregoing; or (viii) wind up or liquidate;

(j)     one or more final judgments for the payment of money in an aggregate amount in excess of $[_____] shall be rendered against any Company or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of any Company, to enforce any such judgment;

(k)     an ERISA Event or noncompliance with respect to Foreign Plans shall have occurred that, in the reasonable opinion of the Note Agent and the Required Noteholders, when taken together with all other such ERISA Events and noncompliance with respect to Foreign Plans that have occurred, could reasonably be expected to result in liability of any Note Party and its ERISA Affiliates in an aggregate amount exceeding $[_____] or the imposition of a Lien on any assets of a Note Party;

(l)     any security interest and Lien purported to be created by any Security Document shall cease to be in full force and effect, or shall cease to give the Collateral Agent, for the benefit of the Secured Parties, the Liens, rights, powers and privileges purported to be created and granted under such Security Documents (including a perfected first priority security interest in and Lien on, all of the Collateral thereunder (except as otherwise expressly provided in such Security Document)) in favor of the Collateral Agent, or shall be asserted by the Issuer or any other Note Party not to be, a valid, perfected, first priority (except as otherwise expressly provided in this Agreement or such Security Document) security interest in or Lien on the Collateral covered thereby;

(m)     any Guarantee shall cease to be in full force and effect except as provided in any Note Document or any Guarantor shall contest the validity or enforceability of any provision of the Guarantee; or

(n)     any Note Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Note Party or any other Person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions

84

of interpretation of any provision thereof), or any Note Party shall repudiate or deny that it has any liability or obligation for the payment of principal or interest or other obligations purported to be created under any Note Document; or

(o)     there shall have occurred a Change in Control;

then, and in every such event (other than any Event of Default described in clause (h) or (i) above), and at any time thereafter during the continuance of such event, the Note Agent may, and at the request of the Required Noteholders shall, by notice to the Issuer, declare the Notes and the PIK Tranche A Notes then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Notes so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Issuer accrued hereunder and under any other Note Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Issuer and the Guarantors, and/or exercise any other rights or remedies available to the Note Agent or the Noteholders under the Note Documents (subject to the Intercreditor Agreement) provided that, with respect to any Event of Default described in clause (h) or (i) above, the principal of the Notes, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Issuer accrued hereunder and under any other Note Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Issuer and the Guarantors, anything contained herein or in any other Note Document to the contrary notwithstanding.

## ARTICLE IX

## THE NOTE AGENT AND THE COLLATERAL AGENT

**Section 9.01.     Appointment**.  Each Noteholder hereby irrevocably designates and appoints each of the Note Agent and the Collateral Agent as an agent of such Noteholder under this Agreement, the Intercreditor Agreement and the other Note Documents.  Each Noteholder irrevocably authorizes each Agent, in such capacity, through its agents or employees, to take such actions on its behalf under the provisions of this Agreement, the Intercreditor Agreement and the other Note Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of this Agreement, the Intercreditor Agreement and the other Note Documents, together with such actions and powers as are reasonably incidental thereto.

**Section 9.02.     Agent in Its Individual Capacity**.  Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Noteholder as any other Noteholder and may exercise the same as though it were not an Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Issuer or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

**Section 9.03.     Exculpatory Provisions**.  No Agent shall have any duties or obligations except those expressly set forth in the Note Documents.  Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties,

85

regardless of whether a Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Note Documents that such Agent is required to exercise in writing by the Required Noteholders (or such other number or percentage of the Noteholders as shall be necessary under the circumstances as provided in <u>Section 10.02</u>), and (c) except as expressly set forth in the Note Documents, no Agent shall have any duty to disclose or shall be liable for the failure to disclose, any information relating to the Issuer or any of its Subsidiaries that is communicated to or obtained by the bank serving as such Agent or any of its Affiliates in any capacity. No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Noteholders (or such other number or percentage of the Noteholders as shall be necessary under the circumstances as provided in <u>Section 10.02</u>) or in the absence of its own gross negligence or willful misconduct. No Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by the Issuer or a Noteholder, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Note Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Note Document, (iv) the validity, enforceability, effectiveness or genuineness of any Note Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere in any Note Document.

Section 9.04. **Reliance by Agent**. Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by a proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by a proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Issuer), independent accountants and other advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or advisors.

Section 9.05. **Delegation of Duties**. Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by such Agent. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Affiliates. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Affiliates of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

Section 9.06. **Successor Agent**. Each Agent may resign as such at any time upon at least 30 days' prior notice to the Noteholders and the Issuer. Upon any such resignation, the Required Noteholders shall have the right, with, if no Default shall have occurred and be continuing, the consent of the Issuer (such consent not to be unreasonably withheld), to appoint a successor Agent from among the Noteholders. If no successor shall have been so appointed by the Required Noteholders and shall have accepted such appointment within 30 days after the

retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Noteholders, appoint a successor Agent, which successor shall be a commercial banking institution organized under the laws of the United States (or any State thereof) or a United States branch or agency of a commercial banking institution, in each case, having combined capital and surplus of at least [$250,000,000].

Upon the acceptance of its appointment as an Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Issuer to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Issuer and such successor. After an Agent's resignation hereunder, the provisions of this Article IX and Section 10.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

**Section 9.07.** **Non-Reliance on Agent and Other Noteholders**. Each Noteholder acknowledges that it has, independently and without reliance upon any Agent or any other Noteholder and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Noteholder also acknowledges that it will, independently and without reliance upon any Agent or any other Noteholder and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Note Document or related agreement or any document furnished hereunder or thereunder.

**Section 9.08.** **Indemnification**. The Noteholders severally agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by the Issuer or the Guarantors and without limiting the obligation of the Issuer or the Guarantors to do so), according to their Ratable Portion in effect on the date on which indemnification is sought under this Section 9.08 (or, if indemnification is sought after the date upon which all Notes shall have been paid in full, ratably in accordance with such outstanding Notes as in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Notes) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, this Agreement, any of the other Note Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided, that no Noteholder shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct. The agreements in this Section 9.08 shall survive the payment of the Notes and all other amounts payable hereunder.

NYDOCS/1230942.8

# ARTICLE X

## MISCELLANEOUS

**Section 10.01.** **Notices**. Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a) if to any Note Party, to the Issuer at:

Atkins Nutritionals, Inc.
105 Maxess Rd, Suite N109
Melville, NY 11747
Attention:  President and General Counsel
Telecopy No.:  (631) 953-4001
with a copy to:

Atkins Nutritionals, Inc
Mark Rodriguez
105 Maxess Rd, Suite N109
Melville, NY 11747

with a copy to:
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Marcia L Goldstein
            Shai Y. Waisman
Telecopy No.: (212) 310-8007

(b) if to the Note Agent or the Collateral Agent, to it at:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut 06901
Attention:  Tom Donnelly
Telecopy No.:  (203) 719-3162;

with a copy to:

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
Attention:  Frederick F. Eisenbiegler
Telecopy No.:  (212) 702-3646

88

(c)     if to a Noteholder, to it at its address (or telecopy number) set forth on the applicable Noteholder Addendum or in the Assignment and Acceptance pursuant to which such Noteholder shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by telecopy or by certified or registered mail, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 10.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 10.01 and failure to deliver courtesy copies of notices and other communications shall in no event affect the validity or effectiveness of such notices and other communications.

Section 10.02.     **Waivers; Amendment**.  (a)  No failure or delay by any Agent, the Collateral Agent, or any Noteholder in exercising any right or power hereunder or under any other Note Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of each Agent, and the Noteholders hereunder and under the other Note Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Note Document or consent to any departure by any Note Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 10.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(b)     Neither this Agreement nor any other Note Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Issuer, the Required Noteholders and the Note Agent or, in the case of any other Note Document, pursuant to an agreement or agreements in writing entered into by the Note Agent and the Note Party or Note Parties that are parties thereto, in each case, with the written consent of the Required Noteholders; provided, that no such agreement shall:

(i)     reduce the principal amount of any Note or reduce the rate of interest thereon, or reduce any fees payable hereunder (or amend the definition of the term "Interest Period" so as to permit intervals in excess of [six] months), without the written consent of each Noteholder entitled to such principal, interest or fee;

(ii)     postpone or extend any scheduled date fixed for payment of interest, fees or premium payable hereunder, or reduce the amount of, waive or excuse any payment except in connection with the waiver of applicability of any post-default increase in interest rate, which waiver shall be effective with the consent of the Required Noteholders, without the written consent of each Noteholder adversely affected thereby;

89

(iii)    change Section 2.10 in a manner that would alter the *pro rata* sharing of payments or setoffs required thereby, without the written consent of each Noteholder;

(iv)    change the percentage set forth in the definition of "Required Noteholders" or "Ratable Portion" or any other provision of any Note Document (including this Section 10.02) specifying the number or percentage of Noteholders required to waive, amend or modify any rights there under or make any determination or grant any consent thereunder, without the written consent of each Noteholder;

(v)    release the Parent or any Subsidiary Guarantor from its Guarantee (except as expressly provided in Article VII), or limit the Parent's or such Subsidiary Guarantor's liability in respect of such Guarantee, without the written consent of each Noteholder; or

(vi)    release all or substantially all of the Collateral from the Liens of the Security Documents or alter the relative priorities of the Obligations entitled to the Liens of the Security Documents (except in connection with securing additional Obligations equally and ratably with the other Obligations), in each case without the written consent of each Noteholder.

provided further, that (1) no such agreement shall amend, modify or otherwise affect the rights or duties of the Note Agent or the Collateral Agent, without the prior written consent of the Note Agent.

**Section 10.03.    Expenses; Indemnity**.  (a)  The Note Parties agree, jointly and severally, to promptly pay (i) all reasonable out-of-pocket costs and expenses (including but not limited to (A) expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses and (B) the fees, charges and disbursements of Bingham McCutchen LLP, or any other counsel for the Note Agent and the Collateral Agent incurred by (x) the Agents in connection with (1) the issuance of the Notes provided for herein, (2) the preparation, filing and/or recordation execution, delivery and administration of this Agreement and the other Note Documents, (3) the perfection and maintenance of the Liens securing the Collateral, and (4) any amendments, consents, enforcement costs, documentary taxes or waivers of the provisions of this Agreement or the other Note Documents (whether or not the transactions hereby or thereby contemplated shall be consummated) or (y) the Agents or any Noteholder in connection with the enforcement or protection of its rights in connection with this Agreement and the other Note Documents or in connection with the Notes issued hereunder, and (ii) the reasonable fees, charges and expenses of any auditors, accountants, counsel, consultants, appraisers or other advisors hired by or on behalf of any of the Agents or any counsel for any of the Agents.

(b)    The Note Parties agree, jointly and severally, to indemnify the Agents, each Noteholder, each Affiliate of any of the foregoing Persons and each of their respective partners, controlling Persons, directors, officers, trustees, employees, advisors and agents (each such Person being called an "**Indemnitee**") against, and to hold each Indemnitee harmless from,

90

all reasonable out-of-pocket costs and any and all losses, claims, damages, liabilities, penalties, judgments, suits and related expenses, including reasonable counsel fees, charges and disbursements, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution, delivery, performance, administration or enforcement of the Note Documents, (ii) any actual or proposed use of the proceeds of the Notes, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, or (iv) any actual or alleged presence or Release or threatened Release of Hazardous Materials, on, at, under or from any Property owned, leased or operated by any Company, or any Environmental Claim related in any way to any Company; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee.

(c)     The provisions of this Section 10.03 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Notes, the release of all or a portion of any Collateral, the invalidity or unenforceability of any term or provision of this Agreement or any other Note Document, or any investigation made by or on behalf of the Agents, or any Noteholder.  All amounts due under this Section 10.03 shall be payable on written demand therefor accompanied by reasonably detailed documentation with respect to any reimbursement, indemnification or other amount requested.

(d)     To the extent that the Issuer fails to promptly pay any amount required to be paid by it to the Agents, under this Section 10.03(a) or (b), each Noteholder severally agrees to pay to the Agents such Noteholder's Ratable Portion  (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against any of the Agents in its capacity as such.

Section 10.04.     **Successors and Assigns**.  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Issuer may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agents and each Noteholder (and any attempted assignment or transfer by the Issuer without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Affiliates of each of the Note Agent and the Noteholders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Any Noteholder shall have the right at any time to assign to one or more banks, insurance companies, investment companies or funds or other institutions all or a portion of its rights and obligations under this Agreement; provided, that (i) except in the case of an assignment to a Noteholder, an Affiliate of a Noteholder or a Noteholder Affiliate, each of the

91

Issuer and the Note Agent must give their prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed), (ii) except in the case of an assignment to a Noteholder, an Affiliate of a Noteholder or a Noteholder Affiliate, any assignment made in connection with the issuance of the Notes, the amount of the Note of the assigning Noteholder subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Note Agent) shall not be less than $1,000,000 (which shall be in the aggregate in the event of simultaneous assignments to or by two or more Noteholder Affiliates) unless each of the Issuer and the Note Agent otherwise consent, (iii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Noteholder's rights and obligations under this Agreement, (iv) the parties to each assignment shall execute and deliver to the Note Agent an Assignment and Acceptance in the form of <u>Exhibit B</u>, together with a processing and recordation fee of $[3,500] (<u>provided</u>, that only one such fee shall be payable in the event of simultaneous assignments to or by two or more Noteholder Affiliates), and (v) the assignee, if it shall not be a Noteholder, shall deliver to the Note Agent an Administrative Questionnaire; <u>provided</u>, <u>further</u>, that any consent of the Issuer otherwise required under this paragraph shall not be required (x) if a Default has occurred and is continuing or (y) in the case of assignments by the Note Agent and its Affiliates, in connection with the issuance of the Notes.  Subject to acceptance and recording thereof pursuant to paragraph <u>(d)</u> of this <u>Section 10.04</u>, from and after the effective date specified in each Assignment and Acceptance the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Noteholder under this Agreement (<u>provided</u>, that any liability of the Issuer to such assignee under <u>Section 2.09(c)</u>, <u>Section 2.09(e)</u>, <u>Section 2.11</u> and <u>Section 2.12</u>, or shall be limited to the amount, if any, that would have been payable thereunder by the Issuer in the absence of such assignment, except to the extent any such amounts are attributable to a Change in Law occurring after the date of such assignment), and the assigning Noteholder thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Noteholder's rights and obligations under this Agreement, such Noteholder shall cease to be a party hereto but shall continue to be entitled to the benefits of and <u>Section 2.09(c)</u>, <u>Section 2.09(e)</u>, <u>Section 2.11</u>, <u>Section 2.12</u> and <u>Section 10.03</u>).

(c)     The Note Agent, acting for this purpose as an agent of the Issuer, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Noteholders, and the principal amount of the Notes owing to, each Noteholder pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive in the absence of manifest error, and the Issuer, the Note Agent and the Noteholders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Noteholder hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Issuer, the Collateral Agent and any Noteholder (with respect to its own interest only), at any reasonable time and from time to time upon reasonable prior notice.

(d)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Noteholder and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Noteholder hereunder), the processing and

recordation fee referred to in Section 10.04(b) and any written consent to such assignment required by Section 10.04(b), the Note Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)     Any Noteholder shall have the right at any time, without the consent of the Issuer or the Note Agent, to sell participations to one or more banks or other entities (a "**Participant**") in all or a portion of such Noteholder's rights and obligations under this Agreement (including all or a portion of its Notes owing to it); provided, that (i) such Noteholder's obligations under this Agreement shall remain unchanged, (ii) such Noteholder shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Issuer, the Note Agent, and the other Noteholders shall continue to deal solely and directly with such Noteholder in connection with such Noteholder's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Noteholder sells such a participation shall provide that such Noteholder shall retain the sole right to enforce the Note Documents and to approve any amendment, modification or waiver of any provision of the Note Documents; provided, that such agreement or instrument may provide that such Noteholder will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 10.02(b)(i) or (ii) that affects such Participant. Subject to paragraph (f) of this Section 10.04, the Issuer agrees that each Participant shall be entitled to the benefits of Section 2.09(c), Section 2.09(e), Section 2.11 and Section 2.12, and to the same extent as if it were a Noteholder and had acquired its interest by assignment pursuant to Section 10.04(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Noteholder; provided, that such Participant agrees to be subject to Section 2.11(e) as though it were a Noteholder. Each Noteholder shall, acting for this purpose as an agent of the Issuer, maintain at one of its offices a register for the recordation of the names and addresses of its Participants, and the amount and terms of its participations; provided, that no Noteholder shall be required to disclose or share the information contained in such register with the Issuer or any other party, except as required by applicable law.

(f)     A Participant shall not be entitled to receive any greater payment than the applicable Noteholder would have been entitled to receive with respect to the participation sold to such Participant, (i) unless the sale of the participation to such Participant is made with the prior written consent of the Issuer (which consent shall not be unreasonably withheld or delayed) or (ii) except to the extent such entitlement to a greater payment results from a Change in Law after such Participant became a Participant. A Participant that would be a Foreign Noteholder if it were a Noteholder shall not be entitled to the benefits of Section 2.11 unless the Issuer is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Issuer, to comply with Section 2.11(e) and (f) as though it were a Noteholder.

(g)     Any Noteholder may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Noteholder, including any pledge or assignment to secure obligations to a Federal Reserve Bank and this Section 10.04 shall not apply to any such pledge or assignment of a security interest; provided, that no such pledge or assignment of a security interest shall release a Noteholder from any of its

obligations hereunder or substitute any such pledgee or assignee for such Noteholder as a party hereto. In the case any Noteholder is a fund that invests in bank loans, such Noteholder may, without the consent of the Issuer or the Note Agent, collaterally assign or pledge all or any portion of its rights under this Agreement, including the Notes or any other instrument evidencing its rights as a Noteholder under this Agreement, to any holder of, trustee for, or any other representative of holders of, obligations owed or securities issued by such fund, as security for such obligations or securities.

Section 10.05. **Survival of Agreement**. All covenants, agreements, representations and warranties made by the Note Parties in the Note Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Note Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Note Documents and the issuance of the Notes, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agents or any Noteholder may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Note or any fee or any other amount payable under this Agreement is outstanding and unpaid. The provisions of Section 2.09(c), Section 2.09(e), Section 2.11, Section 2.12 and Article IX shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Notes or any provision hereof.

Section 10.06. **Counterparts; Integration; Effectiveness**. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts) each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the Intercreditor Agreement and the other Note Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Note Agent and when the Note Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.07. **Severability**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08. **Right of Setoff**. If an Event of Default shall have occurred and be continuing, each Noteholder and each of its Affiliates are hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at

94

any time owing by such Noteholder or Affiliate to or for the credit or the account of the Issuer against any and all of the obligations of the Issuer now or hereafter existing under this Agreement held by such Noteholder, irrespective of whether or not such Noteholder shall have made any demand under this Agreement and although such obligations may be unmatured. The rights of each Noteholder under this <u>Section 10.08</u> are in addition to other rights and remedies (including other rights of setoff) which such Noteholder may have.

**Section 10.09.** **<u>Governing Law; Jurisdiction; Consent to Service of Process</u>**. (a) This Agreement shall be construed in accordance with and governed by the law of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

(b) Each Note Party hereby irrevocably and unconditionally submits, for itself and its Property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Note Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Note Document shall affect any right that the Note Agent or any Noteholder may otherwise have to bring any action or proceeding relating to this Agreement or any other Note Document against any Note Party or its properties in the courts of any jurisdiction.

(c) Each Note Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Note Document in any court referred to in <u>Section 10.09(b)</u>. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to any Note Document in the manner provided for notices in <u>Section 10.01</u>. Nothing in this Agreement or any other Note Document will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable law.

**Section 10.10.** **<u>Waiver of Jury Trial</u>**. Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement, any other Note Document or the transactions contemplated hereby (whether based on contract, tort or any other theory). Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties

95

hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 10.10.

Section 10.11.    **Headings**.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.12.    **Confidentiality**.  (a)  Each of the Note Agent, and the Noteholders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Noteholder Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential pursuant to the terms hereof), (ii) to the extent requested by any regulatory authority, (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (iv) to any other party to this Agreement, (v) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Note Document or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section 10.12, to (x) any assignee or pledgee of or Participant in, or any prospective assignee or pledgee of or Participant in, any of its rights or obligations under this Agreement or (y) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Issuer and its obligations, (vii) with the consent of the Issuer or (viii) to the extent such Information (x) is publicly available at the time of disclosure or becomes publicly available other than as a result of a breach of this Section 10.12 or (y) becomes available to the Note Agent or any Noteholder on a nonconfidential basis from a source other than the Issuer or any Subsidiary.  For the purposes of this Section 10.12, "**Information**" means all information received from the Issuer or any Subsidiary relating to the Issuer or any Subsidiary or its business that is clearly identified at the time of delivery as confidential, other than any such information that is available to the Note Agent or any Noteholder on a nonconfidential basis prior to disclosure by the Issuer or any Subsidiary.  Any Person required to maintain the confidentiality of Information as provided in this Section 10.12 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)    Notwithstanding the foregoing, and notwithstanding any other express or implied agreement or understanding to the contrary, each of the parties hereto and their respective employees, representatives and other agents are authorized to disclose the tax treatment and tax structure of these transactions to any and all Persons, without limitation of any kind.  Each of the parties hereto may disclose all materials of any kind (including opinions or other tax analyses) insofar as they relate to the tax treatment and tax structure of the transactions contemplated by the Note Documents.  This authorization does not extend to disclosure of any other information including (without limitation) (a) the identities of participants or potential participants in the transactions, (b) the existence or status of any negotiations, (c) any pricing or other financial information or (d) any other term or detail not related to the tax treatment and tax structure of the transactions contemplated by the Note Documents.

96

**Section 10.13.** **Interest Rate Limitation**.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Note, together with all fees, charges and other amounts which are treated as interest on such Note under applicable law (collectively, the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Noteholder holding such Note in accordance with applicable law, the rate of interest payable in respect of such Note hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Note but were not payable as a result of the operation of this Section 10.13 shall be cumulated and the interest and Charges payable to such Noteholder in respect of other Notes or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Noteholder.

**Section 10.14.** **Application of Proceeds of Collateral**.  The proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, together with any other sums then held by the Collateral Agent pursuant to this Agreement, promptly by the Collateral Agent in the following order:

(a)      *first*, to pay Obligations in respect of any expense reimbursements including fees and expenses in respect of cash management services or indemnities then due the Note Agent;

(b)      *second*, to pay Obligations in respect of any expense reimbursements including fees and expenses in respect of cash management services or indemnities then due to the Noteholders;

(c)      *third*, to pay Obligations in respect of any fees then due to the Note Agent and the Noteholders;

(d)      *fourth*, to pay interest then due and payable in Cash in respect of the Notes;

(e)      *fifth*, to pay or prepay principal amounts on the Notes;

(f)      *sixth*, to the ratable payment of all other Obligations until such Obligations shall be paid in full; and

(g)      *seventh*, the excess, if any, shall be payable to the Issuer or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct;

provided, that if sufficient funds are not available to fund all payments to be made in respect of any of the Obligations described in any of the foregoing clauses (a) through (f), the available funds being applied with respect to any such Obligation (unless otherwise specified in such clause) shall be allocated to the payment of such Obligations ratably, based on the proportion of the Note Agent's and each Noteholder's interest in the aggregate outstanding

Obligations described in such clauses. The order of priority set forth in clauses (a) through (g) of this Section 10.14(g) may at any time and from time to time be changed by the agreement of the Required Noteholders without necessity of notice to or consent of or approval by the Issuer, any Secured Party that is not a Noteholder or any other Person. The order of priority set forth in clauses (a) through (c) of this Section 10.14(g) may be changed only with the prior written consent of the Note Agent in addition to the Required Noteholders.

Section 10.15. **Noteholder Addendum**. Each Noteholder to become a party to this Agreement on the date hereof shall do so by delivering to the Note Agent, a Noteholder Addendum duly executed by such Noteholder, the Issuer and the Note Agent.

Section 10.16. **Obligations Absolute**. To the fullest extent permitted by applicable law, all obligations of the Note Parties hereunder shall be absolute and unconditional irrespective of:

(a) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any other Note Party;

(b) any lack of validity or enforceability of any Note Document or any other agreement or instrument relating thereto against any other Note Party;

(c) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Note Document or any other agreement or instrument relating thereto;

(d) any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(e) any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Note Document; or

(f) any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Note Parties.

Section 10.17. **Intercreditor Agreement**. In the event of a conflict between this Agreement and the Intercreditor Agreement, the Intercreditor Agreement prevails, and each Noteholder acknowledges and agrees that it has received a copy of the Intercreditor Agreement, has read it and consents and agrees to each provision contained therein and agrees to be bound thereby to the same extent as if a signatory thereto.[12]

---

[12] Subject to further discussion.

NYDOCS/1230942.8

**Section 10.18.** **Information Regarding Holders.** Upon the written request of the Issuer, the Note Agent shall provide the Issuer with the following information as soon as reasonably practical following such request: (a) the name and address for each Noteholder, (b) the amount, type and Interest Period of each Noteholder's Notes, (c) the amount of any principal or interest due and payable or to become due and payable to each Noteholder and (d) the amount of any sum received by the Note Agent from or for the account of the Issuer and each Noteholder's share thereof.

## ARTICLE XI

## SUBORDINATION

**Section 11.01.** **Notes Subordinate to Senior Debt.** (a)  The Issuer hereby covenants and agrees, and each Noteholder likewise covenants and agrees, that, to the extent and in the manner hereinafter set forth in this Article XI, the Senior Subordinated Debt is hereby expressly made subordinate and subject in right of payment to the prior Payment In Full of all Senior Debt.  This Article XI shall be reinstated if at any time any payment of any of the Senior Debt is rescinded or must otherwise be returned by any holder of Senior Debt.  All holders of Senior Debt are third-party beneficiaries of the provisions of this Article XI and are entitled to rely thereon, and so long as any Senior Debt shall not have been Paid in Full, the provisions of this Article XI may not be modified, rescinded, or canceled in whole or in part without the prior written consent of the required percentage of Senior Lenders under the applicable credit agreement with respect to the Exit Facility as provided therein, or the Senior Debt Agent (including, without limitation, an amendment to the definition of the "Senior Debt").

(b) The Issuer will not permit any Note Party to make any payment on account of any Senior Subordinated Debt at any time when the Issuer is prohibited from making any payment on account of Senior Subordinated Debt pursuant to the provisions of this Article XI.

(c) Sections and subsections of this Article XI shall be given independent effect so that if a particular payment is prohibited by any one of such sections or subsections, it shall be prohibited although it otherwise would not be prohibited by another section or subsection of this Agreement.

**Section 11.02.** **Payment Over of Proceeds Upon Dissolution.** In the event of (a) any insolvency or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding in connection therewith, relative to the Issuer or to its creditors, as such, or to its assets, (b) any liquidation, dissolution or other winding up of the Issuer, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or (c) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of the Issuer (any of the foregoing, an **"Insolvency Proceeding"**), then and in any such event:

(i) the holders of Senior Debt shall be entitled to receive Payment In Full of all Senior Debt, before any Noteholder is entitled to receive any payment on account of the Senior Subordinated Debt (other than a distribution of Reorganization Securities);

99

(ii)     any payment or distribution of assets of the Issuer of any kind or character, whether in cash, Property or securities, by set-off or otherwise, to which any Noteholder would be entitled but for the provisions of this Article XI, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other Debt of the Issuer being subordinated to the payment of the Senior Subordinated Debt (other than any payment or distribution in the form of equity or debt securities of the Issuers or any of their respective Subsidiaries or any successor obligor with respect to Senior Subordinated Debt provided for by a plan of reorganization or readjustment that, in the case of any such debt securities, are subordinated in right of payment to the Senior Debt (or any debt securities issued in exchange for all or any portion of the Senior Debt) to at least the same extent as the Senior Subordinated Debt is subordinated to the Senior Debt, (such equity or debt securities being hereinafter referred to as "**Reorganization Securities**") shall be paid by the liquidating trustee or agent or other Person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the Senior Debt Agent on behalf of the holders of Senior Debt or their representative or representatives, to the extent necessary to make Payment In Full of all Senior Debt, after giving effect to any concurrent payment or distribution to the holders of such Senior Debt; and

(iii)     in the event that, notwithstanding the foregoing provisions of this Section 11.02, any Noteholder shall have received any such payment or distribution of assets of the Issuer of any kind or character, whether in cash, Property or securities (other than any Reorganization Securities) before all Senior Debt is Paid In Full, then and in such event such payment or distribution shall be held in trust for the holders of the Senior Debt and paid over or delivered forthwith to the trustee in bankruptcy, receiver, liquidating trustee, custodian, assignee, agent or other Person making payment or distribution of assets of the Issuer for application to the payment of all Senior Debt remaining unpaid, to the extent necessary to make Payment In Full of all Senior Debt, after giving effect to any concurrent payment or distribution to or for the holders of Senior Debt.

If the Noteholders shall have failed to file claims or proofs of claim with respect to the Notes in any Insolvency Proceeding earlier than five days prior to the deadline for any such filing, the Noteholders hereby appoint and empower the Senior Debt Agent to file such claims or proofs of claim; provided, that the Senior Debt Agent shall have no obligation to file any such claim or proof of claim.

Section 11.03.     No Payment in Certain Circumstances. (a)  In the event that any payment of principal of, interest on, or fees and expenses (of an amount that exceeds $[100,000] for fees and expenses) with respect to the Senior Debt is not paid when due, whether at stated maturity, by mandatory prepayment, by acceleration or otherwise (each a "**Senior Debt Payment Default**"), then no payment (other than a payment of interest in kind) of or on account of any Senior Subordinated Debt or as a sinking fund for any Senior Subordinated Debt or in respect of any redemption, retirement, purchase or other acquisition of any Senior Subordinated

100

Debt shall be made by the Issuer unless and until such Senior Debt payment shall have been made or such Senior Debt Payment Default is waived in accordance with the terms of the Senior Debt Documents.

(b)     In the event that any default or event of default under the Senior Debt Documents (other than a Senior Debt Payment Default) that then entitles the Senior Lenders to accelerate payment of all of the Senior Debt (each a "**Senior Debt Non-Payment Default**") shall have occurred and be continuing, and the Issuer shall have received written notice of such Senior Debt Non-Payment Default from the Senior Debt Agent (a "**Blockage Notice**") stating that such notice is a Blockage Notice hereunder, then no payment (in cash, Property, securities or by set-off, rescission or otherwise (other than a payment of interest in kind)) of or on account of any Senior Subordinated Debt or as a sinking fund for any Senior Subordinated Debt or in respect of any redemption, retirement, purchase or other acquisition of any Senior Subordinated Debt shall be made by the Issuer during the period commencing on the date the Issuer and the Noteholders shall each have received such Blockage Notice and ending on the earlier of (i) the date 180 days thereafter and (ii) the date on which such Senior Debt Non-Payment Default has been cured or waived in accordance with the terms of the Senior Debt Documents; provided, that (A) no more than four (4) Blockage Notices may be given so long as this Article XI is in effect and (B) in any 360 consecutive day period, irrespective of the number of defaults with respect to Senior Debt during such period, (x) Blockage Notices may be in effect for no more than 180 days in the aggregate, (y) no more than one Blockage Notice may be given and (z) no Senior Debt Non-Payment Default (or event which, with the giving of notice and/or lapse of time, would become a Senior Debt Non-Payment Default) which existed on the date of the commencement of any such blockage period may be used as the basis for any subsequent Blockage Notice unless such Senior Debt Non-Payment Default or event, as the case may be, shall in the interim have been cured or waived for a period of not less than 90 consecutive days (it being acknowledged that any subsequent action or any breach of any financial covenants for a period commencing after the date of commencement of such blockage period, that in either case, would give rise to a Senior Debt Non-Payment Default pursuant to any provisions under which a Senior Debt Non-Payment Default previously existed or was continuing, shall constitute a new Senior Debt Non-Payment Default for this purpose).

(c)     The failure of the Issuer to make any payment with respect to the Senior Subordinated Debt by reason of the operation of this Section 11.03 shall not be construed as preventing the occurrence of a Default hereunder.  Immediately upon the expiration of any period under this Section 11.03 during which no payment (other than a payment of interest in kind) may be made on account of the Senior Subordinated Debt, the Issuer may resume making any and all payments on account of the Senior Subordinated Debt (including any payment missed during such period).

(d)     In the event that, notwithstanding the foregoing, the Noteholders shall have received any payment prohibited by the foregoing provisions of this Section 11.03, then and in such event such payment shall be held in trust for the holders of the Senior Debt and paid over and delivered forthwith to the Senior Debt Agent for application (in accordance with the Senior Debt Documents) to the Senior Debt until Payment in Full of the Senior Debt.

101

(e)     The provisions of this <u>Section 11.03</u> shall not apply in any circumstance with respect to which <u>Section 11.02</u> hereof would be applicable.

**Section 11.04.     Payments Otherwise Permitted**.  Nothing contained in this <u>Article XI</u> or elsewhere in this Agreement or in the Notes shall prevent the Issuer, at any time except (x) during the pendency of any condition specified in <u>Section 11.02</u> hereof or (y) under the conditions described in <u>Section 11.03</u> hereof, from making payments on the Senior Subordinated Debt.

**Section 11.05.     Subrogation to Rights of Holders of Senior Debt**.  Subject to the Payment In Full of all Senior Debt, the Noteholders shall be subrogated to the rights of the holders of Senior Debt to receive payments and distributions of Cash, Property and securities applicable to the Senior Debt until the principal of and interest on the Notes and all other Obligations shall be paid in full.  For purposes of such subrogation, no payments or distributions to the holders of Senior Debt of any Cash, Property or securities to which the Noteholders would be entitled except for the provisions of this <u>Article XI</u>, and no payments pursuant to the provisions of this <u>Article XI</u> to the holders of Senior Debt by the Noteholders shall, as among the Issuer, its creditors (other than holders of Senior Debt), and the Noteholders be deemed to be a payment or distribution by the Issuer to or on account of the Senior Subordinated Debt.

**Section 11.06.     Provisions Solely to Define Relative Rights**.  The provisions of this <u>Article XI</u> are and are intended solely for the purpose of defining the relative rights of the holders of the Notes on the one hand and the holders of Senior Debt on the other hand. Nothing contained in this <u>Article XI</u> or elsewhere in this Agreement or the Notes is intended to or shall (a) impair, as among the Issuer, its creditors (other than holders of Senior Debt) and the Noteholders, the obligation of the Issuer, which is absolute and unconditional, to pay to the Noteholders the principal of and interest or premium (if any) on, and any other amount payable by the Issuer under the Notes or this Agreement or any other Note Document as and when the same shall become due and payable in accordance with their respective terms; (b) affect the relative rights against the Issuer of the Noteholders and creditors of the Issuer (other than the holders of Senior Debt); or (c) prevent the Noteholders from exercising all remedies otherwise permitted by applicable law upon default under this Agreement or any other Note Document, subject to the rights of the holders of Senior Debt (i) under any of the conditions specified in <u>Section 11.02</u> hereof, to receive, pursuant to and in accordance with such Section, cash, Property and securities otherwise payable or deliverable to the Noteholders (ii) under the conditions specified in <u>Section 11.03</u> hereof, to prevent any payment prohibited by such Section or (iii) under the conditions specified in <u>Section 11.09</u> hereof, to prevent exercise of remedies prohibited by such Section.

**Section 11.07.     No Waiver or Impairment of Subordination Provisions**.  (a) No right of any present or future holder of any Senior Debt to enforce the subordination provisions as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Issuer or by any act or failure to act, in good faith, by any such holder, or by any non-compliance by the Issuer with the terms, provisions and covenants of this Agreement or any other Note Document, regardless of any knowledge thereof any such holder may have or be otherwise charged with.  Without in any way limiting the generality of the

102

foregoing sentence, the holders of Senior Debt may, at any time and from time to time, without the consent of or notice to the Noteholders, without incurring responsibility to the Noteholders and without impairing or releasing the subordination provided in this Article XI or the obligations hereunder of the Noteholders to the holders of Senior Debt, do any one or more of the following: (i) solely to the extent permitted by Section 6.10 hereof, change the manner, place or terms of payment or extend the time of payment of, or renew or alter, Senior Debt or any instrument evidencing the same or any agreement under which Senior Debt is outstanding; (ii) sell, exchange, release or otherwise deal with any Property pledged, mortgaged or otherwise securing Senior Debt; (iii) release any Person liable in any manner for the collection of Senior Debt; and (iv) exercise or refrain from exercising any rights against the Issuer and any other Person.

(b)     The rights and benefits of the holders of Senior Debt and the liabilities and obligations of the Issuer in respect of the subordination provisions set forth in this Article XI shall remain in full force and effect irrespective of (i) any non-perfection of any collateral, or any release or amendment or waiver of or consent to departure from any guaranty for all or any of the Senior Debt or (ii) any other circumstances which might otherwise constitute a defense available to the Issuer in respect of the Senior Debt or the Noteholders in respect of the subordination provisions set forth in Article XI (other than the defense of Payment In Full of the Senior Debt). In furtherance of and not in limitation of the foregoing, in the event that part or all of the Senior Debt or the liens or security interests securing payment thereof are subordinated, set aside, avoided or disallowed in connection with the occurrence of any of the proceedings referred to in this Article XI, Senior Debt shall continue to be treated as Senior Debt and the provisions of this Article XI shall continue to govern the relative rights and priorities of the holders of Senior Debt and the Noteholders.

**Section 11.08.     Reliance on Judicial Order or Certificate of Liquidating Agent**.  Upon any payment or distribution of assets of the Issuer referred to in this Article XI, the Noteholders shall be entitled to rely upon any order or decree entered by any court of competent jurisdiction in which such insolvency, bankruptcy, receivership, liquidation, reorganization, dissolution, winding up or similar case or proceeding is pending, or a certificate of the trustee in bankruptcy, receiver, liquidating trustee, custodian, assignee for the benefit of creditors, agent or other Person making such payment or distribution, delivered to the Noteholders for the purpose of ascertaining the Persons entitled to participate in such payment or distribution, the holders of Senior Debt and other Debt of the Issuer, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article XI.

**Section 11.09.     Limitation on Rights and Remedies; Notice of Exercise of Remedies**.  (a)  Notwithstanding anything contained herein to the contrary, until the Payment in Full of the Senior Debt, no Noteholder shall (i) accelerate any portion of the Senior Subordinated Debt, (ii) initiate any judicial proceeding to collect any portion of the Senior Subordinated Debt, (iii) initiate any Insolvency Proceeding or (iv) exercise any right of set off or counterclaim against the Issuer or any Guarantor (any such remedy or action described in clauses (i) through (iv), an "**Enforcement Action**") until the earliest to occur of (A) the passage of 120 days from receipt by the Senior Debt Agent of written notice stating that an Event of Default has occurred under this Agreement; (B) acceleration of all or any portion of the Senior Debt or termination of

any commitment to extend credit under the Exit Facility other than in accordance with the scheduled termination thereof; (C) the occurrence of an Insolvency Proceeding; and (D) the Senior Debt Agent or any Senior Lender initiates any judicial proceeding or action to collect any portion of the Senior Debt or exercises any right of set off or counterclaim against the Issuer or any Guarantor or commences any action under the provisions of any state or federal law, including, without limitation, the UCC or under any contract or agreement, to foreclose upon, take possession of or sell any Collateral.

(b)     Prior to any Noteholder taking any Enforcement Action, the Note Agent shall give the Senior Debt Agent not less than five Business Days' notice of the intent of the Noteholders to take any such action (which notice may be given during the continuation of any period during which the Noteholders are blocked from receiving payments under Section 11.03 and during any period in which the Noteholders are prohibited from taking any Enforcement Action under this Section 11.09).

(c)     Notwithstanding anything herein to the contrary, no provision herein shall prevent any Noteholder from (i) filing lawsuits solely to prevent the running of any applicable statute of limitations or other similar restriction on claims, but in each case only to the extent reasonably necessary to prevent such running or (ii) seeking specific performance or other injunctive relief to compel any Note Party to comply with a non-payment obligation under the Subordinated Debt Documents.

Section 11.10.     **Assignments**.  The Noteholders agree to notify the holders of the Senior Debt in writing upon the consummation of each assignment of Notes, specifying the identity of the assignee and the principal terms of such assignment.

Section 11.11.     **Notices**.  By their acceptance of the benefits of this Article XI, the holders of the Senior Debt agree that (a) all notices or communications to be given by the Noteholders under this Article XI to the holders of the Senior Debt shall be given to the Senior Debt Agent at its address specified for purposes of notices under the Exit Facility and (b) all notices or communications to be given by the holders of the Senior Debt (or the Senior Debt Agent) under this Article XI to the Noteholders shall be given to them at their respective addresses set forth on Annex I hereto.

Section 11.12.     **Miscellaneous**.  (a)  The Noteholders acknowledge and agree that the foregoing subordination provisions are, and are intended to be, an inducement and a consideration to each holder of Senior Debt, whether such Senior Debt was created or acquired before or after the date hereof, and each holder of Senior Debt shall be deemed conclusively to have relied upon such subordination provisions in acquiring and continuing to hold such Senior Debt.

(b)     By executing this Agreement, the Issuer agrees to be bound by the provisions hereof as they relate to the relative rights of the Noteholders and the Senior Lenders. The Issuer acknowledges that the provisions of this Article XI shall not give the Issuer any substantive rights as against the Senior Debt Agent, the Senior Lenders or the Noteholders.  The Issuer hereby agrees that the Senior Debt Agent, the Senior Lenders and the Noteholders shall

not have any liability to the Issuer for performing its respective responsibilities under this <u>Article XI</u> with respect to the other parties hereto.

[Signature Pages Follow]

NYDOCS/1230942.8

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

ATKINS NUTRITIONALS, INC., as the Issuer

By: _____
Name:
Title:

ATKINS NUTRITIONALS HOLDINGS, INC.

By: _____
Name:
Title:

ATKINS NUTRITIONALS (CANADA) LIMITED

By: _____
Name:
Title:

NYDOCS/1230942.8

**UBS AG, STAMFORD BRANCH**, as Note Agent and as a Noteholder

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

NYDOCS/1230942.8

**Exhibit F**

**[FORM OF]**
**NOTE**

ALL RIGHTS AND INTEREST OF THE HOLDER UNDER THIS INSTRUMENT ARE EXPRESSLY SUBJECT TO THE TERMS OF THAT CERTAIN INTERCREDITOR AGREEMENT DATED AS OF DECEMBER [__], 2005 (AS SUCH AGREEMENT MAY BE AMENDED, AMENDED AND RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "AGREEMENT") AMONG ATKINS NUTRITIONALS, INC, AS BORROWER (AS DEFINED IN THE AGREEMENT), UBS AG, STAMFORD BRANCH, AS FIRST LIEN COLLATERAL AGENT (AS DEFINED IN THE AGREMENT), UBS AG, STAMFORD BRANCH, AS SECOND LIEN COLLATERAL AGENT (AS DEFINED IN THE AGREEMENT) AND UBS AG, STAMFORD BRANCH, AS CONTROL AGENT (AS DEFINED IN THE AGREEMENT).

THIS NOTE IS SUBORDINATED TO THE "SENIOR DEBT" AS DEFINED IN THE TERM NOTE AGREEMENT (DEFINED BELOW) IN THE MANNER AND TO THE EXTENT SET FORTH THEREIN.

$_____                                          New York, New York
                                                                      [Date]

FOR VALUE RECEIVED, the undersigned, ATKINS NUTRITIONALS, INC., a New York corporation ("**Issuer**"), hereby promises to pay to the order of [        ] (the "**Noteholder**") on the Maturity Date (as defined in the Term Note Agreement referred to below), in lawful money of the United States and in immediately available funds, the principal amount of _____ DOLLARS ($_____). Issuer further agrees to pay interest in like money at such office on the unpaid principal amount hereof from time to time from the date hereof at the rates, and on the dates, specified in Section 2.05(a) of such Term Note Agreement.

The holder of this Note may endorse and attach a schedule to reflect the date and amount of the Note of the Noteholder, the date and amount of each interest payment or prepayment of principal hereof, and the date of each Interest Period election or continuation pursuant to Section 2.07 of the Term Note Agreement; *provided* that the failure of the Noteholder to make any such recordation (or any error in such recordation) shall not affect the obligations of Issuer hereunder or under the Term Note Agreement.

This Note (this "**Note**") is one of the Notes referred to in the senior subordinated Term Note Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the ("**Term Note Agreement**") dated as of December [__], 2005, among the Issuer, the Guarantors party thereto, the Noteholders party thereto, and UBS AG, STAMFORD BRANCH, as note agent (in such capacity, "**Note Agent**"), for the Noteholders and as collateral agent (in such capacity, the "**Collateral Agent**") for the Secured Parties. Terms used herein which are defined in the Term Note Agreement shall have such defined meanings unless otherwise defined herein or unless the context otherwise requires.

This Note is secured and guaranteed as provided in the Term Note Agreement and the Security Documents. Reference is hereby made to the Term Note Agreement and the Security Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security and guarantees, the terms and conditions upon which the security interest and each guarantee was granted and the rights of the holder of this Note in respect thereof.

Upon the occurrence of any one or more of the Events of Default specified in the Term Note Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided therein.

This Note is subject to the terms of the Intercreditor Agreement.

All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand, protest and all other notices of any kind.

**THIS NOTE MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS OF THE TERM NOTE AGREEMENT. TRANSFERS OF THIS NOTE MUST BE RECORDED IN THE REGISTER MAINTAINED BY THE NOTE AGENT PURSUANT TO THE TERMS OF THE TERM NOTE AGREEMENT.**

**THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

[Signature Page Follows]

ATKINS NUTRITIONALS, INC.,
  as Issuer

By: _____
      Name:
      Title:

**Exhibit I**

**EXHIBIT I**

No. ___

## Form of PIK Tranche A Note due 2010

THIS PIK TRANCHE A NOTE (THIS "NOTE") HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR REGISTERED OR QUALIFIED UNDER ANY APPLICABLE STATE LAWS AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SUCH ACT. FURTHERMORE, THIS NOTE MAY BE SOLD OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE CONDITIONS SPECIFIED IN THE TERM NOTE AGREEMENT (AS HEREIN DEFINED), A COMPLETE AND CORRECT COPY OF WHICH IS AVAILABLE FOR INSPECTION AT THE PRINCIPAL OFFICE OF THE COMPANY (AS HEREIN DEFINED), AND WILL BE FURNISHED WITHOUT CHARGE TO THE HOLDER OF THIS NOTE UPON WRITTEN REQUEST.

ALL RIGHTS AND INTEREST OF THE HOLDER UNDER THIS INSTRUMENT ARE EXPRESSLY SUBJECT TO THE TERMS OF THAT CERTAIN INTERCREDITOR AGREEMENT DATED AS OF DECEMBER [__], 2005 (AS SUCH AGREEMENT MAY BE AMENDED, AMENDED AND RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "AGREEMENT") AMONG ATKINS NUTRITIONALS, INC, AS BORROWER (AS DEFINED IN THE AGREEMENT), UBS AG, STAMFORD BRANCH, AS FIRST LIEN COLLATERAL AGENT (AS DEFINED IN THE AGREEMENT), UBS AG, STAMFORD BRANCH, AS SECOND LIEN COLLATERAL AGENT (AS DEFINED IN THE AGREEMENT) AND UBS AG, STAMFORD BRANCH, AS CONTROL AGENT (AS DEFINED IN THE AGREEMENT).

THIS PIK TRANCHE A NOTE IS SUBORDINATED TO THE "SENIOR DEBT" AS DEFINED IN THE TERM NOTE AGREEMENT (DEFINED BELOW) IN THE MANNER AND TO THE EXTENT SET FORTH THEREIN.

$_____                                                   _____ __, 20__


ATKINS NUTRITIONALS, INC., a New York corporation (hereinafter called the "Company"), for value received, hereby promises to pay to _____, a _____ corporation (the "Noteholder"), or its registered assigns, the entire principal amount of _____ Dollars ($_____), on [December 31, 2010] (the "Maturity Date"), in accordance with the provisions of Section 2.05(c) of the Term Note Agreement (as hereinafter defined), and to pay interest on the unpaid (and not overdue) principal amount hereof from the date hereof until and including the payment in full of the unpaid principal amount hereof at the rate of 7.0% per annnum compounded quarterly (computed on the basis of a 360 day year). All payments of principal and interest hereof shall be made in lawful money of the United States of America to the account of the holder hereof upon presentation hereof at the

principal office of the Noteholder at _____ or at such other place as the noteholder hereof shall have designated to the Company in writing.

This Note is one of the Notes of the Company issued pursuant to the Term Note Agreement, dated as of even date herewith (as amended, restated, modified, supplemented and in effect from time to time, the "Term Note Agreement"), among the Company, the Guarantors (as defined therein), the Noteholders (as defined therein), and UBS AG, STAMFORD BRANCH as note agent for the Noteholders and as collateral agent for the Secured Parties (as defined therein). The holder of this Note is entitled to enforce the provisions of the Term Note Agreement and to enjoy the benefits thereof to the extent provided therein and is subject to the obligations thereunder as a holder of a Note. All capitalized terms used herein and not otherwise defined herein shall have the same meanings ascribed to such terms in the Term Note Agreement.

This Note is subject to optional prepayment, in whole or in part, is entitled to mandatory prepayment and redemption, and the maturity hereof may be accelerated by the Required Noteholders of the Notes outstanding following an Event of Default, all as provided in the Term Note Agreement, to which reference is made for the terms and conditions of such provisions as to prepayment and acceleration; provided, that no prepayment of this Note may be made except upon compliance with the terms of Sections 2.08 of the Term Note Agreement.

Any permitted transfer of this Note is registrable on the note register of the Company upon presentation at the principal office of the Company accompanied by a written instrument of transfer in form reasonably satisfactory to the Company duly executed by, or on behalf of, the holder hereof. This Note may also be exchanged at such office for one or more Notes in any authorized denominations, as requested by the holder hereof, of a like aggregate unpaid principal amount. The date, time and interest rate applicable to the indebtedness evidenced by this Note and all payments and prepayments of the principal hereof and interest hereon and the respective dates thereof shall be recorded by the holder hereof in its internal records; provided, that the failure to make such a notation or any error in making such a notation shall not in any manner affect the obligation of the Company to make payments of principal and interest in accordance with the terms hereof.

Prior to due presentment for registration of transfer, the Company and any agent of the Company may treat the person in whose name this Note is registered as the owner hereof for the purpose of receiving payment of principal and interest as herein provided and for all other purposes.

This Note shall be subject to the terms of the Intercreditor Agreement.

**The holder of this Note, by acceptance hereof, agrees with the Company that this Note shall be subordinate and junior in right of payment to all Senior Debt to the extent and in the manner provided in Article XI of the Term Note Agreement.**

This Note shall be deemed to take effect under the laws of the State of New York and for all purposes shall be construed in accordance with such laws (without regard to the laws applicable to conflicts or choice of laws).

ATKINS NUTRITIONALS, INC.

By:_____

Title:_____

# Intercreditor Agreement

INTERCREDITOR AGREEMENT


Dated as of December [__], 2005


among


ATKINS NUTRITIONALS, INC.,
as Borrower,


and


UBS AG, STAMFORD BRANCH,
as First Lien Collateral Agent


and


UBS AG, STAMFORD BRANCH,
as Second Lien Collateral Agent


and


UBS AG, STAMFORD BRANCH,
as Control Agent


Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022

# TABLE OF CONTENTS

SECTION 1    DEFINITIONS ............................................................................................2

    1.1    Defined Terms ...........................................................................................2
    1.2    Terms Generally .........................................................................................5

SECTION 2    LIEN PRIORITIES .................................................................................5

    2.1    Relative Priorities.......................................................................................5
    2.2    Failure to Perfect .......................................................................................5
    2.3    Nature of First Lien Obligations................................................................6
    2.4    Prohibition on Contesting Liens ................................................................6
    2.5    No New Liens .............................................................................................6
    2.6    Similar Liens and Agreements....................................................................8

SECTION 3    ENFORCEMENT ......................................................................................8

    3.1    Exercise of Remedies.................................................................................8
    3.2    Actions Upon Breach ...............................................................................11

SECTION 4    PAYMENTS .............................................................................................11

    4.1    Application of Proceeds ...........................................................................11
    4.2    Payment Turnover....................................................................................12
    4.3    Permitted Mandatory Prepayments of Second Lien Obligations .........................12

SECTION 5    OTHER AGREEMENTS.........................................................................12

    5.1    Releases ...................................................................................................12
    5.2    Insurance .................................................................................................13
    5.3    Amendments to First Lien Credit Documents and Second Lien Credit
           Documents ................................................................................................14
    5.4    Rights As Unsecured Creditors ...............................................................16
    5.5    Control Agent for Perfection ...................................................................16
    5.6    When Payment in Full of First Lien Obligations Deemed to Not Have
           Occurred ..................................................................................................18
    5.7    Purchase Right .........................................................................................18

SECTION 6    INSOLVENCY PROCEEDINGS ............................................................19

    6.1    Use of Cash Collateral and Financing Issues ..........................................19
    6.2    Sale Issues ...............................................................................................20
    6.3    Relief from the Automatic Stay................................................................20
    6.4    Adequate Protection.................................................................................20
    6.5    No Waiver ................................................................................................21

i

# TABLE OF CONTENTS

(continued)

| | | |
|---|---|---|
| 6.6 | Avoidance Issues | 21 |
| 6.7 | Separate Grants of Security and Separate Classification | 22 |
| 6.8 | Reorganization Securities | 22 |
| 6.9 | Post-Petition Claims | 22 |
| 6.10 | Waiver | 23 |
| 6.11 | Expense Claims | 23 |
| 6.12 | Other Matters | 23 |
| 6.13 | Effectiveness in Insolvency Proceedings | 23 |
| SECTION 7 | RELIANCE; WAIVERS; ETC. | 23 |
| 7.1 | Non-Reliance | 23 |
| 7.2 | No Warranties or Liability | 24 |
| 7.3 | No Waiver of Lien Priorities | 25 |
| 7.4 | Obligations Unconditional | 27 |
| 7.5 | Certain Notices | 27 |
| SECTION 8 | MISCELLANEOUS | 28 |
| 8.1 | Conflicts | 28 |
| 8.2 | Effectiveness; Continuing Nature of this Agreement; Severability | 28 |
| 8.3 | Amendments; Waivers | 29 |
| 8.4 | Information Concerning Financial Condition of Company and its Subsidiaries | 29 |
| 8.5 | Subrogation | 29 |
| 8.6 | Application of Payments | 30 |
| 8.7 | SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL | 30 |
| 8.8 | Notices | 31 |
| 8.9 | Further Assurances | 31 |
| 8.10 | Binding on Successors and Assigns | 31 |
| 8.11 | Specific Performance | 31 |
| 8.12 | Headings | 31 |
| 8.13 | Counterparts | 31 |
| 8.14 | Authorization | 32 |
| 8.15 | No Third Party Beneficiaries | 32 |
| 8.16 | Provisions Solely to Define Relative Rights | 32 |

# INTERCREDITOR AGREEMENT

This **INTERCREDITOR AGREEMENT**, is dated as of December [__], 2005, and entered into by and among ATKINS NUTRITIONALS, INC., a New York corporation (the "**Company**"), and UBS AG, STAMFORD BRANCH, in its capacity as collateral agent for holders of the First Lien Obligations (as defined below), including its successors and assigns from time to time (the "**First Lien Collateral Agent**"), and UBS AG, STAMFORD BRANCH, in its capacity as collateral agent for holders of the Second Lien Obligations (as defined below), including its successors and assigns from time to time (the "**Second Lien Collateral Agent**") and UBS AG, STAMFORD BRANCH, in its capacity as control agent for the First Lien Collateral Agent and the Second Lien Collateral Agent, including its successors and assigns from time to time (the "**Control Agent**"). Capitalized terms used herein but not otherwise defined herein have the meanings set forth in <u>Section 1</u> below.

## RECITALS

**WHEREAS**, the Company, the Guarantors (as defined below), the lenders party thereto, UBS Securities LLC, as lead arranger, documentation agent and syndication agent, UBS Finance LLC, as swingline lender and UBS AG, Stamford Branch, as administrative agent and collateral agent, have entered into that certain Credit Agreement dated as of the date hereof providing for a revolving credit working capital facility to the Company (the "**Initial First Lien Credit Agreement**");

**WHEREAS**, the Company, the Guarantors, the noteholders party thereto, and UBS AG, Stamford Branch, as note agent and collateral agent, have entered into that certain Term Note Agreement dated as of the date hereof providing for the issuance of secured subordinated notes to the Noteholders (the "**Initial Second Lien Term Note Agreement**");

**WHEREAS**, the obligations of Company and the Guarantors under the First Lien Credit Agreement, will be secured by substantially all of the assets of Company and the Guarantors pursuant to the terms of the First Lien Collateral Documents;

**WHEREAS**, the obligations of Company under the Second Lien Term Note Agreement will be secured by substantially all of the assets of Company and the Guarantors pursuant to the terms of the Second Lien Collateral Documents;

**WHEREAS**, the First Lien Credit Documents and the Second Lien Credit Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral; and

**WHEREAS**, in order to induce the First Lien Collateral Agent and the First Lien Claimholders to consent to the Grantors' incurring the Second Lien Obligations and to induce the First Lien Claimholders to extend credit and other financial accommodations to or for the benefit of Company, or any other Grantor, the Second Lien Collateral Agent on behalf of the Second Lien Claimholders has agreed to the lien subordination and other provisions set forth in this Agreement.

**NOW**, **THEREFORE**, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## SECTION 1   Definitions.

1.1    Defined Terms.  As used in the Agreement, the following terms shall have the following meanings:

"**Agreement**" means this Intercreditor Agreement, as amended, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Bankruptcy Code**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Bankruptcy Law**" means the Bankruptcy Code and all other liquidation, receivership, moratorium, conservatorship, assignment for the benefit of creditors, insolvency or similar federal, state or foreign law for the relief of debtors.

"**Business Day**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Capital Stock**" means (i) in the case of a corporation, capital stock, (ii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (iii) in the case of a partnership, partnership interests (whether general or limited), (iv) in the case of a limited liability company, membership interests and (v) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"**Collateral**" means all of the assets and property of any Grantor, whether tangible or intangible, constituting both First Lien Collateral and Second Lien Collateral.

"**Company**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Control Collateral**" means any Collateral consisting of any Certificated Security, Instrument, Investment Property, Deposit Accounts (each as defined in the UCC), cash and any other Collateral as to which a first priority Lien shall or may be perfected through possession or control by the secured party or any agent therefor.

"**Controlled Account**" means those certain Deposit Accounts (as defined in the UCC) of any Grantor subject to Liens under the terms of the First Lien Collateral Documents and the Second Lien Collateral Documents.

"**DIP Financing**" has the meaning set forth in Section 6.1.

"**Disposition**" has the meaning set forth in Section 5.1(a)(ii).

"**Dollars**" or "**$**" means lawful money of the United States.

"**Exercise of Remedies**" has the meaning set forth in <u>Section 5.1(a)(i)</u>.

"**First Lien Claimholders**" means, at any relevant time, the holders of First Lien Obligations at such time.

"**First Lien Collateral Agent**" has the meaning set forth in the recitals hereto.

"**First Lien Collateral**" means all the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any First Lien Obligations.

"**First Lien Collateral Documents**" means the Security Documents (as defined in the First Lien Credit Agreement).

"**First Lien Credit Agreement**" means the Initial First Lien Credit Agreement and any amendment, modification, refinancing or replacement thereof to the extent permitted by the Second Lien Credit Documents.

"**First Lien Credit Documents**" means the First Lien Credit Agreement and the Loan Documents (as defined in the First Lien Credit Agreement).

"**First Lien Obligations**" means the [Secured Obligations] as defined in the First Lien Collateral Documents, <u>provided</u> that the principal amount of the First Lien Obligations shall not exceed the principal amount of Senior Debt (as defined in the Second Lien Term Note Agreement).

"**Grantors**" means Company and each of the Guarantors that have executed and delivered, or may from time to time hereafter execute and deliver, a First Lien Collateral Document or a Second Lien Collateral Document.

"**Guarantors**" means the Parent and the Subsidiary Guarantors.

"**Governmental Authority**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Initial Second Lien Term Note Agreement**" has the meaning set forth in the recitals hereto.

"**Insolvency Proceeding**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Lien**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Payment in Full**" or "**Paid in Full**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Parent**" means Atkins Nutritionals Holdings, Inc., a Delaware corporation.

"**Person**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Property**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Real Property**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Recovery**" has the meaning set forth in <u>Section 6.6</u>.

"**Required Lenders**" has the meaning set forth in the First Lien Credit Agreement.

"**Second Lien Claimholders**" means, at any relevant time, the holders of Second Lien Obligations at such time.

"**Second Lien Collateral**" means all of the assets and Property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Second Lien Obligations.

"**Second Lien Collateral Agent**" has the meaning set forth in the preamble hereof.

"**Second Lien Collateral Documents**" means the Security Documents (as defined in the Second Lien Term Note Agreement).

"**Second Lien Credit Documents**" means the Second Lien Term Note Agreement and the Note Documents (as defined in the Second Lien Term Note Agreement).

"**Second Lien Enforcement Date**" means the date which is 120 days after the occurrence of (i) an Event of Default (under and as defined in the Second Lien Term Note Agreement) <u>and</u> (ii) the First Lien Collateral Agent's receipt of written notice from the Second Lien Collateral Agent certifying that (x) an Event of Default (under and as defined in the Second Lien Term Note Agreement) has occurred and is continuing and (y) the Second Lien Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the Second Lien Term Note Agreement; <u>provided</u> that the Second Lien Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time the First Lien Collateral Agent or the First Lien Claimholders have commenced and are diligently pursuing any enforcement action with respect to the Collateral, (2) the First Lien Obligations are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the First Lien Credit Agreement, (3) at any time any Grantor is then a debtor under or with respect to (or otherwise subject to) any Insolvency Proceeding or (4) if the acceleration of the Second Lien Obligations (if any) is rescinded in accordance with the terms of the Second Lien Term Note Agreement.

"**Second Lien Lenders**" means the "Noteholders" under and as defined in the Second Lien Term Note Agreement.

"**Second Lien Obligations**" means the "Secured Obligations" as defined in the Second Lien Collateral Documents.

"**Second Lien Term Note Agreement**" means the Initial Second Lien Term Note Agreement, any amendment, modification, refinancing or replacement thereof to the extent permitted by the Second Lien Credit Documents.

"**Subsidiary**" has the meaning set forth in the Second Lien Term Note Agreement.

"**Subsidiary Guarantors** " has the meaning ascribed to such term in the First Lien Credit Agreement or the Second Lien Term Note Agreement, as applicable.

"**UCC**" has the meaning set forth in the Second Lien Term Note Agreement.

**1.2** <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Exhibits or Sections shall be construed to refer to Exhibits or Sections of this Agreement and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**SECTION 2  Lien Priorities.**

**2.1** <u>Relative Priorities</u>. Notwithstanding the date, manner or order of grant, attachment or perfection of any Liens securing the Second Lien Obligations granted on the Collateral or of any Liens securing the First Lien Obligations granted on the Collateral and notwithstanding any provision of the UCC, or any applicable law or the Second Lien Credit Documents, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby agrees that: (a) any Lien on the Collateral securing any First Lien Obligations now or hereafter held by or on behalf of the First Lien Collateral Agent or any First Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any of the Second Lien Obligations; and (b) any Lien on the Collateral now or hereafter held by or on behalf of the Second Lien Collateral Agent, any Second Lien Claimholders or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any First Lien Obligations.

**2.2** <u>Failure to Perfect</u>. All Liens on the Collateral securing any First Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Second Lien Obligations for all purposes, notwithstanding any failure of the First Lien Collateral

Agent or the First Lien Claimholders to adequately perfect its security interests in the Collateral, the subordination of any Lien on the Collateral securing any First Lien Obligations to any Lien securing any other obligation of any Grantor, or the avoidance, invalidation or lapse of any Lien on the Collateral securing any First Lien Obligations.

**2.3** <u>Nature of First Lien Obligations</u>. The Second Lien Collateral Agent, for itself and on behalf of the other Second Lien Claimholders, acknowledges that (a) the First Lien Obligations are revolving in nature, (b) the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, (c) subject to the limitations set forth in <u>Section 5.3</u>, the terms of the First Lien Obligations may be modified, extended or amended from time to time, and (d) subject to the limitations on the aggregate principal amount of First Lien Obligations set forth in the definition of "First Lien Obligations" or in <u>Section 5.3</u>, the aggregate amount of the First Lien Obligations may be increased or refinanced, in either event, without notice to or consent by the Second Lien Claimholders and without affecting the provisions hereof. The Lien priorities provided in <u>Sections 2.1</u> and <u>2.2</u> shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the First Lien Obligations or the Second Lien Obligations, or any portion thereof.

**2.4** <u>Prohibition on Contesting Liens</u>. Each of the Second Lien Collateral Agent, for itself and on behalf of each Second Lien Claimholder, and the First Lien Collateral Agent, for itself and on behalf of each First Lien Claimholder, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency Proceeding), the priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in the First Lien Collateral or by or on behalf of any of the Second Lien Claimholders in the Second Lien Collateral, as the case may be; <u>provided</u> <u>that</u> nothing in this Agreement shall be construed to prevent or impair the rights of the First Lien Collateral Agent or any First Lien Claimholder to enforce this Agreement, including the priority of the Liens securing the First Lien Obligations as provided in <u>Sections 2.1</u> and <u>3.1</u>.

**2.5** <u>No New Liens</u>.

(a) <u>Limitation on other Collateral for First Lien Claimholders</u>. So long as any Second Lien Obligations remain outstanding, and subject to <u>Section 6</u>, (i) the First Lien Collateral Agent agrees that, after the date hereof, neither the First Lien Collateral Agent nor any First Lien Claimholder shall acquire or hold any Lien on any assets of any Grantor securing any First Lien Obligations which assets are not also subject to the Lien of the Second Lien Collateral Agent under the Second Lien Collateral Documents, and (ii) each Grantor agrees not to grant any Lien on any of its assets, or permit any of its Subsidiaries to grant a Lien on any of its assets, in favor of the First Lien Collateral Agent or the First Lien Claimholders unless it, or such Subsidiary, has granted a similar Lien on such assets in favor of the Second Lien Collateral Agent or the Second Lien

Claimholders.[1]  If the First Lien Collateral Agent or any First Lien Claimholder shall (nonetheless and in breach hereof) acquire any Lien on any assets of any Grantor or any of their respective Subsidiaries securing any First Lien Obligations which assets are not also subject to the Lien of the Second Lien Collateral Agent under the Second Lien Collateral Documents, then the First Lien Collateral Agent (or the relevant First Lien Claimholder), shall, without the need for any further consent of any other Person and notwithstanding anything to the contrary in any other First Lien Document hold, and be deemed to have held such Lien and security interest for the benefit of the Second Lien Collateral Agent as security for the Second Lien Obligations subject to the priorities set forth herein, with any amounts received in respect thereof subject to distribution and turnover under Section 4.

(b)     Limitation on other Collateral for Second Lien Claimholders.  Until the date upon which the Payment in Full of First Lien Obligations shall have occurred, (i) the Second Lien Collateral Agent agrees that, after the date hereof, neither the Second Lien Collateral Agent nor any Second Lien Claimholder shall acquire or hold any Lien on any assets of any Borrower, any Guarantor or any of their respective Subsidiaries securing any Second Lien Obligations which assets are not also subject to the Lien of the First Lien Collateral Agent under the First Lien Collateral Documents, and (ii) each Grantor agrees not to grant any Lien on any of its assets, or permit any of its Subsidiaries to grant a Lien on any of its assets, in favor of the Second Lien Collateral Agent or the Second Lien Claimholders unless it, or such Subsidiary, has granted a similar Lien on such assets in favor of the First Lien Collateral Agent or the First Lien Claimholders.  If the Second Lien Collateral Agent or any Second Lien Claimholder shall (nonetheless and in breach hereof) acquire any Lien on any assets of any Grantor or any of their respective Subsidiaries securing any Second Lien Obligations which assets are not also subject to the Lien of the First Lien Collateral Agent under the First Lien Collateral Documents, then the Second Lien Collateral Agent (or the relevant Second Lien Claimholder), shall, without the need for any further consent of any other Person and notwithstanding anything to the contrary in any other Second Lien Document, hold and be deemed to have held such Lien and security interest for the benefit of the First Lien Collateral Agent as security for the First Lien Obligations.

---

[1]     Consider operation of Cash Management System.

**2.6** <u>Similar Liens and Agreements</u>[2].  The parties hereto agree that it is their intention that the First Lien Collateral and the Second Lien Collateral be identical.  In furtherance of the foregoing and of Section 8.9, the parties hereto agree, subject to the other provisions of this Agreement:

(a)     upon request by the First Lien Collateral Agent or the Second Lien Collateral Agent, to use commercially reasonable efforts and to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the First Lien Collateral and the Second Lien Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the First Lien Credit Documents and the Second Lien Credit Documents; and

(b)     that the documents and agreements creating or evidencing the First Lien Collateral and the Second Lien Collateral and guaranties for the First Lien Obligations and the Second Lien Obligations shall be in all material respects substantially the same forms of documents other than with respect to the senior and subordinate nature of the security interests in the Collateral securing the respective Obligations thereunder.

## SECTION 3   <u>Enforcement.</u>

**3.1**     <u>Exercise of Remedies.</u>

(a)     So long as the Payment in Full of First Lien Obligations has not occurred, whether or not any Insolvency Proceeding has been commenced by or against Company or any other Grantor:

(i)     the Second Lien Collateral Agent and the Second Lien Claimholders:

(A)     from the date hereof until the occurrence of the Second Lien Enforcement Date, will not exercise or seek to exercise any rights or remedies (including any right of set-off or recoupment) with respect to any Collateral (including, without limitation, the exercise of any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Second Lien Collateral Agent or any Second Lien Claimholder is a party) or institute or commence (or join with any other Person in commencing) any enforcement, collection, execution, levy or foreclosure action or

---

[2]     The revolver requires that a cash management system and account control agreements be in place.  The Term Note Agreement does not separately have this requirement, however so long as the cash management system and account control agreements are in place, such arrangements shall be for the benefit of the First and Second Lienholders, subject to the provisions of this Agreement.

proceeding (including, without limitation, any Insolvency Proceeding) with respect to any Collateral or Lien held by it under the Second Lien Collateral Documents or any other Second Lien Credit Document or otherwise; and

(B)     will not contest, protest or object to any foreclosure proceeding or action brought by the First Lien Collateral Agent or any First Lien Claimholder or any other exercise by the First Lien Collateral Agent or any First Lien Claimholder, of any rights and remedies relating to the Collateral under the First Lien Credit Documents or otherwise, provided that the respective interests of the Second Lien Claimholders attach to the proceeds thereof, subject to the relative priorities described in Section 2 and Section 4; and

(C)     subject to the rights of the Second Lien Collateral Agent under clause (i)(A) above, object to the forbearance by the First Lien Collateral Agent or the First Lien Claimholders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Collateral; and

(ii)     subject to Section 5.1, the First Lien Collateral Agent and the First Lien Claimholders shall have the exclusive right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make determinations regarding the release, disposition or restrictions with respect to the Collateral without any consultation with or the consent of the Second Lien Collateral Agent or any Second Lien Claimholder; provided, that

(A)     in any Insolvency Proceeding commenced by or against Company or any other Grantor, the Second Lien Collateral Agent may file a claim or statement of interest with respect to the Second Lien Obligations,

(B)     the Second Lien Collateral Agent may take any action (not adverse to the Liens on the Collateral securing the First Lien Obligations, or the rights of any First Lien Collateral Agent or the First Lien Claimholders to exercise remedies in respect thereof) in order to preserve or protect its Lien on the Collateral,

(C)     the Second Lien Claimholders shall be entitled to file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Second Lien Claimholders, including without limitation any claims secured by the Collateral, if any, in each case in accordance with the terms of this Agreement,

(D) in any Insolvency Proceeding, the Second Lien Claimholders shall be entitled to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either Bankruptcy Law or applicable non-bankruptcy law, in each case in accordance with the terms of this Agreement,

(E) in any Insolvency Proceeding, the Second Lien Claimholders shall be entitled to vote on any plan of reorganization, to the extent consistent with the provisions hereof, and

(F) the Second Lien Collateral Agent or any Second Lien Claimholder may exercise any of its rights or remedies with respect to the Collateral upon the occurrence and during the effective continuation of the Second Lien Enforcement Date.

In exercising rights and remedies with respect to the Collateral, the First Lien Collateral Agent and the First Lien Claimholders may enforce the provisions of the First Lien Credit Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by the First Lien Collateral Agent and the First Lien Claimholders to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b) The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including set-off or recoupment) with respect to any Collateral, and that any Collateral or proceeds taken or received by it will be paid over to the First Lien Collateral Agent pursuant to Section 4.2, unless and until the Payment in Full of First Lien Obligations has occurred, except as expressly provided in Section 6.7. Without limiting the generality of the foregoing, unless and until the Payment in Full of First Lien Obligations has occurred, except as expressly provided in Section 3.1(a)(ii), the sole right of the Second Lien Collateral Agent and the Second Lien Claimholders with respect to the Collateral is to hold a Lien on the Collateral pursuant to the Second Lien Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Payment in Full of First Lien Obligations has occurred in accordance with the terms of the Second Lien Credit Documents and applicable law.

(c) Subject to the proviso in clause (ii) of Section 3.1(a), the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, agrees that (i) the Second Lien Collateral Agent and the Second Lien Claimholders will not take any action that would hinder, delay or impede any exercise of remedies under the First Lien Credit Documents, including any sale, lease, exchange, transfer or other disposition of the

Collateral, whether by foreclosure or otherwise, and (ii) the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby waives any and all rights it or the Second Lien Claimholders may have as a junior lien creditor or otherwise to object to the manner or order in which the First Lien Collateral Agent or the First Lien Claimholders seek to enforce or collect the First Lien Obligations or the Liens granted in any of the First Lien Collateral.

(d) The Second Lien Collateral Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second Lien Collateral Documents or any other Second Lien Credit Document shall be deemed to restrict in any way the rights and remedies of the First Lien Collateral Agent or the First Lien Claimholders with respect to the Collateral as set forth in this Agreement and the First Lien Credit Documents.

**3.2** <u>Actions Upon Breach</u>.

(a) If any Second Lien Claimholder, contrary to this Agreement, commences or participates in any action or proceeding against Company, any other Grantor or the Collateral, the First Lien Collateral Agent may interpose in the name of the First Lien Claimholders or in the name of Company or such Grantor the making of this Agreement as a defense or dilatory plea.

(b) Should any Second Lien Claimholder, contrary to this Agreement, in any way take, or attempt or threaten to take, any action with respect to the Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, the First Lien Collateral Agent (in its own name or in the name of a Grantor) may obtain relief against such Second Lien Claimholder by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Second Lien Collateral Agent on behalf of each Second Lien Claimholder that (i) the First Lien Claimholders' damages from such actions may be difficult to ascertain and may be irreparable, and (ii) the Second Lien Collateral Agent on behalf of each Second Lien Claimholder waives any defense that the First Lien Claimholders cannot demonstrate damage or be made whole by the awarding of damages.

**SECTION 4  Payments.**

**4.1** <u>Application of Proceeds</u>. So long as the Payment in Full of First Lien Obligations has not occurred, any proceeds of Collateral received in connection with the sale or other disposition of such Collateral, or collection on such Collateral upon the exercise of remedies, shall be applied by the First Lien Collateral Agent to the First Lien Obligations in such order as specified in the relevant First Lien Credit Documents. Upon the Discharge of the First Lien Obligations, the First Lien Collateral Agent shall deliver to the Second Lien Collateral Agent any proceeds of Collateral held by it in the same form as received, with any necessary endorsements or, as a court of competent jurisdiction may otherwise direct, to be applied by the Second Lien Collateral Agent to the Second Lien Obligations in such order as specified in the Second Lien Collateral Documents.

**4.2**     Payment Turnover.  So long as the Payment in Full of First Lien Obligations has not occurred and except as specifically permitted by Section 4.3, any Collateral or proceeds thereof (together with assets or proceeds subject to Liens referred to in the final sentence of Section 2.3) received by the Second Lien Collateral Agent or any Second Lien Claimholders in connection with the exercise of any right or remedy (including set-off or recoupment) in respect of the Collateral shall be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  The First Lien Collateral Agent is hereby authorized to make any such endorsements as agent for the Second Lien Collateral Agent or any such Second Lien Claimholders.  This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

**4.3**     Permitted Mandatory Prepayments of Second Lien Obligations.  Notwithstanding the foregoing provisions of this Section 4, if no "Event of Default" (as defined in the First Lien Credit Agreement) has occurred and is continuing, mandatory prepayments required under Section 2.8 of the Second Lien Term Note Agreement may be made if and applied to the Second Lien Obligations (A) if (i) the payment to the Second Lien Claimholders is permitted by the First Lien Credit Agreement or (ii) the corresponding mandatory prepayment of the First Lien Credit Documents is waived by the Required Lenders under the First Lien Credit Agreement) or (B) at all times following the Payment in Full of the First Lien Obligations.

**SECTION 5   Other Agreements.**

**5.1**   Releases.

(a)     If, in connection with:

(i)     the exercise of any First Lien Collateral Agent's remedies in respect of the Collateral, including any sale, lease, exchange, transfer or other disposition of any such Collateral (an "**Exercise of Remedies**"); or

(ii)     any sale, lease, exchange, transfer or other disposition of any Collateral permitted under the terms of the First Lien Credit Documents (whether or not an event of default thereunder, and as defined therein, has occurred and is continuing) (a "**Disposition**"), or

(iii)     any release of Liens on the assets of any Grantor, all of the Capital Stock of which is being released pursuant to any other provision of this Section 5.1(a);

the First Lien Collateral Agent, for itself or on behalf of any of the First Lien Claimholders, releases any of its Liens on any part of the Collateral, or releases any Grantor from its obligations under its guaranty of the First Lien Obligations, in each case other than in connection with the Payment in Full of the First Lien Obligations, then the Liens, if any, of the Second Lien Collateral Agent, for itself or for the benefit of the Second Lien Claimholders, on such Collateral, and the obligations of such Grantor under

its guaranty of the Second Lien Obligations, shall be automatically, unconditionally and simultaneously released (the "**Second Lien Release**") and the Second Lien Collateral Agent, for itself or on behalf of any such Second Lien Claimholders, promptly shall execute and deliver to the First Lien Collateral Agent or such Grantor such termination statements, releases and other documents as the First Lien Collateral Agent or such Grantor may request to effectively confirm such release; provided, however, that the Second Lien Release shall not occur without the consent of the Second Lien Collateral Agent (x) in the case of an Exercise of Remedies, as to any Collateral the net proceeds of the disposition of which will not be applied to repay (and, to the extent applicable, to reduce permanently commitments with respect to) the First Lien Obligations or (y) in the case of a Disposition, if the Disposition is prohibited by any provision of the Second Lien Term Note Agreement.

(b)     Until the Payment in Full of First Lien Obligations occurs, the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby irrevocably constitutes and appoints the First Lien Collateral Agent and any officer or agent of the First Lien Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Second Lien Collateral Agent or such holder or in the First Lien Collateral Agent's own name, from time to time in the First Lien Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release.  This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(c)     Until the Payment in Full of First Lien Obligations occurs, to the extent that the First Lien Collateral Agent for itself and on behalf of the First Lien Claimholders (i) has released any Lien on Collateral or any Grantor from its obligation under its guaranty and any such Liens or guaranty are later reinstated or (ii) obtains any new Liens or additional guaranties from Grantors, then the Second Lien Collateral Agent for itself and on behalf of the Second Lien Claimholders shall be granted a Lien on any such Collateral and an additional guaranty, as the case may be, subject to the priorities set forth in Section 2.

**5.2**     Insurance.  The First Lien Collateral Agent and the Second Lien Collateral Agent shall be named as additional insureds and the Control Agent shall be named as loss payee (on behalf of the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent and the Second Lien Claimholders) under any insurance policies maintained from time to time by any Grantor.  Subject to the terms of the Loan Documents, until the date upon which the Payment in Full of First Lien Obligations shall have occurred, as between the First Lien Collateral Agent and the First Lien Claimholders, on the one hand, and the Second Lien Collateral Agent and the Second Lien Claimholders on the other, the First Lien Collateral Agent and the First Lien Claimholders shall have the sole and exclusive right (a) to adjust or settle any insurance policy or claim covering any Collateral in the event of any loss thereunder and (b) to approve any award granted in any condemnation or similar proceeding affecting any Collateral.

Until the date upon which the Payment in Full of First Lien Obligations shall have occurred, all proceeds of any such policy and any such award in respect of any Collateral that are payable to the First Lien Collateral Agent and the Second Lien Collateral Agent shall be paid to the First Lien Collateral Agent for the benefit of the First Lien Claimholders to the extent required under the First Lien Credit Documents and thereafter to the Second Lien Collateral Agent for the benefit of the Second Lien Claimholders to the extent required under the applicable Second Lien Credit Documents and then to the owner of the subject property or as a court of competent jurisdiction may otherwise direct.  If the Second Lien Collateral Agent or any Second Lien Claimholder shall, at any time, receive any proceeds of any such insurance policy or any such award in contravention of this Agreement, it shall pay such proceeds over to the First Lien Collateral Agent in accordance with the terms of Section 4.2.

5.3     Amendments to First Lien Credit Documents and Second Lien Credit Documents.

(a)     The First Lien Credit Documents may be amended, supplemented or otherwise modified in accordance with their terms and the First Lien Credit Agreement may be refinanced in each case, without the consent of the Second Lien Collateral Agent or the Second Lien Claimholders; provided, that the holders of such refinancing debt bind themselves in writing to the terms of this Agreement and any such amendment, supplement, modification or refinancing shall comply with the relevant provisions of the Second Lien Term Note Agreement, including, without limitation, Sections 6.01 and 6.10(b) thereof.

(b)     Until the Payment in Full of First Lien Obligations occurs, the Second Lien Credit Documents may be amended, supplemented or otherwise modified in accordance with their terms and the Second Lien Term Note Agreement may be refinanced in each case, without the consent of the First Lien Collateral Agent or the First Lien Claimholders provided, however, that the holders of such refinancing debt bind themselves in writing to the terms of this Agreement and any such amendment, supplement, modification or refinancing shall comply with the relevant provisions of the First Lien Credit Agreement, including, without limitation, Section 6.09 thereof.

(c)     Notwithstanding the foregoing clauses (a) and (b) of this Section 5.3, until the date upon which the Payment in Full of First Lien Obligations shall have occurred, without the prior written consent of the First Lien Collateral Agent, no Second Lien Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Second Lien Term Note Agreement or Second Lien Collateral Document, would contravene any of the terms of this Agreement.

(d)     The Second Lien Collateral Agent agrees that each Second Lien Collateral Document shall include the following language:

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the collateral agent pursuant to this Agreement and the exercise of any right or remedy by the collateral agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of December [__], 2005 as the same may be

amended, supplemented, modified or replaced from time to time (the "**Intercreditor Agreement**") among UBS AG, STAMFORD BRANCH, as First Lien Collateral Agent, UBS AG, STAMFORD BRANCH, as Second Lien Collateral Agent, UBS AG, STAMFORD BRANCH, as Control Agent, and the Grantors (as defined therein) from time to time a party thereto. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern."

In addition, the Second Lien Collateral Agent agrees that each Second Lien Collateral Document under which any Lien on Real Property owned by any Loan Party is granted to secure the Second Lien Obligations covering any Collateral shall contain such other language as the First Lien Collateral Agent may reasonably request to reflect the priority of the First Lien Collateral Document covering such Collateral over such Second Lien Collateral Document.

(e)     Notwithstanding the foregoing clauses (a) and (b) of this Section 5.3, until the date upon which the Payment in Full of First Lien Obligations shall have occurred, in the event the First Lien Collateral Agent or the First Lien Claimholders enter into any amendment, waiver or consent in respect of any of the First Lien Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of any First Lien Collateral Document or changing in any manner the rights of the First Lien Collateral Agent, the First Lien Claimholders, the Grantors thereunder, then such amendment, waiver or consent shall automatically apply in a comparable manner to any comparable provision of the Second Lien Collateral Documents without the consent of the Second Lien Collateral Agent or the Second Lien Claimholders and without any action by the Second Lien Collateral Agent or any Grantor; provided, however, (A) that no such amendment, waiver or consent shall be effective to (i) release any Lien of the Second Lien Collateral Documents, (ii) remove assets subject to the Lien of the Second Lien Collateral Documents, (iii) adversely affect the perfection or priority of any such Lien, (iv) reduce the principal of, or interest or other amounts payable on, any amount payable under the Second Lien Term Note Agreement or any Second Lien Credit Document, (v) postpone any date fixed for any payment of principal of, or interest or other amounts payable on, any amounts payable under the Second Lien Term Note Agreement or any Second Lien Credit Document, (vi) or permit any Liens on the Collateral not permitted under the Second Lien Credit Documents or Section 6, or (vii) impose duties on the Second Lien Collateral Agent without its consent, except, in the cases of clauses (i), (ii) and (iii), to the extent that a release of, or adverse effect on the perfection or priority of, such Lien is permitted by Section 5.1 or Section 6, and (B) notice of such amendment, waiver or consent shall have been given to the Second Lien Collateral Agent no later than 10 days after its effectiveness, provided that the failure to give such notice shall not affect the effectiveness or validity thereof; and provided further that this paragraph is intended solely to set forth provisions by which the Second Lien Collateral Documents shall be automatically affected by amendments, waivers and consents given by the First Lien Collateral Agent and First Lien Claimholders under the First Lien Credit Agreement and the First Lien Collateral

Documents and is not intended to impose any liability on the First Lien Collateral Agent or First Lien Claimholders.

5.4    <u>Rights As Unsecured Creditors</u>.  Except as otherwise set forth in <u>Section 2.1</u> or <u>Section 3.1</u>, the Second Lien Collateral Agent and the Second Lien Claimholders may exercise rights and remedies as unsecured creditors against any Grantor in accordance with and consistent with the terms of the Second Lien Credit Documents (including <u>Article XI</u> of the Second Lien Term Note Agreement) and applicable law.  Except as otherwise set forth in <u>Section 2.1</u> and <u>Section 4</u>, nothing in this Agreement shall prohibit the receipt by the Second Lien Collateral Agent or any Second Lien Claimholders of the required payments of interest and principal so long as such receipt is not the direct or indirect result of the exercise by the Second Lien Collateral Agent or any Second Lien Claimholders of rights or remedies as a secured creditor (including set-off or recoupment) or enforcement of any Lien held by any of them.  Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Lien Collateral Agent or the First Lien Claimholders may have with respect to the Collateral.  In the event that any Second Lien Claimholder becomes a judgment Lien creditor as a result of its enforcement of its rights as an unsecured creditor, such judgment Lien shall be subject to the terms of this Agreement for all purposes to the same extent as all other Liens securing the Second Lien Obligations subject to this Agreement.

5.5    <u>Control Agent for Perfection</u>.

(a)    The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, each hereby appoint UBS AG, Stamford Branch as its collateral agent (in such capacity, together with any successor in such capacity appointed by the First Lien Collateral Agent and the Second Lien Collateral Agent, the "**Control Agent**") for the limited purpose of acting as the agent on behalf of the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) with respect to the Control Collateral for purposes perfecting the Liens of such parties on the Control Collateral. The Control Agent accepts such appointment and agrees to hold the Control Collateral in its possession or control (or in the possession or control of its agents or bailees) as Control Agent for the benefit of the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) and any permitted assignee of any thereof solely for the purpose of perfecting the security interest granted to such parties in such Control Collateral, subject to the terms and conditions of this <u>Section 5.5</u>.  The First Lien Collateral Agent and the Second Lien Collateral Agent hereby acknowledge that the Control Agent will obtain "control" under the UCC over each Controlled Account as contemplated by the First Lien Collateral Documents and the Second Lien Collateral Documents for the benefit of both the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) pursuant to the control agreements relating to each respective Controlled Account.  The First Lien Collateral Agent and the Second Lien Collateral Agent hereby also acknowledge and agree that the Control Agent will obtain

landlord lien waivers as contemplated by the First Lien Collateral Documents and the Second Lien Collateral Documents for the benefit of (i) the First Lien Collateral Agent for the benefit of the First Lien Claimholders and (ii) the Second Lien Collateral Agent for the benefit of Second Lien Claimholders.

(b)     The Control Agent, the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, each hereby agrees that the First Lien Collateral Agent shall have the sole and exclusive right and authority to give instructions to, and otherwise direct, the Control Agent in respect of the Control Collateral or any control agreement with respect to any Control Collateral until the earlier of (i) the date upon which the Payment in Full of First Lien Obligations shall have occurred and (ii) the Second Lien Enforcement Date and neither the Second Lien Collateral Agent nor any Second Lien Claimholder will impede, hinder, delay or interfere with the exercise of such rights by the First Lien Collateral Agent in any respect.  The Grantors hereby jointly and severally agree to pay, reimburse, indemnify and hold harmless the Control Agent to the same extent and on the same terms that the Grantors are required to do so for the First Lien Collateral Agent in accordance with the First Lien Credit Agreement.  The First Lien Claimholders and the Second Lien Claimholders hereby jointly and severally agree to pay, reimburse, indemnify and hold harmless the Control Agent to the same extent and on the same terms that the First Lien Claimholders are required to do so for the First Lien Collateral Agent in accordance with the First Lien Credit Agreement and the Second Lien Claimholders are required to do so for the Second Lien Collateral Agent in accordance with the Second Lien Term Note Agreement.

(c)     Except as set forth below, the Control Agent shall have no obligation whatsoever to the Second Lien Collateral Agent or any Second Lien Claimholder, including, without limitation, any obligation to assure that the Control Collateral is genuine or owned by any Grantor or one of their respective Subsidiaries or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.5.  In acting on behalf of the Second Lien Collateral Agent and the Second Lien Claimholders and the First Lien Collateral Agent and the First Lien Claimholders, the duties or responsibilities of the Control Agent under this Section 5.5 shall be limited solely (i) to physically holding the Control Collateral delivered to the Control Agent by any Grantor as agent for the First Lien Collateral Agent (on behalf of itself and the First Lien Claimholders) and the Second Lien Collateral Agent (on behalf of itself and the Second Lien Claimholders) for purposes of perfecting the Lien held by the First Lien Collateral Agent and the Second Lien Collateral Agent and (ii) delivering such collateral as set forth in Section 5.5(d).

(d)     The rights of the Second Lien Collateral Agent shall at all times be subject to the terms of this Agreement and to the First Lien Collateral Agent's rights under the First Lien Credit Documents.

(e)     Neither the Control Agent nor the First Lien Collateral Agent shall have by reason of the Second Lien Credit Documents or this Agreement or any other document

a fiduciary relationship in respect of the Second Lien Collateral Agent or any Second Lien Claimholder.

(f)     Upon the Payment in Full of First Lien Obligations (other than in connection with a Refinancing of the First Lien Obligations), the Control Agent shall deliver to the Second Lien Collateral Agent the Control Collateral together with any necessary endorsements (or otherwise allow the Second Lien Collateral Agent to obtain control of such Control Collateral) or as a court of competent jurisdiction may otherwise direct and the Second Lien Collateral Agent shall accept and succeed to the role of the Control Agent as the agent for perfection on the Control Collateral.

(g)     The Control Agent shall have an unfettered right to resign as Control Agent upon 30 days notice to the First Lien Collateral Agent and the Second Lien Collateral Agent.  If upon the effective date of such resignation no successor to the Control Agent has been appointed by the First Lien Collateral Agent and the Second Lien Collateral Agent, the Control Agent shall deliver to the First Lien Collateral Agent the Control Collateral together with any necessary endorsements (or otherwise allow the First Lien Collateral Agent to obtain control of such Control Collateral) or as a court of competent jurisdiction may otherwise direct and the First Lien Collateral Agent shall accept and succeed to the role of the Control Agent as the agent for perfection on the Control Collateral.

**5.6**     <u>When Payment in Full of First Lien Obligations Deemed to Not Have Occurred</u>. If at any time after the Payment in Full of First Lien Obligations has occurred, the Company thereafter enters into any Refinancing of any First Lien Credit Document evidencing a First Lien Obligation which Refinancing is permitted hereby and by the terms of the Second Lien Credit Documents, then such Payment in Full of First Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Payment in Full of First Lien Obligations), and the obligations under such Refinancing First Lien Credit Document shall automatically be treated as First Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the First Lien Collateral Agent under such First Lien Credit Documents shall be a First Lien Collateral Agent for all purposes of this Agreement.  Upon receipt of a notice stating that the Company has entered into a new First Lien Credit Document (which notice shall include the identity of the new collateral agent, such agent, the "**New Agent**"), the Second Lien Collateral Agent shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as the Company or such New Agent shall reasonably request in order to provide to the New Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement.  If the new First Lien Obligations under the new First Lien Credit Documents are secured by assets of the Grantors of the type constituting Collateral that do not also secure the Second Lien Obligations, then the Second Lien Obligations shall be secured at such time by a second priority Lien on such assets to the same extent provided in the Second Lien Collateral Documents.

**5.7** Purchase Right. Without prejudice to the enforcement of the First Lien Claimholders' remedies, the First Lien Claimholders agree that at any time following (a) acceleration of the First Lien Obligations in accordance with the terms of the First Lien Credit Agreement, (b) a payment default under the First Lien Credit Agreement that has not been cured or waived by the First Lien Claimholders within sixty (60) days of the occurrence thereof or (c) the commencement of an Insolvency Proceeding (each, a "**Purchase Event**"), one or more of the Second Lien Claimholders may request, and the First Lien Claimholders hereby offer the Second Lien Claimholders the option, to purchase all, but not less than all, of the aggregate amount of outstanding First Lien Obligations outstanding at the time of purchase at par, (including any applicable premium) without warranty or representation or recourse (except for representations and warranties required to be made by assigning lenders pursuant to the Assignment Agreement (as such term is defined in the First Lien Credit Agreement)). If such right is exercised, the parties shall endeavor to close promptly thereafter but in any event within ten (10) Business Days of the request. If one or more of the Second Lien Claimholders exercise such purchase right, it shall be exercised pursuant to documentation mutually acceptable to each of the First Lien Collateral Agent and the Second Lien Collateral Agent. If none of the Second Lien Claimholders exercise such right, the First Lien Claimholders shall have no further obligations pursuant to this Section 5.7 for such Purchase Event and may take any further actions in their sole discretion in accordance with the First Lien Credit Documents and this Agreement.

## SECTION 6  Insolvency Proceedings.

**6.1** Use of Cash Collateral and Financing Issues. Until the Payment in Full of First Lien Obligations has occurred, if Company or any other Grantor shall be subject to any Insolvency Proceeding and the First Lien Collateral Agent shall desire to permit the use of cash collateral on which the First Lien Collateral Agent or any other creditor has a Lien or to permit Company or any other Grantor to obtain financing, from one or more of the First Lien Claimholders under Section 363 or Section 364 of the Bankruptcy Code or any similar Bankruptcy Law (each, a "**DIP Financing**"), then, so long as the maximum amount of Indebtedness that may be outstanding from time to time in connection with such DIP Financing shall not exceed an amount equal to **[$_____]**[3] then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, (A) agrees that it will raise no objection to such use of cash collateral or DIP Financing nor support any other Person objecting to, such sale, use, or lease of cash collateral or DIP Financing and will not request any form of adequate protection or any other relief in connection therewith (except as agreed by the First Lien Collateral Agent or to the extent expressly permitted by Section 6.4) and, to the extent the Liens securing the First Lien Obligations are subordinated to or pari passu with such DIP Financing, the Second Lien Collateral Agent will subordinate its Liens in the Collateral to (x) the Liens securing such DIP Financing (and all Obligations relating thereto), (y) any adequate protection Liens provided to the First Lien Claimholders and (z) any "carve-out" for professional or United States Trustee fees agreed to by the First Lien Collateral Agent; and (B) agrees that notice received two (2)

---

[3]       Allow First Lien to rollover into DIP.

calendar days prior to the entry of an order approving such usage of cash collateral or approving such DIP Financing shall be adequate notice.

**6.2** <u>Sale Issues</u>. The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will raise no objection to or oppose a sale or other disposition of any Collateral (and any post-petition assets subject to adequate protection liens in favor of the First Lien Collateral Agent) free and clear of its Liens or other claims under Section 363 of the Bankruptcy Code if the Required Lenders under the First Lien Credit Agreement have consented to such sale or disposition of such assets so long as the interests of the Second Lien Claimholders in the Collateral (and any post-petition assets subject to adequate protection liens, if any, in favor of the Second Lien Collateral Agent) attach to the proceeds thereof, subject to the terms of this Agreement. If requested by the First Lien Collateral Agent in connection therewith, the Second Lien Collateral Agent shall affirmatively consent to such a sale or disposition.

**6.3** <u>Relief from the Automatic Stay</u>. Until the Payment in Full of First Lien Obligations has occurred, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall (i) seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of the Collateral, without the prior written consent of the First Lien Collateral Agent, or (ii) oppose any request by the First Lien Collateral Agent or any First Lien Claimholder to seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of the Collateral.

**6.4** <u>Adequate Protection</u>.

(a)     The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall contest (or support any other person contesting) (i) any request by the First Lien Collateral Agent or the First Lien Claimholders for adequate protection or (ii) any objection by the First Lien Collateral Agent or the First Lien Claimholders to any motion, relief, action or proceeding based on the First Lien Collateral Agent or the First Lien Claimholders claiming a lack of adequate protection. In any Insolvency Proceeding, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, may seek adequate protection in respect of the Second Lien Obligations, subject to the provisions of this Agreement, only if (A) the First Lien Claimholders (or any subset thereof) are granted adequate protection in the form of additional collateral including replacement liens on post-petition collateral and (B) such additional protection requested by the Second Lien Collateral Agent is in the form of a Lien on such additional collateral, which Lien, if granted, will be subordinated to the adequate protection Liens securing the First Lien Obligations and the Liens securing any DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the Liens securing the First Lien Obligations under this Agreement and the Liens securing any such DIP Financing. In the event the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, seeks or requests adequate protection in respect of Second Lien Obligations and such adequate protection is granted in the form of additional collateral, then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Collateral Agent shall also be granted a Lien on

such additional collateral as security for the First Lien Obligations and for any DIP Financing and that any Lien on such additional collateral securing the Second Lien Obligations shall be subordinated to the Liens on such collateral securing the First Lien Obligations and any DIP Financing (and all Obligations relating thereto) and to any other Liens granted to the First Lien Claimholders as adequate protection on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the Liens securing the First Lien Obligations under this Agreement and the Liens securing any DIP Financing.

(b)      Similarly, if the First Lien Claimholders are granted adequate protection in the form of a superpriority claim, then the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, may seek or request a superpriority claim, which superpriority claim will be junior in all respects to the superpriority claim granted to the First Lien Collateral Agent and the First Lien Claimholders, and, in the event that the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, seeks or requests adequate protection in respect of Second Lien Obligations and such adequate protection is granted in the form of a superpriority claim, then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Collateral Agent and the providers of any DIP Financing also shall be granted a superpriority claim, which superpriority claim will be senior in all respects to the superpriority claim granted to the Second Lien Collateral Agent and the Second Lien Claimholders.

(c)      Notwithstanding the foregoing, if the First Lien Claimholders are deemed by a court of competent jurisdiction to be fully secured on the petition date of any Insolvency Proceeding, then the Second Lien Collateral Agent and the Second Lien Claimholders shall not be prohibited from seeking adequate protection in the form of payments in the amount of current post-petition interest, incurred fees and expenses or other cash payments.

**6.5**      <u>No Waiver</u>.  Nothing contained herein shall prohibit or in any way limit the First Lien Collateral Agent or any First Lien Claimholder from objecting in any Insolvency Proceeding or otherwise to any action taken by the Second Lien Collateral Agent or any of the Second Lien Claimholders, including the seeking by the Second Lien Collateral Agent or any Second Lien Claimholders of adequate protection or the asserting by the Second Lien Collateral Agent or any Second Lien Claimholders of any of its rights and remedies under the Second Lien Credit Documents or otherwise; <u>provided</u>, <u>however</u>, that this <u>Section 6.5</u> shall not limit the rights of the Second Lien Claimholders under the proviso in <u>Section 3.1(a)(ii)</u> or under <u>Section 6.4</u> or <u>Section 6.9</u>.

**6.6**      <u>Avoidance Issues</u>.  If any First Lien Claimholder is required in any Insolvency Proceeding, or otherwise, to turn over or otherwise pay to the estate of Company or any other Grantor any amount in respect of a First Lien Obligation (a "**Recovery**"), then such First Lien Claimholders shall be entitled to a reinstatement of First Lien Obligations with respect to all such recovered amounts.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not

diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement. Collateral or proceeds thereof received by the Second Lien Collateral Agent or any Second Lien Claimholder after a Payment in Full of First Lien Obligations and prior to the reinstatement of such First Lien Obligations shall be delivered to the First Lien Collateral Agent upon such reinstatement in accordance with <u>Section 4.2</u>.

**6.7** <u>Separate Grants of Security and Separate Classification</u>. Each of the Grantors, the First Lien Claimholders and the Second Lien Claimholders acknowledges and agrees that (i) the grants of Liens pursuant to the First Lien Collateral Documents and the Second Lien Collateral Documents constitute two separate and distinct grants of Liens and (ii) because of, among other things, their differing rights in the Collateral, the Second Lien Obligations are fundamentally different from the First Lien Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Lien Claimholders and Second Lien Claimholders in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the First Lien Claimholders shall be entitled to receive, in addition to amounts distributed to them from, or in respect of, the Collateral in respect of principal, pre-petition interest (including default interest) and other claims, all amounts owing in respect of post-petition interest (including default interest), fees, costs, premiums and other charges, irrespective of whether a claim for such amounts is allowed or allowable in such Insolvency Proceeding, before any distribution from, or in respect of, any Collateral is made in respect of the claims held by the Second Lien Claimholders), with the Second Lien Claimholders hereby acknowledging and agreeing to turn over to the First Lien Claimholders amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Lien Claimholders.

**6.8** <u>Reorganization Securities</u>. If, in any Insolvency Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, both on account of First Lien Obligations and on account of Second Lien Obligations, then, to the extent the debt obligations distributed on account of the First Lien Obligations and on account of the Second Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

**6.9** <u>Post-Petition Claims</u>.

(a) Neither the Second Lien Collateral Agent nor any other Second Lien Claimholder shall oppose or seek to challenge any claim by the First Lien Collateral Agent or any First Lien Claimholder for allowance in any Insolvency Proceeding of First Lien Obligations consisting of post-petition interest, fees, costs, charges or expenses to the extent of the value of the Lien of the First Lien Collateral Agent held for the benefit of the First Lien Claimholders, without regard to the existence of the Lien of the Second Lien Collateral Agent on behalf of the Second Lien Claimholders on the Collateral.

(b)     Neither the First Lien Collateral Agent nor any other First Lien Claimholder shall oppose or seek to challenge any claim by the Second Lien Collateral Agent or any Second Lien Claimholder for allowance in any Insolvency Proceeding of Second Lien Obligations consisting of post-petition interest, fees, costs, charges or expenses to the extent of the value of the Lien of the Second Lien Collateral Agent on behalf of the Second Lien Claimholders on the Collateral (after taking into account Payment in Full of the First Lien Obligations).

**6.10**     Waiver.  The Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, waives any claim it or they may hereafter have against the First Lien Collateral Agent or any First Lien Claimholder arising out of the election of the First Lien Collateral Agent or any First Lien Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code, or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in any Insolvency Proceeding.

**6.11**     Expense Claims.  Neither the Second Lien Collateral Agent nor any Second Lien Claimholder will (i) contest the payment of fees, expenses or other amounts to the First Lien Collateral Agent or any First Lien Claimholder under Section 506(b) of the Bankruptcy Code or otherwise to the extent provided for in the First Lien Credit Agreement or (ii) assert or enforce, at any time prior to the Payment in Full of First Lien Obligations, any claim under Section 506(c) of the Bankruptcy Code senior to or on parity with the First Lien Obligations for costs or expenses of preserving or disposing of any Collateral.

**6.12**     Other Matters.  To the extent that the Second Lien Collateral Agent or any Second Lien Claimholder has or acquires rights under Section 361, Section 363 or Section 364 of the Bankruptcy Code with respect to any of the Collateral, the Second Lien Collateral Agent agrees, on behalf of itself and the Second Lien Claimholders not to assert any of such rights without the prior written consent of the First Lien Collateral Agent; provided that if requested by the First Lien Collateral Agent, the Second Lien Collateral Agent shall timely exercise such rights in the manner requested by the First Lien Collateral Agent, including any rights to payments in respect of such rights.

**6.13**     Effectiveness in Insolvency Proceedings.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Proceeding.  All references in this Agreement to any Grantor shall include such Person as a debtor-in-possession and any receiver or trustee for such Person in any Insolvency Proceeding.

**SECTION 7     Reliance; Waivers; Etc.**

**7.1**     Non-Reliance

(a)     The consent by the First Lien Claimholders to the execution and delivery of the Second Lien Credit Documents and the grant to the Second Lien Collateral Agent on behalf of the Second Lien Claimholders of a Lien on the Collateral and all loans and other extensions of credit made or deemed made on and after the date hereof by the First

Lien Claimholders to the Grantors shall be deemed to have been given and made in reliance upon this Agreement. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, acknowledges that it and the Second Lien Claimholders have, independently and without reliance on the First Lien Collateral Agent or any First Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the Second Lien Term Note Agreement, the other Second Lien Credit Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the Second Lien Term Note Agreement, the other Second Lien Credit Documents or this Agreement.

(b)     The consent by the Second Lien Claimholders to the execution and delivery of the First Lien Credit Documents and the grant to the First Lien Collateral Agent on behalf of the First Lien Claimholders of a Lien on the Collateral and all loans and other extensions of credit made or deemed made on and after the date hereof by the Second Lien Claimholders to the Grantors shall be deemed to have been given and made in reliance upon this Agreement. The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders, acknowledges that it and the First Lien Claimholders have, independently and without reliance on the Second Lien Collateral Agent or any Second Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the First Lien Credit Agreement, the other First Lien Credit Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the First Lien Credit Agreement, the other First Lien Credit Documents or this Agreement.

**7.2**     <u>No Warranties or Liability</u>. The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under its First Lien Credit Documents, acknowledges and agrees that each of the Second Lien Collateral Agent and the Second Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Lien Credit Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The Second Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the Second Lien Credit Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Obligations, acknowledges and agrees that the First Lien Collateral Agent and the First Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Lien Credit Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The First Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under their respective First Lien Credit Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Second Lien Collateral Agent and the Second Lien Claimholders shall have no duty to the First Lien Collateral Agent or any of the First Lien Claimholders, and the First Lien Collateral Agent and the First Lien Claimholders shall have no duty to the Second Lien Collateral Agent or any of the Second Lien Claimholders,

to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with Company or any Guarantor (including the First Lien Credit Documents and the Second Lien Credit Documents), regardless of any knowledge thereof which they may have or be charged with.

**7.3**     No Waiver of Lien Priorities.

(a)     No right of the First Lien Claimholders, the Control Agent, the First Lien Collateral Agent or any of them to enforce any provision of this Agreement or any First Lien Credit Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of Company or any other Grantor or by any act or failure to act by the Control Agent, any First Lien Claimholder or the First Lien Collateral Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First Lien Credit Documents or any of the Second Lien Credit Documents, regardless of any knowledge thereof which the Control Agent, the First Lien Collateral Agent or the First Lien Claimholders, or any of them, may have or be otherwise charged with.

(b)     Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of Company and the other Grantors under the First Lien Credit Documents and subject to the provisions of Section 5.3(b)), the First Lien Claimholders, the First Lien Collateral Agent and any of them may, at any time and from time to time in accordance with the First Lien Credit Documents or applicable law, without the consent of, or notice to, the Second Lien Collateral Agent or any Second Lien Claimholders, without incurring any liabilities to the Second Lien Collateral Agent or any Second Lien Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the Second Lien Collateral Agent or any Second Lien Claimholders is affected, impaired or extinguished thereby) do any one or more of the following:

(i)     make loans and advances to any Grantor or issue, guaranty or obtain letters of credit for the account of any Grantor or otherwise extend credit to any Grantor, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing (subject, in each case, to the limits set forth in the definition of "First Lien Obligations" and Section 5.3);

(ii)     change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the First Lien Obligations or any Lien on any First Lien Collateral or guaranty thereof or any liability of Company or any other Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the First Lien Obligations, without any restriction as to the amount, tenor or terms of any such increase or extension, subject to the limits set forth in the definition of "First Lien Obligations") or, subject to the provisions of this Agreement, otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the First Lien Collateral Agent or any of the First

Lien Claimholders, the First Lien Obligations or any of the First Lien Credit Documents; provided, however, the foregoing shall not prohibit the Second Lien Collateral Agent and the Second Lien Claimholders from enforcing, consistent with the other terms of this Agreement, any right arising under the Second Lien Term Note Agreement as a result of any grantor's violation of the terms thereof.

(iii)     subject to the provisions of this Agreement, sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Collateral or any liability of Company or any other Grantor to the First Lien Claimholders or the First Lien Collateral Agent, or any liability incurred directly or indirectly in respect thereof;

(iv)     settle or compromise any First Lien Obligation or any other liability of Company or any other Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the First Lien Obligations) in any manner or order;

(v)     exercise or delay in or refrain from exercising any right or remedy against Company or any security or any other Grantor or any other Person, elect any remedy and otherwise deal freely with Company, any other Grantor or any First Lien Collateral and any security and any guarantor or any liability of Company or any other Grantor to the First Lien Claimholders or any liability incurred directly or indirectly in respect thereof;

(vi)     take or fail to take any Lien securing the First Lien Obligations or any other collateral security for any First Lien Obligations or take or fail to take any action which may be necessary or appropriate to ensure that any Lien securing First Lien Obligations or any other Lien upon any property is duly enforceable or perfected or entitled to priority as against any other Lien or to ensure that any proceeds of any property subject to any Lien are applied to the payment of any First Lien Obligation or any Obligation secured thereby; or

(vii)     otherwise release, discharge or permit the lapse of any or all Liens securing the First Lien Obligations or any other Liens upon any property at any time securing any First Lien Obligations.

(c)     The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, also agrees that the Control Agent, the First Lien Claimholders and the First Lien Collateral Agent shall have no liability to the Second Lien Collateral Agent or any Second Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives all claims against the Control Agent, any First Lien Claimholder or the First Lien Collateral Agent, arising out of any and all actions which the First Lien Claimholders or the First Lien Collateral Agent may take or permit or omit to take with respect to:  (i) the First Lien Credit Documents, (ii) the collection of the First Lien Obligations or (iii) the foreclosure upon, or sale, liquidation or other disposition of, any Collateral (including, without limitation, the Control Collateral,

as applicable).  The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Claimholders and the First Lien Collateral Agent have no duty to them in respect of the maintenance or preservation of the Collateral, the First Lien Obligations or otherwise.

(d)  The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

**7.4**   Obligations Unconditional.  All rights, interests, agreements and obligations of the First Lien Collateral Agent and the First Lien Claimholders and the Second Lien Collateral Agent and the Second Lien Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

(a)  any lack of validity or enforceability of any First Lien Credit Documents or any Second Lien Credit Documents or any setting aside or avoidance of any Lien;

(b)  except as otherwise set forth in this Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the First Lien Obligations or Second Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any First Lien Credit Document or any Second Lien Credit Document;

(c)  any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First Lien Obligations or Second Lien Obligations or any guaranty thereof;

(d)  the commencement of any Insolvency Proceeding in respect of Company or any other Grantor; or

(e)  any other circumstances which otherwise might constitute a defense available to, or a discharge of, Company or any other Grantor in respect of the First Lien Obligations, or of the Second Lien Collateral Agent or any Second Lien Claimholder in respect of this Agreement.

**7.5**   Certain Notices.

(a)  Promptly upon the Payment in Full of First Lien Obligations, the First Lien Collateral Agent shall deliver written notice confirming same to the Second Lien Collateral Agent; provided that the failure to give any such notice shall not result in any liability of the First Lien Collateral Agent or the First Lien Claimholders hereunder or in the modification, alteration, impairment, or waiver of the rights of any party hereunder.

(b)     Promptly upon (or as soon as practicable following) the commencement by the First Lien Collateral Agent of any enforcement action or the exercise of any remedy with respect to any Collateral (including by way of a public or private sale of Collateral), the First Lien Collateral Agent shall notify the Second Lien Collateral Agent of such action; provided that the failure to give any such notice shall not result in any liability of the First Lien Collateral Agent or the First Lien Claimholders hereunder or in the modification, alteration, impairment, or waiver of the rights of any party hereunder.

**SECTION 8   Miscellaneous.**

**8.1**     Conflicts.  Subject to the first sentence of this Section 8.1, in the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Credit Documents or the Second Lien Credit Documents, the provisions of this Agreement shall govern and control.  The parties hereto acknowledge that the terms of this Agreement are not intended to negate any specific rights granted to Company in the First Lien Credit Documents and the Second Lien Credit Documents.  The parties agree that the provisions of this Agreement and Article XI of the Second Lien Term Note Agreement (and related definitions) are to be read and interpreted as providing supplemental rights and restrictions with respect to the parties thereto and are to be given independent effect.

**8.2**     Effectiveness; Continuing Nature of this Agreement; Severability.  This Agreement shall become effective when executed and delivered by the parties hereto.  This is a continuing agreement of lien subordination and the First Lien Claimholders may continue, at any time and without notice to the Second Lien Collateral Agent or any Second Lien Claimholder subject to the Second Lien Credit Documents, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any Grantor constituting First Lien Obligations in reliance hereof.  The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency Proceeding.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to Company or any other Grantor shall include Company or such Grantor as debtor and debtor-in-possession and any receiver or trustee for Company or any other Grantor (as the case may be) in any Insolvency Proceeding.  This Agreement shall terminate and be of no further force and effect, (i) with respect to the Second Lien Collateral Agent, the Second Lien Claimholders and the Second Lien Obligations, upon the later of (1) the date upon which the obligations under the Second Lien Term Note Agreement terminate and payment has been made in full in cash of all other Second Lien Obligations outstanding on such date and (2) if there are other Second Lien Obligations outstanding on such date, the date upon which such Second Lien Obligations terminate and (ii) with respect to the First Lien Collateral Agent, the First Lien Claimholders and the First Lien Obligations, the date of Payment in Full of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 5.6 and Section 6.5.

**8.3** <u>Amendments; Waivers</u>.  No amendment, modification or waiver of any of the provisions of this Agreement by the Second Lien Collateral Agent or the First Lien Collateral Agent shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, Company shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent its rights or obligations are directly and affected.

**8.4** <u>Information Concerning Financial Condition of Company and its Subsidiaries</u>.

(a)  The First Lien Collateral Agent and the First Lien Claimholders, on the one hand, and the Second Lien Claimholders and the Second Lien Collateral Agent, on the other hand, shall each be responsible for keeping themselves informed of (a) the financial condition of Company and its Subsidiaries and all endorsers and/or guarantors of the First Lien Obligations or the Second Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations or the Second Lien Obligations.  The First Lien Collateral Agent and the First Lien Claimholders shall have no duty to advise the Second Lien Collateral Agent or any Second Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the First Lien Collateral Agent or any of the First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Second Lien Collateral Agent or any Second Lien Claimholder, it or they shall be under no obligation (w) to make, and the First Lien Collateral Agent and the First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information which, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

(b)  The Grantors agree that any information provided to the First Lien Collateral Agent, the Second Lien Collateral Agent, the Control Agent, any First Lien Claimholder or any Second Lien Claimholder may be shared by such Person with any First Lien Claimholder, any Second Lien Claimholder, the Control Agent, the First Lien Collateral Agent or the Second Lien Collateral Agent notwithstanding a request or demand by such Grantor that such information be kept confidential; <u>provided</u>, that such information shall otherwise be subject to the respective confidentiality provisions in the First Lien Credit Agreement and the Second Lien Term Note Agreement, as applicable.

**8.5** <u>Subrogation</u>.  The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any rights of subrogation it may acquire as a result of any payment hereunder until the Payment in Full of First Lien Obligations has occurred.

**8.6** <u>Application of Payments</u>.  All payments received by the First Lien Collateral Agent or the First Lien Claimholders may be applied, reversed and reapplied, in whole or in part, to such part of the First Lien Obligations provided for in the First Lien Credit Documents.  The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, assents to any extension or postponement of the time of payment of the First Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the First Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

**8.7** <u>SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL</u>.

(a)  This Agreement shall be construed in accordance with and governed by the law of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

(b)  Each party hereby irrevocably and unconditionally submits, for itself and its Property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement against any other party or its properties in the courts of any jurisdiction.

(c)  Each party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in <u>Section 8.7(b)</u>.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to this Agreement in the manner provided for notices in <u>Section 8.8</u>.  Nothing in this Agreement or any other Note Document will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable law.

(e)  **Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or any other theory).  Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to**

**enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this <u>Section 8.7.</u>**

      **8.8**    <u>Notices</u>. All notices to the Control Agent, the Second Lien Claimholders and the First Lien Claimholders permitted or required under this Agreement shall also be sent to the Second Lien Collateral Agent and the First Lien Collateral Agent, respectively. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of electronic mail or four (4) Business Days after deposit in the U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

      **8.9**    <u>Further Assurances</u>. The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under the First Lien Credit Documents, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders under the Second Lien Credit Documents, and Company, agrees that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the First Lien Collateral Agent or the Second Lien Collateral Agent may reasonably request to effectuate the terms of and the lien priorities contemplated by this Agreement.

      **8.10**    <u>Binding on Successors and Assigns</u>. This Agreement shall be binding upon the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent, the Second Lien Claimholders, the Control Agent and their respective successors and assigns.

      **8.11**    <u>Specific Performance</u>. Each of the First Lien Collateral Agent and the Second Lien Collateral Agent may demand specific performance of this Agreement. The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under its First Lien Credit Documents, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by any First Lien Collateral Agent or the Second Lien Collateral Agent, as the case may be.

      **8.12**    <u>Headings</u>. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

      **8.13**    <u>Counterparts</u>. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**8.14** <u>Authorization</u>. By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

**8.15** <u>No Third Party Beneficiaries</u>. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent, the Second Lien Claimholders, the Control Agent and the Company. No other Person shall have or be entitled to assert rights or benefits hereunder.

**8.16** <u>Provisions Solely to Define Relative Rights</u>. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Claimholders on the one hand and the Second Lien Claimholders on the other hand. Nothing in this Agreement is intended to or shall impair the rights of Company or any other Grantor, or the obligations of Company or any other Grantor, which are absolute and unconditional, to pay the First Lien Obligations and the Second Lien Obligations as and when the same shall become due and payable in accordance with their terms.

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

**UBS AG, STAMFORD BRANCH,**
as First Lien Collateral Agent,

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

<u>Notice Address</u>:

Principal Office:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut 06901
Attention: Tom Donnelly
Telecopier: (203) 719-3162

with a copy to:

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
Attention: Frederick F. Eisenbiegler
Telephone: (212) 705-3646

**UBS AG, STAMFORD BRANCH,**
as Second Lien Collateral Agent,

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

<u>Notice Address</u>:

Principal Office:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut 06901
Attention: Tom Donnelly
Telecopier: (203) 719-3162

with a copy to:

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
Attention: Frederick F. Eisenbiegler
Telephone: (212) 705-3646

**UBS AG, STAMFORD BRANCH,**
as Control Agent,


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


<u>Notice Address</u>:

Principal Office:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut 06901
Attention: Tom Donnelly
Telecopier: (203) 719-3162

with a copy to:

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
Attention: Frederick F. Eisenbiegler
Telephone: (212) 705-3646

**ATKINS NUTRITIONALS, INC.**
as Company


By:_____
     Name:
     Title:


Notice Address:

Atkins Nutritionals, Inc.
2002 Orville Drive North, Suite A
Ronkonkoma, New York 11779
Attention: President and Chief Executive Officer
Telecopy: (631) 738-8713

with a copy to:

Atkins Nutritionals, Inc.
100 Park Avenue
New York, New York 10017
Attention: Mark Rodriguez

with a copy to :

Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:  Marcia L. Goldstein
         Shai Y. Waisman
Telecopier: (212)310-8007

**Exhibit 8**

**New CVR Agreement**

[Form of Contingent Value Rights Agreement]

**ATKINS NUTRITIONALS HOLDINGS, INC.**

**TO**

**[                    ]**

**as Trustee**

**CONTINGENT VALUE RIGHTS AGREEMENT**

**Dated as of December [  ], 2005**

CROSS REFERENCE TABLE

| Trust Indenture Act Section Reference | Contingent Value Rights Agreement Section |
|---|---|
| 310 (a)(1) | 4.8 |
| (a)(2) | 4.8 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 4.8 |
| (b) | 4.7 |
| (c) | N.A. |
| 311 (a) | 4.12 |
| (b) | 4.12 |
| (c) | N.A. |
| 312 (a) | 5.1, 5.2 |
| (b) | 5.2 |
| (c) | 5.2 |
| 313(a) | 5.3 |
| (b)(1) | N.A. |
| (b)(2) | 5.3 |
| (c) | 1.5, 5.3 |
| (d) | 5.3 |
| 314 (a) | 5.3, 1.52 |
| (b) | N.A. |
| (c)(1) | 1.2 |
| (c)(2) | 1.2 |
| (c)(3) | N.A. |
| (d) | N.A. |
| (e) | 1.2 |
| 315 (a) | 4.1 |
| (b) | 1.5, 8.10 |
| (c) | 4.1 |
| (d) | 4.1 |
| (e) | 8.11 |
| 316 (a) (last sentence) | 1.1 |
| (a)(1)(A) | 8.9 |
| (a)(1)(B) | 8.9 |
| (a)(2) | N.A. |
| (b) | 8.7 |
| 317 (a)(1) | 8.4 |
| (a)(2) | 8.4 |
| (b) | 7.3 |
| 318 (a) | 1.7 |

N.A. means not applicable.

*This Cross Reference Table is not part of the Indenture.

# TABLE OF CONTENTS

Page

ARTICLE I　　　　DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION ..................................................................... 1

1.1　Definitions. ............................................................................. 1

1.2　Compliance Certificates and Opinions. ............................................ 6

1.3　Form of Documents Delivered to Trustee. ......................................... 6

1.4　Acts of Holders. ....................................................................... 7

1.5　Notices, etc., to Trustee and Company. ............................................ 7

1.6　Notice to Holders; Waiver. .......................................................... 8

1.7　Conflict with Trust Indenture Act. .................................................. 8

1.8　Effect of Headings and Table of Contents. ........................................ 8

1.9　Successors and Assigns. .............................................................. 8

1.10　Benefits of Agreement. .............................................................. 8

1.11　Governing Law. ....................................................................... 9

1.12　Separability Clause. .................................................................. 9

ARTICLE II　　　　THE CVRS ..................................................................... 9

2.1　Title and Terms. ....................................................................... 9

2.2　Registrable Form. .................................................................... 11

2.3　Execution, Authentication, Delivery and Dating. ............................... 11

2.4　Temporary CVR Certificates. ...................................................... 12

2.5　Registration and Transfer and Exchange. ........................................ 12

2.6　Mutilated, Destroyed, Lost and Stolen CVR Certificate. ...................... 14

2.7　Presentation of CVR Certificate. .................................................. 14

2.8　Persons Deemed Owners. ........................................................... 15

2.9　Cancellation. .......................................................................... 15

ARTICLE III　　　　CVR FORMS .................................................................. 15

3.1　Forms Generally. ..................................................................... 15

3.2　Form of Face of CVR. ............................................................... 16

3.3　Form of Reverse of CVR. ........................................................... 17

3.4　Form of Trustee's Certificate of Authentication .................................. 18

ARTICLE IV　　　　THE TRUSTEE ............................................................... 19

4.1　Certain Duties and Responsibilities. ............................................... 19

i

4.2     Certain Rights of Trustee. ................................................... 19

4.3     Not Responsible for Recitals or Issuance of CVRs. ........................... 21

4.4     May Hold CVRs. ............................................................. 21

4.5     Money Held in Trust. ....................................................... 21

4.6     Compensation, Reimbursement and Indemnification of the Trustee.............. 21

4.7     Disqualification; Conflicting Interests. .................................. 21

4.8     Corporate Trustee Required; Eligibility. ................................... 22

4.9     Resignation and Removal; Appointment of Successor.......................... 22

4.10    Acceptance of Appointment by Successor..................................... 23

4.11    Merger, Conversion, Consolidation or Succession to Business. .............. 23

4.12    Preferential Collection of Claims Against Company.  The Trustee is
        subject to Section 311(a) of the Trust Indenture Act, excluding any
        creditor relationship listed in Section 311(b) of the Trust Indenture Act .......... 23

ARTICLE V        HOLDERS' LISTS AND REPORTS BY TRUSTEE AND
                 COMPANY ................................................... 24

5.1     Company to Furnish Trustee Names and Addresses of Holders. ................ 24

5.2     Preservation of Information; Communications to Holders. ................... 24

5.3     Reports by Trustee. ....................................................... 25

5.4     Reports by Company........................................................ 25

ARTICLE VI       AMENDMENTS ................................................. 26

6.1     Amendments Without Consent of Holders. .................................... 26

6.2     Amendments with Consent of Holders. ...................................... 26

6.3     Execution of Amendments. .................................................. 27

6.4     Effect of Amendments. ..................................................... 27

6.5     Conformity with Trust Indenture Act. ...................................... 27

6.6     Reference in CVR Certificates to Amendments. .............................. 27

ARTICLE VII      COVENANTS .................................................. 27

7.1     Payment of Amounts, if any, to Holders. ................................... 27

7.2     Maintenance of Office or Agency............................................ 28

7.3     Money and Shares for CVR Payments to Be Held in Trust...................... 28

BUSDOCS/1507188.4

| | | |
|---|---|---|
| 7.4 | Written Statement to Trustee. | 29 |
| 7.5 | Available Shares. | 29 |
| ARTICLE VIII | REMEDIES OF THE TRUSTEE AND HOLDERS ON EVENT OF DEFAULT | 29 |
| 8.1 | Event of Default Defined. | 29 |
| 8.2 | Collection of Indebtedness by Trustee; Trustee May Prove Debt. | 29 |
| 8.3 | Application of Proceeds. | 30 |
| 8.4 | Suits for Enforcement. | 31 |
| 8.5 | Restoration of Rights on Abandonment of Proceedings. | 31 |
| 8.6 | Limitations on Suits by Holders. | 31 |
| 8.7 | Unconditional Right of Holders to Institute Certain Suits. | 32 |
| 8.8 | Powers and Remedies Cumulative; Delay or Omission Not Waiver of Default. | 32 |
| 8.9 | Control by Holders. | 32 |
| 8.10 | Trustee to Give Notice of Default, but May Withhold in Certain Circumstances. | 33 |
| 8.11 | Right of Court to Require Filing of Undertaking to Pay Costs. | 33 |
| ARTICLE IX | CONSOLIDATION, MERGER, SALE OR CONVEYANCE | 33 |
| 9.1 | Company May Consolidate, Etc. | 33 |
| 9.2 | Successor Substituted. | 33 |
| 9.3 | Opinion of Counsel to Trustee. | 34 |
| ARTICLE X | DISCHARGE OF AGREEMENT | 34 |
| 10.1 | Discharge of Liability on CVRs. | 34 |
| 10.2 | Repayment to the Company. | 34 |
| 10.3 | Counterparts. | 34 |

BUSDOCS/1507188.4

**CONTINGENT VALUE RIGHTS AGREEMENT**, dated as of December __, 2005, between **ATKINS NUTRITIONALS HOLDINGS, INC.**, a Delaware corporation (the "<u>Company</u>"), and [_____], as trustee (the "<u>Trustee</u>").

**RECITALS OF THE COMPANY**

**WHEREAS**, the Company and its wholly owned direct and indirect subsidiaries, Atkins Nutritionals Holdings II, Inc., Atkins Nutritionals, Inc. ("<u>ANI</u>"), and Atkins Nutritionals (Canada) Limited (collectively, the "Debtors"), filed their Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated November 16, 2005 (the "<u>Plan</u>"), with the United State Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") and the Bankruptcy Court confirmed the Plan on December __, 2005;

**WHEREAS**, pursuant to the Plan, the Company is authorized as of the Effective Date (as defined in the Plan) to issue and distribute to the holders of Allowed Second Lien Claims (as defined in the Plan) up to 1,600,000 contingent value rights (the "<u>CVRs</u>") of substantially the tenor hereinafter set forth, and to enter into and execute this Agreement; and

**WHEREAS**, all things necessary have been done to make the CVR Certificates, when executed by the Company and authenticated and delivered hereunder, the valid obligations of the Company and to make this Agreement a valid agreement of the Company, in accordance with their and its terms.

**NOW, THEREFORE**, for and in consideration of the promises and the consummation of the transactions referred to above, it is covenanted and agreed, for the equal and proportionate benefit of all Holders of the CVRs, as follows:

**ARTICLE I**
**DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION**

1.1     <u>Definitions</u>.

(a)     For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires, each term set forth below has the meaning assigned to such term:

"<u>Affiliate</u>" of a Person means any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such other Person.

"<u>Agreement</u>" means this Contingent Value Rights Agreement as originally executed and as it may from time to time be supplemented or amended pursuant to the applicable provisions hereof.

"<u>Applicable Procedures</u>" means, with respect to any transfer or exchange of or for beneficial interests in any Global Security, the rules and procedures of the Trustee that apply to such transfer or exchange.

"<u>Board of Directors</u>" means either the board of directors of the Company or any duly authorized committee of that board.

"<u>Board Resolution</u>" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"<u>Business Day</u>" means any day (other than a Saturday or a Sunday) on which banking institutions in the City of New York, New York or in the State of the principal office of the Trustee are not authorized or obligated by law or executive order to close.

Payment in "Cash" means payment made in the Borough of Manhattan, the City of New York, or at any other office or agency maintained by the Company for such purpose, in such coin or currency of the United States of America as at the time is legal tender for the payment of public and private debts; provided, however, that such amounts may be paid by check payable in such money.

"Change of Control" means the occurrence after the Effective Date of: (i) any direct or indirect sale or other transfer of all or substantially all of the assets (regardless of form or structure, and whether in a single transaction or a series of transactions) of the Company or ANI to any Person other than an Affiliate of the Company; (ii) a merger, consolidation or share exchange of the Company into or with any Person (other than an Affiliate of the Company or a merger or consolidation qualifying as a reorganization under Section 368(a)(1)(F) of the Internal Revenue Code of 1986, as amended), if, as a result of such transaction, the Persons (or Affiliates thereof) who were holders of Shares immediately prior to such transaction do not own at least a majority of the issued and outstanding equity securities of the resulting Person (or of the ultimate parent of the resulting Person); (iii) any direct or indirect sale of outstanding Shares (whether in a single transaction or a series of transactions) if, as a result of such sale, (x) more than eighty percent (80%) of the then issued and outstanding Shares are held by (I) a Person which was not a holder of 10% or more of the Shares issued and outstanding as of the Effective Date, or (II) by a Group that does not include a Person who was a holder of 10% or more of the Shares issued and outstanding as of the Effective Date, or (y) more than eighty percent (80%) of the then issued and outstanding Shares are held by (I) Persons who, at the Effective Date, held five percent (5%) or more but less than ten (10%) of the Shares issued and outstanding as of the Effective Date, or (II) by a Group that includes such a Person, and, in the case of clause (iii)(y)(I) or (II), sixty percent (60%) or more of the Persons who are members of the Board of Directors following such sale were not members of the Board of Directors prior to such sale; or (iv) a Qualified IPO.

"Change of Control Consummation Date" means the date on which the Initial Change of Control is consummated.

"Commission" means the Securities and Exchange Commission, as from time to time constituted, created under the Exchange Act, or if at any time after the execution of this Agreement such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties at such time.

"Company" means the Person named as the "Company" in the first paragraph of this Agreement, until a successor Person shall have become such pursuant to the applicable provisions of this Agreement, and thereafter "Company" shall mean such successor Person. To the extent necessary to comply with the requirements of the provisions of Trust Indenture Act Sections 310 through 317 as they are applicable to the Company, the term "Company" shall include any other obligor with respect to the CVRs for the purposes of complying with such provisions.

"Company Request" or "Company Order" means a written request or order signed in the name of the Company by the chairman or vice chairman of the Board of Directors, the president, any vice president, the controller, the treasurer, the secretary or any assistant secretary, and delivered to the Trustee.

The term "control" (including the terms "controlled", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of stock, by contract or otherwise.

"Corporate Trust Office" means the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of execution of this Agreement is located at [_____].

"CVR Certificate" means a certificate representing any of the CVRs, which may be in the form of Global Securities or Definitive Securities.

"CVR Payment Date" means the date that is 30 calendar days (or, if such 30th calendar day is not a Business Day, the first Business Day after such 30th calendar day) following the Change of Control Consummation Date, except as otherwise provided in Section 7.5.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exit Facility" means Exit Revolving Credit Agreement to be dated as of December [ ], 2005, by and among Atkins Nutritionals, Inc., Atkins Nutritionals Holdings, Inc., Atkins Nutritional (Canada) Limited, the lenders, UBS Securities LLC, UBS Loan Finance LLC and UBS AG Stanford Branch.

"Fair Market Value" means the fair market value of any applicable property, services, equity, or other consideration, as determined reasonably and in good faith by the Company's Board of Directors.

"Group" means a syndicate or group of Persons that is considered to be a "person" for purposes of Section 13(d)(3) of the Exchange Act.

"Holder" means a Person in whose name a CVR is registered in the Security Register.

"Implied Equity Value" means the Net Distributable Value minus the aggregate amount of outstanding Indebtedness of the Company and its Affiliates at the Change of Control Consummation Date; provided however, that (i) in the case of a transaction that constitutes a Change of Control within the meaning of clause (iii) of the definition of such term, "Implied Equity Value" means the weighted average sale price of the last Shares purchased by the relevant Person or Group constituting 5% of the number of Shares outstanding on the Change of Control Consummation Date multiplied by the number of Shares outstanding on the Change of Control Consummate Date and (ii) in the case of a Change of Control that is a Qualified IPO, "Implied Equity Value" means the public offering price of the Shares sold in such Qualified IPO, multiplied by the number of Shares outstanding on the Change of Control Consummation Date.

"Indebtedness" means, for any Person, without duplication: (i) all indebtedness for borrowed money of such Person; (ii) all obligations issued, undertaken or assumed by such Person as the deferred purchase price of property or services (other than trade payables and accrued expenses); (iii) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property or businesses; (iv) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person; (v) all capital lease obligations of such Person; and (vi) all indebtedness of other Persons referred to in clauses (i) through (v) secured by any lien upon or in property owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness, limited to the lesser of such indebtedness or the value of such property.

"Initial Change of Control" means the first Change of Control that is consummated after the Effective Date.

"Management Incentive Plan" means that certain Management Incentive Plan, dated of even date herewith.

"Management Interests" means contractual, nontradeable contingent value rights issued to certain members of the Company's management pursuant to the Management Incentive Plan.

"Net Distributable Value" means, at the time of determination in connection with a Change of Control, an amount equal to: (i) the amount of cash, property, or other consideration paid or to be paid to the Company or its Affiliates, or any of their respective equity holders in connection with a Change of Control after deducting transaction costs; plus (ii) without duplication, the amount of Indebtedness (as defined above)

of the Company and its Affiliates (including, without limitation, to the extent applicable, the principal amount outstanding under the Exit Facility) assumed or repaid by the acquirer; plus (iii) without duplication, the amount of any other Indebtedness of any of the reorganized Debtors outstanding at the Effective Date (in each case, including, without limitation, the amount of any prepayment or call protection premiums or penalties) that has been paid or pre-paid after the Effective Date; plus (iv) without duplication, the amount of any Restricted Payments; plus (v) the Fair Market Value of any Remaining Assets; minus (vi) contractual cash bonus payments to employees of the Company or employees of any of its Affiliates in the event of a Change of Control; provided, however, that Net Distributable Value will be calculated before giving effect to any payment or accruals made with respect to the Management Interests or the CVRs.

"Officer's Certificate" means a certificate signed by the chairman or vice chairman of the Board of Directors, the president, any vice president, the controller, the treasurer, the secretary or any assistant secretary of the Company, in his or her capacity as such an officer, and delivered to the Trustee.

"Opinion of Counsel" means a written opinion of counsel, who may be General Counsel for the Company, and who shall be reasonably acceptable to the Trustee.

"Outstanding", when used with respect to CVRs, means, as of the date of determination, all CVRs represented by CVR Certificates theretofore authenticated and delivered under this Agreement, except: (a) CVRs represented by CVR Certificates theretofore cancelled by the Trustee or delivered to the Trustee for cancellation; (b) from and after the CVR Payment Date, CVRs for whose payment cash in the necessary amount has been theretofore deposited by or on behalf of the Company with the Trustee or any Paying Agent (other than the Company) in trust or set aside and segregated in trust by the Company (if the Company shall act as its own Paying Agent) for the Holders of such CVRs; and (c) CVRs represented by CVR Certificates in exchange for or in lieu of which other CVR Certificates have been authenticated and delivered pursuant to this Agreement, other than any such CVRs in respect of which there shall have been presented to the Trustee proof satisfactory to it that such CVRs are held by a bona fide purchaser in whose hands the CVRs are valid obligations of the Company; provided, however, that in determining whether the Holders of the requisite Outstanding CVRs have given any request, demand, direction, consent or waiver hereunder, CVRs owned by the Company or any other obligor upon the CVRs or any Affiliate of the Company or such other obligor shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, direction, consent or waiver, only CVRs which the Trustee knows to be so owned shall be so disregarded.

"Paying Agent" means any Person authorized by the Company to pay the amount determined pursuant to Section 2.1, if any, on any CVRs on behalf of the Company, which shall initially be the Trustee.

"Person" means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof, or any other form of legal entity .

"Qualified IPO" means an underwritten public offering pursuant to an effective registration statement under the Securities Act, covering the issuance, offer and sale of Shares by the Company but only if (x) the number of Shares to be issued, offered and sold by the Company in such public offering is equal to or greater than 25% of the number of Shares then issued and outstanding (giving effect to such public offering); and (y) each of the underwriters participating in such public offering shall be obligated to buy on a "firm commitment" basis all Shares that such underwriters shall have agreed to distribute.

"Remaining Assets" means the Fair Market Value of any and all assets of the Company and its Affiliates that are not sold or transferred in connection with a transaction that constitutes a Change of Control by reason of clause (i) of the definition of such term.

"<u>Reporting Company</u>" means a Person that is subject to the periodic reporting requirements under Sections 13 or 15(d) of the Exchange Act.

"<u>Responsible Officer</u>", when used with respect to the Trustee, means any officer assigned to the Corporate Trust Office and also means, with respect to any particular corporate trust matter, any other officer of the Trustee to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"<u>Restricted Payments</u>" means the sum of: (i) any cash dividend or other distribution, direct or indirect, on account of any equity of the Company or its Affiliates to a Person other than the Company or its Affiliates; plus (ii) any redemption, retirement, sinking fund, or similar payment, purchase, or other acquisition for value, direct or indirect, of any equity of any reorganized Debtor by any reorganized Debtor (other than pursuant to the Management Incentive Plan); plus (iii) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire any equity of the reorganized Debtors; plus (iv) any payment to any Affiliate of any of the reorganized Debtors (other than to parties to the Management Incentive Plan); in each case made after the Effective Date.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Shares</u>" means shares of the Company's Common Stock, $0.01 par value per share.

"<u>Trustee</u>" means the Person named as the "Trustee" in the first paragraph of this Agreement, until a successor Trustee shall have become such pursuant to the applicable provisions of this Agreement, and thereafter "Trustee" shall mean such successor Trustee.

"<u>Trust Indenture Act</u>" means the Trust Indenture Act of 1939 as in force at the date as of which this Agreement was executed, except as provided in Section 6.5.

"<u>Vice President</u>", when used with respect to the Company or the Trustee, means any vice president, whether or not designated by a number or a word or words added before or after the title of "vice president".

The following table sets forth certain other defined terms and the Section of this Agreement in which the meaning of each such term appears:

| | Section(s) |
|---|---|
| "<u>Act</u>" | 1.4 |
| "<u>ANI</u>" | Preamble |
| "<u>Bankruptcy Court</u>" | Preamble |
| "<u>CVRs</u>" | Preamble |
| "<u>CVR Payment</u>" | 2.1 |
| "<u>Debtor</u>" | Preamble |
| "<u>Default Interest Rate</u>" | 3.3 |
| "<u>Definitive Securities</u>" | 2.2 |
| "<u>Event of Default</u>" | 8.1 |
| "<u>Global Securities</u>" | 2.2 |
| "<u>Plan</u>" | Preamble |
| "<u>Security Register</u>" | 2.5(a) |
| "<u>Surviving Person</u>" | 9.1 |
| "<u>Trustee</u>" | Preamble |

(b)     For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

BUSDOCS/1507188.4

(i) terms used in the singular include the plural and terms used in the plural include the singular;

(ii) all accounting terms used herein and not expressly defined shall have the meanings assigned to such terms in accordance with generally accepted accounting principles, and the term "generally accepted accounting principles" means such accounting principles as are generally accepted in the United States of America at the time of any computation;

(iii) all terms used but not defined herein that are defined in the Trust Indenture Act have the meanings assigned to them therein;

(iv) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision;

(v) all references herein to Articles or Sections shall be to Articles or Sections, as the case may be, of this Agreement;

(vi) the words "including", "includes" and similar words shall be deemed to be followed by "without limitation"; and

(vii) the word "or" is not exclusive.

(c)     Certain terms, used principally in Article Four, are defined in that Article.

1.2     Compliance Certificates and Opinions.

Upon any application or request by the Company to the Trustee to take any action under any provision of this Agreement, the Company shall furnish to the Trustee (i) an Officer's Certificate stating that all conditions precedent, if any, provided for in this Agreement (including any covenants, compliance with which constitutes a condition precedent) relating to the proposed action have been complied with, and (ii) an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with.

Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Agreement shall include: (a) a statement that each individual signing such certificate or opinion has read such covenant or condition; (b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based; (c) a statement that, in the opinion of each such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with or satisfied; and (d) a statement as to whether, in the opinion of each such individual, such condition or covenant has been complied with or satisfied.

1.3     Form of Documents Delivered to Trustee.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person or Persons may certify or give an opinion as to such matters in one or several documents. Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Agreement, they may, but need not, be consolidated and form one instrument.

BUSDOCS/1507188.4

Any Officer's Certificate may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his or her certificate is based are erroneous. Any Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Company stating that the information with respect to such factual matters is in the possession of the Company, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his or her opinion is based are erroneous.

Any Officer's Certificate or Opinion of Counsel may be based, insofar as it relates to accounting matters, upon a certificate or opinion of or representations by an accountant or firm of accountants in the employ of the Company, unless such officer or counsel, as the case may be, knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the accounting matters upon which his or her certificate or opinion is based are erroneous. Any certificate or opinion of any independent firm of public accountants filed with the Trustee shall contain a statement that such firm is independent.

1.4     Acts of Holders.

(a)     Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Agreement to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Company. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Agreement and (subject to Section 4.1) conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section.

(b)     The fact and date of the execution by any Person of any such instrument or writing may be proved in any reasonable manner that the Trustee deems sufficient.

(c)     The ownership of CVRs shall be proved by the Security Register.

(d)     At any time prior to the evidencing to the Trustee, as provided in this Section 1.4, of the taking of any action by the Holders of the CVRs specified in this Agreement in connection with such action, any Holder of a CVR may, by filing written notice at the Corporate Trust Office and upon proof of holding as provided in this Section 1.4, revoke such action so far as it concerns such CVR. Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any CVR shall bind every future Holder of the same CVR or the Holder of every CVR represented by a CVR Certificate issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, in respect of anything done, suffered or omitted to be done by the Trustee, any Paying Agent or the Company in reliance thereon, whether or not notation of such action is made upon the CVR Certificate representing such CVR.

1.5     Notices, etc., to Trustee and Company.

Any request, demand, authorization, direction, notice, consent, waiver or Act of Holders or other document required or permitted by this Agreement to be made upon, given or furnished to, or filed with:

(a)     the Trustee by any Holder or by the Company shall be sufficient for every purpose hereunder if made, given, furnished or filed, in writing, to or with the Trustee at the Corporate Trust Office located at _____.

BUSDOCS/1507188.4

(b)      the Company by the Trustee or by any Holder shall be sufficient for every purpose hereunder if in writing and mailed, first-class postage prepaid, to the Company addressed to it at 105 Maxess Road, Ste. N109, Melville, NY  11747, Attention:  General Counsel.

The Company or the Trustee, by notice to the other, may designate additional or different addresses for subsequent notices or communications.

1.6      Notice to Holders; Waiver.

Where this Agreement provides for notice to Holders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to each Holder affected by such event, at such Holder's address as it appears in the Security Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice. In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders. Where this Agreement provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In case by reason of the suspension of regular mail service or by reason of any other cause, it shall be impracticable to mail notice of any event as required by any provision of this Agreement, then any method of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

1.7      Conflict with Trust Indenture Act.

If any provision hereof limits, qualifies or conflicts with (a) another provision hereof that is required to be included in this Agreement by any of the provisions of the Trust Indenture Act, such required provision shall control or (b) any applicable provision of the Trust Indenture Act, such provisions of the Trust Indenture Act shall control.

1.8      Effect of Headings and Table of Contents.

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

1.9      Successors and Assigns.

All covenants and agreements in this Agreement by the Company shall bind its successors and assigns, whether so expressed or not.

1.10      Benefits of Agreement.

Nothing in this Agreement or in the CVRs, express or implied, shall give to any Person (other than the parties hereto and their successors hereunder, any Paying Agent and the Holders) any benefit or any legal or equitable right, remedy or claim under this Agreement or under any covenant or provision herein contained, all such covenants and provisions being for the sole benefit of the parties hereto and their successors, any Paying Agent and the Holders.

BUSDOCS/1507188.4

1.11    Governing Law.

This Agreement, the CVR Certificates and the CVRs shall be governed by and construed in accordance with the laws of the State of New York.

1.12    Separability Clause.

In case any provision in this Agreement or in the CVR Certificates shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

## ARTICLE II
## THE CVRS

2.1    Title and Terms.

(a)    The aggregate number of CVRs that may be issued and represented by CVR Certificates authenticated and delivered under this Agreement is limited to 1,600,000. The Company will not issue any fractional CVRs.

(b)    The CVRs shall be known and designated as the "Contingent Value Rights" of the Company and shall be unsecured obligations of the Company that rank equally with all other unsecured obligations of the Company and the Holders shall have no rights except for those rights explicitly provided for herein and shall not, by virtue of their ownership of CVRs have any of the rights of a stockholder of the Company.

(i)    If the Implied Equity Value determined with respect to the Initial Change of Control is equal to or greater than $140,000,000, then the Company will pay or cause to be paid to each Holder such Holder's pro rata share of an amount equal to the CVR Payment.  Upon payment in full of the CVR Payment, the CVRs will thereafter cease to be Outstanding or to entitle the Holders to any rights or benefits with respect to the CVRs.  If the Implied Equity Value determined with respect to the Initial Change of Control is less than $140,000,000, then the Company will make no CVR Payment and the CVRs will thereafter cease to be Outstanding or entitle the Holders to any right or benefits with respect to the CVRs.  For the avoidance of doubt, the Holders will have no rights or benefits upon the occurrence of any Change of Control except the right to receive the CVR Payment, if any, with respect to the Initial Change of Control in accordance with the terms of this Agreement.  For purposes of this Agreement, a Holder's pro rata share of the CVR Payment shall be equal to a fraction, the numerator of which is the number of CVRs registered in the name of such Holder as of the Change of Control Consummation Date and the denominator of which is the aggregate number of CVRs Outstanding as of the Change of Control Consummation Date.

The CVR Payment, if any, payable with respect to the Initial Change of Control shall be a function of the Implied Equity Value determined with respect to such Initial Change of Control.  If the Implied Equity Value determined with respect to the Initial Change of Control is equal to an Implied Equity Value Step Amount set forth in the following table, then the CVR Payment shall be an amount equal to the Step CVR Payment set forth in the following table for such Implied Equity Value Step Amount.  If the Implied Equity Value determined with respect to the Initial Change of Control falls between two of the Implied Equity Value Step Amounts set forth in the following table, then the CVR Payment shall be an amount calculated as follows:

CVR Payment = A + [((C-D)/(B-D)) x (E-A)], where

A = the Step CVR Payment set forth in the following table for D.
B = the Implied Equity Value Step Amount that is most proximately greater than C.

C = the Implied Equity Value determined with respect to the Initial Change of Control.
D = the Implied Equity Value Step Amount that is most proximately less than C.
E = the Step CVR Payment set forth in the following table for B.

| Implied Equity Value Step Amount | Step CVR Payment |
|---|---|
| $   140,000,000 | $       6,300,000 |
| 165,000,000 | 17,180,000 |
| 190,000,000 | 28,000,000 |
| 215,000,000 | 43,300,000 |
| 240,000,000 | 47,450,000 |
| 265,000,000 | 58,720,000 |
| 290,000,000 | 69,900,000 |
| 315,000,000 | 81,000,000 |
| 340,000,000 | 92,040,000 |

By way of example, if the Implied Equity Value determined with respect to the Initial Change of Control is equal to $151,000,000, then the CVR Payment would be calculated as follows:

CVR Payment = 6,300,000 + [((151,000,000 - 140,000,000)/(165,000,000-140,000,000)) x (17,180,000-6,300,000)]

CVR Payment = 6,300,000 + [(11,000,000/25,000,000) x 10,880,000]
= 6,300,000 + [0.44 x 10,880,000]
= 6,300,000 + 4,787,200
= $11,087,200

Notwithstanding the foregoing, if the Implied Equity Value determined with respect to the Initial Change of Control is (a) more than $340,000,000, then the CVR Payment shall be an amount equal to 27.07% of such Implied Equity Value and (b) less than $140,000,000, then the CVR Payment shall be zero.

(ii)     The CVR Payment, if any, shall be paid by the Company on the CVR Payment Date.  The CVR Payment, if any, shall be paid by the Company in Cash, except in the case of a Change of Control that is a Qualified IPO, in which case the CVR Payment shall be paid by the Company in Shares.  Any Shares so issued shall be valued (for purposes of calculating the number of Shares issuable to Holders) based upon the public offering price of Shares in the Qualified IPO.  Such determinations by the Company absent manifest error shall be final and binding on the Company and the Holders. If the Company makes payment of the CVR Payment in Shares, then the Company will take all steps required to assure that such Shares shall be (i) duly authorized, validly issued, fully paid and nonassessable, (ii) not issued in violation of any preemptive rights or rights of first refusal, (iii) authorized for listing on the same national securities exchange or inter-dealer automated quotation market as are the Shares issued in the Qualified IPO, subject to official notice of issuance, and (iv) issued either in a transaction that satisfied the requirements of Section 3(a)(9) of the Securities Act, or pursuant to an effective registration statement under the Securities Act.  In addition, it shall be a condition precedent to the payment of any portion of the CVR Payment in Shares that the Company shall have complied with the first two paragraphs of Section 7.3 hereof.  No fractional Shares will be issued as payment of any portion of the CVR Payment. If more than one CVR is surrendered for payment by the same Holder, the number of full Shares issuable as payment of a portion of the CVR Payment in respect of such CVRs shall be computed on the basis of the aggregate number of such CVRs. Instead of any fractional Share that would otherwise be issuable as payment of a portion of the CVR Payment, the Company shall calculate and pay a cash adjustment in respect of such fraction (calculated to the nearest 1/100[th] of a Share).

(c)     As soon as practicable, but in any event within ten Business Days after the Change of Control Consummation Date, the Company shall (x) prepare and file with the Trustee an Officer's Certificate setting forth the determinations set forth in Section 2.1(b) and the facts accounting for such determinations and (y) mail to each Holder a copy such Officer's Certificate, indicating the locations at which CVR Certificates may be presented for payment and the date on which the CVR Payment will be made.

(d)     Notwithstanding any provision of this Agreement or the CVR Certificates to the contrary, other than in the case of interest payable in the event of failure to pay the CVR Payment on or before the CVR Payment Date, no interest shall accrue on any amounts payable on the CVRs to any Holder.

(e)     In the event that the Company determines that no amount is payable with respect to the CVRs to the Holders on the CVR Payment Date because the Implied Equity Value is less than $140,000,000, the Company shall give to the Trustee and each Holder notice of such determination. Upon making such determination, absent manifest error, the CVRs shall terminate and become null and void and the Holders thereof shall have no further rights with respect thereto. The failure to give such notice or any defect therein shall not affect the validity of such determination.

2.2     Registrable Form.

The CVR Certificates shall be initially in the form of one or more permanent global securities in registered form, substantially in the form set forth in Article III ("Global Securities"), deposited with the Trustee, and shall bear the legend set forth on Exhibit A; provided that one or more Definitive Securities (as defined below) may be issued initially to any Holder at the request of such Holder. Each Global Security will represent such of the outstanding CVRs as will be specified therein and each shall provide that it represents the aggregate number of outstanding CVRs from time to time endorsed thereon and that the aggregate number of outstanding CVRs represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges. Any CVR Certificates issued in definitive form as may be permitted by this Agreement shall be issued in the form of one or more permanent definitive securities in registered form, substantially in the form set forth in Article III ("Definitive Securities"), deposited with the Trustee, and shall not bear the legend set forth on Exhibit A hereto.

2.3     Execution, Authentication, Delivery and Dating.

The CVR Certificates shall be executed on behalf of the Company by its chairman or vice chairman of the Board of Directors or its president or any vice president or its treasurer, under its corporate seal, which may, but need not, be attested. The signature of any of these officers on the CVR Certificates may be manual or facsimile.

CVR Certificates bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Company shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such CVR Certificates or did not hold such offices at the date of such CVR Certificates.

At any time and from time to time after the execution and delivery of this Agreement, the Company may deliver CVR Certificates executed by the Company to the Trustee for authentication, together with a Company Order for the authentication and delivery of such CVR Certificates; and the Trustee in accordance with such Company Order shall authenticate and deliver such CVR Certificates as provided in this Agreement and not otherwise.

Each CVR Certificate shall be dated as of the date of its authentication.

No CVR Certificate shall be entitled to any benefit under this Agreement or be valid or obligatory for any purpose unless there appears on such CVR Certificate a certification of authentication substantially in the

form provided for herein duly executed by the Trustee by manual signature of an authorized officer, and such certification upon any CVR Certificate shall be conclusive evidence, and the only evidence, that such CVR Certificate has been duly authenticated and delivered hereunder and that the Holder is entitled to the benefits of this Agreement.

2.4     Temporary CVR Certificates.

Until CVR Certificates are ready for delivery, the Company may execute, and upon Company Order the Trustee shall authenticate and deliver, temporary CVR certificates that are printed, lithographed, typewritten, mimeographed or otherwise produced, substantially of the tenor of the CVR Certificates in lieu of which they are issued and with such appropriate insertions, omissions, substitutions and other variations as the officers executing such temporary CVR certificates may determine with the concurrence of the Trustee. Temporary CVR certificates may contain such reference to any provisions of this Agreement as may be appropriate. Every temporary CVR certificate shall be executed by the Company and be authenticated by the Trustee upon the same conditions and in substantially the same manner, and with like effect, as the CVR Certificates.

If temporary CVR certificates are issued, the Company will cause CVR Certificates to be prepared without unreasonable delay. After the preparation of CVR Certificates, the temporary CVR certificates shall be exchangeable for CVR Certificates upon surrender of the temporary CVR certificates at the office or agency of the Company designated for such purpose pursuant to Section 7.2, without charge to the Holder.

Upon surrender for cancellation of any one or more temporary CVR certificates, the Company shall execute and the Trustee shall authenticate and deliver in exchange therefor a like amount of CVR Certificates. Until so exchanged, the temporary CVR certificates shall in all respects be entitled to the same benefits under this Agreement as CVR Certificates.

2.5     Registration and Transfer and Exchange.

(a)     Registration. The Company shall cause to be kept at the Corporate Trust Office a register (the register maintained in such office and in any other office or agency designated pursuant to Section 7.2 being herein sometimes referred to as the "Security Register") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of CVRs and of transfers of CVRs.  The Trustee is hereby initially appointed "Security Registrar" for the purpose of registering CVRs and transfers of CVRs as herein provided.

(b)     Transfer and Exchange.

(i)     Transfer and Exchange of Global Securities. A Global Security may not be transferred except as a whole by the Trustee to a nominee of the Trustee, by a nominee of the Trustee to the Trustee or to another nominee of the Trustee, or by the Trustee or any such nominee to a successor Trustee or a nominee of such successor Trustee. All Global Securities will be exchanged by the Company for Definitive Securities if (i) the Company delivers to the Security Registrar notice from the Trustee that it is unwilling or unable to continue to act as a successor Trustee is not appointed by the Company within 120 days after the date of such notice from the Trustee; (ii) the Company in its sole discretion determines that the Global Securities (in whole but not in part) should be exchanged for Definitive Securities and delivers a written notice to such effect to the Security Registrar or (iii) an Event of Default has occurred and is continuing and the Security Registrar has received a request from the Trustee to issue Definitive Securities. Upon the occurrence of either of the preceding events in (i) or (ii) above, Definitive Securities shall be issued in such names as required by the Trustee.  Global Securities also may be exchanged or replaced, in whole or in part, as provided in Sections 2.4 and 2.6 hereof. Every CVR Certificate authenticated and delivered in exchange for, or in lieu of, a Global Security or any portion thereof, pursuant to this Section 2.5 or Section 2.4 or 2.6 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Security. A Global Security may not be exchanged for

BUSDOCS/1507188.4

another Global Security other than as provided in this Section 2.5(b)(i), however, beneficial interests in a Global Security may be transferred and exchanged as provided in Section 2.5(b)(ii) or (iii) hereof.

(ii) <u>Transfer and Exchange of Beneficial Interests in the Global Securities</u>. The transfer and exchange of beneficial interests in the Global Securities will be effected through the Trustee, in accordance with the provisions of this Agreement and the Applicable Procedures. Beneficial interests in any Global Security may be transferred to Persons who take delivery thereof in the form of a beneficial interest in Global Security. No written orders or instructions shall be required to be delivered to the Security Registrar to effect the transfers described in this Section 2.5(b)(ii).

(iii) <u>Beneficial Interests in Global Securities to Definitive Securities</u>. If any holder of a beneficial interest in a Global Security proposes to exchange such beneficial interest for a Definitive Security or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Security, then the Security Registrar will cause the aggregate number of CVRs represented by the applicable Global Security to be reduced accordingly pursuant to Section 2.5(b)(vi) hereof, and the Company will execute and the Security Registrar will authenticate and deliver to the Person designated in the instructions a Definitive Security representing the appropriate number of CVRs. Any Definitive Security issued in exchange for a beneficial interest pursuant to this Section 2.5(b)(iii) will be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest requests through instructions to the Security Registrar from or through the Trustee.

(iv) <u>Definitive Securities to Beneficial Interests in Global Securities</u>. A Holder of a Definitive Security may exchange such Definitive Security for a beneficial interest in a Global Security or transfer such Definitive Security to a Person who takes delivery thereof in the form of a beneficial interest in a Global Security at any time. Upon receipt of a request for such an exchange or transfer, the Security Registrar will cancel the applicable Definitive Security and increase or cause to be increased the aggregate number of CVRs represented by one of the Global Securities.

(v) <u>Transfer and Exchange of Definitive Securities for Definitive Securities</u>. Upon request by a Holder of Definitive Securities and such Holder's compliance with the provisions of this Section 2.5(b)(v), the Security Registrar will register the transfer or exchange of Definitive Securities. Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Security Registrar the Definitive Securities duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Security Registrar duly executed by such Holder or by its attorney, duly authorized in writing. A Holder of Definitive Securities may transfer such Definitive Securities to a Person who takes delivery thereof in the form of Definitive Securities. Upon receipt of a request to register such a transfer, the Security Registrar shall register the Definitive Securities pursuant to the instructions from the Holder thereof.

(vi) <u>Cancellation and/or Adjustment of Global Securities</u>. At such time as all beneficial interests in a particular Global Security have been exchanged for Definitive Securities or a particular Global Security has been repurchased or canceled in whole and not in part, each such Global Security will be returned to or retained and canceled by the Security Registrar in accordance with Section 2.9 hereof. At any time prior to such cancellation, if any beneficial interest in a Global Security is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Security or for Definitive Securities, the aggregate number of CVRs represented by such Global Security will be reduced accordingly and an endorsement will be made on such Global Security by the Security Registrar or by the Trustee at the direction of the Security Registrar to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Security, such other Global Security will be increased accordingly and an endorsement will be made on such Global Security by the Security Registrar or by the Trustee at the direction of the Security Registrar to reflect such increase.

(vii) <u>General Provisions Relating to Transfers and Exchanges</u>.

BUSDOCS/1507188.4

(A) To permit registrations of transfers and exchanges, the Company will execute and the Trustee will authenticate Global Securities and Definitive Securities upon receipt of a Company Order in accordance with Section 2.3 hereof or at the Security Registrar's request.

(B) No service charge will be made to a holder of a beneficial interest in a Global Security or to a Holder of a Definitive Security for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Section 2.4 hereof).

(C) All Global Securities and Definitive Securities issued upon any registration of transfer or exchange of Global Securities or Definitive Securities will be the valid obligations of the Company, evidencing the same rights, and entitled to the same benefits under this Agreement, as the Global Securities or Definitive Securities surrendered upon such registration of transfer or exchange.

(D) The Trustee will authenticate Global Securities and Definitive Securities in accordance with the provisions of Section 2.3 hereof.

2.6     Mutilated, Destroyed, Lost and Stolen CVR Certificate.

If (a) any mutilated CVR Certificate is surrendered to the Trustee or (b) the Company and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any CVR Certificate, and there is delivered to the Company and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Company or the Trustee that such CVR Certificate has been acquired by a bona fide purchaser, the Company shall execute and upon its written request the Trustee shall authenticate and deliver, in exchange for any such mutilated CVR Certificate or in lieu of any such destroyed, lost or stolen CVR Certificate, a new CVR Certificate of like tenor and amount of CVRs, bearing a number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen CVR Certificate has become or is to become due and payable within 15 days, the Company in its discretion may, instead of issuing a new CVR Certificate, pay such CVR on the CVR Payment Date.

Upon the issuance of any new CVR Certificate under this Section 2.6, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new CVR Certificate issued pursuant to this Section 2.6 in lieu of any destroyed, lost or stolen CVR Certificate shall constitute an original additional contractual obligation of the Company, whether or not the destroyed, lost or stolen CVR Certificate shall be at any time enforceable by anyone, and shall be entitled to all benefits of this Agreement equally and proportionately with any and all other CVR Certificates duly issued hereunder.

The provisions of this Section 2.6 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen CVR Certificates.

2.7     Presentation of CVR Certificate.

BUSDOCS/1507188.4

Payment of any amounts or the issuance of any Shares to Holders of the CVRs shall be made only upon presentation by the Holder thereof at the office or agency of the Company maintained for that purpose or at any other office or agency maintained by the Company for such purpose. The Holder of the CVRs shall furnish to the Company such forms, certificates, or other information as the Company may request to establish the legal entitlement of such Holder to an exemption from withholding taxes. In the event the Company does not receive such forms, certificates, or other evidence establishing a Holder's legal entitlement to exemption from withholding tax, then all payments and disbursements to be made by the Company pursuant to this Agreement or the CVRs shall be reduced by and subject to withholding taxes. The Company shall have no obligation to reimburse, equalize or compensate a Holder or other person for withholding taxes.

2.8     Persons Deemed Owners.

Prior to due presentment for the registration of a transfer of any CVR, the Trustee, the Security Registrar, any of their respective agents and the Company may deem and treat the Person in whose name any CVR is registered as the absolute owner of such CVR for the purpose of receiving payment on such CVRs and for all other purposes, and none of the Trustee, the Security Registrar, any of their respective agents or the Company shall be affected by notice to the contrary.

2.9     Cancellation.

All CVR Certificates surrendered for payment, registration of transfer or exchange shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee and shall be promptly cancelled by it. The Company may at any time deliver to the Trustee for cancellation any CVR Certificates previously authenticated and delivered hereunder which the Company may have acquired in any manner whatsoever, and all CVR Certificates so delivered shall be promptly cancelled by the Trustee. No CVR Certificates shall be authenticated in lieu of or in exchange for any CVR Certificates cancelled as provided in this Section 2.9, except as expressly permitted by this Agreement. All cancelled CVR Certificates held by the Trustee shall be destroyed by the Trustee in accordance with its customary procedures and a certificate of destruction will be delivered to the Company.

**ARTICLE III**
**CVR FORMS**

3.1     Forms Generally.

The CVR Certificates and the Trustee's certificate of authentication shall be in substantially the forms set forth in this Article, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with the rules of any securities exchange or as may be required by law or any rule or regulation pursuant thereto, all as may be determined by officers executing such CVR Certificates, as evidenced by their execution of the CVR Certificates. Any portion of the text of any CVR Certificates may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the CVR Certificates. The definitive CVR Certificates shall be printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner as determined by the officers executing such CVR Certificates, as evidenced by their execution of such CVR Certificates.

3.2    Form of Face of CVR.

## ATKINS NUTRITIONALS HOLDINGS, INC.

No. _____                                                   Certificate for [____] Contingent Value Rights

     This certifies that _____ or its registered assigns (the "Holder") is the registered holder of the number of Contingent Value Rights ("CVRs") set forth above. Each CVR entitles the Holder, subject to the provisions contained herein and in the Agreement referred to on the reverse hereof, to a payment from Atkins Nutritionals Holdings, Inc., a Delaware corporation (the "Company"), in an amount and in the form determined pursuant to the provisions set forth on the reverse hereof and as more fully described in the Agreement. Such payment shall be made in Cash on the CVR Payment Date, or, in the event of a Change of Control that is a Qualified IPO, in Shares.

     Payment of any amounts of Cash or the issuance of any Shares pursuant to this CVR Certificate shall be made only upon presentation of this CVR Certificate by the Holder hereof, at the office or agency of the Company maintained for that purpose. All payments shall be made in the Borough of Manhattan, the City of New York, or at any other office or agency maintained by the Company for such purpose. Cash payments shall be made in such coin or currency of the United States of America as at the time is legal tender for the payment of public and private debts; provided, however, such amounts may be paid by check payable in such money.

     Reference is hereby made to the further provisions of this CVR Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

     Unless the certificate of authentication hereon has been duly executed by the Trustee referred to on the reverse hereof by manual signature, this CVR Certificate shall not be entitled to any benefit under the Agreement or be valid or obligatory for any purpose.

     IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed under its corporate seal.

Dated: _____, 2005                      ATKINS NUTRITIONALS HOLDINGS, INC.


                                              By_____

Attest:

SEAL_____
Authorized Signature

3.3     Form of Reverse of CVR.

This CVR Certificate is issued under and in accordance with the Contingent Value Rights Agreement, dated as of _____, 2005 (the "Agreement"), between the Company and [_____], as trustee (the "Trustee", which term includes any successor Trustee under the Agreement), and is subject to the terms and provisions contained in the Agreement, all of which terms and provisions the Holder of this CVR Certificate consents by acceptance hereof. The Agreement is hereby incorporated herein by reference and made a part hereof. Reference is hereby made to the Agreement for a full statement of the respective rights, limitations of rights, duties, obligations and immunities thereunder of the Company, the Trustee and the Holders of the CVRs. Copies of the Agreement can be obtained by contacting the Trustee.

**PRIOR TO SUCH TIME AS THE COMPANY EFFECTS A PUBLIC OFFERING OF ITS SECURITIES PURSUANT TO A REGISTRATION STATEMENT THAT IS DECLARED EFFECTIVE BY THE SECURITIES AND EXCHANGE COMMISSION, THE COMPANY'S BOARD OF DIRECTORS MAY REFUSE TO RECOGNIZE OR TO REGISTER ANY TRANSFER, OR ATTEMPTED OR PURPORTED TRANSFER, OF CVRS OR ANY INTEREST THEREIN OR RIGHT WITH RESPECT THEREOF, THAT WOULD RESULT IN THE COMPANY'S BECOMING SUBJECT TO THE REQUIREMENTS OF SECTION 12(G) OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, AND IN SUCH CASE SUCH TRANSFER OR ATTEMPTED OR PURPORTED TRANSFER WILL BE VOID AND WILL BE INEFFECTIVE AS AGAINST THE COMPANY.**

The Company shall pay to each Holder an amount equal to such Holder's pro rata share of the CVR Payment, calculated pursuant to Section 2.1(b) of the Agreement, upon the consummation of the Initial Change of Control.  The CVR Payment, if any, shall be paid by the Company, in Cash or, in connection with an Initial Change of Control that is a Qualified IPO, in Shares. Any Shares so issued shall be valued (for purposes of calculating the number of Shares issuable to Holders) based upon the public offering price of Shares in the Qualified IPO.

[_____] has been appointed as Paying Agent.  The CVR Payment to be made by the Company pursuant to this CVR Certificate shall be subject to and reduced by withholding taxes, if any. The Company shall have no obligation to reimburse, equalize, or compensate a Holder or other Person for such withholding taxes. If the Company makes payment of the CVR Payment in Shares, then the Company will take all steps required to assure that such Shares shall be (i) duly authorized, validly issued, fully paid and nonassessable, (ii) not issued in violation of any preemptive rights or rights of first refusal, (iii) authorized for listing on the same national securities exchange or inter-dealer automated quotation market as are the Shares issued in the Qualified IPO, subject to official notice of issuance, and (iv) issued either in a transaction that satisfied the requirements of Section 3(a)(9) of the Securities Act, or pursuant to an effective registration statement under the Securities Act. In addition, it shall be a condition precedent to the payment of any portion of the CVR Payment in Shares that the Company shall have complied with the first two paragraphs of Section 7.3 of the Agreement.  No fractional Shares will be issued as payment for any portion of the CVR Payment but instead the Company will pay a Cash adjustment as provided in the Agreement.

If the Company shall fail to pay the CVR Payment when due, the CVR Payment shall thereafter bear interest at the Default Interest Rate, which shall be payable in Cash, until payment of the CVR Payment shall be made to the Trustee.  "Default Interest Rate" means 8% per annum.

In the event that the Company determines that no amount is payable on the CVRs to the Holder on the CVR Payment Date pursuant to the terms of the Agreement, the Company shall give to the Holder and the Trustee written notice of such determination. Upon making such determination, absent manifest error, the CVRs represented by this CVR Certificate shall terminate and become null and void and the Holder hereof shall have no further rights with respect hereto. The failure to give such notice or any defect therein shall not affect the validity of such determination.

17

Notwithstanding any provision of the Agreement or of this CVR Certificate to the contrary, other than in the case of interest in the event of failure to pay the CVR Amount when due, no interest shall accrue on any amounts payable on the CVRs to the Holder.

The Agreement permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Company and the rights of the Holders of CVRs under the Agreement at any time by the Company and the Trustee with the consent of the Holders of a majority of the CVRs at the time Outstanding.

No reference herein to the Agreement and no provision of this CVR Certificate or of the Agreement shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay any amounts determined pursuant to the terms hereof and of the Agreement at the time and place, and in the form of consideration and amount, herein prescribed.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of the CVRs represented by this CVR Certificate is registrable on the Security Register of the Company, upon surrender of this CVR Certificate for registration of transfer at the office or agency of the Company maintained for such purpose in the [City of New York], duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company and the Security Registrar duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new CVR Certificates, for the same amount of CVRs, will be issued to the designated transferee or transferees. The Company hereby initially designates the office of the Trustee as the office for registration of transfer of this CVR Certificate.

As provided in the Agreement and subject to certain limitations therein set forth, this CVR Certificate is exchangeable for one or more CVR Certificates representing the same number of CVRs as is represented by this CVR Certificate as requested by the Holder surrendering the same. No service charge will be made for any registration of transfer or exchange of CVRs, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to the time of due presentment of this CVR Certificate for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this CVR Certificate is registered as the owner hereof for all purposes, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

All capitalized terms used in this CVR Certificate without definition shall have the meanings assigned to them in the Agreement.

3.4     Form of Trustee's Certificate of Authentication.

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION.**

This is one of the CVR Certificates referred to in the within-mentioned Agreement.

[_____], as Trustee


By _____

Authorized Signatory

# ARTICLE IV
## THE TRUSTEE

4.1    Certain Duties and Responsibilities.

(a)    With respect to the Holders of CVRs issued hereunder, the Trustee, prior to the occurrence of an Event of Default with respect to the CVRs and after the curing or waiving of all Events of Default that may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Agreement. In case an Event of Default with respect to the CVRs has occurred (which has not been cured or waived), the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his own affairs.

(b)    In the absence of bad faith on its part, prior to the occurrence of an Event of Default and after the curing or waiving of all such Events of Default that may have occurred, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Agreement; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Agreement.

(c)    No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    this Subsection (c) shall not be construed to limit the effect of Subsections (a) and (b) of this Section;

(ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii)    no provision of this Agreement shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it; and

(iv)    the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders pursuant to Section 8.9 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Agreement.

(d)    Whether or not therein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section.

4.2    Certain Rights of Trustee.

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Trustee. Subject to the provisions of Trust Indenture Act Sections 315(a) through 315(d) and Section 4.1 hereof:

(a)    the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order,

bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)     any request or direction of the Company mentioned herein shall be sufficiently evidenced by a Company Request or Company Order and any resolution of the Board of Directors may be sufficiently evidenced by a Board Resolution;

(c)     whenever in the administration of this Agreement the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate;

(d)     the Trustee may consult with counsel and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon;

(e)     the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Agreement at the request or direction of any of the Holders pursuant to this Agreement, unless such Holders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction;

(f)     the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, appraisal, security, or other paper or document unless requested in writing to do so by the Holders of not less than a majority in aggregate number of the CVRs then Outstanding; provided that, if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not reasonably assured to the Trustee by the security afforded to it by the terms of this Agreement, the Trustee may require reasonable indemnity against such expenses or liabilities as a condition to proceeding. The reasonable expenses of every such investigation shall be paid by the Company or, if paid by the Trustee or any predecessor Trustee, shall be repaid by the Company upon demand;

(g)     the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder;

(h)     the permissive rights of the Trustee to do things enumerated in this Agreement shall not be construed as a duty and the Trustee shall be liable for its negligence, bad faith or willful misconduct; and

(i)     except for a default under Section 8.1, the Trustee shall not be deemed to have notice of any default or event unless specifically notified in writing of such event by the Company or the Holders of not less than 25% in aggregate number of CVRs Outstanding; as used herein, the term "actual knowledge" means the actual fact or statement of knowing, without any duty to make any investigation with regard thereto.

No provision of this Agreement shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

20

4.3    Not Responsible for Recitals or Issuance of CVRs.

The recitals contained herein and in the CVR Certificates, except the Trustee's certificates of authentication, shall be taken as the statements of the Company, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Agreement, the CVRs or the CVR Certificates.

4.4    May Hold CVRs.

The Trustee, any Paying Agent, Security Registrar or any other agent of the Company, in its individual or any other capacity, may become the owner or pledgee of CVRs, and, subject to Sections 4.7 and 4.10, may otherwise deal with the Company with the same rights it would have if it were not Trustee, Paying Agent, Security Registrar or such other agent.

4.5    Money Held in Trust.

Money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law. The Trustee shall be under no liability for interest on any money received by it hereunder.

4.6    Compensation, Reimbursement and Indemnification of the Trustee.

The Company agrees:

(a)    to pay to the Trustee from time to time reasonable compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(b)    except as otherwise expressly provided herein, to reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Agreement (including the reasonable compensation and the expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to its negligence or bad faith; and

(c)    to indemnify the Trustee for, and to hold it harmless against, any loss, liability or expense incurred without negligence or bad faith on its part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder, including the enforcement of this Section 4.6.

4.7    Disqualification; Conflicting Interests.

The Trustee shall be subject to the provisions of Section 310(b) of the Trust Indenture Act during the period of time provided for therein. Nothing herein shall prevent the Trustee from filing with the Commission the application referred to in the penultimate paragraph of Section 310(b) of the Trust Indenture Act.

BUSDOCS/1507188.4

4.8     Corporate Trustee Required; Eligibility.

There shall at all times be a Trustee hereunder which shall be a corporation organized and doing business under the laws of the United States of America or of any State, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000, subject to supervision or examination by Federal or State authority and, to the extent there is such an institution eligible and willing to serve, having an office or agency in the City of New York. If such corporation publishes reports of condition at least annually pursuant to law or to the requirements of the aforesaid supervising or examining authority, then, for the purposes of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.

This Indenture shall always have a Trustee who satisfies the requirements of Sections 310(a)(1), (2) and (5) of the Trust Indenture Act.

4.9     Resignation and Removal; Appointment of Successor.

(a)     No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Trustee under Section 4.10.

(b)     The Trustee, or any trustee or trustees hereafter appointed, may resign at any time by giving written notice thereof to the Company. If an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)     The Trustee may be removed at any time by (i) the Company, by a Board Resolution or, (ii) an Act of the Holders of a majority of the Outstanding CVRs, delivered to the Trustee and to the Company.

(d)     If at any time:

(i)     the Trustee shall fail to comply with Section 4.7 after written request therefor by the Company or by any Holder who has been a bona fide Holder of a CVR for at least six months,

(ii)    the Trustee shall cease to be eligible under Section 4.8 and shall fail to resign after written request therefor by the Company or by any such Holder, or

(iii)   the Trustee shall become incapable of acting or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then, in any case, (i) the Company by a Board Resolution may remove the Trustee, or (ii) the Holder of any CVR who has been a bona fide Holder of a CVR for at least six months may, on behalf of such Holder and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     if the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Trustee for any reason, the Company, by a Board Resolution, shall promptly appoint a successor Trustee. If, within one year after such resignation, removal or incapability, or the occurrence of such vacancy, a successor Trustee shall be appointed by Act of the Holders of a majority of the Outstanding CVRs delivered to the Company and the retiring Trustee, the successor Trustee so appointed shall, forthwith upon its acceptance of such appointment in accordance with Section 4.10, become the

BUSDOCS/1507188.4

successor Trustee and supersede the successor Trustee appointed by the Company. If no successor Trustee shall have been so appointed by the Company or the Holders of the CVRs and so accepted appointment, the Holder of any CVR who has been a bona fide Holder for at least six months may on behalf of such Holder and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)     The Company shall give notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first-class mail, postage prepaid, to the Holders of CVRs as their names and addresses appear in the Security Register. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office. If the Company fails to send such notice within ten days after acceptance of appointment by a successor Trustee, the successor Trustee shall cause the notice to be mailed at the expense of the Company.

4.10     Acceptance of Appointment by Successor.

Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Company and to the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee; but, on request of the Company or the successor Trustee, such retiring Trustee shall, upon payment of its charges, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder. Upon request of any such successor Trustee, the Company shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

No successor Trustee shall accept its appointment unless at the time of such acceptance such successor Trustee shall be qualified and eligible under this Article.

4.11     Merger, Conversion, Consolidation or Succession to Business.

Any corporation into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such corporation shall be otherwise qualified and eligible under this Article, without the execution or filing of any paper or any further act on the part of any of the parties hereto. In case any CVR Certificates shall have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the CVR Certificates so authenticated with the same effect as if such successor Trustee had itself authenticated such CVR Certificates; and such certificate shall be fully effective, provided that the right to adopt the certificate of authentication of any predecessor Trustee shall apply only to its successor or successors by merger, conversion or consolidation.

4.12     Preferential Collection of Claims Against Company.

The Trustee is subject to Section 311(a) of the Trust Indenture Act, excluding any creditor relationship listed in Section 311(b) of the Trust Indenture Act.  A Trustee who has resigned or been removed shall be subject to Section 311(a) of the Trust Indenture Act to the extent indicated therein.

# ARTICLE V
## HOLDERS' LISTS AND REPORTS BY TRUSTEE AND COMPANY

5.1     Company to Furnish Trustee Names and Addresses of Holders.

The Company will furnish or cause to be furnished to the Trustee, at such times as the Trustee may request in writing, within 30 days after receipt by the Company of any such request, a list, in such form as the Trustee may reasonably require, of the names and the addresses of the Holders as of a date not more than 15 days prior to the time such list is furnished and the Company shall otherwise comply with Section 312(a) of the Trust Indenture Act if the Trustee is not the Security Registrar; provided, however, that, if and so long as the Trustee shall be the Security Registrar, no such list need be furnished by the Company.

5.2     Preservation of Information; Communications to Holders.

(a)     The Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of Holders contained in the most recent list furnished to the Trustee as provided in Section 5.1 and the names and addresses of Holders received by the Trustee in its capacity as Security Registrar and the Trustee shall otherwise comply with Section 312(a) of the Trust Indenture Act. The Trustee may destroy any list furnished to it as provided in Section 5.1 upon receipt of a new list so furnished.

(b)     If three or more Holders (hereinafter referred to as "applicants") apply in writing to the Trustee, and furnish to the Trustee reasonable proof that each such applicant has owned a CVR for a period of at least six months preceding the date of such application, and such application states that the applicants desire to communicate with other Holders with respect to their rights under this Agreement or under the CVRs and is accompanied by a copy of the form of proxy or other communication which such applicants propose to transmit, then the Trustee shall, within five Business Days after the receipt of such application at its election, either:

(i)     afford such applicants access to the information preserved at the time by the Trustee in accordance with Section 5.2(a), or

(ii)     inform such applicants as to the approximate number of Holders whose names and addresses appear in the information preserved at the time by the Trustee in accordance with Section 5.2(a), and as to the approximate cost of mailing to such Holders the form of proxy or other communication, if any, specified in such application.

If the Trustee shall elect not to afford such applicants access to such information, the Trustee shall, upon the written request of such applicants, mail to each Holder whose name and address appear in the information preserved at the time by the Trustee in accordance with Section 5.2(a), a copy of the form of proxy or other communication which is specified in such request, with reasonable promptness after a tender to the Trustee of the material to be mailed and of payment, or provision for the payment, of the reasonable expenses of mailing, unless within five days after such tender, the Trustee shall mail to such applicants and file with the Commission, together with a copy of the material to be mailed, a written statement to the effect that, in the opinion of the Trustee, such mailing would be contrary to the best interests of the Holders or would be in violation of applicable law. Such written statement shall specify the basis of such opinion. If the Commission, after opportunity for a hearing upon the objections specified in the written statement so filed, shall enter an order refusing to sustain any of such objections or if, after the entry of an order sustaining one or more of such objections, the Commission shall find, after notice and opportunity for hearing, that all the objections so sustained have been met and shall enter an order so declaring, the Trustee shall mail copies of such material to all such Holders with reasonable promptness after the entry of such order and the renewal of such tender; otherwise the Trustee shall be relieved of any obligation or duty to such applicants respecting their application.

BUSDOCS/1507188.4

(c)   Every Holder of CVRs, by receiving and holding the same, agrees with the Company and the Trustee that neither the Company nor the Trustee shall be held accountable by reason of the disclosure of any such information as to the names and addresses of the Holders in accordance with Section 5.2(b), regardless of the source from which such information was derived, and that the Trustee shall not be held accountable by reason of mailing any material pursuant to a request made under Section 5.2(b).

5.3      Reports by Trustee.

Within 60 days after May 15 of each year, commencing with the May 15 occurring after the initial issuance of CVRs hereunder, the Trustee shall transmit by mail to the Holders of CVRs, in the manner and to the extent provided in Section 313(c) of the Trust Indenture Act, and to the Company a brief report dated as of such reporting date which satisfies the requirements of Section 313(a) of the Trust Indenture Act (but if no event described in Section 313(a) of the Trust Indenture Act has occurred within the twelve months preceding the reporting date, not report need be transmitted).  The Trustee also shall comply with Section 313(b)(2) of the Trust Indenture Act.

A copy of each report at the time of its mailing to the Holders and the Company shall be filed with the Commission and each stock exchange on which the CVRs are listed (if any) in accordance with Section 313(d) of the Trust Indenture Act.  The Company shall promptly notify the Trustee when the CVRs are listed on any stock exchange or delisted therefrom.

5.4      Reports by Company.

The Company shall file with the Trustee:

(a)   as soon as practicable, but in any event within ninety (90) days  after the end of each fiscal year of the Company, A) a balance sheet as of the last day of such year and an income statement, a statement of cash flows and a statement of changes in stockholders' equity for such year, such financial statements to be prepared and presented in accordance with GAAP and audited and certified by reputable independent public accountants selected by  the Company provided that with respect to the 2005 fiscal year of the Company, only the balance sheet of the Company shall be required to be audited and certified by independent public accountants), and (B) a management's discussion and analysis of such financial statements in such detail as is reasonably necessary to an understanding of the Company's financial condition, changes in financial condition and results of operations;

(b)   as soon as practicable but in any event within forty five (45) days after the end of the first three quarters of each fiscal year of the Company, (A) an unaudited balance sheet as of the last day of such quarter and an unaudited income statement, statement of cash flows and  statement of changes in stockholders' equity for such quarter and the preceding portion of such fiscal year, such financial statements to be prepared and presented in accordance with GAAP and (B) a management's discussion and analysis of such financial statements in such detail as is reasonably necessary to an understanding of the Company's financial condition, changes in financial condition and results of operations; and

(c)   as soon as practicable, but in any event within the time period required for the filing of a Form 8-K by the Company if the Company were a Reporting Company, the information that the Company would be required to disclose by Items 1.01, 1.02, 1.03, 2.01, 2.03, 2.04, 2.05 and 2.06 of Form 8-K if the Company were a Reporting Company

The Trustee shall transmit by mail to all Holders, as their names and addresses appear in the Security Register, within 30 days after the filing thereof with the Trustee, copies of any information, documents and reports required to be filed by the Company pursuant to Subsections (a), (b) and (c) of this Section as may be required by rules and regulations prescribed from time to time by the Commission. The Trustee's expenses with respect to mailing the foregoing shall be reimbursed by the Company.

BUSDOCS/1507188.4

Delivery of reports and information to the Trustee under this Section is for informational purposes only and the Trustee's receipt of the foregoing shall not constitute constructive notice of any information contained therein.

# ARTICLE VI
## AMENDMENTS

6.1     <u>Amendments Without Consent of Holders</u>.

Without the consent of any Holders, the Company, when authorized by a Board Resolution, and the Trustee, at any time and from time to time, may enter into one or more amendments hereto, in form satisfactory to the Trustee, for any of the following purposes:

(a)     to evidence the succession of another Person to the Company and the assumption by any such successor of the covenants of the Company herein and in the CVR Certificates;

(b)     to add to the covenants of the Company such further covenants, restrictions, conditions or provisions as its Board of Directors and the Trustee shall consider to be for the protection of the Holders of CVRs, and to make the occurrence, or the occurrence and continuance, of a default in any such additional covenants, restrictions, conditions or provisions an Event of Default permitting the enforcement of all or any of the several remedies provided in this Agreement as herein set forth; provided that in respect of any such additional covenant, restriction, condition or provision such amendment may provide for a particular period of grace after default (which period may be shorter or longer than that allowed in the case of other defaults) or may provide for an immediate enforcement upon such an Event of Default or may limit the remedies available to the Trustee upon such an Event of Default or may limit the right of the Holders of a majority of the Outstanding CVRs to waive such an Event of Default;

(c)     to cure any ambiguity, to correct or supplement any provision herein which may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement; provided that in each case, such provisions shall not adversely affect the interests of the Holders; or

(d)     to comply with the requirements of the Commission in order to effect or maintain the qualification of the Agreement under the Trust Indenture Act.

6.2     <u>Amendments with Consent of Holders</u>.

With the consent of the Holders of not less than a majority of the Outstanding CVRs as required to amend this Agreement in accordance with the Trust Indenture Act, by Act of said Holders delivered to the Company and the Trustee, the Company, when authorized by a Board Resolution, and the Trustee may enter into one or more amendments hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the Holders under this Agreement; provided that no such amendment shall, without the consent of the Holder of each Outstanding CVR affected thereby:

(a)     modify the definition of Change of Control, Change of Control Consummation Date, CVR Payment Date, CVR Payment, Default Interest Rate, Event of Default, Initial Change of Control, Net Distributable Value, or Implied Equity Value, or modify Section 2.1(b) or otherwise extend the maturity of the CVRs or reduce the amounts payable in respect of the CVRs;

(b)     reduce the amount of the Outstanding CVRs, the consent of whose Holders is required for any such amendment; or

BUSDOCS/1507188.4

(c)     modify any of the provisions of this Section, except to increase any such percentage or to provide that certain other provisions of this Agreement cannot be modified or waived without the consent of the Holder of each CVR affected thereby.

It shall not be necessary for any Act of Holders under this Section to approve the particular form of any proposed amendment, but it shall be sufficient if such Act shall approve the substance thereof.

Promptly after the execution by the Company and the Trustee of any amendment pursuant to the provisions of this Section, the Company shall mail a notice thereof by first class mail to the Holders of CVRs at their addresses as they shall appear on the Security Register, setting forth in general terms the substance of such amendment. Any failure of the Company to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment.

6.3     Execution of Amendments.

In executing any amendment permitted by this Article, the Trustee shall be entitled to receive, and (subject to Section 4.1) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Agreement. The Trustee may, but shall not be obligated to, enter into any such amendment which affects the Trustee's own rights, duties or immunities under this Agreement or otherwise.

6.4     Effect of Amendments.

Upon the execution of any amendment under this Article, this Agreement shall be modified in accordance therewith, and such amendment shall form a part of this Agreement for all purposes; and every Holder of CVRs represented by CVR Certificates theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

6.5     Conformity with Trust Indenture Act.

Every amendment executed pursuant to this Article shall conform to the requirements of the Trust Indenture Act as then in effect.

6.6     Reference in CVR Certificates to Amendments.

CVR Certificates authenticated and delivered after the execution of any amendment pursuant to this Article may, and shall if required by the Trustee, bear a notation in form approved by the Trustee as to any matter provided for in such amendment. If the Company shall so determine, new CVR Certificates so modified as to conform, in the opinion of the Trustee and the Board of Directors, to any such amendment may be prepared and executed by the Company and authenticated and delivered by the Trustee in exchange for CVR Certificates representing Outstanding CVRs.

**ARTICLE VII**
**COVENANTS**

7.1     Payment of Amounts, if any, to Holders.

The Company will duly and punctually pay the CVR Payment, if any, in the manner provided for in Sections 2.1(b) and 2.7 hereof and in accordance with the terms of the CVRs and this Agreement.

27

7.2     Maintenance of Office or Agency.

As long as any of the CVR Certificates remain Outstanding, the Company will maintain an office or agency where CVR Certificates may be presented or surrendered for payment. The Company also will maintain an office or agency (i) where CVR Certificates may be surrendered for registration of transfer or exchange and (ii) where notices and demands to or upon the Company in respect of the CVRs and this Agreement may be served. The Company hereby initially designates the office of the Trustee at the Corporate Trust Office, as the office or agency of the Company where CVR Certificates may be presented for payment, and such offices of the Trustee as the office or agency where CVR Certificates may be surrendered for registration of transfer or exchange and where such notices or demands may be served, in each case, unless the Company shall designate and maintain some other office or agency for one or more of such purposes. The Company will give prompt written notice to the Trustee of any change in the location of any such office or agency. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at such offices of the Trustee, and the Company hereby appoints the Trustee as its agent to receive all such presentations, surrenders, notices and demands.

The Company may from time to time designate one or more other offices or agencies (in or outside of the City of New York) where the CVR Certificates may be presented or surrendered for any or all such purposes, and may from time to time rescind such designation; provided, however, that no such designation or rescission shall in any manner relieve the Company of its obligations as set forth in the preceding paragraph. The Company will give prompt written notice to the Trustee of any such designation or rescission and any change in the location of any such office or agency.

7.3     Money and Shares for CVR Payments to Be Held in Trust.

If the Company shall at any time act as its own Paying Agent, it will, on or before the CVR Payment Date, segregate and hold in trust for the benefit of the Persons entitled thereto an amount of Cash sufficient to pay the Cash portion of the CVR Payment, if any, along with a number of Shares sufficient to pay the Share portion of the CVR Payment, if any, so becoming due until such amounts shall be paid to such Persons or otherwise disposed of as herein provided, and will promptly notify the Trustee of its action or failure so to act.

Whenever the Company shall have one or more Paying Agents, it will, on or before the CVR Payment Date, deposit with a Paying Agent an amount in Cash in same day funds and certificates representing the Shares sufficient to make the CVR Payment, if any, so becoming due, such Cash and Shares to be held in trust for the benefit of the Persons entitled to such amount, and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee of such action or any failure so to act.

The Company will cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee, subject to the provisions of this Section, that (A) such Paying Agent will hold all sums held by it for the payment of any amount payable on CVRs in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and (B) that it will give the Trustee notice of any failure by the Company (or by any other obligor on the CVRs) to make any payment on the CVRs when the same shall be due and payable.

Any Cash or Shares deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment on any CVRs and remaining unclaimed for two years after the CVR Payment Date shall be returned to the Company on Company Request, or (if then held by the Company) shall be discharged from such trust; and the Holder of such CVR shall thereafter, as an unsecured general creditor, look only to the Company for payment thereof and all liability of the Trustee or such Paying Agent with respect to such trust money shall thereupon cease.

BUSDOCS/1507188.4

7.4    Written Statement to Trustee.

The Company will deliver to the Trustee, within 120 days after the end of each fiscal year, a brief certificate from the principal executive officer, principal financial officer or principal accounting officer of the Company as to his or her knowledge of the Company's compliance with all conditions and covenants under this Agreement. For purposes of this Section, such compliance shall be determined without regard to any period of grace or requirement of notice under this Agreement.

7.5    Available Shares.

If, at the time when a CVR Payment shall be payable in Shares, there shall be an insufficient number of authorized but unissued Shares to make such CVR Payment, the Company shall, within 30 calendar days after the relevant Change of Control Consummation Date, call a stockholders' meeting for the purpose of, and shall recommend to its stockholders at such meeting, the adoption of an amendment to the Company's certificate of incorporation to authorize the issuance of a sufficient number of Shares to make such CVR Payment.  Such stockholders' meeting shall be held as promptly as such meeting may lawfully be held following such Change of Control Consummation Date.  In such case, the CVR Payment Date shall be the tenth calendar day after the date of such stockholders' meeting or, if such tenth calendar day is not a Business Day, then the first Business Day after such tenth calendar day.

## ARTICLE VIII
## REMEDIES OF THE TRUSTEE AND HOLDERS ON EVENT OF DEFAULT

8.1    Event of Default Defined.

"Event of Default" means any failure to make the CVR Payment, in the amount, if any, required by this Agreement, on or before the CVR Payment Date, which failure shall have occurred and be continuing (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body).

8.2    Collection of Indebtedness by Trustee; Trustee May Prove Debt.

The Company covenants that in case of the occurrence and continuation of an Event of Default, the Company will pay to the Trustee for the benefit of the Holders of the CVRs the whole amount, in Cash (or in Shares in the case of a Qualified IPO), that then shall have become due and payable on all CVRs (with interest from the CVR Payment Date and payable to the date of such payment upon the overdue amount at the Default Interest Rate); and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including reasonable compensation to the Trustee and each predecessor Trustee, their respective agents, attorneys and counsel, and any expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of its negligence or bad faith.

In case the Company shall fail forthwith to pay such amounts upon such demand, the Trustee, in its own name and as trustee of an express trust, shall be entitled and empowered to institute any action or proceedings at law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceedings to judgment or final decree, and may enforce any such judgment or final decree against the Company or other obligor upon such CVRs and collect in the manner provided by law out of the property of the Company or other obligor upon such CVRs, wherever situated, the moneys adjudged or decreed to be payable.

In case there shall be pending proceedings relative to the Company or any other obligor upon the CVRs under Title 11 of the United States Code or any other applicable Federal or State bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator,

sequestrator or similar official shall have been appointed for or taken possession of the Company or its property or such other obligor, or in case of any other judicial proceedings relative to the Company or other obligor upon the CVRs, or to the creditors or property of the Company or such other obligor, the Trustee, irrespective of whether any CVR Payment shall then be due and payable and irrespective of whether the Trustee shall have made any demand pursuant to the provisions of this Section, shall be entitled and empowered, by intervention in such proceedings or otherwise:

        (a)     to file and prove a claim or claims for the whole amount owing and unpaid, if any, in respect of the CVRs, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of negligence or bad faith) and of the Holders allowed in any judicial proceedings relative to the Company or other obligor upon the CVRs, or to the creditors or property of the Company or such other obligor;

        (b)     unless prohibited by applicable law and regulations, to vote on behalf of the Holders in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency proceedings or Person performing similar functions in comparable proceedings; and

        (c)     to collect and receive any moneys or other property payable or deliverable on any such claims, and to distribute all amounts receivable with respect to the claims of the Holders and of the Trustee on their behalf and any trustee, receiver, or liquidator, custodian or other similar official is hereby authorized by each of the Holders to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Holders, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith and all other amounts due to the Trustee or any predecessor Trustee pursuant to Section 4.6.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the CVRs or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

All rights of action and of asserting claims under this Agreement, or under any of the CVRs, may be enforced by the Trustee without the possession of any of the CVR Certificates or the production thereof at any trial or other proceedings relative thereto, and any such action or proceedings instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Trustee, each predecessor Trustee and their respective agents and attorneys, shall be for the ratable benefit of the Holders.

In any proceedings brought by the Trustee (and also any proceedings involving the interpretation of any provision of this Agreement to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders, and it shall not be necessary to make any Holders of such CVRs parties to any such proceedings.

8.3    <u>Application of Proceeds</u>.

Any monies or securities collected by the Trustee pursuant to this Article in respect of any CVRs shall be applied in the following order at the date or dates fixed by the Trustee upon presentation of the several CVR Certificates in respect of which monies have been collected and stamping (or otherwise noting) thereon the payment in exchange for the presented CVR Certificates if only partially paid or upon surrender thereof if fully paid:

FIRST: To the payment of costs and expenses in respect of which monies have been collected, including reasonable compensation to the Trustee and each predecessor Trustee and their respective agents and attorneys and of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith, and all other amounts due to the Trustee or any predecessor Trustee pursuant to Section 4.6;

SECOND: To the payment of the whole amount then owing and unpaid upon all the CVRs, with interest at the Default Interest Rate on all such amounts, and in case such moneys shall be insufficient to pay in full the whole amount so due and unpaid upon the CVRs, then to the payment of such amounts without preference or priority of any CVR over any other CVR, ratably to the aggregate of such amounts due and payable; and

THIRD: To the payment of the remainder, if any, to the Company or any other person lawfully entitled thereto.

8.4     Suits for Enforcement.

In case an Event of Default has occurred, has not been waived and is continuing, the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Agreement by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights, either at law or in equity or in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Agreement or in aid of the exercise of any power granted in this Agreement or to enforce any other legal or equitable right vested in the Trustee by this Agreement or by law.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders of the CVRs allowed in any judicial proceedings relative to the Company (or any other obligor upon the CVRs), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 4.6.

8.5     Restoration of Rights on Abandonment of Proceedings.

In case the Trustee shall have proceeded to enforce any right under this Agreement and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Trustee, then and in every such case the Company and the Trustee shall be restored respectively to their former positions and rights hereunder, and all rights, remedies and powers of the Company, the Trustee and the Holders shall continue as though no such proceedings had been taken.

8.6     Limitations on Suits by Holders.

No Holder of any CVR shall have any right by virtue or by availing itself of any provision of this Agreement to institute any action or proceeding at law or in equity or in bankruptcy or otherwise upon or under or with respect to this Agreement, or for the appointment of a trustee, receiver, liquidator, custodian or other similar official or for any other remedy hereunder, unless such Holder previously shall have given to the Trustee written notice of default and of the continuance thereof as hereinbefore provided, and unless also the Holders of not less than 25% of the CVRs then Outstanding shall have made written request upon the Trustee to institute such action or proceedings in its own name as trustee hereunder and shall have offered to the

BUSDOCS/1507188.4

Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby and the Trustee for 30 days after its receipt of such notice, request and offer of indemnity shall have failed to institute any such action or proceeding and no direction inconsistent with such written request shall have been given to the Trustee pursuant to Section 8.9; it being understood and intended, and being expressly covenanted by the taker and Holder of every CVR with every other taker and Holder and the Trustee, that no one or more Holders of CVRs shall have any right in any manner whatever by virtue or by availing itself or themselves of any provision of this Agreement to effect, disturb or prejudice the rights of any other such Holder of CVRs, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Agreement, except in the manner herein provided and for the equal, ratable and common benefit of all Holders of CVRs. For the protection and enforcement of the provisions of this Section, each and every Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

8.7     Unconditional Right of Holders to Institute Certain Suits.

Notwithstanding any other provision in this Agreement and any provision of any CVR Certificate, the right of any Holder of any CVR to receive payment in Cash or Shares of the amounts, if any, payable in respect of such CVR on or after the CVR Payment Date, or to institute suit for the enforcement of any such payment on or after such date, shall not be impaired or affected without the consent of such Holder.

8.8     Powers and Remedies Cumulative; Delay or Omission Not Waiver of Default.

Except as provided in Section 8.6, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

No delay or omission of the Trustee or of any Holder to exercise any right or power accruing upon any Event of Default occurring and continuing as aforesaid shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein; and, subject to Section 8.6, every power and remedy given by this Agreement or by law to the Trustee or to the Holders may be exercised from time to time, and as often as shall be deemed expedient, by the Trustee or by the Holders.

8.9     Control by Holders.

The Holders of a majority of the CVRs at the time Outstanding shall have the right to direct the time, method, and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee with respect to the CVRs by this Agreement; provided that such direction shall not be otherwise than in accordance with law and the provisions of this Agreement; and provided further that (subject to the provisions of Section 4.1) the Trustee shall have the right to decline to follow any such direction if the Trustee, being advised by counsel, shall determine that the action or proceeding so directed may not lawfully be taken or if the Trustee in good faith by its board of directors, the executive committee, or a trust committee of directors or Responsible Officers of the Trustee shall determine that the action or proceedings so directed would involve the Trustee in personal liability or if the Trustee in good faith shall so determine that the actions or forbearances specified in or pursuant to such direction would be unduly prejudicial to the interests of Holders of the CVRs not joining in the giving of said direction, it being understood that (subject to Section 4.1) the Trustee shall have no duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders.

Nothing in this Agreement shall impair the right of the Trustee in its discretion to take any action deemed proper by the Trustee and which is not inconsistent with such direction or directions by Holders.

BUSDOCS/1507188.4

The Holders of a majority of the CVRs at the time Outstanding by written notice to the Trustee may on behalf of the Holders of all of the CVRs waive an existing default and its consequences hereunder, except a continuing default in the payment of the CVR Payment or interest on the CVRs. Upon any such waiver, such default shall cease to exist, and any default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

8.10    Trustee to Give Notice of Default, but May Withhold in Certain Circumstances.

The Trustee shall transmit to the Holders, as the names and addresses of such Holders appear on the Security Register, notice by mail of all defaults which have occurred, such notice to be transmitted within 45 days after the occurrence thereof unless such defaults shall have been cured before the giving of such notice.

8.11    Right of Court to Require Filing of Undertaking to Pay Costs.

All parties to this Agreement agree, and each Holder of any CVR by such Holder's acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Agreement or in any suit against the Trustee for any action taken, suffered or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith or the claims or defenses made by such party litigant; but the provisions of this Section shall not apply to any suit instituted by the Trustee, to any suit instituted by any Holder or group of Holders holding in the aggregate more than 10% of the CVRs Outstanding or to any suit instituted by any Holder for the enforcement of the payment of any CVR on or after the due date expressed in such CVR.

## ARTICLE IX
## CONSOLIDATION, MERGER, SALE OR CONVEYANCE

9.1    Company May Consolidate, Etc.

The Company shall not consolidate with or merge with or into any other Person or convey, transfer or lease its properties and assets substantially as an entirety to any Person, unless:

(a)    in case the Company shall consolidate with or merge with or into any other Person or convey, transfer or lease its properties and assets substantially as an entirety to any Person (if such event is not a Change of Control), the Person formed by such consolidation or into which the Company is merged or the Person which acquires by conveyance or transfer, or which leases, the properties and assets of the Company substantially as an entirety (the "Surviving Person") shall be a corporation, partnership or trust organized and existing under the laws of the United States of America, any state thereof or the District of Columbia and shall expressly assume payment of amounts on all the CVRs and the performance of every covenant of this Agreement on the part of the Company to be performed or observed;

(b)    immediately after giving effect to such transaction, no Event of Default shall have happened and be continuing; and

(c)    the Company has delivered to the Trustee an Officer's Certificate stating that such consolidation, merger, conveyance, transfer or lease complies with this Article and that all conditions precedent herein provided for relating to such transaction have been complied with.

9.2    Successor Substituted.

33

Upon any consolidation of or merger by the Company with or into any other Person, or any conveyance, transfer or lease of the properties and assets substantially as an entirety to any Person in accordance with Section 9.1, the Surviving Person shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Agreement with the same effect as if the Surviving Person had been named as the Company herein, and thereafter, the predecessor corporation shall be relieved of all obligations and covenants under this Agreement and the CVRs.

9.3     Opinion of Counsel to Trustee.

The Trustee, subject to the provisions of Sections 4.1 and 4.2, may receive an Opinion of Counsel, prepared in accordance with Sections 1.2 and 1.3, as conclusive evidence that any such consolidation, merger, sale, lease or conveyance, and any such assumption, and any such liquidation or dissolution, complies with the applicable provisions of this Agreement.

## ARTICLE X
## DISCHARGE OF AGREEMENT

10.1     Discharge of Liability on CVRs.

When (i) the Company delivers to the Trustee all outstanding CVR Certificates (other than CVR Certificates replaced pursuant to Section 2.6) for cancellation, (ii) all outstanding CVRs have become due and payable and the Company irrevocably deposits with the Trustee or the Paying Agent (if the Paying Agent is not the Company or any of its Affiliates) cash sufficient to pay all Cash amounts or Shares due and owing on all outstanding CVRs (other than CVRs replaced pursuant to Section 2.6 or CVRs held by the Company or any Affiliate thereof), or (iii) the Initial Change of Control is consummated and no CVR Payment is due in accordance with the terms of this Agreement, then this Agreement shall, subject to Section 4.6, cease to be of further effect. The Trustee shall join in the execution of a document prepared by the Company acknowledging satisfaction and discharge of this Agreement on demand of the Company accompanied by an Officer's Certificate and Opinion of Counsel and at the cost and expense of the Company.

10.2     Repayment to the Company.

The Trustee and the Paying Agent shall return to the Company upon written request any money or securities held by them for the payment of any amount with respect to the CVRs that remains unclaimed for two years, subject to applicable unclaimed property law. After return to the Company, Holders entitled to the money or securities must look to the Company for payment as general creditors unless an applicable abandoned property law designates another person and the Trustee and the Paying Agent shall have no further liability to the Holders with respect to such money or securities for that period commencing after the return thereof.

10.3     Counterparts.

This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, and their respective corporate seals to be hereunto affixed and attested, all as of the day and year first above written.

ATKINS NUTRITIONALS HOLDINGS, INC.

By: _____
     Name:
     Title

[TRUSTEE]

By: _____
     Name:
     Title:

## FORM OF LEGEND FOR BOOK-ENTRY GLOBAL SECURITIES

Any Global Security authenticated and delivered hereunder shall bear a legend in substantially the following form:

THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING OF THE CONTINGENT VALUE RIGHTS AGREEMENT (THE "AGREEMENT") HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE TRUSTEE OR A NOMINEE OF THE TRUSTEE OR A SUCCESSOR TRUSTEE FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF. THIS SECURITY IS NOT EXCHANGEABLE FOR SECURITIES REGISTERED IN THE NAME OF A PERSON OTHER THAN THE TRUSTEE OR ITS NOMINEE EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE AGREEMENT, AND NO TRANSFER OF THIS SECURITY (OTHER THAN A TRANSFER OF THIS SECURITY AS A WHOLE BY THE TRUSTEE TO A NOMINEE OF THE TRUSTEE OR BY A NOMINEE OF THE TRUSTEE TO THE TRUSTEE OR ANOTHER NOMINEE OF THE TRUSTEE) MAY BE REGISTERED EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE AGREEMENT.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SECURITIES IN DEFINITIVE FORM, THIS SECURITY MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE TRUSTEE TO A NOMINEE OF THE TRUSTEE OR BY A NOMINEE OF THE TRUSTEE TO THE TRUSTEE OR ANOTHER NOMINEE OF THE TRUSTEE OR BY THE TRUSTEE OR ANY SUCH NOMINEE TO A SUCCESSOR TRUSTEE OR A NOMINEE OF SUCH SUCCESSOR TRUSTEE. UNLESS THIS SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE TRUSTEE TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF TRUSTEE OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF TRUSTEE (AND ANY PAYMENT IS MADE TO TRUSTEE. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF TRUSTEE), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, THE TRUSTEE, HAS AN INTEREST HEREIN.

## Exhibit 9

## New CVR Interest

[Form of Face of CVR Certificate[*]]

**ATKINS NUTRITIONALS HOLDINGS, INC.**

No. _____ Certificate for [_____] Contingent
Value Rights

     This certifies that _____ or its registered assigns (the "Holder") is the registered holder of the number of Contingent Value Rights ("CVRs") set forth above. Each CVR entitles the Holder, subject to the provisions contained herein and in the Agreement referred to on the reverse hereof, to a payment from Atkins Nutritionals Holdings, Inc., a Delaware corporation (the "Company"), in an amount and in the form determined pursuant to the provisions set forth on the reverse hereof and as more fully described in the Agreement. Such payment shall be made in Cash on the CVR Payment Date, or, in the event of a Change of Control that is a Qualified IPO, in Shares.

     Payment of any amounts of Cash or the issuance of any Shares pursuant to this CVR Certificate shall be made only upon presentation of this CVR Certificate by the Holder hereof, at the office or agency of the Company maintained for that purpose. All payments shall be made in the [Borough of Manhattan, the City of New York], or at any other office or agency maintained by the Company for such purpose. Cash payments shall be made in such coin or currency of the United States of America as at the time is legal tender for the payment of public and private debts; provided, however, such amounts may be paid by check payable in such money.

     Reference is hereby made to the further provisions of this CVR Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

     Unless the certificate of authentication hereon has been duly executed by the Trustee referred to on the reverse hereof by manual signature, this CVR Certificate shall not be entitled to any benefit under the Agreement or be valid or obligatory for any purpose.

     IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed under its corporate seal.

Dated: _____, 2005      ATKINS NUTRITIONALS HOLDINGS, INC.

By_____

Attest:

SEAL_____
Authorized Signature

---

[*] Such legends or endorsements to be placed thereon as may be required to comply with the rules of any securities exchange or as may be required by law or any rule or regulation pursuant thereto.

This is one of the CVR Certificates referred to in the within-mentioned Agreement.

[_____], as Trustee

By_____
      Authorized Signatory

## [Form of Reverse of CVR Certificate]

This CVR Certificate is issued under and in accordance with the Contingent Value Rights Agreement, dated as of _____, 2005 (the "Agreement"), between the Company and [_____], as trustee (the "Trustee", which term includes any successor Trustee under the Agreement), and is subject to the terms and provisions contained in the Agreement, all of which terms and provisions the Holder of this CVR Certificate consents by acceptance hereof. The Agreement is hereby incorporated herein by reference and made a part hereof. Reference is hereby made to the Agreement for a full statement of the respective rights, limitations of rights, duties, obligations and immunities thereunder of the Company, the Trustee and the Holders of the CVRs. Copies of the Agreement can be obtained by contacting the Trustee.

**PRIOR TO SUCH TIME AS THE COMPANY EFFECTS A PUBLIC OFFERING OF ITS SECURITIES PURSUANT TO A REGISTRATION STATEMENT THAT IS DECLARED EFFECTIVE BY THE SECURITIES AND EXCHANGE COMMISSION, THE COMPANY'S BOARD OF DIRECTORS MAY REFUSE TO RECOGNIZE OR TO REGISTER ANY TRANSFER, OR ATTEMPTED OR PURPORTED TRANSFER, OF CVRS OR ANY INTEREST THEREIN OR RIGHT WITH RESPECT THEREOF, THAT WOULD RESULT IN THE COMPANY'S BECOMING SUBJECT TO THE REQUIREMENTS OF SECTION 12(G) OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, AND IN SUCH CASE SUCH TRANSFER OR ATTEMPTED OR PURPORTED TRANSFER WILL BE VOID AND WILL BE INEFFECTIVE AS AGAINST THE COMPANY.**

The Company shall pay to each Holder an amount equal to such Holder's pro rata share of the CVR Payment, calculated pursuant to Section 2.1(b) of the Agreement, upon the consummation of the Initial Change of Control. The CVR Payment, if any, shall be paid by the Company, in Cash or, in connection with an Initial Change of Control that is a Qualified IPO, in Shares. Any Shares so issued shall be valued (for purposes of calculating the number of Shares issuable to Holders) based upon the public offering price of Shares in the Qualified IPO.

[_____] has been appointed as Paying Agent. The CVR Payment to be made by the Company pursuant to this CVR Certificate shall be subject to and reduced by withholding taxes, if any. The Company shall have no obligation to reimburse, equalize, or compensate a Holder or other Person for such withholding taxes. If the Company makes payment of the CVR Payment in Shares, then the Company will take all steps required to assure that such Shares shall be (i) duly authorized, validly issued, fully paid and nonassessable, (ii) not issued in violation of any preemptive rights or rights of first refusal, (iii) authorized for listing on the same national securities exchange or inter-dealer automated quotation market as are the Shares issued in the Qualified IPO, subject to official notice of issuance, and (iv) issued either in a transaction that satisfied the requirements of Section 3(a)(9) of the Securities Act, or pursuant to an effective registration statement under the Securities Act. In addition, it shall be a condition precedent to the payment of any portion of the CVR Payment in Shares that the Company shall have complied with the first two paragraphs of Section 7.3 of the Agreement. No fractional Shares will be issued as payment for any portion of the CVR Payment but instead the Company will pay a Cash adjustment as provided in the Agreement.

If the Company shall fail to pay the CVR Payment when due, the CVR Payment shall thereafter bear interest at the Default Interest Rate, which shall be payable in Cash, until payment of the CVR Payment shall be made to the Trustee. "Default Interest Rate" means 8% per annum.

In the event that the Company determines that no amount is payable on the CVRs to the Holder on the CVR Payment Date pursuant to the terms of the Agreement, the Company shall give to the Holder and the Trustee written notice of such determination. Upon making such determination,

absent manifest error, the CVRs represented by this CVR Certificate shall terminate and become null and void and the Holder hereof shall have no further rights with respect hereto. The failure to give such notice or any defect therein shall not affect the validity of such determination.

Notwithstanding any provision of the Agreement or of this CVR Certificate to the contrary, other than in the case of interest in the event of failure to pay the CVR Amount when due, no interest shall accrue on any amounts payable on the CVRs to the Holder.

The Agreement permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Company and the rights of the Holders of CVRs under the Agreement at any time by the Company and the Trustee with the consent of the Holders of a majority of the CVRs at the time Outstanding.

No reference herein to the Agreement and no provision of this CVR Certificate or of the Agreement shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay any amounts determined pursuant to the terms hereof and of the Agreement at the time and place, and in the form of consideration and amount, herein prescribed.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of the CVRs represented by this CVR Certificate is registrable on the Security Register of the Company, upon surrender of this CVR Certificate for registration of transfer at the office or agency of the Company maintained for such purpose in the [City of New York], duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Company and the Security Registrar duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new CVR Certificates, for the same amount of CVRs, will be issued to the designated transferee or transferees. The Company hereby initially designates the office of the Trustee as the office for registration of transfer of this CVR Certificate.

As provided in the Agreement and subject to certain limitations therein set forth, this CVR Certificate is exchangeable for one or more CVR Certificates representing the same number of CVRs as is represented by this CVR Certificate as requested by the Holder surrendering the same. No service charge will be made for any registration of transfer or exchange of CVRs, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Prior to the time of due presentment of this CVR Certificate for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name this CVR Certificate is registered as the owner hereof for all purposes, and neither the Company, the Trustee nor any such agent shall be affected by notice to the contrary.

All capitalized terms used in this CVR Certificate without definition shall have the meanings assigned to them in the Agreement.

**Exhibit 10**

**Management Incentive Plan**

# ATKINS NUTRITIONALS, INC.
# MANAGEMENT INCENTIVE PLAN

## 1.    PURPOSE

The Atkins Nutritionals, Inc. Management Incentive Plan provides participants with incentives to continue their employment with Atkins Nutritionals, Inc., a New York corporation ("ANI"), or its parent corporation, Atkins Nutritionals Holdings, Inc., a Delaware corporation ("Holdings" and collectively with ANI, the "Company") and to maximize the value of the Company in connection with the Company's emergence from bankruptcy, and its subsequent pursuit of a possible sale (including, without limitation, a sale of the Company's equity in an initial public offering).

## 2.    STRUCTURE OF THE PLAN

The Plan is divided into the following three separate incentive programs:

- Emergence Bonus Program – under which the Company will pay cash bonuses to eligible participants on the Effective Date pursuant to existing letter agreements (or in the case of the Company's chief executive officer, one-half on the Effective Date and one-half on March 31, 2006).

- Equity Compensation Program – under which eligible participants are granted an interest that provides them with a right to receive a portion of the Company's Implied Equity Value upon a Change of Control; and

- Sale Bonus Program – under which eligible participants are granted a right to receive a Sale Bonus, the value of which depends upon the Net Distributable Value following a Change of Control.

## 3.    ADMINISTRATION

(a)    Administrator.  The Plan and each of the programs under the Plan shall be administered by the members of the Board of Directors of Holdings who are not employed by the Company or, at its election, by one or more committees consisting of one or more members who are not employed by the Company who have been appointed by the Board (the "Committee").  The Committee shall have such authority and be responsible for such functions as may be delegated to it by the Board, and any reference to the Board in the Plan or under any program shall be construed as a reference to the Committee with respect to functions delegated to it.

(b)    Authority.  The Board (or in the case of the Emergence Bonus Program only, the chief executive officer of ANI or his designee) shall have full authority and sole discretion to take any actions it deems necessary or advisable for the administration and operation of the Plan and the programs hereunder, including, without limitation, the right to construe and interpret the provisions of the Plan or program, to provide for any omission in the Plan or program, to resolve any ambiguity or conflict under the Plan or program, to accelerate vesting of or otherwise waive any requirements applicable to any payment under the Plan or program, to establish terms or conditions applicable to any program and to review any decisions or actions made or taken by the Committee.  All decisions, interpretations and other actions of the Board or, in the absence of any action by the Board, any Committee shall be final and binding on all participants and other persons deriving their rights from a participant.

## 4.    ELIGIBILITY AND PARTICIPATION

(a)    Eligibility.  The Company shall determine in its sole discretion the key employees who shall participate in the Plan and each program hereunder on the Effective Date. Participation in one program shall not entitle a participant to participate in another program.

(b)    Participation.  No employee shall become a participant in the Plan or any program unless and until his or her participation is confirmed in writing by the Company by means of a separate letter of participation.  A participation letter may set forth any additional terms and conditions of participation (beyond the provisions of the Plan) as the Company may, in its sole discretion, determine.  If so provided in a participation letter, a participant shall not become a participant unless and until he or she signs and agrees to the terms and conditions of such participation letter and the Plan.

(c)    Termination of Participation.  A participant's participation in the Plan shall automatically terminate, without notice to or consent of the participant, and the participant shall not be treated as a participant, upon the earliest of the participant's termination of employment by the Company, unless such termination is without Cause, and on such other dates as is set forth under the applicable program or in the participation letter.

## 5.    EMERGENCE BONUS PROGRAM

(a)    Participation in Program.  Participants in the Emergence Bonus Program are those key employees who have received a participation letter prior to the effective date describing a bonus payable upon the earlier of a Change of Control or the Company's emergence from bankruptcy.  A list of those senior executive officers who are participants in the Emergence Bonus program with their scheduled payment amount, as well as the aggregate amount payable to other key employees of the Company is set forth in Schedule A.  Participants in the program shall receive their scheduled payment on the Effective Date, except in the case of the Company's chief executive officer, whose

scheduled payment shall be made in two equal installments: one on the Effective Date and the other on March 31, 2006. In no event shall the aggregate payments to all participants pursuant to the Emergence Bonus Program exceed $1,575,000.

(b)     Terms of the Program.  The terms of the Emergence Bonus program as set forth in each participant's participation letter shall remain in effect and nothing in this Plan shall be read as superseding such letters.

# 6.     EQUITY COMPENSATION PROGRAM

(a)     Participation in Program.  A key employee shall become a participant in the Equity Compensation Program upon the grant of a CVR Interest, which grant shall be evidenced by a participation letter.  Each CVR Interest entitles the holder to a percentage of the share of the Company's Implied Equity Value up to the Maximum Aggregate CVR Interest, which percentage shall be set forth in the applicable participation letter.  The participation letter shall state such additional terms and conditions as may apply to the CVR Interest.

(b)     Maximum Aggregate CVR Interest.  The maximum aggregate CVR Interest shall be 6.6169% of the Company's Implied Equity Value upon a Change of Control, as described in Schedule B.

(c)     Determination and Settlement.  The Company shall determine the Net Distributable Value and the consequential value of each CVR Interest as of the Change of Control Consummation Date.

(i)     Merger/Consolidation/Asset Sale/80% Acquisition:  If the Change of Control is a merger, consolidation or asset sale described in Section 8(e)(i) or Section 8(e)(ii) of this Plan or an acquisition described in Section 8(e)(iii) of this Plan in which a person or group acquires 80% or more of the voting equity securities of Holdings, CVR Interests shall be settled in cash as soon as practicable following a Change of Control Consummation Date;

(ii)     Less Than 80% Acquisition:  If the Change of Control is an acquisition as described in Section 8(e)(iii) of this Plan in which a Person or Group acquires more than 50% percent but less than 80% of the voting equity securities of Holdings, no distributions shall be made in respect of the CVR Interests under this program but each holder of a CVR Interest shall be vested in a right to receive the value of their interest, determined on the date of such Change of Control, should a subsequent Change of Control occur in which in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the initial Change of Control.  Such value shall be distributed in shares of the voting equity securities of Holdings or the resulting surviving entity.

(iii)  Qualified IPO:  If the Change of Control is a Qualified IPO, the CVR Interest shall be settled six (6) months following the Change of Control based on the Net Distributable Value implied by the initial public offering price, and the settlement shall be made in the voting equity securities of Holdings or the surviving entity.

(d)  Threshold Net Distributable Value.  No amounts shall be distributable in respect of vested CVR Interests if the Net Distributable Value on the Change of Control Consummation Date is less than $125 million.

(e)  Implied Equity Value.  For purposes of this program, "Implied Equity Value" shall mean the Net Distributable Value minus the Initial Indebtedness; *provided, however,* that if any portion of the Initial Indebtedness has been paid or pre-paid after the Effective Date, the Implied Equity Value shall be determined by subtracting only that portion of the Initial Indebtedness outstanding on the Change of Control Consummation Date; and *provided, further,* that (i) in the case of a transaction that constitutes a Change of Control within the meaning of Section 8(e)(iii) of this Plan, "Implied Equity Value" means the weighted average sale price of the last Shares purchased by the relevant Person or Group effecting the Change of Control multiplied by the number of Shares outstanding on the Change of Control Consummate Date, and (ii) that in the case of a Change of Control that is a Qualified IPO, "Implied Equity Value" shall mean the public offering price of the Shares sold in such Qualified IPO, multiplied by the number of Shares outstanding on the Change of Control Consummation Date.[1]

## 7.  SALE BONUS PROGRAM

(a)  Sale Bonus.  Participants in the Sale Bonus Program shall have the opportunity to earn a bonus upon a Change of Control that occurs prior to March 31, 2007, based upon the Net Distributable Value on the Change of Control Consummation Date.  Each Sale Bonus Program participant shall receive a participant letter stating the dollar amount or method for calculating the Sale Bonus and such additional terms and conditions as may apply.

(b)  Determination and Payment.  Sale Bonuses shall be determined as of the Change of Control Consummation Date and paid as soon as practicable thereafter, unless the Change of Control is a Qualified IPO), in which case Sale Bonuses shall be paid six (6) months following the Change of Control Consummation Date based on the Net Distributable Value implied by the initial public offering price.

(c)  Maximum Sale Bonuses.  Aggregate sale bonuses payable under the Sale Bonus Program shall not exceed the Bonus Pool Amount.

---

[1] This definition is subject to such modifications as may be agreed to by the Debtors and prepetition agent.

(d)    Threshold Net Distributable Values.  No Sale Bonuses shall be payable under the Sale Bonus Program if the Net Distributable Value on the Change of Control Consummation Date is less than $125 million or greater than $225 million.

(e)    Sale Bonus Pool Amount.  For purposes of this program, the "Sale Bonus Pool Amount" shall mean one of the following amounts, depending on the amount of the Net Distributable Value on the Change of Control Consummation Date: (i) $1 million if the Net Distributable Value is equal to or greater than $125 million but less than $200 million, and (ii) $500,000, if the Net Distributable Value is equal to or greater than $200 million or equal to or less than $225 million.

## 8.    DEFINITIONS

The following definitions shall apply to all programs under this Plan:

(a)    "Affiliate" of a Person shall mean any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such other Person

(b)    "ANI" shall have the meaning set forth in Section 1 of this Plan.

(c)    "Board" shall mean the Board of Directors of Holdings.

(d)    "Cause" shall mean, "Cause" as defined in any employment agreement between the Company and a participant, and in the absence of any such agreement, any act or any failure to act, which constitutes: (i) habitual intoxication, (ii) drug addition, (iii) conviction of a felony, (iv) adjudication as an incompetent, (v) fraud in connection with employment, (vi) proven intentional misbehavior harmful to the Company (including, without limitation, dishonesty, willful misconduct, disloyalty, acts of bad faith, neglect of duty, or material and continuing breach of agreements with the Company or, duties or obligations of the Company), or (vii) habitual disregard of or habitual failure to perform in accordance with the Company's established policies and procedures.

(e)    "Change of Control" shall mean the occurrence after the Effective Date of:

(i)    any direct or indirect sale or other transfer of all or substantially all of the assets (regardless of form or structure, and whether in a single transaction or a series of transactions) of Holdings or ANI to any Person other than an Affiliate of Holdings;

(ii)    a merger, consolidation or share exchange of Holdings into or with any Person (other than an Affiliate of Holdings or a merger or consolidation qualifying as a reorganization under Section 368(a)(1)(F) of the Internal Revenue Code of 1986, as amended), if, as a result of such transaction, the Persons (or

Affiliates thereof) who were holders of Shares immediately prior to such transaction do not own at least a majority of the issued and outstanding equity securities of the resulting Person (or of the ultimate parent of the resulting Person);

(iii) any direct or indirect sale of outstanding Shares (whether in a single transaction or a series of transactions) if, as a result of such sale,

(1) more than fifty percent (50%) of the then issued and outstanding Shares are held by:

(A) a Person that was not a holder of 10% or more of the Shares issued and outstanding as of the Effective Date, or

(B) a Group that does not include a Person who was a holder of 10% or more of the Shares issued and outstanding as of the Effective Date, or

(2) more than fifty percent (50%) of the then issued and outstanding Shares are held by:

(A) Persons who, at the Effective Date, held five percent (5%) or more but less than ten (10%) of the Shares issued and outstanding as of the Effective Date, or

(B) a Group that includes such a Person,

and, in the case of clause (iii)(2)(A) or (B), sixty (60%) or more of the Persons who are members of the Board of Directors following such sale were not members of the Board of Directors prior to such sale; or

(iv) a Qualified IPO.

(f) "Change of Control Consummation Date" shall mean the date on which the Initial Change of Control is consummated.

(g) "Company" shall have the meaning set forth in Section 1 of this Plan.

(h) "Fair Market Value" shall mean the fair market value of any applicable property, services, equity, or other consideration, as determined reasonably and in good faith by the Company's Board of Directors.

(i) "Group" shall mean a syndicate or group of Persons that is considered to be a "person" for purposes of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

(j)      "Holdings" shall have the meaning set forth in Section 1 of this Plan.

(k)      "Implied Equity Value" shall have the meaning set forth in Section 6(e) of this Plan.

(l)      "Indebtedness" shall mean, for any Person, without duplication: (i) all indebtedness for borrowed money of such Person; (ii) all obligations issued, undertaken or assumed by such Person as the deferred purchase price of property or services (other than trade payables and accrued expenses); (iii) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property or businesses; (iv) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person; (v) all capital lease obligations of such Person; and (vi) all indebtedness of other Persons referred to in clauses (i) through (v) secured by any lien upon or in property owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness, limited to the lesser of such indebtedness or the value of such property.

(m)      "Initial Change of Control" means the first Change of Control that is consummated after the Effective Date.

(n)      "Initial Indebtedness" shall mean $110 million, which is the value on the Effective Date of the Term Note between ANI, as Issuer, the Guarantors Party thereto, the Noteholders party thereto and UBS AG, Stamford Branch as Note Agent and Collateral Agent.

(o)      "Net Distributable Value" shall mean, at the time of determination in connection with a Change of Control, an amount equal to: (i) the amount of cash, property, or other consideration paid or to be paid to the Company or its Affiliates, or any of their respective equity holders in connection with a Change of Control after deducting transaction costs; plus (ii) without duplication, the amount of Indebtedness of the Company and its Affiliates (including, without limitation, to the extent applicable, the principal amount outstanding under the Exit Revolving Credit Agreement to be dated as of December [   ], 2005, by and among ANI, Holdings, Atkins Nutritional (Canada) Limited, as borrowers and UBS Securities LLC, UBS Loan Finance LLC and UBS AG Stanford Branch) assumed or repaid by the acquirer; plus (iii) without duplication, the amount of any other Indebtedness of any of the reorganized Debtors outstanding at the Effective Date (in each case, including, without limitation, the amount of any prepayment or call protection premiums or penalties) that has been paid or pre-paid after the Effective Date; plus (iv) without duplication, the amount of any Restricted Payments; plus (v) the Fair Market Value of any Remaining Assets; minus (vi) contractual cash bonus payments to employees of the Company or employees of any of its Affiliates in the event of a Change of Control; provided, however, that Net Distributable Value will be calculated before giving effect to any payment or accruals made with respect to (i) the Sale Bonus

Program and Equity Compensation Program under this Plan and (ii) the contingent value rights issued pursuant to the Contingent Value Rights Agreement, dated as of December __, 2005, between Holdings and [_____], as trustee.

(p)     "Person" shall mean an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof, or any other form of legal entity.

(q)     "Qualified IPO" shall mean an underwritten public offering pursuant to an effective registration statement under the Securities Act, covering the issuance, offer and sale of Shares by the Company but only if (x) the number of Shares to be issued, offered and sold by the Company in such public offering is equal to or greater than 25% of the number of Shares then issued and outstanding (giving effect to such public offering); and (y) each of the underwriters participating in such public offering shall be obligated to buy on a "firm commitment" basis all Shares that such underwriters shall have agreed to distribute.

(r)     "Remaining Assets" shall mean the fair market value of any and all assets of the Company and its Affiliates that are not sold or transferred in connection with a transaction that constitutes a Change of Control by reason of clause (i) of the definition of such term.

(s)     "Restricted Payments" shall mean the sum of: (i) any cash dividend or other distribution, direct or indirect, on account of any equity of the Company or its Affiliates to a Person other than the Company or its Affiliates; plus (ii) any redemption, retirement, sinking fund, or similar payment, purchase, or other acquisition for value, direct or indirect, of any equity of the Company by either Holdings or ANI (other than pursuant to this Plan); plus (iii) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire any equity of Holdings or ANI; plus (iv) any payment to any Affiliate of Holdings (other than to Plan participants pursuant to the Sale Bonus Program or CVR Interest Program); in each case made after the Effective Date.

(t)     "Sale Bonus Pool Amount" shall have the meaning set forth in Section 7(e) of this Plan.

(u)     "Shares" shall mean shares of Holding's common stock, $0.01 par value per share.

## 9.   MISCELLANEOUS

(a)     Benefits.  Amounts payable under any program under this Plan are in addition to and not in lieu of any existing ordinary course bonus arrangements and any severance program.  However, no amounts paid under this Plan under any program shall constitute compensation for any purpose under any retirement plan or other employee benefit plan,

program, arrangement or agreement of the Company or any affiliate (including without limitation any severance program).

(b)     Tax Withholding.  All amounts payable under this Plan shall be less applicable federal, state, local, and foreign withholding requirements.  In the event that CVR Interests are settled in shares of common stock of Holdings, receipt of such shares is expressly conditioned upon a participant's making such arrangements as the Company shall require for the satisfaction of withholding requirements.

(c)     Additional Restrictions on Shares.  In the event that CVR Interests are settled in shares of common stock of Holdings, such shares shall be subject to such additional conditions and restrictions on transfer as may be required by law, the certificate of incorporation or by-laws of Holdings or as the Board may establish in the participation letter.

(d)     No Guarantee of Employment.  Nothing in this Plan or any program shall confer upon a participant any right to continue in the Company's employment or other service for any specific duration or interfere with or otherwise restrict in any way the rights of the Company, which rights are hereby expressly reserved by each, to terminate the participant's employment at any time and for any reason.

(e)     Unfunded Plan.  Nothing contained in the Plan, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind, nor a fiduciary relationship between the Company and any participant, beneficiary, legal representative or any other person.  To the extent that any person acquires a right to receive payments from the Company under the Plan, such right shall be no greater than the rights of an unsecured general creditor of the Company.  All payments to be made hereunder shall be paid from the general funds of the Company and no special or separate fund shall be established and no segregation of assets shall be made to assure payment of such amounts.

(f)     Governing Law.  This Plan and each program hereunder shall be governed by the laws of the State of New York (without reference to any of conflicts of law provisions).  This Plan is not intended to be subject to the Employee Retirement Income Security Act of 1974, as amended.

## 10.    DURATION AND AMENDMENTS

(a)     Term of the Plan.  The Plan shall be effective on the date a court-approved plan of reorganization under chapter 11 of the Bankruptcy Code becomes effective (such date, the "Effective Date").  Unless earlier terminated by the Board, the Plan shall terminate automatically on the date that all interests under the Plan have been satisfied.

(b)     Right to Amend or Terminate the Plan.  The Board of Directors may amend, suspend or terminate the Plan or any program hereunder at any time and for any reason; *provided, however,* that no change adverse to participants may be made to any

participation letter unless the change is presented to the participant in writing and the participant consents to such change; and *provided, further,* that any amendment that would increase the rights of a holder a CVR Interest under the Equity Compensation Program shall require the approval of the majority of the stockholders of Holdings.

# Schedule A

## Emergence Bonus Participants and Bonus Amounts

| Name | Title | Emergence Bonus |
|---|---|---:|
| Mark Rodriguez | CEO and President | 490,000 |
| Joseph Conklin | SVP, General Counsel and Director of Human Resources | 222,000 |
| Jeff Powers | VP, Sales and Customer Management | 190,000 |
| Steve Galinski | VP, Customer Support and Logistics | 61,000 |
| Matt Spolar | VP, Product Technology | 61,000 |
| Beth Neumann | VP and Chief Marketing Officer | 55,000 |
| Other Participants | | 493,000 |
| | | **1,572,000** |

**Schedule B**

**Management Portion of Increase
in Implied Equity Value**

| Net Distributable Value | Tranche A Debt | Implied Equity Value(1) | Value to Management | Marginal Increase ($) | Marginal Inc. as % of Inc. Implied Eq. Val. | Mgmt Portion % of Equity Distribution(1) |
|---|---|---|---|---|---|---|
| $100.0 | $110.0 | $ - | $ - | NA | NA | NA |
| 125.0 | 110.0 | 15.0 | 0.3 | 0.3 | 1.7% | 1.7000% |
| 150.0 | 110.0 | 40.0 | 1.0 | 0.8 | 3.0% | 2.5125% |
| 175.0 | 110.0 | 65.0 | 2.0 | 1.0 | 4.0% | 3.0846% |
| 200.0 | 110.0 | 90.0 | 3.3 | 1.3 | 5.0% | 3.6167% |
| 225.0 | 110.0 | 115.0 | 4.9 | 1.6 | 6.5% | 4.2435% |
| 250.0 | 110.0 | 140.0 | 6.8 | 1.9 | 7.5% | 4.8250% |
| 275.0 | 110.0 | 165.0 | 8.9 | 2.1 | 8.5% | 5.3818% |
| 300.0 | 110.0 | 190.0 | 11.0 | 2.1 | 8.5% | 5.7921% |
| 325.0 | 110.0 | 215.0 | 13.1 | 2.1 | 8.5% | 6.1070% |
| 350.0 | 110.0 | 240.0 | 15.3 | 2.1 | 8.5% | 6.3563% |
| 375.0 | 110.0 | 265.0 | 17.3 | 2.0 | 8.0% | 6.5113% |
| 400.0 | 110.0 | 290.0 | 19.0 | 1.8 | 7.0% | 6.5534% |
| 425.0 | 110.0 | 315.0 | 20.8 | 1.8 | 7.0% | 6.5889% |
| 450.0 | 110.0 | 340.0 | 22.5 | 1.8 | 7.0% | 6.6191% |
| or more | | or more | or more | or more | or more | (plan max) |

($millions)

(1)     This is not subject to dilution by grants of CVR Interests to non-employees outside of this Plan.

**Exhibit 11**

**New Management Agreements**

# EMPLOYMENT AGREEMENT

**AGREEMENT**, dated as of the ___ day of December 2005, (the "Effective Date") by and between Atkins Nutritionals, Inc., a New York corporation (the "Company"), and Mark Rodriguez, a resident of Bronxville, New York (the "Executive").

**WHEREAS,** the Company desires to engage the services of Executive and Executive desires to be employed by the Company on the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of such employment and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Executive agree as follows:

1.     **Employment and Position.** The Company hereby employs Executive as its President and Chief Executive Officer, and Executive hereby accepts such employment under and subject to the terms and conditions hereinafter set forth.

2.     **Employment Period.** This Agreement shall begin on the Effective Date, as such term is defined in the Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated November 16, 2005, of Atkins Nutritionals, Inc., et al (the "Plan of Reorganization"), and shall expire on the third (3rd) anniversary of the Effective Date unless terminated earlier in accordance with Section 6 of this Agreement (such period, the "Employment Period"). The Employment Period may be extended and renewed automatically for successive one-year periods (each, an "Extension Period") unless the Company gives notice to Executive of its desire not to extend and renew at least one hundred twenty (120) days prior to the end of the Employment Period or any Extension Period. If the Company fails to renew this Agreement, such employment termination shall be treated as a termination without Cause. If Executive fails to renew this Agreement, it shall be treated as a resignation without Good Reason.

3.     **Duties.** During the Employment Period, Executive shall perform services in a managerial capacity in a manner consistent with Executive's position as President and Chief Executive Officer, subject to the general supervision of the Board of Directors of the Company. Executive hereby agrees to devote his full business time to the faithful performance of such duties and to the promotion and forwarding of the business and affairs of the Company during the Employment Period, provided, however, that Executive shall be permitted to (i) engage in other activities of a civic, religious, political or charitable nature, (ii) manage investments of Executive and Executive's family in securities, mutual funds or other collective investment funds, limited partner interests or similar passive investments, (iii) engage in the corporate directorships and other business activities, as may hereafter be specifically approved in writing by the Board of Directors of the Company, which in each case and in the aggregate do not materially interfere with the performance of his obligations hereunder.

4.     **Compensation**

(a)     Salary. In consideration of the services rendered by Executive under this Agreement, the Company shall pay Executive a base salary (the "Base Salary") at the rate of

$500,000 per calendar year. The Base Salary shall be paid in such installments and at such times as the Company pays its salaried executives and shall be subject to all necessary withholding taxes, FICA contributions and similar deductions. The Board of Directors (the "Board") of the Company shall annually review the Base Salary payable to Executive hereunder and may, in its reasonable discretion, increase but not decrease, Executive's salary rate. Any such increased salary shall be and become the "Base Salary" for purposes of this Agreement.

(b) Performance Bonus. During the Employment Period, the Company shall maintain an annual bonus program for its employees. Executive shall be a participant in the annual bonus program and shall have an annual target bonus opportunity of not less than seventy percent (70%) of Base Salary (such annual target bonus opportunity, as adjusted from time to time hereafter, "Target Annual Bonus"). A schedule setting forth minimum and maximum payments under the bonus plan is set forth as Schedule I hereto, however, the actual performance targets for payment of the Target Annual Bonus shall be established annually by a committee of the Board responsible for executive compensation. Any Target Annual Bonus payable to Executive shall be pro-rated for any period of service less than a full year. Except as otherwise provided herein, the annual bonus shall be paid no later than March 15 of the year following the year to which the annual bonus relates, however, if the annual bonus program establishes quarterly or bi-annual performance incentives, bonus payments shall be made in quarterly or bi-annual installments, as the case may be.

(c) Emergence Bonus. On the Effective Date, the Company shall pay Executive a cash amount equal to $245,000, which amount represents the amount due under the Emergence Bonus Program under the Atkins Nutritionals, Inc. Management Incentive Plan (the "Atkins MIP"). In accordance with the terms of the Emergence Bonus Program, the Company shall pay Executive an additional cash amount equal to $245,000 on March 31, 2006.

(d) Sale Bonus. Executive shall participate in the Sale Bonus Program under the Atkins MIP, in accordance with the participation letter attached hereto as Exhibit A.

(e) CVR Interest. The Company shall also grant Executive a CVR Interest under the Equity Compensation Program of the Atkins MIP, in accordance with the participation letter attached hereto as Exhibit B.

**5. Benefits.** During the Employment Period Executive and/or Executive's family, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare benefit plans, programs, practices and policies provided generally by the Company to similarly-situated executives of the Company (including, without limitation, any medical, prescription, dental, disability, employee life, group life, accidental death and travel accident insurance plans and programs that may be provided by the Company from time to time). Such plans, programs, practices and policies are subject to change from time to time by the Company.

**6. Employment Termination.**

(a) Severance Date. Executive's employment shall terminate on the earliest to occur of (i) the date of Executive's death, (ii) the date the Company terminates his employment for any reason, (iii) the date Executive resigns his employment for any reason, or

(iv) the last day of the Employment Period or any Extension Period (such date, the "Severance Date").

(b)    Notice of Termination.   If the Company terminates Executive's employment for Cause (defined below) or if Executive resigns for Good Reason, the Company, or Executive as the case may be shall provide at least thirty (30) days advance written notice (at least sixty (60) days in the case of the Company's termination without Cause) of the Severance Date, to the extent applicable, an explanation in reasonable detail of the facts and circumstances claimed to provide a basis for termination under the provision so indicated. The failure by Executive or the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Good Reason or Cause shall not waive any right of Executive or the Company, respectively, hereunder or preclude Executive or the Company, respectively, from asserting such fact or circumstance in enforcing Executive's or the Company's rights hereunder. In the event of a termination without Cause, the Company shall provide Executive with at least sixty (60) days notice of the Severance Date.

(c)    Disability. The Company shall provide Executive with at least thirty (30) days advance written notice that it is terminating Executive's employment on account of Disability and the Severance Date shall be effective as of the date specified in the notice of termination unless Executive shall have returned to full-time performance of Executive's duties under this Agreement. For purposes of this Agreement, "Disability" shall mean the absence or inability of Executive to perform his duties under this Agreement on a full-time basis for either (i) one hundred eighty (180) consecutive days or (ii) for the aggregate of any two hundred seventy (270) days within any consecutive twelve (12) month period, as a result of incapacity due to mental or physical illness which is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to Executive or Executive's legal representative.

(d)    Termination for Cause. Executive's employment may be terminated by the Company at any time for Cause which shall be effective thirty (30) days following receipt of written notice by Executive. For purposes of this Agreement, "Cause" means a determination by the Board that one or more of the following has occurred:

(i)    Executive shall have been convicted of, or have plead guilty or *nolo contendere* to, any felony or misdemeanor involving fraud or dishonesty;

(ii)    Executive's gross misconduct, which is substantially injurious to the business or reputation of the Company as determined in good faith and in the reasonable judgment of the Board;

(iii)    Executive shall have committed any fraud, embezzlement, misappropriation of funds, misrepresentation, or breach of fiduciary duty against the Company;

(iv)    the willful and continued failure of Executive to perform substantially Executive's duties with the Company (other than any such failure resulting from incapacity due to physical or mental illness), for a period of thirty (30) days after a written demand for

performance is delivered to Executive by the Board which specifically identifies the manner in which the Board believes that Executive has not substantially performed Executive's duties; or

(v)     a material breach by Executive of his obligations under Section 8 of this Agreement, which breach is not cured by Executive within thirty (30) days after receipt of notice thereof from the Company setting forth the alleged breach in reasonable detail.

(e)     <u>Resignation for Good Reason</u>.  Executive shall provide the Company with at least thirty (30) days notice that he is resigning his employment for Good Reason.  For purposes of this Agreement, "<u>Good Reason</u>" means:

(i)     the assignment to Executive of any duties inconsistent in any material respect with Executive's position, authority, duties or responsibilities, a change in Executive's title, or any other action by the Company which results in a material and permanent diminution in such position, authority, duties or responsibilities;

(ii)     any failure by the Company to comply with any of the provisions of Section 4 or 5 of this Agreement;

(iii)     a breach by the Company of any material provision of this Agreement, that is not cured by the Company within 20 days after receipt of notice thereof from Executive setting forth the alleged breach in reasonable detail;

(iv)     any requirement of the Company that Executive be based anywhere other than the Company's headquarters in Melville, New York, unless such new location is closer to Executive's primary residence or is located in Manhattan, New York; or

(v)     the occurrence of a Change of Control (as defined below).

For purposes of this Agreement, any good faith determination of Good Reason made by Executive shall be conclusive; <u>provided</u>, <u>however</u>, any isolated, insubstantial and inadvertent action taken in good faith that is remedied by the Company promptly after receipt of notice thereof shall not constitute Good Reason.

(f)     <u>Change of Control Defined</u>.  "<u>Change of Control</u>" shall have the meaning set forth in the Atkins MIP, as in effect on the Effective Date hereof.

## 7.     Effect of Employment Termination.

(a)     <u>Survival of Certain Provisions</u>.   Following Executive's employment termination, neither party shall have any further obligation to the other party, except as may be required by law (such as the benefit continuation provisions of COBRA), Section 7 (Effect of Employment Termination), Section 8 (Restrictive Covenants), Section 9 (Directors and Officers Liability Insurance; Indemnification), Section 10 (Dispute Resolution) and Section 11 (Successors and Assigns) shall survive for the periods (if any) specified in such Sections.

(b)     <u>Accrued Benefits</u>.  If Executive's employment terminates for any reason, the Company shall pay to Executive (or his estate) (i) all salary and bonuses earned or accrued

through the Severance Date on the next regularly scheduled pay date; (ii) all reimbursements due to Executive in accordance with the Company's regular reimbursement policy; and (iii) all other payments and benefits to which Executive may be entitled under the terms of any applicable compensation arrangement or benefit plan or program of the Company, including, without limitation, any earned and accrued but unused PTO pay.

(c)     Death Benefit.  In the event Executive's employment with the Company is terminated due to his death, then in addition to the accrued benefits described above Executive's estate or beneficiaries, as the case may be, shall be entitled to receive no later than thirty (30) days following Executive's death, (i) a lump sum cash payment equal to six (6) month's Base Salary, and (ii) a pro rata bonus for any incomplete performance period at the time Executive's death occurs, assuming that Executive would have received a bonus equal to 100% of the Target Annual Bonus.

(d)     Disability.  In the event Executive's employment with the Company is terminated due to his Disability, then in addition to the accrued benefits described above Executive shall be entitled to receive his Base Salary until the expiration of the month following the Severance Date.

(e)     Severance Benefits.  If Executive's employment is terminated by the Company without Cause (other than due to Executive's death or Disability) or by Executive for Good Reason then, in addition to the accrued benefits described above in this Section 7, as his exclusive right and remedy in respect of such employment termination.

     (i)     Severance Pay.  The Company shall provide to Executive, a lump sum cash amount equal to 1.5 times the sum of (i) Executive's annual Base Salary and (ii) Executive's Target Annual Bonus;

     (ii)     Benefit Continuation.  For eighteen (18) months following the Severance Date, the Company shall continue to keep in full force and effect all policies of medical, dental and accident insurance with respect to Executive and his dependents with the same level of coverage, upon the same terms and otherwise to the same extent as such policies shall have been in effect immediately prior to the Severance Date, and the Company and Executive shall share the costs of the continuation of such insurance coverage in the same proportion as such costs were shared immediately prior to the Severance Date; provided that, if Executive becomes eligible during such period to participate in another group plan with respect to any such policies by reason of subsequent employment or otherwise, Executive's coverage under the Company policies will terminate in accordance with the transition of coverage provisions in the Company's policies;

     (iii)     Outplacement.  The Company shall provide Executive with executive level outplacement services through a reputable outplacement firm; and

(iv)    <u>All Other Benefits Cease</u>. Effective on the day after the Severance Date, Executive shall cease to participate in any other plan, benefit, program or arrangement providing employee benefits or perquisites offered by the Company.

(f)    <u>Release</u>. As a condition precedent to Executive's right to receive the payments and/or benefits described in Section 7(e), Executive shall execute, on or about the date of Executive's termination, a general release (the "<u>Release</u>") in favor of the Company in substantially the form annexed hereto as <u>Exhibit C</u>. Executive shall have twenty one (21) days in which to execute and return the Release. Any cash payment due to Executive pursuant to Section 7(e) shall be paid in a single lump sum no later than two (2) weeks after the date the Release is executed and delivered to the Company (the "<u>Release Date</u>"); provided, however, that if the Company is treated as a corporation whose securities are publicly traded on an established securities market for purposes of Section 409A of the Internal Revenue Code of 1986, as amended, then payment shall be delayed until six (6) months following the Severance Date to the extent required by such law.

(g)    <u>No Mitigation</u>. The Company's obligation to make any payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against Executive or others. In no event shall Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to Executive under any of the provisions of this Agreement.

## 8.    Restrictive Covenants.

(a)    <u>Non-Competition</u>. Executive shall not, during the Employment Period or any Extension Period and for the eighteen-month period thereafter, engage in, or otherwise directly or indirectly be associated with, or act as an independent contractor or consultant for or to, or be a director, officer, employee, owner or partner of, any other business or organization, whether or not such business or organization is now or shall then be competing with the Company or any affiliate, or invest in the securities of any other business or organization if such business or organization whose primary business is related to developing, marketing or distributing very low carbohydrate nutritional bars and/or nutritional beverages that derive no more than ten percent (10%) of their caloric content from carbohydrates in the United States (the "<u>Competitive Business</u>"), except that Executive shall not be precluded from owning, solely as an investment, securities of any such business or organization if (i) the securities are publicly traded on a national or regional stock exchange or on the over-the-counter market, (ii) Executive is neither a controlling person or a member of a group which controls such business or organization, and (iii) Executives does not, directly or indirectly, own five percent (5%) or more of such business or organization.

(b)    <u>Non-Solicitation</u>. During the Employment Period or any Extension Period and for the eighteen-month period thereafter, Executive shall not directly or indirectly, solicit or entice, or endeavor to solicit or entice any of the employees of the Company or any affiliate to quit or abandon their employment or engagement with the Company nor shall he call upon, solicit, divert or attempt to solicit or divert from the Company or any of its affiliates any of their

customers or suppliers or potential customers or suppliers, of whose names he was aware during the Employment Period; provided, however, that nothing in this Section 8(b) shall be deemed to prohibit Executive from calling upon or soliciting a customer or supplier if such action relates solely to a business which is not a Competitive Business.

(c) Non-Disclosure and Non-Use of Confidential Business Information. During the Employment Period or any Extension Period and thereafter, Executive shall not disclose to any third person any Confidential Business Information (as hereinafter defined) and shall not use any such information for his own benefit or for the benefit of any third person, either during the Employment Period or thereafter, whether such information was obtained or conceived by Executive or others, without the prior written consent of the Board of Directors.

(d) Confidential Business Information. For purposes of this Agreement, the term "Confidential Business Information", includes without limitation, "know-how", trade secrets, customer lists, details of client or executive contracts, pricing policies, bidding practices and procedures, operational methods, marketing plans or strategies, project development techniques or plans, business acquisition plans, financial results or projections, budgets, capital spending plans, other financial matters, new personnel acquisition plans, methods of production, manufacture and installation, technical processes, designs and design projects, inventions and research projects of the Company or any affiliate learned by Executive heretofore or during the Employment Period.

Confidential Business Information shall not include: (i) information which at the time of the disclosure is, or subsequently becomes, generally part of the public domain through no breach of the terms hereof by Executive; or (ii) information which is lawfully acquired from a third party who did not breach a confidential obligation by disclosing the same to Executive; (iii) information which was known by Executive prior to the date of commencement of Executive's employment with the Company; or (iv) information which is required to be disclosed to comply with the applicable laws, governmental rules or regulations, subpoenas or court order.

(e) Return of Business Documents. All memoranda, notes, letters, documents, tapes and other media of every kind and description (whether electronic, paper or otherwise) and all copies thereof (i) containing Confidential Business Information, or (ii) made or compiled by or on behalf of Executive in the course of performing his duties for the Company or any affiliate (or made available to Executive relating to the Company or any affiliate during the Employment Period), (collectively, "Business Documents"), are and shall be the sole and exclusive property of the Company (or affiliate, as applicable). Executive shall surrender to the Company at the time his employment terminates, or at such other time or times as the Board of Directors of the Company may specify all Business Documents then in Executive's possession or control.

(f) Inventions and Patents. Executive shall promptly deliver to the Company (and no one else) all improvements, discoveries, ideas and inventions that may be of significance to the Company or any affiliate, made or conceived by Executive alone or in conjunction with others (whether or not patentable and whether or not conceived at the request of or upon the suggestion of the Company or other affiliate Group) in the course of providing services under

7

this Agreement, or made or conceived within one (1) year after the Severance Date, if resulting from, suggested by or relating to such services. All such improvements, discoveries, ideas and inventions shall be the sole and exclusive property of the Company and are hereby assigned to the Company. At the request and cost of the Company, Executive shall assist the Company or its designee in obtaining patents or other proprietary rights registrations or confirmations relating to such improvements, discoveries, ideas and inventions, and shall in connection therewith execute such applications, statements and other documents, furnish such information and take such other action (including but not limited to, testifying) as the Company may from time to time reasonably request.

(g)     Professional Work. All works and writings of a professional nature which are produced by Executive during the Employment Period and that are related to his services under this Agreement ("Professional Work") constitute works made for hire and are the sole and absolute property of the Company. Executive grants the Company the exclusive right to copyright all such Professional Work in the United States and in foreign jurisdictions. To the extent any such Professional Work is deemed to not be works for hire, Executive hereby assigns and agrees to assign all his interests therein to the Company or its nominee. Whenever requested to do so by the Company, Executive shall execute any and all applications, assignments, or other instruments that the Company may deem necessary to protect the Company's interest therein.

(h)     Rights and Remedies upon Breach. If Executive breaches one or more of the restrictive covenants contained in this Section 8, the Company shall have the following rights and remedies, each of which shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity:

(i)     Specific Performance. The right and remedy to have the restrictive covenants specifically enforced by any court of competent jurisdiction, without the necessity of proof of actual damage or posting of a bond, it being agreed that any breach of the restrictive covenants would cause irreparable injury to the Company and that money damages would not provide an adequate remedy to the Company.

(ii)     Accounting. The right and remedy to require the Executive to account for and pay to the Company all compensation, profits, monies, accruals, increments or other benefits derived or received by the Executive as the result of any transaction constituting a breach of the restrictive covenants.

9.     **Directors and Officers Liability Insurance; Indemnification.**

(a)     Directors and Officers Liability Insurance. The Company agrees that, notwithstanding a termination of his/her employment with the Company, the Company shall, for at least three (3) years after the Severance Date, have Executive included as a named insured or otherwise covered for actions or failures to act by Executive in his capacity as a director or officer of the Company to at least the same extent as other executive officers or directors, as the case may be, of the Company under any directors and officers liability insurance policies maintained by the Company.

(b)  <u>Indemnification</u>.  The Company agrees that it will not alter the indemnification provisions in its certificate of incorporation or by-laws so as to give Executive less protection thereunder with respect to periods during which Executive serves the Company as an executive officer or other employee than is afforded to Executive as of the Effective Date.

## 10.   Dispute Resolution.

(a)  <u>Arbitration</u>.  Except as provided in Section 8(h) above, any and all disputes, controversies or claims arising or existing among or between the Company and Executive concerning any matter whatsoever shall be arbitrated in New York County, New York before the American Arbitration Association ("<u>AAA</u>") in accordance with the then prevailing Rules of Arbitration of the AAA, including, but not limited to, any and all claims or controversies arising under or concerning this Agreement.

(b)  <u>Attorney's Fees</u>.  If any contest or dispute shall arise under this Agreement involving termination of Executive's employment with the Company or involving the failure or refusal of the Company to perform fully in accordance with the terms hereof, the Company shall reimburse Executive, on a current basis, for all legal fees and expenses, if any, incurred by Executive in connection with such contest or dispute.

(c)  <u>Governing Law; Consent to Jurisdiction; Venue</u>.  The interpretation, construction and performance of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without regard to the principle of conflicts of laws.

**11.   Successors and Assigns.**  The provisions of this Agreement shall be binding on and shall inure to the benefit of any successor in interest to the Company.  The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as a sealed instrument as of the day and year first above written.

ATKINS NUTRITIONALS, INC.


By:_____
Name:
Title:



_____
Mark Rodriguez

## Schedule I

### Executive Bonus Schedule

| Percentage of Plan Achieved | Bonus Available as Percentage of Target Annual Bonus |
|---|---|
| 130 | 250% of Target |
| 120 | 200% of Target |
| 115 | 175% of Target |
| 110 | 150% of Target |
| 105 | 125% of Target |
| 100 | 100% of Target |
| 85 | 70% of Target |
| 80 | 50% of Target |
| Less than 80% | 0 |

Any level of Company performance which falls between two specific points set forth above under "Percentage of Plan Achieved" shall entitle Executive to receive a percentage of Base Salary determined on a straight-line basis between such two points. Such amount shall be calculated as follows:

$$[(A-B) \times .1] \times (C-D) + D$$

Where:

A = The actual percentage of plan achieved.

B = The Percentage of Plan set forth above which is less than and closest to actual results.

C = The Percentage Available as Percentage of Base Salary set forth above which is greater than and closest to the percentage that would apply based on actual results.

D = The Percentage Available as Percentage of Base Salary set forth above which is less than and closest to the percentage that would apply based on actual results.

## List of Exhibits

Exhibit A:     Sale Bonus Participation Letter
Exhibit B:     CVR Interest Participation Letter
Exhibit C:     Form of Release

**EXHIBIT A**

December __, 2005

Mark Rodriguez
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

Re:   MIP Sale Bonus

Dear Mark:

This letter describes the terms of a Sale Bonus opportunity for you under the Atkins Nutritionals, Inc. Management Incentive Plan ("MIP").

1.   **Sale Bonus**

   a.   **Bonus Amount** – 47% of the Sale Bonus Pool Amount.

   "Sale Bonus Pool Amount" means one of the following amounts: depending on the amount of the Net Distributable Value on the Change of Control Consummation Date: (i) $1 million if the Net Distributable Value is equal to or greater than $125 million but less than $200 million, and (ii) $500,000, if the Net Distributable Value is equal to or greater than $200 million and equal to or less than $225 million.

   b.   **Conditions to Payment** – The Sale Bonus will _only_ be payable if:

      (i)   Change of Control – A Change of Control occurs on or before March 31, 2007; **AND**

      (ii)  Employment – One of the following statements is true:

         •   You are employed by the Company on the date of the Change of Control; **OR**

         •   Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as

defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

**AND**

(iii)   <u>Threshold Achieved</u> – The Net Distributable Value from the Change of Control is at least $125,000,000.

c.   **Form and Timing of Payment** – Except as provided below, the Sale Bonus will be paid in one lump sum on the Change of Control Consummation Date.

(i)   <u>Qualified IPO</u>.  If the Change of Control is a Qualified IPO, your Sale Bonus will be paid six (6) months after the Change of Control Consummation Date with the Net Distributable Value determined based on the Net Distributable Value implied by the initial public offering price.

(ii)   <u>Less than 80% Acquisition</u>.  If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Atkins Nutritionals Holdings, Inc. ("<u>Holdings</u>") (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your Sale Bonus will be determined on the Change of Control Distribution Date.  However, you will receive <u>NO PAYMENT</u> in respect of your Sale Bonus until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2.   **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3.   **Severance Benefits** – The Sale Bonus payable under this letter is in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4.   **Benefits** – This Sale Bonus is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company.  However, since this Sale Bonus represents a unique

payment to you, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5. **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from your Sale Bonus payment.

6. **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter. Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7. **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates. Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration. Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company. Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,

I have read, I understand, and I agree to the forgoing:

_____                    _____

Mark Rodriguez                                                            Date

**EXHIBIT B**

December \_\_, 2005

Mark Rodriguez
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

Re: <u>CVR Interest</u>

Dear Mark:

This letter describes the terms of the CVR interest granted to you under the Atkins Nutritionals, Inc. Management Incentive Plan ("<u>MIP</u>").

1.    **CVR Interest**

    a.    **CVR Interest** – 47% of the Implied Equity Value Pool.

"<u>Implied Equity Value Pool</u>" shall be an amount determined in accordance with the following table:

| Implied Equity Value (in millions) | Implied Equity Value Pool |
|---|---|
| $0.0 | NA |
| 15.0 | 1.7000% |
| 40.0 | 2.5125% |
| 65.0 | 3.0846% |
| 90.0 | 3.6167% |
| 115.0 | 4.2435% |
| 140.0 | 4.8250% |
| 165.0 | 5.3818% |
| 190.0 | 5.7921% |
| 215.0 | 6.1070% |
| 240.0 | 6.3563% |
| 265.0 | 6.5113% |
| 290.0 | 6.5534% |
| 315.0 | 6.5889% |
| *340.0 and above* | 6.6191% (plan max) |

    b.    **Conditions to Settlement** – You will <u>*only*</u> be entitled to a settlement in respect of your CVR Interest if:

        (i)    <u>Employment</u> – One of the following statements is true:

- You are employed by the Company on the date of the Change of Control; **OR**

- Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

    **AND**

(ii)    <u>Threshold Achieved</u> – The Net Distributable Value from the Change of Control is at least $125,000,000.

c.    **Form and Timing of CVR Interest Settlement** – Except as provided below, your CVR Interest will be settled by the payment of a lump sum cash amount on the Change of Control Consummation Date.

(i)    <u>Qualified IPO</u>. If the Change of Control is a Qualified IPO, your CVR Interest will be settled in the voting equity securities of Atkins Nutritionals Holdings, Inc. ("<u>Holdings</u>") or the surviving entity with the implied equity value determined based on the Net Distributable Value implied by the initial public offering price.

(ii)    <u>Less than 80% Acquisition</u>. If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Holdings (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your CVR Interest will be determined on the Change of Control Distribution Date and settled in the voting equity securities of Holdings or the surviving entity. However, you will receive <u>NO PAYMENT</u> in respect of your CVR Interest until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2.    **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3. **Severance Benefits** – Any amounts due in respect of a CVR Interest granted under this letter are in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4. **Benefits** – This CVR Interest is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company. However, since this CVR Interest represents unique compensation, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5. **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from amounts due in respect of your CVR Interest.

6. **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter. Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7. **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates. Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration. Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company. Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,

I have read, I understand, and I agree to the forgoing:

_____                    _____
Mark Rodriguez                                                               Date

**EXHIBIT C**

# AGREEMENT AND GENERAL RELEASE

## (PLEASE READ CAREFULLY.  THIS AGREEMENT AND GENERAL RELEASE HAS IMPORTANT LEGAL CONSEQUENCES)

This Agreement and General Release (the "Agreement") is between Atkins Nutritionals, Inc. (the "Company") and _____ ("Executive").  The term "The Company" shall include any subsidiaries or related companies, directors, officers, shareholders, employees, agents, attorneys, and successors of the Company.

IT IS AGREED THAT:

1.  Executive's last date of employment with the Company is _____.

2.  Ten (10) days after the date Executive executes this Agreement, the Company will pay Executive the payments and/or benefits described in a certain Severance Agreement executed by and between the Executive and the Company, dated _____, less applicable federal, state, and local legally required deductions (the "Payment"). Executive agrees that the Company owes Executive nothing else, including but not limited to wages or benefits.

3.  In exchange for the payment, Executive understands that Executive releases and forever gives up the right to sue or make any claim whatsoever against the Company, for any reason whatsoever, including but not limited to any claim under contract and/or equity and/or any law, relating in any way to Executive's employment with the Company or the termination of that employment.  This waiver of claims includes any claims of discrimination on any grounds, whether or not Executive has previously filed such a claim.  Executive understands that Executive is giving up any rights or claims which Executive may have under the numerous laws and regulations regulating employment, whether on the federal, state, or local level, including, but not limited to, the Age Discrimination in Employment Act of 1967, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Fair Labor Standards Act, the Equal Pay Act, and the New York State Human Rights Law.

4.  Executive agrees that Executive has returned to the Company any and all identification cards, files, books, records, materials, equipment or documents in Executive's possession which were provided to or obtained by Executive in connection with Executive's employment.

5.  It is understood and agreed that Executive will not talk about, discuss or communicate with anyone, orally or in writing, concerning the matter which is the subject of this Agreement or any aspect of Executive's employment with the Company except Executive may (i) discuss this Agreement with Executive's spouse and children,

(ii) permit Executive's accountant to review this Agreement in connection with the filing of tax returns, (iii) permit attorney(s) of Executive's choice to review this Agreement, and (iv) testify truthfully under oath pursuant to a subpoena (in which event Executive will provide The Company with prompt notice of the subpoena).

6. Executive represents that Executive is not aware of any breach of contract, wrongdoing or liability by the Company, and Executive expressly agrees that this Agreement is not and shall not in any way be deemed to constitute an admission or evidence of any breach of contract, wrongdoing or liability on the part of the Company, nor of any violation of any federal, state or municipal statute, regulation or principle of common law or equity.

7. Executive acknowledges that Executive has received a copy of this Agreement and that The Company has informed Executive that Executive should consult with an attorney in connection with it. Executive acknowledges that Executive's decision to consult with an attorney or not to consult with an attorney was made without influence by the Company. Executive further acknowledges that Executive has had at least 21 days in which to consider, execute, and return this Agreement. Notwithstanding Executive's right to consider this Agreement for 21 days, if Executive signs this Agreement before the expiration of the 21-day period, Executive will have done so knowingly and voluntarily, and will have expressly waived Executive's right to consider this Agreement for the balance of the 21-day period.

8. This Agreement shall not become effective until seven (7) days after the date Executive executes the Agreement, and Executive may cancel this Agreement within seven (7) days of the date Executive executes it, except that any cancellation must be in writing, signed by Executive, and delivered to the Company.

9. This Agreement is made in the State of New York. This Agreement is to be interpreted under the law of the State of New York.

10. EXECUTIVE ACKNOWLEDGES THAT EXECUTIVE HAS CAREFULLY READ THIS AGREEMENT; THAT EXECUTIVE HAS HAD AT LEAST 21 DAYS IN WHICH TO CONSIDER AND RETURN THIS AGREEMENT; THAT EXECUTIVE HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF EXECUTIVE'S CHOICE IN CONNECTION WITH THIS AGREEMENT; THAT EXECUTIVE FULLY UNDERSTANDS THE TERMS, CONDITIONS, AND SIGNIFICANCE AND CONSEQUENCES OF THIS AGREEMENT; AND THAT EXECUTIVE HAS EXECUTED THIS AGREEMENT KNOWINGLY AND VOLUNTARILY, AND OF EXECUTIVE'S OWN FREE WILL.

**ATKINS NUTRITIONALS, INC.**

By:_____

_____

# EMPLOYMENT AGREEMENT

**AGREEMENT**, dated as of the ___ day of December 2005, (the "<u>Effective Date</u>") by and between Atkins Nutritionals, Inc., a New York corporation (the "<u>Company</u>"), and Joseph Conklin, a resident of Huntington, New York (the "<u>Executive</u>").

**WHEREAS,** the Company desires to engage the services of Executive and Executive desires to be employed by the Company on the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of such employment and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Executive agree as follows:

1. **Employment and Position.** The Company hereby employs Executive as its Senior Vice President, General Counsel and Director of Human Resources, and Executive hereby accepts such employment under and subject to the terms and conditions hereinafter set forth.

2. **Employment Period.** This Agreement shall begin on the Effective Date, as such term is defined in the Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated November 16, 2005, of Atkins Nutritionals, Inc., et al (the "<u>Plan of Reorganization</u>"), and shall expire on the third (3rd) anniversary of the Effective Date unless terminated earlier in accordance with Section 6 of this Agreement (such period, the "<u>Employment Period</u>"). The Employment Period may be extended and renewed automatically for successive one-year periods (each, an "<u>Extension Period</u>") unless the Company gives notice to Executive of its desire not to extend and renew at least one hundred twenty (120) days prior to the end of the Employment Period or any Extension Period. If the Company fails to renew this Agreement, such employment termination shall be treated as a termination without Cause. If Executive fails to renew this Agreement, it shall be treated as a resignation without Good Reason.

3. **Duties.** During the Employment Period, Executive shall perform services in a managerial capacity in a manner consistent with Executive's position as Senior Vice President, General Counsel and Director of Human Resources, subject to the general supervision of the Chief Executive Officer of the Company. Executive hereby agrees to devote his full business time to the faithful performance of such duties and to the promotion and forwarding of the business and affairs of the Company during the Employment Period, provided, however, that Executive shall be permitted to (i) engage in other activities of a civic, religious, political or charitable nature, (ii) manage investments of Executive and Executive's family in securities, mutual funds or other collective investment funds, limited partner interests or similar passive investments, (iii) engage in the corporate directorships and other business activities, as may hereafter be specifically approved in writing by the Chief Executive Officer of the Company, which in each case and in the aggregate do not materially interfere with the performance of his obligations hereunder.

### 4. Compensation

(a)  <u>Salary</u>.  In consideration of the services rendered by Executive under this Agreement, the Company shall pay Executive a base salary (the "<u>Base Salary</u>") at the rate of $226,571 per calendar year.  The Base Salary shall be paid in such installments and at such times as the Company pays its salaried executives and shall be subject to all necessary withholding taxes, FICA contributions and similar deductions.  The Board of Directors (the "<u>Board</u>") of the Company shall annually review the Base Salary payable to Executive hereunder and may, in its reasonable discretion, increase but not decrease, Executive's salary rate.  Any such increased salary shall be and become the "<u>Base Salary</u>" for purposes of this Agreement.

(b)  <u>Performance Bonus</u>.  During the Employment Period, the Company shall maintain an annual bonus program for its employees.  Executive shall be a participant in the annual bonus program and shall have an annual target bonus opportunity of not less than fifty percent (50%) of Base Salary (such annual target bonus opportunity, as adjusted from time to time hereafter, "<u>Target Annual Bonus</u>").  A schedule setting forth minimum and maximum payments under the bonus plan is set forth as <u>Schedule I</u> hereto, however, the actual performance targets for payment of the Target Annual Bonus shall be established annually by a committee of the Board responsible for executive compensation.  Any Target Annual Bonus payable to Executive shall be pro-rated for any period of service less than a full year.  Except as otherwise provided herein, the annual bonus shall be paid no later than March 15 of the year following the year to which the annual bonus relates, however, if the annual bonus program establishes quarterly or bi-annual performance incentives, bonus payments shall be made in quarterly or bi-annual installments, as the case may be.

(c)  <u>Emergence Bonus</u>.  On the Effective Date, the Company shall pay Executive a cash amount equal to $222,000, which amount represents the amount due under the Emergence Bonus Program under the Atkins Nutritionals, Inc. Management Incentive Plan (the "<u>Atkins MIP</u>").

(d)  <u>Sale Bonus</u>.  Executive shall participate in the Sale Bonus Program under the Atkins MIP, in accordance with the participation letter attached hereto as <u>Exhibit A</u>.

(e)  <u>CVR Interest</u>.  The Company shall also grant Executive a CVR Interest under the Equity Compensation Program of the Atkins MIP, in accordance with the participation letter attached hereto as <u>Exhibit B</u>.

### 5. Benefits.

During the Employment Period Executive and/or Executive's family, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare benefit plans, programs, practices and policies provided generally by the Company to similarly-situated executives of the Company (including, without limitation, any medical, prescription, dental, disability, employee life, group life, accidental death and travel accident insurance plans and programs that may be provided by the Company from time to time).  Such plans, programs, practices and policies are subject to change from time to time by the Company.

## 6. Employment Termination.

(a)     Severance Date.  Executive's employment shall terminate on the earliest to occur of (i) the date of Executive's death, (ii) the date the Company terminates his employment for any reason, (iii) the date Executive resigns his employment for any reason, or (iv) the last day of the Employment Period or any Extension Period (such date, the "Severance Date").

(b)     Notice of Termination.  If the Company terminates Executive's employment for Cause (defined below) or if Executive resigns for Good Reason, the Company, or Executive as the case may be shall provide at least thirty (30) days advance written notice (at least sixty (60) days in the case of the Company's termination without Cause) of the Severance Date, to the extent applicable, an explanation in reasonable detail of the facts and circumstances claimed to provide a basis for termination under the provision so indicated.  The failure by Executive or the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Good Reason or Cause shall not waive any right of Executive or the Company, respectively, hereunder or preclude Executive or the Company, respectively, from asserting such fact or circumstance in enforcing Executive's or the Company's rights hereunder.  In the event of a termination without Cause, the Company shall provide Executive with at least sixty (60) days notice of the Severance Date.

(c)     Disability.  The Company shall provide Executive with at least thirty (30) days advance written notice that it is terminating Executive's employment on account of Disability and the Severance Date shall be effective as of the date specified in the notice of termination unless Executive shall have returned to full-time performance of Executive's duties under this Agreement.  For purposes of this Agreement, "Disability" shall mean the absence or inability of Executive to perform his duties under this Agreement on a full-time basis for either (i) one hundred eighty (180) consecutive days or (ii) for the aggregate of any two hundred seventy (270) days within any consecutive twelve (12) month period, as a result of incapacity due to mental or physical illness which is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to Executive or Executive's legal representative.

(d)     Termination for Cause.  Executive's employment may be terminated by the Company at any time for Cause which shall be effective thirty (30) days following receipt of written notice by Executive.  For purposes of this Agreement, "Cause" means a determination by the Board that one or more of the following has occurred:

(i)     Executive shall have been convicted of, or have plead guilty or *nolo contendere* to, any felony or misdemeanor involving fraud or dishonesty;

(ii)     Executive's gross misconduct, which is substantially injurious to the business or reputation of the Company as determined in good faith and in the reasonable judgment of the Board;

(iii)     Executive shall have committed any fraud, embezzlement, misappropriation of funds, misrepresentation, or breach of fiduciary duty against the Company;

(iv)    the willful and continued failure of Executive to perform substantially Executive's duties with the Company (other than any such failure resulting from incapacity due to physical or mental illness), for a period of thirty (30) days after a written demand for performance is delivered to Executive by the Board which specifically identifies the manner in which the Board believes that Executive has not substantially performed Executive's duties; or

(v)    a material breach by Executive of his obligations under Section 8 of this Agreement, which breach is not cured by Executive within thirty (30) days after receipt of notice thereof from the Company setting forth the alleged breach in reasonable detail.

(e)    <u>Resignation for Good Reason</u>. Executive shall provide the Company with at least thirty (30) days notice that he is resigning his employment for Good Reason. For purposes of this Agreement, "<u>Good Reason</u>" means:

(i)    the assignment to Executive of any duties inconsistent in any material respect with Executive's position, authority, duties or responsibilities, a change in Executive's title, or any other action by the Company which results in a material and permanent diminution in such position, authority, duties or responsibilities;

(ii)    any failure by the Company to comply with any of the provisions of Section 4 or 5 of this Agreement;

(iii)    a breach by the Company of any material provision of this Agreement, that is not cured by the Company within 20 days after receipt of notice thereof from Executive setting forth the alleged breach in reasonable detail;

(iv)    any requirement of the Company that Executive be based anywhere other than the Company's headquarters in Melville, New York, unless such new location is closer to Executive's primary residence or is located in Manhattan, New York; or

(v)    the occurrence of a Change of Control (as defined below).

For purposes of this Agreement, any good faith determination of Good Reason made by Executive shall be conclusive; <u>provided</u>, <u>however</u>, any isolated, insubstantial and inadvertent action taken in good faith that is remedied by the Company promptly after receipt of notice thereof shall not constitute Good Reason.

(f)    <u>Change of Control Defined</u>. "<u>Change of Control</u>" shall have the meaning set forth in the Atkins MIP, as in effect on the Effective Date hereof.

## 7.    Effect of Employment Termination.

(a)    <u>Survival of Certain Provisions</u>.    Following Executive's employment termination, neither party shall have any further obligation to the other party, except as may be required by law (such as the benefit continuation provisions of COBRA), Section 7 (Effect of Employment Termination), Section 8 (Restrictive Covenants), Section 9 (Directors and Officers Liability Insurance; Indemnification), Section 10 (Dispute Resolution) and Section 11 (Successors and Assigns) shall survive for the periods (if any) specified in such Sections.

(b)     Accrued Benefits.  If Executive's employment terminates for any reason, the Company shall pay to Executive (or his estate) (i) all salary and bonuses earned or accrued through the Severance Date on the next regularly scheduled pay date; (ii) all reimbursements due to Executive in accordance with the Company's regular reimbursement policy; and (iii) all other payments and benefits to which Executive may be entitled under the terms of any applicable compensation arrangement or benefit plan or program of the Company, including, without limitation, any earned and accrued but unused PTO pay.

(c)     Death Benefit.  In the event Executive's employment with the Company is terminated due to his death, then in addition to the accrued benefits described above Executive's estate or beneficiaries, as the case may be, shall be entitled to receive no later than thirty (30) days following Executive's death, (i) a lump sum cash payment equal to six (6) month's Base Salary, and (ii) a pro rata bonus for any incomplete performance period at the time Executive's death occurs, assuming that Executive would have received a bonus equal to 100% of the Target Annual Bonus.

(d)     Disability.  In the event Executive's employment with the Company is terminated due to his Disability, then in addition to the accrued benefits described above Executive shall be entitled to receive his Base Salary until the expiration of the month following the Severance Date.

(e)     Severance Benefits.  If Executive's employment is terminated by the Company without Cause (other than due to Executive's death or Disability) or by Executive for Good Reason then, in addition to the accrued benefits described above in this Section 7, as his exclusive right and remedy in respect of such employment termination.

(i)     Severance Pay.  The Company shall provide to Executive, a lump sum cash amount equal to  the sum of (i) Executive's annual Base Salary and (ii) Executive's Target Annual Bonus;

(ii)    Benefit Continuation.  For twelve (12) months following the Severance Date, the Company shall continue to keep in full force and effect all policies of medical, dental and accident insurance with respect to Executive and his dependents with the same level of coverage, upon the same terms and otherwise to the same extent as such policies shall have been in effect immediately prior to the Severance Date, and the Company and Executive shall share the costs of the continuation of such insurance coverage in the same proportion as such costs were shared immediately prior to the Severance Date; provided that, if Executive becomes eligible during such period to participate in another group plan with respect to any such policies by reason of subsequent employment or otherwise, Executive's coverage under the Company policies will terminate in accordance with the transition of coverage provisions in the Company's policies;

(iii)   Outplacement.  The Company shall provide Executive with executive level outplacement services through a reputable outplacement firm; and

(iv)     All Other Benefits Cease. Effective on the day after the Severance Date, Executive shall cease to participate in any other plan, benefit, program or arrangement providing employee benefits or perquisites offered by the Company.

(f)     Release. As a condition precedent to Executive's right to receive the payments and/or benefits described in Section 7(e), Executive shall execute, on or about the date of Executive's termination, a general release (the "Release") in favor of the Company in substantially the form annexed hereto as Exhibit C. Executive shall have twenty one (21) days in which to execute and return the Release. Any cash payment due to Executive pursuant to Section 7(e) shall be paid in a single lump sum no later than two (2) weeks after the date the Release is executed and delivered to the Company (the "Release Date"); provided, however, that if the Company is treated as a corporation whose securities are publicly traded on an established securities market for purposes of Section 409A of the Internal Revenue Code of 1986, as amended, then payment shall be delayed until six (6) months following the Severance Date to the extent required by such law.

(g)     No Mitigation. The Company's obligation to make any payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against Executive or others. In no event shall Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to Executive under any of the provisions of this Agreement.

**8.     Restrictive Covenants.**

(a)     Non-Competition. Executive shall not, during the Employment Period or any Extension Period and for the twelve-month period thereafter, engage in, or otherwise directly or indirectly be associated with, or act as an independent contractor or consultant for or to, or be a director, officer, employee, owner or partner of, any other business or organization, whether or not such business or organization is now or shall then be competing with the Company or any affiliate, or invest in the securities of any other business or organization if such business or organization whose primary business is related to developing, marketing or distributing very low carbohydrate nutritional bars and/or nutritional beverages that derive no more than ten percent (10%) of their caloric content from carbohydrates in the United States (the "Competitive Business"), except that Executive shall not be precluded from owning, solely as an investment, securities of any such business or organization if (i) the securities are publicly traded on a national or regional stock exchange or on the over-the-counter market, (ii) Executive is neither a controlling person or a member of a group which controls such business or organization, and (iii) Executives does not, directly or indirectly, own five percent (5%) or more of such business or organization.

(b)     Non-Solicitation. During the Employment Period or any Extension Period and for the twelve-month period thereafter, Executive shall not directly or indirectly, solicit or entice, or endeavor to solicit or entice any of the employees of the Company or any affiliate to quit or abandon their employment or engagement with the Company nor shall he call upon, solicit, divert or attempt to solicit or divert from the Company or any of its affiliates any of their

customers or suppliers or potential customers or suppliers, of whose names he was aware during the Employment Period; provided, however, that nothing in this Section 8(b) shall be deemed to prohibit Executive from calling upon or soliciting a customer or supplier if such action relates solely to a business which is not a Competitive Business.

(c)     Non-Disclosure and Non-Use of Confidential Business Information. During the Employment Period or any Extension Period and thereafter, Executive shall not disclose to any third person any Confidential Business Information (as hereinafter defined) and shall not use any such information for his own benefit or for the benefit of any third person, either during the Employment Period or thereafter, whether such information was obtained or conceived by Executive or others, without the prior written consent of the Board of Directors.

(d)     Confidential Business Information.  For purposes of this Agreement, the term "Confidential Business Information", includes without limitation, "know-how", trade secrets, customer lists, details of client or executive contracts, pricing policies, bidding practices and procedures, operational methods, marketing plans or strategies, project development techniques or plans, business acquisition plans, financial results or projections, budgets, capital spending plans, other financial matters, new personnel acquisition plans, methods of production, manufacture and installation, technical processes, designs and design projects, inventions and research projects of the Company or any affiliate learned by Executive heretofore or during the Employment Period.

Confidential Business Information shall not include: (i) information which at the time of the disclosure is, or subsequently becomes, generally part of the public domain through no breach of the terms hereof by Executive; or (ii) information which is lawfully acquired from a third party who did not breach a confidential obligation by disclosing the same to Executive; (iii) information which was known by Executive prior to the date of commencement of Executive's employment with the Company; or (iv) information which is required to be disclosed to comply with the applicable laws, governmental rules or regulations, subpoenas or court order.

(e)     Return of Business Documents.  All memoranda, notes, letters, documents, tapes and other media of every kind and description (whether electronic, paper or otherwise) and all copies thereof (i) containing Confidential Business Information, or (ii) made or compiled by or on behalf of Executive in the course of performing his duties for the Company or any affiliate (or made available to Executive relating to the Company or any affiliate during the Employment Period), (collectively, "Business Documents"), are and shall be the sole and exclusive property of the Company (or affiliate, as applicable). Executive shall surrender to the Company at the time his employment terminates, or at such other time or times as the Chief Executive Officer of the Company may specify all Business Documents then in Executive's possession or control.

(f)     Inventions and Patents.  Executive shall promptly deliver to the Company (and no one else) all improvements, discoveries, ideas and inventions that may be of significance to the Company or any affiliate, made or conceived by Executive alone or in conjunction with others (whether or not patentable and whether or not conceived at the request of or upon the suggestion of the Company or other affiliate Group) in the course of providing services under

this Agreement, or made or conceived within one (1) year after the Severance Date, if resulting from, suggested by or relating to such services. All such improvements, discoveries, ideas and inventions shall be the sole and exclusive property of the Company and are hereby assigned to the Company. At the request and cost of the Company, Executive shall assist the Company or its designee in obtaining patents or other proprietary rights registrations or confirmations relating to such improvements, discoveries, ideas and inventions, and shall in connection therewith execute such applications, statements and other documents, furnish such information and take such other action (including but not limited to, testifying) as the Company may from time to time reasonably request.

(g)     Professional Work. All works and writings of a professional nature which are produced by Executive during the Employment Period and that are related to his services under this Agreement ("Professional Work") constitute works made for hire and are the sole and absolute property of the Company. Executive grants the Company the exclusive right to copyright all such Professional Work in the United States and in foreign jurisdictions. To the extent any such Professional Work is deemed to not be works for hire, Executive hereby assigns and agrees to assign all his interests therein to the Company or its nominee. Whenever requested to do so by the Company, Executive shall execute any and all applications, assignments, or other instruments that the Company may deem necessary to protect the Company's interest therein.

(h)     Rights and Remedies upon Breach. If Executive breaches one or more of the restrictive covenants contained in this Section 8, the Company shall have the following rights and remedies, each of which shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity:

(i)     Specific Performance. The right and remedy to have the restrictive covenants specifically enforced by any court of competent jurisdiction, without the necessity of proof of actual damage or posting of a bond, it being agreed that any breach of the restrictive covenants would cause irreparable injury to the Company and that money damages would not provide an adequate remedy to the Company.

(ii)     Accounting. The right and remedy to require the Executive to account for and pay to the Company all compensation, profits, monies, accruals, increments or other benefits derived or received by the Executive as the result of any transaction constituting a breach of the restrictive covenants.

### 9.     Directors and Officers Liability Insurance; Indemnification.

(a)     Directors and Officers Liability Insurance. The Company agrees that, notwithstanding a termination of his/her employment with the Company, the Company shall, for at least three (3) years after the Severance Date, have Executive included as a named insured or otherwise covered for actions or failures to act by Executive in his capacity as a director or officer of the Company to at least the same extent as other executive officers or directors, as the case may be, of the Company under any directors and officers liability insurance policies maintained by the Company.

(b) <u>Indemnification</u>. The Company agrees that it will not alter the indemnification provisions in its certificate of incorporation or by-laws so as to give Executive less protection thereunder with respect to periods during which Executive serves the Company as an executive officer or other employee than is afforded to Executive as of the Effective Date.

## 10. Dispute Resolution.

(a) <u>Arbitration</u>. Except as provided in Section 8(h) above, any and all disputes, controversies or claims arising or existing among or between the Company and Executive concerning any matter whatsoever shall be arbitrated in New York County, New York before the American Arbitration Association ("<u>AAA</u>") in accordance with the then prevailing Rules of Arbitration of the AAA, including, but not limited to, any and all claims or controversies arising under or concerning this Agreement.

(b) <u>Attorney's Fees</u>. If any contest or dispute shall arise under this Agreement involving termination of Executive's employment with the Company or involving the failure or refusal of the Company to perform fully in accordance with the terms hereof, the Company shall reimburse Executive, on a current basis, for all legal fees and expenses, if any, incurred by Executive in connection with such contest or dispute.

(c) <u>Governing Law; Consent to Jurisdiction; Venue</u>. The interpretation, construction and performance of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without regard to the principle of conflicts of laws.

**11. Successors and Assigns.** The provisions of this Agreement shall be binding on and shall inure to the benefit of any successor in interest to the Company. The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as a sealed instrument as of the day and year first above written.

ATKINS NUTRITIONALS, INC.

By:_____
Name:
Title:


_____
Joseph Conklin

## Schedule I

### Executive Bonus Schedule

| Percentage of<br>Plan Achieved | Bonus Available<br>as Percentage<br>of Target Annual Bonus |
|:---:|:---:|
| 130 | 250% of Target |
| 120 | 200% of Target |
| 115 | 175% of Target |
| 110 | 150% of Target |
| 105 | 125% of Target |
| 100 | 100% of Target |
| 85 | 70% of Target |
| 80 | 50% of Target |
| Less than 80% | 0 |

Any level of Company performance which falls between two specific points set forth above under "Percentage of Plan Achieved" shall entitle Executive to receive a percentage of Base Salary determined on a straight-line basis between such two points. Such amount shall be calculated as follows:

$$[(A-B) \times .1] \times (C-D) + D$$

Where:

A = The actual percentage of plan achieved.

B = The Percentage of Plan set forth above which is less than and closest to actual results.

C = The Percentage Available as Percentage of Base Salary set forth above which is greater than and closest to the percentage that would apply based on actual results.

D = The Percentage Available as Percentage of Base Salary set forth above which is less than and closest to the percentage that would apply based on actual results.

## List of Exhibits

Exhibit A:     Sale Bonus Participation Letter
Exhibit B:     CVR Interest Participation Letter
Exhibit C:     Form of Release

**EXHIBIT A**

December __, 2005

Joseph Conklin
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

       Re:    MIP Sale Bonus

Dear Joseph:

     This letter describes the terms of a Sale Bonus opportunity for you under the Atkins Nutritionals, Inc. Management Incentive Plan ("MIP").

1.    **Sale Bonus**

    a.    **Bonus Amount** – 19% of the Sale Bonus Pool Amount.

    "Sale Bonus Pool Amount" means one of the following amounts: depending on the amount of the Net Distributable Value on the Change of Control Consummation Date: (i) $1 million if the Net Distributable Value is equal to or greater than $125 million but less than $200 million, and (ii) $500,000, if the Net Distributable Value is equal to or greater than $200 million and equal to or less than $225 million.

    b.    **Conditions to Payment** – The Sale Bonus will _only_ be payable if:

        (i)    Change of Control – A Change of Control occurs on or before March 31, 2007; **AND**

        (ii)    Employment – One of the following statements is true:

            • You are employed by the Company on the date of the Change of Control; **OR**

            • Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as

defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

**AND**

(iii)    Threshold Achieved – The Net Distributable Value from the Change of Control is at least $125,000,000.

c.    **Form and Timing of Payment** – Except as provided below, the Sale Bonus will be paid in one lump sum on the Change of Control Consummation Date.

(i)    Qualified IPO.  If the Change of Control is a Qualified IPO, your Sale Bonus will be paid six (6) months after the Change of Control Consummation Date with the Net Distributable Value determined based on the Net Distributable Value implied by the initial public offering price.

(ii)    Less than 80% Acquisition.  If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Atkins Nutritionals Holdings, Inc. ("Holdings") (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your Sale Bonus will be determined on the Change of Control Distribution Date.  However, you will receive NO PAYMENT in respect of your Sale Bonus until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2.    **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3.    **Severance Benefits** – The Sale Bonus payable under this letter is in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4.    **Benefits** – This Sale Bonus is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company.  However, since this Sale Bonus represents a unique

payment to you, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5.  **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from your Sale Bonus payment.

6.  **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter.  Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7.  **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates.  Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration.  Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company.  Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,

I have read, I understand, and I agree to the forgoing:

_____                          _____

Joseph Conklin                                                                         Date

**EXHIBIT B**

December __, 2005

Joseph Conklin
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

                    Re:    CVR Interest

Dear Joseph:

   This letter describes the terms of the CVR interest granted to you under the Atkins Nutritionals, Inc. Management Incentive Plan ("MIP").

1.    **CVR Interest**

   a.    **CVR Interest** – 19% of the Implied Equity Value Pool.

           "Implied Equity Value Pool" shall be an amount determined in accordance with the following table:

| Implied Equity Value (in millions) | Implied Equity Value Pool |
|---|---|
| $0.0 | NA |
| 15.0 | 1.7000% |
| 40.0 | 2.5125% |
| 65.0 | 3.0846% |
| 90.0 | 3.6167% |
| 115.0 | 4.2435% |
| 140.0 | 4.8250% |
| 165.0 | 5.3818% |
| 190.0 | 5.7921% |
| 215.0 | 6.1070% |
| 240.0 | 6.3563% |
| 265.0 | 6.5113% |
| 290.0 | 6.5534% |
| 315.0 | 6.5889% |
| *340.0 and above* | 6.6191% (plan max) |

   b.    **Conditions to Settlement** – You will *only* be entitled to a settlement in respect of your CVR Interest if:

           (i)    Employment – One of the following statements is true:

- You are employed by the Company on the date of the Change of Control; **OR**

- Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

**AND**

(ii) <u>Threshold Achieved</u> – The Net Distributable Value from the Change of Control is at least $125,000,000.

c. **Form and Timing of CVR Interest Settlement** – Except as provided below, your CVR Interest will be settled by the payment of a lump sum cash amount on the Change of Control Consummation Date.

(i) <u>Qualified IPO</u>. If the Change of Control is a Qualified IPO, your CVR Interest will be settled in the voting equity securities of Atkins Nutritionals Holdings, Inc. ("<u>Holdings</u>") or the surviving entity with the implied equity value determined based on the Net Distributable Value implied by the initial public offering price.

(ii) <u>Less than 80% Acquisition</u>. If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Holdings (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your CVR Interest will be determined on the Change of Control Distribution Date and settled in the voting equity securities of Holdings or the surviving entity. However, you will receive <u>NO PAYMENT</u> in respect of your CVR Interest until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2. **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3.   **Severance Benefits** – Any amounts due in respect of a CVR Interest granted under this letter are in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4.   **Benefits** – This CVR Interest is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company. However, since this CVR Interest represents unique compensation, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5.   **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from amounts due in respect of your CVR Interest.

6.   **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter. Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7.   **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates. Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration. Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company. Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,

I have read, I understand, and I agree to the forgoing:

_____          _____

Joseph Conklin                                              Date

**EXHIBIT C**

# AGREEMENT AND GENERAL RELEASE

## (PLEASE READ CAREFULLY.  THIS AGREEMENT AND GENERAL RELEASE HAS IMPORTANT LEGAL CONSEQUENCES)

This Agreement and General Release (the "Agreement") is between Atkins Nutritionals, Inc. (the "Company") and _____ ("Executive").  The term "The Company" shall include any subsidiaries or related companies, directors, officers, shareholders, employees, agents, attorneys, and successors of the Company.

IT IS AGREED THAT:

1.  Executive's last date of employment with the Company is _____.

2.  Ten (10) days after the date Executive executes this Agreement, the Company will pay Executive the payments and/or benefits described in a certain Severance Agreement executed by and between the Executive and the Company, dated _____, less applicable federal, state, and local legally required deductions (the "Payment"). Executive agrees that the Company owes Executive nothing else, including but not limited to wages or benefits.

3.  In exchange for the payment, Executive understands that Executive releases and forever gives up the right to sue or make any claim whatsoever against the Company, for any reason whatsoever, including but not limited to any claim under contract and/or equity and/or any law, relating in any way to Executive's employment with the Company or the termination of that employment.  This waiver of claims includes any claims of discrimination on any grounds, whether or not Executive has previously filed such a claim.  Executive understands that Executive is giving up any rights or claims which Executive may have under the numerous laws and regulations regulating employment, whether on the federal, state, or local level, including, but not limited to, the Age Discrimination in Employment Act of 1967, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Fair Labor Standards Act, the Equal Pay Act, and the New York State Human Rights Law.

4.  Executive agrees that Executive has returned to the Company any and all identification cards, files, books, records, materials, equipment or documents in Executive's possession which were provided to or obtained by Executive in connection with Executive's employment.

5.  It is understood and agreed that Executive will not talk about, discuss or communicate with anyone, orally or in writing, concerning the matter which is the subject of this Agreement or any aspect of Executive's employment with the Company except Executive may (i) discuss this Agreement with Executive's spouse and children,

(ii) permit Executive's accountant to review this Agreement in connection with the filing of tax returns, (iii) permit attorney(s) of Executive's choice to review this Agreement, and (iv) testify truthfully under oath pursuant to a subpoena (in which event Executive will provide The Company with prompt notice of the subpoena).

6. Executive represents that Executive is not aware of any breach of contract, wrongdoing or liability by the Company, and Executive expressly agrees that this Agreement is not and shall not in any way be deemed to constitute an admission or evidence of any breach of contract, wrongdoing or liability on the part of the Company, nor of any violation of any federal, state or municipal statute, regulation or principle of common law or equity.

7. Executive acknowledges that Executive has received a copy of this Agreement and that The Company has informed Executive that Executive should consult with an attorney in connection with it. Executive acknowledges that Executive's decision to consult with an attorney or not to consult with an attorney was made without influence by the Company. Executive further acknowledges that Executive has had at least 21 days in which to consider, execute, and return this Agreement. Notwithstanding Executive's right to consider this Agreement for 21 days, if Executive signs this Agreement before the expiration of the 21-day period, Executive will have done so knowingly and voluntarily, and will have expressly waived Executive's right to consider this Agreement for the balance of the 21-day period.

8. This Agreement shall not become effective until seven (7) days after the date Executive executes the Agreement, and Executive may cancel this Agreement within seven (7) days of the date Executive executes it, except that any cancellation must be in writing, signed by Executive, and delivered to the Company.

9. This Agreement is made in the State of New York. This Agreement is to be interpreted under the law of the State of New York.

10. EXECUTIVE ACKNOWLEDGES THAT EXECUTIVE HAS CAREFULLY READ THIS AGREEMENT; THAT EXECUTIVE HAS HAD AT LEAST 21 DAYS IN WHICH TO CONSIDER AND RETURN THIS AGREEMENT; THAT EXECUTIVE HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF EXECUTIVE'S CHOICE IN CONNECTION WITH THIS AGREEMENT; THAT EXECUTIVE FULLY UNDERSTANDS THE TERMS, CONDITIONS, AND SIGNIFICANCE AND CONSEQUENCES OF THIS AGREEMENT; AND THAT EXECUTIVE HAS EXECUTED THIS AGREEMENT KNOWINGLY AND VOLUNTARILY, AND OF EXECUTIVE'S OWN FREE WILL.

**ATKINS NUTRITIONALS, INC.**

By:_____

_____

# EMPLOYMENT AGREEMENT

**AGREEMENT**, dated as of the ___ day of December 2005, (the "<u>Effective Date</u>") by and between Atkins Nutritionals, Inc., a New York corporation (the "<u>Company</u>"), and Jeff Powers, a resident of Sacramento, California (the "<u>Executive</u>").

**WHEREAS,** the Company desires to engage the services of Executive and Executive desires to be employed by the Company on the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of such employment and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Executive agree as follows:

1. **Employment and Position.** The Company hereby employs Executive as its Vice President, Sales and Customer Management, and Executive hereby accepts such employment under and subject to the terms and conditions hereinafter set forth.

2. **Employment Period.** This Agreement shall begin on the Effective Date, as such term is defined in the Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated November 16, 2005, of Atkins Nutritionals, Inc., et al (the "<u>Plan of Reorganization</u>"), and shall expire on the third (3rd) anniversary of the Effective Date unless terminated earlier in accordance with Section 6 of this Agreement (such period, the "<u>Employment Period</u>"). The Employment Period may be extended and renewed automatically for successive one-year periods (each, an "<u>Extension Period</u>") unless the Company gives notice to Executive of its desire not to extend and renew at least one hundred twenty (120) days prior to the end of the Employment Period or any Extension Period. If the Company fails to renew this Agreement, such employment termination shall be treated as a termination without Cause. If Executive fails to renew this Agreement, it shall be treated as a resignation without Good Reason.

3. **Duties.** During the Employment Period, Executive shall perform services in a managerial capacity in a manner consistent with Executive's position as Vice President, Sales and Customer Management, subject to the general supervision of the Chief Executive Officer of the Company. Executive hereby agrees to devote his full business time to the faithful performance of such duties and to the promotion and forwarding of the business and affairs of the Company during the Employment Period, <u>provided</u>, <u>however</u>, that Executive shall be permitted to (i) engage in other activities of a civic, religious, political or charitable nature, (ii) manage investments of Executive and Executive's family in securities, mutual funds or other collective investment funds, limited partner interests or similar passive investments, (iii) engage in the corporate directorships and other business activities, as may hereafter be specifically approved in writing by the Chief Executive Officer of the Company, which in each case and in the aggregate do not materially interfere with the performance of his obligations hereunder.

4. **Compensation**

(a) <u>Salary</u>. In consideration of the services rendered by Executive under this Agreement, the Company shall pay Executive a base salary (the "<u>Base Salary</u>") at the rate of

$194,000 per calendar year. The Base Salary shall be paid in such installments and at such times as the Company pays its salaried executives and shall be subject to all necessary withholding taxes, FICA contributions and similar deductions. The Board of Directors (the "Board") of the Company shall annually review the Base Salary payable to Executive hereunder and may, in its reasonable discretion, increase but not decrease, Executive's salary rate. Any such increased salary shall be and become the "Base Salary" for purposes of this Agreement.

(b) <u>Performance Bonus</u>. During the Employment Period, the Company shall maintain an annual bonus program for its employees. Executive shall be a participant in the annual bonus program and shall have an annual target bonus opportunity of not less than fifty percent (50%) of Base Salary (such annual target bonus opportunity, as adjusted from time to time hereafter, "Target Annual Bonus"). A schedule setting forth minimum and maximum payments under the bonus plan is set forth as <u>Schedule I</u> hereto, however, the actual performance targets for payment of the Target Annual Bonus shall be established annually by a committee of the Board responsible for executive compensation. Any Target Annual Bonus payable to Executive shall be pro-rated for any period of service less than a full year. Except as otherwise provided herein, the annual bonus shall be paid no later than March 15 of the year following the year to which the annual bonus relates, however, if the annual bonus program establishes quarterly or bi-annual performance incentives, bonus payments shall be made in quarterly or bi-annual installments, as the case may be.

(c) <u>Emergence Bonus</u>. On the Effective Date, the Company shall pay Executive a cash amount equal to $190,000, which amount represents the amount due under the Emergence Bonus Program under the Atkins Nutritionals, Inc. Management Incentive Plan (the "Atkins MIP").

(d) <u>Sale Bonus</u>. Executive shall participate in the Sale Bonus Program under the Atkins MIP, in accordance with the participation letter attached hereto as <u>Exhibit A</u>.

(e) <u>CVR Interest</u>. The Company shall also grant Executive a CVR Interest under the Equity Compensation Program of the Atkins MIP, in accordance with the participation letter attached hereto as <u>Exhibit B</u>.

**5. Benefits.** During the Employment Period Executive and/or Executive's family, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare benefit plans, programs, practices and policies provided generally by the Company to similarly-situated executives of the Company (including, without limitation, any medical, prescription, dental, disability, employee life, group life, accidental death and travel accident insurance plans and programs that may be provided by the Company from time to time). Such plans, programs, practices and policies are subject to change from time to time by the Company.

**6. Employment Termination.**

(a) <u>Severance Date</u>. Executive's employment shall terminate on the earliest to occur of (i) the date of Executive's death, (ii) the date the Company terminates his employment for any reason, (iii) the date Executive resigns his employment for any reason, or

(iv) the last day of the Employment Period or any Extension Period (such date, the "Severance Date").

(b)   Notice of Termination.   If the Company terminates Executive's employment for Cause (defined below) or if Executive resigns for Good Reason, the Company, or Executive as the case may be shall provide at least thirty (30) days advance written notice (at least sixty (60) days in the case of the Company's termination without Cause) of the Severance Date, to the extent applicable, an explanation in reasonable detail of the facts and circumstances claimed to provide a basis for termination under the provision so indicated.   The failure by Executive or the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Good Reason or Cause shall not waive any right of Executive or the Company, respectively, hereunder or preclude Executive or the Company, respectively, from asserting such fact or circumstance in enforcing Executive's or the Company's rights hereunder.   In the event of a termination without Cause, the Company shall provide Executive with at least sixty (60) days notice of the Severance Date.

(c)   Disability.   The Company shall provide Executive with at least thirty (30) days advance written notice that it is terminating Executive's employment on account of Disability and the Severance Date shall be effective as of the date specified in the notice of termination unless Executive shall have returned to full-time performance of Executive's duties under this Agreement.   For purposes of this Agreement, "Disability" shall mean the absence or inability of Executive to perform his duties under this Agreement on a full-time basis for either (i) one hundred eighty (180) consecutive days or (ii) for the aggregate of any two hundred seventy (270) days within any consecutive twelve (12) month period, as a result of incapacity due to mental or physical illness which is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to Executive or Executive's legal representative.

(d)   Termination for Cause.   Executive's employment may be terminated by the Company at any time for Cause which shall be effective thirty (30) days following receipt of written notice by Executive.   For purposes of this Agreement, "Cause" means a determination by the Board that one or more of the following has occurred:

(i)   Executive shall have been convicted of, or have plead guilty or *nolo contendere* to, any felony or misdemeanor involving fraud or dishonesty;

(ii)   Executive's gross misconduct, which is substantially injurious to the business or reputation of the Company as determined in good faith and in the reasonable judgment of the Board;

(iii)   Executive shall have committed any fraud, embezzlement, misappropriation of funds, misrepresentation, or breach of fiduciary duty against the Company;

(iv)   the willful and continued failure of Executive to perform substantially Executive's duties with the Company (other than any such failure resulting from incapacity due to physical or mental illness), for a period of thirty (30) days after a written demand for

performance is delivered to Executive by the Board which specifically identifies the manner in which the Board believes that Executive has not substantially performed Executive's duties; or

(v)     a material breach by Executive of his obligations under Section 8 of this Agreement, which breach is not cured by Executive within thirty (30) days after receipt of notice thereof from the Company setting forth the alleged breach in reasonable detail.

(e)     Resignation for Good Reason.  Executive shall provide the Company with at least thirty (30) days notice that he is resigning his employment for Good Reason.  For purposes of this Agreement, "Good Reason" means:

(i)     the assignment to Executive of any duties inconsistent in any material respect with Executive's position, authority, duties or responsibilities, a change in Executive's title, or any other action by the Company which results in a material and permanent diminution in such position, authority, duties or responsibilities;

(ii)     any failure by the Company to comply with any of the provisions of Section 4 or 5 of this Agreement;

(iii)     a breach by the Company of any material provision of this Agreement, that is not cured by the Company within 20 days after receipt of notice thereof from Executive setting forth the alleged breach in reasonable detail;

(iv)     any requirement of the Company that Executive be based anywhere other than his primary residence as of the Effective Date, unless such new location is within a fifty (50) mile radius of such residence; or

(v)     the occurrence of a Change of Control (as defined below).

For purposes of this Agreement, any good faith determination of Good Reason made by Executive shall be conclusive; provided, however, any isolated, insubstantial and inadvertent action taken in good faith that is remedied by the Company promptly after receipt of notice thereof shall not constitute Good Reason.

(f)     Change of Control Defined.  "Change of Control" shall have the meaning set forth in the Atkins MIP, as in effect on the Effective Date hereof.

**7.     Effect of Employment Termination.**

(a)     Survival of Certain Provisions.  Following Executive's employment termination, neither party shall have any further obligation to the other party, except as may be required by law (such as the benefit continuation provisions of COBRA), Section 7 (Effect of Employment Termination), Section 8 (Restrictive Covenants), Section 9 (Directors and Officers Liability Insurance; Indemnification), Section 10 (Dispute Resolution) and Section 11 (Successors and Assigns) shall survive for the periods (if any) specified in such Sections.

(b)     Accrued Benefits.  If Executive's employment terminates for any reason, the Company shall pay to Executive (or his estate) (i) all salary and bonuses earned or accrued

through the Severance Date on the next regularly scheduled pay date; (ii) all reimbursements due to Executive in accordance with the Company's regular reimbursement policy; and (iii) all other payments and benefits to which Executive may be entitled under the terms of any applicable compensation arrangement or benefit plan or program of the Company, including, without limitation, any earned and accrued but unused PTO pay.

(c)     Death Benefit.  In the event Executive's employment with the Company is terminated due to his death, then in addition to the accrued benefits described above Executive's estate or beneficiaries, as the case may be, shall be entitled to receive no later than thirty (30) days following Executive's death, (i) a lump sum cash payment equal to six (6) month's Base Salary, and (ii) a pro rata bonus for any incomplete performance period at the time Executive's death occurs, assuming that Executive would have received a bonus equal to 100% of the Target Annual Bonus.

(d)     Disability.  In the event Executive's employment with the Company is terminated due to his Disability, then in addition to the accrued benefits described above Executive shall be entitled to receive his Base Salary until the expiration of the month following the Severance Date.

(e)     Severance Benefits.  If Executive's employment is terminated by the Company without Cause (other than due to Executive's death or Disability) or by Executive for Good Reason then, in addition to the accrued benefits described above in this Section 7, as his exclusive right and remedy in respect of such employment termination.

(i)     Severance Pay.  The Company shall provide to Executive, a lump sum cash amount equal to  the sum of (i) Executive's annual Base Salary and (ii) Executive's Target Annual Bonus;

(ii)     Benefit Continuation.  For twelve (12) months following the Severance Date, the Company shall continue to keep in full force and effect all policies of medical, dental and accident insurance with respect to Executive and his dependents with the same level of coverage, upon the same terms and otherwise to the same extent as such policies shall have been in effect immediately prior to the Severance Date, and the Company and Executive shall share the costs of the continuation of such insurance coverage in the same proportion as such costs were shared immediately prior to the Severance Date; provided that, if Executive becomes eligible during such period to participate in another group plan with respect to any such policies by reason of subsequent employment or otherwise, Executive's coverage under the Company policies will terminate in accordance with the transition of coverage provisions in the Company's policies;

(iii)     Outplacement.  The Company shall provide Executive with executive level outplacement services through a reputable outplacement firm; and

(iv)     <u>All Other Benefits Cease</u>.  Effective on the day after the Severance Date, Executive shall cease to participate in any other plan, benefit, program or arrangement providing employee benefits or perquisites offered by the Company.

(f)     <u>Release</u>.  As a condition precedent to Executive's right to receive the payments and/or benefits described in Section 7(e), Executive shall execute, on or about the date of Executive's termination, a general release (the "<u>Release</u>") in favor of the Company in substantially the form annexed hereto as <u>Exhibit C</u>.  Executive shall have twenty one (21) days in which to execute and return the Release.  Any cash payment due to Executive pursuant to Section 7(e) shall be paid in a single lump sum no later than two (2) weeks after the date the Release is executed and delivered to the Company (the "<u>Release Date</u>"); <u>provided</u>, <u>however</u>, that if the Company is treated as a corporation whose securities are publicly traded on an established securities market for purposes of Section 409A of the Internal Revenue Code of 1986, as amended, then payment shall be delayed until six (6) months following the Severance Date to the extent required by such law.

(g)     <u>No Mitigation</u>.  The Company's obligation to make any payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against Executive or others.  In no event shall Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to Executive under any of the provisions of this Agreement.

## 8.     **Restrictive Covenants.**

(a)     <u>Non-Competition</u>.  Executive shall not, during the Employment Period or any Extension Period and for the twelve-month period thereafter, engage in, or otherwise directly or indirectly be associated with, or act as an independent contractor or consultant for or to, or be a director, officer, employee, owner or partner of, any other business or organization, whether or not such business or organization is now or shall then be competing with the Company or any affiliate, or invest in the securities of any other business or organization if such business or organization whose primary business is related to developing, marketing or distributing very low carbohydrate nutritional bars and/or nutritional beverages that derive no more than ten percent (10%) of their caloric content from carbohydrates in the United States (the "<u>Competitive Business</u>"), except that Executive shall not be precluded from owning, solely as an investment, securities of any such business or organization if (i) the securities are publicly traded on a national or regional stock exchange or on the over-the-counter market, (ii) Executive is neither a controlling person or a member of a group which controls such business or organization, and (iii) Executives does not, directly or indirectly, own five percent (5%) or more of such business or organization.

(b)     <u>Non-Solicitation</u>.  During the Employment Period or any Extension Period and for the twelve-month period thereafter, Executive shall not directly or indirectly, solicit or entice, or endeavor to solicit or entice any of the employees of the Company or any affiliate to quit or abandon their employment or engagement with the Company nor shall he call upon, solicit, divert or attempt to solicit or divert from the Company or any of its affiliates any of their

customers or suppliers or potential customers or suppliers, of whose names he was aware during the Employment Period; provided, however, that nothing in this Section 8(b) shall be deemed to prohibit Executive from calling upon or soliciting a customer or supplier if such action relates solely to a business which is not a Competitive Business.

(c) Non-Disclosure and Non-Use of Confidential Business Information. During the Employment Period or any Extension Period and thereafter, Executive shall not disclose to any third person any Confidential Business Information (as hereinafter defined) and shall not use any such information for his own benefit or for the benefit of any third person, either during the Employment Period or thereafter, whether such information was obtained or conceived by Executive or others, without the prior written consent of the Board of Directors.

(d) Confidential Business Information. For purposes of this Agreement, the term "Confidential Business Information", includes without limitation, "know-how", trade secrets, customer lists, details of client or executive contracts, pricing policies, bidding practices and procedures, operational methods, marketing plans or strategies, project development techniques or plans, business acquisition plans, financial results or projections, budgets, capital spending plans, other financial matters, new personnel acquisition plans, methods of production, manufacture and installation, technical processes, designs and design projects, inventions and research projects of the Company or any affiliate learned by Executive heretofore or during the Employment Period.

Confidential Business Information shall not include: (i) information which at the time of the disclosure is, or subsequently becomes, generally part of the public domain through no breach of the terms hereof by Executive; or (ii) information which is lawfully acquired from a third party who did not breach a confidential obligation by disclosing the same to Executive; (iii) information which was known by Executive prior to the date of commencement of Executive's employment with the Company; or (iv) information which is required to be disclosed to comply with the applicable laws, governmental rules or regulations, subpoenas or court order.

(e) Return of Business Documents. All memoranda, notes, letters, documents, tapes and other media of every kind and description (whether electronic, paper or otherwise) and all copies thereof (i) containing Confidential Business Information, or (ii) made or compiled by or on behalf of Executive in the course of performing his duties for the Company or any affiliate (or made available to Executive relating to the Company or any affiliate during the Employment Period), (collectively, "Business Documents"), are and shall be the sole and exclusive property of the Company (or affiliate, as applicable). Executive shall surrender to the Company at the time his employment terminates, or at such other time or times as the Chief Executive Officer of the Company may specify all Business Documents then in Executive's possession or control.

(f) Inventions and Patents. Executive shall promptly deliver to the Company (and no one else) all improvements, discoveries, ideas and inventions that may be of significance to the Company or any affiliate, made or conceived by Executive alone or in conjunction with others (whether or not patentable and whether or not conceived at the request of or upon the suggestion of the Company or other affiliate Group) in the course of providing services under

this Agreement, or made or conceived within one (1) year after the Severance Date, if resulting from, suggested by or relating to such services. All such improvements, discoveries, ideas and inventions shall be the sole and exclusive property of the Company and are hereby assigned to the Company. At the request and cost of the Company, Executive shall assist the Company or its designee in obtaining patents or other proprietary rights registrations or confirmations relating to such improvements, discoveries, ideas and inventions, and shall in connection therewith execute such applications, statements and other documents, furnish such information and take such other action (including but not limited to, testifying) as the Company may from time to time reasonably request.

(g)     Professional Work. All works and writings of a professional nature which are produced by Executive during the Employment Period and that are related to his services under this Agreement ("Professional Work") constitute works made for hire and are the sole and absolute property of the Company. Executive grants the Company the exclusive right to copyright all such Professional Work in the United States and in foreign jurisdictions. To the extent any such Professional Work is deemed to not be works for hire, Executive hereby assigns and agrees to assign all his interests therein to the Company or its nominee. Whenever requested to do so by the Company, Executive shall execute any and all applications, assignments, or other instruments that the Company may deem necessary to protect the Company's interest therein.

(h)     Rights and Remedies upon Breach. If Executive breaches one or more of the restrictive covenants contained in this Section 8, the Company shall have the following rights and remedies, each of which shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity:

(i)     Specific Performance. The right and remedy to have the restrictive covenants specifically enforced by any court of competent jurisdiction, without the necessity of proof of actual damage or posting of a bond, it being agreed that any breach of the restrictive covenants would cause irreparable injury to the Company and that money damages would not provide an adequate remedy to the Company.

(ii)     Accounting. The right and remedy to require the Executive to account for and pay to the Company all compensation, profits, monies, accruals, increments or other benefits derived or received by the Executive as the result of any transaction constituting a breach of the restrictive covenants.

9.     **Directors and Officers Liability Insurance; Indemnification.**

(a)     Directors and Officers Liability Insurance. The Company agrees that, notwithstanding a termination of his/her employment with the Company, the Company shall, for at least three (3) years after the Severance Date, have Executive included as a named insured or otherwise covered for actions or failures to act by Executive in his capacity as a director or officer of the Company to at least the same extent as other executive officers or directors, as the case may be, of the Company under any directors and officers liability insurance policies maintained by the Company.

(b)  Indemnification.  The Company agrees that it will not alter the indemnification provisions in its certificate of incorporation or by-laws so as to give Executive less protection thereunder with respect to periods during which Executive serves the Company as an executive officer or other employee than is afforded to Executive as of the Effective Date.

## 10.  Dispute Resolution.

(a)  Arbitration.  Except as provided in Section 8(h) above, any and all disputes, controversies or claims arising or existing among or between the Company and Executive concerning any matter whatsoever shall be arbitrated in New York County, New York before the American Arbitration Association ("AAA") in accordance with the then prevailing Rules of Arbitration of the AAA, including, but not limited to, any and all claims or controversies arising under or concerning this Agreement.

(b)  Attorney's Fees.  If any contest or dispute shall arise under this Agreement involving termination of Executive's employment with the Company or involving the failure or refusal of the Company to perform fully in accordance with the terms hereof, the Company shall reimburse Executive, on a current basis, for all legal fees and expenses, if any, incurred by Executive in connection with such contest or dispute.

(c)  Governing Law; Consent to Jurisdiction; Venue.  The interpretation, construction and performance of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without regard to the principle of conflicts of laws.

## 11.  Successors and Assigns.  The provisions of this Agreement shall be binding on and shall inure to the benefit of any successor in interest to the Company.  The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as a sealed instrument as of the day and year first above written.

ATKINS NUTRITIONALS, INC.


By:_____
Name:
Title:



_____
Jeff Powers

## Schedule I

### Executive Bonus Schedule

| Percentage of<br>Plan Achieved | Bonus Available<br>as Percentage<br>of Target Annual Bonus |
|---|---|
| 130 | 250% of Target |
| 120 | 200% of Target |
| 115 | 175% of Target |
| 110 | 150% of Target |
| 105 | 125% of Target |
| 100 | 100% of Target |
| 85 | 70% of Target |
| 80 | 50% of Target |
| Less than 80% | 0 |

Any level of Company performance which falls between two specific points set forth above under "Percentage of Plan Achieved" shall entitle Executive to receive a percentage of Base Salary determined on a straight-line basis between such two points. Such amount shall be calculated as follows:

$$[(A-B) \times .1] \times (C-D) + D$$

Where:

A = The actual percentage of plan achieved.

B = The Percentage of Plan set forth above which is less than and closest to actual results.

C = The Percentage Available as Percentage of Base Salary set forth above which is greater than and closest to the percentage that would apply based on actual results.

D = The Percentage Available as Percentage of Base Salary set forth above which is less than and closest to the percentage that would apply based on actual results.

## List of Exhibits

Exhibit A:    Sale Bonus Participation Letter
Exhibit B:    CVR Interest Participation Letter
Exhibit C:    Form of Release

**EXHIBIT A**

December __, 2005

Jeff Powers
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

Re:     MIP Sale Bonus

Dear Jeff:

This letter describes the terms of a Sale Bonus opportunity for you under the Atkins Nutritionals, Inc. Management Incentive Plan ("MIP").

1.   **Sale Bonus**

   a.     **Bonus Amount** – 11.33% of the Sale Bonus Pool Amount.

   "Sale Bonus Pool Amount" means one of the following amounts: depending on the amount of the Net Distributable Value on the Change of Control Consummation Date: (i) $1 million if the Net Distributable Value is equal to or greater than $125 million but less than $200 million, and (ii) $500,000, if the Net Distributable Value is equal to or greater than $200 million and equal to or less than $225 million.

   b.     **Conditions to Payment** – The Sale Bonus will _only_ be payable if:

      (i)     Change of Control – A Change of Control occurs on or before March 31, 2007; **AND**

      (ii)     Employment – One of the following statements is true:

         • You are employed by the Company on the date of the Change of Control; **OR**

         • Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason" (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as

defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

**AND**

(iii)    <u>Threshold Achieved</u> – The Net Distributable Value from the Change of Control is at least $125,000,000.

c.    **Form and Timing of Payment** – Except as provided below, the Sale Bonus will be paid in one lump sum on the Change of Control Consummation Date.

(i)    <u>Qualified IPO</u>.  If the Change of Control is a Qualified IPO, your Sale Bonus will be paid six (6) months after the Change of Control Consummation Date with the Net Distributable Value determined based on the Net Distributable Value implied by the initial public offering price.

(ii)    <u>Less than 80% Acquisition</u>.  If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Atkins Nutritionals Holdings, Inc. ("<u>Holdings</u>") (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your Sale Bonus will be determined on the Change of Control Distribution Date.  However, you will receive <u>NO PAYMENT</u> in respect of your Sale Bonus until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2.    **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3.    **Severance Benefits** – The Sale Bonus payable under this letter is in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4.    **Benefits** – This Sale Bonus is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company.  However, since this Sale Bonus represents a unique

payment to you, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5.  **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from your Sale Bonus payment.

6.  **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter. Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7.  **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates. Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration. Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company. Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,

I have read, I understand, and I agree to the forgoing:

_____                    _____

Jeff Powers                                                             Date

**EXHIBIT B**

December __, 2005

Jeff Powers
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

                    Re:    CVR Interest

Dear Jeff:

    This letter describes the terms of the CVR interest granted to you under the Atkins Nutritionals, Inc. Management Incentive Plan ("MIP").

1.    **CVR Interest**

    a.    **CVR Interest** – 11.33% of the Implied Equity Value Pool.

        "Implied Equity Value Pool" shall be an amount determined in accordance with the following table:

| Implied Equity Value (in millions) | Implied Equity Value Pool |
|---|---|
| $0.0 | NA |
| 15.0 | 1.7000% |
| 40.0 | 2.5125% |
| 65.0 | 3.0846% |
| 90.0 | 3.6167% |
| 115.0 | 4.2435% |
| 140.0 | 4.8250% |
| 165.0 | 5.3818% |
| 190.0 | 5.7921% |
| 215.0 | 6.1070% |
| 240.0 | 6.3563% |
| 265.0 | 6.5113% |
| 290.0 | 6.5534% |
| 315.0 | 6.5889% |
| *340.0 and above* | 6.6191% (plan max) |

    b.    **Conditions to Settlement** – You will *only* be entitled to a settlement in respect of your CVR Interest if:

        (i)    Employment – One of the following statements is true:

- You are employed by the Company on the date of the Change of Control; **OR**

- Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

    **AND**

(ii)    <u>Threshold Achieved</u> – The Net Distributable Value from the Change of Control is at least $125,000,000.

c.    **Form and Timing of CVR Interest Settlement** – Except as provided below, your CVR Interest will be settled by the payment of a lump sum cash amount on the Change of Control Consummation Date.

(i)    <u>Qualified IPO</u>. If the Change of Control is a Qualified IPO, your CVR Interest will be settled in the voting equity securities of Atkins Nutritionals Holdings, Inc. ("<u>Holdings</u>") or the surviving entity with the implied equity value determined based on the Net Distributable Value implied by the initial public offering price.

(ii)    <u>Less than 80% Acquisition</u>. If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Holdings (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your CVR Interest will be determined on the Change of Control Distribution Date and settled in the voting equity securities of Holdings or the surviving entity. However, you will receive <u>NO PAYMENT</u> in respect of your CVR Interest until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2.    **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3.  **Severance Benefits** – Any amounts due in respect of a CVR Interest granted under this letter are in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4.  **Benefits** – This CVR Interest is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company. However, since this CVR Interest represents unique compensation, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5.  **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from amounts due in respect of your CVR Interest.

6.  **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter. Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7.  **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates. Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration. Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company. Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

                                    Sincerely,

I have read, I understand, and I agree to the forgoing:

_____                    _____
Jeff Powers                                         Date

**EXHIBIT C**

# AGREEMENT AND GENERAL RELEASE

## (PLEASE READ CAREFULLY. THIS AGREEMENT AND GENERAL RELEASE HAS IMPORTANT LEGAL CONSEQUENCES)

This Agreement and General Release (the "Agreement") is between Atkins Nutritionals, Inc. (the "Company") and _____ ("Executive"). The term "The Company" shall include any subsidiaries or related companies, directors, officers, shareholders, employees, agents, attorneys, and successors of the Company.

IT IS AGREED THAT:

1. Executive's last date of employment with the Company is _____.

2. Ten (10) days after the date Executive executes this Agreement, the Company will pay Executive the payments and/or benefits described in a certain Severance Agreement executed by and between the Executive and the Company, dated _____, less applicable federal, state, and local legally required deductions (the "Payment"). Executive agrees that the Company owes Executive nothing else, including but not limited to wages or benefits.

3. In exchange for the payment, Executive understands that Executive releases and forever gives up the right to sue or make any claim whatsoever against the Company, for any reason whatsoever, including but not limited to any claim under contract and/or equity and/or any law, relating in any way to Executive's employment with the Company or the termination of that employment. This waiver of claims includes any claims of discrimination on any grounds, whether or not Executive has previously filed such a claim. Executive understands that Executive is giving up any rights or claims which Executive may have under the numerous laws and regulations regulating employment, whether on the federal, state, or local level, including, but not limited to, the Age Discrimination in Employment Act of 1967, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Fair Labor Standards Act, the Equal Pay Act, and the New York State Human Rights Law.

4. Executive agrees that Executive has returned to the Company any and all identification cards, files, books, records, materials, equipment or documents in Executive's possession which were provided to or obtained by Executive in connection with Executive's employment.

5. It is understood and agreed that Executive will not talk about, discuss or communicate with anyone, orally or in writing, concerning the matter which is the subject of this Agreement or any aspect of Executive's employment with the Company except Executive may (i) discuss this Agreement with Executive's spouse and children,

(ii) permit Executive's accountant to review this Agreement in connection with the filing of tax returns, (iii) permit attorney(s) of Executive's choice to review this Agreement, and (iv) testify truthfully under oath pursuant to a subpoena (in which event Executive will provide The Company with prompt notice of the subpoena).

6. Executive represents that Executive is not aware of any breach of contract, wrongdoing or liability by the Company, and Executive expressly agrees that this Agreement is not and shall not in any way be deemed to constitute an admission or evidence of any breach of contract, wrongdoing or liability on the part of the Company, nor of any violation of any federal, state or municipal statute, regulation or principle of common law or equity.

7. Executive acknowledges that Executive has received a copy of this Agreement and that The Company has informed Executive that Executive should consult with an attorney in connection with it. Executive acknowledges that Executive's decision to consult with an attorney or not to consult with an attorney was made without influence by the Company. Executive further acknowledges that Executive has had at least 21 days in which to consider, execute, and return this Agreement. Notwithstanding Executive's right to consider this Agreement for 21 days, if Executive signs this Agreement before the expiration of the 21-day period, Executive will have done so knowingly and voluntarily, and will have expressly waived Executive's right to consider this Agreement for the balance of the 21-day period.

8. This Agreement shall not become effective until seven (7) days after the date Executive executes the Agreement, and Executive may cancel this Agreement within seven (7) days of the date Executive executes it, except that any cancellation must be in writing, signed by Executive, and delivered to the Company.

9. This Agreement is made in the State of New York. This Agreement is to be interpreted under the law of the State of New York.

10. EXECUTIVE ACKNOWLEDGES THAT EXECUTIVE HAS CAREFULLY READ THIS AGREEMENT; THAT EXECUTIVE HAS HAD AT LEAST 21 DAYS IN WHICH TO CONSIDER AND RETURN THIS AGREEMENT; THAT EXECUTIVE HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF EXECUTIVE'S CHOICE IN CONNECTION WITH THIS AGREEMENT; THAT EXECUTIVE FULLY UNDERSTANDS THE TERMS, CONDITIONS, AND SIGNIFICANCE AND CONSEQUENCES OF THIS AGREEMENT; AND THAT EXECUTIVE HAS EXECUTED THIS AGREEMENT KNOWINGLY AND VOLUNTARILY, AND OF EXECUTIVE'S OWN FREE WILL.

**ATKINS NUTRITIONALS, INC.**

By:_____          _____

# EMPLOYMENT AGREEMENT

**AGREEMENT**, dated as of the ___ day of December 2005, (the "<u>Effective Date</u>") by and between Atkins Nutritionals, Inc., a New York corporation (the "<u>Company</u>"), and Steve Galinski, a resident of East Setauket, New York (the "<u>Executive</u>").

**WHEREAS,** the Company desires to engage the services of Executive and Executive desires to be employed by the Company on the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of such employment and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Executive agree as follows:

1. **Employment and Position.** The Company hereby employs Executive as its Vice President, Customer Support and Logistics, and Executive hereby accepts such employment under and subject to the terms and conditions hereinafter set forth.

2. **Employment Period.** This Agreement shall begin on the Effective Date, as such term is defined in the Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated November 16, 2005, of Atkins Nutritionals, Inc., et al (the "<u>Plan of Reorganization</u>"), and shall expire on the third (3rd) anniversary of the Effective Date unless terminated earlier in accordance with Section 6 of this Agreement (such period, the "<u>Employment Period</u>"). The Employment Period may be extended and renewed automatically for successive one-year periods (each, an "<u>Extension Period</u>") unless the Company gives notice to Executive of its desire not to extend and renew at least one hundred twenty (120) days prior to the end of the Employment Period or any Extension Period. If the Company fails to renew this Agreement, such employment termination shall be treated as a termination without Cause. If Executive fails to renew this Agreement, it shall be treated as a resignation without Good Reason.

3. **Duties.** During the Employment Period, Executive shall perform services in a managerial capacity in a manner consistent with Executive's position as Vice President, Customer Support and Logistics, subject to the general supervision of the Chief Executive Officer of the Company. Executive hereby agrees to devote his full business time to the faithful performance of such duties and to the promotion and forwarding of the business and affairs of the Company during the Employment Period, <u>provided</u>, <u>however</u>, that Executive shall be permitted to (i) engage in other activities of a civic, religious, political or charitable nature, (ii) manage investments of Executive and Executive's family in securities, mutual funds or other collective investment funds, limited partner interests or similar passive investments, (iii) engage in the corporate directorships and other business activities, as may hereafter be specifically approved in writing by the Chief Executive Officer of the Company, which in each case and in the aggregate do not materially interfere with the performance of his obligations hereunder.

4. **Compensation**

(a) <u>Salary</u>. In consideration of the services rendered by Executive under this Agreement, the Company shall pay Executive a base salary (the "<u>Base Salary</u>") at the rate of

$160,000 per calendar year. The Base Salary shall be paid in such installments and at such times as the Company pays its salaried executives and shall be subject to all necessary withholding taxes, FICA contributions and similar deductions. The Board of Directors (the "Board") of the Company shall annually review the Base Salary payable to Executive hereunder and may, in its reasonable discretion, increase but not decrease, Executive's salary rate. Any such increased salary shall be and become the "Base Salary" for purposes of this Agreement.

(b) Performance Bonus. During the Employment Period, the Company shall maintain an annual bonus program for its employees. Executive shall be a participant in the annual bonus program and shall have an annual target bonus opportunity of not less than fifty percent (50%) of Base Salary (such annual target bonus opportunity, as adjusted from time to time hereafter, "Target Annual Bonus"). A schedule setting forth minimum and maximum payments under the bonus plan is set forth as Schedule I hereto, however, the actual performance targets for payment of the Target Annual Bonus shall be established annually by a committee of the Board responsible for executive compensation. Any Target Annual Bonus payable to Executive shall be pro-rated for any period of service less than a full year. Except as otherwise provided herein, the annual bonus shall be paid no later than March 15 of the year following the year to which the annual bonus relates, however, if the annual bonus program establishes quarterly or bi-annual performance incentives, bonus payments shall be made in quarterly or bi-annual installments, as the case may be.

(c) Emergence Bonus. On the Effective Date, the Company shall pay Executive a cash amount equal to $61,000, which amount represents the amount due under the Emergence Bonus Program under the Atkins Nutritionals, Inc. Management Incentive Plan (the "Atkins MIP").

(d) Sale Bonus. Executive shall participate in the Sale Bonus Program under the Atkins MIP, in accordance with the participation letter attached hereto as Exhibit A.

(e) CVR Interest. The Company shall also grant Executive a CVR Interest under the Equity Compensation Program of the Atkins MIP, in accordance with the participation letter attached hereto as Exhibit B.

**5. Benefits.** During the Employment Period Executive and/or Executive's family, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare benefit plans, programs, practices and policies provided generally by the Company to similarly-situated executives of the Company (including, without limitation, any medical, prescription, dental, disability, employee life, group life, accidental death and travel accident insurance plans and programs that may be provided by the Company from time to time). Such plans, programs, practices and policies are subject to change from time to time by the Company.

**6. Employment Termination.**

(a) Severance Date. Executive's employment shall terminate on the earliest to occur of (i) the date of Executive's death, (ii) the date the Company terminates his employment for any reason, (iii) the date Executive resigns his employment for any reason, or

(iv) the last day of the Employment Period or any Extension Period (such date, the "Severance Date").

(b) Notice of Termination. If the Company terminates Executive's employment for Cause (defined below) or if Executive resigns for Good Reason, the Company, or Executive as the case may be shall provide at least thirty (30) days advance written notice (at least sixty (60) days in the case of the Company's termination without Cause) of the Severance Date, to the extent applicable, an explanation in reasonable detail of the facts and circumstances claimed to provide a basis for termination under the provision so indicated. The failure by Executive or the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Good Reason or Cause shall not waive any right of Executive or the Company, respectively, hereunder or preclude Executive or the Company, respectively, from asserting such fact or circumstance in enforcing Executive's or the Company's rights hereunder. In the event of a termination without Cause, the Company shall provide Executive with at least sixty (60) days notice of the Severance Date.

(c) Disability. The Company shall provide Executive with at least thirty (30) days advance written notice that it is terminating Executive's employment on account of Disability and the Severance Date shall be effective as of the date specified in the notice of termination unless Executive shall have returned to full-time performance of Executive's duties under this Agreement. For purposes of this Agreement, "Disability" shall mean the absence or inability of Executive to perform his duties under this Agreement on a full-time basis for either (i) one hundred eighty (180) consecutive days or (ii) for the aggregate of any two hundred seventy (270) days within any consecutive twelve (12) month period, as a result of incapacity due to mental or physical illness which is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to Executive or Executive's legal representative.

(d) Termination for Cause. Executive's employment may be terminated by the Company at any time for Cause which shall be effective thirty (30) days following receipt of written notice by Executive. For purposes of this Agreement, "Cause" means a determination by the Board that one or more of the following has occurred:

(i) Executive shall have been convicted of, or have plead guilty or *nolo contendere* to, any felony or misdemeanor involving fraud or dishonesty;

(ii) Executive's gross misconduct, which is substantially injurious to the business or reputation of the Company as determined in good faith and in the reasonable judgment of the Board;

(iii) Executive shall have committed any fraud, embezzlement, misappropriation of funds, misrepresentation, or breach of fiduciary duty against the Company;

(iv) the willful and continued failure of Executive to perform substantially Executive's duties with the Company (other than any such failure resulting from incapacity due to physical or mental illness), for a period of thirty (30) days after a written demand for

performance is delivered to Executive by the Board which specifically identifies the manner in which the Board believes that Executive has not substantially performed Executive's duties; or

(v)     a material breach by Executive of his obligations under Section 8 of this Agreement, which breach is not cured by Executive within thirty (30) days after receipt of notice thereof from the Company setting forth the alleged breach in reasonable detail.

(e)     <u>Resignation for Good Reason</u>.  Executive shall provide the Company with at least thirty (30) days notice that he is resigning his employment for Good Reason.  For purposes of this Agreement, "<u>Good Reason</u>" means:

(i)     the assignment to Executive of any duties inconsistent in any material respect with Executive's position, authority, duties or responsibilities, a change in Executive's title, or any other action by the Company which results in a material and permanent diminution in such position, authority, duties or responsibilities;

(ii)     any failure by the Company to comply with any of the provisions of Section 4 or 5 of this Agreement;

(iii)     a breach by the Company of any material provision of this Agreement, that is not cured by the Company within 20 days after receipt of notice thereof from Executive setting forth the alleged breach in reasonable detail;

(iv)     any requirement of the Company that Executive be based anywhere other than the Company's headquarters in Melville, New York, unless such new location is closer to Executive's primary residence or is located in Manhattan, New York; or

(v)     the occurrence of a Change of Control (as defined below).

For purposes of this Agreement, any good faith determination of Good Reason made by Executive shall be conclusive; <u>provided</u>, <u>however</u>, any isolated, insubstantial and inadvertent action taken in good faith that is remedied by the Company promptly after receipt of notice thereof shall not constitute Good Reason.

(f)     <u>Change of Control Defined</u>.  "<u>Change of Control</u>" shall have the meaning set forth in the Atkins MIP, as in effect on the Effective Date hereof.

**7.     Effect of Employment Termination.**

(a)     <u>Survival of Certain Provisions</u>.  Following Executive's employment termination, neither party shall have any further obligation to the other party, except as may be required by law (such as the benefit continuation provisions of COBRA), Section 7 (Effect of Employment Termination), Section 8 (Restrictive Covenants), Section 9 (Directors and Officers Liability Insurance; Indemnification), Section 10 (Dispute Resolution) and Section 11 (Successors and Assigns) shall survive for the periods (if any) specified in such Sections.

(b)     <u>Accrued Benefits</u>.  If Executive's employment terminates for any reason, the Company shall pay to Executive (or his estate) (i) all salary and bonuses earned or accrued

through the Severance Date on the next regularly scheduled pay date; (ii) all reimbursements due to Executive in accordance with the Company's regular reimbursement policy; and (iii) all other payments and benefits to which Executive may be entitled under the terms of any applicable compensation arrangement or benefit plan or program of the Company, including, without limitation, any earned and accrued but unused PTO pay.

(c)     Death Benefit.  In the event Executive's employment with the Company is terminated due to his death, then in addition to the accrued benefits described above Executive's estate or beneficiaries, as the case may be, shall be entitled to receive no later than thirty (30) days following Executive's death, (i) a lump sum cash payment equal to six (6) month's Base Salary, and (ii) a pro rata bonus for any incomplete performance period at the time Executive's death occurs, assuming that Executive would have received a bonus equal to 100% of the Target Annual Bonus.

(d)     Disability.  In the event Executive's employment with the Company is terminated due to his Disability, then in addition to the accrued benefits described above Executive shall be entitled to receive his Base Salary until the expiration of the month following the Severance Date.

(e)     Severance Benefits.  If Executive's employment is terminated by the Company without Cause (other than due to Executive's death or Disability) or by Executive for Good Reason then, in addition to the accrued benefits described above in this Section 7, as his exclusive right and remedy in respect of such employment termination.

(i)     Severance Pay.  The Company shall provide to Executive, a lump sum cash amount equal to 0.5 times the sum of (i) Executive's annual Base Salary and (ii) Executive's Target Annual Bonus;

(ii)     Benefit Continuation.  For six (6) months following the Severance Date, the Company shall continue to keep in full force and effect all policies of medical, dental and accident insurance with respect to Executive and his dependents with the same level of coverage, upon the same terms and otherwise to the same extent as such policies shall have been in effect immediately prior to the Severance Date, and the Company and Executive shall share the costs of the continuation of such insurance coverage in the same proportion as such costs were shared immediately prior to the Severance Date; provided that, if Executive becomes eligible during such period to participate in another group plan with respect to any such policies by reason of subsequent employment or otherwise, Executive's coverage under the Company policies will terminate in accordance with the transition of coverage provisions in the Company's policies;

(iii)     Outplacement.  The Company shall provide Executive with executive level outplacement services through a reputable outplacement firm; and

(iv)     All Other Benefits Cease.  Effective on the day after the Severance Date, Executive shall cease to participate in any other plan, benefit, program or

arrangement providing employee benefits or perquisites offered by the Company.

(f)     <u>Release</u>.  As a condition precedent to Executive's right to receive the payments and/or benefits described in Section 7(e), Executive shall execute, on or about the date of Executive's termination, a general release (the "<u>Release</u>") in favor of the Company in substantially the form annexed hereto as <u>Exhibit C</u>.  Executive shall have twenty one (21) days in which to execute and return the Release.  Any cash payment due to Executive pursuant to Section 7(e) shall be paid in a single lump sum no later than two (2) weeks after the date the Release is executed and delivered to the Company (the "<u>Release Date</u>"); <u>provided</u>, <u>however</u>, that if the Company is treated as a corporation whose securities are publicly traded on an established securities market for purposes of Section 409A of the Internal Revenue Code of 1986, as amended, then payment shall be delayed until six (6) months following the Severance Date to the extent required by such law.

(g)     <u>No Mitigation</u>.  The Company's obligation to make any payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against Executive or others.  In no event shall Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to Executive under any of the provisions of this Agreement.

**8.     Restrictive Covenants.**

(a)     <u>Non-Competition</u>.  Executive shall not, during the Employment Period or any Extension Period and for the six-month period thereafter, engage in, or otherwise directly or indirectly be associated with, or act as an independent contractor or consultant for or to, or be a director, officer, employee, owner or partner of, any other business or organization, whether or not such business or organization is now or shall then be competing with the Company or any affiliate, or invest in the securities of any other business or organization if such business or organization whose primary business is related to developing, marketing or distributing very low carbohydrate nutritional bars and/or nutritional beverages that derive no more than ten percent (10%) of their caloric content from carbohydrates in the United States (the "<u>Competitive Business</u>"), except that Executive shall not be precluded from owning, solely as an investment, securities of any such business or organization if (i) the securities are publicly traded on a national or regional stock exchange or on the over-the-counter market, (ii) Executive is neither a controlling person or a member of a group which controls such business or organization, and (iii) Executives does not, directly or indirectly, own five percent (5%) or more of such business or organization.

(b)     <u>Non-Solicitation</u>.  During the Employment Period or any Extension Period and for the six-month period thereafter, Executive shall not directly or indirectly, solicit or entice, or endeavor to solicit or entice any of the employees of the Company or any affiliate to quit or abandon their employment or engagement with the Company nor shall he call upon, solicit, divert or attempt to solicit or divert from the Company or any of its affiliates any of their customers or suppliers or potential customers or suppliers, of whose names he was aware during the Employment Period; <u>provided</u>, <u>however</u>, that nothing in this Section 8(b) shall be deemed to

prohibit Executive from calling upon or soliciting a customer or supplier if such action relates solely to a business which is not a Competitive Business.

(c)     Non-Disclosure and Non-Use of Confidential Business Information. During the Employment Period or any Extension Period and thereafter, Executive shall not disclose to any third person any Confidential Business Information (as hereinafter defined) and shall not use any such information for his own benefit or for the benefit of any third person, either during the Employment Period or thereafter, whether such information was obtained or conceived by Executive or others, without the prior written consent of the Board of Directors.

(d)     Confidential Business Information. For purposes of this Agreement, the term "Confidential Business Information", includes without limitation, "know-how", trade secrets, customer lists, details of client or executive contracts, pricing policies, bidding practices and procedures, operational methods, marketing plans or strategies, project development techniques or plans, business acquisition plans, financial results or projections, budgets, capital spending plans, other financial matters, new personnel acquisition plans, methods of production, manufacture and installation, technical processes, designs and design projects, inventions and research projects of the Company or any affiliate learned by Executive heretofore or during the Employment Period.

Confidential Business Information shall not include: (i) information which at the time of the disclosure is, or subsequently becomes, generally part of the public domain through no breach of the terms hereof by Executive; or (ii) information which is lawfully acquired from a third party who did not breach a confidential obligation by disclosing the same to Executive; (iii) information which was known by Executive prior to the date of commencement of Executive's employment with the Company; or (iv) information which is required to be disclosed to comply with the applicable laws, governmental rules or regulations, subpoenas or court order.

(e)     Return of Business Documents. All memoranda, notes, letters, documents, tapes and other media of every kind and description (whether electronic, paper or otherwise) and all copies thereof (i) containing Confidential Business Information, or (ii) made or compiled by or on behalf of Executive in the course of performing his duties for the Company or any affiliate (or made available to Executive relating to the Company or any affiliate during the Employment Period), (collectively, "Business Documents"), are and shall be the sole and exclusive property of the Company (or affiliate, as applicable). Executive shall surrender to the Company at the time his employment terminates, or at such other time or times as the Chief Executive Officer of the Company may specify all Business Documents then in Executive's possession or control.

(f)     Inventions and Patents. Executive shall promptly deliver to the Company (and no one else) all improvements, discoveries, ideas and inventions that may be of significance to the Company or any affiliate, made or conceived by Executive alone or in conjunction with others (whether or not patentable and whether or not conceived at the request of or upon the suggestion of the Company or other affiliate Group) in the course of providing services under this Agreement, or made or conceived within one (1) year after the Severance Date, if resulting from, suggested by or relating to such services. All such improvements, discoveries, ideas and

inventions shall be the sole and exclusive property of the Company and are hereby assigned to the Company. At the request and cost of the Company, Executive shall assist the Company or its designee in obtaining patents or other proprietary rights registrations or confirmations relating to such improvements, discoveries, ideas and inventions, and shall in connection therewith execute such applications, statements and other documents, furnish such information and take such other action (including but not limited to, testifying) as the Company may from time to time reasonably request.

(g)    Professional Work. All works and writings of a professional nature which are produced by Executive during the Employment Period and that are related to his services under this Agreement ("Professional Work") constitute works made for hire and are the sole and absolute property of the Company. Executive grants the Company the exclusive right to copyright all such Professional Work in the United States and in foreign jurisdictions. To the extent any such Professional Work is deemed to not be works for hire, Executive hereby assigns and agrees to assign all his interests therein to the Company or its nominee. Whenever requested to do so by the Company, Executive shall execute any and all applications, assignments, or other instruments that the Company may deem necessary to protect the Company's interest therein.

(h)    Rights and Remedies upon Breach. If Executive breaches one or more of the restrictive covenants contained in this Section 8, the Company shall have the following rights and remedies, each of which shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity:

(i)    Specific Performance. The right and remedy to have the restrictive covenants specifically enforced by any court of competent jurisdiction, without the necessity of proof of actual damage or posting of a bond, it being agreed that any breach of the restrictive covenants would cause irreparable injury to the Company and that money damages would not provide an adequate remedy to the Company.

(ii)    Accounting. The right and remedy to require the Executive to account for and pay to the Company all compensation, profits, monies, accruals, increments or other benefits derived or received by the Executive as the result of any transaction constituting a breach of the restrictive covenants.

9.    **Directors and Officers Liability Insurance; Indemnification.**

(a)    Directors and Officers Liability Insurance. The Company agrees that, notwithstanding a termination of his/her employment with the Company, the Company shall, for at least three (3) years after the Severance Date, have Executive included as a named insured or otherwise covered for actions or failures to act by Executive in his capacity as a director or officer of the Company to at least the same extent as other executive officers or directors, as the case may be, of the Company under any directors and officers liability insurance policies maintained by the Company.

(b)    Indemnification. The Company agrees that it will not alter the indemnification provisions in its certificate of incorporation or by-laws so as to give Executive

less protection thereunder with respect to periods during which Executive serves the Company as an executive officer or other employee than is afforded to Executive as of the Effective Date.

## 10. Dispute Resolution.

(a) <u>Arbitration</u>. Except as provided in Section 8(h) above, any and all disputes, controversies or claims arising or existing among or between the Company and Executive concerning any matter whatsoever shall be arbitrated in New York County, New York before the American Arbitration Association ("<u>AAA</u>") in accordance with the then prevailing Rules of Arbitration of the AAA, including, but not limited to, any and all claims or controversies arising under or concerning this Agreement.

(b) <u>Attorney's Fees</u>. If any contest or dispute shall arise under this Agreement involving termination of Executive's employment with the Company or involving the failure or refusal of the Company to perform fully in accordance with the terms hereof, the Company shall reimburse Executive, on a current basis, for all legal fees and expenses, if any, incurred by Executive in connection with such contest or dispute.

(c) <u>Governing Law; Consent to Jurisdiction; Venue</u>. The interpretation, construction and performance of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without regard to the principle of conflicts of laws.

## 11. Successors and Assigns.
The provisions of this Agreement shall be binding on and shall inure to the benefit of any successor in interest to the Company. The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as a sealed instrument as of the day and year first above written.

ATKINS NUTRITIONALS, INC.


By:_____
Name:
Title:



_____
Steve Galinski

## Schedule I

### Executive Bonus Schedule

| Percentage of Plan Achieved | Bonus Available as Percentage of Target Annual Bonus |
|---|---|
| 130 | 250% of Target |
| 120 | 200% of Target |
| 115 | 175% of Target |
| 110 | 150% of Target |
| 105 | 125% of Target |
| 100 | 100% of Target |
| 85 | 70% of Target |
| 80 | 50% of Target |
| Less than 80% | 0 |

Any level of Company performance which falls between two specific points set forth above under "Percentage of Plan Achieved" shall entitle Executive to receive a percentage of Base Salary determined on a straight-line basis between such two points. Such amount shall be calculated as follows:

$$[(A-B) \times .1] \times (C-D) + D$$

Where:

A = The actual percentage of plan achieved.

B = The Percentage of Plan set forth above which is less than and closest to actual results.

C = The Percentage Available as Percentage of Base Salary set forth above which is greater than and closest to the percentage that would apply based on actual results.

D = The Percentage Available as Percentage of Base Salary set forth above which is less than and closest to the percentage that would apply based on actual results.

## List of Exhibits

Exhibit A:    Sale Bonus Participation Letter
Exhibit B:    CVR Interest Participation Letter
Exhibit C:    Form of Release

**EXHIBIT A**

December ___, 2005

Steve Galinski
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

Re:     MIP Sale Bonus

Dear Steve:

This letter describes the terms of a Sale Bonus opportunity for you under the Atkins Nutritionals, Inc. Management Incentive Plan ("MIP").

1.     **Sale Bonus**

a.     **Bonus Amount** – 11.33% of the Sale Bonus Pool Amount.

"Sale Bonus Pool Amount" means one of the following amounts: depending on the amount of the Net Distributable Value on the Change of Control Consummation Date: (i) $1 million if the Net Distributable Value is equal to or greater than $125 million but less than $200 million, and (ii) $500,000, if the Net Distributable Value is equal to or greater than $200 million and equal to or less than $225 million.

b.     **Conditions to Payment** – The Sale Bonus will _only_ be payable if:

(i)     Change of Control – A Change of Control occurs on or before March 31, 2007; **AND**

(ii)     Employment – One of the following statements is true:

- You are employed by the Company on the date of the Change of Control; **OR**

- Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as

defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

**AND**

(iii) <u>Threshold Achieved</u> – The Net Distributable Value from the Change of Control is at least $125,000,000.

c. **Form and Timing of Payment** – Except as provided below, the Sale Bonus will be paid in one lump sum on the Change of Control Consummation Date.

(i) <u>Qualified IPO</u>. If the Change of Control is a Qualified IPO, your Sale Bonus will be paid six (6) months after the Change of Control Consummation Date with the Net Distributable Value determined based on the Net Distributable Value implied by the initial public offering price.

(ii) <u>Less than 80% Acquisition</u>. If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Atkins Nutritionals Holdings, Inc. ("<u>Holdings</u>") (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your Sale Bonus will be determined on the Change of Control Distribution Date. However, you will receive <u>NO PAYMENT</u> in respect of your Sale Bonus until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2. **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3. **Severance Benefits** – The Sale Bonus payable under this letter is in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4. **Benefits** – This Sale Bonus is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company. However, since this Sale Bonus represents a unique

payment to you, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5.  **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from your Sale Bonus payment.

6.  **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter. Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7.  **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates. Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration. Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company. Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,

I have read, I understand, and I agree to the forgoing:

_____                    _____

Steve Galinski                                                           Date

**EXHIBIT B**

December __, 2005

Steve Galinski
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

      Re:    <u>CVR Interest</u>

Dear Steve:

      This letter describes the terms of the CVR interest granted to you under the Atkins Nutritionals, Inc. Management Incentive Plan ("<u>MIP</u>").

1.     **CVR Interest**

     a.     **CVR Interest** – 11.33% of the Implied Equity Value Pool.

          "<u>Implied Equity Value Pool</u>" shall be an amount determined in accordance with the following table:

| Implied Equity Value (in millions) | Implied Equity Value Pool |
|---|---|
| $0.0 | NA |
| 15.0 | 1.7000% |
| 40.0 | 2.5125% |
| 65.0 | 3.0846% |
| 90.0 | 3.6167% |
| 115.0 | 4.2435% |
| 140.0 | 4.8250% |
| 165.0 | 5.3818% |
| 190.0 | 5.7921% |
| 215.0 | 6.1070% |
| 240.0 | 6.3563% |
| 265.0 | 6.5113% |
| 290.0 | 6.5534% |
| 315.0 | 6.5889% |
| *340.0 and above* | 6.6191% (plan max) |

     b.     **Conditions to Settlement** – You will <u>*only*</u> be entitled to a settlement in respect of your CVR Interest if:

          (i)     <u>Employment</u> – One of the following statements is true:

- You are employed by the Company on the date of the Change of Control; **OR**

- Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

**AND**

(ii)     Threshold Achieved – The Net Distributable Value from the Change of Control is at least $125,000,000.

c.     **Form and Timing of CVR Interest Settlement** – Except as provided below, your CVR Interest will be settled by the payment of a lump sum cash amount on the Change of Control Consummation Date.

(i)     Qualified IPO. If the Change of Control is a Qualified IPO, your CVR Interest will be settled in the voting equity securities of Atkins Nutritionals Holdings, Inc. ("Holdings") or the surviving entity with the implied equity value determined based on the Net Distributable Value implied by the initial public offering price.

(ii)     Less than 80% Acquisition. If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Holdings (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your CVR Interest will be determined on the Change of Control Distribution Date and settled in the voting equity securities of Holdings or the surviving entity. However, you will receive NO PAYMENT in respect of your CVR Interest until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2.     **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3. **Severance Benefits** – Any amounts due in respect of a CVR Interest granted under this letter are in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4. **Benefits** – This CVR Interest is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company. However, since this CVR Interest represents unique compensation, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5. **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from amounts due in respect of your CVR Interest.

6. **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter. Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7. **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates. Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration. Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company. Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,

I have read, I understand, and I agree to the forgoing:

_____    _____
Steve Galinski                                    Date

**EXHIBIT C**

# AGREEMENT AND GENERAL RELEASE

## (PLEASE READ CAREFULLY. THIS AGREEMENT AND GENERAL RELEASE HAS IMPORTANT LEGAL CONSEQUENCES)

This Agreement and General Release (the "Agreement") is between Atkins Nutritionals, Inc. (the "Company") and _____ ("Executive"). The term "The Company" shall include any subsidiaries or related companies, directors, officers, shareholders, employees, agents, attorneys, and successors of the Company.

IT IS AGREED THAT:

    1. Executive's last date of employment with the Company is _____.

    2. Ten (10) days after the date Executive executes this Agreement, the Company will pay Executive the payments and/or benefits described in a certain Severance Agreement executed by and between the Executive and the Company, dated _____, less applicable federal, state, and local legally required deductions (the "Payment"). Executive agrees that the Company owes Executive nothing else, including but not limited to wages or benefits.

    3. In exchange for the payment, Executive understands that Executive releases and forever gives up the right to sue or make any claim whatsoever against the Company, for any reason whatsoever, including but not limited to any claim under contract and/or equity and/or any law, relating in any way to Executive's employment with the Company or the termination of that employment. This waiver of claims includes any claims of discrimination on any grounds, whether or not Executive has previously filed such a claim. Executive understands that Executive is giving up any rights or claims which Executive may have under the numerous laws and regulations regulating employment, whether on the federal, state, or local level, including, but not limited to, the Age Discrimination in Employment Act of 1967, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Fair Labor Standards Act, the Equal Pay Act, and the New York State Human Rights Law.

    4. Executive agrees that Executive has returned to the Company any and all identification cards, files, books, records, materials, equipment or documents in Executive's possession which were provided to or obtained by Executive in connection with Executive's employment.

    5. It is understood and agreed that Executive will not talk about, discuss or communicate with anyone, orally or in writing, concerning the matter which is the subject of this Agreement or any aspect of Executive's employment with the Company except Executive may (i) discuss this Agreement with Executive's spouse and children,

(ii) permit Executive's accountant to review this Agreement in connection with the filing of tax returns, (iii) permit attorney(s) of Executive's choice to review this Agreement, and (iv) testify truthfully under oath pursuant to a subpoena (in which event Executive will provide The Company with prompt notice of the subpoena).

6. Executive represents that Executive is not aware of any breach of contract, wrongdoing or liability by the Company, and Executive expressly agrees that this Agreement is not and shall not in any way be deemed to constitute an admission or evidence of any breach of contract, wrongdoing or liability on the part of the Company, nor of any violation of any federal, state or municipal statute, regulation or principle of common law or equity.

7. Executive acknowledges that Executive has received a copy of this Agreement and that The Company has informed Executive that Executive should consult with an attorney in connection with it. Executive acknowledges that Executive's decision to consult with an attorney or not to consult with an attorney was made without influence by the Company. Executive further acknowledges that Executive has had at least 21 days in which to consider, execute, and return this Agreement. Notwithstanding Executive's right to consider this Agreement for 21 days, if Executive signs this Agreement before the expiration of the 21-day period, Executive will have done so knowingly and voluntarily, and will have expressly waived Executive's right to consider this Agreement for the balance of the 21-day period.

8. This Agreement shall not become effective until seven (7) days after the date Executive executes the Agreement, and Executive may cancel this Agreement within seven (7) days of the date Executive executes it, except that any cancellation must be in writing, signed by Executive, and delivered to the Company.

9. This Agreement is made in the State of New York. This Agreement is to be interpreted under the law of the State of New York.

10. EXECUTIVE ACKNOWLEDGES THAT EXECUTIVE HAS CAREFULLY READ THIS AGREEMENT; THAT EXECUTIVE HAS HAD AT LEAST 21 DAYS IN WHICH TO CONSIDER AND RETURN THIS AGREEMENT; THAT EXECUTIVE HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF EXECUTIVE'S CHOICE IN CONNECTION WITH THIS AGREEMENT; THAT EXECUTIVE FULLY UNDERSTANDS THE TERMS, CONDITIONS, AND SIGNIFICANCE AND CONSEQUENCES OF THIS AGREEMENT; AND THAT EXECUTIVE HAS EXECUTED THIS AGREEMENT KNOWINGLY AND VOLUNTARILY, AND OF EXECUTIVE'S OWN FREE WILL.

**ATKINS NUTRITIONALS, INC.**

By:_____     _____

# EMPLOYMENT AGREEMENT

**AGREEMENT**, dated as of the ___ day of December 2005, (the "<u>Effective Date</u>") by and between Atkins Nutritionals, Inc., a New York corporation (the "<u>Company</u>"), and Beth Neumann, a resident of New York, New York (the "<u>Executive</u>").

**WHEREAS,** the Company desires to engage the services of Executive and Executive desires to be employed by the Company on the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of such employment and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Executive agree as follows:

1. **Employment and Position.** The Company hereby employs Executive as its Vice President and Chief Marketing Officer, and Executive hereby accepts such employment under and subject to the terms and conditions hereinafter set forth.

2. **Employment Period.** This Agreement shall begin on the Effective Date, as such term is defined in the Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated November 16, 2005, of Atkins Nutritionals, Inc., et al (the "<u>Plan of Reorganization</u>"), and shall expire on the third (3rd) anniversary of the Effective Date unless terminated earlier in accordance with Section 6 of this Agreement (such period, the "<u>Employment Period</u>"). The Employment Period may be extended and renewed automatically for successive one-year periods (each, an "<u>Extension Period</u>") unless the Company gives notice to Executive of its desire not to extend and renew at least one hundred twenty (120) days prior to the end of the Employment Period or any Extension Period. If the Company fails to renew this Agreement, such employment termination shall be treated as a termination without Cause. If Executive fails to renew this Agreement, it shall be treated as a resignation without Good Reason.

3. **Duties.** During the Employment Period, Executive shall perform services in a managerial capacity in a manner consistent with Executive's position as Vice President and Chief Marketing Officer, subject to the general supervision of the Chief Executive Officer of the Company. Executive hereby agrees to devote his full business time to the faithful performance of such duties and to the promotion and forwarding of the business and affairs of the Company during the Employment Period, <u>provided</u>, <u>however</u>, that Executive shall be permitted to (i) engage in other activities of a civic, religious, political or charitable nature, (ii) manage investments of Executive and Executive's family in securities, mutual funds or other collective investment funds, limited partner interests or similar passive investments, (iii) engage in the corporate directorships and other business activities, as may hereafter be specifically approved in writing by the Chief Executive Officer of the Company, which in each case and in the aggregate do not materially interfere with the performance of his obligations hereunder.

4. **Compensation**

(a) <u>Salary</u>. In consideration of the services rendered by Executive under this Agreement, the Company shall pay Executive a base salary (the "<u>Base Salary</u>") at the rate of

$170,000 per calendar year. The Base Salary shall be paid in such installments and at such times as the Company pays its salaried executives and shall be subject to all necessary withholding taxes, FICA contributions and similar deductions. The Board of Directors (the "Board") of the Company shall annually review the Base Salary payable to Executive hereunder and may, in its reasonable discretion, increase but not decrease, Executive's salary rate. Any such increased salary shall be and become the "Base Salary" for purposes of this Agreement.

(b)  Performance Bonus. During the Employment Period, the Company shall maintain an annual bonus program for its employees. Executive shall be a participant in the annual bonus program and shall have an annual target bonus opportunity of not less than fifty percent (50%) of Base Salary (such annual target bonus opportunity, as adjusted from time to time hereafter, "Target Annual Bonus"). A schedule setting forth minimum and maximum payments under the bonus plan is set forth as Schedule I hereto, however, the actual performance targets for payment of the Target Annual Bonus shall be established annually by a committee of the Board responsible for executive compensation. Any Target Annual Bonus payable to Executive shall be pro-rated for any period of service less than a full year. Except as otherwise provided herein, the annual bonus shall be paid no later than March 15 of the year following the year to which the annual bonus relates, however, if the annual bonus program establishes quarterly or bi-annual performance incentives, bonus payments shall be made in quarterly or bi-annual installments, as the case may be.

(c)  Emergence Bonus. On the Effective Date, the Company shall pay Executive a cash amount equal to $55,000, which amount represents the amount due under the Emergence Bonus Program under the Atkins Nutritionals, Inc. Management Incentive Plan (the "Atkins MIP").

(d)  Sale Bonus. Executive shall participate in the Sale Bonus Program under the Atkins MIP, in accordance with the participation letter attached hereto as Exhibit A.

(e)  CVR Interest. The Company shall also grant Executive a CVR Interest under the Equity Compensation Program of the Atkins MIP, in accordance with the participation letter attached hereto as Exhibit B.

**5.  Benefits.** During the Employment Period Executive and/or Executive's family, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare benefit plans, programs, practices and policies provided generally by the Company to similarly-situated executives of the Company (including, without limitation, any medical, prescription, dental, disability, employee life, group life, accidental death and travel accident insurance plans and programs that may be provided by the Company from time to time). Such plans, programs, practices and policies are subject to change from time to time by the Company.

**6.  Employment Termination.**

(a)  Severance Date. Executive's employment shall terminate on the earliest to occur of (i) the date of Executive's death, (ii) the date the Company terminates his employment for any reason, (iii) the date Executive resigns his employment for any reason, or

(iv) the last day of the Employment Period or any Extension Period (such date, the "Severance Date").

(b)     Notice of Termination.     If the Company terminates Executive's employment for Cause (defined below) or if Executive resigns for Good Reason, the Company, or Executive as the case may be shall provide at least thirty (30) days advance written notice (at least sixty (60) days in the case of the Company's termination without Cause) of the Severance Date, to the extent applicable, an explanation in reasonable detail of the facts and circumstances claimed to provide a basis for termination under the provision so indicated.   The failure by Executive or the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Good Reason or Cause shall not waive any right of Executive or the Company, respectively, hereunder or preclude Executive or the Company, respectively, from asserting such fact or circumstance in enforcing Executive's or the Company's rights hereunder.   In the event of a termination without Cause, the Company shall provide Executive with at least sixty (60) days notice of the Severance Date.

(c)     Disability.   The Company shall provide Executive with at least thirty (30) days advance written notice that it is terminating Executive's employment on account of Disability and the Severance Date shall be effective as of the date specified in the notice of termination unless Executive shall have returned to full-time performance of Executive's duties under this Agreement.   For purposes of this Agreement, "Disability" shall mean the absence or inability of Executive to perform his duties under this Agreement on a full-time basis for either (i) one hundred eighty (180) consecutive days or (ii) for the aggregate of any two hundred seventy (270) days within any consecutive twelve (12) month period, as a result of incapacity due to mental or physical illness which is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to Executive or Executive's legal representative.

(d)     Termination for Cause.   Executive's employment may be terminated by the Company at any time for Cause which shall be effective thirty (30) days following receipt of written notice by Executive.   For purposes of this Agreement, "Cause" means a determination by the Board that one or more of the following has occurred:

(i)     Executive shall have been convicted of, or have plead guilty or *nolo contendere* to, any felony or misdemeanor involving fraud or dishonesty;

(ii)     Executive's gross misconduct, which is substantially injurious to the business or reputation of the Company as determined in good faith and in the reasonable judgment of the Board;

(iii)     Executive shall have committed any fraud, embezzlement, misappropriation of funds, misrepresentation, or breach of fiduciary duty against the Company;

(iv)     the willful and continued failure of Executive to perform substantially Executive's duties with the Company (other than any such failure resulting from incapacity due to physical or mental illness), for a period of thirty (30) days after a written demand for

performance is delivered to Executive by the Board which specifically identifies the manner in which the Board believes that Executive has not substantially performed Executive's duties; or

(v)    a material breach by Executive of his obligations under Section 8 of this Agreement, which breach is not cured by Executive within thirty (30) days after receipt of notice thereof from the Company setting forth the alleged breach in reasonable detail.

(e)    <u>Resignation for Good Reason</u>.  Executive shall provide the Company with at least thirty (30) days notice that he is resigning his employment for Good Reason.  For purposes of this Agreement, "<u>Good Reason</u>" means:

(i)    the assignment to Executive of any duties inconsistent in any material respect with Executive's position, authority, duties or responsibilities, a change in Executive's title, or any other action by the Company which results in a material and permanent diminution in such position, authority, duties or responsibilities;

(ii)    any failure by the Company to comply with any of the provisions of Section 4 or 5 of this Agreement;

(iii)    a breach by the Company of any material provision of this Agreement, that is not cured by the Company within 20 days after receipt of notice thereof from Executive setting forth the alleged breach in reasonable detail;

(iv)    any requirement of the Company that Executive be based anywhere other than the Company's headquarters in Melville, New York, unless such new location is closer to Executive's primary residence or is located in Manhattan, New York; or

(v)    the occurrence of a Change of Control (as defined below).

For purposes of this Agreement, any good faith determination of Good Reason made by Executive shall be conclusive; <u>provided</u>, <u>however</u>, any isolated, insubstantial and inadvertent action taken in good faith that is remedied by the Company promptly after receipt of notice thereof shall not constitute Good Reason.

(f)    <u>Change of Control Defined</u>.  "<u>Change of Control</u>" shall have the meaning set forth in the Atkins MIP, as in effect on the Effective Date hereof.

**7.    Effect of Employment Termination.**

(a)    <u>Survival of Certain Provisions</u>.  Following Executive's employment termination, neither party shall have any further obligation to the other party, except as may be required by law (such as the benefit continuation provisions of COBRA), Section 7 (Effect of Employment Termination), Section 8 (Restrictive Covenants), Section 9 (Directors and Officers Liability Insurance; Indemnification), Section 10 (Dispute Resolution) and Section 11 (Successors and Assigns) shall survive for the periods (if any) specified in such Sections.

(b)    <u>Accrued Benefits</u>.  If Executive's employment terminates for any reason, the Company shall pay to Executive (or his estate) (i) all salary and bonuses earned or accrued

through the Severance Date on the next regularly scheduled pay date; (ii) all reimbursements due to Executive in accordance with the Company's regular reimbursement policy; and (iii) all other payments and benefits to which Executive may be entitled under the terms of any applicable compensation arrangement or benefit plan or program of the Company, including, without limitation, any earned and accrued but unused PTO pay.

(c)     Death Benefit. In the event Executive's employment with the Company is terminated due to his death, then in addition to the accrued benefits described above Executive's estate or beneficiaries, as the case may be, shall be entitled to receive no later than thirty (30) days following Executive's death, (i) a lump sum cash payment equal to six (6) month's Base Salary, and (ii) a pro rata bonus for any incomplete performance period at the time Executive's death occurs, assuming that Executive would have received a bonus equal to 100% of the Target Annual Bonus.

(d)     Disability. In the event Executive's employment with the Company is terminated due to his Disability, then in addition to the accrued benefits described above Executive shall be entitled to receive his Base Salary until the expiration of the month following the Severance Date.

(e)     Severance Benefits. If Executive's employment is terminated by the Company without Cause (other than due to Executive's death or Disability) or by Executive for Good Reason then, in addition to the accrued benefits described above in this Section 7, as his exclusive right and remedy in respect of such employment termination.

(i)     Severance Pay. The Company shall provide to Executive, a lump sum cash amount equal to 0.5 times the sum of (i) Executive's annual Base Salary and (ii) Executive's Target Annual Bonus;

(ii)    Benefit Continuation. For six (6) months following the Severance Date, the Company shall continue to keep in full force and effect all policies of medical, dental and accident insurance with respect to Executive and his dependents with the same level of coverage, upon the same terms and otherwise to the same extent as such policies shall have been in effect immediately prior to the Severance Date, and the Company and Executive shall share the costs of the continuation of such insurance coverage in the same proportion as such costs were shared immediately prior to the Severance Date; provided that, if Executive becomes eligible during such period to participate in another group plan with respect to any such policies by reason of subsequent employment or otherwise, Executive's coverage under the Company policies will terminate in accordance with the transition of coverage provisions in the Company's policies;

(iii)   Outplacement. The Company shall provide Executive with executive level outplacement services through a reputable outplacement firm; and

(iv)    All Other Benefits Cease. Effective on the day after the Severance Date, Executive shall cease to participate in any other plan, benefit, program or

arrangement providing employee benefits or perquisites offered by the Company.

(f)     Release.  As a condition precedent to Executive's right to receive the payments and/or benefits described in Section 7(e), Executive shall execute, on or about the date of Executive's termination, a general release (the "Release") in favor of the Company in substantially the form annexed hereto as Exhibit C.  Executive shall have twenty one (21) days in which to execute and return the Release.  Any cash payment due to Executive pursuant to Section 7(e) shall be paid in a single lump sum no later than two (2) weeks after the date the Release is executed and delivered to the Company (the "Release Date"); provided, however, that if the Company is treated as a corporation whose securities are publicly traded on an established securities market for purposes of Section 409A of the Internal Revenue Code of 1986, as amended, then payment shall be delayed until six (6) months following the Severance Date to the extent required by such law.

(g)     No Mitigation.  The Company's obligation to make any payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against Executive or others.  In no event shall Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to Executive under any of the provisions of this Agreement.

8.     **Restrictive Covenants.**

(a)     Non-Competition.  Executive shall not, during the Employment Period or any Extension Period and for the six-month period thereafter, engage in, or otherwise directly or indirectly be associated with, or act as an independent contractor or consultant for or to, or be a director, officer, employee, owner or partner of, any other business or organization, whether or not such business or organization is now or shall then be competing with the Company or any affiliate, or invest in the securities of any other business or organization if such business or organization whose primary business is related to developing, marketing or distributing very low carbohydrate nutritional bars and/or nutritional beverages that derive no more than ten percent (10%) of their caloric content from carbohydrates in the United States (the "Competitive Business"), except that Executive shall not be precluded from owning, solely as an investment, securities of any such business or organization if (i) the securities are publicly traded on a national or regional stock exchange or on the over-the-counter market, (ii) Executive is neither a controlling person or a member of a group which controls such business or organization, and (iii) Executives does not, directly or indirectly, own five percent (5%) or more of such business or organization.

(b)     Non-Solicitation.  During the Employment Period or any Extension Period and for the six-month period thereafter, Executive shall not directly or indirectly, solicit or entice, or endeavor to solicit or entice any of the employees of the Company or any affiliate to quit or abandon their employment or engagement with the Company nor shall he call upon, solicit, divert or attempt to solicit or divert from the Company or any of its affiliates any of their customers or suppliers or potential customers or suppliers, of whose names he was aware during the Employment Period; provided, however, that nothing in this Section 8(b) shall be deemed to

prohibit Executive from calling upon or soliciting a customer or supplier if such action relates solely to a business which is not a Competitive Business.

(c)     Non-Disclosure and Non-Use of Confidential Business Information. During the Employment Period or any Extension Period and thereafter, Executive shall not disclose to any third person any Confidential Business Information (as hereinafter defined) and shall not use any such information for his own benefit or for the benefit of any third person, either during the Employment Period or thereafter, whether such information was obtained or conceived by Executive or others, without the prior written consent of the Board of Directors.

(d)     Confidential Business Information.  For purposes of this Agreement, the term "Confidential Business Information", includes without limitation, "know-how", trade secrets, customer lists, details of client or executive contracts, pricing policies, bidding practices and procedures, operational methods, marketing plans or strategies, project development techniques or plans, business acquisition plans, financial results or projections, budgets, capital spending plans, other financial matters, new personnel acquisition plans, methods of production, manufacture and installation, technical processes, designs and design projects, inventions and research projects of the Company or any affiliate learned by Executive heretofore or during the Employment Period.

Confidential Business Information shall not include: (i) information which at the time of the disclosure is, or subsequently becomes, generally part of the public domain through no breach of the terms hereof by Executive; or (ii) information which is lawfully acquired from a third party who did not breach a confidential obligation by disclosing the same to Executive; (iii) information which was known by Executive prior to the date of commencement of Executive's employment with the Company; or (iv) information which is required to be disclosed to comply with the applicable laws, governmental rules or regulations, subpoenas or court order.

(e)     Return of Business Documents.   All memoranda, notes, letters, documents, tapes and other media of every kind and description (whether electronic, paper or otherwise) and all copies thereof (i) containing Confidential Business Information, or (ii) made or compiled by or on behalf of Executive in the course of performing his duties for the Company or any affiliate (or made available to Executive relating to the Company or any affiliate during the Employment Period), (collectively, "Business Documents"), are and shall be the sole and exclusive property of the Company (or affiliate, as applicable).  Executive shall surrender to the Company at the time his employment terminates, or at such other time or times as the Chief Executive Officer of the Company may specify all Business Documents then in Executive's possession or control.

(f)     Inventions and Patents.  Executive shall promptly deliver to the Company (and no one else) all improvements, discoveries, ideas and inventions that may be of significance to the Company or any affiliate, made or conceived by Executive alone or in conjunction with others (whether or not patentable and whether or not conceived at the request of or upon the suggestion of the Company or other affiliate Group) in the course of providing services under this Agreement, or made or conceived within one (1) year after the Severance Date, if resulting from, suggested by or relating to such services.  All such improvements, discoveries, ideas and

inventions shall be the sole and exclusive property of the Company and are hereby assigned to the Company. At the request and cost of the Company, Executive shall assist the Company or its designee in obtaining patents or other proprietary rights registrations or confirmations relating to such improvements, discoveries, ideas and inventions, and shall in connection therewith execute such applications, statements and other documents, furnish such information and take such other action (including but not limited to, testifying) as the Company may from time to time reasonably request.

(g)     Professional Work.  All works and writings of a professional nature which are produced by Executive during the Employment Period and that are related to his services under this Agreement ("Professional Work") constitute works made for hire and are the sole and absolute property of the Company.  Executive grants the Company the exclusive right to copyright all such Professional Work in the United States and in foreign jurisdictions.  To the extent any such Professional Work is deemed to not be works for hire, Executive hereby assigns and agrees to assign all his interests therein to the Company or its nominee.  Whenever requested to do so by the Company, Executive shall execute any and all applications, assignments, or other instruments that the Company may deem necessary to protect the Company's interest therein.

(h)     Rights and Remedies upon Breach.  If Executive breaches one or more of the restrictive covenants contained in this Section 8, the Company shall have the following rights and remedies, each of which shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity:

(i)     Specific Performance. The right and remedy to have the restrictive covenants specifically enforced by any court of competent jurisdiction, without the necessity of proof of actual damage or posting of a bond, it being agreed that any breach of the restrictive covenants would cause irreparable injury to the Company and that money damages would not provide an adequate remedy to the Company.

(ii)     Accounting. The right and remedy to require the Executive to account for and pay to the Company all compensation, profits, monies, accruals, increments or other benefits derived or received by the Executive as the result of any transaction constituting a breach of the restrictive covenants.

**9.     Directors and Officers Liability Insurance; Indemnification.**

(a)     Directors and Officers Liability Insurance.  The Company agrees that, notwithstanding a termination of his/her employment with the Company, the Company shall, for at least three (3) years after the Severance Date, have Executive included as a named insured or otherwise covered for actions or failures to act by Executive in his capacity as a director or officer of the Company to at least the same extent as other executive officers or directors, as the case may be, of the Company under any directors and officers liability insurance policies maintained by the Company.

(b)     Indemnification.   The Company agrees that it will not alter the indemnification provisions in its certificate of incorporation or by-laws so as to give Executive

less protection thereunder with respect to periods during which Executive serves the Company as an executive officer or other employee than is afforded to Executive as of the Effective Date.

## 10. Dispute Resolution.

(a) <u>Arbitration</u>. Except as provided in Section 8(h) above, any and all disputes, controversies or claims arising or existing among or between the Company and Executive concerning any matter whatsoever shall be arbitrated in New York County, New York before the American Arbitration Association ("<u>AAA</u>") in accordance with the then prevailing Rules of Arbitration of the AAA, including, but not limited to, any and all claims or controversies arising under or concerning this Agreement.

(b) <u>Attorney's Fees</u>. If any contest or dispute shall arise under this Agreement involving termination of Executive's employment with the Company or involving the failure or refusal of the Company to perform fully in accordance with the terms hereof, the Company shall reimburse Executive, on a current basis, for all legal fees and expenses, if any, incurred by Executive in connection with such contest or dispute.

(c) <u>Governing Law; Consent to Jurisdiction; Venue</u>. The interpretation, construction and performance of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without regard to the principle of conflicts of laws.

## 11. Successors and Assigns.
The provisions of this Agreement shall be binding on and shall inure to the benefit of any successor in interest to the Company. The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as a sealed instrument as of the day and year first above written.

ATKINS NUTRITIONALS, INC.

By:_____

Name:

Title:

_____

Beth Neumann

## Schedule I

### Executive Bonus Schedule

| Percentage of Plan Achieved | Bonus Available as Percentage of Target Annual Bonus |
|---|---|
| 130 | 250% of Target |
| 120 | 200% of Target |
| 115 | 175% of Target |
| 110 | 150% of Target |
| 105 | 125% of Target |
| 100 | 100% of Target |
| 85 | 70% of Target |
| 80 | 50% of Target |
| Less than 80% | 0 |

Any level of Company performance which falls between two specific points set forth above under "Percentage of Plan Achieved" shall entitle Executive to receive a percentage of Base Salary determined on a straight-line basis between such two points. Such amount shall be calculated as follows:

$$[(A-B) \times .1] \times (C-D) + D$$

Where:

A = The actual percentage of plan achieved.

B = The Percentage of Plan set forth above which is less than and closest to actual results.

C = The Percentage Available as Percentage of Base Salary set forth above which is greater than and closest to the percentage that would apply based on actual results.

D = The Percentage Available as Percentage of Base Salary set forth above which is less than and closest to the percentage that would apply based on actual results.

## List of Exhibits

Exhibit A:    Sale Bonus Participation Letter
Exhibit B:    CVR Interest Participation Letter
Exhibit C:    Form of Release

**EXHIBIT A**

December __, 2005

Beth Neumann
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

Re:   MIP Sale Bonus

Dear Beth:

This letter describes the terms of a Sale Bonus opportunity for you under the Atkins Nutritionals, Inc. Management Incentive Plan ("MIP").

1.    **Sale Bonus**

a.    **Bonus Amount** – 11.33% of the Sale Bonus Pool Amount.

"Sale Bonus Pool Amount" means one of the following amounts: depending on the amount of the Net Distributable Value on the Change of Control Consummation Date: (i) $1 million if the Net Distributable Value is equal to or greater than $125 million but less than $200 million, and (ii) $500,000, if the Net Distributable Value is equal to or greater than $200 million and equal to or less than $225 million.

b.    **Conditions to Payment** – The Sale Bonus will *only* be payable if:

(i)    Change of Control – A Change of Control occurs on or before March 31, 2007; **AND**

(ii)   Employment – One of the following statements is true:

- You are employed by the Company on the date of the Change of Control; **OR**

- Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as

defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

**AND**

(iii) <u>Threshold Achieved</u> – The Net Distributable Value from the Change of Control is at least $125,000,000.

c. **Form and Timing of Payment** – Except as provided below, the Sale Bonus will be paid in one lump sum on the Change of Control Consummation Date.

(i) <u>Qualified IPO</u>. If the Change of Control is a Qualified IPO, your Sale Bonus will be paid six (6) months after the Change of Control Consummation Date with the Net Distributable Value determined based on the Net Distributable Value implied by the initial public offering price.

(ii) <u>Less than 80% Acquisition</u>. If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Atkins Nutritionals Holdings, Inc. ("<u>Holdings</u>") (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your Sale Bonus will be determined on the Change of Control Distribution Date. However, you will receive <u>NO PAYMENT</u> in respect of your Sale Bonus until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2. **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3. **Severance Benefits** – The Sale Bonus payable under this letter is in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4. **Benefits** – This Sale Bonus is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company. However, since this Sale Bonus represents a unique

payment to you, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5. **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from your Sale Bonus payment.

6. **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter. Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7. **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates. Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration. Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company. Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,


I have read, I understand, and I agree to the forgoing:


_____                    _____
Beth Neumann                                                        Date

**EXHIBIT B**

December __, 2005

Beth Neumann
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

Re:     CVR Interest

Dear Beth:

This letter describes the terms of the CVR interest granted to you under the Atkins Nutritionals, Inc. Management Incentive Plan ("MIP").

1.     **CVR Interest**

a.     **CVR Interest** – 11.33% of the Implied Equity Value Pool.

"Implied Equity Value Pool" shall be an amount determined in accordance with the following table:

| Implied Equity Value (in millions) | Implied Equity Value Pool |
|---|---|
| $0.0 | NA |
| 15.0 | 1.7000% |
| 40.0 | 2.5125% |
| 65.0 | 3.0846% |
| 90.0 | 3.6167% |
| 115.0 | 4.2435% |
| 140.0 | 4.8250% |
| 165.0 | 5.3818% |
| 190.0 | 5.7921% |
| 215.0 | 6.1070% |
| 240.0 | 6.3563% |
| 265.0 | 6.5113% |
| 290.0 | 6.5534% |
| 315.0 | 6.5889% |
| *340.0 and above* | 6.6191% (plan max) |

b.     **Conditions to Settlement** – You will *only* be entitled to a settlement in respect of your CVR Interest if:

(i)     Employment – One of the following statements is true:

- You are employed by the Company on the date of the Change of Control; **OR**

- Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

**AND**

(ii) <u>Threshold Achieved</u> – The Net Distributable Value from the Change of Control is at least $125,000,000.

c. **Form and Timing of CVR Interest Settlement** – Except as provided below, your CVR Interest will be settled by the payment of a lump sum cash amount on the Change of Control Consummation Date.

(i) <u>Qualified IPO</u>. If the Change of Control is a Qualified IPO, your CVR Interest will be settled in the voting equity securities of Atkins Nutritionals Holdings, Inc. ("<u>Holdings</u>") or the surviving entity with the implied equity value determined based on the Net Distributable Value implied by the initial public offering price.

(ii) <u>Less than 80% Acquisition</u>. If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Holdings (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your CVR Interest will be determined on the Change of Control Distribution Date and settled in the voting equity securities of Holdings or the surviving entity. However, you will receive <u>NO PAYMENT</u> in respect of your CVR Interest until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2. **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3. **Severance Benefits** – Any amounts due in respect of a CVR Interest granted under this letter are in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4. **Benefits** – This CVR Interest is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company. However, since this CVR Interest represents unique compensation, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5. **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from amounts due in respect of your CVR Interest.

6. **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter. Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7. **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates. Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration. Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company. Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,

I have read, I understand, and I agree to the forgoing:

_____

Beth Neumann

_____
Date

**EXHIBIT C**

# AGREEMENT AND GENERAL RELEASE

## (PLEASE READ CAREFULLY. THIS AGREEMENT AND GENERAL RELEASE HAS IMPORTANT LEGAL CONSEQUENCES)

This Agreement and General Release (the "Agreement") is between Atkins Nutritionals, Inc. (the "Company") and _____ ("Executive"). The term "The Company" shall include any subsidiaries or related companies, directors, officers, shareholders, employees, agents, attorneys, and successors of the Company.

IT IS AGREED THAT:

1. Executive's last date of employment with the Company is
_____.

2. Ten (10) days after the date Executive executes this Agreement, the Company will pay Executive the payments and/or benefits described in a certain Severance Agreement executed by and between the Executive and the Company, dated _____, less applicable federal, state, and local legally required deductions (the "Payment"). Executive agrees that the Company owes Executive nothing else, including but not limited to wages or benefits.

3. In exchange for the payment, Executive understands that Executive releases and forever gives up the right to sue or make any claim whatsoever against the Company, for any reason whatsoever, including but not limited to any claim under contract and/or equity and/or any law, relating in any way to Executive's employment with the Company or the termination of that employment. This waiver of claims includes any claims of discrimination on any grounds, whether or not Executive has previously filed such a claim. Executive understands that Executive is giving up any rights or claims which Executive may have under the numerous laws and regulations regulating employment, whether on the federal, state, or local level, including, but not limited to, the Age Discrimination in Employment Act of 1967, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Fair Labor Standards Act, the Equal Pay Act, and the New York State Human Rights Law.

4. Executive agrees that Executive has returned to the Company any and all identification cards, files, books, records, materials, equipment or documents in Executive's possession which were provided to or obtained by Executive in connection with Executive's employment.

5. It is understood and agreed that Executive will not talk about, discuss or communicate with anyone, orally or in writing, concerning the matter which is the subject of this Agreement or any aspect of Executive's employment with the Company except Executive may (i) discuss this Agreement with Executive's spouse and children,

(ii) permit Executive's accountant to review this Agreement in connection with the filing of tax returns, (iii) permit attorney(s) of Executive's choice to review this Agreement, and (iv) testify truthfully under oath pursuant to a subpoena (in which event Executive will provide The Company with prompt notice of the subpoena).

6. Executive represents that Executive is not aware of any breach of contract, wrongdoing or liability by the Company, and Executive expressly agrees that this Agreement is not and shall not in any way be deemed to constitute an admission or evidence of any breach of contract, wrongdoing or liability on the part of the Company, nor of any violation of any federal, state or municipal statute, regulation or principle of common law or equity.

7. Executive acknowledges that Executive has received a copy of this Agreement and that The Company has informed Executive that Executive should consult with an attorney in connection with it. Executive acknowledges that Executive's decision to consult with an attorney or not to consult with an attorney was made without influence by the Company. Executive further acknowledges that Executive has had at least 21 days in which to consider, execute, and return this Agreement. Notwithstanding Executive's right to consider this Agreement for 21 days, if Executive signs this Agreement before the expiration of the 21-day period, Executive will have done so knowingly and voluntarily, and will have expressly waived Executive's right to consider this Agreement for the balance of the 21-day period.

8. This Agreement shall not become effective until seven (7) days after the date Executive executes the Agreement, and Executive may cancel this Agreement within seven (7) days of the date Executive executes it, except that any cancellation must be in writing, signed by Executive, and delivered to the Company.

9. This Agreement is made in the State of New York. This Agreement is to be interpreted under the law of the State of New York.

10. EXECUTIVE ACKNOWLEDGES THAT EXECUTIVE HAS CAREFULLY READ THIS AGREEMENT; THAT EXECUTIVE HAS HAD AT LEAST 21 DAYS IN WHICH TO CONSIDER AND RETURN THIS AGREEMENT; THAT EXECUTIVE HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF EXECUTIVE'S CHOICE IN CONNECTION WITH THIS AGREEMENT; THAT EXECUTIVE FULLY UNDERSTANDS THE TERMS, CONDITIONS, AND SIGNIFICANCE AND CONSEQUENCES OF THIS AGREEMENT; AND THAT EXECUTIVE HAS EXECUTED THIS AGREEMENT KNOWINGLY AND VOLUNTARILY, AND OF EXECUTIVE'S OWN FREE WILL.

| | |
|---|---|
| **ATKINS NUTRITIONALS, INC.**<br><br>By:_____ | <br><br>_____ |

# EMPLOYMENT AGREEMENT

**AGREEMENT**, dated as of the ___ day of December 2005, (the "<u>Effective Date</u>") by and between Atkins Nutritionals, Inc., a New York corporation (the "<u>Company</u>"), and Matthew Spolar, a resident of Brooklyn, New York (the "<u>Executive</u>").

**WHEREAS,** the Company desires to engage the services of Executive and Executive desires to be employed by the Company on the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of such employment and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Executive agree as follows:

1. **Employment and Position.** The Company hereby employs Executive as its Vice President, Product Technology, and Executive hereby accepts such employment under and subject to the terms and conditions hereinafter set forth.

2. **Employment Period.** This Agreement shall begin on the Effective Date, as such term is defined in the Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated November 16, 2005, of Atkins Nutritionals, Inc., et al (the "<u>Plan of Reorganization</u>"), and shall expire on the third (3rd) anniversary of the Effective Date unless terminated earlier in accordance with Section 6 of this Agreement (such period, the "<u>Employment Period</u>"). The Employment Period may be extended and renewed automatically for successive one-year periods (each, an "<u>Extension Period</u>") unless the Company gives notice to Executive of its desire not to extend and renew at least one hundred twenty (120) days prior to the end of the Employment Period or any Extension Period. If the Company fails to renew this Agreement, such employment termination shall be treated as a termination without Cause. If Executive fails to renew this Agreement, it shall be treated as a resignation without Good Reason.

3. **Duties.** During the Employment Period, Executive shall perform services in a managerial capacity in a manner consistent with Executive's position as Vice President, Product Technology, subject to the general supervision of the Chief Executive Officer of the Company. Executive hereby agrees to devote his full business time to the faithful performance of such duties and to the promotion and forwarding of the business and affairs of the Company during the Employment Period, <u>provided</u>, <u>however</u>, that Executive shall be permitted to (i) engage in other activities of a civic, religious, political or charitable nature, (ii) manage investments of Executive and Executive's family in securities, mutual funds or other collective investment funds, limited partner interests or similar passive investments, (iii) engage in the corporate directorships and other business activities, as may hereafter be specifically approved in writing by the Chief Executive Officer of the Company, which in each case and in the aggregate do not materially interfere with the performance of his obligations hereunder.

4. **Compensation**

(a) <u>Salary</u>. In consideration of the services rendered by Executive under this Agreement, the Company shall pay Executive a base salary (the "<u>Base Salary</u>") at the rate of

$154,500 per calendar year. The Base Salary shall be paid in such installments and at such times as the Company pays its salaried executives and shall be subject to all necessary withholding taxes, FICA contributions and similar deductions. The Board of Directors (the "Board") of the Company shall annually review the Base Salary payable to Executive hereunder and may, in its reasonable discretion, increase but not decrease, Executive's salary rate. Any such increased salary shall be and become the "Base Salary" for purposes of this Agreement.

(b)     Performance Bonus. During the Employment Period, the Company shall maintain an annual bonus program for its employees. Executive shall be a participant in the annual bonus program and shall have an annual target bonus opportunity of not less than fifty percent (50%) of Base Salary (such annual target bonus opportunity, as adjusted from time to time hereafter, "Target Annual Bonus"). A schedule setting forth minimum and maximum payments under the bonus plan is set forth as Schedule I hereto, however, the actual performance targets for payment of the Target Annual Bonus shall be established annually by a committee of the Board responsible for executive compensation. Any Target Annual Bonus payable to Executive shall be pro-rated for any period of service less than a full year. Except as otherwise provided herein, the annual bonus shall be paid no later than March 15 of the year following the year to which the annual bonus relates, however, if the annual bonus program establishes quarterly or bi-annual performance incentives, bonus payments shall be made in quarterly or bi-annual installments, as the case may be.

(c)     Emergence Bonus. On the Effective Date, the Company shall pay Executive a cash amount equal to $61,000, which amount represents the amount due under the Emergence Bonus Program under the Atkins Nutritionals, Inc. Management Incentive Plan (the "Atkins MIP").

**5.     Benefits.** During the Employment Period Executive and/or Executive's family, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare benefit plans, programs, practices and policies provided generally by the Company to similarly-situated executives of the Company (including, without limitation, any medical, prescription, dental, disability, employee life, group life, accidental death and travel accident insurance plans and programs that may be provided by the Company from time to time). Such plans, programs, practices and policies are subject to change from time to time by the Company.

**6.     Employment Termination.**

(a)     Severance Date. Executive's employment shall terminate on the earliest to occur of (i) the date of Executive's death, (ii) the date the Company terminates his employment for any reason, (iii) the date Executive resigns his employment for any reason, or (iv) the last day of the Employment Period or any Extension Period (such date, the "Severance Date").

(b)     Notice of Termination. If the Company terminates Executive's employment for Cause (defined below) or if Executive resigns for Good Reason, the Company, or Executive as the case may be shall provide at least thirty (30) days advance written notice (at least sixty (60) days in the case of the Company's termination without Cause) of the Severance Date, to the extent applicable, an explanation in reasonable detail of the facts and circumstances

claimed to provide a basis for termination under the provision so indicated. The failure by Executive or the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Good Reason or Cause shall not waive any right of Executive or the Company, respectively, hereunder or preclude Executive or the Company, respectively, from asserting such fact or circumstance in enforcing Executive's or the Company's rights hereunder. In the event of a termination without Cause, the Company shall provide Executive with at least sixty (60) days notice of the Severance Date.

(c)     Disability. The Company shall provide Executive with at least thirty (30) days advance written notice that it is terminating Executive's employment on account of Disability and the Severance Date shall be effective as of the date specified in the notice of termination unless Executive shall have returned to full-time performance of Executive's duties under this Agreement. For purposes of this Agreement, "Disability" shall mean the absence or inability of Executive to perform his duties under this Agreement on a full-time basis for either (i) one hundred eighty (180) consecutive days or (ii) for the aggregate of any two hundred seventy (270) days within any consecutive twelve (12) month period, as a result of incapacity due to mental or physical illness which is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to Executive or Executive's legal representative.

(d)     Termination for Cause. Executive's employment may be terminated by the Company at any time for Cause which shall be effective thirty (30) days following receipt of written notice by Executive. For purposes of this Agreement, "Cause" means a determination by the Board that one or more of the following has occurred:

(i)     Executive shall have been convicted of, or have plead guilty or *nolo contendere* to, any felony or misdemeanor involving fraud or dishonesty;

(ii)     Executive's gross misconduct, which is substantially injurious to the business or reputation of the Company as determined in good faith and in the reasonable judgment of the Board;

(iii)     Executive shall have committed any fraud, embezzlement, misappropriation of funds, misrepresentation, or breach of fiduciary duty against the Company;

(iv)     the willful and continued failure of Executive to perform substantially Executive's duties with the Company (other than any such failure resulting from incapacity due to physical or mental illness), for a period of thirty (30) days after a written demand for performance is delivered to Executive by the Board which specifically identifies the manner in which the Board believes that Executive has not substantially performed Executive's duties; or

(v)     a material breach by Executive of his obligations under Section 8 of this Agreement, which breach is not cured by Executive within thirty (30) days after receipt of notice thereof from the Company setting forth the alleged breach in reasonable detail.

(e)     Resignation for Good Reason. Executive shall provide the Company with at least thirty (30) days notice that he is resigning his employment for Good Reason. For purposes of this Agreement, "Good Reason" means:

(i) the assignment to Executive of any duties inconsistent in any material respect with Executive's position, authority, duties or responsibilities, a change in Executive's title, or any other action by the Company which results in a material and permanent diminution in such position, authority, duties or responsibilities;

(ii) any failure by the Company to comply with any of the provisions of Section 4 or 5 of this Agreement;

(iii) a breach by the Company of any material provision of this Agreement, that is not cured by the Company within 20 days after receipt of notice thereof from Executive setting forth the alleged breach in reasonable detail;

(iv) any requirement of the Company that Executive be based anywhere other than the Company's headquarters in Melville, New York, unless such new location is closer to Executive's primary residence or is located in Manhattan, New York; or

(v) the occurrence of a Change of Control (as defined below).

For purposes of this Agreement, any good faith determination of Good Reason made by Executive shall be conclusive; provided, however, any isolated, insubstantial and inadvertent action taken in good faith that is remedied by the Company promptly after receipt of notice thereof shall not constitute Good Reason.

(f) Change of Control Defined. "Change of Control" shall have the meaning set forth in the Atkins MIP, as in effect on the Effective Date hereof.

7. **Effect of Employment Termination.**

(a) Survival of Certain Provisions. Following Executive's employment termination, neither party shall have any further obligation to the other party, except as may be required by law (such as the benefit continuation provisions of COBRA), Section 7 (Effect of Employment Termination), Section 8 (Restrictive Covenants), Section 9 (Directors and Officers Liability Insurance; Indemnification), Section 10 (Dispute Resolution) and Section 11 (Successors and Assigns) shall survive for the periods (if any) specified in such Sections.

(b) Accrued Benefits. If Executive's employment terminates for any reason, the Company shall pay to Executive (or his estate) (i) all salary and bonuses earned or accrued through the Severance Date on the next regularly scheduled pay date; (ii) all reimbursements due to Executive in accordance with the Company's regular reimbursement policy; and (iii) all other payments and benefits to which Executive may be entitled under the terms of any applicable compensation arrangement or benefit plan or program of the Company, including, without limitation, any earned and accrued but unused PTO pay.

(c) Death Benefit. In the event Executive's employment with the Company is terminated due to his death, then in addition to the accrued benefits described above Executive's estate or beneficiaries, as the case may be, shall be entitled to receive no later than thirty (30) days following Executive's death, (i) a lump sum cash payment equal to six (6) month's Base Salary, and (ii) a pro rata bonus for any incomplete performance period at the time Executive's

death occurs, assuming that Executive would have received a bonus equal to 100% of the Target Annual Bonus.

(d) <u>Disability</u>. In the event Executive's employment with the Company is terminated due to his Disability, then in addition to the accrued benefits described above Executive shall be entitled to receive his Base Salary until the expiration of the month following the Severance Date.

(e) <u>Severance Benefits</u>. If Executive's employment is terminated by the Company without Cause (other than due to Executive's death or Disability) or by Executive for Good Reason then, in addition to the accrued benefits described above in this Section 7, as his exclusive right and remedy in respect of such employment termination.

(i) <u>Severance Pay</u>. The Company shall provide to Executive, a lump sum cash amount equal to 0.5 times the sum of (i) Executive's annual Base Salary and (ii) Executive's Target Annual Bonus;

(ii) <u>Benefit Continuation</u>. For six (6) months following the Severance Date, the Company shall continue to keep in full force and effect all policies of medical, dental and accident insurance with respect to Executive and his dependents with the same level of coverage, upon the same terms and otherwise to the same extent as such policies shall have been in effect immediately prior to the Severance Date, and the Company and Executive shall share the costs of the continuation of such insurance coverage in the same proportion as such costs were shared immediately prior to the Severance Date; <u>provided</u> that, if Executive becomes eligible during such period to participate in another group plan with respect to any such policies by reason of subsequent employment or otherwise, Executive's coverage under the Company policies will terminate in accordance with the transition of coverage provisions in the Company's policies;

(iii) <u>Outplacement</u>. The Company shall provide Executive with executive level outplacement services through a reputable outplacement firm; and

(iv) <u>All Other Benefits Cease</u>. Effective on the day after the Severance Date, Executive shall cease to participate in any other plan, benefit, program or arrangement providing employee benefits or perquisites offered by the Company.

(f) <u>Release</u>. As a condition precedent to Executive's right to receive the payments and/or benefits described in Section 7(e), Executive shall execute, on or about the date of Executive's termination, a general release (the "<u>Release</u>") in favor of the Company in substantially the form annexed hereto as <u>Exhibit A</u>. Executive shall have twenty one (21) days in which to execute and return the Release. Any cash payment due to Executive pursuant to Section 7(e) shall be paid in a single lump sum no later than two (2) weeks after the date the Release is executed and delivered to the Company (the "<u>Release Date</u>"); <u>provided</u>, <u>however</u>, that if the Company is treated as a corporation whose securities are publicly traded on an established

securities market for purposes of Section 409A of the Internal Revenue Code of 1986, as amended, then payment shall be delayed until six (6) months following the Severance Date to the extent required by such law.

(g)    No Mitigation.    The Company's obligation to make any payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against Executive or others.  In no event shall Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to Executive under any of the provisions of this Agreement.

## 8.    Restrictive Covenants.

(a)    Non-Competition.  Executive shall not, during the Employment Period or any Extension Period and for the six-month period thereafter, engage in, or otherwise directly or indirectly be associated with, or act as an independent contractor or consultant for or to, or be a director, officer, employee, owner or partner of, any other business or organization, whether or not such business or organization is now or shall then be competing with the Company or any affiliate, or invest in the securities of any other business or organization if such business or organization whose primary business is related to developing, marketing or distributing very low carbohydrate nutritional bars and/or nutritional beverages that derive no more than ten percent (10%) of their caloric content from carbohydrates in the United States (the "Competitive Business"), except that Executive shall not be precluded from owning, solely as an investment, securities of any such business or organization if (i) the securities are publicly traded on a national or regional stock exchange or on the over-the-counter market, (ii) Executive is neither a controlling person or a member of a group which controls such business or organization, and (iii) Executives does not, directly or indirectly, own five percent (5%) or more of such business or organization.

(b)    Non-Solicitation.  During the Employment Period or any Extension Period and for the six-month period thereafter, Executive shall not directly or indirectly, solicit or entice, or endeavor to solicit or entice any of the employees of the Company or any affiliate to quit or abandon their employment or engagement with the Company nor shall he call upon, solicit, divert or attempt to solicit or divert from the Company or any of its affiliates any of their customers or suppliers or potential customers or suppliers, of whose names he was aware during the Employment Period; provided, however, that nothing in this Section 8(b) shall be deemed to prohibit Executive from calling upon or soliciting a customer or supplier if such action relates solely to a business which is not a Competitive Business.

(c)    Non-Disclosure and Non-Use of Confidential Business Information.  During the Employment Period or any Extension Period and thereafter, Executive shall not disclose to any third person any Confidential Business Information (as hereinafter defined) and shall not use any such information for his own benefit or for the benefit of any third person, either during the Employment Period or thereafter, whether such information was obtained or conceived by Executive or others, without the prior written consent of the Board of Directors.

(d)    Confidential Business Information.  For purposes of this Agreement, the

term "Confidential Business Information", includes without limitation, "know-how", trade secrets, customer lists, details of client or executive contracts, pricing policies, bidding practices and procedures, operational methods, marketing plans or strategies, project development techniques or plans, business acquisition plans, financial results or projections, budgets, capital spending plans, other financial matters, new personnel acquisition plans, methods of production, manufacture and installation, technical processes, designs and design projects, inventions and research projects of the Company or any affiliate learned by Executive heretofore or during the Employment Period.

Confidential Business Information shall not include: (i) information which at the time of the disclosure is, or subsequently becomes, generally part of the public domain through no breach of the terms hereof by Executive; or (ii) information which is lawfully acquired from a third party who did not breach a confidential obligation by disclosing the same to Executive; (iii) information which was known by Executive prior to the date of commencement of Executive's employment with the Company; or (iv) information which is required to be disclosed to comply with the applicable laws, governmental rules or regulations, subpoenas or court order.

(e)     Return of Business Documents.    All memoranda, notes, letters, documents, tapes and other media of every kind and description (whether electronic, paper or otherwise) and all copies thereof (i) containing Confidential Business Information, or (ii) made or compiled by or on behalf of Executive in the course of performing his duties for the Company or any affiliate (or made available to Executive relating to the Company or any affiliate during the Employment Period), (collectively, "Business Documents"), are and shall be the sole and exclusive property of the Company (or affiliate, as applicable). Executive shall surrender to the Company at the time his employment terminates, or at such other time or times as the Chief Executive Officer of the Company may specify all Business Documents then in Executive's possession or control.

(f)     Inventions and Patents.  Executive shall promptly deliver to the Company (and no one else) all improvements, discoveries, ideas and inventions that may be of significance to the Company or any affiliate, made or conceived by Executive alone or in conjunction with others (whether or not patentable and whether or not conceived at the request of or upon the suggestion of the Company or other affiliate Group) in the course of providing services under this Agreement, or made or conceived within one (1) year after the Severance Date, if resulting from, suggested by or relating to such services. All such improvements, discoveries, ideas and inventions shall be the sole and exclusive property of the Company and are hereby assigned to the Company. At the request and cost of the Company, Executive shall assist the Company or its designee in obtaining patents or other proprietary rights registrations or confirmations relating to such improvements, discoveries, ideas and inventions, and shall in connection therewith execute such applications, statements and other documents, furnish such information and take such other action (including but not limited to, testifying) as the Company may from time to time reasonably request.

(g)     Professional Work.  All works and writings of a professional nature which are produced by Executive during the Employment Period and that are related to his services under this Agreement ("Professional Work") constitute works made for hire and are the sole and

absolute property of the Company. Executive grants the Company the exclusive right to copyright all such Professional Work in the United States and in foreign jurisdictions. To the extent any such Professional Work is deemed to not be works for hire, Executive hereby assigns and agrees to assign all his interests therein to the Company or its nominee. Whenever requested to do so by the Company, Executive shall execute any and all applications, assignments, or other instruments that the Company may deem necessary to protect the Company's interest therein.

(h)     Rights and Remedies upon Breach. If Executive breaches one or more of the restrictive covenants contained in this Section 8, the Company shall have the following rights and remedies, each of which shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity:

(i)     Specific Performance. The right and remedy to have the restrictive covenants specifically enforced by any court of competent jurisdiction, without the necessity of proof of actual damage or posting of a bond, it being agreed that any breach of the restrictive covenants would cause irreparable injury to the Company and that money damages would not provide an adequate remedy to the Company.

(ii)     Accounting. The right and remedy to require the Executive to account for and pay to the Company all compensation, profits, monies, accruals, increments or other benefits derived or received by the Executive as the result of any transaction constituting a breach of the restrictive covenants.

## 9.     Directors and Officers Liability Insurance; Indemnification.

(a)     Directors and Officers Liability Insurance. The Company agrees that, notwithstanding a termination of his/her employment with the Company, the Company shall, for at least three (3) years after the Severance Date, have Executive included as a named insured or otherwise covered for actions or failures to act by Executive in his capacity as a director or officer of the Company to at least the same extent as other executive officers or directors, as the case may be, of the Company under any directors and officers liability insurance policies maintained by the Company.

(b)     Indemnification. The Company agrees that it will not alter the indemnification provisions in its certificate of incorporation or by-laws so as to give Executive less protection thereunder with respect to periods during which Executive serves the Company as an executive officer or other employee than is afforded to Executive as of the Effective Date.

## 10.     Dispute Resolution.

(a)     Arbitration. Except as provided in Section 8(h) above, any and all disputes, controversies or claims arising or existing among or between the Company and Executive concerning any matter whatsoever shall be arbitrated in New York County, New York before the American Arbitration Association ("AAA") in accordance with the then prevailing Rules of Arbitration of the AAA, including, but not limited to, any and all claims or controversies arising under or concerning this Agreement.

(b)     Attorney's Fees.  If any contest or dispute shall arise under this Agreement involving termination of Executive's employment with the Company or involving the failure or refusal of the Company to perform fully in accordance with the terms hereof, the Company shall reimburse Executive, on a current basis, for all legal fees and expenses, if any, incurred by Executive in connection with such contest or dispute.

(c)     Governing Law; Consent to Jurisdiction; Venue.   The interpretation, construction and performance of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without regard to the principle of conflicts of laws.

**11.**     **Successors and Assigns.**   The provisions of this Agreement shall be binding on and shall inure to the benefit of any successor in interest to the Company.  The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as a sealed instrument as of the day and year first above written.

ATKINS NUTRITIONALS, INC.


By:_____
Name:
Title:



_____
Matthew Spolar

## Schedule I

### Executive Bonus Schedule

| Percentage of Plan Achieved | Bonus Available as Percentage of Target Annual Bonus |
|---|---|
| 130 | 250% of Target |
| 120 | 200% of Target |
| 115 | 175% of Target |
| 110 | 150% of Target |
| 105 | 125% of Target |
| 100 | 100% of Target |
| 85 | 70% of Target |
| 80 | 50% of Target |
| Less than 80% | 0 |

Any level of Company performance which falls between two specific points set forth above under "Percentage of Plan Achieved" shall entitle Executive to receive a percentage of Base Salary determined on a straight-line basis between such two points. Such amount shall be calculated as follows:

$$[(A-B) \times .1] \times (C-D) + D$$

Where:

A =    The actual percentage of plan achieved.

B =    The Percentage of Plan set forth above which is less than and closest to actual results.

C =    The Percentage Available as Percentage of Base Salary set forth above which is greater than and closest to the percentage that would apply based on actual results.

D =    The Percentage Available as Percentage of Base Salary set forth above which is less than and closest to the percentage that would apply based on actual results.

## List of Exhibits

Exhibit A:     Form of Release

**EXHIBIT A**

# AGREEMENT AND GENERAL RELEASE

## (PLEASE READ CAREFULLY.  THIS AGREEMENT AND GENERAL RELEASE HAS IMPORTANT LEGAL CONSEQUENCES)

This Agreement and General Release (the "Agreement") is between Atkins Nutritionals, Inc. (the "Company") and _____ ("Executive").  The term "The Company" shall include any subsidiaries or related companies, directors, officers, shareholders, employees, agents, attorneys, and successors of the Company.

IT IS AGREED THAT:

1. Executive's last date of employment with the Company is _____.

2. Ten (10) days after the date Executive executes this Agreement, the Company will pay Executive the payments and/or benefits described in a certain Severance Agreement executed by and between the Executive and the Company, dated _____, less applicable federal, state, and local legally required deductions (the "Payment"). Executive agrees that the Company owes Executive nothing else, including but not limited to wages or benefits.

3. In exchange for the payment, Executive understands that Executive releases and forever gives up the right to sue or make any claim whatsoever against the Company, for any reason whatsoever, including but not limited to any claim under contract and/or equity and/or any law, relating in any way to Executive's employment with the Company or the termination of that employment.  This waiver of claims includes any claims of discrimination on any grounds, whether or not Executive has previously filed such a claim.  Executive understands that Executive is giving up any rights or claims which Executive may have under the numerous laws and regulations regulating employment, whether on the federal, state, or local level, including, but not limited to, the Age Discrimination in Employment Act of 1967, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Fair Labor Standards Act, the Equal Pay Act, and the New York State Human Rights Law.

4. Executive agrees that Executive has returned to the Company any and all identification cards, files, books, records, materials, equipment or documents in Executive's possession which were provided to or obtained by Executive in connection with Executive's employment.

5. It is understood and agreed that Executive will not talk about, discuss or communicate with anyone, orally or in writing, concerning the matter which is the subject of this Agreement or any aspect of Executive's employment with the Company except Executive may (i) discuss this Agreement with Executive's spouse and children,

(ii) permit Executive's accountant to review this Agreement in connection with the filing of tax returns, (iii) permit attorney(s) of Executive's choice to review this Agreement, and (iv) testify truthfully under oath pursuant to a subpoena (in which event Executive will provide The Company with prompt notice of the subpoena).

6. Executive represents that Executive is not aware of any breach of contract, wrongdoing or liability by the Company, and Executive expressly agrees that this Agreement is not and shall not in any way be deemed to constitute an admission or evidence of any breach of contract, wrongdoing or liability on the part of the Company, nor of any violation of any federal, state or municipal statute, regulation or principle of common law or equity.

7. Executive acknowledges that Executive has received a copy of this Agreement and that The Company has informed Executive that Executive should consult with an attorney in connection with it. Executive acknowledges that Executive's decision to consult with an attorney or not to consult with an attorney was made without influence by the Company. Executive further acknowledges that Executive has had at least 21 days in which to consider, execute, and return this Agreement. Notwithstanding Executive's right to consider this Agreement for 21 days, if Executive signs this Agreement before the expiration of the 21-day period, Executive will have done so knowingly and voluntarily, and will have expressly waived Executive's right to consider this Agreement for the balance of the 21-day period.

8. This Agreement shall not become effective until seven (7) days after the date Executive executes the Agreement, and Executive may cancel this Agreement within seven (7) days of the date Executive executes it, except that any cancellation must be in writing, signed by Executive, and delivered to the Company.

9. This Agreement is made in the State of New York. This Agreement is to be interpreted under the law of the State of New York.

10. EXECUTIVE ACKNOWLEDGES THAT EXECUTIVE HAS CAREFULLY READ THIS AGREEMENT; THAT EXECUTIVE HAS HAD AT LEAST 21 DAYS IN WHICH TO CONSIDER AND RETURN THIS AGREEMENT; THAT EXECUTIVE HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF EXECUTIVE'S CHOICE IN CONNECTION WITH THIS AGREEMENT; THAT EXECUTIVE FULLY UNDERSTANDS THE TERMS, CONDITIONS, AND SIGNIFICANCE AND CONSEQUENCES OF THIS AGREEMENT; AND THAT EXECUTIVE HAS EXECUTED THIS AGREEMENT KNOWINGLY AND VOLUNTARILY, AND OF EXECUTIVE'S OWN FREE WILL.

**ATKINS NUTRITIONALS, INC.**

By:_____

_____

**Exhibit 12**

**New Management Interests**

December __, 2005

Mark Rodriguez
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

                    Re:    <u>CVR Interest</u>

Dear Mark:

      This letter describes the terms of the CVR interest granted to you under the Atkins Nutritionals, Inc. Management Incentive Plan ("<u>MIP</u>").

1.      **CVR Interest**

      a.      **CVR Interest** – *47%* of the Implied Equity Value Pool.

            "<u>Implied Equity Value Pool</u>" shall be an amount determined in accordance with the following table:

| Implied Equity Value (in millions) | Implied Equity Value Pool |
|---|---|
| $0.0 | NA |
| 15.0 | 1.7000% |
| 40.0 | 2.5125% |
| 65.0 | 3.0846% |
| 90.0 | 3.6167% |
| 115.0 | 4.2435% |
| 140.0 | 4.8250% |
| 165.0 | 5.3818% |
| 190.0 | 5.7921% |
| 215.0 | 6.1070% |
| 240.0 | 6.3563% |
| 265.0 | 6.5113% |
| 290.0 | 6.5534% |
| 315.0 | 6.5889% |
| *340.0 and above* | 6.6191% (plan max) |

      b.      **Conditions to Settlement** – You will <u>*only*</u> be entitled to a settlement in respect of your CVR Interest if:

            (i)      <u>Employment</u> – One of the following statements is true:

- You are employed by the Company on the date of the Change of Control; **OR**

- Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

**AND**

(ii) <u>Threshold Achieved</u> – The Net Distributable Value from the Change of Control is at least $125,000,000.

c. **Form and Timing of CVR Interest Settlement** – Except as provided below, your CVR Interest will be settled by the payment of a lump sum cash amount on the Change of Control Consummation Date.

(i) <u>Qualified IPO</u>. If the Change of Control is a Qualified IPO, your CVR Interest will be settled in the voting equity securities of Atkins Nutritionals Holdings, Inc. ("<u>Holdings</u>") or the surviving entity with the implied equity value determined based on the Net Distributable Value implied by the initial public offering price.

(ii) <u>Less than 80% Acquisition</u>. If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Holdings (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your CVR Interest will be determined on the Change of Control Distribution Date and settled in the voting equity securities of Holdings or the surviving entity. However, you will receive <u>NO PAYMENT</u> in respect of your CVR Interest until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2. **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3.     **Severance Benefits** – Any amounts due in respect of a CVR Interest granted under this letter are in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4.     **Benefits** – This CVR Interest is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company. However, since this CVR Interest represents unique compensation, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5.     **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from amounts due in respect of your CVR Interest.

6.     **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter. Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7.     **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates. Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration. Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company. Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,

I have read, I understand, and I agree to the forgoing:

_____         _____

Mark Rodriguez                                         Date

December __, 2005

Joseph Conklin
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

Re:    CVR Interest

Dear Joseph:

This letter describes the terms of the CVR interest granted to you under the Atkins Nutritionals, Inc. Management Incentive Plan ("MIP").

1.    **CVR Interest**

a.    **CVR Interest** – 19% of the Implied Equity Value Pool.

"Implied Equity Value Pool" shall be an amount determined in accordance with the following table:

| Implied Equity Value (in millions) | Implied Equity Value Pool |
|---|---|
| $0.0 | NA |
| 15.0 | 1.7000% |
| 40.0 | 2.5125% |
| 65.0 | 3.0846% |
| 90.0 | 3.6167% |
| 115.0 | 4.2435% |
| 140.0 | 4.8250% |
| 165.0 | 5.3818% |
| 190.0 | 5.7921% |
| 215.0 | 6.1070% |
| 240.0 | 6.3563% |
| 265.0 | 6.5113% |
| 290.0 | 6.5534% |
| 315.0 | 6.5889% |
| *340.0 and above* | 6.6191% (plan max) |

b.    **Conditions to Settlement** – You will _only_ be entitled to a settlement in respect of your CVR Interest if:

(i)    Employment – One of the following statements is true:

- You are employed by the Company on the date of the Change of Control; **OR**

- Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

**AND**

(ii)     <u>Threshold Achieved</u> – The Net Distributable Value from the Change of Control is at least $125,000,000.

c.     **Form and Timing of CVR Interest Settlement** – Except as provided below, your CVR Interest will be settled by the payment of a lump sum cash amount on the Change of Control Consummation Date.

(i)     <u>Qualified IPO</u>.  If the Change of Control is a Qualified IPO, your CVR Interest will be settled in the voting equity securities of Atkins Nutritionals Holdings, Inc. ("<u>Holdings</u>") or the surviving entity with the implied equity value determined based on the Net Distributable Value implied by the initial public offering price.

(ii)     <u>Less than 80% Acquisition</u>.  If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Holdings (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your CVR Interest will be determined on the Change of Control Distribution Date and settled in the voting equity securities of Holdings or the surviving entity. However, you will receive <u>NO PAYMENT</u> in respect of your CVR Interest until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2.     **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3. **Severance Benefits** – Any amounts due in respect of a CVR Interest granted under this letter are in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4. **Benefits** – This CVR Interest is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company. However, since this CVR Interest represents unique compensation, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5. **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from amounts due in respect of your CVR Interest.

6. **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter. Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7. **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates. Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration. Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company. Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,

I have read, I understand, and I agree to the forgoing:

_____                    _____

Joseph Conklin                                                              Date

Jeff Powers
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

        Re:    <u>CVR Interest</u>

Dear Jeff:

This letter describes the terms of the CVR interest granted to you under the Atkins Nutritionals, Inc. Management Incentive Plan ("<u>MIP</u>").

1. **CVR Interest**

a. **CVR Interest** – 11.33% of the Implied Equity Value Pool.

"<u>Implied Equity Value Pool</u>" shall be an amount determined in accordance with the following table:

| Implied Equity Value (in millions) | Implied Equity Value Pool |
|---|---|
| $0.0 | NA |
| 15.0 | 1.7000% |
| 40.0 | 2.5125% |
| 65.0 | 3.0846% |
| 90.0 | 3.6167% |
| 115.0 | 4.2435% |
| 140.0 | 4.8250% |
| 165.0 | 5.3818% |
| 190.0 | 5.7921% |
| 215.0 | 6.1070% |
| 240.0 | 6.3563% |
| 265.0 | 6.5113% |
| 290.0 | 6.5534% |
| 315.0 | 6.5889% |
| *340.0 and above* | 6.6191% (plan max) |

b. **Conditions to Settlement** – You will <u>*only*</u> be entitled to a settlement in respect of your CVR Interest if:

(i)     <u>Employment</u> – One of the following statements is true:

- You are employed by the Company on the date of the Change of Control; **OR**

- Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

**AND**

(ii) <u>Threshold Achieved</u> – The Net Distributable Value from the Change of Control is at least $125,000,000.

c. **Form and Timing of CVR Interest Settlement** – Except as provided below, your CVR Interest will be settled by the payment of a lump sum cash amount on the Change of Control Consummation Date.

(i) <u>Qualified IPO</u>. If the Change of Control is a Qualified IPO, your CVR Interest will be settled in the voting equity securities of Atkins Nutritionals Holdings, Inc. ("<u>Holdings</u>") or the surviving entity with the implied equity value determined based on the Net Distributable Value implied by the initial public offering price.

(ii) <u>Less than 80% Acquisition</u>. If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Holdings (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your CVR Interest will be determined on the Change of Control Distribution Date and settled in the voting equity securities of Holdings or the surviving entity. However, you will receive <u>NO PAYMENT</u> in respect of your CVR Interest until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2. **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3. **Severance Benefits** – Any amounts due in respect of a CVR Interest granted under this letter are in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4. **Benefits** – This CVR Interest is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company. However, since this CVR Interest represents unique compensation, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5. **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from amounts due in respect of your CVR Interest.

6. **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter. Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7. **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates. Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration. Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company. Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,

I have read, I understand, and I agree to the forgoing:

_____                          _____
Jeff Powers                                                                              Date

December __, 2005

Steve Galinski
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

　　　　　Re:　　CVR Interest

Dear Steve:

　　　　This letter describes the terms of the CVR interest granted to you under the Atkins Nutritionals, Inc. Management Incentive Plan ("MIP").

1.　　**CVR Interest**

　　　a.　　**CVR Interest** – 11.33% of the Implied Equity Value Pool.

　　　　　　"Implied Equity Value Pool" shall be an amount determined in accordance with the following table:

| Implied Equity Value (in millions) | Implied Equity Value Pool |
|---|---|
| $0.0 | NA |
| 15.0 | 1.7000% |
| 40.0 | 2.5125% |
| 65.0 | 3.0846% |
| 90.0 | 3.6167% |
| 115.0 | 4.2435% |
| 140.0 | 4.8250% |
| 165.0 | 5.3818% |
| 190.0 | 5.7921% |
| 215.0 | 6.1070% |
| 240.0 | 6.3563% |
| 265.0 | 6.5113% |
| 290.0 | 6.5534% |
| 315.0 | 6.5889% |
| *340.0 and above* | 6.6191% (plan max) |

　　　b.　　**Conditions to Settlement** – You will _only_ be entitled to a settlement in respect of your CVR Interest if:

　　　　　　(i)　　Employment – One of the following statements is true:

- You are employed by the Company on the date of the Change of Control; **OR**

- Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

**AND**

(ii)    <u>Threshold Achieved</u> – The Net Distributable Value from the Change of Control is at least $125,000,000.

c.    **Form and Timing of CVR Interest Settlement** – Except as provided below, your CVR Interest will be settled by the payment of a lump sum cash amount on the Change of Control Consummation Date.

(i)    <u>Qualified IPO</u>. If the Change of Control is a Qualified IPO, your CVR Interest will be settled in the voting equity securities of Atkins Nutritionals Holdings, Inc. ("<u>Holdings</u>") or the surviving entity with the implied equity value determined based on the Net Distributable Value implied by the initial public offering price.

(ii)    <u>Less than 80% Acquisition</u>. If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Holdings (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your CVR Interest will be determined on the Change of Control Distribution Date and settled in the voting equity securities of Holdings or the surviving entity. However, you will receive <u>NO PAYMENT</u> in respect of your CVR Interest until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2.    **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3.  **Severance Benefits** – Any amounts due in respect of a CVR Interest granted under this letter are in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4.  **Benefits** – This CVR Interest is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company.  However, since this CVR Interest represents unique compensation, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5.  **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from amounts due in respect of your CVR Interest.

6.  **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter.  Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7.  **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates.  Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration.  Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company.  Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,

I have read, I understand, and I agree to the forgoing:

_____                    _____
Steve Galinski                                                              Date

December __, 2005

Beth Neumann
c/o Atkins Nutritionals, Inc.
105 Maxess Road
Melville, NY 11747

Re:    CVR Interest

Dear Beth:

This letter describes the terms of the CVR interest granted to you under the Atkins Nutritionals, Inc. Management Incentive Plan ("MIP").

1.    **CVR Interest**

a.    **CVR Interest** – 11.33% of the Implied Equity Value Pool.

"Implied Equity Value Pool" shall be an amount determined in accordance with the following table:

| Implied Equity Value (in millions) | Implied Equity Value Pool |
|---|---|
| $0.0 | NA |
| 15.0 | 1.7000% |
| 40.0 | 2.5125% |
| 65.0 | 3.0846% |
| 90.0 | 3.6167% |
| 115.0 | 4.2435% |
| 140.0 | 4.8250% |
| 165.0 | 5.3818% |
| 190.0 | 5.7921% |
| 215.0 | 6.1070% |
| 240.0 | 6.3563% |
| 265.0 | 6.5113% |
| 290.0 | 6.5534% |
| 315.0 | 6.5889% |
| *340.0 and above* | 6.6191% (plan max) |

b.    **Conditions to Settlement** – You will *only* be entitled to a settlement in respect of your CVR Interest if:

(i)    Employment – One of the following statements is true:

- You are employed by the Company on the date of the Change of Control; **OR**

- Your employment terminated without Cause (as defined in the employment agreement between you and the Company), you resign for Good Reason (as defined in the employment agreement between you and the Company) or your employment is terminated due to your death or Disability (as defined in the employment agreement between you and the Company) no earlier than six (6) months prior to the Change of Control;

**AND**

(ii)     Threshold Achieved – The Net Distributable Value from the Change of Control is at least $125,000,000.

c.     **Form and Timing of CVR Interest Settlement** – Except as provided below, your CVR Interest will be settled by the payment of a lump sum cash amount on the Change of Control Consummation Date.

(i)     Qualified IPO.  If the Change of Control is a Qualified IPO, your CVR Interest will be settled in the voting equity securities of Atkins Nutritionals Holdings, Inc. ("Holdings") or the surviving entity with the implied equity value determined based on the Net Distributable Value implied by the initial public offering price.

(ii)     Less than 80% Acquisition.  If the Change of Control results from the acquisition by a Person or Group of more than fifty percent (50%) of the common stock of Holdings (but such Change of Control represents less than eighty percent (80%)) of the voting equity securities of Holdings), your CVR Interest will be determined on the Change of Control Distribution Date and settled in the voting equity securities of Holdings or the surviving entity. However, you will receive NO PAYMENT in respect of your CVR Interest until the earlier of:

- March 31, 2010, or

- the date of a subsequent Change of Control in which a person or group acquires 80% or more of the voting equity securities of Holdings or the entity surviving the Initial Change of Control.

2.     **Definitions** – Unless otherwise indicated, all capitalized terms have the meaning ascribed to them in the MIP.

3.      **Severance Benefits** – Any amounts due in respect of a CVR Interest granted under this letter are in addition to benefits for which you may be eligible under any employment agreement or severance pay plan to which you are eligible at the time of your termination of employment.

4.      **Benefits** – This CVR Interest is in addition to and not in lieu of any existing ordinary cash bonus arrangements or other compensation you are entitled to receive from the Company.  However, since this CVR Interest represents unique compensation, this amount will not be considered in calculating salary related benefits (e.g., 401(k) or other retirement benefits).

5.      **Tax Withholding** – All federal, state, city or other taxes that the Company may determine are required to be withheld pursuant to any applicable law or regulation, will be deducted from amounts due in respect of your CVR Interest.

6.      **Resolution of Disputes** – The Board of Directors or its designee is responsible for the interpretation of this letter.  Should there be any dispute under this Agreement, the Board of Directors shall have sole discretion to resolve any questions, ambiguities or disputes arising under this letter and its decision shall be final and binding.

7.      **No Guarantee of Employment** – Nothing in this letter guarantees you any specific term of employment or specific assignment with the Company or any of its affiliates.  Nothing in this letter shall constitute a contract of employment, implied or otherwise, for a specified duration.  Additionally, the Company is an employment-at-will company, unless otherwise specified in a written individual employment contract between you and the Company.  Under employment-at-will, either the Company and/or the employee may terminate the employment relationship at any time, for any reason, with or without notice or cause.

Sincerely,

I have read, I understand, and I agree to the forgoing:

_____                    _____

Beth Neumann                                                                              Date

**Exhibit 13**

**List of Executory Contracts and Unexpired Leases to be Assumed**

## SCHEDULE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED PURSUANT TO THE PLAN OF REORGANIZATION[1]

*Inclusion of any contract or lease herein is not an admission that such contract or lease is an executory contract or unexpired lease. The Debtors hereby reserve their rights to assert that any of the contracts or leases on this Schedule 8.1 are not executory contracts or unexpired leases.*

| Contracting Party | Contact Information | Effective Date | Cure Amount | Description of Agreement |
|---|---|---|---|---|
| A.C. Nielsen | A.C. Nielsen (US), Inc. P.O. Box 88956 Chicago, IL 60695-8956 | January 1, 2005 | $34,993.77 | Amended and Restated Master License Agreement to provide POS data services |
| Acosta | Acosta Sales & Marketing Co. Attn: Jim Feeser 6600 Corporate Center Parkway Jacksonville, FL 32216 | October 1, 2004 | $19,020.50 | Broker Client Contract |
| Acosta Canada | Acosta Canada Corporation Attn: Peter Singer 250 Rowntree Dairy Road Vaughan, Ontario, L4L 9J7 Canada | November 15, 2004 | CDN $29,947.35 | Broker Client Contract |
| Advantage Logistics | Advantage Logistics USA East, LLC Attn: President/LSP C/O SUPERVALU Holdings, Inc. 11840 Valley View Road Eden Prairie, MN 55344 | February 14, 2004 | $58,973.47 | Operating Agreement for warehousing and logistics services |
| American International Life Assurance Company of New York | American International Life Assurance Company of New York 70 Pine Street New York, NY 10270 | June 10, 2004 | $0 | Business Travel Accident Insurance Policy |
| American International Specialty Lines Insurance Company | Attn: John R. Dina C/O Marsh USA, Inc. 300 Broadhollow Road, Ste 201 Melville, NY 11747 | April 30, 2005 | $0 | Media Liability Insurance Policy #004915351 |
| American Greetings Corporation | American Greetings Corporation Attn: Michael Brown One American Road Cleveland, OH 44144 | September 1, 2003 | $0 | License Agreement |

---

[1] All executory contracts and unexpired leases between and among the Debtors that are included in this Schedule 8.1 shall be deemed assumed by each Debtor that is a party thereto.

| Contracting Party | Contact Information | Effective Date | Cure Amount | Description of Agreement |
|---|---|---|---|---|
| American Nutritional Exchange | John A. Margolis, Esq. Law Offices of John A. Margolis Ste 330, 9990 S.W. 77th Avenue Miami, FL 33156-2661 | July 21, 2005 | $0 | Settlement Agreement |
| Anthony R. Calascibetta | Attn: Kenneth I. Nowak, Esq. Zazzali, Fagella, Nowak, Kleinbaum & Friedman, P.C. 15 West 72nd Street, Ste 26-C New York, NY 10023 | October 15, 2003 | $0 | Settlement Agreement |
| Asenda | Asenda Attn: Doug Stone #150-13711 Mayfield Place Richmond, British Columbia V6V 2G9 Canada | December 20, 2004 | $0 | Inventory Credit Arrangement |
| Assist Cornerstone Technologies, Inc. | Assist Cornerstone Technologies, Inc. 57 West 200 South, 5th Floor Salt Lake City, UT 84101-1612 | November 12, 2003 | $0 | Software Maintenance Agreement |
| Associated Logistics | Associated Logistics Solutions, Inc. Attn: Cameron Joyce, President 6099 McLaughlin Road Mississauga Ontario L5R 3K5 Canada | January 25, 2005 | $0 | Letter of Intent to provide fulfillment services |
| Auburn Merchandising Distribution | Auburn Merchandising Distribution Attn: Mr. Bob Pontes 355 Main Street Whitinsville, MA 01588 | December 20, 2004 | $0 | Inventory credit arrangement |
| Avaya, Inc. | Avaya C/O RMS Bankruptcy Services P.O. Box 5126 Timonium, MA 21094 | December 7, 2004 | $145.97 | Channel Service Agreement |
| Ben Fink | Elizabeth Shieldkret Attorney at Law 136 E. 55th Street, 10th Floor New York, NY 10022 | April 21, 2004 | $0 | Photography Services & License Agreement |
| CAI Benefits, Inc. | CAI Benefits, Inc. 6 East 43rd Street, 18th Floor New York, NY 10017 | November 12, 2003 | $0 | Administrative Services Agreement for Flexible Spending Account |
| C&R Foods (n/k/a First Wave Sales) | C&R Foods, Inc. (n/k/a First Wave Sales) P.O. Box 488 Point Vedra Beach, FL 32004-0488 | June 1, 2003 | $20,883.37 | Brokerage Services Agreement |

| Contracting Party | Contact Information | Effective Date | Cure Amount | Description of Agreement |
|---|---|---|---|---|
| Charles C. Parks | Attn: Mr. Paul Fitts<br>Charles C. Parks<br>P.O. Box 119<br>Gallatin, TN 37066 | February 25, 2005 | $0 | Inventory credit arrangement |
| Coremark – Aurora | Coremark – Aurora<br>Attn: Phil Yamamoto<br>3797 N. Windsor Drive<br>Aurora, CO 80011 | February 28, 2005 | $0 | Inventory credit arrangement |
| De Lage Landen | De Lage Landen<br>P.O. Box 41601<br>Philadelphia, PA 19101-1601 | April 2, 2004 | $1,405.30 | Equipment Lease #24551552 |
| Derosa Sales | Attn: Mr. Gerald Veal<br>Derosa Sales<br>1948 Hayes Lane<br>Woodland, CA 95776 | December 20, 2004 | $0 | Inventory credit arrangement |
| Digital Chocolate, Inc. | Digital Chocolate, Inc.<br>1855 S. Grant Street, 2nd Floor<br>San Mateo, CA 94402 | October 1, 2004 | $0 | License Agreement |
| Distribution Plus, Inc. | Attn: Jayson M. Folus<br>Vice President of Procurement<br>Distribution Plus, Inc.<br>825 Green Bay Road, Ste 200<br>Wilmette, IL 60091 | November 18, 2004 | $0 | Inventory credit arrangement |
| Duane Reade | Attn: Mr. Mike Cicilli<br>Duane Reade<br>440 Ninth Avenue<br>New York, NY 10001 | March 4, 2005 | $0 | Inventory credit arrangement |
| Eby Brown | Attn: Mr. John Scardinia<br>Eby Brown – Portland<br>P.O. Box 3067<br>Naperville, IL 60566 | December 20, 2004 | $0 | Inventory credit arrangement |
| E Diets | EDiets.com, Inc.<br>3801 W. Hillsboro Blvd<br>Deerfield Beach, FL 33442 | February 14, 2003 | $1,470.17 | License Agreement, as amended |
| Edner of Nevada | Edner of Nevada, Inc.<br>Attn; Ed Kirschner, President<br>2801 Conestoga Drive<br>Carson City, NV 89706 | December 20, 2004 | $0 | Co-packing Agreement |
| Eleanor Barr | Eleanor Barr<br>5303 Fossil Ridge Drive<br>Ft. Collins, CO 80525-3817 | July 26, 2005 | $1,100 | Settlement Agreement |
| ESchool (Powered) | Powered, Inc.<br>221 West Sixth Street, 11th Floor<br>Austin, TX 78701 | December 22, 2003 | $0 | Client Agreement, as amended, to provide application services |

| Contracting Party | Contact Information | Effective Date | Cure Amount | Description of Agreement |
|---|---|---|---|---|
| Evanston Insurance Company | Attn: John R. Dina<br>Marsh USA, Inc.<br>300 Broadhollow Road, Ste 201<br>Melville, NY 11747 | October 17, 2003 | $0 | Policy # SM-821484 to provide PL ERP for clinic location |
| Executive Risk Indemnity Company | Attn: John R. Dina<br>Marsh USA, Inc.<br>300 Broadhollow Road, Ste 201<br>Melville, NY 11747 | October 17, 2003 | $0 | Policy #81706296 to provide run-off coverage for Robert C. Atkins |
| Food Lion, LLC | Food Lion, LLC<br>Attn: Ms. Karen Barbee<br>2100 Executive Drive<br>Salisbury, NC 28145 | October 28, 2004 | $0 | Inventory credit arrangement |
| FTS Industries | FTS Industries, Inc.<br>Attn: Shirley Sooy, COO & President<br>58 Chambers Brook Road<br>Somerville, NJ 08876 | September 1, 2004 | $0 | Payment Service Agreement |
| FTS Industries | FTS Industries, Inc.<br>Attn: Shirley Sooy, COO & President<br>58 Chambers Brook Road<br>Somerville, NJ 08876 | November 1, 2005 | $0 | Confidentiality & Non-Disclosure Agreement |
| Gehl's Guernsey Farms | Guel's Guernsey Farms, Inc.<br>Attn: John Gehl, CEO<br>N116 W15970 Main Street<br>Germantown, WI 53022<br><br>Copy to:<br>Gehl's Guernsey Farms, Inc.<br>Attn: Andy Gehl President<br>N116 W15970 Main Street<br>Germantown, WI 53022 | March 19, 2004 | $0 | Developing, Marketing and Manufacturing Agreement |
| Hackney Miami | Attn: Mr. Nessim Delgado<br>Hackney – Miami<br>2580 N.W. 38th Drive<br>Miami, FL 33167 | February 25, 2005 | $0 | Inventory credit arrangement |
| Hannaford | Attn: Mr. David Ham<br>Category Manager<br>Hannaford Brothers<br>P.O. Box 1000<br>Portland, ME 04104 | December 3, 2004 | $0 | Inventory credit arrangement |
| HarperCollins Publishing, LLC | HarperCollins Publishing, LLC<br>10 East 53rd Street<br>New York, NY 10022 | November 6, 2003 | $0 | Publishing Agreement |

| Contracting Party | Contact Information | Effective Date | Cure Amount | Description of Agreement |
|---|---|---|---|---|
| Hartford Fire Insurance Company | Hartford Fire Insurance Company<br>Hartford Plaza<br>Tower A T-1-55<br>Hartford, CT 06115<br><br>Copy to:<br><br>Attn: John R. Dina<br>Marsh USA, Inc.<br>300 Broadhollow Road, Ste 201<br>Melville, NY 11747 | June 10, 2005 | $0 | Policy# 10UUNUT2798 to provide property insurance |
| Health Food Distributors | Attn: Ms. Jacki Morin<br>Health Food Distributors<br>1893 Northwood Drive<br>Troy, MI 48084 | November 5, 2004 | $0 | Inventory credit arrangement |
| Henry's Foods, Inc. | Henry's Foods, Inc.<br>Attn: Bruce Stueven<br>P.O. Box 1057<br>Alexandria, MN 56308 | December 20, 2004 | $0 | Inventory credit arrangement |
| Hotjobs.com, Inc. | Hotjobs.com, Ltd<br>P.O. Box 0506<br>Carol Stream, IL 60132-0506 | February 13, 2005 | $0 | Agreement to provide recruiting services |
| H.T. Hackney | Attn: Mr. Mike Anderson<br>Corporate Director of Purchasing<br>H.T. Hackney<br>1586 Brea Road<br>Naperville, IL 60566 | December 20, 2004 | $0 | Inventory credit arrangement |
| HP Hood, Inc. | HP Hood, Inc.<br>90 Everett Avenue<br>Chelsea, MA 02150-2301 | June 13, 2005 | $0 | License Termination Agreement |
| IBM | Attn: Joseph DeBella<br>IBM Corporation<br>4600 McAuley Place, Ste 200<br>Cincinnati, OH 45242 | April 5, 2004 | $0 | Letter of Authorization to provide software maintenance services |
| Integrated Brands | Integrated Brands, Inc.<br>4175 Veterans Memorial Highway<br>Ronkonkoma, New York 11779 | August 25, 2003 | $0 | Supply and Distribution Agreement |
| IQ Design Group, Inc. | IQ Design Group, Inc.<br>Attn: Bob Avino, Principal<br>32 W. 22nd Street<br>New York, NY 10010 | May 31, 2005 | $74,177.30 | Agreement to provide marketing services |
| Kwik Trip | Attn: Ms. Karen Lodico<br>Kwik Trip<br>1626 Oak Street<br>La Crosse, WI 54602 | February 25, 2005 | $0 | Inventory credit arrangement |

| Contracting Party | Contact Information | Effective Date | Cure Amount | Description of Agreement |
|---|---|---|---|---|
| Les Aliment Multibar | Les Aliment Multibar<br>Attn: David A. Lysak, VP<br>7775 Rue Bombardier<br>Anjou (Montreal), Quebec, H1J 2L2<br>Canada<br><br>Copy to:<br>Ravinsky Ryan<br>Attn: Melvin J. Ravinsky<br>1200 Place du Canada<br>Montreal, Quebec, H3B 2P9<br>Canada | January 1, 2000 | $17,775.20 | Contract Manufacturing and Packaging Agreement, as Amended |
| Les Aliment Multibar | Les Aliment Multibar<br>Attn: David A. Lysak, VP<br>7775 Rue Bombardier<br>Anjou (Montreal), Quebec, H1J 2L2<br>Canada<br><br>Copy to:<br>Ravinsky Ryan<br>Attn: Melvin J. Ravinsky<br>1200 Place du Canada<br>Montreal, Quebec, H3B 2P9<br>Canada | December 20, 2001 | $0 | Loan and Equipment Security Agreement and related documents |
| Lexington Insurance Company | Attn: John R. Dina<br>Marsh USA, Inc.<br>300 Broadhollow Road, Ste 201<br>Melville, NY 11747 | July 25, 2005 | $0 | Policy #6791154 to provide Umbrella Liability coverage |
| Lynn Todd Edgerton | The Carrick Law Group<br>Attn: Roger Lane Carrick<br>350 South Grand Avenue<br>Suite 2930<br>Los Angeles, CA 90071-3406 | December 19, 2003 | $0 | Consent Judgment |
| Market Builders | Market Builders International<br>Attn: Andrew Hudson<br>1087 Satinlead Street<br>Hollywood, FL 33019 | January 1, 2005 | $7,692.00 | Brokerage Agreement |
| Mark Ferri | Mr. Kevin R. Schochat<br>Photographer's Agent<br>49 MacDougal Street, Suite One<br>New York, NY 10012 | August 18, 2004 | $0 | Agreement to provide photographic images |
| Mass Mutual Financial Group | Mass Mutual Financial Group<br>1295 State Street<br>Springfield, MA 0111-0001 | March 1, 2004 | $0 | Investment Agreement |

| Contracting Party | Contact Information | Effective Date | Cure Amount | Description of Agreement |
|---|---|---|---|---|
| McLane Company, Inc. | McLane Company, Inc.<br>Attn: Mr. Tony Frankenberger<br>6201 NW HK Dodgen Loop<br>Temple, TX 76504 | May 31, 2005 | $0 | Swell letter |
| McLane Company, Inc. | McLane Company, Inc.<br>4747 McLane Parkway<br>Temple, TX 76503 | November 12, 2003 | $0 | Vendor Agreement |
| McLane Company, Inc. | McLane Company, Inc.<br>4747 McLane Parkway<br>Temple, TX 76503 | January 1, 2005 | $0 | Mpulse Database Access Agreement |
| McNeil-PPC, Inc. through its wholly-owned subsidiary, Splenda, Inc. | McNeil-PPC, Inc.<br>Attn: President<br>501 George Street<br>New Brunswick, NJ 08903<br><br>Copy to:<br>Splenda<br>Attn: Vice President, Sales<br>7050 Camp Hill Road<br>Fort Washington, PA 19034 | December 20, 2002 | $0 | Purchase and Sale Trademark License Agreement |
| Merchant Grocery | Attn: Mr. Mike Hicks<br>Merchant Grocery<br>P.O. Box 1268<br>Culpepper, VA 22701 | February 25, 2005 | $0 | Inventory credit arrangement |
| Microsoft | Microsoft Licensing, GP<br>Department 551, Volume Licensing<br>6100 Nell Road, Ste 210<br>Reno, NV 89511-1137 | April 29, 2004 | $31,025.96 | Enterprise License Agreement, as amended |
| Monster, Inc. | Monster, Inc.<br>5 Clock Tower Place, 5th Floor<br>Maynard, MA 01754 | January 30, 2004 | $0 | Agreement to provide recruiting services |
| Mister Cookie Face, Inc. | Mister Cookie Face, Inc.<br>Attn: Frank Labrusciano, CFO<br>1989 Rutgers University Boulevard<br>Lakewood, NJ 08701<br><br>With copy to:<br><br>Mr. James M. Piro<br>Piro Zinna Cifelli Paris & Genitempo, PC<br>360 Passaic Avenue<br>Nutley, NJ 07110-2787 | April 6, 2005 | $0 | License Agreement Termination and Mutual Release |
| M.R. Williams | Attn: Ms. Linda Wilson<br>M.R. Williams<br>235 Raleigh Road<br>Henderson, NC 27536 | February 11, 2005 | $0 | Inventory credit arrangement |

| Contracting Party | Contact Information | Effective Date | Cure Amount | Description of Agreement |
|---|---|---|---|---|
| Nash Finch GMS | Nash Finch GMS<br>Attn: Mike R. Schmidt<br>4067 County Route 130N<br>Bellefontaine, OH 43311 | November 23, 2004 | $0 | Inventory credit arrangement |
| National Union Fire Insurance Company | Attn: John R. Dina<br>Marsh USA, Inc.<br>300 Broadhollow Road, Ste 201<br>Melville, NY 11747 | October 29, 2005 | $0 | Policy #004945600 to provide Employee Benefit Plan Fiduciary Liability coverage |
| National Union Fire Insurance Company | Attn: John R. Dina<br>Marsh USA, Inc.<br>300 Broadhollow Road, Ste 201<br>Melville, NY 11747 | October 29, 2005 | $0 | Policy #004945637 to provide Private Edge Directors, Officers and Private Company Liability coverage |
| Nature's Best | Attn: Mr. Russell Parker<br>Vice President, Purchasing & Marketing<br>Nature's Best<br>105 South Puente<br>Brea, CA 92821 | November 1, 2004 | $0 | Inventory credit arrangement |
| NOVII Lifestyles, Inc. | NOVII Lifestyles, Inc.<br>388 Beale Street, Ste 808<br>San Francisco, CA 94105 | October 1, 2004 | $0 | License Agreement |
| Nutmeg Insurance Company | Attn: John R. Dina<br>Marsh USA, Inc.<br>300 Broadhollow Road, Ste 201<br>Melville, NY 11747 | July 25, 2005 | $0 | Policy #10EMNOA84 20 to provide General Liability, Products and Employee Benefits Liability coverage |
| Nutrition Excellence | Nutrition Excellence<br>Attn: Mr. Jeff Steinberg<br>3325 North Service Road, Unit 11A<br>Burlington, Ontario L7N 3G2 Canada | December 22, 2004 | $0 | Inventory credit arrangement |
| Palko | Attn; Mr. James Palko, Owner<br>Palko Distributing Co., Inc.<br>4991 West U.S. Highway 20<br>Michigan city, IN 46360 | November 5, 2004 | $0 | Inventory credit arrangement |

| Contracting Party | Contact Information | Effective Date | Cure Amount | Description of Agreement |
|---|---|---|---|---|
| Pentec | Pentec<br>72 Queen Street<br>P.O. Box 653<br>Southington, CT 06489 | February 17, 2005 | $0 | Engagement Agreement to provide human resources services |
| PurFoods, Inc. | PurFoods, Inc.<br>718 SE Shurfane Drive<br>Ankeny, IA 50021 | December 14, 2004 | $0 | License Agreement |
| Resnick Distributors | Resnick Distributors<br>Attn: Mr. Steven Resnick<br>25 VanDyke Avenue<br>New Brunswick, NJ 08901 | February 25, 2005 | $0 | Inventory credit arrangement |
| RCD Holdings | RCD Holdings, Inc.<br>Attn: James C. Schmidt, President<br>300 River Place<br>Detroit, MI 48207<br><br>Copy to:<br>Rader, Fishman & Grauer PLLC<br>Attn: Michael D. Fishman, Esq.<br>39533 Woodward Avenue, Ste 140<br>Bloomfield Hills, MI 48304 | June 22, 2002 | $12,978.00 | License Agreement |
| River Bend Executive Center | River Bend Executive Center, Inc.<br>C/O Richard Kremheller<br>One Omega Drive<br>P.O. Box 4047<br>Stamford, CT 06907 | June 15, 2004 | $18.00 | Agreement to provide data center space |
| Robert C. Atkins | Corrigan & Associates, LLC<br>Attn: John P. Corrigan<br>1311 Mamoraneck Avenue<br>White Plains, NY 10605 | February 15, 2001 | $0 | License & Trademark Agreement |
| Sam's Club | Attn: Doug Walt<br>Sam's Club<br>608 Southwest 8th Street<br>Bentonville, AK 72716-0745 | June 15, 2005 | $0 | Swell letter |
| Simply Lite | SLF Foods Corporation<br>Attn: Savatore Asaro<br>74 Mall Drive<br>Commack, NY 11725<br><br>Copy to:<br>Steinberg, Fineo, Berger & Burlant<br>Attn: Stuart M. Steinberg, Esq.<br>1001 Franklin Avenue, Ste 302<br>Garden City, NJ 11530 | April 10, 2002 | $0 | Development and Manufacturing Agreement, as amended |

| Contracting Party | Contact Information | Effective Date | Cure Amount | Description of Agreement |
|---|---|---|---|---|
| Southco Distributing | Southco Distributing<br>Attn: Mr. Harvey Thompson<br>2201 S. John Street<br>Goldsboro, NC 27530 | December 13, 2004 | $0 | Inventory credit arrangement |
| Specialty Risk Services, LLC | Specialty Risk Services, LLC<br>Attn: Kenneth Shoop<br>Goodwin Square – 16th Floor<br>225 Asylum Street<br>Hartford, CT 06103 | July 25, 2004 | $0 | Claim Service and Funding Agreement |
| The Standard Candy Company | The Standard Candy Company<br>715 Massman Drive<br>Nashville, TN 37210 | July 22, 2002 | $0 | Manufacturing Agreement |
| Super Natural Distributors | Attn: Ms. April Rawski<br>Super Natural Distributors<br>W229 N1680 Westwood Drive<br>Waukesha, WI 53186-1152 | November 16, 2004 | $0 | Inventory credit arrangement |
| TGI Friday's, Inc. | TGI Friday's, Inc.<br>7540 LBJ Freeway<br>Dallas, TX 75251 | November 17, 2003 | $0 | Reciprocal License Agreement |
| Thomas & Howard | Attn: Mr. David Perkins<br>Thomas & Howard<br>P.O. Box 23659<br>Columbia, SC 29224 | February 25, 2005 | $0 | Inventory credit agreement |
| Time Inc. Home Entertainment | Time Inc. Home Entertainment<br>1271 Avenue of the Americas<br>New York, NY 10020 | November 12, 2003 | $0 | Agreement to provide publishing services |
| Tree of Life | Tree of Life<br>Attn: Mr. David Humphrey<br>405 Golfway West Drive<br>St. Augustine, FL 32085-9000 | November 23, 2004 | $0 | Inventory credit arrangement |
| Twin City Fire Insurance Company | Attn: John R. Dina<br>Marsh USA, Inc.<br>300 Broadhollow Road, Ste 201<br>Melville, NY 11747 | June 10, 2005 | $0 | Policy # 10WEGE2762 to provide Workers Compensation coverage |
| United Natural Foods, Inc. | Attn: Mr. Daniel V. Atwood<br>Senior Vice President &<br>President, United Natural<br>Brands<br>United Natural Foods, Inc.<br>190 Main Street<br>Danielson, CT 06239 | November 22, 2004 | $0 | Inventory credit arrangement |
| Unipharm Wholesale Drugs | Unipharm Wholesale Drugs Ltd.<br>Attn: Judy Thompson<br>2051 VanDyke Place<br>Richmond, British Columbia<br>V6V 1X6 Canada | November 20, 2004 | $0 | Inventory credit arrangement |

| Contracting Party | Contact Information | Effective Date | Cure Amount | Description of Agreement |
|---|---|---|---|---|
| Valu Merchandisers | Attn: Mr. Jay Goble<br>Vice President of Merchandising<br>Valu Merchandisers<br>624 Westport Road<br>Kansas City, MO 64111 | October 27, 2004 | $0 | Inventory credit arrangement |
| VanElla | VanElla<br>8745 West Higgins Road, Ste 110<br>Chicago, IL 60631 | April 2, 2003 | $147.00 | Consumer Report User Agreement |
| Vigilant Insurance Company | Attn: John R. Dina<br>Marsh USA, Inc.<br>300 Broadhollow Road, Ste 201<br>Melville, NY 11747 | October 29, 2003 | $0 | Policy #81901672 to provide run off coverage for Atkins Nutritionals, Inc. and for the Atkins Foundation |
| Vision Marketing Group | Vision Marketing Group, Inc.<br>25 Sylvan Road South, Suite F<br>Westport, CT 06880 | April 11, 2005 | $14,215.56 | Preferred Agency Agreement |
| Wakefern Food Corporation | Attn: Mr. Joe Gozzi<br>Vice President – Specialty Grocery Division<br>Wakefern Food Corporation<br>355 Davidsons Mill Road<br>Jamesburg, NJ 08831 | July 11, 2005 | $0 | Inventory credit arrangement |
| Walgreen | Walgreens<br>Attn: Mr. Jeff Gormanous<br>200 Wimont Road<br>Deerfield, IL 60025 | December 13, 2004 | $0 | Inventory credit arrangement |
| Wal-Mart Stores, Inc., Wal-Mart Stores East LP, Wal-Mart Stores East, Inc., Wal-Mart Stores Texas LP, Sam's West, Inc., Sam's East, Inc. and affiliates | Wal-Mart Stores, Inc.<br>Attn: General Merchandise Manager<br>702 S.W. 8th Street<br>Bentonville, AR 72716 | April 13, 2005 | $0 | Supplier Agreement |
| York Insurance Company of Maine | Attn: John R. Dina<br>Marsh USA, Inc.<br>300 Broadhollow Road, Ste 201<br>Melville, NY 11747 | July 25, 2005 | $0 | Policy #MPX056705 to provide Excess Umbrella Liability coverage |
| Zurich American Insurance Company | Attn: John R. Dina<br>Marsh USA, Inc.<br>300 Broadhollow Road, Ste 201<br>Melville, NY 11747 | June 10, 2004 | $0 | Policy # FID533756400 to provide Crime coverage |